PATRICK MILLER
Email: Patrick.miller@impactadvocateslaw.com
Impact Advocates APC
121 S Oak Ave
Pasadena, CA 91107
Telephone:    213-364-7581

Attorney for Judgement Creditor
BELGIUM INVESTMENTS 960 BAY DR,
LLC A CALIFORNIA CORP.

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re Bassem Victor El Mallakh | Case No 8:22-bk-11605-TA<br>Chapter 11<br><br>**NOTICE OF OBJECTION AND OBJECTION TO DEBTOR'S CLAIMED HOMESTEAD EXEMPTION; MEMORANDUM OF POINTS & AUTHORITIES; DECLARATION OF PATRICK MILLER**<br><br>**Date**: 11 January 2023<br>**Time**: 10am<br>**Crtrm**: Virtual/5B |

**TO THE HONORABLE THEODOR ALBERT, UNITED STATES BANKRUPTCY JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE, THE DEBTOR AND HIS ATTORNEYS OF RECORD, AND ALL PARTIES IN INTEREST:**

**PLEASE TAKE NOTICE** that on 11 January 2023 at 10:00 am, or as soon thereafter as the Court may hear the matter, in Courtroom 5B (or via Zoom) of the United States Bankruptcy Court located at 411 West Fourth Street, Santa Ana, CA 92701, the Court will conduct a hearing

OBJECTION TO DEBTOR'S CLAIMED HOMESTEAD EXEMPTION

on the OBJECTION TO DEBTOR'S CLAIMED HOMESTEAD EXEMPTION filed by the Creditor Belgium Investments 960 Bay Dr, LLC, a California Corp. ("**Belgium**")

The grounds for the relief requested in the Objection are that: the Debtor has presented conflicting testimony as to his residence while there is objective evidence showing he does not reside at the subject property. Debtor's failure to demonstrate his residence prevents his claiming an automatic homestead exemption. He is also prevented from claiming the homestead exemption in the present proceedings by virtue of res judicata because the matter has already been ruled upon in a previous hearing. Additionally, if any homestead exemption is available, it should be limited to the amount available at the time when Belgium's Abstract of Judgement was recorded on 9 November 2020.

The Objection is based on this Notice, the accompanying Memorandum of Points and Authorities, the concurrently filed Declaration of Patrick Miller, all pleadings on file in this case, all other matters of which this Court may take judicial notice pursuant to Rule 201 of the Federal Rules of Evidence, and such other arguments and/or evidence as may be presented at or prior to the hearing on the Motion.

**PLEASE TAKE FURTHER NOTICE** that any response/opposition to the Objection must be in writing, filed with the Court, and served on counsel for Belgium at the address listed above, at least 14 days prior to the hearing date of 11 January 2023.

**PLEASE TAKE FURTHER NOTICE** that the failure to respond in writing by the above referenced deadline may be deemed by the Court to be a lack of opposition to the relief requested in the Objection.

1

Dated:        23 Nov 2022                                    Impact Advocates APC

2

3

4

By_____

5

Patrick Miller

Attorney for

6

Judgement Creditor

Belgium Investments

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

OBJECTION TO DEBTOR'S CLAIMED HOMESTEAD EXEMPTION

# TABLE OF CONTENTS

| Section | Description | Page |
|---------|-------------|------|
| I | Introduction. | 5 |
| II | The Objection is timely. | 6 |
| III | Debtor has the burden of proving his right to the HS exemption. | 6 |
| IV | Debtor's evidence is not credible because it is contradictory and transparently self-serving. | 7 |
| IV.A | Summary of the two stories advanced by Debtor regarding his residency. | 7 |
| IV.B | Summary of the relevant factual background. | 8 |
| V | The objective evidence shows that Debtor does not reside in the Rockefeller Property. | 18 |
| VI | Debtor does not meet the legal requirements for claiming an automatic homestead exemption because he does not reside in the subject property. | 20 |
| VII | Debtor is estopped from claiming a HS exemption in the present bankruptcy proceedings by virtue of res judicata. | 22 |
| VIII | If a HS exemption is available, it should be capped at $75,000 because this was the maximum amount available when the Abstract of Judgement was recorded. | 23 |
| IX | Conclusion. | 25 |

**POINTS & AUTHORITIES**

## I.    Introduction.

The debtor is not entitled to claim the automatic homestead exemption under California Civil Procedure Code Sections 704.710-850 (the "**HS exemption**") because he has not established that he resided in the subject property at any time in the past five years. The subject property is located at 116 Rockefeller, Irvine, CA, 92612 (the "**Rockefeller Property**").

Debtor has not produced any credible evidence as to where he *intends* to reside and/or where he *actually* resides. This is because he has given conflicting testimony when it suits his interest.

As will be elaborated below, when he was contesting service of process in connection with the proceedings in Florida (and the enforcement of the default judgement resulting from the same), Debtor claimed on multiple occasions that he had not resided in the Rockefeller Property since late-2016 and only visited the Rockefeller Property a handful of times during that period. He claimed to reside full-time at the apartment he rented located at 525 Broadway, Santa Monica, CA, 90410 (the "**Santa Monica Property**").

Now that he is hoping to obtain an automatic HS exemption through this bankruptcy, he claims that he has continually resided in the Rockefeller Property since he purchased it in 2013, suggesting that he would commute to Los Angeles and only occasionally sleep at the Santa Monica Property overnight.

Debtor's evidence cannot be trusted because he has egregiously changed his story to suit his changing legal position. In the absence of credible evidence from Debtor, this court should rely on the key pieces of objective evidence that are available. In particular, it should rely on the lease agreement between Debtor and his sister, Reem Hanna, which makes clear that Debtor has no right to occupy the Rockefeller Property until at least 1 January 2025. Under such circumstances,

Debtor cannot argue that he resides in the Rockefeller Property which is a requirement for claiming an automatic HS exemption.

Separately, this court should not make a new ruling on the HS exemption by virtue of the doctrine of res judicata, since this matter was already addressed during the enforcement action in California and the Orange County Superior Court has already issued an order finding that the Rockefeller Property is not subject to a HS exemption.

Notwithstanding the points above, if the court finds that Debtor is entitled to claim a HS exemption, the maximum amount of the HS exemption should be capped at $75,000 as this is the amount which was available to Debtor at the time Belgium's Abstract of Judgement was recorded.

## II.  The Objection is timely.

Fed. R. Bankr. P. 4003(b) states: "a party in interest may file an objection to the list of property claimed as exempt within 30 days after the meeting of creditors held under §341(a) ("**341 meeting**") is concluded or within 30 days after any amendment to the list of or supplemental schedules is filed, whichever is later." The 341 meeting in this case was first held on 28 October 2022. As such, this objection is timely.

## III. Debtor has the burden of proving his right to the HS exemption.

The burden of proof regarding a disputed claim of exemption based on the provisions of the Bankruptcy Code rests upon the objecting party. Fed. R. Bankr. P. 4003(c). However, if the exemption is based on state law—as it is here—the burden of proof is governed by state law. See In re Pashenee, 531 B.R. 834, 837 (Bankr. E.D. Cal. 2015) (citing Raleigh v. Illinois Dept. of Rev., 530 U.S. 15 (2000)); see also In re Albert- Sheridan, 2019 WL 7372667, at *7 (B.A.P. 9th Cir. Dec. 18, 2019) ("where the debtor asserts exemption claims based on state law, the burden of proof is a substantive part of the exemption claim, so where a state law exemption statute

specifically allocates the burden of proof to the debtor, [the bankruptcy rules] do not change that allocation.").

Here, California exemption law applies because California has opted out of the federal exemptions provided to debtors under 11 U.S.C. § 522(b)(2), (see Cal. Code. Civ. Proc. § 704.130). Debtor has the burden of establishing his exemption rights under Cal. Code Civ. Proc. §704.780(a)(1). Accordingly, the Debtor bears the burden of proof regarding the validity and amount of the claimed HS exemption.

**IV. Debtor's evidence is not credible because it is contradictory and transparently self-serving.**

Below, we set out some key points in the factual background which demonstrate Debtor's continued resort to deceit in order to suit the legal needs of the moment, with particular emphasis on the conflicting testimony relating to his residency at the Rockefeller Property.

**A. Summary of the two contradictory stories advanced by Debtor regarding his residency.**

We appreciate that it may be difficult to absorb the various stories advanced by Debtor since there are so many conflicting details. We have therefore attempted to summarize the Debtor's two stories as to his residency before setting out the factual background in detail.

The ("**Service of Process Story**") was put forward in Feb/Mar 2021 while Debtor was arguing that service of process in both Florida and California was deficient. It was supported by written and oral testimony from Debtor & his sister—and sworn to under penalty of perjury. It can be summarized as:

- From 1 Nov 2016 until the date the evidence was given (Feb/Mar 2021), Debtor resided in the Santa Monica Property exclusively and almost never went to the Rockefeller Property or saw his sister. His sister lived in the Rockefeller Property with her teenage son and no one else, beginning on 1 January 2017.

Now, as the Debtor is presently arguing that he qualifies for the automatic HS exemption, he has advanced what can be referred to as the ("**HS Exemption Story**"), which Debtor has told (and retold) at multiple 341 meetings under penalty of perjury. It can be summarized as:

- Debtor always resided in the Rockefeller Property since the time he purchased the townhouse in 2013. The Santa Monica Property was only a place that he occasionally stayed overnight while he was working on a startup venture based in Los Angeles. He stayed in the Rockefeller Property most days, unless he had to stay overnight in Los Angeles to avoid lengthy commutes. His sister did not move into the Rockefeller Property until late-2018 (despite there being a lease agreement which was signed on 1 January 2017) and she lived in the townhouse with her teenage son and adult brother/landlord (Debtor).

### B. Summary of the relevant factual background

On 17 August 2018, Belgium filed a complaint in the 11th Circuit Court of Florida claiming millions of dollars in damages due to various acts of fraud and other misconduct committed by the Debtor[1]. Importantly, at no point during the numerous submissions which have been filed has Debtor ever suggested that he is innocent of this misconduct or that he would otherwise assist Belgium in its efforts to obtain redress[2]. One might expect that an innocent defendant might highlight that point in a motion to dismiss a default judgement, or to stay execution of the same, even if the substance of the claim was not technically at issue.

On 17 April 2019, Debtor's sister, Reem Hanna, was served with the complaint and other related documents at the Rockefeller Property[3].

A default judgment (the "**FL judgement**") was entered on 25 February 2020[4]. The FL judgement was entered in California on 18 June 2020[5].

---

[1] See the Declaration of Patrick Miller at paragraph 4.
[2] See the Declaration of Patrick Miller at paragraph 4.
[3] See Belgium's Response to Debtor's Motion to Vacate in Florida with Motion for Sanctions for Debtor's Perjury at Ex 1; see also the Declaration of Patrick Miller at paragraph 5.

OBJECTION TO DEBTOR'S CLAIMED HOMESTEAD EXEMPTION

On 13 September 2020, the Notice of Entry of Sister State Judgement and related documents were served on Debtor's sister, Reem Hanna, at the Rockefeller Property[6]. The Abstract of Judgment was recorded by the Orange County Recorder's office on 9 November 2020[7].

Debtor's bank accounts, and the Rockefeller Property, were levied upon in early-2021[8]. Following these levies, the Debtor filed motions to vacate the FL Judgement and the entry of the same in California[9]. On 17 February 2021, Debtor filed a motion to vacate the sister state judgement in Orange County Superior Court. Debtor included a signed Declaration with this motion which states:

> ***I have been residing fulltime at my residence in Santa Monica since 11/21/16.***
>
> *Attached hereto as Ex.6 is a true and correct copy of the lease I executed for my residence in Santa Monica.*
>
> ...
>
> ***I have not occupied the real property located at 116 Rockefeller, Irvine CA. since 11/21/16.***
>
> *Although I own the property at 116 Rockefeller, Irvine CA,* ***I leased the property to Reem Hanna, commencing 1/17/17.*** *Attached hereto is as Ex.7, is true and correct copy of the lease as between myself and Reem Hanna.*
>
> ...
>
> *I had no idea that the Judgment Creditor had filed an Application For Entry of Sister State Judgment, the Notice of Entry of Sister State Judgment, or the Sister State*

---

[4] See Belgium's Default Judgement against the Debtor at Ex 2 ;see also the Declaration of Patrick Miller at paragraph 6.
[5] See the Declaration of Patrick Miller at paragraph 7.
[6] See Belgium's Proof of Service for the enforcement documents at Ex 3; see also the Declaration of Patrick Miller at paragraph 8.
[7] See Belgium's Abstract of Judgement at Ex 4; see also the Declaration of Patrick Miller at paragraph 9.
[8] See the Declaration of Patrick Miller at paragraph 10.
[9] See the Declaration of Patrick Miller at paragraph 10.

OBJECTION TO DEBTOR'S CLAIMED HOMESTEAD EXEMPTION

*Judgment. I had never seen the documents until I hired counsel to represent me and set*

*the Sister State Judgment aside.* (emphasis added)[10].

To summarize the above quotes, Debtor stated that: (i) he had not resided in the Rockefeller

Property since late-2016; (ii) he rented the Rockefeller Property to his sister; and (iii) his sister

had not informed him that she had received documents which stated that he was liable for a

judgement that exceeded $4 million.

Debtor's sister, Reem Hanna, also submitted a signed Declaration in support of the motion

to vacate which stated:

*I have been residing fulltime at my residence at 116 Rockefeller, Irvine CA since*

*1/1/17. Attached hereto is as Ex.7 is a true and correct copy of the lease I executed for*

*my residence.*

*I have never been served with the Application For Entry of Sister State Judgment,*

*the Notice of Entry of Sister State Judgment or the Sister State Judgments.*

*The process server never served me as claimed in the proof of service attached as*

*Ex 5.*

*The proof of serve states at section 5.b. that the process server left a copy of the*

*documents with, "Hanna Reem __co-occupant__ to Bassem Essam El Mallakh." (Emphasis*

*added [in original text]). This is a complete untruth. **First, I was never served, and***

***second Bassem Essam El Mallakh is not nor ever has been a co-occupant at my***

***residence. Since the inception of the lease Bassem Essam El Mallakh has never-been***

***a co-occupant.*** (emphasis added)[11].

---

[10] See the Declaration filed by Debtor in support of his motion to vacate entry of default judgement in California at Ex 5; see also the Declaration of Patrick Miller at paragraph 11.

[11] See the Declaration filed by Debtor's sister, Reem Hanna, in support of his motion to vacate entry of default judgement in California at Ex 6; see also the Declaration of Patrick Miller at paragraph 12.

OBJECTION TO DEBTOR'S CLAIMED HOMESTEAD EXEMPTION

In summary, Debtor's sister made many of the same claims regarding her and her brother's residency. Although she added the incredulous claim that the proof of service filed by the Process Server was false in that she was never served with the documents.

On 19 February 2021, Debtor filed a motion to vacate the default judgement in FL which made the same claims as above (supported by another signed Declaration by the Debtor and his sister)[12].

On 18 March 2021, Debtor participated in a deposition conducted by Belgium's Florida counsel in connection with the motion to vacate in Florida where he made numerous statements in support of his Service of Process Story[13]. Frankly, there are so many instances of testimony which conflicts with the recent HS Exemption Story that it would belabor the text to include each instance. Below we have set out a few key instances of testimony where Debtor makes statements which are wholly-incongruous with the HS Exemption Story, a more comprehensive set of extracts from Debtor's deposition testimony is attached at Ex 8:

Q. **Okay. Where do you reside**?

A. **I live in Santa Monica.**

Q. Okay. What address?

A. **525 Broadway**.

Q. How long have you resided there?

A. Since November 1st of 2016.

Q. **And do you essentially sleep every night there in 525 Broadway in Santa Monica?**

A. **Yes.**

(see pg 25)

Q. Was there a Ring camera at your property at 116 Rockefeller in 2019?

---

[12] See the Declaration of Patrick Miller at paragraph 13.
[13] See the Transcripts of the Deposition of Bassem Essam El Mallakh dated 18 March 2021 at Ex 7; see also the Declaration of Patrick Miller at paragraph 14.

OBJECTION TO DEBTOR'S CLAIMED HOMESTEAD EXEMPTION

*A.* **To be -- to be honest with you, I have not been here in 116 Rockefeller for about probably like over two and a half years, maybe -- maybe more, you know.**

*Q. Okay.*

*A. It's been a while.*

*...*

*Q. Do you know if there was a Ring intercom system in 2020 at 116 Rockefeller?*

*A. Can you -- can you raise your voice a bit?*

*Q. Yeah. Was there a Ring camera system at 116 Rockefeller in 2020, to your knowledge?*

*MR. DELLORUSSO: Objection.*

*THE WITNESS: I'm not sure, Andrew, because, as I mentioned to you,* **I have not been in the Irvine house, not even once in 2020, not even once in 2019. I believe even when I came to Orange County in 2018 it was just for Christmas** *-- Christmas Eve at my cousin's house in Mission Viejo area, which is like south of Irvine.*

(pgs 36-37)

*BY MR. DELLORUSSO [Counsel for the Debtor]:*

*Q. In the year of 2018, where was your primary residence?*

*A. 525 Broadway, Santa Monica, Los Angeles.*

*Q. In the year 2019, where was your --*

*A. 525 Broadway, Santa Monica, Los Angeles.*

*Q. In the year 2020, where was your primary residence?*

*A. 525 Broadway, Santa Monica, Los Angeles.*

*Q. And is that the same for 2021?*

*A. Yes.*

(pg 61)

*Q. Okay. And then I want to briefly discuss with you -- let's see if I can -- the 116 Rockefeller, Irvine, California, address. Are you aware of that address?*

*A. Yes, I am.*

OBJECTION TO DEBTOR'S CLAIMED HOMESTEAD EXEMPTION

*Q. Okay. **And who resides at that address?***

*A. **My sister, Reem Hanna.***

*Q. **And does she reside with anybody else?***

*A. **No. She lives with her son.***

*Q. **Okay. Do you reside at that address?***

*A. **I do not.***

(pg 62) (emphasis added)[14].

Debtor's sister, Reem Hanna, also participated in a deposition on the same day in March 2021 where she gave further evidence in support of the Service of Process Story[15]. Again, a full set of extracts can be found at Ex 10, below are just a few of the many problematic statements made during her deposition:

*Q. Okay**. Did you live with anybody else at 116 Rockefeller, Irvine, California in April 2019?***

*A. My son.*

*Q. Okay. How old is your son?*

*A. He's 15.*

*Q. Okay. **So it's just you and your son at 116 Rockefeller, Irvine in March and April 2019?***

*A. **Yes.***

(pgs 45-46)

*Q. **Okay. How often do you see your brother?***

*A. **Not very often.***

*Q. **Okay. In 2020, how many times would you say***

*you'd see your brother?***

*MR. DELLORUSSO: Objection.*

---

[14] See the Extracts of the Deposition of Bassem Essam El Mallakh dated 18 March 2021 at Ex 8; see also the Declaration of Patrick Miller at paragraph 15.

[15] See the Transcripts of the Deposition of Reem Hanna dated 18 March 2021 at Ex 9; see also the Declaration of Patrick Miller at paragraph 16.

OBJECTION TO DEBTOR'S CLAIMED HOMESTEAD EXEMPTION

1

*THE WITNESS: I don't remember.*

2

*...*

3

*Q. Okay. Would you say you saw your brother more*

4

*than 10 times in 2020?*

5

*A. Probably not.*

6

*Q. Okay. So you see your brother -- you saw your*

7

*brother less than 10 times in 2020?*

8

*MR. DELLORUSSO: Objection.*

*THE WITNESS: Yeah. Maybe even less.*

9

*BY MR. BERNHARD:*

10

*Q. Okay.*

11

**A. Very infrequent.**

12

*Q. Okay. What about 2019; same amount of time?*

13

***You saw your brother more or less than five times or so in 2019?***

14

**A. Probably.**

15

**Q. Okay. What about 2021; how often do you see your brother?**

16

**A. Very infrequent.**

17

*Q. Okay. So one of those where you say less than*

18

*five times in 2021? It's only been three months.*

19

*A. Oh, for sure.*

20

(pgs 62-63) (emphasis added)

21

*Q. Okay. The 116 Rockefeller, Irvine, California address, is that your residence?*

22

*A. Yes.*

23

*Q. You live there?*

24

*A. Yes.*

25

**Q. Does your brother, Bassem Essam El Mallakh, live there?**

26

**A. No.**

27

**Q. Where does he live?**

28

**A. In Santa Monica.**

OBJECTION TO DEBTOR'S CLAIMED HOMESTEAD EXEMPTION

Page. 14

(pg 91) (emphasis added)[16].

On 15 May 2021, the Florida court denied Debtor's motion to vacate[17]. While Debtor and his sister contended he never had knowledge of the Florida proceedings, the Florida court did not find those statements persuasive, instead citing Debtor's own deposition testimony where he accepted that he <u>did</u> have knowledge of the claims against him in Florida[18].

Following the denial of his motion to vacate in Florida, Debtor put forward several new arguments (largely based on factual issues) as to why the decision should be revisited. These motions have been summarily dismissed by the Florida courts[19].

For nearly a year, the various motions to revisit the court's decision in Florida allowed for a stay of enforcement in California. Notably, Debtor claimed that the Rockefeller Property would not change in character and this was a reason against ordering that an undertaking be provided to secure Belgium's judgment[20].

Nonetheless, by April 2022, the Florida courts had made clear that Debtor's attempts to revisit the decision would not prevail and the Orange County Superior Court confirmed its order to sell the Rockefeller Property[21]. This Order specifically stated that the Rockefeller Property is not subject to a HS exemption (see further below at Section VII on res judicata)[22]. During the

---

[16] See the Extracts of the Deposition of Reem Hanna dated 18 March 2021 at Ex 10; see also the Declaration of Patrick Miller at paragraph 17.

[17] See the Order Denying Debtor's Motion to Vacate from the 11th Circuit Court in Florida at Ex 11; see also the Declaration of Patrick Miller at paragraph 18. Debtor's motion to vacate in California was also denied on 15 July 2021.

[18] See Ex 11, where the court states on page 11 of its ruling: *"Here, El Mallakh [Debtor] had repeated notice of this lawsuit and opportunity to be heard, over and over again for years. El Mallakh recently testified that he was specifically aware of this lawsuit as of October 9, 2019, and specifically aware that Belgium was attempting service of summons upon him at that time".*

[19] These dismissals can be found at Ex 12; see also the Declaration of Patrick Miller at paragraph 19.

[20] See the Declaration of Patrick Miller at paragraph 20.

[21] See the Orange County Superior Court's Order to sell the Rockefeller Property at Ex 13; see also the Declaration of Patrick Miller at paragraph 21. The hearing on this order was held on 21 April 2022 and the order was filed by the clerk on 10 May 2022.

[22] See the Orange County Superior Court's Order to sell the Rockefeller Property at Ex 13; see also the Declaration of Patrick Miller at paragraph 21. The hearing on this order was held on 21 April 2022 and the order was filed by the clerk on 10 May 2022.

hearing on whether to sell the property in April 2022, the court noted that it did not have any evidence that Debtor resided in the Rockefeller Property—this was an issue because much of Debtor's arguments against ordering a sale of the property were only relevant if it were a homestead[23]. If Debtor resided there at the time, he might have presented such evidence.

We understand that Debtor first met with bankruptcy counsel at the law firm Heston & Heston in April 2022, this seems to have been after the sale order was confirmed at the hearing on 21 April 2022—although we cannot be sure as the Debtor has not confirmed the exact date in his Declaration[24].

In July 2022, over two months after first meeting with bankruptcy counsel, Debtor filed for Ch 13 protection on the eve of the Sheriff's sale despite him being clearly over the limit for liabilities under this chapter. The bad faith nature of this filing has been addressed in previous submissions.

As of 7 September 2022, Debtor still contended through his Declaration that he was not served with documents for the Florida proceedings despite the evidence that these documents were served at the Rockefeller Property (where he now claims to have been residing when the documents were served)[25].

The present case was filed under Ch 11 on the eve of the second scheduled Sheriff's sale of the Rockefeller Property—and Belgium maintains that this has also been filed in bad faith.

There have been two recent creditors meetings under Section 341 of the Bankruptcy Code in connection with these Ch 11 proceedings. The first meeting took place on 28 October 2022 and the second meeting took place on 10 November 2022. Belgium's counsel was only

---

[23] See the Opposition filed by Debtor on 1 April 2022 at Ex 14; see also the Declaration of Patrick Miller at paragraph 22.
[24] See the Declaration of the Debtor filed in the Ch 11 proceedings at Ex 15; see also the Declaration of Patrick Miller at paragraph 23.
[25] See Ex 15 at paragraph 2.

OBJECTION TO DEBTOR'S CLAIMED HOMESTEAD EXEMPTION

Page. 16

present telephonically at the second meeting—but has listened to the recordings of both meetings[26].

For the first time, Debtor has now begun to claim that he continually resided at the Rockefeller Property and that he would only occasionally stay at the Santa Monica property when it was necessary—we are characterizing this as the HS Exemption Story. In particular, he stated:

> *"The Rockefeller is my house, **Rockefeller has been my house since I bought it in 2013, it's always been my primary house**, actually it's my only house that I own and I live in it. And then just during that period when my friends and I started working on a tech startup and we were just like working together during the R&D stage, so most of the expertise that we were meeting and trying to work with, they all lived in LA, so I was meeting and commuting to LA on almost a daily basis and weekly basis. And then it was just like difficult to drive through traffic every day and sometimes it could take three hours just to get there and back. **So then my friend and I we just decided to get a place close to most of the expertise that we needed to meet up with. So then you know we would just like work all day and then spend the night and then I would go back to Orange County the next day or what-not. And then at one point, you know, I would just like maybe go to Santa Monica for like 3 days a week or 4 days a week, and then I would always come back to my house [the Rockefeller Property] on the weekends when I finished work."***
> (emphasis added)[27].

He proceeded to confirm that he began leasing the Santa Monica Property in November 2016, but still he:

> *"**would stay in Rockefeller, you know, most of the time, and then when I don't have any work, then I, you know, I don't actually have to go to Santa Monica,** just like stay and relax in the Rockefeller, but, you know, the Santa Monica is basically an office, like a, kind of a*

---

[26] See the Declaration of Patrick Miller at paragraph 24.

[27] See the recording of the second 341 Creditor's meeting which took place on 10 November 2022 at minutes 32-34; see also the Declaration of Patrick Miller related to the same at paragraph 24. A similar statement was made during the first 341 meeting and can be heard around minute 16.

*live and work kind of an office, while I'm working on the project…**Like an office that you can actually spend the night in if you're tired from work and don't wanna drive**, you know, back late."* (emphasis added)[28].

Debtor then explained that his business partner, Mohamed Rostom, is still currently living at the Santa Monica property and that he (Debtor), still stays overnight in the Santa Monica apartment on a weekly basis and they are hoping to work together on a new business project[29].

Debtor also stated that his sister, Reem Hanna, did not begin living in the Rockefeller Property until late-2018[30]. This also contradicts their previous testimony in support of the Service of Process Story—and is but one further instance of Debtor's contradictory evidence.

As is clear from the above, the Service of Process Story—which Debtor and his sister testified to on numerous occasions in 2021—is wholly-inconsistent with the HS Exemption Story—which the Debtor has now sworn to on multiple occasions in these Ch 11 proceedings.

Debtor's evidence as to his residency is transparently self-serving, contradictory and therefore wholly-unreliable.

**V.    The objective evidence shows that Debtor does not reside in the Rockefeller Property.**

Debtor's evidence regarding his residency is riddled with contradictions and transparently self-serving. This evidence cannot be relied upon when assessing (i) where he resided during the operative time frame; and/or (ii) his entitlement to claim the automatic homestead exemption.

---

[28] See the recording of the second 341 Creditor's meeting which took place on 10 November 2022 at minutes 32-34; see also the Declaration of Patrick Miller related to the same at paragraph 24. A similar statement was made during the first 341 meeting and can be heard around minute 16.

[29] See the recording of the second 341 Creditor's meeting which took place on 10 November 2022 at minutes 35-37; see also the Declaration of Patrick Miller related to the same at paragraph 24.

[30] See the recording of the second 341 Creditor's meeting which took place on 10 November 2022 at minute 6; see also the Declaration of Patrick Miller related to the same at paragraph 24.

In the absence of credible testimony from the Debtor as to his residency, the court should rely on the key pieces of objective evidence which are available, particularly the lease agreement between Debtor and his sister, Reem Hanna[31]. This approach is consistent with the California jurisprudence on this issue (see eg *In re Bhangoo,* 634 B.R. 80, 89 (B.A.P. 9th Cir. 2021), where the court stated "*courts should focus on what objective evidence showed an intent to return*" when assessing the residency requirement to claim a homestead exemption).

The lease agreement attached to Debtor's February 2021 Declaration, which has a term from 1 January 2017 until 31 December 2024, does not allow Debtor to reside in the Rockefeller Property. It states: "*[t]he Premises is to be occupied strictly as a residential dwelling **with only the Tenant(s) mentioned above [Reem Hanna] as the Occupant(s)**.*"[32] (emphasis added).

It goes on to state that: *[t]he Landlord [Debtor] hereby rents to the Tenant(s), subject to the following terms and conditions of this Agreement, a condominium with the address of 116 Rockefeller, Irvine, California, 92612 **consisting of 3.5 bathroom(s) and 3 bedroom(s) hereinafter known as the "Premises"*** [33] (emphasis added).

The lease covers the entirety of the Rockefeller Property and states that no one else shall reside within it. This means that Debtor has no right to reside in the Rockefeller Property, irrespective of what he presently claims. Since Debtor cannot reside in the property, he cannot avail himself of the automatic HS exemption.

There are several other indications that point to Debtor residing elsewhere, including:

- o  Debtor admits that he still regularly stays overnight in the Santa Monica Property;

---

[31] This was attached to his February 2021 Declaration and can be found at Ex 5. Debtor has confirmed that this is the only lease agreement covering the Rockefeller Property and that the only change made to the agreement concerns the price raise from $3,00/month to $4,000/month (although he has not confirmed when this change went into effect). See the recording of the 341 Creditor's meeting which took place on 10 November 2022 at minute 4; see also the Declaration of Patrick Miller related to the same at paragraph 24.

[32] See page 1 of the lease agreement attached to Debtor's February 2021 Declaration at Ex 5.

[33] See page 1 of the lease agreement attached to Debtor's February 2021 Declaration at Ex 5.

○ The lease for the Santa Monica Property which was signed by Debtor, and his business partner Mohamed Rostom, is still currently operative;

○ Debtor's family also has a house in Egypt where he stays overnight;

○ Debtor is considering taking a job that would have him living in Egypt for potentially half the year and his work would be based in either Los Angeles or Orange County for the remainder of the year;

○ It seems unusual that Debtor's sister, Reem Hanna, has agreed to pay $4,000 per month to a bankrupt landlord, who is also her brother, even when he insists on living with her and her teenage son in a three-bedroom townhouse.

**VI.    Debtor does not meet the legal requirements for claiming an automatic homestead exemption because he does not reside in the subject property.**

This is not a declared homestead, therefore Debtor must qualify for California's automatic homestead exemption under California Civil Procedure Code Sections 704.710-850. But the Rockefeller Property does not meet the definition of homestead under the CCP because Debtor did not reside there when Belgium's judgement lien attached to the dwelling—being the day the Abstract of Judgement was recorded on 9 November 2020. This issue was already addressed—and dispensed with—in previous proceedings (see further below at Section VII on res judicata).

Debtor may suggest that some alternative date is operative for determining whether he meets the residency requirement under California law. However, this is neither here nor there because the Debtor's evidence as to his residency for the past five years is wholly-unreliable and self-serving. As such, reliance should be placed on objective evidence, particularly the lease agreement with his sister which makes clear that he has not resided in the Rockefeller Property since the lease was signed on 1 January 2017.

*"The essential factors in determining residency for homestead purposes are physical occupancy of the property and the intent to live there."* (see *In re Fisher*, No. 09-91587-D-7,

2009 WL 9087842, at *2 (Bankr. E.D. Cal. Sept. 22, 2009), citing *In re Dodge,* 138 B.R. 602, 607 (Bankr.E.D.Cal.1992), citing *Ellsworth v. Marshall,* 196 Cal.App.2d 471, 474 (1961)).

It is difficult to find jurisprudence squarely relevant to this situation because there are few (if any) cases where Debtor's evidence on his residency is wholly-contradictory. Usually, there is credible evidence put forward by the Debtor that they intend to—and/or actually—reside within the subject property and the court is asked to assess whether objective factors support Debtor's credible evidence.

Here, Debtor's evidence as to his intent and actual residency is wholly-unreliable and self-serving. Therefore, the court should rely on other objective indicia, which all point to the conclusion that he does not reside in the subject property—and thus cannot claim it as an automatic homestead.

This is not a case where Debtor stays in multiple places and has provided credible evidence of its intent to reside in the subject property such that the court is asked to assess whether Debtor has the requisite intent. This case is similar to the facts in *In re Yau*, 115 B.R. 245, 249 (Bankr. C.D. Cal. 1990), where the Debtor "***provided no evidence*** *of how much time may lapse before they would return or, indeed,* ***that they would ever move back into the [subject] property****. Thus,* ***because the Debtors are not temporarily absent from the [subject] property and have not resided at the [subject] property since before this chapter 7 case was filed, they are not entitled to the automatic dwelling exemption of CCP section 704.730.***" (emphasis added).

The Sections below addressing res judicata and the amount of the available HS exemption under California law may give rise to legal issues for review. But the present inquiry, which obviates the need for any further inquiry below, is a straightforward factual inquiry which asks this court to determine the facts as to Debtor's residency based on the credible, objective

evidence which is available. As set out above, Debtor does not reside in the subject property and therefore cannot claim a HS exemption.

**VII.    Debtor is estopped from claiming a homestead exemption in the present bankruptcy proceedings by virtue of res judicata.**

The homestead issue was specifically addressed at the hearing on the Order for Sale of the Rockefeller Property on 21 April 2022 when the Debtor's counsel argued against the Order because certain steps weren't taken which would be applicable to selling real property subject to a homestead exemption, eg obtaining an estimate of the property's value. During the hearing, the court asked Debtor's counsel whether he had any basis to argue that this property qualified as a homestead. Debtor's counsel did not provide any evidence/basis and the resulting Order for Sale specifically noted that "*that the property is not subject to any homestead exemption*" based on proof made to the satisfaction of the court.

"*Generally, the preclusive effect of a former adjudication is referred to as 'res judicata.'*" *Robi v. Five Platters, Inc.*, 838 F.2d 318, 321-22 (9th Cir. 1988). Res judicata includes two types of preclusion: "claim preclusion" and "issue preclusion."

There are three elements a party must establish to invoke claim preclusion: (i) an identity of claims; (ii) a final judgment on the merits; and (iii) party privity. *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Reg'l Planning Agency*, 322 F.3d 1064, 1077 (9th Cir. 2003). Here, all three requirements are met—and the Sale Order acts as claim preclusion barring the Debtor's HS exemption claim in the Rockefeller Property.

The Sale Order dated 10 May 2022 (at Ex 13) is certainly a final order and the parties to that action are identical to the present parties (Belgium and Debtor).

The "identity of claims" requirement is satisfied because the hearing on the Order of Sale and the Superior Court's Sale Order involve the same nucleus of facts, the same rights (eg

Debtor's right to claim a HS exemption), and depend on substantially the same evidence. Additionally, the rights established through the Superior Court's Sale Order would be destroyed or impaired if Debtor is allowed to claim a HS exemption in these proceedings. *See Mpoyo v. Litton Eletrco-Optical Sys.*, 430 F.3d 985, 987 (9th Cir. 2005) (addressing factors considered in analyzing presence of "identity of claims").

In the 9th Circuit, issue preclusion applies where (1) there was a full and fair opportunity to litigate the identical issue in the prior action; (2) the issue was actually litigated in the prior action; (3) the issue was decided in a final judgment; and (4) the party against whom issue preclusion is asserted was a party or in privity with a party to the prior action. *Syverson v. International Business Machines Corp.,* 472 F.3d 1072, 1078 (9th Cir.2007) (citations omitted). Here, the Court should sustain the Objection and disallow the Exemption because each element of issue preclusion is established.

There was a full and fair opportunity to litigate this issue as Debtor's counsel set out its objections to the sale order in written submissions and then repeated those objections at the hearing. The only available evidence was Debtor's February 2021 Declaration where stated he did not reside in the Rockefeller Property. If there was other proof to put forward, there wa opportunity to do so. The issue was actually litigated at the hearing on the Order for Sale of the Rockefeller Property, which resulted in a final judgement, against the Debtor.

**VIII.    If a HS exemption is available, it should be capped at $75,000 because this was the maximum amount available when the Abstract of Judgement was recorded.**

Notwithstanding the above arguments as to Debtor's residency and res judicata, Debtor is not entitled to claim a homestead exemption of $626,000 under controlling California and 9th Circuit law. Debtor is apparently claiming the increased homestead exemption rate in effect following

the change in California law effective 1 January 2021. However, Belgium's Abstract of Judgment was recorded on 9 November 2020—which is before that change came into effect. He is only entitled to claim an exemption amount of $75,000 pursuant to the version of Cal. Civ. Proc. Code § 703.730 which was in effect on the day the lien was created.

The 9th Circuit has repeatedly held that California exemption law must be applied in California bankruptcies because "*California has chosen to 'opt out' of the federal exemption scheme, so California residents filing for bankruptcy are limited to the exemptions afforded under state law.*" In re Rolland, 317 B.R. 402, 412 (Bankr. C.D. Cal. 2004) (citation omitted). As such, issues such as the amount of an available exemption must be resolved based on California law (see In re Nolan, 618 B.R. 860, 863 (Bankr. C.D. Cal. 2020) (citing In re Tallerico, 532 B.R. 774, 780 (Bankr. E.D. Cal. 2015)).

Under California's exemption law, **"[t]he determination whether property is exempt or the amount of an exemption shall be made by application of the exemption statutes in effect (1) at the time the judgment creditor's lien on the property was created** . . . ." Cal. Civ. Proc. Code § 703.050(a) (emphasis added). Here, the lien was created when the Abstract of Judgement was recorded on 9 November 2020.

This approach is supported by California jurisprudence. See, e.g., In re Yau, 115 B.R. 245, 251 (Bankr. C.D. Cal. 1990) (a decision by retired bankruptcy judge Alan Ahart, who authored the seminal book on enforcement of judgments in California, providing that "***[u]nder California law the validity and amount of the homestead exemption is also determined under the exemption statutes in effect when the attachment lien was created*** . . . ."); RUTTER GUIDE, Special Requirements for Sale of Real Property Dwellings: Cal. Prac. Guide Enf. J. & Debt Ch. 6D-8; Bernhanu v. Metzger, 12 Cal.App.4th 445, 447 (1992) (homestead exemption amount determined under exemption statutes in effect at time judgment creditor's lien created);

In re Morgan, 157 B.R. 467, 469-71 (Bankr. C.D. Cal. 1993) ("A plain reading of the California exemption scheme provides that, pursuant to C.C.P. § 703.050(a), the determination of the amount of an exemption shall be made by application of the exemption statutes in effect at the time the judgment creditor's lien was created. A lien on real property is created by recording an abstract of judgment.").

## IX.    Conclusion.

In a recent hearing regarding the bad faith Ch 13 filing, this court noted its expectation that Debtor behave with the utmost good faith going forward. Instead, he has offered unbelievable evidence regarding his finances, unfeasible plans for reorganization, and now a story regarding his residency which completely contradicts his previous evidence. The reason for this contradiction is clear—Debtor does not reside in the subject property. This fact is supported by objective evidence and prohibits him from claiming the HS exemption.

Additionally, res judicata prohibits Debtor from receiving a HS exemption in these proceedings when the matter has already been decided in a previous ruling. And if any exemption is available, it should be capped at $75,000 since this was the amount available when Belgium's lien was created.


Dated:        23 Nov 2022                              Impact Advocates APC


                                                       By_____
                                                           Patrick Miller
                                                           Attorney for
                                                           Judgement Creditor
                                                           Belgium Investments

Patrick Miller, Esq., SBN 301819
Impact Advocates APC
121 S. Oak Ave.
Pasadena, CA 91107
213-364-7581
Patrick.miller@impactadvocateslaw.com

Attorney for the Creditor
Belgium Investments 960 Bay Dr,
LLC, a California Corp

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

IN RE BASSEM VICTOR EL MALLAKH

)  Case No.: 8:22-bk-11605-TA
)  Ch 11
)
)  **DECLARATION OF PATRICK MILLER**
)  **IN SUPPORT OF THE OBJECTION TO**
)  **DEBTOR'S CLAIMED HOMESTEAD**
)  **EXEMPTION**
)
)  _____
)
)  **Hearing Date:  11 January 2023**
)  **Hearing Time: 10:00 AM**
)  **Dept.: 5B/Virtual**
)
)
)

## DECLARATION

1.  I, Patrick Miller, am counsel for the Creditor Belgium Investments 960 Bay Dr, LLC, a California Corp. ("**Belgium**"). I have read the Objection to Debtor's Homestead Exemption and know the contents thereof. The same is true of my own knowledge, except as those matters that are stated on information and belief, and as to these matters, I believe them to be true.

2.  I am over the age of 18 years and am fully familiar with the facts and circumstances surrounding my declaration and could and would competently testify thereto if called upon to do so.

3. I was engaged as counsel for the Defendant in April 2020 in order to enforce the judgement obtained in the Florida courts against the Debtor, Bassem Essam Victor El Mallakh.

4. I reviewed several of the submissions made for the proceedings in Florida which note that the Complaint was filed on 17 August 2018. I do not remember reviewing any submission where Debtor explained why he is innocent of the complaints alleged.

5. Attached to this declaration as Ex 1 is a true and correct copy of Belgium's Response to Debtor's Motion to Vacate in Florida with Motion for Sanctions for Debtor's Perjury filed by Belgium's Florida counsel.

6. Attached to this declaration as Ex 2 is a true and correct copy of Belgium's Default Judgement against the Debtor in the proceedings in Florida.

7. I recently reviewed the Application for Entry of Sister State Judgement and Writ of Execution for this enforcement action which noted that the judgment was entered on 18 June 2020.

8. Attached to this declaration is a true and correct copy of Belgium's Proof of Service for the enforcement documents at Ex 3

9. Attached to this declaration is a true and correct copy of Belgium's Abstract of Judgement at Ex 4.

10. I was involved in the process whereby Belgium secured levies on Debtor's bank accounts and the Rockefeller Property in early-2021. Following these levies, the Debtor filed motions to vacate the Default Judgment in Florida and the entry of the same in California.

11. Attached to this declaration is a true and correct copy of the Declaration filed by Debtor in support of his motion to vacate entry of default judgement in California at Ex 5.

12. Attached to this declaration is a true and correct copy of the Declaration filed by Debtor's sister, Reem Hanna, in support of his motion to vacate entry of default judgement in California at Ex 6.

13. I reviewed the Declarations by Debtor and Reem Hanna that were filed in connection with the FL motion to vacate the Default Judgement and these Declarations made very similar claims with respect to Debtor's residency as the Declarations in the California enforcement matter.

14. Attached to this declaration is a true and correct copy of the Transcripts of the Deposition of Bassem Essam El Mallakh dated 18 March 2021 at Ex 7. This was previously attached to Belgium's Opposition to the FL Motion to Vacate at Ex 5.

15. Attached to this declaration is a true and correct copy of the Extracts of the Deposition of Bassem Essam El Mallakh dated 18 March 2021 at Ex 8. I identified and extracted these lines from Debtor's testimony because they show that Debtor's previous story regarding his residency is incongruous with his latest story; and/or Debtor's insistence on presenting incredulous/untruthful evidence in the previous hearing, eg (i) the suggestion that Debtor was not aware of the FL proceedings (which is controverted by his own evidence); or (ii) the suggestion that Debtor was never accused of any acts of fraud or deceit in court before this case (which was also false).

16. Attached to this declaration is a true and correct copy of the Transcripts of the Deposition of Reem Hanna dated 18 March 2021 at Ex 9.

17. Attached to this declaration is a true and correct copy of the Extracts of the Deposition of Reem Hanna dated 18 March 2021 at Ex 10. I identified and extracted these lines from Debtor's testimony because they show that Ms Hanna's previous story regarding her brother's residency is incongruous with his latest story; and/or Ms Hanna's insistence on presenting incredulous/untruthful evidence in the previous hearing, eg (i) the suggestion that she was never accused of any acts of fraud or deceit in court before this case (which was false); (ii) her suggestion that multiple independent process servers were untruthful when claiming that they left documents at her doorstep or otherwise served her with documents; or (iii) that she never informed her brother of her encounters with process servers in connection with a multi-million dollar case against him.

3

18. Attached to this declaration is a true and correct copy of the Order Denying Debtor's Motion to Vacate from the 11th Circuit Court in Florida at Ex 11.

19. I have reviewed several of Debtor's submissions putting forward new arguments (largely based on factual issues) as to why the decision should be revisited which have been raised by Debtor's counsel in the Florida proceedings. I have also reviewed the decisions from the Florida courts summarily dismissing these motions. True and correct copies of these dismissals are attached to this declaration at Ex 12

20. I was involved in Belgium's enforcement of its judgement in California and attended hearings where the Orange County Court considered whether to order a stay of enforcement and, if so, whether an undertaking should be provided. During the hearing where the court considered these issues, counsel for the Debtor noted that Debtor's main asset was the Rockefeller Property and that it would not be moved (or presumably its character would not be changed). This seemed to be a key factor the court considered when ordering that enforcement should be stayed without providing an undertaking.

21. Attached to this declaration is a true and correct copy of the Orange County Superior Court's Order to sell the Rockefeller Property at Ex 13.

22. I was counsel for Belgium at the hearing on Belgium's motion for an order of sale of the Rockefeller Property on 21 April 2022 and I remember that the court noted that it did not have any evidence that the Rockefeller Property qualified as a homestead. This was an issue because Debtor's counsel raised a number of procedural challenges which would have only been applicable if the subject property were a homestead (a true and correct copy of the Opposition filed by Debtor on 1 April 2022 is attached at Ex 14).

23. Attached to this declaration is a true and correct copy of the Declaration of the Debtor filed in the Ch 11 proceedings at Ex 15.

24. I received an audio recording of the first 341 meeting on 9 Nov 2022 through an email from the US Trustee Nancy Goldenberg. I attended the second 341 meeting on 10 Nov 2022 and received an audio recording of this meeting the same day from the US Trustee.

I have listened to the recordings of both 341 meetings multiple times. I have replicated what I heard on the recording of the second meeting in the quoted passages included within Belgium's Objection. I note that there were statements made in the recording of the first meeting which are similar to those in the quoted passages from the second meeting.

25. I declare under penalty of perjury that the foregoing is true and correct.

Date: 11/23/22

_____

Patrick Miller

PROOF OF ELECTRONIC SERVICE

I am employed in the County of LOS ANGELES, State of California. I am over the age of 18 and not a party to the within action. My business address is, 121 S Oak Ave, Pasadena, CA 91107.

A true and correct copy of the foregoing described as **OBJECTION TO DEBTOR'S CLAIMED HOMESTEAD EXEMPTION AND DECLARATION OF PATRICK MILLER IN SUPPORT OF THE SAME** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d) (through electronic filing); and **(b)** in the manner stated below:

 **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On 11/23/22, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

Michael Jay Berger on behalf of Debtor Bassem Victor El Mallakh
michael.berger@bankruptcypower.com,
yathida.nipha@bankruptcypower.com;michael.berger@ecf.inforuptcy.com

Chad L Butler on behalf of Interested Party Courtesy NEF
caecf@tblaw.com

Nancy S Goldenberg on behalf of U.S. Trustee United States Trustee (SA)
nancy.goldenberg@usdoj.gov

Benjamin Heston on behalf of Interested Party Benjamin Heston

bhestonecf@gmail.com,

benheston@recap.email,NexusBankruptcy@jubileebk.net


Patrick Miller on behalf of Creditor Belgium Investments 960 Bay Dr,

LLC A California Corp.

patrick.miller@impactadvocateslaw.com


Randall P Mroczynski on behalf of Creditor TD Bank, N.A., successor in

interest to TD Auto Finance LLC

randym@cookseylaw.com


United States Trustee (SA)

ustpregion16.sa.ecf@usdoj.gov


I declare under penalty of perjury under the laws of the State of California that the above is true
and correct.

Executed on this 11/23/2022, at Pasadena, California.

Patrick Miller

## **TABLE OF EXHIBITS**

| Exhibit 1 | Belgium's Response to Debtor's Motion to Vacate in Florida with Motion for Sanctions for Debtor's Perjury filed By Belgium's Florida counsel in the proceedings in Florida |
| --- | --- |
| Exhibit 2 | Belgium's Default Judgement against the Debtor |
| Exhibit 3 | Belgium's Proof of Service for the enforcement documents |
| Exhibit 4 | Belgium's Abstract of Judgement |
| Exhibit 5 | Declaration filed by Debtor in support of his motion to vacate entry of default judgement in California |
| Exhibit 6 | Declaration filed by Debtor's sister, Reem Hanna, in support of his motion to vacate entry of default judgement in California |
| Exhibit 7 | Transcripts of the Deposition of Bassem Essam El Mallakh dated 18 March 2021 |
| Exhibit 8 | Extracts of the Deposition of Bassem Essam El Mallakh dated 18 March 2021 |
| Exhibit 9 | Transcripts of the Deposition of Reem Hanna dated 18 March 2021 |
| Exhibit 10 | Extracts of the Deposition of Reem Hanna dated 18 March 2021 |
| Exhibit 11 | Order Denying Debtor's Motion to Vacate from the 11th Circuit Court in Florida |
| Exhibit 12 | Orders of the Florida Courts dismissing Debtor's requests to revisit the 11th Circuit's dismissal of the motion to vacate |
| Exhibit 13 | Orange County Superior Court's Order to sell the Rockefeller Property |
| Exhibit 14 | Opposition filed by Debtor on 1 April 2022 |
| Exhibit 15 | Declaration of the Debtor filed in the Ch 11 proceedings |

# EXHIBIT "1"

IN THE CIRCUIT COURT OF THE 11TH
JUDICIAL  CIRCUIT  IN  AND  FOR
MIAMI-DADE COUNTY, FLORIDA

BELGIUM INVESTMENTS 960 BAY DR, LLC,
a California LLC, et al.,

      Plaintiffs,

v.

SPENCER BLANK, et al.,

      Defendants.

_____/

CASE NO.: 18-28145 CA

### RESPONSE TO EL MALLAKH'S MOTION TO VACATE, WITH BELGIUM'S MOTION FOR SANCTIONS FOR EL MALLAKH'S PERJURY

Defendant Bassem El Mallakh stole and squandered millions from Plaintiff Belgium Investments in a false scheme to completely renovate a mid-rise condominium building in Miami Beach. The Court found in summary judgment that the Defendants left the building "entirely gutted and in a state of demolition only" after years of representing it was on the brink of completion with certificate of occupancy. Exhibit 9. El Mallakh is the only defendant who did not actively participate in this lawsuit, despite repeated service of process, confirmed notices of this lawsuit from multiple sources, and years of opportunity to be heard—all of which El Mallakh knowingly and intentionally squandered to evade this case.

Now that judgment has frozen his assets in California, El Mallakh has first filed a general appearance, with a later unverified and time-barred motion to vacate, all more than a year after the Court entered its order of judicial default. El Mallakh has failed to prove by clear and convincing evidence that service of process was invalid and instead has confirmed his notices and opportunities to be heard throughout this case. In a last-ditch effort to avoid responsibility, El Mallakh and his sister Reem Hanna have committed perjury to attempt to escape the long-standing

1

orders against El Mallakh. Significant investigation and testimony of numerous process servers shows the falsity of El Mallakh's allegations and testimony.

The Court should deny the motion to vacate because:

I.   The service of process at El Mallakh's home, which he owns and where his car was registered, upon his adult sister also residing there, sufficed Florida Statutes § 48.031 and gave due process notice and opportunity to be heard;

II.  El Mallakh had repeated due process notice and opportunity to be heard from multiple sources, which he intentionally squandered in a bad faith attempt to evade this lawsuit;

III. The motion to vacate the order of judicial default became time-barred on November 19, 2020, under the allegations of defective but not total lack of service attempts;

IV.  The Court must deny the motion to vacate because it was not verified upon filing and remains unverified with El Mallakh's contradictory testimony;

V.   El Mallakh waived any objection to personal jurisdiction by failing to challenge jurisdiction at appearance and failing to move to quash at first filing; and

VI.  El Mallakh and Hanna's perjury requires sanctions, including denial and striking of this bad faith motion to vacate.

Accordingly, the Court should deny the motion to vacate.

## FACTS

**A.  Skip traces and investigation showed El Mallakh resided at 116 Rockefeller, together with Mohamed Rostom and sister/co-conspirator Reem Hanna.**

1.      Belgium Investments filed this lawsuit on August 17, 2018, naming El Mallakh as defendant.

2.      On August 29, 2018, the Clerk issued a summons for El Mallakh.

3.      On January 8, 2019, plaintiff Belgium Investments ran a skip trace on El Mallakh, which showed that he resided at 116 Rockefeller, Irvine CA. Exhibit 1 (1/8/19 skip trace).

4.      The skip trace showed that El Mallakh owned 116 Rockefeller, Irvine CA. *Id*. at *3.

5.      The skip trace showed that Equifax also showed 116 Rockefeller as El Mallakh's address. *Id*. at *5.

6.      The 2019 skip trace provided no other potential addresses for El Mallakh. *Id*.

7.      The skip trace identified Reem Hanna as El Mallakh's associate or relative, co-defendant in a business fraud lawsuit, and co-resident of El Mallakh's at 116 Rockefeller, along with previous addresses of 606 Rockefeller, 405 Rockefeller, and 34 Falkner Drive. *Id*. at *4, 19–29 and 56.

8.      The skip trace identified Mohamed Rostom as El Mallakh's associate or relative, and co-resident of El Mallakh at 116 Rockefeller. *Id*. at *6.

9.      The skip trace identified a 2014 lawsuit against Bassem El Mallakh and Reem Hanna, along with Essam El Mallakh and Mona Mikhaeil, for making false and slanderous representations, in Orange County Case No. 2014-00728897-CU-BT-CJC. *Id*. at *19.

10.     The Complaint in that case sued Reem Hanna and El Mallakh for slander and conspiracy, alleging that they conspired to effectuate an illegal and fraudulent transfer of real estate to their co-conspirator's name. Exhibit 2 (Complaint in Doe v. Hanna) at *3.

11.     The Complaint sued Hanna for slander for making false statements (Count I) and El Mallakh and Hanna for conspiracy to defraud the plaintiff out of real estate (Count III).

12.     Given the information in the skip traces, Belgium Investments drafted an alias summons to serve El Mallakh at his house at 116 Rockefeller, through him or his co-residents Hanna and Rostom.

13.     On January 25, 2019, the Clerk of Court issued an alias summons for El Mallakh for his 116 Rockefeller address. Exhibit 3 (Alias summons).

**B.**  **Private investigator Johnson confirmed El Mallakh registered his car at 116 Rockefeller, and served him through his sister/co-conspirator Reem Hanna.**

14.     Plaintiff Belgium hired a private investigator to further investigate El Mallakh at his 116 Rockefeller address. Exhibit 4 (Declaration of The Titan Group, Professional Investigations).

15.     Private investigator Johnson performed a California DMV search on El Mallakh and found that his vehicle, a 2016 Mercedes Benz C Class was registered at 116 Rockefeller. Exhibit 4 (Declaration of The Titan Group, Professional Investigations).

16.     Private investigator Johnson attempted service at 116 Rockefeller on March 19, 2019. *Id*.

17.     Reem Hanna answered the door at 116 Rockefeller, identified herself as "Reem," and misrepresented that she did not know El Mallakh. *Id*.

18.     Private investigator Johnson reviewed public database sources and identified the woman as Reem Hanna, co-resident at 116 Rockefeller. *Id*.

19.     Private investigator Johnson returned on

   a.  March 28, 2019

   b.  March 31, 2019

   c.  April 6, 2019

However, no resident came to the door.

20.    On April 13, 2019, co-defendant Bernard Petit contacted El Mallakh to ask whether he had been contacted or served in this lawsuit—thereby confirming El Mallakh's notice and knowledge of this lawsuit against him. Exhibit 5 (Bassem deposition) at Tr. 53, ln. 17.

21.    On April 17, 2019, at 12:20 p.m., private investigator Johnson again returned to 116 Rockefeller.

22.    Reem Hanna identified herself as "Reem Hanna," and investigator Johnson notified her that she had legal documents for El Mallakh and that she was being sub-served. Exhibit 4 (Declaration of Brittany Johnson of The Titan Group, Professional Investigations) at *2.

23.    Hanna again misrepresented that she did not know El Mallakh and refused to open the door to take the documents, for which the investigator placed the alias summons and complaint at the door of 116 Rockefeller. *Id*.

24.    On July 1, 2019, Plaintiff Belgium filed a return of service for El Mallakh, showing that he was sub-served at his 116 Rockefeller residence on April 17, 2019, through co-resident Reem Hanna.

C.    **El Mallakh confirmed notice of lawsuit from co-defendant Petit in October 2019, prior to default, but chose to squander his opportunity to be heard.**

25.    On July 1, 2019, Belgium filed a motion for default against El Mallakh.

26.    On October 9, 2019, El Mallakh contacted co-defendant Petit to advise that he was aware of Plaintiff Belgium's activity, that he believed Belgium was seeking to sell the Property at issue in this lawsuit, despite the pending lawsuit. Exhibit 5 (Mallakh deposition) at Tr. 54, ln. 3– Tr. 55, ln. 20.

27.    As to October 9, 2019, El Mallakh recently testified that he was specifically aware of this lawsuit at that time, and specifically aware that Belgium was attempting service of summons upon him at that time:

> [A]t that time, also Bernard [Petit] asked me – I remember very well. He says 'Did anybody try to serve you any documents?'

Exhibit 5 (Mallakh deposition) Tr. 55, ln. 17–20.

28.    On October 23, 2019, Belgium moved the Court for an order of judicial default against El Mallakh.

29.    On November 18, 2019, the Court entered judicial default against El Mallakh, for his failure to respond or participate in this lawsuit in any way. Exhibit 6 (order of judicial default).

30.    On February 21, 2020, the Court entered default judgment against El Mallakh. Exhibit 7.

31.    Between October 2019 and February 2020, El Mallakh continued to communicate with his co-defendant Petit as to this lawsuit, its stage of advance, and its impact on El Mallakh's interests—this is according to El Mallakh's testimony. Exhibit 5 (Mallakh deposition) at Tr. 59, ln. 9–Tr. 60, ln. 12.

32.    Co-defendant Petit and Blank's counsels represented to the Court that Petit was in communication with El Mallakh and that El Mallakh was truly the culpable party who had stolen all of the funds in this project. *See, e.g*., Exhibit 8 (Blank's letter as to El Mallakh).[1]

### D. **El Mallakh received notice of judgment in September 2020, but chose to squander his opportunity to be heard.**

33.    Plaintiff Belgium initiated domestication of El Mallakh's February 25th judgment in California, in Orange County Case No. 2020-01148745.

34.    On July 7, 2020, the Court entered summary judgment against El Mallakh's co-defendant Redcliff Builders. Exhibit 9.

---

[1] The Court should take judicial notice of these facts, occurring in open court.

6

35.    In July 2020 Belgium engaged California process server Michael Danley to serve El Mallakh with Notice of Entry of Sister-State Judgment and related documents. Exhibit 10 (Declaration of Michael Danley) at ¶ 2.

36.    Process server Danley attempted on:

    a.    September 12, 2020 at 10:50 a.m.

    b.    September 13, 2020 at 9:10 a.m.

    c.    September 13, 2020 at 8:27 p.m.

However, no resident came to the door. Exhibit 10 (Declaration of Michael Danley) at ¶ 7.

37.    On September 13, 2020 after 8:27 p.m., process server Hanley briefly staked out 116 Rockefeller.  Exhibit 10 (Declaration of Michael Danley) at ¶ 8.

38.    Around 9:02 p.m., process server Danley witnessed lights come on at 116 Rockefeller and people began moving around inside. Exhibit 10 (Declaration of Michael Danley) at ¶ 9.

39.    Process server Danley took a photograph of the lit property after the lights came on. Exhibit 10 (Declaration of Michael Danley) at ¶ 9 and Ex. B.

40.    Process server Danley approached 116 Rockefeller and called out to a woman inside the apartment near the sliding glass door. Exhibit 10 (Declaration of Michael Danley) at ¶ 10.

41.    Process server Danely called out "Reem Hanna" and the woman said "yes," confirming she was Reem Hanna. Exhibit 10 (Declaration of Michael Danley) at ¶ 10.

42.    *A middle-aged man came to the door of 116 Rockefeller* but refused to identify himself. Exhibit 10 (Declaration of Michael Danley) at ¶ 11.

43.    Reem Hanna came to the door and refused to identify the man or provide any information as to El Mallakh. Exhibit 10 (Declaration of Michael Danley) at ¶ 12.

44.    Process server Danely then served the court papers upon El Mallakh's co-resident Hanna. Exhibit 10 (Declaration of Michael Danley) at ¶ 13.

45.    Process server Danely informed Hanna of the nature of the documents and mailed the documents thereafter to 116 Rockefeller. Exhibit 10 (Declaration of Michael Danley) at ¶ 14.

**E.    El Mallakh received notice of judgment lien from his bank in November 2020, before expiration of year to vacate, but squandered his opportunity to be heard.**

46.    On September 23, 2020, the Court dismissed the other defendants pursuant to an approved settlement agreement; the order and agreement expressly excluded El Mallakh because he had refused to participate and was under order of default. Exhibit 11 (order dismissal).

47.    On November 16, 2020, El Mallakh "became aware of a judgment against me [Mallakh] on November 16, 2020 when the County of Orange Clerk of Records sent a Courtesy Notice regarding a lien that was placed on my [El Mallakh's] property." Exhibit 15 (Florida Declaration of El Mallakh) at ¶ 7.

48.    El Mallakh failed to take any action or exercise his opportunity to be heard.

49.    On November 18, 2020, the deadline to move to vacate the Court's order of judicial default expired under Rule 1.540(b).

50.    On February 12, 2021, El Mallakh filed a general appearance in this Florida case. Exhibit 12 (general appearance of El Mallakh).

**F.    In February 2021 El Mallakh enlisted his sister Reem Hanna to commit perjury to conceal his evasion of this lawsuit, despite consistent notice and opportunity to be heard.**

51.    On February 17, 2021, El Mallakh filed a declaration with the Orange County Superior Court of California, testifying that: "I had no idea that the Judgment Creditor had filed

an Application for Entry of Sister State Judgment, the Notice of Entry of Sister State Judgment, or the Sister State Judgment . . . until I hired counsel to represent me and set the Sister State Judgment aside." Exhibit 13 (California Declaration of El Mallakh) at ¶ 7.

52.    El Mallakh further testified that "I took absolutely no steps to hide, hinder or sequester myself to avoid service." Exhibit 13 (California Declaration of El Mallakh) at ¶ 8.

53.    El Mallakh provided a purported 2016 lease to an unspecified unit at 525 Broadway, Santa Monica, CA, to Mohamed Rostom and Bassem Essam—*not to El Mallakh*—and a purported 2021 (not 2019) bank statement to 525 Broadway. *Id*.

54.    El Mallakh also filed an affidavit of his sister Reem Hanna. Exhibit 14 (California Declaration of Reem Hanna).

55.    There, Hanna testified that:

[REEM HANNA]: I have never been served with the Application for Entry of Sister State Judgment, Notice of Entry of Sister State Judgment, or the Sister State Judgment . . . First, I was never served.

Exhibit 14 (California Declaration of Reem Hanna) at ¶¶ 4–6.

56.    On February 19, 2021, El Mallakh filed an *underified* motion to vacate default order and default judgment in this Florida case, with no exhibits or supporting evidence.

57.    In the motion, El Mallakh advised the Court that Reem Hanna is his sister. Motion at ¶ 4.

58.    El Mallakh also confirmed that the Court entered an order of judicial default on July 1, 2019—nearly two years beforehand.

59.    El Mallakh's motion was *NOT VERIFIED* and had no exhibits or supporting evidence.

60.    El Mallakh made the unverified allegation that he had resided at 525 Broadway, Apt 5037, Santa Monica, CA 90401, since 2017.

61.    On February 22, 2021—more than a year after the final judgment—El Mallakh filed some purported exhibits, but no verified motion.

62.    El Mallakh included an affidavit by him, testifying: "I only became aware of a judgment against me on November 16, 2020 when the County of Orange Clerk of Records sent a Courtesy Notice regarding a lien that was placed on my property." Exhibit 15 (Florida Declaration of El Mallakh) at ¶ 7.

63.    In so doing, El Mallakh contradicted his California affidavit:

| California Affidavit of El Mallakh | Florida Affidavit of El Mallakh |
| --- | --- |
| "**I had no idea** that the Judgment Creditor had filed an Application for Entry of Sister State Judgment, the Notice of Entry of Sister State Judgment, or the Sister State Judgment . . . **until I hired counsel to represent me** and set the Sister State Judgment aside." | "**I only became aware of a judgment against me on November 16, 2020** when the **County of Orange Clerk of Records sent a Courtesy Notice regarding a lien** that was placed on my property." |
| CA Affidavit at ¶ 8. | FL Affidavit at ¶ 7. |

64.    El Mallakh provided no explanation as to why he waited from November 16, 2020 to take any action in this matter—this created at least **three months of more delay**.

65.    El Mallakh provided no explanation of how he received notice from the Orange Clerk of Records on November 16, 2020.

66.    El Mallakh filed an affidavit of Reem Hanna, testifying that:

[REEM HANNA]: I never received notice of this lawsuit or the judgment against my brother in this case. I am unaware of any service attempted to be made to me or my brother.

Exhibit 16 (Florida Declaration of Reem Hanna) at ¶¶ 4–5.

67.    Hanna's testimony conflicted with that of private investigator Johnson (as to March and April 2019 notice and service of process) and process server Danley (as to September 2020 notice and service of process).

**G.  Plaintiff Belgium fully investigated and debunked El Mallakh's false claim that his usual place of abode is 525 Broadway, Santa Monica, rather than 116 Rockefeller.**

68.    To investigate El Mallakh and Hanna's testimony, Plaintiff Belgium began to attempt service of process at 525 Broadway, Apt 5037, Santa Monica, CA 90401.

69.    Plaintiff Belgium staked out 525 Broadway, Apt 5037, Santa Monica, CA 90401, from February 22, 2021 to March 22, 2021.

70.    In the past month, process servers Carlos Conejo, Dorian Wordlaw, Robert Mann, and Ruven King have been to 525 Broadway, Apt 5037 nearly every day, including on:

    a.  February 22, 2021 (Carlos Conejo)

    b.  February 23, 2021 (Ruven King)

    c.  February 24, 2021 (Ruven King)

    d.  February 25, 2021 (Ruven King)

    e.  February 26, 2021 (Ruven King)

    f.  February 27, 2021 (Dorion Wordlaw)

    g.  February 28, 2021 (Dorion Wordlaw)

    h.  March 2, 2021 (Ruven King)

    i.  March 3, 2021 (Ruven King)

    j.  March 4, 2021 (Ruven King)

    k.  March 5, 2021 (Ruven King)

    l.  March 6, 2021 (Ruven King)

    m.  March 7, 2021 (Robert Mann)

n.  March 8, 2021 (Ruven King)

o.  March 9, 2021 (Ruven King)

p.  March 10, 2021 (Robert Mann)

q.  March 11, 2021 (Ruven King)

r.  March 12, 2021 (Ruven King)

s.  March 13, 2021 (Ruven King)

t.  March 14, 2021 (Robert Mann)

u.  March 15, 2021 (Ruven King)

v.  March 16, 2021 (Ruven King)

w.  March 18, 2021 (Robert Mann)

x.  March 18, 2021 (Ruven King)

y.  March 20, 2021 (Ruven King)

z.  March 21, 2021 (Ruven King)

However, no resident came to the door at 525 Broadway, Apt 5037. Exhibit 17 (Declaration of

Carlos Conejo); Exhibit 18 (Declaration of Dorion Wordlaw); Exhibit 19 (Declaration of Robert

Mann); and Exhibit 20 (Declaration of Ruven King).

71.    These process servers have gone at all types of regular and non-regular hours, and

have also staked out the house for entire days, so as to ensure a complete understanding of El

Mallakh's usual place of abode.

72.    **What is plain from this investigation is that El Mallakh's usual place of abode
is NOT 525 Broadway, Apt 5037**.

73.     On February 22, 2021, the building manager at 525 Broadway told Carlos Conejo,

that **"Mr. Bassem [El Mallakh] <u>is hardly there</u>, as he is overseas, and he owns multiple

properties."** Exhibit 17 (Declaration of Carlos Conejo).

74.     The process servers all witnessed that the same old building notices sat against the

front door of Apartment 5037 for weeks, with no movement whatsoever. Exhibit 18 (Declaration

of Dorion Wordlaw); Exhibit 19 (Declaration of Robert Mann); and Exhibit 20 (Declaration of

Ruven King).

**H. <u>El Mallakh and Hanna confirmed perjury in their March 18, 2021 depositions.</u>**

75.     On March 18, 2021, Plaintiff Belgium deposed El Mallakh and Hanna.

76.     Plaintiff Belgium issued notices of deposition duces tecum requiring El Mallakh

and Hanna to produce any additional clear and convincing evidence of El Mallakh's usual place

of abode, but they failed to do so. Exhibit 22 (notices of deposition duces tecum); Exhibit 5

(Mallakh deposition) at Tr. 19, ln. 23–25 (Mallakh did produce his ID); Exhibit 21 (Reem

deposition) at Tr. 83, ln. 20–Tr. 87, ln. 7.[2]

77.     Mallakh testified that he does NOT pay utilities at 525 Broadway. Exhibit 5

(Transcript El Mallakh) at Tr. 42, ln. 15–Tr. 43, ln. 4.

78.     Mallakh testified that he does NOT get mail at 525 Broadway. Exhibit 5 (Transcript

El Mallakh) at Tr. 28, ln. 14–20 ("I don't really get mail").

79.     Mallakh testified that he had his Mercedes C-Class car registered to 116

Rockefeller in at least 2018 or later. Exhibit 5 (Transcript El Mallakh) at Tr. 43, ln. 16–24.

---

[2] The Court should take judicial notice that although deponents stipulated that they would produce
such documents, they failed to do so. The undersigned certifies to that fact.

80.    Mallakh testified that his roommate was Mohamed Rostom, but that Rostom had moved to Dubai in December 2020. Exhibit 5 (Transcript El Mallakh) at Tr. 29, ln. 20–Tr. 30, ln. 8.

81.    Mallakh testified that he had no confirmable third-party employment since at least March 2019 and before. Exhibit 5 (Transcript El Mallakh) at Tr. 30, ln. 15–Tr. 31, ln. 15.

82.    In other words, El Mallakh is a ghost—he can provide no clear and convincing evidence as to his usual place of abode.

83.    Hanna testified that El Mallakh had slept the previous night (March 17, 2021) at 116 Rockefeller, not 525 Broadway. Exhibit 21 (Deposition Hanna) at Tr. 60, ln. 24–Tr. 61, ln. 1.

84.    Mallakh testified that he was in town in March 2019 and April 2019 when service of process was originally made by investigator Johnson, including on April 17, 2019. Exhibit 5 (Transcript El Mallakh) at Tr. 31, ln. 22 – Tr. 34, ln. 4.

85.    Mallakh testified that he was never away from 525 Broadway for more than two days in the year 2020. Exhibit 5 (Transcript El Mallakh) at Tr. 27, ln. 16–24.

86.    **Mallakh testified that he was not away from 525 Broadway for more than two days during the period of February 22, 2021 to March 17, 2021**. Exhibit 5 (Transcript El Mallakh) at Tr. 26, ln. 6–Tr. 27, ln. 6.

87.    This contradicts the testimony of process servers Carlos Conejo, Dorian Wordlaw, Robert Mann, and Ruven King, who have been to 525 Broadway, Apt 5037 essentially every day during that period, and have testified that no one has been to that unit in some time.

88.    Mallakh falsely testified as to when he learned of the judgment against him:

[MALLAKH]: When I went to the bank in February . . . then they said that your account has been frozen; and they took all the money out based on a judgment. And I'm like—I was like 'What kind of judgment?' And they gave me a printout that says a judgment based on a Florida case. And that's when I actually found out that

there is a lawsuit/judgment. So I found out about it in February of 2021 just from going to the bank.

Q: And that's the very first time you heard anything about it.

[MALLAKH]: First time. First time, February 2021.

Exhibit 5 (Transcript El Mallakh) at Tr. 48, ln. 25 – Tr. 49, ln. 11.

89.    This again contradicted Mallakh's prior testimony:

| CA Affidavit of El Mallakh | FLAffidavit of El Mallakh | Deposition of El Mallakh |
|---|---|---|
| "**I had no idea** that the Judgment Creditor had filed an Application for Entry of Sister State Judgment, the Notice of Entry of Sister State Judgment, or the Sister State Judgment . . . **until I hired counsel to represent me** and set the Sister State Judgment aside." | "**I only became aware of a judgment against me on November 16, 2020** when the **County of Orange Clerk of Records sent a Courtesy Notice regarding a lien** that was placed on my property." | "And **that's when I actually found out that there is a lawsuit/judgment**. So I found out about it in February of 2021 just from going to the bank. [Q: And that's the very first time you heard anything about it?] "First time. **First time, February 2021.**" |
| CA Affidavit at ¶ 8. | FL Affidavit at ¶ 7. | Depo. Tr. 48, ln. 25 – Tr. 49, ln. 11 |

90.    Further, Mallakh testified that he had been in communications with co-defendant Bernard Petit, as to this Florida lawsuit and the property at issue on **April 13, 2019**. Exhibit 5 (Transcript El Mallakh) at Tr. 53, ln. 4–17.

91.    Mallakh then testified that he had been in communications with co-defendant Bernard Petit, as to this Florida lawsuit and the property at issue on **October 9, 2019**, and that co-defendant Petit specifically asked El Mallakh if he had been served with summons yet for this

lawsuit—**confirming Mallakh's notice and knowledge of this lawsuit against him and need to defend**. Exhibit 5 (Transcript El Mallakh) at Tr. 54, ln. 3–Tr. 55, ln. 19.

92.    Mallakh testified that he continued to talk to co-defendant Petit several times between October 2019 and February 2021. Exhibit 5 (Transcript El Mallakh) at Tr. 59, ln. 9–Tr. 61, ln. 1.

**I.** **El Mallakh testified that he intentionally wasted his opportunity to be heard in this case, despite repeated notice from various sources from April 2019 to February 2021, to evade this lawsuit.**

93.    Mallakh then testified that from October 2019 and after he continued to be aware that he was sued in this Florida lawsuit, but that he intentionally and knowingly refused to investigate, hire an attorney, or exercise his multiple opportunities to participate in this lawsuit:

Q: from **October 2019** to today, you think you've talked to [co-defendant] Bernard Petit once or twice?

[MALLAKH]: Once or twice.

Q: Okay. In all that, did he mention to you that you were being sued in a lawsuit here in Florida?

[MALLAKH]: He said he's – he's getting sued, and he says, 'Did you get any documents or any service – service?' And I said, 'I did not.'

**Q: Did you understand by that question that somebody was attempting to serve documents about a lawsuit on you?**

**[MALLAKH]: Right.**

Q: Okay. Did you do anything to investigate if you were getting sued or what that was all about?

[MALLAKH]: No. I did not because, you know, usually when someone is suing you, you need to obviously service you with the documents to know what is going on with the lawsuit.

Q: Okay. Did you hire an attorney to look into it?

[MALLAKH]: No, because I was waiting to get serviced.

16

Q: Okay. Did you call anybody in Miami or in Florida to find out what was going on with the lawsuit against you?

[MALLAKH]: No.

Q: So you're just waiting for somebody to service summons on you?

[MALLAKH]: Right.

Exhibit 5 (Transcript El Mallakh) at Tr. 59, ln. 18–Tr. 61, ln. 1.

94.    This again contradicted with his previous testimony:

| CA Affidavit | FL Affidavit | Deposition (1) | Deposition (2) |
|---|---|---|---|
| "**I had no idea** that the Judgment Creditor had filed an Application for Entry of Sister State Judgment, the Notice of Entry of Sister State Judgment, or the Sister State Judgment . . . **until I hired counsel to represent me** and set the Sister State Judgment aside." | "**I only became aware** of a judgment against me **on November 16, 2020** when the County of Orange Clerk of Records sent a Courtesy Notice regarding a lien that was placed on my property." | "And **that's when I actually found out that there is a lawsuit/judgment**. So I found out about it in February of 2021 just from going to the bank.<br><br>[Q: And that's the very first time you heard anything about it?]<br><br>"First time. **First time, February 2021.**" | "Q: from **October 2019** . . . did he mention to you that **you were being sued in a lawsuit here in Florida?** Did you understand by that question that somebody was attempting to serve documents about a lawsuit on you?<br><br>[MALLAKH]:<br>**Right.**" |
| CA Affidavit at ¶ 8. | FL Affidavit at ¶ 7. | Depo. Tr. 48, ln. 25–Tr. 49, ln. 11 | Tr. 59, ln. 18–Tr. 61, ln. 1. |

95.    This is perjury.

96.    Additionally, both Mallakh and Hanna falsely testified about their role in a 2014 slander, fraud, and conspiracy case. Exhibit 5 (Transcript El Mallakh) at Tr. 45, ln. 7–Tr. 48, ln. 17 (denying having been sued or accused of slander, fraud, conspiracy, or the like); Exhibit 21

(Transcript Hanna) at Tr. 77, ln. 7–Tr. 81, ln. 4 (same); *cf.* Exhibit 2 (Complaint for slander, fraud, and conspiracy).

97.      Hanna falsely testified about any interaction with investigator Johnson in March and April 2019, and falsely testified that there was no middle-aged man with her upon receipt of service in September 2020:

> Q: Do you recall why you were at your brother, Bassem's place on September 13, 2020, in particular?
>
> [HANNA]: Visiting.
>
> Q: Okay. Well, we've got a process server who's stated that they came to 116 Rockefeller on September 13, 2020, around 9 o'clock p.m. and—and spoke to you in particular. Does that sound familiar at all?
>
> [HANNA]: Yeah. . . . There was someone knocking on the door . . . I opened the door, and they said, "Is Bassem . . . Is Bassem here" . . .
>
> Q: So your testimony here under penalty of perjury is that only you and your 15-year-old son were at 116 Rockefeller at 9 o'clock p.m. **on September 13, 2020, when this process server came to your house; is that right?**
>
> **[HANNA]: Right.**
> . . .
> Q: Okay. Is that your typical way of behaving when somebody comes and asks for your brother that you slam the door in their face?
>
> [HANNA]: Yea. I don't – I don't have an answer.

Exhibit 21 (Transcript Hanna) at Tr. 71, ln. 17 –Tr. 73, ln. 20.

98.      In doing so, Ms. Hanna contradicted her California affidavit:

| CA Affidavit of Hanna | FL Deposition Testimony of Hanna |
|---|---|
| "[HANNA]: **I have never been served** with the Application for Entry of Sister State Judgment, Notice of Entry of Sister State Judgment, or the Sister State Judgment . . . First, I was never served." | "Q: at 116 Rockefeller at 9 o'clock p.m. **on September 13, 2020, when this process server came to your house; is that right?**<br><br>**"[HANNA]: Right."** |

| California Declaration of Reem Hanna) at ¶¶ 4–6. | Tr. 71, ln. 17 –Tr. 73, ln. 20 |
| --- | --- |

99.     Ultimately, in the conversations between El Mallakh's November 2019 judicial order of default and his February 2021 unverified motion to vacate default, El Mallakh was specifically aware of the service of process in this lawsuit and the proceedings against him:

EL MALLAKH: [Co-defendant El Mallakh] said he's – he's getting sued, and he says, 'Did you get any documents or any service – service?' And I said, 'I did not.'

Q: Did you understand by that question that somebody was attempting to serve documents about a lawsuit on you?

EL MALLAKH: Right.

Exhibit 5 (Deposition El Mallakh) at Tr. 60, ln. 2–8.

100.     El Mallakh has simply made every step to conceal his whereabouts and avoid service of process in this case.

## **LEGAL STANDARD**

A process server's affidavit alone is sufficient to support a finding of valid service, and creates a presumption of effective service of process. *Magazine v. Bedoya*, 475 So. 2d 1035, 1035 (Fla. 3d DCA 1985) (affirming order denying motion to vacate where defendant failed to show by clear and convincing evidence that service was defective); *Buttigieg v. Prunetti*, 610 So. 2d 667, (Fla. 4th DCA 1992) (same).

A plaintiff need only substantially comply with service statutes to acquire personal jurisdiction and overcome a motion to quash service or vacate an order on service of process. *Fernandez v. Chamberlain*, 201 So. 2d 781, 784–85 (Fla. 2d DCA 1967) (holding substantial

compliance with service statute was sufficient to defeat motion to quash, despite inability to file return receipt)

Where there is sufficient evidence from which it might be reasonably found that service of summons was sufficient, the Court may deny a motion to vacate service of process, notwithstanding that the return of service has technical variances or does not address every aspect of proper service. *Pentecostal Holiness Church, Inc. v. Mauney*, 220 So. 2d 25, 26 (Fla. 4th DCA 1969).

A defendant challenging service of process must prove invalidity of the service by clear and convincing evidence, and failure to do so will have the service of process stand as effective. *Conde v. Professional Mediquip of Fla., Inc.*, 436 So. 2d 322, 323–24 (Fla. 4th DCA 1983) (holding that where defendant admits to having notice of lawsuit, and has not by clear and convincing evidence demonstrated the invalidity of the service, the service will stand as effective); *Travelers Ins. Co. v. Davis*, 371 So. 2d 702, 703 (Fla. 3d DCA 1979) (defendant must prove the invalidity of service of process by clear and convincing evidence).

Where defendant does not provide clear and convincing record evidence to overturn presumption of valid service, the Court cannot grant a motion to vacate. *Magazine v. Bedoya*, 475 So. 2d 1035, 1035 (Fla. 3d DCA 1985) (affirming order denying motion to vacate where defendant failed to show by clear and convincing evidence that service was defective); *Wadkin Ltd. v. Platt*, 545 So. 2d 314, 314 (Fla. 4th DCA 1989) (affirming order denying motion to quash service of process, where defendant failed to provide clear and convincing evidence to overturn presumption of effective service of process).

## LEGAL ARGUMENT

**I.  The service of process at El Mallakh's home, which he owns and where his car was registered, upon his adult sister also residing there, sufficed Florida Statutes § 48.031 and gave due process notice and opportunity to be heard.**

Florida Statutes § 48.031(1) provides that service of process can be made by leaving copies of summons at a defendant's usual place of abode with any person residing therein who is 15 years of age or older. § 48.031(1), Fla. Stat. (2019). Under Florida Statutes s. 48.031(1)(a), the term "usual place of abode" means the place where the defendant is actually living at the time of service. *Shurman v. Atlantic Mortg. & Inv. Corp.*, 795 So. 2d 952, 954 (Fla. 2001).[3]

Where a person to be served with process evades the presence of a process server in a deliberate attempt to avoid service of process, the delivery requirement may be satisfied if the process server leaves the papers at a place in which such person can easily retrieve them and takes reasonable steps to call such delivery to the attention of the person to be served. *Palamara v. World Class Yachts, Inc.*, 824 So. 2d 194, 194–95 (Fla. 4th DCA 2002); *Haney v. Olin Corp.,* 245 So. 2d 671, 670–71 (Fla. 4th DCA 1971); *Olin Corp. v. Haney*, 245 So. 2d 669, 673–74 (Fla. 4th DCA 1971); *Liberman v. Commercial Nat'l Bank of Broward Cnty.*, 256 So. 2d 63 (Fla. 4th DCA 1971); *Dowd Shipping, Inc. v. Lee*, 354 So. 2d 1252 (Fla. 4th DCA 1978); *see also Wendel v. Int'l Real Estate News, LLC,* 2020WL5803510 at \*4 (S.D. Fla. Aug. 10, 2020) (denying motion to vacate default where defendant failed to meet burden to present strong and convincing evidence that she

---

[3] For example, six-week stay at a location is long enough to be properly regarded as their residence, and make the recipient "a person residing therein" under Florida Statutes s. 48.031(1). *Magazine v. Bedoya*, 475 So. 2d 1035, 1035 (Fla. 3d DCA 1985) (affirming order denying motion to vacate where defendant failed to show by clear and convincing evidence that service was defective); *Sangmeister v. McElnea*, 278 So. 2d 675, 676 (Fla. 3d DCA 1973) (four-month visit establishes residing therein requirement).

had not evaded service); *Kennedy v. Grova*, 2012WL1368139 at *3 (S.D. Fla. April 19, 2012);

*U.S. S.E.C. v. Reinhard*, 352 Fed. App'x 309, 313 (11th Cir. 2009).

Here, the service of process at El Mallakh's home, which he owns and where his car was registered, upon his adult sister also residing there, sufficed Florida Statutes § 48.031 and gave due process notice and opportunity to be heard.

Authorized investigator Johnson served process upon El Mallakh through his sister Reem Hanna at 116 Rockefeller, Irvine CA, on April 17, 2019. Exhibit 4 (Declaration of Brittany Johnson of The Titan Group, Professional Investigations) at *2. Hanna had previously identified herself to investigator Johnson on March 19, 2019, and again identified herself as "Reem Hanna" on April 17, 2019. *Id*. at *1. Despite Hanna's misrepresentations that she did not know El Mallakh, investigator Johnson notified Hanna that she had legal documents for El Mallakh and that she was being sub-served, in compliance with Florida law. *Id*. at *2

A skip trace showed El Mallakh owned and resided at 116 Rockefeller, Irvine CA, with no other possible addresses. Exhibit 1 (1/8/19 skip trace). The skip trace showed Reem Hanna was his co-resident there, along with Mohamed Roston. *Id*. at *4, 6, 19–29 and 56. The skip trace identified a 2014 lawsuit against Bassem El Mallakh and Reem Hannah for making false representations and fraud, and thus Hanna could be expected to make false statements as to her familiarity with El Mallakh. Exhibit 2 (Complaint in Doe v. Hanna) at *3.

Investigator Johnson performed a California DMV search on El Mallakh and found that his vehicle, a 2016 Mercedes Benz C Class was currently registered at 116 Rockefeller. Exhibit 4 (Declaration of The Titan Group, Professional Investigations). The return of service is regular on its face, creating the presumption of good service. This suffices and puts burden on El Mallakh to prove by clear and convincing evidence that service was defective.

An extensive investigation of El Mallakh in 2021 has confirmed that his usual place of abode is certainly NOT 525 Broadway, Apt 5037, Santa Monica, CA 90401. Exhibit 17 (Declaration of Carlos Conejo); Exhibit 18 (Declaration of Dorion Wordlaw); Exhibit 19 (Declaration of Robert Mann); and Exhibit 20 (Declaration of Ruven King). Investigators have staked out that address essentially every day for a month straight, when El Mallakh testified he was at home, and found that El Mallakh does not have his usual place of abode in Santa Monica. On February 22, 2021, the building manager at 525 Broadway told Carlos Conejo, that **"Mr. Bassem [El Mallakh] <u>is hardly there</u>, as he is overseas, and he owns multiple properties."** Exhibit 17 (Declaration of Carlos Conejo).

Although El Mallakh and Hanna have misrepresented otherwise, they failed provide clear and convincing evidence that El Mallakh's usual place of abode is not 116 Rockefeller, Irvine CA. El Mallakh testified that he does NOT pay utilities at 525 Broadway (Exhibit 5 (Transcript El Mallakh) at Tr. 42, ln. 15–Tr. 43, ln. 4); he does NOT get mail at 525 Broadway (*id*. at Tr. 28, ln. 14–20 ("I don't really get mail"); he had his Mercedes C-Class car registered to 116 Rockefeller in at least 2018 or later (*id*. at Tr. 43, ln. 16–24); he had no confirmable third-party employment to show his home address since at least March 2019 and before (*id*. at Tr. 30, ln. 15–Tr. 31, ln. 15); and his purported roommate Mohamed Rostom has not testified, moved to Dubai in December 2020 (*id*. at Tr. 29, ln. 20–Tr. 30, ln. 8), and skip trace shows Rostom and Hanna lived at 116 Rockefeller (Exhibit 1 (1/8/19 skip trace) at *4, 6, 19–29 and 56).

Reem Hanna has testified that El Mallakh slept at 116 Rockefeller on the night before the March 18, 2020 deposition and apparently on the night before the September 13, 2020 service of process. Exhibit 21 (Transcript Hanna) at Tr. 71, ln. 17 –Tr. 73, ln. 20 (as to 9/12/20) and at Tr. 60, ln. 24–Tr. 61, ln. 1 (as to 3/17/21). El Mallakh has since provided no other clear and convincing

evidence of any other usual place of abode. Exhibit 22 (notices duces tecum). Thus, the Court

should deny the motion to vacate.

## II.  El Mallakh had repeated due process notice and opportunity to be heard from multiple sources, which he intentionally squandered in a bad faith attempt to evade this lawsuit.

The purpose of service of process is to provide the defendant due process notice and

opportunity to be heard. The Third District Court of Appeal has plainly stated:

> The purpose of service of process is to give a defendant proper notice that it is
> answerable to a plaintiff's claim, to advise the defendant of the nature of that claim,
> and to afford the defendant an opportunity to defend against it.

*Am. Hosp. of Miami, Inc. v. Nateman*, 498 So. 2d 444, 445 (Fla. 3d DCA 1986) (affirming denial

of motion to vacate despite defect in summons, where defendant received notice and opportunity

to be heard); *Travelers Ins. Co. v. Davis*, 371 So. 2d 702, 703 (Fla. 3d DCA 1979) (holding object

of service of process is to give defendant notice that legal proceeding has been instituted, and

opportunity to defend against it); *Shurman v. Atlantic Mortg. & Inv. Corp.*, 795 So. 2d 952, 954

(Fla. 2001) ("the purpose of this jurisdictional scheme is to give the person affected notice of the

proceedings and an opportunity to defend his rights."); *Cruz v. Citimortgage, Inc.*, 197 So. 3d

1185, 1189 (Fla. 4th DCA 2016) ("It is well-settled that the fundamental purpose of the service of

process statute 'is to give the person affected notice of the proceedings and an opportunity to

defend his rights.'") (citing *Shurman*).

As the *Kozinski v. Phillips* court discussed:

> Further, cases addressing insufficient service of process have emphasized that **a
> defendant may not 'simply ignore the process, sit idly by, let default be entered
> against it,' and then successfully move to set aside** the judgment more than a year
> after it is rendered. *Craven v. J.M. Fields, Inc.*, 226 So. 2d 407, 410 (Fla. 4th DCA
> 1969). Instead, '**a party complaining of an irregular service or return is
> required to move diligently to effectuate those remedies available to the party
> by our rules of civil procedure <u>lest the party suffer the consequences</u>**.' *Id*.

*Kathleen G. Kozinski, P.A. v. Phillips*, 126 So. 3d 1264, 1268 (Fla. 4th DCA 2013) (emphasis added). Likewise, a defendant and his family cannot make deliberate attempts to avoid the presence of a process server and service of process. *Palamara* at 194–95; *Haney* at 670–71; *Olin Corp.* at 673–74; *Liberman* at 63; *Dowd Shipping* at 1252; *Wendel* at *4; *Kennedy* at *3; *Reinhard* at 313.

Where defendants have notice and an opportunity to be heard prior to entry of a default order or default judgment, the Court property denies their later motion to vacate and the Third District Court of Appeal should affirm. *Estrada v. Estrada*, 274 So. 3d 426, 430 (Fla. 3d DCA 2019) (holding son and daughter-in-law had notice of action by father, and thus due process rights were preserved and default order entered after they filed appearance and answer to complaint was not void).

Additionally, irregularities or technical variances in service of process, summons, and return of service which do not result in prejudice to defendant do not serve to invalidate service. *Am. Hosp. of Miami, Inc. v. Nateman*, 498 So. 2d 444, 445–46 (Fla. 3d DCA 1986) (affirming denial of motion to vacate despite defect in summons, where defendant received notice and opportunity to be heard); *Buttigieg v. Prunetti*, 610 So. 2d 667, 669–70 (Fla. 4th DCA 1992) ("Irregularities in a writ or other process, where they do not prejudice a defendant, will not invalidate the service.").

Hyper-technical defects in summonses or returns of service do not require the Court to quash service, where the defendant did have notice and opportunity to be heard. *Am. Hosp. of Miami, Inc. v. Nateman*, 498 So. 2d 444, 445–46 (Fla. 3d DCA 1986) (affirming denial of motion to vacate despite defect in summons, where defendant received notice and opportunity to be heard).

Where the purpose of service of process—i.e., to give a defendant notice that he is answerable to a plaintiff's claim, to advise him of the nature of that claim and to afford the

defendant an opportunity to defend against it—is served, a technically defective service of process may still stand and the Court may deny a motion to vacate thereon. *Buttigieg v. Prunetti*, 610 So. 2d 667, 669–70 (Fla. 4th DCA 1992) ("Irregularities in a writ or other process, where they do not prejudice a defendant, will not invalidate the service."); *Conde v. Professional Mediquip of Fla., Inc.*, 436 So. 2d 322, 323–24 (Fla. 4th DCA 1983) (holding that where defendant admits to having notice of lawsuit, and has not by clear and convincing evidence demonstrated the invalidity of the service, the service will stand as effective).

Here, El Mallakh had repeated notice of this lawsuit and opportunity to be heard; over and over again for years. El Mallakh recently testified that he was specifically aware of this lawsuit as of October 9, 2019, and specifically aware that Belgium was attempting service of summons upon him at that time:

> [MALLAHK]: [A]t that time, also Bernard [Petit] asked me – I remember very well. He says 'Did anybody try to serve you any documents?'
>
> Q: from **October 2019** . . . did he mention to you that **you were being sued in a lawsuit here in Florida?** Did you understand by that question that somebody was attempting to serve documents about a lawsuit on you?
>
> [MALLAKH]: **Right**."

Exhibit 5 (Mallakh deposition) Tr. 55, ln. 17–20 and Tr. 59, ln. 18–Tr. 61, ln. 1. This was before Belgium moved for an order of judicial default against El Mallakh (motion filed 10/23/19). Between October 2019 and February 2020, El Mallakh continued to communicate with his co-defendant Petit as to this lawsuit, its stage of advance, and its impact on El Mallakh's interests— this is according to El Mallakh's testimony. Exhibit 5 (Mallakh deposition) at Tr. 59, ln. 9–Tr. 60, ln. 12.

Further, El Mallakh had notice by delivery of summons and complaint through his sister at his house on April 17, 2019. Exhibit 4 (declaration of investigator Johnson). El Mallakh had notice

26

on September 13, 2020, when process server Hanley served notice of default judgment upon El Mallakh through Reem Hanna at El Mallakh's home. Exhibit 10 (Declaration of Michael Danley) at ¶¶ 8–14. This was in the presence of Reem Hanna and a middle-aged man who refused to identify himself, and who Hanna has misrepresented did not exist. Exhibit 10 (Declaration of Michael Danley) at ¶ 11. It is undisputed that process server Hanley communicated with Hanna on September 13, 2020 to give service of process to El Mallakh at his home. Exhibit 21 (Transcript Hanna) at Tr. 71, ln. 17 –Tr. 73, ln. 20 ("Q: at 116 Rockefeller at 9 o'clock p.m. on September 13, 2020, when this process server came to your house; is that right?" "[HANNA]: Right.").

El Mallakh also testified that he received additional notice of the Florida judgment against him **on November 16, 2020** when the County of Orange Clerk of Records sent a Courtesy Notice regarding a lien that was placed on my property." Exhibit 13 (Mallakh CA affidavit) at ¶ 7. El Mallakh could not explain why he continued to delay his appearance in this Court to address this lawsuit against him.

Mallakh has testified that he knowingly and intentionally squandered his due process notice and opportunity to be heard for years, after he continued to be aware that he was sued in this Florida lawsuit, but that he intentionally and knowingly refused to investigate, hire an attorney, or exercise his multiple opportunities to participate in this lawsuit:

> Q: from **October 2019** to today, you think you've talked to [co-defendant] Bernard Petit once or twice?
>
> [MALLAKH]: Once or twice.
>
> Q: Okay. In all that, did he mention to you that you were being sued in a lawsuit here in Florida?
>
> [MALLAKH]: He said he's – he's getting sued, and he says, 'Did you get any documents or any service – service?' And I said, 'I did not.'

27

**Q: Did you understand by that question that somebody was attempting to serve documents about a lawsuit on you?**

**[MALLAKH]: Right.**

Q: Okay. Did you do anything to investigate if you were getting sued or what that was all about?

[MALLAKH]: No. I did not because, you know, usually when someone is suing you, you need to obviously service you with the documents to know what is going on with the lawsuit.

Q: Okay. Did you hire an attorney to look into it?

[MALLAKH]: No, because I was waiting to get serviced.

Q: Okay. Did you call anybody in Miami or in Florida to find out what was going on with the lawsuit against you?

[MALLAKH]: No.

**Q: So you're just waiting for somebody to service summons on you?**

**[MALLAKH]: Right.**

Exhibit 5 (Transcript El Mallakh) at Tr. 59, ln. 18–Tr. 61, ln. 1.

The above notice and opportunity to be heard sufficed El Mallakh's due process rights. *Nateman* at 445; *Davis* at 703; *Shurman* at 954; *Cruz* at 1189. Florida law requires El Mallakh to diligently exercise his due process rights to participate in this lawsuit, upon such notice. *Kozinski* at 1268. Instead, El Mallakh chose to "simply ignore the process, sit idly by, let default be entered against [him]." *Id*. Florida law prohibits El Mallakh from now successfully moving to set aside the judgment more than a year after it is rendered. *Id*.; *Craven* at 410. Accordingly, the Court should deny the motion to vacate.

**III.  The motion to vacate the order of judicial default became time-barred on November 19, 2020, under the allegations of defective but not total lack of service attempts.**

The Court must differentiate between "defective" service and "total lack" of service.

*Kathleen G. Kozinski, P.A. v. Phillips*, 126 So. 3d 1264, 1268 (Fla. 4th DCA 2013). Total lack of service renders a judgment void, while defective service renders a judgment **voidable**. *Kathleen G. Kozinski, P.A. v. Phillips*, 126 So. 3d 1264, 1268 (Fla. 4th DCA 2013).

As the Florida Supreme Court and several appellate courts thereafter have explained:

A distinction is to be noted between a total want of service where the defendant received no notice at all, and a service which is irregular or defective but actually gives the defendant notice of the proceedings against him. The former confers no jurisdiction of the person by the court, but the latter or defective service of process, on the contrary, confers jurisdiction upon the court of the person summoned so that the judgment based upon it is voidable only and not void and cannot be collaterally attacked.

*Kathleen G. Kozinski, P.A. v. Phillips*, 126 So. 3d 1264, 1268 (Fla. 4th DCA 2013) (quoting *Decker v. Kaplus*, 763 So. 2d 1229, 1230 (Fla. 5th DCA 2000) (quoting *State ex rel. Gore v. Chillingworth*, 126 Fla. 645, 652 (Fla. 1936))).

Under such circumstances, **a defendant has only one year to move to vacate** a particular order, under Florida Rule of Civil Procedure 1.540(b). *Id*. As the *Kozinski* court discussed:

'It is only where service is so defective as to amount to no notice that a judgment is void, because then there is a denial of due process. Where notice is adequate, defects in process or service of process are waived if not timely raised.' *Peleais v. Wang*, 632 So. 2d 1132, 1135 (Fla. 4th DCA 1994). . . .

Further, cases addressing insufficient service of process have emphasized that a defendant may not 'simply ignore the process, sit idly by, let default be entered against it,' and then successfully move to set aside the judgment more than a year after it is rendered. Craven v. J.M. Fields, Inc., 226 So. 2d 407, 410 (Fla. 4th DCA 1969). Instead, 'a party complaining of an irregular service or return is required to move diligently to effectuate those remedies available to the party by our rules of civil procedure lest the party suffer the consequences.' *Id*.

*Id*. at 1268.

In *Kozinski*, the appellate court found that the plaintiff "never served [the defendant] with process in compliance with the statutes," but that the "defective attempts at service of process were sufficient to put [the defendant] on notice of the proceedings against her." *Kozinski* at 1268. The Court held that:

> Because the defective service was sufficient to put [defendant] on notice of the lawsuit against her, the one-year time limitation for voidable judgments applied and it was improper for the trial court to vacate [the order] almost two years after it was entered.

*Kozinski* at 1268.

Here, the record shows that El Mallakh had repeated notice of this lawsuit and opportunity to be heard; over and over again for years. Exhibit 5 (Mallakh deposition) Tr. 55, ln. 17–20 and Tr. 59, ln. 18–Tr. 61, ln. 1 (notice and opportunity to be heard in October 2019 before default entered); Exhibit 5 (Mallakh deposition) at Tr. 59, ln. 9–Tr. 60, ln. 12 (notice and opportunity to be heard between October 2019 and February 2020); Exhibit 4 (declaration of investigator Johnson, with notice and opportunity to be heard after service on April 2019); Exhibit 10 (Declaration of Michael Danley, with notice and opportunity to be heard after service on September 13, 2020); Exhibit 13 (Mallakh CA affidavit at ¶ 7, with notice of the Florida judgment and opportunity to be heard as of on November 16, 2020).

Mallakh has testified that he knowingly and intentionally squandered his due process notice and opportunity to be heard for years, after he continued to be aware that he was sued in this Florida lawsuit, but that he intentionally and knowingly refused to investigate, hire an attorney, or exercise his multiple opportunities to participate in this lawsuit. Exhibit 5 (Transcript El Mallakh) at Tr. 59, ln. 18–Tr. 61, ln. 1.

Thus, El Mallakh only had one year from the November 19, 2019 order of judicial default to move to vacate that order—**up to November 19, 2020**. Fla. R. Civ. P. 1.540(b); *Kozinski* at

1268; *Decker* at 1230; *Chillingworth* at 652. The Court should take judicial notice that El Mallakh testified to receiving a **notice of judgment lien from Orange County on November 16, 2020**, **still within time** to move to vacate. Exhibit 13 (Mallakh CA affidavit at ¶ 7, with notice of the Florida judgment and opportunity to be heard as of on November 16, 2020). El Mallakh intentionally squandered his notice and opportunity to be heard. Exhibit 5 (Transcript El Mallakh) at Tr. 59, ln. 18–Tr. 61, ln. 1. Accordingly, the Court should deny the motion to vacate.

## IV. The Court must deny the motion to vacate because it was not verified upon filing and remains unverified with El Mallakh's contradictory testimony.

Florida law requires that a motion to set aside default final judgment be verified. *Citibank, FSB v. PNC Mortg. Corp. of Am., Inc.*, 718 So. 2d 300 (Fla. 2d DCA 1998) (holding that the trial court properly denied a rule 1.540(b) motion that was unsupported by sworn evidence); *Poly v. State*, 517 So. 2d 122, 123 (Fla. 4th DCA 1987) (holding trial court correctly denied motion to vacate for which verification was insufficient); *accord Blimpie Capital Venture, Inc., v. Palms Plaza Partners, Ltd.*, 636 So. 2d 838, 840 (Fla. 2d DCA 1994); *Yu v. Weaver*, 364 So. 2d 539, 540–41 (Fla. 4th DCA 1978). Failure to properly verify the motion to vacate requires that the Court deny it. *Id*.

Here, El Mallakh's initial motion to vacate was unverified. It had no sworn testimony or statutory verification signed by any witness (although the title falsely states that the motion is verified). Subsequent filings and testimony are contradictory at best, which fails to provide the clear and convincing evidence and verification required by Florida law:

| CA Affidavit | FL Affidavit | Deposition (1) | Deposition (2) |
|---|---|---|---|
| "**I had no idea that** the Judgment Creditor had filed an Application for Entry of Sister State | "**I only became aware** of a judgment against me **on November 16, 2020** when the County of | "And **that's when I actually found out that there is a lawsuit/judgment**. So I found out about it in | "Q: from **October 2019** . . . did he mention to you that **you were being sued in a lawsuit here in** |

| | | | |
|---|---|---|---|
| Judgment, the Notice of Entry of Sister State Judgment, or the Sister State Judgment . . . **until I hired counsel to represent me** and set the Sister State Judgment aside." | Orange Clerk of Records sent a Courtesy Notice regarding a lien that was placed on my property." | February of 2021 just from going to the bank. [Q: And that's the very first time you heard anything about it?] "First time. **First time, February 2021**." | **Florida?** Did you understand by that question that somebody was attempting to serve documents about a lawsuit on you? [MALLAKH]: **Right**." |
| Ex. 13 at ¶ 8. | Ex. 15 at ¶ 7. | Ex. 5 at Tr. 48, ln. 25–Tr. 49, ln. 11 | Ex. 5 at Tr. 59, ln. 18–Tr. 61, ln. 1. |

Accordingly, the Court must deny the motion to vacate for lack of sufficient verification.

## V. El Mallakh waived any objection to personal jurisdiction by failing to challenge jurisdiction at appearance and failing to move to quash at first filing.

A defendant waives the right to contest personal jurisdiction by making general appearance when he files a motion to vacate default judgment and failed to raise issue of in personam jurisdiction or challenge service of process. *Buttigieg v. Prunetti*, 610 So. 2d 667, 669–70 (Fla. 4th DCA 1992). By failing to object to personal jurisdiction in his first filing in which a plaintiff moves to vacate a default, a defendant waives the issue and a trial court properly denies a defendant's motion to quash service of process filed thereafter. *Consolidated Aluminum Corp. v. Weinroth*, 422 So. 2d 330, (Fla. 5th DCA 1982); *see also Chestnut v. Nationstar Mortg. LLC*, 255 So. 3d 397, 399 (Fla. 3d DCA 2018); *Golden State Indus., Inc. v. Cueto*, 883 So. 2d 817, 820–21 (Fla. 3d DCA 2004); *Astra v. Colt Indus. Operating Corp.*, 452 So. 2d 1031, 1032 (Fla. 4th DCA 1984); *Consolidated Aluminum Corp. v. Weinroth*, 422 So. 2d 330 (Fla. 5th DCA 1982); *Miller v. Marriner*, 403 So. 2d 472 (Fla. 5th DA 1981); *Visioneering Concrete Constr. Co. v. Rodgers*, 120 So. 2d 644 (Fla. 2d DCA 1960).

Here, El Mallakh's first filing was a general appearance on February 12, 2021, which failed to challenge in personam jurisdiction in any way. Exhibit 12. El Mallakh's second filing was an unverified motion to vacate, with no challenge to jurisdiction and no request to quash service of process. Thus, this challenge to jurisdiction is waived and the Court must deny the motion.

## VI. El Mallakh and Hanna's perjury requires sanctions, including denial and striking of this bad faith motion to vacate.

On the spectrum of conduct that is sanctionable, perjury is the most egregious conduct, because few acts strike more viciously against the integrity of the justice system than that of perjury. *Empire World Towers, LLC v. CDR Creances, S.A.S.*, 89 So. 3d 1034, 1038 (Fla. 3d DCA 2012) (*aff'ing* sanction of judgment against party based on fraud on the court). Florida appellate courts readily affirm dismissal or striking of pleadings and motions against any party that engages in perjury, where it enters proceedings and is directly related to a party's claim. *Id.*[4]

---

[4] *See also Willie-Koonce v. Miami Sunshine Transfer & Tours Corp.*, 233 So. 3d 1271, 1273 (Fla. 3d DCA 2017) (*aff'ing* dismissal of Plaintiff's action as sanction for fraud on the court in lying under oath about the injuries she sustained); *Obregon v. Rosana Corp.*, 232 So. 3d 1100, 1103 (Fla. 3d DCA 2017) (*aff'ing* dismissal of Plaintiff's claim as sanction for fraud on the court in lying under oath about the extent and background of claimed damages); *Cal v. Forward Air Solutions, Inc.*, 199 So. 3d 312, 314–15 (Fla. 3d DCA 2016) (*aff'ing* dismissal of Plaintiff's complaint as sanction for giving false testimony directly related to her claims, despite stating it was simple lapse of memory); *Williams v. Miami-Dade Cnty. Public Health Trust*, 17 So. 3d 859, 859 (Fla. 3d DCA 2009) (*aff'ing* dismissal of Plaintiff's complaint as sanction for non-disclosures, false statements, and omissions designed to interfere with the administration of justice); *Faddis v. City of Homestead*, 121 So. 3d 1134, 1134 (Fla. 3d DCA 2013) (*aff'ing* dismissal and striking of Plaintiff's pleadings, for perjury on central and material issue); *Babe Elias Builders Inc v. Pernick*, 765 So. 2d 119, 120–21 (Fla. 3d DCA 2000) (*aff'ing* sanction of judgment against party who prepared fraudulent invoices, suborned perjury on the legitimacy of the fraudulent invoices, and falsely testified on them); *Papadopoulos v. Cruise Ventures Three Corp.*, 974 So. 2d 418, 419–20 (Fla. 3d DCA 2007) ("[Plaintiff] has forfeited his right to seek redress for his claimed injuries based upon his material misrepresentations and omissions that go to the heart of his claims."); *Metropolitan Dade Cnty. v. Martinsen*, 736 So. 2d 794, 794–95 (Fla. 3d DCA 1999) (remanding for dismissal of Plaintiff's case because her "untruthful sworn statements," and her "misrepresentations and omissions . . . went to the heart of her claim and subverted the integrity of the action."); *Mendez v. Blanco,* 665 So. 2d 1149, 1150 (Fla. 3d DCA 1996) (holding that the trial court did not abuse its discretion in dismissing Plaintiff's complaint where he "committed serious misconduct by repeatedly lying under oath during a deposition."); *O'Vahey v. Miller*, 644 So. 2d 550, 551 (Fla. 3d DCA 1994) (holding that Plaintiff's repeated lies in discovery, uncovered only by the "assiduous efforts of opposing counsel," "constituted such serious misconduct" that dismissal of the case was required).

Here, both El Mallakh and Reem Hanna have committed perjury in their attempt to vacate

the order of default and default judgment. El Mallakh committed perjury in testifying as to when

he first received notice of this lawsuit and judgment:

| CA Affidavit | FL Affidavit | Deposition (1) | Deposition (2) |
|---|---|---|---|
| "**I had no idea** that the Judgment Creditor had filed an Application for Entry of Sister State Judgment, the Notice of Entry of Sister State Judgment, or the Sister State Judgment . . . **until I hired counsel to represent me** and set the Sister State Judgment aside." | "**I only became aware** of a judgment against me **on November 16, 2020** when the County of Orange Clerk of Records sent a Courtesy Notice regarding a lien that was placed on my property." | "And **that's when I actually found out that there is a lawsuit/judgment**. So I found out about it in February of 2021 just from going to the bank. [Q: And that's the very first time you heard anything about it?] "First time. **First time, February 2021**." | "Q: from **October 2019** . . . did he mention to you that **you were being sued in a lawsuit here in Florida?** Did you understand by that question that somebody was attempting to serve documents about a lawsuit on you? [MALLAKH]: **Right**." |
| Ex. 13 at ¶ 8. | Ex. 15 at ¶ 7. | Ex. 5 at Tr. 48, ln. 25– Tr. 49, ln. 11 | Ex. 5 at Tr. 59, ln. 18– Tr. 61, ln. 1. |

This is perjury.

Additionally, both Mallakh and Hanna falsely testified about their role in a 2014 slander,

fraud, and conspiracy case. Exhibit 5 (Transcript El Mallakh) at Tr. 45, ln. 7–Tr. 48, ln. 17 (denying

having been sued or accused of slander, fraud, conspiracy, or the like); Exhibit 21 (Transcript

Hanna) at Tr. 77, ln. 7–Tr. 81, ln. 4 (same); *cf.* Exhibit 2 (Complaint for slander, fraud, and

conspiracy).

Hanna falsely testified about any interaction with investigator Johnson in March and April

2019, and falsely testified that there was no middle-aged man with her upon receipt of service in

September 2020. Exhibit 21 (Transcript Hanna) at Tr. 71, ln. 17 –Tr. 73, ln. 20; *cf.* Exhibit 4

(declaration of investigator Johnson) and Exhibit 10 (declaration of process server Danley). In

doing so, Ms. Hanna contradicted her California affidavit:

| CA Affidavit of Hanna | FL Deposition Testimony of Hanna |
| --- | --- |
| "[HANNA]: **I have never been served** with the Application for Entry of Sister State Judgment, Notice of Entry of Sister State Judgment, or the Sister State Judgment . . . First, I was never served." | "Q: at 116 Rockefeller at 9 o'clock p.m. **on September 13, 2020, when this process server came to your house; is that right?"**<br><br>**"[HANNA]: Right."** |
| California Declaration of Reem Hanna) at ¶¶ 4–6. | Tr. 71, ln. 17 –Tr. 73, ln. 20 |

This perjury is the most egregious conduct and most sanctionable, as it strikes most

viciously against the integrity of the justice system. *Empire* at 1038; *supra* n. 5. The Court should

strike El Mallakh's motion to vacate and filings as sanction for this perjury.

## <u>CONCLUSION</u>

The Court should deny El Mallakh's motion to vacate because: (1) the service of process

at El Mallakh's home, which he owns and where his car was registered, upon his adult sister also

residing there, sufficed Florida Statutes § 48.031 and gave due process notice and opportunity to

be heard; (2) El Mallakh had repeated due process notice and opportunity to be heard from multiple

sources, which he intentionally squandered in a bad faith attempt to evade this lawsuit; (3) the

motion to vacate the order of judicial default became time-barred on November 19, 2020, under

the allegations of defective but not total lack of service attempts; (4) the Court must deny the

motion to vacate because it was not verified upon filing and remains unverified with El Mallakh's

contradictory testimony; (5) El Mallakh waived any objection to personal jurisdiction by failing to

challenge jurisdiction at appearance and failing to move to quash at first filing; and (6) El Mallakh

and Hanna's perjury requires sanctions, including denial and striking of this bad faith motion to

vacate.

Respectfully submitted,

**BERNHARD LAW FIRM PLLC**
Counsel for Plaintiff Belgium
333 SE 2nd Avenue, Suite 2000
Miami, Florida 33131
Telephone:  786.871.3349
E-mail: abernhard@bernhardlawfirm.com
By: _/s/ Andrew J. Bernhard, Esq._
    Florida Bar No. 84031

## CERTIFICATE OF SERVICE

I CERTIFY that, in accordance with Fla. R. Jud. Admin. 2.516, a copy of this document was served on March 24, 2021.

36

# EXHIBIT "2"

CFN: 20200138107 BOOK 31
DATE:03/04/2020  04:15:21 F
HARVEY RUVIN, CLERK OF COU

IN THE CIRCUIT COURT OF THE 11TH
JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

BELGIUM INVESTMENTS 960 BAY DR, LLC,
a California LLC, et al.,

        Plaintiffs,

v.

SPENCER BLANK, et al.,

        Defendants.

_____/

CASE NO.: 18-28145 CA

## FINAL JUDGMENT AGAINST BASSEM ESSAM EL MALLAKH

THIS CAUSE having come before the Court upon Plaintiff's Motion for Entry of Final

Judgment Against Bassem Essam El Mallakh (the "Motion"), and the Court having reviewed the

record and been otherwise duly advised, it is hereby

**ORDERED AND ADJUDGED:**

1.    The Motion is GRANTED.

2.    The Court hereby enters final judgment against Defendant Bassem Essam El

Mallakh as to Count VI, Count VII, and Count VIII.

3.    This judgment is final.

4.    Plaintiff is currently due $4,255,000.00 (four million two hundred and fifty-five

thousand dollars USD) in damages from Defendant Bassem Essam El Mallakh.

5.    Plaintiff is entitled to post-judgment interest from Defendant Bassem Essam El

Mallakh.

6.    The sum referenced above in paragraph 4 shall bear interest from this date forward

at the prevailing legal rate of interest.

7.      The Court finds that it has jurisdiction over the Defendant Bassem Essam El Mallakh.

8.      The Court further finds that Defendant failed to timely respond to the Complaint, default has been entered against Defendant, and thus Defendant has admitted *pro confesso* to the allegations in the Complaint.

9.      The Court finds as follows as to Defendant Bassem Essam El Mallakh:

a.      Plaintiff BELGIUM INVESTMENTS 960 BAY DR, LLC ("Plaintiff Belgium") owns the property located at 960 W Bay Drive, Miami Beach, Florida (the "Property").

b.      Plaintiff Belgium was originally co-managed by, among others, Defendant Bassem Essam El Mallakh.

c.      Defendant Bassem Essam El Mallakh was acting in a fiduciary capacity, oversaw decisions on Plaintiff Belgium's behalf, and co-managed its operations.

d.      Amongst the tasks Defendant Bassem Essam El Mallakh was required to perform, was the engagement and supervision of contractors to perform construction and renovation work on the Property.

e.      Unbeknownst to the Plaintiffs, and as set forth with specificity in the Complaint, Defendant Bassem Essam El Mallakh engaged in activity to defraud Plaintiff Belgium of hundreds of thousands of dollars.

f.      Defendant Bassem Essam El Mallakh acted to introduce and induce Plaintiffs to engage certain contractors, whom Defendant Bassem Essam El Mallakh improperly lauded and extoled in order to induce Plaintiffs to engage them.

2

g.       Defendant Bassem Essam El Mallakh concealed key details concerning his relationship to the certain contractors, including without limitations, that they were partners in various other projects.

h.       Had the Plaintiffs been aware of all the facts—including without limitation the undisclosed closed ties between Defendant Bassem Essam El Mallakh and the contractors, and the conspiracy between them to improperly enrich themselves at the expense of the Plaintiffs— they would not have engaged the contractors.

i.       As a consequence of Defendant Bassem Essam El Mallakh's acts, Plaintiffs entered into an agreement dated March 14, 2016 (the "Agreement") to finish the renovation of the Property (the "Project") for an amount of $400,000.

j.       The timeframe promised to complete the project was 60 days i.e., by May 18, 2016, including a certificate of occupancy.

k.       Under Defendant Bassem Essam El Mallakh's mismanagement and improper acts, the Project failed to complete on the specified time or otherwise, and instead lost all funds to and through Defendant Bassem Essam El Mallakh, whereby he defrauded and improperly enriched himself at the expense of the Plaintiffs.

l.       Under Defendant Bassem Essam El Mallakh's mismanagement and improper acts, additional funds were improperly taken under threat that a failure to provide the additional funds would result in their abrupt withdrawal from the Project, which would inter alia, cause the Project to fail.

m.       Defendant Bassem Essam El Mallakh misrepresented to Plaintiffs that the financial requests were legitimate when they were not, and urged the payment of additional and unwarranted moneys improperly.

3

n.    Defendant Bassem Essam El Mallakh then took the ill-gotten profits from overcharging Plaintiffs.

o.    Defendant Bassem Essam El Mallakh would support and otherwise corroborate the risks to Project if the Plaintiffs did not pay the additional funds.

p.    As a consequence of Defendant Bassem Essam El Mallakh actions, Defendant Bassem Essam El Mallakh initially extorted over $703,912.00.

q.    Notwithstanding the additional funds paid by Plaintiffs, the Project did not get close to being finished.

r.    Plaintiffs requested on multiple instances an accounting and/or explanation on the use of the additional funds (over the agreed-upon amount) paid by Plaintiffs, yet Defendant Bassem Essam El Mallakh never provided it.

s.    Under Defendant Bassem Essam El Mallakh's mismanagement, and improper acts a revised "final budget" requesting an additional $667,500 to complete the Project was made to Plaintiffs, with another $134,030.66, allegedly for "past work performed," accompanied by threats to withdraw from the Project, and to record liens upon the Property if Plaintiffs did not provide the additional monies demanded.

t.    Defendant Bassem Essam El Mallakh provided no documentary support for the "requests" for additional funds; no invoices (or other support) were provided by Defendant Bassem Essam El Mallakh.

u.    The limited actual work performed was shoddy, incomplete, and failed to meet minimum acceptable standards, and did not meet the requirements necessary to obtain a certificate of occupancy, as promised in the Agreement.

4

v.      All conditions precedent to bringing this action occurred, have been performed, or have been waived.

w.      Plaintiffs have provided additional supporting documentation and evidence on damages, which remain uncontested by Defendant Bassem Essam El Mallakh.

10.    As to Count VI for breach of fiduciary duty:

a.      Defendant Bassem Essam El Mallakh owed a fiduciary duty to Plaintiff Belgium and all of its members to act with the highest degree of good faith and loyalty, and to always act for the benefit of Plaintiff Belgium and its members.

b.      Defendant Bassem Essam El Mallakh breached his fiduciary duty by mismanaging and misappropriating Plaintiff Belgium's monies, using those monies for their personal benefit and not for the benefit of Plaintiff Belgium, and engaging in actions contrary to the best interests of Plaintiff Belgium and its members, for their own personal interest.

c.      As a result of Defendant Bassem Essam El Mallakh's breach of fiduciary duty, the Plaintiff Belgium has suffered, and continues to suffer, damages.

d.      WHEREFORE, the Court enters final judgment against Defendant Bassem Essam El Mallakh for breach of fiduciary duty, for $4,255,000.00 in damages, plus interest, attorney's fees and costs.

11.    As to Count VII for conversion/theft:

a.      By using and misappropriating the assets and property of Plaintiff Belgium for his own personal use and benefit, Defendant Bassem Essam El Mallakh has exercised wrongful dominion and control over the assets and property of Plaintiff Belgium, to the detriment of the rights of Plaintiff Belgium, the rightful and lawful owner of same.

5

      b.    Defendant Bassem Essam El Mallakh's conduct constitutes a conversion and theft of Plaintiff Belgium's property and assets, which has caused, and continues to cause, damage to the Plaintiff Belgium.

      c.    WHEREFORE, the Court enters default final judgment against Defendant Bassem Essam El Mallakh for $4,255,000.00 in damages, plus interest, attorney's fees and costs.

12.    As to Count VIII for unjust enrichment:

      a.    By diverting Plaintiff Belgium's funds to himself, and for his own personal benefit, Defendant Bassem Essam El Mallakh has conferred a benefit on themselves to which he was not lawfully entitled.

      b.    Defendant Bassem Essam El Mallakh knew, or should have known, that the monies taken belonged to the Plaintiff Belgium and not to him individually.

      c.    Defendant Bassem Essam El Mallakh improperly retained the Plaintiff Belgium's funds, despite a lack of lawful right to do so.

      d.    It would be unjust and inequitable to allow Defendant Bassem Essam El Mallakh to retain said benefit without adequate consideration.

      e.    WHEREFORE, the Court enters default final judgment against Defendant Bassem Essam El Mallakh for $4,255,000.00  in damages, plus attorney's fees and costs.

13.    Execution shall issue immediately upon Defendant Bassem Essam El Mallakh for the judgment principal of $4,255,000.00, along with post-judgment interest at the prevailing legal rate, due to Plaintiffs by Defendant Bassem Essam El Mallakh.

14.    This Court retains jurisdiction to enforce this judgment and enter further orders that are proper.

15.    Defendant Bassem Essam El Mallakh shall serve within 45 calendar days a fact

information sheet with all supporting documentation, as provided under Florida Rule of Civil

Procedure 1.977.

**DONE AND ORDERED** in Chambers in Miami-Dade County, Florida this _21_

day of ___February___, 2020.

_____
THE HONORABLE WILLIAM THOMAS
CIRCUIT COURT JUDGE

**William Thomas**
Circuit Court Judge

7

# EXHIBIT "3"

30-2020-01148745-CU-EN-CJC - ROA # 10 - DAVID H YAMASAKI, Clerk of the Court By e Clerk, Deputy Clerk.

| | POS-010 |
|---|---|
| **ATTORNEY OR PARTY WITHOUT ATTORNEY** *(Name, State Bar number, and address)*<br>P MILLER LEGAL SERVICES<br>PATRICK MILLER<br>285 E CALIFORNIA BLVD UNIT 102<br>PASADENA, CA 91106<br>TELEPHONE NO: 213 364 7581　　FAX NO *(Optional)*:<br>E-MAIL ADDRESS *(Optional)*: patrick.miller@pmillerlegal.com<br>ATTORNEY FOR *(Name)*: | FOR COURT USE ONLY |

| **SUPERIOR COURT OF CALIFORNIA, COUNTY OF** Orange |
|---|
| STREET ADDRESS: 700 Civic Center Drive West |
| MAILING ADDRESS: |
| CITY AND ZIP CODE: Santa Ana, 92701-4045 |
| BRANCH NAME: Superior Court of California, County of Orange |

| PLAINTIFF / PETITIONER: Belgium Investments 960 Bay Dr, LLC, a California Corp. | CASE NUMBER: |
|---|---|
| DEFENDANT / RESPONDENT: Bassem Essam El Mallakh | 30-2020-01148745-CU-EN-CJC |

| **PROOF OF SERVICE OF SUMMONS** | Ref. No. or File No.:<br>4697271 |
|---|---|

*(Separate proof of service is required for each party served.)*

1. At the time of service I was at least 18 years of age and not a party to this action.
2. I served copies of:
   a. ☐ summons
   b. ☐ complaint
   c. ☐ Alternative Dispute Resolution (ADR) package
   d. ☐ Civil Case Cover Sheet *(served in complex cases only)*
   e. ☐ cross-complaint
   f. ☒ other *(specify documents)*: NOTICE OF ENTRY OF JUDGMENT ON SISTER-STATE JUDGMENT (EJ-110) , Conformed APPLICATION FOR ENTRY OF JUDGMENT ON SISTER-STATE JUDGMENT (EJ-105) , Conformed Copy FINAL JUDGMENT AGAINST BASSEM ESSAM EL MALLAKH dated February 21, 2020
3. a. Party served *(specify name of party as shown on documents served)*:
      BASSEM ESSAM EL MALLAKH
   b. ☐ Person (other than the party in item 3a) served on behalf of an entity or as an authorized agent (and not a person under item 5b on whom substituted service was made) *(specify name and relationship to the party named in item 3a)*:
4. Address where the party was served:
   116 ROCKEFELLER, IRVINE, CA 92612
5. I served the party *(check proper box)*
   a. ☐ **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on *(date)*:　　　　(2) at *(time)*:
   b. ☒ **by substituted service.** On *(date)*: Sun, Sep 13 2020　　　　at *(time)*: 09:20 PM　　I left the documents listed in item 2 with or in the presence of *(name and title or relationship to person indicated in item 3)*:
      by leaving copies with Hanna Reem co-occupant to BASSEM ESSAM EL MALLAKH
      (1) ☐ **(business)** a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served. I informed him or her of the general nature of the papers.
      (2) ☐ **(home)** a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party. I informed him or her of the general nature of the papers.
      (3) ☒ **(physical address unknown)** a person at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box. I informed him or her of the general nature of the papers.
      (4) ☒ I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ. Proc., § 415.20). I mailed the documents on *(date)*: Sep 14 2020 from *(city)*: Santa ana　　　　or ☐ a declaration of mailing is attached.
      (5) ☒ I attach a **declaration of diligence** stating actions taken first to attempt personal service.

Form Adopted for Mandatory Use
Judicial Council of California
POS-010 [Rev. January 1, 2007]

**PROOF OF SERVICE OF SUMMONS**

Page 1 of 2
Code of Civil Procedure, § 417.10

| PLAINTIFF / PETITIONER: Belgium Investments 960 Bay Dr, LLC, a California Corp. | CASE NUMBER: |
|---|---|
| DEFENDANT / RESPONDENT: Bassem Essam El Mallakh | 30-2020-01148745-CU-EN-CJC |

5.  c.  ☐  **by mail and acknowledgment of receipt of service.** I mailed the documents listed in item 2 to the party, to the address shown in item 4, by first-class mail, postage prepaid,

    (1)  on *(date)*:        (2)  from *(city)*:

    (3)  ☐  with two copies of the *Notice and Acknowledgment of Receipt* and a postage-paid return envelope addressed to me. *(Attach completed Notice and Acknowledgement of Receipt.)* (Code Civ. Proc., § 415.30.)

    (4)  ☐  to an address outside California with return receipt requested. (Code Civ. Proc., § 415.40.)

  d.  ☐  **by other means** *(specify means of service and authorizing code section)*:

    ☐  Additional page describing service is attached.

6.  The "Notice to the Person Served" (on the summons) was completed as follows:

  a.  ☒  as an individual defendant.

  b.  ☐  as the person sued under the fictitious name of *(specify)*:

  c.  ☐  as occupant.

  d.  ☐  On behalf of *(specify)*:

    under the following Code of Civil Procedure section:

    ☐  416.10 (corporation)        ☐  415.95 (business organization, form unknown)

    ☐  416.20 (defunct corporation)       ☐  416.60 (minor)

    ☐  416.30 (joint stock company/association)    ☐  416.70 (ward or conservatee)

    ☐  416.40 (association or partnership)    ☐  416.90 (authorized person)

    ☐  416.50 (public entity)        ☐  415.46 (occupant)

    ☐  other:

7.  **Person who served papers**

  a.  Name:        Michael Danley

  b.  Address:     333 City Blvd 17th Flr, Orange, Ca 92868

  c.  Telephone number:  714-971-2217

  d.  **The fee** for service was:  $71.98

  e.  I am:

    (1)  ☐  not a registered California process server.

    (2)  ☐  exempt from registration under Business and Professions Code section 22350(b).

    (3)  ☒  a registered California process server:

        (i)  ☐ owner  ☐ employee  ☐ independent contractor

        (ii)  Registration No:  Reg Orange Co. 1782

        (iii)  County:

8.  ☒  **I declare** under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

    or

9.  ☐  **I am a California sheriff or marshal and** I certify that the foregoing is true and correct.

Date:  9/15/20

Michael Danley
_____     _____
   (NAME OF PERSON WHO SERVED PAPERS / SHERIFF OR MARSHAL)      (SIGNATURE)

| | | MC-031 |
|---|---|---|
| PLAINTIFF / PETITIONER: | Belgium Investments 960 Bay Dr, LLC, a California Corp. | |
| DEFENDANT / RESPONDENT: | Bassem Essam El Mallakh | |

CASE NUMBER:
30-2020-01148745-CU-EN-CJC

## DECLARATION OF DILIGENCE
(This form must be attached to another form or court paper before it can be filed in court.)

1) Unsuccessful Attempt: Sep 12, 2020, 10:05 am PDT at 116 ROCKEFELLER, IRVINE, CA 92612

I received this service last week of July I made many attempts to serve the defendant, several of the attempts were at other address such as 405 Rockefeller Irvine Occupant never hear of the defendant. Also 606 Rockefeller Irvine again occupant never heard of the defendant.

2) Unsuccessful Attempt: Sep 13, 2020, 9:10 am PDT at 116 ROCKEFELLER, IRVINE, CA 92612
No answer at door

3) Unsuccessful Attempt: Sep 13, 2020, 8:27 pm PDT at 116 ROCKEFELLER, IRVINE, CA 92612
No answer at door

4) Successful Attempt: Sep 13, 2020, 9:20 pm PDT at 116 ROCKEFELLER, IRVINE, CA 92612 received by Hanna Reem co-occupant to BASSEM ESSAM EL MALLAKH

**I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.**

Date:   9/15/20

Michael Danley
_____
(TYPE OR PRINT NAME)

_____
(SIGNATURE OF DECLARANT)

☐ Attorney for   ☐ Plaintiff   ☐ Petitioner   ☐ Defendant
☐ Respondent   ☐ Other (Specify):

# EXHIBIT "4"

30-2020-01148745-CU-EN-CJC - ROA # 15 - DAVID H. YAMASAKI, Clerk of the Court By Arlene Gill, Deputy Clerk.

320

**EJ-001**

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, address, and State Bar number):*
After recording, return to:
Patrick Miller (Cal Bar No 301819)
285 E California, Unit 201
Pasadena, CA, 91106

TEL NO.:                    FAX NO. (optional):

E-MAIL ADDRESS *(Optional):* patrick.miller@pmillerlegal.com

| [x] ATTORNEY FOR | [x] JUDGMENT CREDITOR | [ ] ASSIGNEE OF RECORD |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Orange
STREET ADDRESS: 700 Civic Center Dr West
MAILING ADDRESS:
CITY AND ZIP CODE: Santa Ana, CA 92701
BRANCH NAME: Unlimited Civil

Recorded in Official Records, Orange County
Hugh Nguyen, Clerk-Recorder

|||||||||| 98.00
\* $ R 0 0 1 2 2 2 5 4 5 8 \*
2020000643121 10:39 am 11/09/20
320 RW1A A03    2
0.00 0.00 0.00 0.00 3.00 10.00 0.000.0075.00 3.00

*FOR RECORDER'S USE ONLY*

PLAINTIFF: Belgium Investments 960 Bay Dr, LLC, a California Corp.
DEFENDANT: Bassem Essam El Mallakh

CASE NUMBER:
30-2020-01148745-CU-EN-CJC

IT
2P
SB
FF
ID

## ABSTRACT OF JUDGMENT—CIVIL AND SMALL CLAIMS    [ ] Amended

*FOR COURT USE ONLY*

Pursuant to California Government Code § 68150(f), the Clerk of the Court hereby certifies this document accurately reflects the official court record. The electronic signature and seal on this document have the same validity and legal force and effect as an original clerk's signature and court seal. California Government Code § 68150(g).

1. The [x] judgment creditor  [ ] assignee of record
   applies for an abstract of judgment and represents the following:
   a.  Judgment debtor's
       Name and last known address
   
   Bassem Essam El Mallakh, 116 Rockefeller Irvine, CA, 92612

   b.  Driver's license no. [last 4 digits] and state:                [x] Unknown
   c.  Social security no. [last 4 digits]:                           [x] Unknown
   d.  Summons or notice of entry of sister-state judgment was personally served or mailed to *(name and address):*

       Bassem Essam El Mallakh, 116 Rockefeller Irvine, CA, 92612 (through substituted service on Ms Reem Hanna)

2. [ ] Information on additional judgment debtors is shown on page 2.
3. Judgment creditor *(name and address):*
   Belgium Investments 960 Bay Dr, LLC, a California Corporation
   960 Bay Drive, Miami, FL, 33141

   Date: October 29, 2020
   Patrick Miller
   _____
   (TYPE OR PRINT NAME)

4. [ ] Information on additional judgment creditors is shown on page 2.
5. [ ] Original abstract recorded in this county:
   a.  Date:
   b.  Instrument No.:

   _____
   (SIGNATURE OF APPLICANT OR ATTORNEY)

6. Total amount of judgment as entered or last renewed:
   $4,345,250

7. All judgment creditors and debtors are listed on this abstract.

8. a.  Judgment entered on *(date):* 6/18/20
   b.  Renewal entered on *(date):*

9. [ ] This judgment is an installment judgment.

[SEAL]

David H. Yamasaki, Clerk of the Court

This abstract issued on *(date):*
11/06/2020

10. [ ] An [ ] execution lien [ ] attachment lien
    is endorsed on the judgment as follows:
    a.  Amount: $
    b.  In favor of *(name and address):*

11. A stay of enforcement has
    a.  [x] not been ordered by the court.
    b.  [ ] been ordered by the court effective until *(date):*

12. a.  [x] I certify that this is a true and correct abstract of the judgment entered in this action.
    b.  [ ] A certified copy of the judgment is attached.

    Clerk, by    A. Gill    , Deputy

Form Adopted for Mandatory Use
Judicial Council of California
EJ-001 [Rev. July 1, 2014]

**ABSTRACT OF JUDGMENT—CIVIL AND SMALL CLAIMS**

Page 1 of 2
Code of Civil Procedure, §§ 488.480, 674, 700.190

| PLAINTIFF: Belgium Investments 960 Bay Dr, LLC, a California Corp. | COURT CASE NO.: |
| DEFENDANT: Bassem Essam El Mallakh | 30-2020-01148745-CU-EN-CJC |

**NAMES AND ADDRESSES OF ADDITIONAL JUDGMENT CREDITORS:**

13. Judgment creditor *(name and address):*

14. Judgment creditor *(name and address):*

15. ☐ Continued on Attachment 15.

**INFORMATION ON ADDITIONAL JUDGMENT DEBTORS:**

16. Name and last known address

17. Name and last known address

Driver's license no. [last 4 digits] and state:
☐ Unknown
Social security no. [last 4 digits]:
☐ Unknown
Summons was personally served at or mailed to *(address):*

Driver's license no. [last 4 digits] and state:
☐ Unknown
Social security no. [last 4 digits]:
☐ Unknown
Summons was personally served at or mailed to *(address):*

18. Name and last known address

19. Name and last known address

Driver's license no. [last 4 digits] and state:
☐ Unknown
Social security no. [last 4 digits]:
☐ Unknown
Summons was personally served at or mailed to *(address):*

Driver's license no. [last 4 digits] and state:
☐ Unknown
Social security no. [last 4 digits]:
☐ Unknown
Summons was personally served at or mailed to *(address):*

20. ☐ Continued on Attachment 20.

# EXHIBIT "5"

1  Michael Sayer, State Bar No. 141038
   Debt Recovery Attorneys
2  17595 Harvard Ave., Suite C-557
3  Irvine, CA 92614
   Tel. (949) 292-3511
4  Dra@dracollections.com

5  Attorneys for Defendant, BASSEM ESSAM EL MALLAKH

6

7

8                    SUPERIOR COURT OF CALIFORNIA

9                        COUNTY OF ORANGE

10

11  BELGIUM INVESTMENTS 960 BAY      ) CASE NO: 30-2020-01148745
    DR., LLC, a California Corp.      )
12                                    )
            Plaintiff,                ) DECLARATION OF DEFENDANT BASSEM
13                                    ) ESSAM EL MALLAKH IN SUPPORT OF MOTION
14          v.                        ) TO SET ASIDE AND VACATE  SISTER STATE
                                      ) JUDGMENT AND TO VACATE THE ABSTRACT
15  SPENCE BANK ET AL                 ) OF JUDGMENT AND WRIT OF EXECUTION
                                      )
16          Defendant.               ) Date:
17  _____  ) Time:
                                      ) Place:
18
                                     Reservation No.
19

20          **DECLARATION OF BASSEM ESSAM EL MALLAKH**

21  1.      I, BASSEM ESSAM EL MALLAKH, hereby declare as follows:

22  2.      I am over the age of 18 years and am fully familiar with the facts and circumstances
23
    surrounding this litigation and could and would competently testify thereto if called upon to do so.
24
25  3.      I have been residing fulltime at my residence in Santa Monica since 11/21/16. Attached hereto
26  as Ex.6 is a true and correct copy of the lease I executed for my residence in Santa Monica.

                                      - 1 –
27       DECLARATION OF DEFENDANT BASSEM ESSAM EL MALLAKH IN SUPPORT OF MOTION TO SET
       ASIDE AND VACATE  SISTER STATE JUDGMENT AND TO VACATE THE ABSTRACT OF JUDGMENT
28                               AND WRIT OF EXECUTION

dotloop signature verification: dtlp.us/ap4G-CbP3-YbBN

4.      I have not occupied the real property located at 116 Rockefeller, Irvine CA. since 11/21/16.

5.      Although I own the property at 116 Rockefeller, Irvine CA, I leased the property to Reem Hanna, commencing 1/17/17. Attached hereto is as Ex.7, is  true and correct copy of the lease as between myself and Reem Hanna.

6.      I have never been served with the Application For Entry of Sister State Judgment, the Notice of Entry of Sister State Judgment, or the Sister State Judgment.

7.      I had no idea that the Judgment Creditor had filed an Application For Entry of Sister State Judgment, the Notice of Entry of Sister State Judgment, or the Sister State Judgment. I had never seen the documents until I hired counsel to represent me and set the Sister State Judgment aside.

8.      I took absolutely no steps to hide, hinder or sequester myself to avoid service of the herein noted Application For Entry of Sister State Judgment, the Notice of Entry of Sister State Judgment, or the Sister State Judgment.

9.      Attached hereto as Ex.8 is a true and correct copy of my Wells Frago bank statement showing that the judgment creditor levied my account in the sum of $29,271.76.

10.     Attached hereto as Ex.9 is a true and correct copy of my JP Morgan Chase statement showing the active levy.

I declare under penalty of perjury that the forgoing is true and correct.

Dated: 2/17/2021

dotloop verified
02/17/21 4:51 PM PST
VW9R-DUKE-VHUW-E0FW

Bassem Essam El Mallakh

- 2 –
DECLARATION OF DEFENDANT BASSEM ESSAM EL MALLAKH IN SUPPORT OF MOTION TO SET
ASIDE AND VACATE  SISTER STATE JUDGMENT AND TO VACATE THE ABSTRACT OF JUDGMENT
AND WRIT OF EXECUTION

**PROOF OF ELECTRONIC SERVICE**

I am employed in the County of ORANGE, State of California.  I am over the age of 18 and not a party to the within action.  My business address is, 17595 Harvard, Suite C-557, Irvine, CA 92614.

On the date indicated below, I served by ELECTRONIC SERVICE the foregoing document described as DECLARATION OF DEFENDANT BASSEM ESSAM EL MALLAKH IN SUPPORT OF MOTION TO SET ASIDE AND VACATE  SISTER STATE JUDGMENT AND TO VACATE THE ABSTRACT OF JUDGMENT AND WRIT OF EXECUTION on all interested to the electronic address as listed for each party and attorney below, using the e-filing service pursuant to   2019 California Rules of Court Rule 2.251.(b), Electronic service.

| | |
|---|---|
| Patrick Miller<br>P Miller Legal Services<br>285 E. California, Unite 201<br>Pasadena, CA 91106<br>Partick.miller@pmillerlegal.com | |

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on this 2/17/2021, at Irvine, California.

*Michael Sayer*
Michael Sayer

- 3 –
DECLARATION OF DEFENDANT BASSEM ESSAM EL MALLAKH IN SUPPORT OF MOTION TO SET ASIDE AND VACATE  SISTER STATE JUDGMENT AND TO VACATE THE ABSTRACT OF JUDGMENT AND WRIT OF EXECUTION

# EXHIBIT 6

Mohamed Rostom and Bassem Essam
525 Broadway #5037

🖨 Print   Close ✖

**Scroll** to the bottom of each page. **Click** in the colored box above each colored signature or initials box to sign. Use the navigation at the bottom to click to the next page. This is a legally binding document.

Sway

 **ALLIANCE**

## CALIFORNIA LEASE AGREEMENT

**1.**

| LANDLORD NAME: | PRIII/Broadstone Trino, LLC |
| --- | --- |
| LANDLORD'S AGENT: | Alliance Communities Inc. |
| LANDLORD ADDRESS: | 525 Broadway, Santa Monica, CA 90401 |
| PHONE/E-MAIL: | (310) 393-9696 / sway@allresco.com |

**2.**

| RESIDENT NAME: | Mohamed Rostom and Bassem Essam | | | |
| --- | --- | --- | --- | --- |
| OTHER OCCUPANTS: | | | | |
| RESIDENT ADDRESS: | | | | |
| | UNIT | PARKING SPACE: | MAILBOX: | |

**3.**

| LEASE TERM: | 1 year | ☐ Lease Renewal: |
| --- | --- | --- |
| | START DATE: November 1, 2016 | END DATE: October 31, 2017 |
| | MOVE-IN DATE: November 1, 2016 | |

**4.**

| MONTHLY CHARGES | | **5.** | DEPOSITS | |
| --- | --- | --- | --- | --- |
| Base Rent | $6,075.00 | | Deposit | $3,000.00 |
| TOTAL | $6,075.00 | | TOTAL | $3,000.00 |

**6.**

| KEYS: | APARTMENT | 2 | ☐ MAIL | 2 |
| --- | --- | --- | --- | --- |
| | ☐ REMOTE | 2 | ☐ POOL | 0 |
| | ☐ GARAGE | 0 | ☐ STORAGE | 0 |
| | ☐ CARD | 0 | ☐ COMMON AREA | 0 |

This Lease is entered into on the date signed, by and between the above named parties herein after called respectively LANDLORD and RESIDENT. In the event of more than one Resident, each Resident is jointly and severally liable for each provision of this Lease and service of any notice or demand upon one shall constitute notice to each other Resident.

Each Resident states that they are of legal age to enter into a binding Lease for lodging. All obligations hereunder are to be performed in the county and state where the Community is located. No oral agreements have been entered into with respect to this Lease. This Lease shall not be modified unless by an instrument in writing signed by Resident and an Agent of Landlord. Landlord hereby leases and Resident hereby hires and takes the premises as defined in Section 2 outlining the leased premises for the term specified herein and subject to all of the terms and provisions set forth.

## A. TERM OF LEASE

**7. INITIAL TERM:** The initial term of this Lease shall commence and end as outlined in Section 3 and shall **automatically continue as a tenancy from month-to-month upon expiration of the term.**

**8. LEASE EXPIRATION:** Either party, Landlord or Resident, may terminate this Lease after the initial term by giving the other party at least **thirty (30) days'** written notice of its intention to terminate the tenancy; provided that if Resident has been residing in the Community for more than one (1) year, Landlord shall give Resident at least sixty (60) days written notice of its intention to termination the tenancy. In the absence of written notice of termination, or a new lease, after the expiration of the initial term, the tenancy shall become month-to-month subject to a rental increase and applicable fees as allowed under state law. Resident agrees to pay all rent up to and including the end of any **thirty (30) day** (or, as applicable, sixty (60) day) notice period (which may not occur before the end of the Lease term) or until the premises are re-occupied, whichever occurs first.

Initials: MK  BE

**9. FAILURE TO VACATE AFTER NOTICE:** If Resident gives written notice to vacate the premises and fails to completely vacate prior to the expiration of the notice, Resident shall be liable, unless otherwise prohibited by law, in addition to all other damages provided for under this Lease, for the daily rental based on a pro-ration of the monthly rental provided for in the Lease for each day Resident remains in the premises. In addition, Landlord may collect cost for loss suffered from future resident losses, legal costs, lost rent, and other expenses, and any other amount allowed by law.

**10. OPTION FOR EARLY TERMINATION:** Resident is expected to remain a Resident for the entire term specified in the Lease. If Resident fails to do so, Resident will be responsible to Landlord for all damages provided by law, including (but not limited to) rent due through the end of the contract term, minus rents paid by a replacement resident (if any). This amount will vary depending upon how long it takes Landlord to find a replacement resident which typically cannot be determined in advance of move-out.

To avoid this uncertainty, Resident may choose to exercise an Early Termination Option. Resident understands and acknowledges that Landlord is not legally obligated to allow early termination of the Lease unless provided for pursuant to statutory or common law. To exercise this option, Resident must deliver to Landlord:

**i.** A written notice stating that Resident has elected to exercise the Early Termination Option;
**ii.** An early termination option payment of **$6,075.00**;
**iii.** An executed agreement for repayment of concessions received prior to the early termination (if applicable, see Concession Section); and
**iv.** Payment of rent and other amounts due through the new Lease end date.

When Landlord has (1) received the written notice and the Early Termination Option payment and (2) signed the notice, the Lease end date will be amended. The new Lease end date will be the date specified in the notice which must be at least **thirty** days after the written election and payment are given to Landlord. Exercise of the Early Termination Option will affect only Resident's rent obligations after the new Lease end date. Resident must comply with all other Lease obligations.

  Initials: MK BE

1



**Mohamed Rostom and Bassem Essam**
525 Broadway #5037

🖨 Print     Close ✖

Scroll to the bottom of each page. **Click** in the colored box above each colored signature or initials box to sign. Use the navigation at the bottom to click to the next page. This is a legally binding document.

Sway

 ALLIANCE

responsibility of the Resident to check regularly that each permit is secured on the appropriate vehicle and visible. Failure to properly display parking permits may result in the vehicle towed at Resident's own expense.

18. **Solicitors and Salespeople:**   Solicitors are not allowed in the Community. Residents shall report all solicitors or salespeople to the Landlord immediately.

19. **Car Wash and Repair:**   Vehicle repairs, including oil changes, and washing of vehicles are prohibited unless there is a designated area provided by Landlord.

20. **Moving of Furniture:**   Landlord may designate the time and method for moving items to and from the Unit such as any furniture, merchandise, goods, freight or other such items. Residents may not move furniture to and from the Unit through the lobby, patio doors, or through the use of elevators (if available) without Landlord's permission. If elevators are installed at the Community, Landlord does not guaranty that the elevators will be available for use by Resident nor shall Landlord be liable for any loss resulting from the unavailability of elevator service.

21. **Parking:**   Resident shall report in writing to Landlord any changes to the make, model and license plate number of every vehicle authorized to park at the Community. Commercial vehicles, boats and recreational vehicles are not authorized to park on the Premises unless Landlord has a designated location.

22. **Notification of Changes:**   Resident shall notify Landlord immediately in writing with any change to Resident's employer, employer telephone number, alternate phone numbers, emergency contact and other pertinent information.

Resident(s) acknowledges to have read this Addendum and understands the terms and conditions contained herein.

| | 10/29/2016 01:41 PM PDT | | | 10/31/2016 03:26 PM PDT |
|---|---|---|---|---|
| Mohamed Rostom *(Resident)* | Date | | Bassem Essam *(Resident)* | Date |

**Signed by Chellie Stinson**
Mon Oct 31 2016 15:58:09 PM PDT
Key: D9A84B6C; IP Address: 71.177.221.208

*(Owner/Agent)*                                      Date

 Initials: MR  BE

15

 On-Site

Mohamed Rostom and Bassem Essam
525 Broadway #5037

 Print    Close ✕

**Scroll** to the bottom of each page. **Click** in the colored box above each colored signature or initials box to sign. Use the navigation at the bottom to click to the next page. This is a legally binding document.



# EXHIBIT 7

# LEASE WITH OPTION TO PURCHASE

This Agreement, dated January 1 2017, by and between an individual known as Bassem Elmallakh of 525 Broadway, Santa Monica, California, 90401, hereinafter known as the "Landlord",

**AND**

An individual known as Reem Hanna, hereinafter known as the "Tenant(s)", agree to the following:

**OCCUPANT(S)**: The Premises is to be occupied strictly as a residential dwelling with only the Tenant(s) mentioned above as the Occupant(s).

**OFFER TO RENT**: The Landlord hereby rents to the Tenant(s), subject to the following terms and conditions of this Agreement, a condominium with the address of 116 Rockefeller , Irvine, California, 92612 consisting of 3.5 bathroom(s) and 3 bedroom(s) hereinafter known as the "Premises". The Landlord may also use the address for notices sent to the Tenant(s).

**PURPOSE**: The Tenant(s) and any Occupant(s) may only use the Premises as a residential dwelling. It may not be used for storage, manufacturing of any type of food or product, professional service(s), or for any commercial use unless otherwise stated in this Agreement.

**FURNISHINGS**: The Premises is furnished with the following:

Bedroom Set(s), Dining Room Set(s), Kitchen Set (Including Pots, Pans, Glasses, Mugs, Dishes, etc.), Living Room Set(s) and all other furnishings to be provided by the Tenant(s). Any damage to the Landlord's furnishings shall be the liability of the Tenant(s), reasonable wear-and-tear excepted, to be billed directly or less the Security Deposit.

**APPLIANCES**: The Landlord shall provide the following appliances:

Air Conditioner(s), Dishwasher, Dryer (for Laundry), Fan(s), Hot Water Heater, HVAC, Iron (for Clothes), Microwave, Oven(s), Refrigerator, Stove(s), Television(s), Washer (for Laundry), with all other appliances to be provided by the Tenant(s). Any damage to the Landlord's appliances shall be the liability of the Tenant(s), reasonable wear-and-tear excepted, to be billed directly or less the Security Deposit.

**LEASE TERM**: This Agreement shall be a fixed-period arrangement beginning on January 1 2017 and ending on December 31 2024 with the Tenant(s) having the option to continue to occupy the Premises under the same terms and conditions of this Agreement under a Month-to-Month arrangement (Tenancy at Will) with either the Landlord or Tenant having the option to cancel the tenancy with at least thirty (30) days notice or the minimum time-period set by the State, whichever is shorter. For the Tenant to continue under Month-to-Month tenancy at the expiration of the Lease Term, the Landlord must be notified within sixty (60) days before the end of the Lease Term. Hereinafter known as the "Lease Term".

**RENT**: Tenant(s) shall pay the Landlord in equal monthly installments of $3,000.00 (US Dollars) hereinafter known as the "Rent". The Rent will be due on the First (1st) of every month and be paid via the following instructions:

Money Wire

**NON-SUFFICIENT FUNDS (NSF CHECKS)**: If the Tenant(s) attempts to pay the rent with a check that is not honored or an electronic transaction (ACH) due to insufficient funds (NSF) there shall be no fee (US Dollars).

**LATE FEE**: If rent is not paid on the due date, there shall be a late fee assessed by the Landlord in the amount of:

Calculated as 10% percent of the monthly rent per occurrence for each month payment that is late after the 4th Day rent is due.

**FIRST (1ST) MONTH'S RENT**: First (1st) month's rent shall be due by the Tenant(s) upon the execution of this Agreement.

**PRE-PAYMENT**: The Landlord shall not require any pre-payment of rent by the Tenant(s).

**PRORATION PERIOD**: The Tenant(s) will not move into the Premises before the start of the Lease Term.

**SECURITY DEPOSIT**: The Tenant(s) shall not be obligated to pay a Security Deposit as part of this Agreement.

**POSSESSION**: Tenant(s) has examined the condition of the Premises and by taking possession acknowledges that they have accepted the Premises in good order and in its current condition except as herein otherwise stated. Failure of the Landlord to deliver possession of the Premises at the start of the Lease Term to the Tenant(s) shall terminate this Agreement at the option of the Tenant(s). Furthermore, under such failure to deliver possession by the Landlord, and if the Tenant(s) cancels this Agreement, the Security Deposit (if any) shall be returned to the Tenant(s) along with any other pre-paid rent, fees, including if the Tenant(s) paid a fee during the application process before the execution of this Agreement.

**OPTION TO PURCHASE**. The Tenant(s) shall have the right to purchase the Premises described herein for 1,000,000.00 at any time during the course of the Lease Term, along with any renewal periods or extensions, by providing written notice to the Landlord along with a deposit of $50,000.00 that is subject to the terms and conditions of a Purchase and Sale Agreement to be negotiated, in "good faith", between the Landlord and Tenant(s).

If the Landlord and Tenant(s) cannot produce a signed Purchase and Sale Agreement within a reasonable time period then the deposit shall be refunded to the Tenant(s) and this Lease Agreement shall continue under its terms and conditions.

If the option to purchase is exercised by the Tenant(s) all Rent that is paid to the Landlord shall remain separate from any and all deposits, consideration, or payments, made to the Landlord in regards to the purchase of the Premises.

**RECORDING**. The Tenant(s) shall be withheld from recording this Option to Purchase unless the Tenant(s) has the written consent from the Landlord.

**ACCESS**: Upon the beginning of the Proration Period or the start of the Lease Term, whichever is earlier, the Landlord agrees to give access to the Tenant(s) in the form of keys, fobs, cards, or any type of keyless security entry as needed to enter the common areas and the Premises. Duplicate copies of the access provided may only be authorized under the consent of the Landlord and, if any

replacements are needed, the Landlord may provide them for a fee. At the end of this Agreement all access provided to the Tenant(s) shall be returned to the Landlord or a fee will be charged to the Tenant(s) or the fee will be subtracted from the Security Deposit.

**MOVE-IN INSPECTION**: Before, at the time of the Tenant(s) accepting possession, or shortly thereafter, the Landlord and Tenant(s) shall perform an inspection documenting the present condition of all appliances, fixtures, furniture, and any existing damage within the Premises.

**SUBLETTING**: The Tenant(s) shall not have the right to sub-let the Premises or any part thereof without the prior written consent of the Landlord. If consent is granted by the Landlord, the Tenant(s) will be responsible for all actions and liabilities of the Sublessee including but not limited to: damage to the Premises, non-payment of rent, and any eviction process (In the event of an eviction the Tenant(s) shall be responsible for all court filing fee(s), representation, and any other fee(s) associated with removing the Sublessee). The consent by the Landlord to one sub-let shall not be deemed to be consent to any subsequent subletting.

**ABANDONMENT**: If the Tenant(s) vacates or abandons the property for a time-period that is the minimum set by State law or seven (7) days, whichever is less, the Landlord shall have the right to terminate this Agreement immediately and remove all belongings including any personal property off of the Premises. If the Tenant(s) vacates or abandons the property, the Landlord shall immediately have the right to terminate this Agreement.

**ASSIGNMENT**: Tenant(s) shall not assign this Lease without the prior written consent of the Landlord. The consent by the Landlord to one assignment shall not be deemed to be consent to any subsequent assignment.

**PARKING**: The Landlord shall provide the Tenant(s) 2 Parking Spaces.

The Landlord shall not charge a fee for the 2 Parking Spaces.

**RIGHT OF ENTRY**: The Landlord shall have the right to enter the Premises during normal working hours by providing notice in accordance with the minimum State requirement in order for inspection, make necessary repairs, alterations or improvements, to supply services as agreed or for any reasonable purpose. The Landlord may exhibit the Premises to prospective purchasers, mortgagees, or lessees upon reasonable notice.

**SALE OF PROPERTY**: If the Premises is sold, the Tenant(s) is to be notified of the new Owner, and if there is a new Manager, their contact details for repairs and maintenance shall be forwarded. If the Premises is conveyed to another party, the new owner shall not have the right to terminate this Agreement and it shall continue under the terms and conditions agreed upon by the Landlord and Tenant(s).

**UTILITIES**: The Landlord shall not pay for any of the utilities and services and will be the responsibility of the Tenant(s).

**MAINTENANCE, REPAIRS, OR ALTERATIONS**: The Tenant(s) shall, at their own expense and at all times, maintain premises in a clean and sanitary manner, and shall surrender the same at termination hereof, in as good condition as received, normal wear and tear excepted. The Tenant(s) may not make any alterations to the leased premises without the consent in writing of the Landlord. The Landlord shall be responsible for repairs to the interior and exterior of the building. If the Premises includes a washer, dryer, freezer, dehumidifier unit and/or air conditioning unit, the Landlord makes no warranty as to the repair or replacement of units if one or all shall fail to

operate. The Landlord will place fresh batteries in all battery-operated smoke detectors when the Tenant(s) moves into the premises. After the initial placement of the fresh batteries it is the responsibility of the Tenant(s) to replace batteries when needed. A monthly "cursory" inspection may be required for all fire extinguishers to make sure they are fully charged.

**EARLY TERMINATION**: The Tenant(s) may be allowed to cancel this Agreement under the following conditions:
The Tenant(s) must provide at least 30 days' notice. During the notice period of 30 days the rent shall be paid in accordance with this Agreement.

**PETS**: The Tenant(s) shall not be allowed to have pets on the Premises or common areas except those that are necessary for individuals with disabilities.

**NOISE/WASTE**: The Tenant(s) agrees not to commit waste on the premises, maintain, or permit to be maintained, a nuisance thereon, or use, or permit the premises to be used, in an unlawful manner. The Tenant(s) further agrees to abide by any and all local, county, and State noise ordinances.

**GUESTS**: There shall be no other persons living on the Premises other than the Tenant(s) and any Occupant(s). Guests of the Tenant(s) are allowed for periods not lasting for more than forty-eight hours unless otherwise approved by the Landlord.

**SMOKING POLICY**: Smoking on the Premises is prohibited on the entire property, including individual units, common areas, every building and adjoining properties.

**COMPLIANCE WITH LAW**: The Tenant(s) agrees that during the term of the Agreement, to promptly comply with any present and future laws, ordinances, orders, rules, regulations, and requirements of the Federal, State, County, City, and Municipal government or any of their departments, bureaus, boards, commissions and officials thereof with respect to the premises, or the use or occupancy thereof, whether said compliance shall be ordered or directed to or against the Tenant(s), the Landlord, or both.

**DEFAULT**: If the Tenant(s) fails to comply with any of the financial or material provisions of this Agreement, or of any present rules and regulations or any that may be hereafter prescribed by the Landlord, or materially fails to comply with any duties imposed on the Tenant(s) by statute or State laws, within the time period after delivery of written notice by the Landlord specifying the non-compliance and indicating the intention of the Landlord to terminate the Agreement by reason thereof, the Landlord may terminate this Agreement. If the Tenant(s) fails to pay rent when due and the default continues for the time-period specified in the written notice thereafter, the Landlord may, at their option, declare the entire balance (compiling all months applicable to this Agreement) of rent payable hereunder to be immediately due and payable and may exercise any and all rights and remedies available to the Landlord at law or in equity and may immediately terminate this Agreement.

The Tenant(s) will be in default if: (a) Tenant(s) does not pay rent or other amounts that are owed in accordance with respective State laws; (b) Tenant(s), their guests, or the Occupant(s) violate this Agreement, rules, or fire, safety, health, or criminal laws, regardless of whether arrest or conviction occurs; (c) Tenant(s) abandons the Premises; (d) Tenant(s) gives incorrect or false information in the rental application; (e) Tenant(s), or any Occupant(s) is arrested, convicted, or given deferred adjudication for a criminal offense involving actual or potential physical harm to a person, or involving possession, manufacture, or delivery of a controlled substance, marijuana, or drug paraphernalia under state statute; (f) any illegal drugs or paraphernalia are found in the Premises or

on the person of the Tenant(s), guests, or Occupant(s) while on the Premises and/or; (g) as otherwise allowed by law.

**MULTIPLE TENANT(S) OR OCCUPANT(S)**: Each individual that is considered a Tenant(s) is jointly and individually liable for all of this Agreement's obligations, including but not limited to rent monies. If any Tenant(s), guest, or Occupant(s) violates this Agreement, the Tenant(s) is considered to have violated this Agreement. Landlord's requests and notices to the Tenant(s) or any of the Occupant(s) of legal age constitutes notice to the Tenant(s). Notices and requests from the Tenant(s) or any one of the Occupant(s) (including repair requests and entry permissions) constitutes notice from the Tenant(s). In eviction suits, the Tenant(s) is considered the agent of the Premise for the service of process.

**DISPUTES**: If a dispute arises during or after the term of this Agreement between the Landlord and Tenant(s), they shall agree to hold negotiations amongst themselves, in "good faith", before any litigation.

**SEVERABILITY**: If any provision of this Agreement or the application thereof shall, for any reason and to any extent, be invalid or unenforceable, neither the remainder of this Agreement nor the application of the provision to other persons, entities or circumstances shall be affected thereby, but instead shall be enforced to the maximum extent permitted by law.

**SURRENDER OF PREMISES**: The Tenant(s) has surrendered the Premises when (a) the move-out date has passed and no one is living in the Premise within the Landlord's reasonable judgment; or (b) Access to the Premise have been turned in to Landlord – whichever comes first. Upon the expiration of the term hereof, the Tenant(s) shall surrender the Premise in better or equal condition as it were at the commencement of this Agreement, reasonable use, wear and tear thereof, and damages by the elements excepted.

**RETALIATION**: The Landlord is prohibited from making any type of retaliatory acts against the Tenant(s) including but not limited to restricting access to the Premises, decreasing or cancelling services or utilities, failure to repair appliances or fixtures, or any other type of act that could be considered unjustified.

**WAIVER**: A Waiver by the Landlord for a breach of any covenant or duty by the Tenant(s), under this Agreement is not a waiver for a breach of any other covenant or duty by the Tenant(s), or of any subsequent breach of the same covenant or duty. No provision of this Agreement shall be considered waived unless such a waiver shall be expressed in writing as a formal amendment to this Agreement and executed by the Tenant(s) and Landlord.

**EQUAL HOUSING**: If the Tenant(s) possess(es) any mental or physical impairment, the Landlord shall provide reasonable modifications to the Premises unless the modifications would be too difficult or expensive for the Landlord to provide. Any impairment of the Tenant(s) is/are encouraged to be provided and presented to the Landlord in writing in order to seek the most appropriate route for providing the modifications to the Premises.

**HAZARDOUS MATERIALS**: The Tenant(s) agrees to not possess any type of personal property that could be considered a fire hazard such as a substance having flammable or explosive characteristics on the Premises. Items that are prohibited to be brought into the Premises, other than for everyday cooking or the need of an appliance, includes but is not limited to gas (compressed), gasoline, fuel, propane, kerosene, motor oil, fireworks, or any other related content in the form of a liquid, solid, or gas.

**WATERBEDS**: The Tenant(s) is not permitted to furnish the Premises with waterbeds.

**INDEMNIFICATION**: The Landlord shall not be liable for any damage or injury to the Tenant(s), or any other person, or to any property, occurring on the Premises, or any part thereof, or in common areas thereof, and the Tenant(s) agrees to hold the Landlord harmless from any claims or damages unless caused solely by the Landlord's negligence. It is recommended that renter's insurance be purchased at the Tenant(s)'s expense.

**COVENANTS**: The covenants and conditions herein contained shall apply to and bind the heirs, legal representatives, and assigns of the parties hereto, and all covenants are to be construed as conditions of this Agreement.

**NOTICES**: Any notice to be sent by the Landlord or the Tenant(s) to each other shall use the following mailing addresses:

**Landlord's/Agent's Mailing Address**

Bassem Elmallakh
525 Broadway, Santa Monica, California, 90401

**Tenant(s)'s Mailing Address**

Reem Hanna
116 Rockefeller , Irvine, California, 92612

**AGENT/MANAGER**: The Landlord does not have an Agent or Manager and all contact in regards to any repair, maintenance, or complaint must go through the Landlord through the following contact information:

Landlord's Phone Number: (949) 413-7074 Email: bassemelmallakh@gmail.com.

**PREMISES DEEMED UNINHABITABLE**: If the Property is deemed uninhabitable due to damage beyond reasonable repair the Tenant(s) will be able to terminate this Agreement by written notice to the Landlord. If said damage was due to the negligence of the Tenant(s), the Tenant(s) shall be liable to the Landlord for all repairs and for the loss of income due to restoring the Premises back to a livable condition in addition to any other losses that can be proved by the Landlord.

**ACCESS BY LANDLORD**: The Landlord must grant at least twenty-four (24) hours notice to the Tenant(s) prior to entry for maintenance or any non-emergency reason. For any move-out inspection forty-eight (48) hours notice by Landlord shall be required.

**BED BUGS**: The Landlord acknowledges that there is no existence of bed bugs on the Premises. In addition, there shall be an addendum attached to this agreement that certifies the Tenant(s) have inspected the Premises and any existing furniture and confirm that bed bugs do not exist on the Premises.

**MEGAN'S LAW**: Notice: Pursuant to Section 290.46 of the Penal Code, information about specified registered sex offenders is made available to the public via an Internet Web site maintained by the Department of Justice at www.meganslaw.ca.gov. Depending on an offender's criminal history, this information will include either the address at which the offender resides or the community of residence and ZIP Code in which he or she resides.

**SERVICEMEMBERS CIVIL RELIEF ACT:** In the event the Tenant(s) is or hereafter becomes, a member of the United States Armed Forces on extended active duty and hereafter the Tenant(s) receives permanent change of station (PCS) orders to depart from the area where the Premises are located, or is relieved from active duty, retires or separates from the military, is ordered into military housing, or receives deployment orders, then in any of these events, the Tenant may terminate this lease upon giving thirty (30) days written notice to the Landlord. The Tenant shall also provide to the Landlord a copy of the official orders or a letter signed by the Tenant's commanding officer, reflecting the change which warrants termination under this clause. The Tenant will pay prorated rent for any days which he/she occupies the dwelling past the beginning of the rental period.

The damage/security deposit will be promptly returned to Tenant, provided there are no damages to the Premises.

**LEAD PAINT:** The Premises was not constructed before 1978 and therefore does not contain lead-based paint.

**GOVERNING LAW:** This Agreement is to be governed under the laws located in the State of California.

**ADDITIONAL TERMS AND CONDITIONS:** There are no further terms or conditions that will be added to this Agreement other than any attachments or addendums attached.

**ENTIRE AGREEMENT:** This Agreement contains all the terms agreed to by the parties relating to its subject matter including any attachments or addendums. This Agreement replaces all previous discussions, understandings, and oral agreements. The Landlord and Tenant(s) agree to the terms and conditions and shall be bound until the end of the Lease Term.

The parties have agreed and executed this agreement on January 1 2017.


**LANDLORD(S) SIGNATURE**


**Landlord's Signature** _____

By Bassem ElMallakh


**TENANT(S) SIGNATURE**


**Tenant's Signature** _____

# EXHIBIT 8

# Checking/Savings Account History

**STATEMENT MAILING NAME:  BASSEM E ELMALLAKH**

Show 10 ⌄ entries

Search: [                    ]

| Date | Description | Image Available | Check Number | Amount | Balance |
|------|-------------|-----------------|--------------|--------|---------|
| 02/08/2021 | OVERDRAFT XFER FROM CREDIT CARD OR LINE | No | | +69.88 | |
| 02/08/2021 | ATT Payment 020621 217902014EPAYX BASSEM ELMALLAKH 9864031004 217902014EPAYX 0R00000091004231871889 | No | | 69.88 | -69.88 |
| 02/05/2021 | OVERDRAFT XFER FROM CREDIT CARD OR LINE | No | | +150.00 | |
| 02/05/2021 | AMERICAN EXPRESS ACH PMT 210205 A0020 BASSEM E ELMALLAKH 6133133497 A0020 0O00000091003736781926 | No | | 150.00 | -150.00 |
| 02/03/2021 | LEGAL ORDER DEBIT - CONTACT OC SHERIFF (480) 724-2000 - Case# 4792621 | No | | 569.00 | |
| 02/02/2021 | PORTFOLIO MONTHLY SERVICE FEE REVERSAL | No | | +30.00 | 569.00 |
| 02/02/2021 | PORTFOLIO BY WELLS FARGO MNTHLY SRVC FEE | No | | 30.00 | 539.00 |
| 01/07/2021 | ATT Payment 010621 776777011EPAYS BASSEM ELMALLAKH 9864031004 776777011EPAYS 0R00000091003957942166 | No | | 69.80 | 569.00 |
| 01/05/2021 | PORTFOLIO MONTHLY SERVICE FEE REVERSAL | No | | +30.00 | 638.80 |
| 01/05/2021 | PORTFOLIO BY WELLS FARGO MNTHLY SRVC FEE | No | | 30.00 | 608.80 |

Showing 1 to 10 of 14 entries

Previous  **1**  2  Next

CLOSE

# Checking/Savings Account History

**STATEMENT MAILING NAME:  BASSEM E ELMALLAKH**

Regulation D Withdrawals:    0 (Current Service Charge Cycle)

Show 10 [v] entries                                                    Search: [          ]

| Date | Description | Image Available | Check Number | Amount | Balance |
|------|-------------|-----------------|--------------|--------|---------|
| 02/03/2021 | LEGAL ORDER FEE DEBIT CASE# 4792621 | No | | 125.00 | |
| 02/03/2021 | LEGAL ORDER DEBIT - CONTACT OC SHERIFF (480) 724-2000 - Case# 4792621 | No | | 2,083.40 | 125.00 |
| 01/29/2021 | MONTHLY SERVICE FEE REVERSAL | No | | +10.00 | 2,208.40 |
| 01/29/2021 | MONTHLY SERVICE FEE | No | | 10.00 | 2,198.40 |
| 01/29/2021 | INTEREST PAYMENT | No | | +0.03 | 2,208.40 |
| 12/31/2020 | MONTHLY SERVICE FEE REVERSAL | No | | +10.00 | 2,208.37 |
| 12/31/2020 | MONTHLY SERVICE FEE | No | | 10.00 | 2,198.37 |
| 12/31/2020 | INTEREST PAYMENT | No | | +0.04 | 2,208.37 |
| 11/30/2020 | MONTHLY SERVICE FEE REVERSAL | No | | +10.00 | 2,208.33 |
| 11/30/2020 | MONTHLY SERVICE FEE | No | | 10.00 | 2,198.33 |

Showing 1 to 10 of 11 entries                          Previous  [1]  2  Next

CLOSE

# Checking/Savings Account History

**STATEMENT MAILING NAME:  BASSEM E ELMALLAKH**

Show 10 ☑ entries                                    Search: [                    ]

| Date | Description | Image Available | Check Number | Amount | Balance |
|------|-------------|-----------------|--------------|--------|---------|
| 02/03/2021 | LEGAL ORDER DEBIT - CONTACT OC SHERIFF (480) 724-2000 - Case# 4792621 | No | | 12,006.97 | 1,788.00 |
| 01/29/2021 | INTEREST PAYMENT | No | | +0.12 | 13,794.97 |
| 12/31/2020 | INTEREST PAYMENT | No | | +0.11 | 13,794.85 |
| 11/30/2020 | INTEREST PAYMENT | No | | +0.12 | 13,794.74 |

Showing 1 to 4 of 4 entries                                  Previous   1   Next

CLOSE

# Checking/Savings Account History

**STATEMENT MAILING NAME:**   BASSEM E ELMALLAKH

Show [10 ▼] entries             Search: [_____]

| Date | Description | Image Available | Check Number | Amount | Balance |
|------|-------------|-----------------|--------------|--------|---------|
| 02/03/2021 | LEGAL ORDER DEBIT - CONTACT OC SHERIFF (480) 724-2000 - Case# 4792621 | No | | 7,634.49 | |
| 01/27/2021 | MONTHLY SERVICE FEE REVERSAL | No | | +15.00 | 7,634.49 |
| 01/27/2021 | MONTHLY SERVICE FEE | No | | 15.00 | 7,619.49 |
| 01/27/2021 | INTEREST PAYMENT | No | | +0.07 | 7,634.49 |
| 12/23/2020 | MONTHLY SERVICE FEE REVERSAL | No | | +15.00 | 7,634.42 |
| 12/23/2020 | MONTHLY SERVICE FEE | No | | 15.00 | 7,619.42 |
| 12/23/2020 | INTEREST PAYMENT | No | | +0.06 | 7,634.42 |
| 11/25/2020 | MONTHLY SERVICE FEE REVERSAL | No | | +15.00 | 7,634.36 |
| 11/25/2020 | MONTHLY SERVICE FEE | No | | 15.00 | 7,619.36 |
| 11/25/2020 | INTEREST PAYMENT | No | | +0.06 | 7,634.36 |

Showing 1 to 10 of 10 entries            Previous [ 1 ] Next

[ CLOSE ]

# Checking/Savings Account History

**STATEMENT MAILING NAME:  BASSEM E ELMALLAKH**

Show 10 ⌄ entries                                      Search:

| Date | Description | Image Available | Check Number | Amount | Balance |
|------|-------------|-----------------|--------------|--------|---------|
| 02/03/2021 | LEGAL ORDER DEBIT - CONTACT OC SHERIFF (480) 724-2000 - Case# 4792621 | No | | 6,852.90 | |
| 01/29/2021 | INTEREST PAYMENT | No | | +0.06 | 6,852.90 |
| 12/31/2020 | INTEREST PAYMENT | No | | +0.05 | 6,852.84 |
| 11/30/2020 | INTEREST PAYMENT | No | | +0.06 | 6,852.79 |

Showing 1 to 4 of 4 entries                          Previous  1  Next

CLOSE

# EXHIBIT 9


**CHASE**

PO Box 183164
Columbus, OH 43218-3164

**Questions?**

📞 1-866-578-7022

00420 COL 703 020 04121 NNNNNNNNNNNNN CL1 E
**BASSEM ELMALLAKH**
525 BROADWAY APT 5037
SANTA MONICA CA 90401-2964

February 10, 2021

**Amended**

Important:  **Federal/state law required us to place a hold on your Chase account(s), which may include safe deposit box(es)**

Dear BASSEM ELMALLAKH:

We recently received the enclosed court order, which either enforces a legal judgment against you or secures a possible judgment in a lawsuit that's been filed against you. As a result, federal or state law required us to immediately place a hold on your Chase account(s). This means that you aren't able to use or withdraw any amount(s) less than or equal to the amount of the hold until the hold is released.

| Date We Placed Hold | Account Number (Last Four Digits) | Amount of Hold* |
|---|---|---|
| 02/10/2021 | 3252 | $16809.64 |
| 02/10/2021 | 0395 | $0.27 |
| 02/10/2021 | 7332 | $736.89 |

*The hold amount may be greater or less than the balance in your Chase accounts.

We know this situation is difficult because you can't access these funds in your account. Although we're not permitted to give you legal advice, we are providing some information in this letter to explain how your account is affected and to help you understand your options.

**Here's how this affects your account**
The following may apply based on your account type.

The amount that has a hold on it stays in your account, but you cannot use it for withdrawals, payments or any other reason.

Additionally, please note the following:
- If withdrawals are returned because your account doesn't have available funds, we may charge you Overdraft or Insufficient Funds Fee(s).
- We may have disconnected your Overdraft Protection service.
- We may charge you a Legal Processing Fee of $0.00.
- In certain states, you may also be responsible for the bank's fees if we are required to obtain outside counsel.

COAL-08Feb21-894
JPMorgan Chase Bank, N.A.

**Understanding your options**
You may have options to access some funds or to have the hold on your account released. These options are outlined below.

**Getting your money back**
You may be able to reduce the amount of the hold. Federal and state laws protect certain money from being used to pay most judgments or court orders, including:
- Social Security
- Supplemental Security Income (SSI)
- Veterans benefits

Depending on where you live, protected money may also include:
- Funds from public assistance (welfare)
- Alimony or child support
- Unemployment benefits
- Disability benefits
- Public or private pensions
- Workers' compensation benefits

These protections generally don't apply to business accounts. If you think your funds may be protected, contact the judgment creditor's attorney.

**Releasing the hold on your account(s)**
We can only release the hold on your account if we receive a written release of the court order signed by the judgment creditor's attorney or the court. In most situations, you're the only one who can ask the judgment creditor's attorney or the court to release your funds.

If you have questions or would like to request a written release of your funds, please call the judgment creditor's attorney at 1-213-364-7581 or the court at the number on the enclosed order. If they agree to send us a written release, they can mail it to us at the address listed on the first page of this letter.

Otherwise, we're required by law to hold the funds in your account(s) until:
- We send the funds to the issuer as required by law; or
- The hold expiration date, if applicable. If there's a hold expiration date, you'll see it on the enclosed court order. We recommend you review it carefully.

**Getting legal advice**
If you need legal advice, you should consult an attorney. If you're unable to afford a private attorney, you can visit the Legal Services Corporation's website at lsc.gov to find out where to go in your area for help.

**We're here to help**
If you have questions, please call us at 1-866-578-7022. We're here to help you Monday through Friday from 8 a.m. to 9 p.m. and Saturday from 8 a.m. to 7 p.m. Eastern Time.

Sincerely,

*Steven J. Criswell*

Steven J. Criswell
Executive Director
Customer Service

Enclosure

CL1

# EXHIBIT "6"

1  Michael Sayer, State Bar No. 141038
2  Debt Recovery Attorneys
   17595 Harvard Ave., Suite C-557
3  Irvine, CA 92614
   Tel. (949) 292-3511
4  Dra@dracollections.com

5  Attorneys for Defendant, BASSEM ESSAM EL MALLAKH

6

7

8                          SUPERIOR COURT OF CALIFORNIA

9                              COUNTY OF ORANGE

10

11  BELGIUM INVESTMENTS 960 BAY      ) CASE NO: 30-2020-01148745
    DR., LLC, a California Corp.     )
12                                   )
13        Plaintiff,                 ) DECLARATION OF REEM HANNA IN SUPPORT
                                     ) OF DEFENDANT'S MOTION TO SET ASIDE AND
14        v.                         ) VACATE SISTER STATE JUDGMENT AND TO
                                     ) VACATE THE ABSTRACT OF JUDGMENT AND
15  SPENCE BANK ET AL                ) WRIT OF EXECUTION
                                     )
16        Defendant.                 ) Date:
                                     ) Time:
17  _____ ) Place:
18
                                       Reservation No.
19

20                     **DECLARATION OF REEM HANNA**

21  1.      I, REEM HANNA, hereby declare as follows:

22  2.      I am over the age of 18 years and am fully familiar with the facts and circumstances
23
    surrounding this litigation and could and would competently testify thereto if called upon to do so.
24
25  3.      I have been residing fulltime at my residence at 116 Rockefeller, Irvine CA since
26  since 1/1/17. Attached hereto is as Ex.7 is a true and correct copy of the lease I executed for my
27
                                          – 1 –
28  DECLARATION OF REEM HANNA IN SUPPORT OF DEFENDANT'S MOTION TO SET ASIDE AND VACATE
    SISTER STATE JUDGMENT AND TO VACATE THE ABSTRACT OF JUDGMENT AND WRIT OF EXECUTION

residence.

4.      I have never been served with the Application For Entry of Sister State Judgment, the Notice of Entry of Sister State Judgment or the Sister State Judgment.

5.      The process server never served me as claimed in the proof of service attached as Ex.5.

6.      The proof of serve states at section 5.b. that the process server left a copy of the documents with, "Hanna Reem *co-occupant* to Bassem Essam El Mallakh." (Emphases added). This is a complete untruth. First, I was never served, and second Bassem Essam El Mallakh is not nor ever has been a co-occupant at my residence. Since the inception of the lease Bassem Essam El Mallakh has never been a co-occupant.

I declare under penalty of perjury that the forgoing is true and correct.

Dated: 2/17/2021

Reem Hanna

-2-
DECLARATION OF REEM HANNA IN SUPPORT OF DEFENDANT'S MOTION TO SET ASIDE AND VACATE SISTER STATE JUDGMENT AND TO VACATE THE ABSTRACT OF JUDGMENT AND WRIT OF EXECUTION

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PROOF OF ELECTRONIC SERVICE**

I am employed in the County of ORANGE, State of California. I am over the age of 18 and not a party to the within action. My business address is, 17595 Harvard, Suite C-557, Irvine, CA 92614.

On the date indicated below, I served by ELECTRONIC SERVICE the foregoing document described as DECLARATION OF REEM HANNA IN SUPPORT OF DEFENDANT'S MOTION TO SET ASIDE AND VACATE SISTER STATE JUDGMENT AND TO VACATE THE ABSTRACT OF JUDGMENT AND WRIT OF EXECUTION all interested to the electronic address as listed for each party and attorney below, using the e-filing service pursuant to 2019 California Rules of Court Rule 2.251.(b), Electronic service

| Patrick Miller | |
| P Miller Legal Services | |
| 285 E. California, Unite 201 | |
| Pasadena, CA 91106 | |
| Partick.miller@pmillerlegal.com | |

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on this 2/17/2021, at Irvine, California.

*Michael Sayer*
Michael Sayer

– 3 –
DECLARATION OF REEM HANNA IN SUPPORT OF DEFENDANT'S MOTION TO SET ASIDE AND VACATE SISTER STATE JUDGMENT AND TO VACATE THE ABSTRACT OF JUDGMENT AND WRIT OF EXECUTION

# EXHIBIT 5

**POS-010**

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*<br>P MILLER LEGAL SERVICES<br>PATRICK MILLER<br>285 E CALIFORNIA BLVD UNIT 102<br>PASADENA, CA 91106<br>TELEPHONE NO: 213 364 7581     FAX NO *(Optional)*:<br>E-MAIL ADDRESS *(Optional)*: patrick.miller@pmillerlegal.com<br>ATTORNEY FOR *(Name)*: | FOR COURT USE ONLY |
|---|---|

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF   Orange |
|---|
| STREET ADDRESS:  700 Civic Center Drive West |
| MAILING ADDRESS: |
| CITY AND ZIP CODE:  Santa Ana, 92701-4045 |
| BRANCH NAME:  Superior Court of California, County of Orange |

| PLAINTIFF / PETITIONER:  Belgium Investments 960 Bay Dr, LLC, a California Corp. | CASE NUMBER: |
|---|---|
| DEFENDANT / RESPONDENT:  Bassem Essam El Mallakh | 30-2020-01148745-CU-EN-CJC |

| PROOF OF SERVICE OF SUMMONS | Ref. No. or File No.:<br>4697271 |
|---|---|

*(Separate proof of service is required for each party served.)*

1. At the time of service I was at least 18 years of age and not a party to this action.
2. I served copies of:
   a. ☐  summons
   b. ☐  complaint
   c. ☐  Alternative Dispute Resolution (ADR) package
   d. ☐  Civil Case Cover Sheet *(served in complex cases only)*
   e. ☐  cross-complaint
   f. ☒  other *(specify documents)*:     NOTICE OF ENTRY OF JUDGMENT ON SISTER-STATE JUDGMENT (EJ-110) , Conformed APPLICATION FOR ENTRY OF JUDGMENT ON SISTER-STATE JUDGMENT (EJ-105) , Conformed Copy FINAL JUDGMENT AGAINST BASSEM ESSAM EL MALLAKH dated February 21, 2020
3. a. Party served *(specify name of party as shown on documents served)*:
      BASSEM ESSAM EL MALLAKH
   b. ☐  Person (other than the party in item 3a) served on behalf of an entity or as an authorized agent (and not a person under item 5b on whom substituted service was made) *(specify name and relationship to the party named in item 3a)*:
4. Address where the party was served:
   116 ROCKEFELLER, IRVINE, CA 92612
5. I served the party *(check proper box)*
   a. ☐  **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on *(date)*:                          (2) at *(time)*:
   b. ☒  **by substituted service.** On *(date)*:  Sun, Sep 13 2020                 at *(time)*:  09:20 PM          I left the documents listed in item 2 with or in the presence of *(name and title or relationship to person indicated in item 3)*:
      by leaving copies with Hanna Reem co-occupant to BASSEM ESSAM EL MALLAKH
      (1) ☐  **(business)** a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served. I informed him or her of the general nature of the papers.
      (2) ☐  **(home)** a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party. I informed him or her of the general nature of the papers.
      (3) ☒  **(physical address unknown)** a person at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box. I informed him or her of the general nature of the papers.
      (4) ☒  I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ. Proc., § 415.20). I mailed the documents on *(date)*:  Sep 14 2020      from *(city)*:   Santa ana                          or ☐ a declaration of mailing is attached.
      (5) ☒  I attach a **declaration of diligence** stating actions taken first to attempt personal service.

**PROOF OF SERVICE OF SUMMONS**

| PLAINTIFF / PETITIONER: | Belgium Investments 960 Bay Dr, LLC, a California Corp | CASE NUMBER: |
|---|---|---|
| DEFENDANT / RESPONDENT: | Bassem Essam El Mallakh | 30-2020-01148745-CU-EN-CJC |

5. c. ☐ **by mail and acknowledgment of receipt of service.** I mailed the documents listed in item 2 to the party, to the address shown in item 4, by first-class mail, postage prepaid,

    (1) on *(date)*:                      (2)   from *(city)*:

    (3) ☐ with two copies of the *Notice and Acknowledgment of Receipt* and a postage-paid return envelope addressed to me. *(Attach completed Notice and Acknowledgement of Receipt.)* (Code Civ. Proc., § 415.30.)

    (4) ☐ to an address outside California with return receipt requested. (Code Civ. Proc., § 415.40.)

  d. ☐ **by other means** *(specify means of service and authorizing code section)*:

    ☐ Additional page describing service is attached.

6. The "Notice to the Person Served" (on the summons) was completed as follows:

  a. ☒ as an individual defendant.

  b. ☐ as the person sued under the fictitious name of *(specify)*:

  c. ☐ as occupant.

  d. ☐ On behalf of *(specify)*:

    under the following Code of Civil Procedure section:

    ☐ 416.10 (corporation)                   ☐ 415.95 (business organization, form unknown)

    ☐ 416.20 (defunct corporation)             ☐ 416.60 (minor)

    ☐ 416.30 (joint stock company/association)    ☐ 416.70 (ward or conservatee)

    ☐ 416.40 (association or partnership)       ☐ 416.90 (authorized person)

    ☐ 416.50 (public entity)                 ☐ 415.46 (occupant)

    ☐ other:

7. **Person who served papers**

  a. Name:       Michael Danley

  b. Address:     333 City Blvd 17th Flr, Orange, Ca 92868

  c. Telephone number:  714-971-2217

  d. **The fee** for service was:  $71.98

  e. I am:

    (1) ☐ not a registered California process server.

    (2) ☐ exempt from registration under Business and Professions Code section 22350(b).

    (3) ☒ a registered California process server:

      (i) ☐ owner ☐ employee ☐ independent contractor

      (ii) Registration No:  Reg Orange Co. 1782

      (iii) County:

8. ☒ **I declare** under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

    or

9. ☐ **I am a California sheriff or marshal and** I certify that the foregoing is true and correct.

Date:  9/15/20

Michael Danley
_____
(NAME OF PERSON WHO SERVED PAPERS / SHERIFF OR MARSHAL)

_____
(SIGNATURE)

| PLAINTIFF / PETITIONER: | Belgium Investments 960 Bay Dr, LLC, a California Corp. | | MC-031 |
|---|---|---|---|
| DEFENDANT / RESPONDENT: | Bassem Essam El Mallakh | CASE NUMBER:<br>30-2020-01148745-CU-EN-CJC | |

## DECLARATION OF DILIGENCE
(This form must be attached to another form or court paper before it can be filed in court.)

1) Unsuccessful Attempt: Sep 12, 2020, 10:05 am PDT at 116 ROCKEFELLER, IRVINE, CA 92612

I received this service last week of July I made many attempts to serve the defendant, several of the attempts were at other address such as 405 Rockefeller Irvine Occupant never hear of the defendant. Also 606 Rockefeller Irvine again occupant never heard of the defendant.

2) Unsuccessful Attempt: Sep 13, 2020, 9:10 am PDT at 116 ROCKEFELLER, IRVINE, CA 92612
No answer at door

3) Unsuccessful Attempt: Sep 13, 2020, 8:27 pm PDT at 116 ROCKEFELLER, IRVINE, CA 92612
No answer at door

4) Successful Attempt: Sep 13, 2020, 9:20 pm PDT at 116 ROCKEFELLER, IRVINE, CA 92612 received by Hanna Reem co-occupant to BASSEM ESSAM EL MALLAKH

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:    9/15/20

Michael Danley
_____
(TYPE OR PRINT NAME)

_____
(SIGNATURE OF DECLARANT)

☐ Attorney for    ☐ Plaintiff    ☐ Petitioner    ☐ Defendant
☐ Respondent    ☐ Other (Specify):

# EXHIBIT 7

# LEASE WITH OPTION TO PURCHASE

This Agreement, dated January 1 2017, by and between an individual known as Bassem Elmallakh of 525 Broadway, Santa Monica, California, 90401, hereinafter known as the "Landlord",

**AND**

An individual known as Reem Hanna, hereinafter known as the "Tenant(s)", agree to the following:

**OCCUPANT(S)**: The Premises is to be occupied strictly as a residential dwelling with only the Tenant(s) mentioned above as the Occupant(s).

**OFFER TO RENT**: The Landlord hereby rents to the Tenant(s), subject to the following terms and conditions of this Agreement, a condominium with the address of 116 Rockefeller , Irvine, California, 92612 consisting of 3.5 bathroom(s) and 3 bedroom(s) hereinafter known as the "Premises". The Landlord may also use the address for notices sent to the Tenant(s).

**PURPOSE**: The Tenant(s) and any Occupant(s) may only use the Premises as a residential dwelling. It may not be used for storage, manufacturing of any type of food or product, professional service(s), or for any commercial use unless otherwise stated in this Agreement.

**FURNISHINGS**: The Premises is furnished with the following:

Bedroom Set(s), Dining Room Set(s), Kitchen Set (Including Pots, Pans, Glasses, Mugs, Dishes, etc.), Living Room Set(s) and all other furnishings to be provided by the Tenant(s). Any damage to the Landlord's furnishings shall be the liability of the Tenant(s), reasonable wear-and-tear excepted, to be billed directly or less the Security Deposit.

**APPLIANCES**: The Landlord shall provide the following appliances:

Air Conditioner(s), Dishwasher, Dryer (for Laundry), Fan(s), Hot Water Heater, HVAC, Iron (for Clothes), Microwave, Oven(s), Refrigerator, Stove(s), Television(s), Washer (for Laundry), with all other appliances to be provided by the Tenant(s). Any damage to the Landlord's appliances shall be the liability of the Tenant(s), reasonable wear-and-tear excepted, to be billed directly or less the Security Deposit.

**LEASE TERM**: This Agreement shall be a fixed-period arrangement beginning on January 1 2017 and ending on December 31 2024 with the Tenant(s) having the option to continue to occupy the Premises under the same terms and conditions of this Agreement under a Month-to-Month arrangement (Tenancy at Will) with either the Landlord or Tenant having the option to cancel the tenancy with at least thirty (30) days notice or the minimum time-period set by the State, whichever is shorter. For the Tenant to continue under Month-to-Month tenancy at the expiration of the Lease Term, the Landlord must be notified within sixty (60) days before the end of the Lease Term. Hereinafter known as the "Lease Term".

**RENT**: Tenant(s) shall pay the Landlord in equal monthly installments of $3,000.00 (US Dollars) hereinafter known as the "Rent". The Rent will be due on the First (1st) of every month and be paid via the following instructions:

Money Wire

**NON-SUFFICIENT FUNDS (NSF CHECKS)**: If the Tenant(s) attempts to pay the rent with a check that is not honored or an electronic transaction (ACH) due to insufficient funds (NSF) there shall be no fee (US Dollars).

**LATE FEE**: If rent is not paid on the due date, there shall be a late fee assessed by the Landlord in the amount of:

Calculated as 10% percent of the monthly rent per occurrence for each month payment that is late after the 4th Day rent is due.

**FIRST (1ST) MONTH'S RENT**: First (1st) month's rent shall be due by the Tenant(s) upon the execution of this Agreement.

**PRE-PAYMENT**: The Landlord shall not require any pre-payment of rent by the Tenant(s).

**PRORATION PERIOD**: The Tenant(s) will not move into the Premises before the start of the Lease Term.

**SECURITY DEPOSIT**: The Tenant(s) shall not be obligated to pay a Security Deposit as part of this Agreement.

**POSSESSION**: Tenant(s) has examined the condition of the Premises and by taking possession acknowledges that they have accepted the Premises in good order and in its current condition except as herein otherwise stated. Failure of the Landlord to deliver possession of the Premises at the start of the Lease Term to the Tenant(s) shall terminate this Agreement at the option of the Tenant(s). Furthermore, under such failure to deliver possession by the Landlord, and if the Tenant(s) cancels this Agreement, the Security Deposit (if any) shall be returned to the Tenant(s) along with any other pre-paid rent, fees, including if the Tenant(s) paid a fee during the application process before the execution of this Agreement.

**OPTION TO PURCHASE**. The Tenant(s) shall have the right to purchase the Premises described herein for 1,000,000.00 at any time during the course of the Lease Term, along with any renewal periods or extensions, by providing written notice to the Landlord along with a deposit of $50,000.00 that is subject to the terms and conditions of a Purchase and Sale Agreement to be negotiated, in "good faith", between the Landlord and Tenant(s).

If the Landlord and Tenant(s) cannot produce a signed Purchase and Sale Agreement within a reasonable time period then the deposit shall be refunded to the Tenant(s) and this Lease Agreement shall continue under its terms and conditions.

If the option to purchase is exercised by the Tenant(s) all Rent that is paid to the Landlord shall remain separate from any and all deposits, consideration, or payments, made to the Landlord in regards to the purchase of the Premises.

**RECORDING**. The Tenant(s) shall be withheld from recording this Option to Purchase unless the Tenant(s) has the written consent from the Landlord.

**ACCESS**: Upon the beginning of the Proration Period or the start of the Lease Term, whichever is earlier, the Landlord agrees to give access to the Tenant(s) in the form of keys, fobs, cards, or any type of keyless security entry as needed to enter the common areas and the Premises. Duplicate copies of the access provided may only be authorized under the consent of the Landlord and, if any

Page 2

replacements are needed, the Landlord may provide them for a fee. At the end of this Agreement all access provided to the Tenant(s) shall be returned to the Landlord or a fee will be charged to the Tenant(s) or the fee will be subtracted from the Security Deposit.

**MOVE-IN INSPECTION**: Before, at the time of the Tenant(s) accepting possession, or shortly thereafter, the Landlord and Tenant(s) shall perform an inspection documenting the present condition of all appliances, fixtures, furniture, and any existing damage within the Premises.

**SUBLETTING**: The Tenant(s) shall not have the right to sub-let the Premises or any part thereof without the prior written consent of the Landlord. If consent is granted by the Landlord, the Tenant(s) will be responsible for all actions and liabilities of the Sublessee including but not limited to: damage to the Premises, non-payment of rent, and any eviction process (In the event of an eviction the Tenant(s) shall be responsible for all court filing fee(s), representation, and any other fee(s) associated with removing the Sublessee). The consent by the Landlord to one sub-let shall not be deemed to be consent to any subsequent subletting.

**ABANDONMENT**: If the Tenant(s) vacates or abandons the property for a time-period that is the minimum set by State law or seven (7) days, whichever is less, the Landlord shall have the right to terminate this Agreement immediately and remove all belongings including any personal property off of the Premises. If the Tenant(s) vacates or abandons the property, the Landlord shall immediately have the right to terminate this Agreement.

**ASSIGNMENT**: Tenant(s) shall not assign this Lease without the prior written consent of the Landlord. The consent by the Landlord to one assignment shall not be deemed to be consent to any subsequent assignment.

**PARKING**: The Landlord shall provide the Tenant(s) 2 Parking Spaces.

The Landlord shall not charge a fee for the 2 Parking Spaces.

**RIGHT OF ENTRY**: The Landlord shall have the right to enter the Premises during normal working hours by providing notice in accordance with the minimum State requirement in order for inspection, make necessary repairs, alterations or improvements, to supply services as agreed or for any reasonable purpose. The Landlord may exhibit the Premises to prospective purchasers, mortgagees, or lessees upon reasonable notice.

**SALE OF PROPERTY**: If the Premises is sold, the Tenant(s) is to be notified of the new Owner, and if there is a new Manager, their contact details for repairs and maintenance shall be forwarded. If the Premises is conveyed to another party, the new owner shall not have the right to terminate this Agreement and it shall continue under the terms and conditions agreed upon by the Landlord and Tenant(s).

**UTILITIES**: The Landlord shall not pay for any of the utilities and services and will be the responsibility of the Tenant(s).

**MAINTENANCE, REPAIRS, OR ALTERATIONS**: The Tenant(s) shall, at their own expense and at all times, maintain premises in a clean and sanitary manner, and shall surrender the same at termination hereof, in as good condition as received, normal wear and tear excepted. The Tenant(s) may not make any alterations to the leased premises without the consent in writing of the Landlord. The Landlord shall be responsible for repairs to the interior and exterior of the building. If the Premises includes a washer, dryer, freezer, dehumidifier unit and/or air conditioning unit, the Landlord makes no warranty as to the repair or replacement of units if one or all shall fail to

operate. The Landlord will place fresh batteries in all battery-operated smoke detectors when the Tenant(s) moves into the premises. After the initial placement of the fresh batteries it is the responsibility of the Tenant(s) to replace batteries when needed. A monthly "cursory" inspection may be required for all fire extinguishers to make sure they are fully charged.

**EARLY TERMINATION**: The Tenant(s) may be allowed to cancel this Agreement under the following conditions:
The Tenant(s) must provide at least 30 days' notice. During the notice period of 30 days the rent shall be paid in accordance with this Agreement.

**PETS**: The Tenant(s) shall not be allowed to have pets on the Premises or common areas except those that are necessary for individuals with disabilities.

**NOISE/WASTE**: The Tenant(s) agrees not to commit waste on the premises, maintain, or permit to be maintained, a nuisance thereon, or use, or permit the premises to be used, in an unlawful manner. The Tenant(s) further agrees to abide by any and all local, county, and State noise ordinances.

**GUESTS**: There shall be no other persons living on the Premises other than the Tenant(s) and any Occupant(s). Guests of the Tenant(s) are allowed for periods not lasting for more than forty-eight hours unless otherwise approved by the Landlord.

**SMOKING POLICY**: Smoking on the Premises is prohibited on the entire property, including individual units, common areas, every building and adjoining properties.

**COMPLIANCE WITH LAW**: The Tenant(s) agrees that during the term of the Agreement, to promptly comply with any present and future laws, ordinances, orders, rules, regulations, and requirements of the Federal, State, County, City, and Municipal government or any of their departments, bureaus, boards, commissions and officials thereof with respect to the premises, or the use or occupancy thereof, whether said compliance shall be ordered or directed to or against the Tenant(s), the Landlord, or both.

**DEFAULT**: If the Tenant(s) fails to comply with any of the financial or material provisions of this Agreement, or of any present rules and regulations or any that may be hereafter prescribed by the Landlord, or materially fails to comply with any duties imposed on the Tenant(s) by statute or State laws, within the time period after delivery of written notice by the Landlord specifying the non-compliance and indicating the intention of the Landlord to terminate the Agreement by reason thereof, the Landlord may terminate this Agreement. If the Tenant(s) fails to pay rent when due and the default continues for the time-period specified in the written notice thereafter, the Landlord may, at their option, declare the entire balance (compiling all months applicable to this Agreement) of rent payable hereunder to be immediately due and payable and may exercise any and all rights and remedies available to the Landlord at law or in equity and may immediately terminate this Agreement.

The Tenant(s) will be in default if: (a) Tenant(s) does not pay rent or other amounts that are owed in accordance with respective State laws; (b) Tenant(s), their guests, or the Occupant(s) violate this Agreement, rules, or fire, safety, health, or criminal laws, regardless of whether arrest or conviction occurs; (c) Tenant(s) abandons the Premises; (d) Tenant(s) gives incorrect or false information in the rental application; (e) Tenant(s), or any Occupant(s) is arrested, convicted, or given deferred adjudication for a criminal offense involving actual or potential physical harm to a person, or involving possession, manufacture, or delivery of a controlled substance, marijuana, or drug paraphernalia under state statute; (f) any illegal drugs or paraphernalia are found in the Premises or

on the person of the Tenant(s), guests, or Occupant(s) while on the Premises and/or; (g) as otherwise allowed by law.

**MULTIPLE TENANT(S) OR OCCUPANT(S)**: Each individual that is considered a Tenant(s) is jointly and individually liable for all of this Agreement's obligations, including but not limited to rent monies. If any Tenant(s), guest, or Occupant(s) violates this Agreement, the Tenant(s) is considered to have violated this Agreement. Landlord's requests and notices to the Tenant(s) or any of the Occupant(s) of legal age constitutes notice to the Tenant(s). Notices and requests from the Tenant(s) or any one of the Occupant(s) (including repair requests and entry permissions) constitutes notice from the Tenant(s). In eviction suits, the Tenant(s) is considered the agent of the Premise for the service of process.

**DISPUTES**: If a dispute arises during or after the term of this Agreement between the Landlord and Tenant(s), they shall agree to hold negotiations amongst themselves, in "good faith", before any litigation.

**SEVERABILITY**: If any provision of this Agreement or the application thereof shall, for any reason and to any extent, be invalid or unenforceable, neither the remainder of this Agreement nor the application of the provision to other persons, entities or circumstances shall be affected thereby, but instead shall be enforced to the maximum extent permitted by law.

**SURRENDER OF PREMISES**: The Tenant(s) has surrendered the Premises when (a) the move-out date has passed and no one is living in the Premise within the Landlord's reasonable judgment; or (b) Access to the Premise have been turned in to Landlord – whichever comes first. Upon the expiration of the term hereof, the Tenant(s) shall surrender the Premise in better or equal condition as it were at the commencement of this Agreement, reasonable use, wear and tear thereof, and damages by the elements excepted.

**RETALIATION**: The Landlord is prohibited from making any type of retaliatory acts against the Tenant(s) including but not limited to restricting access to the Premises, decreasing or cancelling services or utilities, failure to repair appliances or fixtures, or any other type of act that could be considered unjustified.

**WAIVER**: A Waiver by the Landlord for a breach of any covenant or duty by the Tenant(s), under this Agreement is not a waiver for a breach of any other covenant or duty by the Tenant(s), or of any subsequent breach of the same covenant or duty. No provision of this Agreement shall be considered waived unless such a waiver shall be expressed in writing as a formal amendment to this Agreement and executed by the Tenant(s) and Landlord.

**EQUAL HOUSING**: If the Tenant(s) possess(es) any mental or physical impairment, the Landlord shall provide reasonable modifications to the Premises unless the modifications would be too difficult or expensive for the Landlord to provide. Any impairment of the Tenant(s) is/are encouraged to be provided and presented to the Landlord in writing in order to seek the most appropriate route for providing the modifications to the Premises.

**HAZARDOUS MATERIALS**: The Tenant(s) agrees to not possess any type of personal property that could be considered a fire hazard such as a substance having flammable or explosive characteristics on the Premises. Items that are prohibited to be brought into the Premises, other than for everyday cooking or the need of an appliance, includes but is not limited to gas (compressed), gasoline, fuel, propane, kerosene, motor oil, fireworks, or any other related content in the form of a liquid, solid, or gas.

**WATERBEDS**: The Tenant(s) is not permitted to furnish the Premises with waterbeds.

**INDEMNIFICATION**: The Landlord shall not be liable for any damage or injury to the Tenant(s), or any other person, or to any property, occurring on the Premises, or any part thereof, or in common areas thereof, and the Tenant(s) agrees to hold the Landlord harmless from any claims or damages unless caused solely by the Landlord's negligence. It is recommended that renter's insurance be purchased at the Tenant(s)'s expense.

**COVENANTS**: The covenants and conditions herein contained shall apply to and bind the heirs, legal representatives, and assigns of the parties hereto, and all covenants are to be construed as conditions of this Agreement.

**NOTICES**: Any notice to be sent by the Landlord or the Tenant(s) to each other shall use the following mailing addresses:

**Landlord's/Agent's Mailing Address**

Bassem Elmallakh
525 Broadway, Santa Monica, California, 90401

**Tenant(s)'s Mailing Address**

Reem Hanna
116 Rockefeller , Irvine, California, 92612

**AGENT/MANAGER**: The Landlord does not have an Agent or Manager and all contact in regards to any repair, maintenance, or complaint must go through the Landlord through the following contact information:

Landlord's Phone Number: (949) 413-7074 Email: bassemelmallakh@gmail.com.

**PREMISES DEEMED UNINHABITABLE**: If the Property is deemed uninhabitable due to damage beyond reasonable repair the Tenant(s) will be able to terminate this Agreement by written notice to the Landlord. If said damage was due to the negligence of the Tenant(s), the Tenant(s) shall be liable to the Landlord for all repairs and for the loss of income due to restoring the Premises back to a livable condition in addition to any other losses that can be proved by the Landlord.

**ACCESS BY LANDLORD**: The Landlord must grant at least twenty-four (24) hours notice to the Tenant(s) prior to entry for maintenance or any non-emergency reason. For any move-out inspection forty-eight (48) hours notice by Landlord shall be required.

**BED BUGS**: The Landlord acknowledges that there is no existence of bed bugs on the Premises. In addition, there shall be an addendum attached to this agreement that certifies the Tenant(s) have inspected the Premises and any existing furniture and confirm that bed bugs do not exist on the Premises.

**MEGAN'S LAW**: Notice: Pursuant to Section 290.46 of the Penal Code, information about specified registered sex offenders is made available to the public via an Internet Web site maintained by the Department of Justice at www.meganslaw.ca.gov. Depending on an offender's criminal history, this information will include either the address at which the offender resides or the community of residence and ZIP Code in which he or she resides.

**SERVICEMEMBERS CIVIL RELIEF ACT:** In the event the Tenant(s) is or hereafter becomes, a member of the United States Armed Forces on extended active duty and hereafter the Tenant(s) receives permanent change of station (PCS) orders to depart from the area where the Premises are located, or is relieved from active duty, retires or separates from the military, is ordered into military housing, or receives deployment orders, then in any of these events, the Tenant may terminate this lease upon giving thirty (30) days written notice to the Landlord. The Tenant shall also provide to the Landlord a copy of the official orders or a letter signed by the Tenant's commanding officer, reflecting the change which warrants termination under this clause. The Tenant will pay prorated rent for any days which he/she occupies the dwelling past the beginning of the rental period.

The damage/security deposit will be promptly returned to Tenant, provided there are no damages to the Premises.

**LEAD PAINT:** The Premises was not constructed before 1978 and therefore does not contain lead-based paint.

**GOVERNING LAW:** This Agreement is to be governed under the laws located in the State of California.

**ADDITIONAL TERMS AND CONDITIONS:** There are no further terms or conditions that will be added to this Agreement other than any attachments or addendums attached.

**ENTIRE AGREEMENT:** This Agreement contains all the terms agreed to by the parties relating to its subject matter including any attachments or addendums. This Agreement replaces all previous discussions, understandings, and oral agreements. The Landlord and Tenant(s) agree to the terms and conditions and shall be bound until the end of the Lease Term.

The parties have agreed and executed this agreement on January 1 2017.


**LANDLORD(S) SIGNATURE**


**Landlord's Signature** _____
By Bassem ElMallakh


**TENANT(S) SIGNATURE**


**Tenant's Signature** _____

# EXHIBIT "7"

```
              IN THE CIRCUIT COURT OF THE
          11TH JUDICIAL CIRCUIT IN AND FOR
             MIAMI-DADE COUNTY, FLORIDA

                CASE NO.: 18-28145 CA


BELGIUM INVESTMENTS 960 BAY DR, LLC,
A CALIFORNIA LLC, ET AL.,

     Plaintiff,

     -vs-

SPENCER BLANK, ET AL.,

     Defendant.
_____/


              Deposition Taken via Zoom

               4:40 p.m. to 6:01 p.m.


                  DEPOSITION OF

               BASSEM EL MALLAKH


     Taken before Erica Hylton, Court Reporter, a

Notary Public for the State of Florida at Large,

pursuant to Notice of Taking Deposition Duces Tecum

filed in the above-styled cause.
```

EXHIBIT 5

2

1                    APPEARANCES:

2       On Behalf of the Plaintiff:

3       BERNHARD LAW FIRM PLLC

4       BY: ANDREW BERNHARD

5       333 SE 2nd Avenue, Suite 2000

6       Miami, Florida 33131

7       (786) 871-3349

8       abernhard@bernhardlawfirm.com

9

10      On Behalf of the Defendant:

11      SOUTH FLORIDA LAW, PLLC

12      BY:  FRANK DELLORUSSO, ESQUIRE

13      1920 East Hallandale Beach Boulevard

14      Suite 702

15      Hallandale, Florida 33009

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 5

3

1                              INDEX

2      TESTIMONY OF BASSEM EL MALLAKH          PAGE

3      Examination by Mr. Bernhard             5

4      Examination by Mr. DelloRusso           61

5      Certificate of Oath                     68

6      Certificate of Reporter                 69

7

8                      INDEX OF EXHIBITS

9              DEFENDANT'S EXHIBITS MARKED

10     NUMBER          DESCRIPTION             PAGE

11     Exhibit 6       39-page document        20

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 5

1           MR. BERNHARD:  I can see, Bassem, that you're now

2       where Reem was previously sitting.  We're invoking

3       the rule, which means that I don't want the other

4       witness' testimony to be modified by what you have

5       to say.  Can you confirm that Reem is not in the

6       room with you and not listening to your testimony?

7           MR. EL MALLAKH:  Yes.  She is not.  We just

8       switched rooms.  She went upstairs, and I came

9       downstairs.

10          MR. BERNHARD:  Okay.  I appreciate that.

11      Thank you.  And we're all just going to rely in

12      good faith that you're going to adhere to that,

13      right?

14          MR. EL MALLAKH:  Uh-huh (affirmative).

15          MR. BERNHARD:  Okay.

16  THEREUPON:

17                  BASSEM EL MALLAKH,

18          was examined and testified as follows:

19                  DIRECT EXAMINATION

20  BY MR. BERNHARD:

21      Q.   So as I'm sure you've already heard, my name

22  is Andrew.  I'm taking your deposition.  You've seen how

23  it worked with Reem.  But I'll just go over the ground

24  rules really fast with you.  Have you ever had your

25  deposition taken before?

# EXHIBIT 5

1      A.   Yes, I have.

2      Q.   Okay.  When was that?

3      A.   Back in 2013, 2014.

4      Q.   Okay.  What were the circumstances?

5      A.   Oh.  One in like 2010 too like for some

6  accident in the street that I had to like go and be the

7  deposed for for some stranger, you know.

8      Q.   Okay.  So deposition 2010 for an accident you

9  witnessed, and a deposition in 2013 and 2014.  What was

10  that for?

11      A.   I had a lawsuit.  The previous company that I

12  worked for were suing me.  And then I won that lawsuit.

13      Q.   Okay.  Where was that lawsuit?

14      A.   It was in Irvine, California.

15      Q.   Okay.  And -- and what was the name of the

16  company suing you?

17      A.   It was Global Premier Development.

18      Q.   Global Premier Development?

19      A.   Uh-huh (affirmative).

20      Q.   Okay.  And what were they suing you for?

21      A.   They were suing me for -- they thought that I

22  took clients from their company and used them to benefit

23  my own new business, but then it was all incorrect; and

24  you know, that was -- that was settled.

25      Q.   So was it settled or did you win?

# EXHIBIT 5

1    A.    I won, actually.  I won.  I won at -- at the

2  actual court on the hearing date.  Their attorneys, you

3  know, said, "Hey" -- they told the judge, "We're going

4  to go ahead and -- and -- and remove the -- the -- the

5  lawsuit, you know, the claim, and -- and just settle."

6    Q.    Okay.  So I just -- you know, forgive me

7  because I might just have a different understanding of

8  -- of the difference between won and settled.  What do

9  you mean when you say you won?

10    A.    So basically they -- they -- they couldn't

11  produce any documents that shows that I really took any

12  clients from them.

13    Q.    Okay.  Did you have an adjudication by a judge

14  that said that the other side lost and you won?

15    A.    No.  Right when the hearing started, the

16  lawyer -- the plaintiff lawyer told the judge that we

17  are going to go ahead and -- and decline the -- the

18  lawsuit.

19    Q.    Okay.  So for the record, you settled the case

20  before there was an adjudication; is that right?

21    A.    Yeah.

22    Q.    Okay.  And did you enter into like a

23  settlement agreement?  Without telling me the contents,

24  did you enter into a settlement agreement?

25    A.    Yeah.  We had a settlement agreement.

EXHIBIT 5

1    Q.    Okay.  And so the -- the court there never made a

2    final determination as to who won or who lost; instead,

3    you just settled the case?

4    A.    I'm not sure.  I'm not sure how it worked

5    after.  I just know that, you know, we signed the

6    settlement agreement.

7    Q.    Okay.  Was that -- you said that was right

8    before things were going to be produced to the judge; is

9    that right?

10    A.    Yeah.  They didn't have any documents to -- to

11    show or prove that I really did take any of their

12    clients.

13    Q.    Okay.  And when did that case settle out?

14    A.    Sometime in 2014, I believe.

15    Q.    Okay.  And that was *Global Premier Development

16    versus Bassem El Mallakh*.  Is that the name of it?

17    A.    That -- my name is -- I have -- I grew up in

18    Egypt, and in Egypt you actually have to have four

19    names.  So my name on my ID is my first name, my dad's

20    name, my grandfather's name, and then my last name.  So

21    my name is Bassem Essam Victor El Mallakh.

22    Q.    Okay.  So in that -- your first name is

23    Bassem; your last name is El Mallakh; and your middle

24    names are Essam and Victor.

25    A.    You can call it middle name, but it's actually

# EXHIBIT 5

1  technically my dad's name, and Victor is my grandfather's

2  name.

3       Q.   Okay.

4       A.   It's a different system in Egypt.

5       Q.   Is everybody's last name -- for your

6  grandfather, your father, and you, is everybody's last

7  name El Mallakh.

8       A.   Usually the last name, it could be like -- you

9  know, it could be 20 generations back.  It could be like

10  your great, great, great grandfather, you know.  So some

11  people just use a short of, obviously, first dad's,

12  grandfather, and then the last name it could be your

13  fourth grandfather, it could be 20, you know,

14  grandfather's back.

15       Q.   Okay.  My question was just whether you, your

16  father, your grandfather all use the last name El

17  Mallakh.

18       A.   Yes.  We all use the same last name, El

19  Mallakh.

20       Q.   Okay.  Now, so that case, the 2013 case --

21  2014 case in Irvine was *Global Premier Development*

22  *versus Bassem Essam Victor El Mallakh*?

23       A.   Yes.

24       Q.   Okay.

25       A.   And also, you know, a few LLCs.

# EXHIBIT 5

1    Q.    And a few LLCs.  Any LLCs from this case?

2    A.    Yeah.  Actually, it was this -- this LLC as

3  well.

4    Q.    Which LLC?

5    A.    Belgium Investments 960 Bay Drive LLC.

6    Q.    Okay.  And was that -- was Belgium Investments

7  a plaintiff, a defendant?

8    A.    Defendant.

9    Q.    And do you know whether Jean Claude Reusche

10  (phonetic) was involved in that case?

11    A.    They sued the LLCs -- they sued all the LLCs,

12  so Jean Claude Reusche is actually the -- the larger

13  partner in that LLC.  So I basically, obviously, had to

14  defend everybody and -- and defend the case.  I don't

15  want -- I don't want the company to sue my partners.

16    Q.    Okay.  So the question was: was Jean Claude

17  Reusche involved in that case?

18    A.    He was not.

19    Q.    Okay.  Did you notify Jean Claude Reusche of

20  that lawsuit?

21    A.    I notified my other partner about it, and I

22  told him, you know, "We're getting sued, and it could --

23  I don't think it's a big matter.  It could finish in a

24  month.  It could finish in two.  I'll let you when it's

25  settled."  And, you know, it was not -- I guess it was

EXHIBIT 5

1  not like some big deal that I thought it was going to, you

2  know, take some time.

3       Q.   Okay.  Who is your other partner?

4       A.   His name is Bernard Petite (phonetic).

5       Q.   Okay.  So you notified Bernard Petite.  Did

6  you notify Jean Claude Reusche?

7       A.   Yeah.  I notified, but not -- because Bernard

8  was my partner in the B. B. Global Investment Partners.

9       Q.   But --

10      A.   Jean Claude was not part of that.  Basically,

11 it's the general managing partner of the LLCs, and 950

12 Bay Drive is one of them.

13      Q.   Did you notify Jean Claude Reusche is my

14 question.

15      A.   I did not.

16      Q.   And do you recall when that lawsuit began?

17      A.   I believe early 2014.

18      Q.   Do you believe it also settled in 2014?

19      A.   I believe what you said?

20      Q.   Do you think it settled also in 2014?

21      A.   Oh, yeah.  It is -- it is -- it is settled in

22 -- either in late 2014 or early 2015.  I don't know the

23 exact dates.

24      Q.   Okay.  And you said that you sat for

25 deposition in that case?

# EXHIBIT 5

1      A.   Yes, I did.

2      Q.   Okay.  And any reason specifically that you

3   did not notify Jean Claude Reusche of that lawsuit?

4      A.   I just didn't think it was -- again, I just --

5   you know, know it's like, you know, I was -- I'm the

6   manager of the LLCs, so then I obviously have to take,

7   you know, the -- the managerial decisions when it comes

8   to anything related to the business, and I didn't think

9   -- it's like, you know, you can have an apartment

10  building and someone fall and break their leg, and then

11  they go and sue the LLC.  I have to be the one

12  responding.  I don't have to bother my silent partners

13  with any of the -- you know, these issues, especially

14  that I didn't think it was a big issue.

15       MR. DELLORUSSO:  Andrew, I'm being quiet here,

16       but I'm going to start instructing my client not to

17       answer if you don't stop getting -- you know, start

18       getting to the scope of the order.

19       MR. BERNHARD:  Sure.  Well, you know, in a

20       deposition, a person's previous experience in a

21       deposition is unquestionably within the scope of

22       their experience to a deposition.  It's standard

23       question.  Every single deposition I've ever sat in

24       is what depos have you sat through before and what

25       happened in them, so we have an understanding of

# EXHIBIT 5

1          his comfort level and his experience with those

2          depositions.  So I'm literally just going off of

3          what your client's saying, right.

4                  MR. DELLORUSSO:  Okay.

5                  MR. BERNHARD:  Okay.

6                  MR. DELLORUSSO:  Keep going.

7    BY MR. BERNHARD:

8          Q.    And at that time, 2014, your understanding was

9    that Jean Claude Reusche was the majority owner of

10   Belgium Investments, correct?

11         A.    Yes.  Uh-huh (affirmative).  Yes.

12         Q.    So there is the 2013, 2014 lawsuit you just

13   talked about against you and Belgium Investments in

14   Irvine by Global Premier Development.  There is a 2010

15   accident in which you were just a witness and were not a

16   party; is that right?

17         A.    Yeah.  It was -- I was driving to work in the

18   morning, and then I literally saw like a car almost kind

19   of flying; and then it hit the car in front of me.  And

20   then I got out of the car, and then I started to help

21   the person that was in the car, you know, just to kind

22   of get him out of the car and whatnot.

23                And then when the -- when the cops came to --

24   to report it, you know, they took my information, and

25   then I was later deposed to give my witness deposition,

EXHIBIT 5

1  you know, tell them exactly what happened with that case --

2        Q.    Okay.

3        A.    -- when they asked.

4        Q.    Any other time you sat for a deposition?

5        A.    No.   That was it.

6        Q.    Okay.   Have you ever witnessed any other

7  deposition besides those two and --

8        A.    No.

9        Q.    -- the one for Ms. Hanna here today?

10        A.    No.

11        Q.    Okay.   So as you've seen now, your experience

12  and with Reem, I ask you questions; you give the

13  answers, and the court reporter writes everything down,

14  right.

15        A.    Absolutely.

16        Q.    Okay.   So like I said with Reem, I need you to

17  give oral answers because the court reporter can't write

18  down shrugs, uh-huhs, nods, anything like that, okay.

19  Can you give full verbal answers?

20        A.    Absolutely.

21        Q.    Okay.   If I don't state any question very

22  well, you don't understand what I say, just let us know.

23  I want to make sure you fully understand the question

24  before you answer, okay.

25        A.    I will ask you to repeat if I didn't hear you

EXHIBIT 5

14

1  well.

2      Q.   Perfect.  And if you don't understand it, ask

3  me to clarify.  My job is to -- is to make sure you get

4  what I'm asking, all right.

5      A.   Correct.

6      Q.   All right.  I want to make sure that whatever

7  you're telling us is the most accurate, exact, and

8  truthful answer you can provide, okay.

9      A.   I will do my absolute best.

10     Q.   Awesome.  If you want to take a break at any

11 time, just let us know.  I just ask you finish your

12 answer, and we'll take a break, all right.

13     A.   Will do.  I'll let you know if I need a break.

14     Q.   If at any time you are answering a question

15 and you realize that something you said before needs to

16 be clarified, elaborated on, modified in any way, please

17 let us know right then, all right.

18     A.   Sure.  I will.

19     Q.   I want to make sure that whatever answer

20 you're giving, they're your fullest, most honest,

21 exactly what you want to say for your deposition, all

22 right.

23     A.   I will.

24     Q.   If any time you think of any documents that

25 might help you, let me and your attorney know.  We might

EXHIBIT 5

1 | be able to find them and help you with your answers, all

2 | right.

3 |     A.    I will share them on my screen.

4 |     Q.    Okay.  The next questions are formalities that

5 | make sure that you're competent to testify today.

6 | First, are you taking any medication or drugs of any

7 | kind that might make it difficult for you to understand

8 | and answer my questions honestly and accurately today?

9 |     A.    I'm not taking any drugs.

10 |     Q.    Okay.  Have you had any -- anything alcoholic

11 | to drink in the last eight hours?

12 |     A.    I have not.

13 |     Q.    Are you sick at all today?

14 |     A.    I am not.

15 |     Q.    Are you currently under a doctor's care for

16 | any illness?

17 |     A.    I am not.  I just have a sore throat that just

18 | happened like three, four days ago.

19 |     Q.    Okay.

20 |     A.    It's in my left tonsil.

21 |     Q.    Will that sore throat in any way affect your

22 | ability to understand my questions and answer truthfully

23 | and honestly today?

24 |     A.    No.  It wouldn't affect my -- my answer or --

25 | I mean, understanding the question, but if -- if my

# EXHIBIT 5

1   voice started getting a little rusty, I'm going to have some

2   water.

3        Q.   Okay.  Perfect.

4             Have you ever been arrested or convicted for

5   any acts of fraud or other crimes involving deceit?

6        A.   I have not.

7        Q.   Have you ever been accused in court of any

8   acts of fraud or other acts of deceit?

9        A.   I have not.

10       Q.   Okay.  Have you ever been sued for any act of

11  fraud, misrepresentation, or deceit?

12       A.   I have not.  No.  I have not.

13       Q.   To your knowledge, have you been sued for that

14  by Belgium Investments in this lawsuit today?

15       A.   I have -- I don't know anything about the

16  lawsuit of Belgium Investments.

17       Q.   You don't know anything about it whatsoever.

18       A.   Not -- I never received anything.  I guess

19  they were trying to serve me in the address that I don't

20  -- I don't live in anymore.

21       Q.   Is there any reason you can think of why you

22  would not be able to answer my questions fully and

23  truthfully today?

24       A.   No.  There's no reason.

25       Q.   And you understand you're speaking under

EXHIBIT 5

1  penalty of perjury; is that right?

2      A.   Yes.

3      Q.   And that means that you're sworn to tell the

4  truth, the whole truth, nothing but the truth, and that

5  your failure to do so may be held as perjury; you

6  understand?

7      A.   Yes.

8      Q.   Okay.  And you understand that perjury is a

9  third degree felony under Florida statutes 837.02 and

10  92.525 punishable by prison and a fine?

11      A.   Yes.

12      Q.   And you agree to be sworn in and bound by

13  Florida notary; is that correct?

14      A.   I was sworn by a California notary.

15      Q.   Okay.

16          MR. BERNHARD:  Madam Court Reporter, are you a

17      California notary or a Florida notary?

18          THE REPORTER:  Florida.

19          THE WITNESS:  (Audio distortion)

20  BY MR. BERNHARD:

21      Q.   Okay.  So do you understand you've been sworn

22  in by a Florida notary, Bassem?

23      A.   Okay.  I did.  I wasn't sure if the -- the

24  court reporter was in California or in Florida.

25      Q.   Now do you understand that the court reporter

# EXHIBIT 5

1   is in Florida and has sworn you in in Florida?

2        A.   Yes.

3        Q.   Do you agree to be bound by your oath and the

4   penalty of perjury in California the same?

5        A.   Yes.

6        Q.   Okay.  Now, I understood -- just again, for

7   clarity of the record since now you're under oath --

8   that you are at Reem's house at 116 Rockefeller, but

9   that you have assured she outside of the room and is not

10  listening to your testimony; is that correct?

11       A.   Yes.

12       Q.   Okay.  And have you prepared to speak or to

13  give your deposition at all today?

14       A.   I did last night.

15       Q.   Okay.  What did you do to prepare?

16       A.   I got an email from my counsel with all the

17  exhibits.  I just put them all together.

18       Q.   Okay.

19            MR. DELLORUSSO:  I just want to object.

20       Anything that we spoke about is attorney-client

21       privilege, but you may let him know about any

22       preparations you've done.

23            THE WITNESS:  Okay.

24  BY MR. BERNHARD:

25       Q.   Okay.  And that's for sure, Bassem.  I want to

EXHIBIT 5

1  make sure, anything you talk about directly with your

2  attorney is entirely confidential, and I don't want you

3  to tell us about it.  If you feel like you're coming

4  upon a moment where you might divulge something that you

5  communicated confidentially to your attorney, please

6  stop yourself, consult with your attorney.  Do not tell

7  us, okay.

8      A.   Sure.  Andrew, can you speak up a bit?  I'm

9  noticing you're not sometimes -- I don't know if it's my

10  computer.  I'm not -- the volume is not as loud.  Let me

11  put the volume a little bit louder.

12      Q.   Sure.

13      A.   I'm going to try that.  Okay.  I think this is

14  better.  Go ahead.

15      Q.   So did you hear what I said about not telling

16  us about your --

17      A.   Yes.

18      Q.   -- confidential communications?  Okay.  Good.

19      A.   Yes.

20      Q.   Make sure you don't do that.  I want to make

21  sure you maintain your privilege.

22      A.   Yes.

23      Q.   Okay.  And the documents that you said you put

24  together, are those the ones that you submitted to your

25  attorney?

# EXHIBIT 5

20

1          A.   Yes.

2               MR. BERNHARD:  And, Frank, are those the ones

3    that you submitted to me?

4               MR. DELLORUSSO:  Correct.

5               MR. BERNHARD:  Okay.  We'll mark those as

6    Exhibit -- Madam Court Reporter, what number are we on?

7               THE REPORTER:  We were on 5.

8               MR. BERNHARD:  5?

9               THE REPORTER:  Well, I think in the last when

10   we were still talking to her, Frank had marked it as 5,

11   so.

12              MR. BERNHARD:  Okay.  So then we'll call this

13   Exhibit 6, which I'll send to you with the other

14   documents submitted by your attorney.  We'll pull those

15   up, make sure we're looking at the same thing, okay.

16   Let me share my screen right now.  And are we all

17   looking at this thing that says at the top left,

18   "Michael Sayer State Bar Number 141038"?

19              THE WITNESS:  Yes.

20              MR. BERNHARD:  Okay.

21              (Deposition Exhibit 6 marked)

22   BY MR. BERNHARD:

23       Q.   I've got here a 39-page series of documents.

24   Is this the 39-page set of documents that you gave to

25   your attorney?

# EXHIBIT 5

1      A.   Yes.

2      Q.   Okay.  Great.  Okay.

3           Okay.  So I understood your full name is

4    Bassem Essam Victor El Mallakh; is that right?

5      A.   Yeah.  I attached my ID in the exhibits, and I

6    do have a -- the hardcopy of my ID if you guys want to

7    maybe zoom in and see it.

8      Q.   I got it with the exhibit, so I think it's

9    there.

10     A.   Oh, perfect.

11     Q.   Okay.

12          MR. DELLORUSSO:  You can share the screen if

13     you want, just to make it clearer for me.

14          THE WITNESS:  Okay.

15          MR. BERNHARD:  I got it.  We have it.

16          THE WITNESS:  Oh.  You got it?  Okay.  Yeah.

17   BY MR. BERNHARD:

18     Q.   Do you ever go by any other name or alias?

19     A.   I go by either Bassem Essam or Bassem El

20   Mallakh or Bassem Victor, really, you know, just --

21     Q.   Why do you do that?

22     A.   Huh?

23     Q.   Why do you do that?

24     A.   I don't know.  I mean, these are my names.

25     Q.   Well, sure.  I've got lots of names, but in

# EXHIBIT 5

1  the United States, we have a legal last name and a legal

2  first name; and we're legally not supposed to

3  interchange them with other names.  So I'm trying to

4  understand why you might do that, if you do.

5        A.    I mean, it's just like I can go to the bank

6  and try to open an account, and then they can write my

7  name on the bank card as Bassem El Mallakh; another bank

8  they can write it as Bassem Essam.  Using at an

9  apartment, they can write it as Bassem Victor.  It's

10  just -- I don't really pick it.  Whoever -- it's like my

11  AT&T bill, they put it as Bassem El Mallakh, but based

12  on my internet, they had it as Bassem Victor.  It's just

13  -- I don't even pick it.  They just -- when I show them

14  my ID, they are the ones that are inputting the

15  information.

16        But usually when anybody ask me, I just say

17  Bassem El Mallakh.

18        Q.    Okay.  When somebody writes down your middle

19  name as your last name, you don't correct them?

20        A.    I mean, it is my name, same as like when I

21  lived in Egypt.  I would just use, you know, any -- any

22  of these names.  These are all your names on -- on my

23  birth certificate.

24        MR. BERNHARD:  Motion to strike as

25        nonresponsive.

# EXHIBIT 5

1   BY MR. BERNHARD:

2       Q.   And you've already testified that your last

3   name is El Mallakh, correct?

4       A.   Yes.

5       Q.   Okay.  That's your last name, correct?

6       A.   That is my last name.

7       Q.   You understand that in the United States of

8   America, when somebody asks you what your last name is,

9   that's what they're referring to?

10      A.   Yes.

11      Q.   Okay.  And you've testified that your first

12  name is Bassem; is that right?

13      A.   Yes.

14      Q.   You understand that in the United States of

15  America, when somebody asks your first name, that's what

16  they're referring to, correct?

17      A.   Yes.

18      Q.   Okay.

19      A.   Bassem is my first name.

20      Q.   And you understand that in -- under United

21  States standards, Essam and Victor would be considered

22  middle names; is that right?

23      A.   They -- they could be considered here middle

24  names, but I -- in my country they're not considered

25  middle names.

# EXHIBIT 5

24

1     Q.   Right.  My question is only if you understand that

2  in the United States of America those are considered

3  middle names, Bassem Essam -- or I'm sorry, Essam

4  Victor.

5     A.   Yes.

6     Q.   Okay.  So when somebody in the United States

7  of America puts your middle name as your last name, do

8  you correct them?

9         MR. DELLORUSSO:  Objection.  You can answer.

10       THE WITNESS:  Yeah.  I sure.  I can correct

11     them if they do that.

12  BY MR. BERNHARD:

13     Q.   Do you do that regularly, or do you just let

14  people use your middle name as your last name?

15         MR. DELLORUSSO:  Objection.

16       THE WITNESS:  I don't -- I don't do that

17     regularly, no, because it -- it doesn't really

18     happen to me often at all.

19  BY MR. BERNHARD:

20     Q.   Okay.  I thought you were just describing that

21  that did happen to you rather frequently with different

22  things that you do.  Is that not true anymore?

23     A.   No.  I'm saying when I would go to sign up for

24  any type of billing or any type of a subscription, I

25  just put my name, and then whoever, how they insert it

EXHIBIT 5

1  in their system, I don't really -- I don't really care, you

2  know.  That doesn't change the fact that this is my

3  name.

4        Q.   Okay.  But whenever you fill out forms, you

5  put your first name as Bassem as your last name as El

6  Mallakh.

7        A.   Yes.

8        Q.   Okay.  And you say you're currently located

9  116 Rockefeller but you reside somewhere else; is that

10 right?

11       A.   Yes.

12       Q.   Okay.  Where do you reside?

13       A.   I live in Santa Monica.

14       Q.   Okay.  What address?

15       A.   525 Broadway.

16       Q.   How long have you resided there?

17       A.   Since November 1st of 2016.

18       Q.   And do you essentially sleep every night there

19 in 525 Broadway in Santa Monica?

20       A.   Yes.

21       Q.   Do you regularly take vacations or trips that

22 would have you not sleeping at that property?

23       A.   Yeah.  I do usually take some vacations.

24       Q.   Okay.  How frequently do you vacation?

25       A.   Probably like maybe three or four times a

EXHIBIT 5

1   year.

2       Q.   Okay.  Those vacations, are they long, short,

3   a week?

4       A.   Sometimes it could be a week, and the longest

5   vacation, it could be like a month.

6       Q.   Okay.  Have you been on any vacations lately?

7       A.   Not in 2021.  Like I mean, just Santa Barbara,

8   you know, Palm Springs, like stuff like that, not like

9   out of the state.

10      Q.   Well, have you been away from your home at --

11  at your residence at 525 Broadway for any period more

12  than two nights in 2021?

13      A.   Yeah, of course.

14      Q.   Okay.  Well, it's not of course to me.  So --

15      A.   Sorry.  I just wasn't understanding your

16  question.

17      Q.   So when have you been away from your residence

18  at 525 Broadway for more than two days in 2021?

19      A.   Most of -- most of the -- most of like the

20  first week of February.  Most of the first week of

21  February, and that's -- that's about it.  Yeah.

22      Q.   Okay.  That's 2021?

23      A.   2021, yeah.

24      Q.   Where were you for the first week of February

25  in 2021?

EXHIBIT 5

1        A.    I was just like spending some time with my

2    girlfriend.

3        Q.    Okay.  Was that someplace out in Santa Monica?

4        A.    Santa Monica.

5        Q.    In Santa Monica, just not at 525 Broadway?

6        A.    No.

7        Q.    What's the name of your girlfriend?

8        A.    Ally (phonetic).

9        Q.    What's Ally's last name?

10       A.    Chambers.

11       Q.    C-h-a-m-b --

12       A.    C-h-a-m-b-e-r-s.

13       Q.    Okay.  And does she reside in Santa Monica

14   too?

15       A.    She does.

16       Q.    Okay.  What about 2019.  Were you -- sorry,

17   2020.  Were you away from 525 Broadway for any

18   protracted period of time, more than two days?

19       A.    2020 was the pandemic, so I was -- I was

20   pretty much at home throughout the whole year pretty

21   much, you know.  I don't know if you guys are familiar

22   with the LA cases that we had the highest COVID cases in

23   the -- I mean, not in just the country -- I the world.

24   So it was very dangerous for me to get out of the house.

25       Q.    Okay.  So is there any time you were away from

EXHIBIT 5

1   525 Broadway sleeping somewhere else for more than two days

2   in 2020?

3       A.   No.  No.  Just either between my house or my

4   girlfriend's house.  That's about it.  Nothing --

5       Q.   Okay.  What about 2019.  Any time you were

6   away from the house, 525 Broadway, for more than two

7   nights?

8       A.   2019 I traveled quite a bit.  I traveled quite

9   a bit in 2019.  Yeah.  2019 I traveled quite a bit.

10      Q.   Okay.  Where did you go?

11      A.   I went to Puerto Rico, the Caribbean.  I went

12  to Europe for about like three weeks.  Yeah.  I traveled

13  quite a bit in 2019.

14      Q.   Okay.  For -- for 525 Broadway, is that the

15  address that USPS has for you?  Is that where you're

16  registered as your residence?

17      A.   Yeah.  That's my -- that's my address of mail

18  because -- I mean, I only have Amazon.  I don't really

19  get mail.  I just have Amazon and the DMV.  That's about

20  it.

21      Q.   Okay.  Has 525 Broadway been your registered

22  address with the DMV since when?

23      A.   Since -- let me look at my ID -- 10/19/2017.

24  You'll see it at the very bottom right.

25      Q.   Okay.  And why don't you get any mail?

EXHIBIT 5

1      A.   I'm sorry, what?  My bank statements are all

2  paperless.  My phone bill is paperless.  You know, just

3  Amazon and DMV.  That's about it.

4      Q.   You don't get any junk mail?

5      A.   Yeah.  I do get junk mail, but I -- you know,

6  a bunch of magazines and, you know, coupons and offers;

7  and I just like throw them in the trash.

8      Q.   Okay.  Do you get that junk mail to 525

9  Broadway in your name?

10     A.   Yes.

11     Q.   Okay.  What's your current job?

12     A.   I am currently unemployed.

13     Q.   How long have you been unemployed?

14     A.   Since the pandemic.

15     Q.   And does that mean since March 2019?

16     A.   Yeah.

17     Q.   Okay.  At 525 Broadway, do you pay rent?

18     A.   I do.

19     Q.   Do you have a roommate?

20     A.   I used to -- I used to have a roommate.  Yeah.

21     Q.   Who was that?

22     A.   His name is Mohammad Rostom.

23     Q.   How do you spell his last name?

24     A.   R-o-s-t-o-m.

25     Q.   And when was he your roommate?

EXHIBIT 5

1    A.    When?

2    Q.    Yeah.

3    A.    Since we moved -- we moved in in November of

4  2016.

5    Q.    And when did he stop being your roommate?

6    A.    He moved -- he actually moved out of the

7  country and moved to Dubai in late December, like, you

8  know, a week before Christmas of -- of 2020.

9    Q.    And since then you've just been covering rent

10  yourself?

11    A.    Actually, since -- so I -- the last check I

12  paid for the rent was in January, and then I did not pay

13  February and March just yet because of, you know, the

14  judgment.  They froze all my bank accounts.

15    Q.    Okay.  And were you working in March and April

16  2019?

17    A.    I was.

18    Q.    Okay.  Where did you work then?

19    A.    I was working on some, you know, technology

20  project still under the, you know, R&D phase, and then

21  that stopped when the pandemic, you know, start.

22    Q.    Did you work for a company, or did you have a

23  boss?

24    A.    No, no.  It was self -- no.  It was just self-

25  employed.

# EXHIBIT 5

1    Q.    So what was the name of your employer?

2    A.    I didn't -- I didn't register an LLC for it

3  yet.  It was just all within the, you know, R&D

4  research, you know, period and, you know, all the

5  brainstorming and all the -- you know, it's -- the

6  technology business can be a bit -- a bit difficult, you

7  know.  It takes -- takes a while before you a product.

8    Q.    Okay.  So --

9    A.    But I was not making any income.

10   Q.    Before you started doing this R&D thing for

11 yourself with no LLC, self-employed, what -- what was

12 your job before that?

13   A.    Before that, I was in real estate investments.

14   Q.    Who was your boss there?

15   A.    Self-employed.

16   Q.    Okay.  Are you a citizen of the US?

17   A.    I am a permanent resident.

18   Q.    Okay.  Is that the same for your sister?

19   A.    My sister is a US citizen.

20   Q.    Okay.  And your sister is Reem Hanna?

21   A.    Yeah.  My sister is Reem Hanna.

22   Q.    Okay.  Do you recall where you were in March

23 2019?

24   A.    Let me look on my phone.

25          Okay.  I opened all my March photos, so just

EXHIBIT 5

1  tell me which date, and I can look.

2      Q.    Sure.   How about just, you know, towards the

3  end of March 2019.   Were you --

4      A.    End of March.

5      Q.    Were you in California, or were you somewhere

6  else?

7      A.    I'm looking right now.   So I'm going to start

8  from March 31st, and then I will go back.

9      Q.    Okay.

10     A.    So Santa Monica, Santa Monica, Santa Monica.

11 I take a lot of pictures, almost every day.   Santa

12 Monica, Santa Monica, Santa Monica, Malibu, Santa

13 Monica.   Okay.   This is the LA Marathon.   That was March

14 24th.   We were watching it with our friends from a

15 rooftop.   Again, all -- just all Santa Monica really.

16 Yeah.   All the way to March 16th all Santa Monica,

17 Malibu.

18     Q.    How about --

19     A.    How much back do you want me to go for March?

20     Q.    That's fine.

21     A.    Oh.

22     Q.    How about the first -- first two weeks of

23 April 2019.   Were you in California?   I'm just trying to

24 see if you were out of California.

25     A.    Yeah, sure.   Yeah, yeah, yeah.   I got -- oh.

# EXHIBIT 5

1  So you want April.  Okay.  Hold on.  April 2019.  Santa

2  Monica, Santa Monica, Santa Monica all the way to April

3  -- these are all -- these are all Santa Monica.  Let me

4  see.  These are all Santa Monica.  As you can see also

5  on the iPhone it says the -- the location and the day.

6  And then Pacific Palisades, Santa Monica.

7          MR. BERNHARD:  Witness is showing the camera

8      the phone, showing us some photos to show that

9      April 2019 and March 2019, photos which -- you

10     know, just to contribute to the record -- put in

11     the record.

12         THE WITNESS:  Malibu, Malibu.  I remember in

13     Hollywood, this is the Hollywood, you know, sign.

14 BY MR. BERNHARD:

15     Q.   Yeah.

16     A.   And then on April 13th, I went (audio

17 distortion) and I was there --

18     Q.   Where is that?

19     A.   A music conference in California.  It's called

20 Coachella.

21     Q.   Sure.  Okay.

22     A.   So you usually have two weekends.  I went the

23 first weekend and the second weekend.  So the first

24 weekend was April 13th to April 15th.  And me and my

25 girlfriend are -- you know, I'm there.  And then on

# EXHIBIT 5

1   April -- let's see.  Coachella is in a city called Indio,

2   which is about -- it's like two hours away from LA.  And

3   then April 17, I was in Santa Monica.  Just disregard

4   that picture.

5          April 18, Pacific Palisades, which is like --

6   like next door to Malibu.  I want to say Venice.  This

7   is the second weekend of Coachella April 19.  UCLA,

8   Westview Mall, Beverly Hills.  And then Easter on the

9   21st was in Beverly Hills.  Hollywood Hills -- I mean,

10  Hollywood.  I was in the church for Easter, April 25th.

11  April 26th.

12         And then I went to Hawaii on April 26th, and I

13  was in Hawaii just for the weekend.  Then I came back to

14  LA, Beverly Hills.  And then I went to London on --

15  wait, I don't know on this one.  Yeah.  No.  This is

16  still LA, but I don't know why my phone -- and then

17  Santa Monica 27th; 28th, Hollywood Hills.  Yeah.

18     Q.   Okay.  Got it.  Not, you got this place at --

19  at 116 Rockefeller at Irvine.  That's something that you

20  own; is that correct?

21     A.   Yes.

22     Q.   Okay.  Do you own any other properties in --

23  in Irvine, California?

24     A.   No.  I do not.

25     Q.   Okay.  Is this 116 Rockefeller -- is that a

EXHIBIT 5

1  condo?

2      A.   It's a townhome.

3      Q.   It's a townhome.  How many rooms is it?

4      A.   Three bedrooms.

5      Q.   Okay.  And how much rent -- sorry.  Does Reem

6  Hanna pay you rent for --

7      A.   She does.  She does.

8      Q.   How much rent does she pay you?

9      A.   She's paying $3000 a month.

10     Q.   Okay.  Did she pay you that in 2019 every

11 moth?

12     A.   Yes.  I have all the bank statements.

13     Q.   Same for 2020?

14     A.   Same for 2020.

15     Q.   Same for 2021?

16     A.   2021, she only paid me January and February.

17 Yeah.  And then after that, I can't access my bank

18 accounts anymore.

19     Q.   Okay.  So at 116 Rockefeller, is there -- are

20 there any cameras on the outside for security?

21     A.   I believe there's a camera that I saw when I

22 came yesterday at the door -- at the front door.  It's

23 one of these like Ring, you know, Amazon cameras --

24     Q.   Yeah.

25     A.   -- at the front door, but that's about it.

EXHIBIT 5

1    Q.    Okay.  Is there an intercom system?

2    A.    No.  There's not.

3    Q.    Okay.  Is there a doorman?

4    A.    No.  It's a -- it's a house.

5    Q.    Was there a Ring camera at your property at

6    116 Rockefeller in 2019?

7    A.    To be -- to be honest with you, I have not

8    been here in 116 Rockefeller for about probably like

9    over two and a half years, maybe -- maybe more, you

10   know.

11   Q.    Okay.

12   A.    It's been a while.

13   Q.    Does that mean you don't know whether there

14   was a Ring doorbell system in 2019 at 116 Rockefeller?

15        MR. DELLORUSSO:  Objection.

16        THE WITNESS:  I'm not sure.  I'm not sure, to

17   be honest with you.

18   BY MR. BERNHARD:

19   Q.    Do you know if there was a Ring intercom

20   system in 2020 at 116 Rockefeller?

21   A.    Can you -- can you raise your voice a bit?

22   Q.    Yeah.  Was there a Ring camera system at 116

23   Rockefeller in 2020, to your knowledge?

24        MR. DELLORUSSO:  Objection.

25        THE WITNESS:  I'm not sure, Andrew, because,

# EXHIBIT 5

1       as I mentioned to you, I have not been in the Irvine

2       house, not even once in 2020, not even once in

3       2019.  I believe even when I came to Orange County

4       in 2018 it was just for Christmas -- Christmas Eve

5       at my cousin's house in Mission Viejo area, which

6       is like south of Irvine.

7   BY MR. BERNHARD:

8       Q.   Okay.  I saw that you testified that you're

9   not evading service and made -- have made no attempts to

10  evade service in this lawsuit; is that correct?

11      A.   I have not serviced what you said?

12      Q.   That you -- that you are not attempting to

13  evade service -- a processor?

14      A.   What do you mean by evade service?

15      Q.   I think that's in your affidavit, that you

16  made no attempts to evade service.  Does that sound

17  familiar at all?

18      A.   You mean I was serviced?  Is that what you're

19  saying?

20      Q.   So there is a lawsuit --

21      A.   Uh-huh (affirmative).

22      Q.   -- yeah, right, pending called Belgium

23  Investments versus Blank.  Are you aware of that

24  lawsuit?

25      A.   Yeah.  I didn't know anything about the

EXHIBIT 5

1  lawsuit.  I was never served.

2      Q.    Okay.  Have you done anything whatsoever to

3  avoid getting handed a summons for this lawsuit?

4      A.    Absolutely not because no one ever knocked on

5  my door in Santa Monica and said, hey, you are served;

6  here's the lawsuit document.  Because if this -- if this

7  would have ever been the case, I would have called my

8  attorney right away and said, hey, I just got served.  I

9  never got anybody in the -- you know, in Santa Monica to

10 serve me since I lived there in -- since 2016 up until

11 now.

12     Q.    Okay.  Have you -- do you have any -- are you

13 currently avoiding service of process of the summons?

14     A.    No.  I am not.

15     Q.    Okay.  Do you have any problem just accepting

16 service of process for the summons for this lawsuit now?

17         MR. DELLORUSSO:  Objection.  Do not answer

18     that question.

19         THE WITNESS:  Okay.  I object.

20         MR. BERNHARD:  Is there a basis for that?

21     It's not privileged?

22         MR. DELLORUSSO:  Well, yes, it has to do with

23     communications that I had with him in regard to

24     that, and you're asking him to do something that is

25     -- that I spoke to him about.  So --

# EXHIBIT 5

1  BY MR. BERNHARD:

2      Q.   Okay.  I'm not asking you about your

3  conversations with your attorney whatsoever.  I'm asking

4  you right now, do you accept or will you accept service

5  of process of the summons?

6          MR. DELLORUSSO:  I'm going to object.  Do not

7      answer that.

8          MR. BERNHARD:  Okay.  On what basis?

9          MR. DELLORUSSO:  I just told you why.  I spoke

10     to him in regard to this, and I have given him some

11     legal advice that I do not want to come out in

12     regard to that question.

13         MR. BERNHARD:  Okay.  Well, he --

14 BY MR. BERNHARD:

15     Q.   -- don't -- don't tell me any legal advice

16 that your attorney has given you.  You can say I don't

17 accept.  You can say I do accept.  That doesn't reflect

18 on legal advice your -- your attorney has given you.  If

19 the answer is no, just say, no, I will not accept it.

20         MR. DELLORUSSO:  If you can say it without

21     giving your -- any legal advice, then go ahead and

22     answer.

23         THE WITNESS:  As I mentioned to you, Andrew,

24     you know, I'm like why would I not accept service.

25     If anybody came to my door and -- and knock on my

EXHIBIT 5

40

1          door, which is where I live in Santa Monica, and said,

2          hey, you're serviced, I would not have an issue

3          with it at all.  But nobody had -- nobody ever

4          came.

5    BY MR. BERNHARD:

6          Q.   Do you agree just to accept service now?

7               MR. DELLORUSSO:  Same objection.

8    BY MR. BERNHARD:

9          Q.   You can answer.

10         A.   I don't think I should answer that question

11   because, again, you -- you know, do you want to talk

12   about servicing me on a lawsuit?

13         Q.   Yeah.  I'm asking will you just agree to

14   accept service now for this lawsuit.

15         A.   I will have to talk with my attorney.

16              MR. DELLORUSSO:  (Audio distortion)

17   BY MR. BERNHARD:

18         Q.   So is that a no?

19         A.   I will have to consult with my counsel.  I'll

20   have to consult with my counsel first.

21              MR. BERNHARD:  Do you guys want to take a

22         five-minute break and let you consult, and you can

23         come up with a yes or no?

24              MR. DELLORUSSO:  That's fine.

25              MR. BERNHARD:  Okay.  Let's take a quick five.

# EXHIBIT 5

1      We'll be back at 27, okay.  So 2:27.

2            THE WITNESS:  Okay.

3            THE REPORTER:  Okay.

4            MR. BERNHARD:  Okay.

5            THE REPORTER:  All right.  We are off the

6      record.

7            (Recess taken)

8            THE REPORTER:  Okay.  We are back on the

9      record at 5:29 p.m. Florida time.

10           THE WITNESS:  All right.

11           MR. BERNHARD:  Okay.  We're back on the

12     record.

13  BY MR. BERNHARD:

14     Q.   Bassem, do you realize you're still under

15  oath?

16     A.   Yes.

17     Q.   Okay.  We just took a break so you could talk

18  to your attorney.  I want to make sure you don't tell me

19  anything that you talked about with your attorney or

20  told your attorney or he told you.  My question was: do

21  you agree to accept service process now just voluntarily

22  in this depo.

23     A.   I do not.  I do not accept service now.

24     Q.   Okay.  To your knowledge, has Reem Hanna ever

25  received mail for you or deliveries for you at 116

EXHIBIT 5

1  Rockefeller in --

2      A.   No, never.

3      Q.   -- 2019?  Never?

4      A.   Never.

5      Q.   Never at all?

6      A.   No.

7      Q.   Not in 2019?

8      A.   No, never.

9      Q.   Not in 2020?

10     A.   No.

11     Q.   Not in 2021.

12     A.   I don't even have a mail -- I don't even -- my

13  mail is not going to this house.  It goes to Santa

14  Monica.

15     Q.   Okay.  And do you pay utilities at 525

16  Broadway, Apartment 5037?

17     A.   I do not pay the utilities.

18     Q.   Okay.  How do those utilities get paid?

19     A.   It's  -- it's like all included.  The only

20  thing that was paid was the internet, and that was paid

21  by my roommate, and then when he moved out, I switched

22  account under my name, and I'm paying for it.

23     Q.   Okay.  So in 2019, there were no utilities in

24  your name whatsoever at 525 Broadway?

25     A.   No.  Just the rent.

# EXHIBIT 5

43

1      Q.    Same for 2020.  No utilities whatsoever in your

2   name --

3      A.    Same for 2020.  Same since 2016 and '17 and

4   '18.

5      Q.    Okay.  Do you own a car?

6      A.    I do.

7      Q.    Okay.  What car do you own?

8      A.    A Mercedes C-Class.

9      Q.    Okay.  What year is that car?

10     A.    2016.

11     Q.    And where is that car registered?

12     A.    It's in Santa Monica, as well, and it's in my

13  garage in Santa Monica, as well.

14     Q.    Okay.  Is it registered to your address 525

15  Broadway, Santa Monica?

16     A.    You know what, I'm not sure because I bought

17  the car at a dealership in Inland Empire in August of

18  2016, and then at that time I was still living in Irvine

19  address, so they probably like registered it for me in

20  the 116 address.  But I'm not sure if I paid the new

21  registration -- the new registration back in I believe

22  2018 at the 525 Broadway.  I mean, it should be because

23  that's where my ID is also showing, so I think it's now

24  switched to the Santa Monica from 2018.

25     Q.    And is your Mercedes insured as being at 525

# EXHIBIT 5

1  Broadway or at --

2      A.    Yeah.   It did up until my insurance expired

3  last year in -- again, right before the pandemic.

4  Obviously, nobody's driving anymore, so then I just

5  didn't get a new insurance.

6      Q.    Okay.   So was your car registered as insured

7  at your Santa Monica address?

8      A.    525 Broadway.   Yeah.   525 Broadway.

9      Q.    Is that the same for 2019?

10     A.    Same as '19 and '18, and I believe '17, yeah,

11 as well.

12     Q.    Okay.   Do you have any documentation

13 reflecting having your car insured at 525 Broadway

14 rather than at --

15     A.    I can check with my insurance agent.

16     Q.    Okay.   Do you agree to produce that to us?

17     A.    Yeah, yeah.   I'll call him, and then I will

18 have him send me some kind of an email.   It's Farmer's

19 Insurance.   I'll have him send me some kind of an email

20 showing the insurance address.

21     Q.    Okay.

22     A.    Let me write that in my notes.   Just give me a

23 second.

24         Obtain an insurance for my -- my Mercedes at

25 525 Broadway from Farmer's Insurance.   Okay.   Got it.

# EXHIBIT 5

1      Q.   And so is it your position that your sister, Reem

2   Hanna, has never mentioned anything about receiving

3   service of process, a summons, mail, delivery, or even a

4   person knocking at her door for you at any time in the

5   past three years?

6      A.   No, never.

7      Q.   Okay.  Have you ever been accused in court of

8   making a false statement?

9      A.   No.

10      Q.   Okay.  Have you ever been sued for slander,

11   which is the making of a false statement that damages a

12   person's reputation?

13      A.   No.

14      Q.   Okay.  Have you ever been sued for conspiracy,

15   which is a secret planned by a group to do something

16   unlawful?

17      A.   No.

18      Q.   To your knowledge, has your sister, Reem

19   Hanna, ever been accused in court of making a false

20   statement?

21          MR. DELLORUSSO:  Objection.

22          THE WITNESS:  No.

23   BY MR. BERNHARD:

24      Q.   To your knowledge --

25      A.   No.  I don't have any knowledge to that.  No.

# EXHIBIT 5

1        Q.    To your knowledge, has your sister, Reem Hanna,

2   ever been sued?

3        A.    I don't have a knowledge of that.   No.

4        Q.    To your knowledge, has your sister, Reem

5   Hanna, ever been sued for slander, which is the making

6   of a false statement that damages of a person's

7   reputation?

8            MR. DELLORUSSO:   Objection.

9            THE WITNESS:   Not to my knowledge.   No.

10  BY MR. BERNHARD:

11       Q.    To your knowledge, has your sister, Reem

12  Hanna, ever been sued for conspiracy, which is a secret

13  planned by a group to do something unlawful?

14           MR. DELLORUSSO:   Objection.

15           THE WITNESS:   Not to my knowledge at all.

16  BY MR. BERNHARD:

17       Q.    To your knowledge, has your father, Essam El

18  Mallakh, ever been accused in court of making a false

19  statement?

20       A.    No.

21       Q.    To your knowledge, has your father, Essam El

22  Mallakh, ever been sued?

23       A.    No.

24       Q.    To your knowledge, has your father, Essam El

25  Mallakh, ever been sued for slander, which is the making

# EXHIBIT 5

1  of a false statement that damages a person's reputation?

2      A.   No.

3          MR. DELLORUSSO:   Objection.

4  BY MR. BERNHARD:

5      Q.   To your knowledge, has your father, Sam El

6  Mallakh, ever been sued for conspiracy, which is a

7  secret planned by a group to do something unlawful?

8      A.   No.

9      Q.   And to your knowledge, has your mother, Mona

10 Mallakh, ever been accused in court of --

11     A.   Mona Soliman.

12     Q.   Mona Soliman, sorry.  Mona Soliman ever been

13 accused in court of making a false statement?

14     A.   No.

15     Q.   Have you -- has your mother ever gone by the

16 name Mona McCale?

17     A.   I believe so.  Yeah.

18     Q.   Is that like a maiden name?

19     A.   Dad's name.

20     Q.   Okay.  To your knowledge, has your mother,

21 Mona Soliman, also known as Mona McCale, ever been sued?

22     A.   No.

23     Q.   To your knowledge, has your mother, Mona

24 Soliman, also known as Mona McCale, ever been sued for

25 slander, which is the making of a false statement for

EXHIBIT 5

1    damages --

2        A.   No.

3        Q.   -- that damage a person's reputation?

4            MR. DELLORUSSO:  Objection.

5            THE WITNESS:  No.

6    BY MR. BERNHARD:

7        Q.   To your knowledge, has your mother, Mona

8    Soliman, also known as Mona McCale, ever been sued for

9    conspiracy, which is a secret planned by a group to do

10   something unlawful?

11       A.   No.

12       Q.   Have you ever been accused in court of having

13   participated in the commission of a fraud?

14       A.   No.

15       Q.   Do you understand that fraud is -- is an act

16   of dishonesty?

17       A.   Yes.

18       Q.   When do you say you first became a lawsuit

19   that there was a lawsuit pending against you in Florida

20   as to Belgium Investments?

21       A.   I'm sorry.  Say that again.

22       Q.   When did you first -- very first become aware

23   that there was a lawsuit pending against you in Florida

24   from Belgium --

25       A.   When I went to the bank in February to try to

# EXHIBIT 5

1  coordinate to pay my rent at Wells Fargo, and then they said

2  that your account has been frozed; and they took all the

3  money out based on a judgment.  And I'm like -- I was

4  like, "What kind of judgment?"  And the -- they gave me

5  a printout that says a judgment based on a Florida case.

6  And that's when I actually found out that there is a

7  lawsuit/judgment.  So I found out about it in February

8  of 2021 just from going to the bank.

9      Q.   And that's the very first time you heard

10  anything about it.

11      A.   First time.  First time, February 2021.

12      Q.   And when was the last time you spoke with

13  Spencer Blank or his attorneys Eric Jackwin or Michael

14  Caramadre?

15      A.   Spencer, he used to be the construction

16  company for the project at -- over at 960 Bay Drive, and

17  the last time we spoke was probably somewhere --

18  somewhere in the 2016 -- 2016 period because I was the

19  -- the manager of the LLC.

20          And then based on the partners, they just

21  didn't like my performance.  So they -- my partner

22  called me and he said, "Hey, the partners just do not

23  want you to manage the property anymore."  So that was

24  back in 2016.  And they said, "We wanted to remove you

25  from management."  And they were -- basically Spencer

EXHIBIT 5

1    and Bernard were going to be the ones actually managing the

2    project.

3         Q.   By Bernard, you mean Bernard Petite?

4         A.   Bernard Petite.  Yeah.

5         Q.   And since 2016, you have not spoken or heard

6    from Spencer Blank?

7         A.   No.  No.  I don't think so.  He just came one

8    time to LA somewhere in the 2016 time.  He was visiting

9    his -- his brother, and then we just met at a nightclub

10   in Hollywood, just going out and drinking and, you know,

11   having fun.  But that's about it.  We didn't talk about

12   anything business related.

13        Q.   And that time in 2016 when you went to a

14   nightclub in Hollywood with Spencer Blank is the last

15   time you spoke to Spencer Blank in any way?

16        A.   Yeah.

17        Q.   By email, telephone, text message, or anything

18   else?

19        A.   I believe so.  I don't think I had any

20   communication with Spencer ever since Bernard told me

21   that they wanted to remove me from managing the

22   property.

23        Q.   Which you've testified is 2016?

24        A.   2016.

25        Q.   Okay.  Is that the same answer for Spencer

EXHIBIT 5

1    Blank's attorneys, Eric Jackwin or Michael Caramadre?

2        A.   I don't know who Eric Jackwin or Mark -- or

3    Mark -- or -- or -- I don't know who those -- who those

4    people are.

5        Q.   Okay.   What about Bernard Petite.   When was

6    the last time you heard from Bernard Petite in any way?

7        A.   The last time I heard from him was -- I was --

8    I was checking, you know, how are things going with the

9    project, you know, if they finished the construction,

10   what's happening.   And, yeah, that was about -- that was

11   about it.

12       Q.   When was that?

13       A.   Maybe early 2019.   Either early 2019 or early

14   2018 because what happened is I got a call from the --

15   the real estate agent that actually helped us buying and

16   acquiring that building in Miami.   And then he says,

17   "Hey, I just found out that you guys are listing the

18   property for sale."

19            And I was like, "I'm not aware of  -- of

20   anything like that."   And that's when I called Bernard

21   and I said, "Hey, are you guys selling the property?"

22            He's like, "No.   I'm to aware of it, but it

23   seems like Jean Claude is actually trying to sell the

24   property like without telling us, you know."   And that's

25   when him and -- and Jean Claude were supposed to figure

# EXHIBIT 5

52

1  out what's -- what's happening with the property.

2      Q.    And when was that communication with Bernard

3  Petite?

4      A.    I have to check my phone, but I'm thinking

5  either early 2019 or early 2018.  It was the beginning

6  of the year, early 2019 maybe, or -- early 2019 when I

7  found out that they were -- they were listing the

8  property.  I can all look at the MLS, see when they

9  listed the property initially.  That's when I got a call

10  from the agent.

11      Q.    Do you keep a call log with Bernard Petite, or

12  is he in your contact list in your phone?

13      A.    Yeah, he is.

14      Q.    Okay.  Does it say there on your phone the

15  last time you spoke to him?

16      A.    Let me -- let me look.  Honestly, just -- I

17  have one message from him on April 13.  He goes, "Make

18  sure he does."  I think that's when he was replying me

19  -- because I called him on the phone when that happened.

20  I didn't text him.  I just called him, you know, quick,

21  and I said, "Hey, they are trying to sell the property.

22  What's happening?"  Because Bernard and I were -- we

23  have a shareholding interest in the LLC.

24          And so, again, you know -- you know, we don't

25  need to get into a long story, but basically we had

# EXHIBIT 5

1  another deal where actually Jean Claude was able to sell

2  that investment and not give Bernard and I any of our

3  profits at a project in another state -- in Colorado.

4        So that's why him and I, we kind of felt like

5  we -- you know, we can't feel like we can trust, you

6  know, what he can do, so we thought he was going to sell

7  the property without telling us.  So that's when I

8  called Bernard.  I said, "Hey, you know, I heard that

9  they're listing the property.  The agent told me."  And

10 then I told him, "I'm going to make sure -- you know,

11 hey, tell me if -- if -- if anything is -- is under

12 contract."

13       So then that's when he replied to me.  He

14 says, "Make sure he doesn't."  That was April -- I don't

15 know if you can see -- April 13, 2019.

16    Q.   Okay.  So that's April 2019?

17    A.   Yeah.  April 13, 2019, at 1:14 p.m.

18    Q.   Okay.  Is that the very last time that you

19 spoke to Bernard Petite in any way?

20    A.   You know, I can check my newer phone that I --

21 because this phone just, you know, broke, so then I

22 bought a new phone.  So I can check on my new phone when

23 was the last text from him on the new phone.

24    Q.   Is that something that you got there, or is

25 that something that you need to get?

EXHIBIT 5

1    A.    What is it?  Something what?

2    Q.    -- you can do now?

3    A.    Yeah, yeah.  I'm looking at my phone right now

4  as we speak.  Yeah.  October of -- October 9, 2019, I

5  was texting him, and I said, "Do you know that the

6  property on Bay Drive was sold February 19th this year

7  for $2.8 million?"  And he goes, "No.  I don't know

8  that, and it's not possible as I had -- as I had a

9  mediation with Jean Claude on Monday on this."  And then

10 he goes, "What makes you say that?"  And then I said,

11 "Look at the listing."

12    Q.    Okay.  Anything else?

13    A.    No.  And then he goes -- I said -- and then I

14 told him, "Because I got a call from Dennis, the agent

15 in Miami that sold us the property, and he said that he

16 heard that the property was sold."  He goes, "Let's

17 check, but highly impossible."

18        I can check -- and I -- and I told him, "I can

19 check with -- with the title companies, you know, that I

20 can call and -- but I thought that he wouldn't have been

21 able to do that without our signature since we're all a

22 part of LLC."  And then this is his reply.  He goes,

23 "You're kidding.  He sold Denver without -- without us."

24    Q.    Okay.

25    A.    And, yeah, that was about it.

# EXHIBIT 5

1    Q.    So was October 9, 2019, the last time you spoke

2  with Bernard Petite?

3    A.    Yeah, yeah.

4    Q.    Okay.  And when he's referencing mediation

5  there, did you not understand that he's talking about

6  mediating the lawsuit?

7    A.    Him and -- him and Jean Claude.  He never

8  mentioned to me ever that I'm a part of any -- any type

9  of a mediation or any type of a lawsuit.

10    Q.    So you understood at that time that he was in

11  a lawsuit with Jean Claude over this other Belgium

12  Investments?

13    A.    Right.  I understand that Bernard and -- and

14  Jean Claude were having some -- some type of a, you

15  know, legal battle between each other.

16    Q.    And did you ever think --

17    A.    And then at that -- and then at that time,

18  also Bernard asked me -- I remember very well.  He says,

19  "Did anybody try to serve you any documents?"  And said

20  that I have not gotten any documents.

21        And as a matter of fact, Bernard, he came to

22  visit me in my Santa Monica house and -- I'll tell you

23  the exact date because, you know, he spent like a few

24  days with me, and we went to have like some lunch in

25  Malibu and, you know, just kind of spend some time.  So

# EXHIBIT 5

1  that's actually the last time I saw him, and I can tell you.

2  And then he was actually staying in my -- my Santa

3  Monica address.  So I don't like if -- if -- I'm --

4  honestly, I don't even know who's suing me, if it's like

5  Jean Claude or Spencer.  I'm, you know, confused who is

6  suing me.

7         So then they are all talking to each other.

8  So if someone, like my partner, came and stayed at my

9  house in Santa Monica and they are suing me, why don't

10  they go and tell the service person to come to the Santa

11  Monica to serve -- to serve me?  And they all know that

12  I've been living in LA since 2016.

13    Q.    Okay.  So when did Bernard Petite come to your

14  -- stay with --

15    A.    Yeah.  Let me look.  I'll tell you right now.

16         (Pause)

17         You know, I'll have to look more on my phone

18  because we have pictures of the places that we had lunch

19  at and stuff.  I just -- I have to look more on my

20  phone.  I have so many pictures.

21    Q.    Do you think it was after October 2019 or

22  before?

23    A.    I'm actually -- now I keep going back with the

24  dates, so many pictures.  Yeah.  I will have to look

25  again.  I know it's -- I know I have the pictures on the

EXHIBIT 5

1  phone, and I can tell you exactly what date.  One second.

2  Yeah.  I will have to check.

3       Q.   Okay.  Do you think it was after October of

4  2019 that --

5       A.   After October what?

6       Q.   2019.

7       A.   Oh, no, no, no.  It was way before.

8       Q.   Okay.  So it was April 2019 that you contacted

9  Bernard Petite about, you know, the -- the property

10  sale, the money of each property from Belgium

11  Investments from --

12       A.   Right.

13       Q.   -- 2019.  You said that you're -- you're

14  talking and he -- and Bernard Petite is talking about

15  being in mediation in -- in these lawsuits.  Does that

16  sound right so far?

17       A.   Right.  He was mentioning that him and -- and

18  -- and Jean Claude are going through some kind of a

19  mediation.

20       Q.   And so it was after that that he came and

21  stayed at your house -- that Bernard Petite came and

22  stayed at your house in Santa Monica?

23       A.   No, no, no.  He came before -- before that.

24       Q.   Okay.  Do you think it was sometime in 2019?

25       A.   No, no.  Not in '19.  That was -- he came and

# EXHIBIT 5

1  visit me I believe sometime in 2018, maybe -- either 2018 or

2  2017.  I will look through my phone.  I will get you the

3  exact picture with Bernard and I in Malibu having

4  champagne.

5       Q.   So after you October 2019, did you ever heard

6  from -- communicate with Bernard Petite in any way?

7       A.   After October 2019?

8       Q.   Yep.

9       A.   No.  Not necessarily, just maybe just seeing

10 how he is, you know.  Not like any -- anything special.

11      Q.   Well, I'm not asking for special.  I'm just

12 asking for any contact whatsoever.

13      A.   Yes.

14      Q.   Okay.  When else did you talk to him after

15 October 2019?

16      A.   Let me look again.

17           MR. DELLORUSSO:  Andrew, how is this relevant

18       to service?

19           MR. BERNHARD:  Please, you know the -- the

20       rules.

21           MR. DELLORUSSO:  Well, I know.  I'm asking

22       you.

23           MR. BERNHARD:  Speaking objections -- don't

24       ask me.  Just either say objection to form,

25       instruct your client not to answer.

# EXHIBIT 5

1          MR. DELLORUSSO:  I'm going to do that very shortly

2      if you don't stop with these questions.  You've got

3      to stick the service.

4          MR. BERNHARD:  Please stop speaking.  You are

5      coercing the witness's testimony.

6          MR. DELLORUSSO:  I'm not.

7          THE WITNESS:  No.  I don't see any records.

8  BY MR. BERNHARD:

9      Q.    Okay.  So to your knowledge, you may have

10  talked to him a few times after October 2019, but you

11  don't know exactly what or when --

12      A.    You know, we talked on the phone, but I don't

13  see any -- you know, obviously, I don't have a call log,

14  you know, to show me what day we talked.  But I know we

15  did talk on the phone probably like, you know, once or

16  twice in a -- in a -- within that, you know, two years'

17  period.

18      Q.    Okay.  In the past two years, you talked once

19  or twice to Bernard Petite?

20      A.    I'm sorry.  Say that again.

21      Q.    In the past two years, meaning from October

22  2019 to today, you think you've talked to Bernard Petite

23  once or twice?

24      A.    Once or twice.

25      Q.    Okay.  In all that, did he mention to you that

# EXHIBIT 5

1    you were being sued in a lawsuit here in Florida?

2        A.    He said he's -- he's getting sued, and he

3    says, "Did you get any documents or any service --

4    service?"  And I said, "I did not."

5        Q.    Did you understand by that question that

6    somebody was attempting to serve documents about a

7    lawsuit on you?

8        A.    Right.

9        Q.    Okay.  Did you do anything to investigate if

10   you were getting sued or what that was all about?

11           MR. DELLORUSSO:  Objection.

12           THE WITNESS:  No.  I did not because, you

13       know, usually when someone is suing you, you need

14       to obviously service you with the documents to know

15       what is going on with the lawsuit.

16   BY MR. BERNHARD:

17       Q.    Okay.  Did you hire an attorney to look into

18   it?

19       A.    No, because I was waiting to get serviced.

20       Q.    Okay.  Did you call anybody in Miami or in

21   Florida to find out what was going on with the lawsuit

22   against you?

23       A.    No.

24       Q.    So you're just waiting for somebody to service

25   summons on you?

# EXHIBIT 5

1        A.   Right.

2        Q.   Okay.

3            MR. BERNHARD:  I have no other questions.

4            MR. DELLORUSSO:  I have like a few questions.

5    Bassem, you can just proceed.  I'll be like five

6    minutes.

7            THE WITNESS:  Sure.

8                 EXAMINATION BY MR. DELLORUSSO

9    BY MR. DELLORUSSO:

10       Q.   In the year of 2018, where was your primary

11   residence?

12       A.   525 Broadway, Santa Monica, Los Angeles.

13       Q.   In the year 2019, where was your --

14       A.   525 Broadway, Santa Monica, Los Angeles.

15       Q.   In the year 2020, where was your primary

16   residence?

17       A.   525 Broadway, Santa Monica, Los Angeles.

18       Q.   And is that the same for 2021?

19       A.   Yes.

20       Q.   Were you ever served with any documents

21   related to this lawsuit in 2000 -- between 2018 and

22   2020?

23       A.   No.  I have not -- never been served.

24       Q.   Have you ever seen a copy of the complaint --

25   have you ever seen a copy of the complaint before --

# EXHIBIT 5

1    before 2020?

2         A.   Before 2020 or before 2021?

3         Q.   Before -- before 2020.  Have you ever seen a

4    copy of the --

5         A.   No.  No, nothing.

6         Q.   Okay.  Were you aware of any attempts -- were

7    you aware of any attempts of service of process on you

8    -- on your sister, Reem Hanna?

9         A.   No.

10        Q.   Okay.

11        A.   I was never aware.

12        Q.   Okay.  And then I want to briefly discuss with

13   you -- let's see if I can -- the 116 Rockefeller,

14   Irvine, California, address.  Are you aware of that

15   address?

16        A.   Yes, I am.

17        Q.   Okay.  And who resides at that address?

18        A.   My sister, Reem Hanna.

19        Q.   And does she reside with anybody else?

20        A.   No.  She lives with her son.

21        Q.   Okay.  Do you reside at that address?

22        A.   I do not.

23        Q.   Okay.  And I think you testified earlier you

24   have a Mercedes?

25        A.   Yes, I do.

# EXHIBIT 5

63

1    Q.    Okay.  What color is your Mercedes?

2    A.    It's a white Mercedes C-300.

3    Q.    Okay.  Would that white Mercedes C-300 ever be

4  at the 116 Rockefeller, Irvine, California, address?

5    A.    No.  It's parked in my garage at 525 Broadway.

6    Q.    Okay.  Were you ever served with -- were --

7  strike that.

8          If there was ever attempt to provide service

9  upon you, would you accept service?

10   A.    If there was a service that someone was trying

11 to attempt to service me?

12   Q.    Correct.  Would you accept?

13   A.    Yeah.  If -- yeah.  If someone will come and

14 service me, I will accept service.

15   Q.    Okay.  Would you ever attempt to avoid

16 service?

17   A     No, never.

18   Q.    Okay.  Have you ever attempted to evade

19 service of process?

20   A.    No.

21   Q.    Okay.  Have you instructed anyone in your

22 family to evade service of process on this lawsuit?

23   A.    No, never.

24   Q.    Okay.  Have you had any other residences in

25 the years between 2018 and 2020 besides the residence

# EXHIBIT 5

64

1  that you're living in now?

2      A.   No.  Just the -- the same Santa Monica address

3  since November 1, 2016.

4      Q.   Okay.  And you've been sued before, correct?

5      A.   Yes, I have.

6      Q.   You're aware of how lawsuits work, correct?

7      A.   Absolutely.

8      Q.   You're aware that they have to actually serve

9  you with papers, correct?

10     A.   Of course, especially here in California.

11     Q.   Okay.

12          MR. DELLORUSSO:  No further questions.

13          THE WITNESS:  Okay.

14          MR. BERNHARD:  No further questions.  I really

15  appreciate it, Bassem.  Thanks for taking the time.  I

16  know you guys had a long day.  I appreciate you coming

17  in.

18          THE WITNESS:  Oh, no problem.  I'm -- I have

19  this all day if you guys have any questions.

20          MR. BERNHARD:  Nope.  Thanks so much, guys.

21          MR. DELLORUSSO:  Andrew, real quick since I

22  have you here.  I had my assistant call for -- for

23  dates.  I believe we talked about the 23rd and 24th.

24          MR. BERNHARD:  Yeah.

25          MR. DELLORUSSO:  The only availability right

# EXHIBIT 5

1  now -- I know we talked about the afternoon, so I just want

2  to do the notice.  The date that -- I mean, the time

3  that she told me was -- let me pull it up.

4          THE REPORTER:  Did you want to order?

5          MR. BERNHARD:  I do want to order.  Rush

6  delivery for mine.

7          THE REPORTER:  Okay.  Rush.

8          MR. BERNHARD:  And, Frank, if you just send me

9  the date and time, I will have to check with my wife

10  because of the kid.  We have to do this joint thing.

11  But I will respond to you tonight if you just shoot me

12  the dates by email.

13          MR. DELLORUSSO:  Okay.

14          THE WITNESS:  And also, sorry for -- sorry,

15  Frank.  I just wanted to -- to just let everybody know

16  that, you know, with the judgment that they have against

17  me now, I cannot literally live.  I'm already having so

18  much damages.  I'm going to actually put a whole list of

19  all the damages I've been going through by not able to

20  access any of my bank accounts.  We need to like rush

21  this as -- as -- you know, remove this judgment as much

22  -- as soon as possible.

23          MR. DELLORUSSO:  We have an order to that

24  effect.

25          Andrew, I'll email you, but it's -- it's the

# EXHIBIT 5

```
 1  24th at 3:15 for 45 minutes.

 2          MR. BERNHARD:  Okay.  Well, I'll find out

 3  tonight.

 4          MR. DELLORUSSO:  Okay.  I'll email you.

 5          MR. BERNHARD:  All right.  Thanks, guys.  All

 6  right.

 7          THE WITNESS:  All right.  Thank you, guys.

 8  Thank you, Frank.

 9          MR. BERNHARD:  Thank you, guys.

10          MR. DELLORUSSO:  And also, Madam Court

11  Reporter?

12          THE REPORTER:  Yes.

13          MR. DELLORUSSO:  Can you just send me the cost

14  of -- of -- of a copy if I wanted a copy of that, what

15  the cost would be?  Can you just email me?

16          THE REPORTER:  Yeah.  Well, if you have my --

17  you have my email address, right?  I put it in the chat.

18          MR. DELLORUSSO:  Okay.  Well -- well, I think

19  --

20          MR. BERNHARD:  I copied you -- I coped you

21  too, Frank, so you can just email her.

22          MR. DELLORUSSO:  Okay.  I'll email you.

23          MR. BERNHARD:  All right, guys.

24          THE REPORTER:  Okay.  And did you want -- you

25  wanted a copy also rushed?
```

# EXHIBIT 5

1           MR. DELLORUSSO:  I don't know yet.  I need to talk

2    to my client.  I just wanted to get prices first --

3           THE REPORTER:  Okay.

4           MR. DELLORUSSO:  -- for a copy.

5           THE REPORTER:  I don't have the prices.  My

6    boss sets those prices.

7           MR. DELLORUSSO:  Sure.  Whenever you have

8    them, just let me know.

9           THE REPORTER:  Okay.  Thank you.

10          MR. DELLORUSSO:  Thank you.

11          MR. BERNHARD:  Guys, all right.

12          THE WITNESS:  Thank you, guys.

13          THE REPORTER:  Bye.

14          THE WITNESS:  Bye-bye.

15          (Thereupon, the deposition was concluded at

16    6:01 p.m.)

17

18

19

20

21

22

23

24

25

# EXHIBIT 5

68

CERTIFICATE OF OATH

STATE OF FLORIDA

COUNTY OF BROWARD


        I, Erica Hylton, Court Reporter, Notary

Public, State of Florida, certify that Bassem El

Mallakh, appeared before me via Zoom video on the

18th day of March 2021, and was duly sworn.

        Signed this 21st day of March 2021.




        _____

        Erica Hylton, Court Reporter

        Notary Public, State of Florida

        Commission No.:

        Commission Expires:


EXHIBIT 5

1                           CERTIFICATE OF REPORTER

2        STATE OF FLORIDA

3        COUNTY OF BROWARD

4

5            I, Erica Hylton, Court Reporter, certify that

6        I was authorized to and did report the Deposition

7        of Bassem El Mallakh; that a review of the

8        transcript was waived; and that the transcript is a

9        true and correct record of my notes.

10           I further certify that I am not a relative,

11       employee, attorney, or counsel of any of the

12       parties, nor am I a relative or employee of any of

13       the parties' attorneys or counsel connected with

14       the action, nor am I financially interested in the

15       action.

16           Dated this 21st day of March 2021.

17

18

19       _____

20       Erica Hylton, Court Reporter

21

22

23

24

25

# EXHIBIT 5

# EXHIBIT "8"

1  voice started getting a little rusty, I'm going to have some

2  water.

3       Q.   Okay.   Perfect.

4            Have you ever been arrested or convicted for

5  any acts of fraud or other crimes involving deceit?

6       A.   I have not.

7       Q.   Have you ever been accused in court of any

8  acts of fraud or other acts of deceit?

9       A.   I have not.

10      Q.   Okay.   Have you ever been sued for any act of

11 fraud, misrepresentation, or deceit?

12      A.   I have not.   No.   I have not.

13      Q.   To your knowledge, have you been sued for that

14 by Belgium Investments in this lawsuit today?

15      A.   I have -- I don't know anything about the

16 lawsuit of Belgium Investments.

17      Q.   You don't know anything about it whatsoever.

18      A.   Not -- I never received anything.   I guess

19 they were trying to serve me in the address that I don't

20 -- I don't live in anymore.

21      Q.   Is there any reason you can think of why you

22 would not be able to answer my questions fully and

23 truthfully today?

24      A.   No.   There's no reason.

25      Q.   And you understand you're speaking under

EXHIBIT 5

25

1  in their system, I don't really -- I don't really care, you

2  know.  That doesn't change the fact that this is my

3  name.

4      Q.   Okay.  But whenever you fill out forms, you

5  put your first name as Bassem as your last name as El

6  Mallakh.

7      A.   Yes.

8      Q.   Okay.  And you say you're currently located

9  116 Rockefeller but you reside somewhere else; is that

10 right?

11     A.   Yes.

12     Q.   Okay.  Where do you reside?

13     A.   I live in Santa Monica.

14     Q.   Okay.  What address?

15     A.   525 Broadway.

16     Q.   How long have you resided there?

17     A.   Since November 1st of 2016.

18     Q.   And do you essentially sleep every night there

19 in 525 Broadway in Santa Monica?

20     A.   Yes.

21     Q.   Do you regularly take vacations or trips that

22 would have you not sleeping at that property?

23     A.   Yeah.  I do usually take some vacations.

24     Q.   Okay.  How frequently do you vacation?

25     A.   Probably like maybe three or four times a

# EXHIBIT 5

1  year.

2      Q.    Okay.   Those vacations, are they long, short,

3  a week?

4      A.    Sometimes it could be a week, and the longest

5  vacation, it could be like a month.

6      Q.    Okay.  Have you been on any vacations lately?

7      A.    Not in 2021.   Like I mean, just Santa Barbara,

8  you know, Palm Springs, like stuff like that, not like

9  out of the state.

10     Q.    Well, have you been away from your home at --

11  at your residence at 525 Broadway for any period more

12  than two nights in 2021?

13     A.    Yeah, of course.

14     Q.    Okay.  Well, it's not of course to me.  So --

15     A.    Sorry.  I just wasn't understanding your

16  question.

17     Q.    So when have you been away from your residence

18  at 525 Broadway for more than two days in 2021?

19     A.    Most of -- most of the -- most of like the

20  first week of February.  Most of the first week of

21  February, and that's -- that's about it.  Yeah.

22     Q.    Okay.  That's 2021?

23     A.    2021, yeah.

24     Q.    Where were you for the first week of February

25  in 2021?

# EXHIBIT 5

1        A.    I was just like spending some time with my

2   girlfriend.

3        Q.    Okay.  Was that someplace out in Santa Monica?

4        A.    Santa Monica.

5        Q.    In Santa Monica, just not at 525 Broadway?

6        A.    No.

7        Q.    What's the name of your girlfriend?

8        A.    Ally (phonetic).

9        Q.    What's Ally's last name?

10       A.    Chambers.

11       Q.    C-h-a-m-b --

12       A.    C-h-a-m-b-e-r-s.

13       Q.    Okay.  And does she reside in Santa Monica

14  too?

15       A.    She does.

16       Q.    Okay.  What about 2019.  Were you -- sorry,

17  2020.  Were you away from 525 Broadway for any

18  protracted period of time, more than two days?

19       A.    2020 was the pandemic, so I was -- I was

20  pretty much at home throughout the whole year pretty

21  much, you know.  I don't know if you guys are familiar

22  with the LA cases that we had the highest COVID cases in

23  the -- I mean, not in just the country -- I the world.

24  So it was very dangerous for me to get out of the house.

25       Q.    Okay.  So is there any time you were away from

# EXHIBIT 5

1   525 Broadway sleeping somewhere else for more than two days

2   in 2020?

3       A.   No.   No.   Just either between my house or my

4   girlfriend's house.   That's about it.   Nothing --

5       Q.   Okay.   What about 2019.   Any time you were

6   away from the house, 525 Broadway, for more than two

7   nights?

8       A.   2019 I traveled quite a bit.   I traveled quite

9   a bit in 2019.   Yeah.   2019 I traveled quite a bit.

10      Q.   Okay.   Where did you go?

11      A.   I went to Puerto Rico, the Caribbean.   I went

12  to Europe for about like three weeks.   Yeah.   I traveled

13  quite a bit in 2019.

14      Q.   Okay.   For -- for 525 Broadway, is that the

15  address that USPS has for you?   Is that where you're

16  registered as your residence?

17      A.   Yeah.   That's my -- that's my address of mail

18  because -- I mean, I only have Amazon.   I don't really

19  get mail.   I just have Amazon and the DMV.   That's about

20  it.

21      Q.   Okay.   Has 525 Broadway been your registered

22  address with the DMV since when?

23      A.   Since -- let me look at my ID -- 10/19/2017.

24  You'll see it at the very bottom right.

25      Q.   Okay.   And why don't you get any mail?

# EXHIBIT 5

1      A.   I'm sorry, what?  My bank statements are all

2  paperless.  My phone bill is paperless.  You know, just

3  Amazon and DMV.  That's about it.

4      Q.   You don't get any junk mail?

5      A.   Yeah.  I do get junk mail, but I -- you know,

6  a bunch of magazines and, you know, coupons and offers;

7  and I just like throw them in the trash.

8      Q.   Okay.  Do you get that junk mail to 525

9  Broadway in your name?

10     A.   Yes.

11     Q.   Okay.  What's your current job?

12     A.   I am currently unemployed.

13     Q.   How long have you been unemployed?

14     A.   Since the pandemic.

15     Q.   And does that mean since March 2019?

16     A.   Yeah.

17     Q.   Okay.  At 525 Broadway, do you pay rent?

18     A.   I do.

19     Q.   Do you have a roommate?

20     A.   I used to -- I used to have a roommate.  Yeah.

21     Q.   Who was that?

22     A.   His name is Mohammad Rostom.

23     Q.   How do you spell his last name?

24     A.   R-o-s-t-o-m.

25     Q.   And when was he your roommate?

EXHIBIT 5

35

1   condo?

2        A.   It's a townhome.

3        Q.   It's a townhome.  How many rooms is it?

4        A.   Three bedrooms.

5        Q.   Okay.  And how much rent -- sorry.  Does Reem

6   Hanna pay you rent for --

7        A.   She does.  She does.

8        Q.   How much rent does she pay you?

9        A.   She's paying $3000 a month.

10        Q.   Okay.  Did she pay you that in 2019 every

11   moth?

12        A.   Yes.  I have all the bank statements.

13        Q.   Same for 2020?

14        A.   Same for 2020.

15        Q.   Same for 2021?

16        A.   2021, she only paid me January and February.

17   Yeah.  And then after that, I can't access my bank

18   accounts anymore.

19        Q.   Okay.  So at 116 Rockefeller, is there -- are

20   there any cameras on the outside for security?

21        A.   I believe there's a camera that I saw when I

22   came yesterday at the door -- at the front door.  It's

23   one of these like Ring, you know, Amazon cameras --

24        Q.   Yeah.

25        A.   -- at the front door, but that's about it.

EXHIBIT 5

1    Q.    Okay.  Is there an intercom system?

2    A.    No.  There's not.

3    Q.    Okay.  Is there a doorman?

4    A.    No.  It's a -- it's a house.

5    Q.    Was there a Ring camera at your property at

6  116 Rockefeller in 2019?

7    A.    To be -- to be honest with you, I have not

8  been here in 116 Rockefeller for about probably like

9  over two and a half years, maybe -- maybe more, you

10  know.

11    Q.    Okay.

12    A.    It's been a while.

13    Q.    Does that mean you don't know whether there

14  was a Ring doorbell system in 2019 at 116 Rockefeller?

15          MR. DELLORUSSO:  Objection.

16          THE WITNESS:  I'm not sure.  I'm not sure, to

17      be honest with you.

18  BY MR. BERNHARD:

19    Q.    Do you know if there was a Ring intercom

20  system in 2020 at 116 Rockefeller?

21    A.    Can you -- can you raise your voice a bit?

22    Q.    Yeah.  Was there a Ring camera system at 116

23  Rockefeller in 2020, to your knowledge?

24          MR. DELLORUSSO:  Objection.

25          THE WITNESS:  I'm not sure, Andrew, because,

# EXHIBIT 5

1         as I mentioned to you, I have not been in the Irvine

2         house, not even once in 2020, not even once in

3         2019.  I believe even when I came to Orange County

4         in 2018 it was just for Christmas -- Christmas Eve

5         at my cousin's house in Mission Viejo area, which

6         is like south of Irvine.

7    BY MR. BERNHARD:

8         Q.   Okay.  I saw that you testified that you're

9    not evading service and made -- have made no attempts to

10   evade service in this lawsuit; is that correct?

11        A.   I have not serviced what you said?

12        Q.   That you -- that you are not attempting to

13   evade service -- a processor?

14        A.   What do you mean by evade service?

15        Q.   I think that's in your affidavit, that you

16   made no attempts to evade service.  Does that sound

17   familiar at all?

18        A.   You mean I was serviced?  Is that what you're

19   saying?

20        Q.   So there is a lawsuit --

21        A.   Uh-huh (affirmative).

22        Q.   -- yeah, right, pending called Belgium

23   Investments versus Blank.  Are you aware of that

24   lawsuit?

25        A.   Yeah.  I didn't know anything about the

# EXHIBIT 5

1      Q.   And so is it your position that your sister, Reem

2  Hanna, has never mentioned anything about receiving

3  service of process, a summons, mail, delivery, or even a

4  person knocking at her door for you at any time in the

5  past three years?

6      A.   No, never.

7      Q.   Okay.  Have you ever been accused in court of

8  making a false statement?

9      A.   No.

10     Q.   Okay.  Have you ever been sued for slander,

11  which is the making of a false statement that damages a

12  person's reputation?

13     A.   No.

14     Q.   Okay.  Have you ever been sued for conspiracy,

15  which is a secret planned by a group to do something

16  unlawful?

17     A.   No.

18     Q.   To your knowledge, has your sister, Reem

19  Hanna, ever been accused in court of making a false

20  statement?

21          MR. DELLORUSSO:  Objection.

22          THE WITNESS:  No.

23  BY MR. BERNHARD:

24     Q.   To your knowledge --

25     A.   No.  I don't have any knowledge to that.  No.

# EXHIBIT 5

1     Q.   To your knowledge, has your sister, Reem Hanna,

2  ever been sued?

3     A.   I don't have a knowledge of that.  No.

4     Q.   To your knowledge, has your sister, Reem

5  Hanna, ever been sued for slander, which is the making

6  of a false statement that damages of a person's

7  reputation?

8          MR. DELLORUSSO:  Objection.

9          THE WITNESS:  Not to my knowledge.  No.

10 BY MR. BERNHARD:

11    Q.   To your knowledge, has your sister, Reem

12 Hanna, ever been sued for conspiracy, which is a secret

13 planned by a group to do something unlawful?

14         MR. DELLORUSSO:  Objection.

15         THE WITNESS:  Not to my knowledge at all.

16 BY MR. BERNHARD:

17    Q.   To your knowledge, has your father, Essam El

18 Mallakh, ever been accused in court of making a false

19 statement?

20    A.   No.

21    Q.   To your knowledge, has your father, Essam El

22 Mallakh, ever been sued?

23    A.   No.

24    Q.   To your knowledge, has your father, Essam El

25 Mallakh, ever been sued for slander, which is the making

# EXHIBIT 5

1  of a false statement that damages a person's reputation?

2      A.   No.

3          MR. DELLORUSSO:  Objection.

4  BY MR. BERNHARD:

5      Q.   To your knowledge, has your father, Sam El

6  Mallakh, ever been sued for conspiracy, which is a

7  secret planned by a group to do something unlawful?

8      A.   No.

9      Q.   And to your knowledge, has your mother, Mona

10 Mallakh, ever been accused in court of --

11     A.   Mona Soliman.

12     Q.   Mona Soliman, sorry.  Mona Soliman ever been

13 accused in court of making a false statement?

14     A.   No.

15     Q.   Have you -- has your mother ever gone by the

16 name Mona McCale?

17     A.   I believe so.  Yeah.

18     Q.   Is that like a maiden name?

19     A.   Dad's name.

20     Q.   Okay.  To your knowledge, has your mother,

21 Mona Soliman, also known as Mona McCale, ever been sued?

22     A.   No.

23     Q.   To your knowledge, has your mother, Mona

24 Soliman, also known as Mona McCale, ever been sued for

25 slander, which is the making of a false statement for

# EXHIBIT 5

1    damages --

2        A.    No.

3        Q.    -- that damage a person's reputation?

4            MR. DELLORUSSO:  Objection.

5            THE WITNESS:  No.

6    BY MR. BERNHARD:

7        Q.    To your knowledge, has your mother, Mona

8    Soliman, also known as Mona McCale, ever been sued for

9    conspiracy, which is a secret planned by a group to do

10   something unlawful?

11       A.    No.

12       Q.    Have you ever been accused in court of having

13   participated in the commission of a fraud?

14       A.    No.

15       Q.    Do you understand that fraud is -- is an act

16   of dishonesty?

17       A.    Yes.

18       Q.    When do you say you first became a lawsuit

19   that there was a lawsuit pending against you in Florida

20   as to Belgium Investments?

21       A.    I'm sorry.  Say that again.

22       Q.    When did you first -- very first become aware

23   that there was a lawsuit pending against you in Florida

24   from Belgium --

25       A.    When I went to the bank in February to try to

# EXHIBIT 5

1  coordinate to pay my rent at Wells Fargo, and then they said

2  that your account has been frozen; and they took all the

3  money out based on a judgment.  And I'm like -- I was

4  like, "What kind of judgment?"  And the -- they gave me

5  a printout that says a judgment based on a Florida case.

6  And that's when I actually found out that there is a

7  lawsuit/judgment.  So I found out about it in February

8  of 2021 just from going to the bank.

9       Q.   And that's the very first time you heard

10  anything about it.

11       A.   First time.  First time, February 2021.

12       Q.   And when was the last time you spoke with

13  Spencer Blank or his attorneys Eric Jackwin or Michael

14  Caramadre?

15       A.   Spencer, he used to be the construction

16  company for the project at -- over at 960 Bay Drive, and

17  the last time we spoke was probably somewhere --

18  somewhere in the 2016 -- 2016 period because I was the

19  -- the manager of the LLC.

20            And then based on the partners, they just

21  didn't like my performance.  So they -- my partner

22  called me and he said, "Hey, the partners just do not

23  want you to manage the property anymore."  So that was

24  back in 2016.  And they said, "We wanted to remove you

25  from management."  And they were -- basically Spencer

EXHIBIT 5

1      A.   What is it?  Something what?

2      Q.   -- you can do now?

3      A.   Yeah, yeah.  I'm looking at my phone right now

4  as we speak.  Yeah.  October of -- October 9, 2019, I

5  was texting him, and I said, "Do you know that the

6  property on Bay Drive was sold February 19th this year

7  for $2.8 million?"  And he goes, "No.  I don't know

8  that, and it's not possible as I had -- as I had a

9  mediation with Jean Claude on Monday on this."  And then

10 he goes, "What makes you say that?"  And then I said,

11 "Look at the listing."

12     Q.   Okay.  Anything else?

13     A.   No.  And then he goes -- I said -- and then I

14 told him, "Because I got a call from Dennis, the agent

15 in Miami that sold us the property, and he said that he

16 heard that the property was sold."  He goes, "Let's

17 check, but highly impossible."

18          I can check -- and I -- and I told him, "I can

19 check with -- with the title companies, you know, that I

20 can call and -- but I thought that he wouldn't have been

21 able to do that without our signature since we're all a

22 part of LLC."  And then this is his reply.  He goes,

23 "You're kidding.  He sold Denver without -- without us."

24     Q.   Okay.

25     A.   And, yeah, that was about it.

# EXHIBIT 5

1    Q.    So was October 9, 2019, the last time you spoke

2 with Bernard Petite?

3    A.    Yeah, yeah.

4    Q.    Okay.  And when he's referencing mediation

5 there, did you not understand that he's talking about

6 mediating the lawsuit?

7    A.    Him and -- him and Jean Claude.  He never

8 mentioned to me ever that I'm a part of any -- any type

9 of a mediation or any type of a lawsuit.

10    Q.    So you understood at that time that he was in

11 a lawsuit with Jean Claude over this other Belgium

12 Investments?

13    A.    Right.  I understand that Bernard and -- and

14 Jean Claude were having some -- some type of a, you

15 know, legal battle between each other.

16    Q.    And did you ever think --

17    A.    And then at that -- and then at that time,

18 also Bernard asked me -- I remember very well.  He says,

19 "Did anybody try to serve you any documents?"  And said

20 that I have not gotten any documents.

21         And as a matter of fact, Bernard, he came to

22 visit me in my Santa Monica house and -- I'll tell you

23 the exact date because, you know, he spent like a few

24 days with me, and we went to have like some lunch in

25 Malibu and, you know, just kind of spend some time.  So

# EXHIBIT 5

56

1   that's actually the last time I saw him, and I can tell you.

2   And then he was actually staying in my -- my Santa

3   Monica address.  So I don't like if -- if -- I'm --

4   honestly, I don't even know who's suing me, if it's like

5   Jean Claude or Spencer.  I'm, you know, confused who is

6   suing me.

7         So then they are all talking to each other.

8   So if someone, like my partner, came and stayed at my

9   house in Santa Monica and they are suing me, why don't

10   they go and tell the service person to come to the Santa

11   Monica to serve -- to serve me?  And they all know that

12   I've been living in LA since 2016.

13     Q.  Okay.  So when did Bernard Petite come to your

14   -- stay with --

15     A.  Yeah.  Let me look.  I'll tell you right now.

16        (Pause)

17        You know, I'll have to look more on my phone

18   because we have pictures of the places that we had lunch

19   at and stuff.  I just -- I have to look more on my

20   phone.  I have so many pictures.

21     Q.  Do you think it was after October 2019 or

22   before?

23     A.  I'm actually -- now I keep going back with the

24   dates, so many pictures.  Yeah.  I will have to look

25   again.  I know it's -- I know I have the pictures on the

EXHIBIT 5

59

```
 1            MR. DELLORUSSO:  I'm going to do that very shortly

 2       if you don't stop with these questions.  You've got

 3       to stick the service.

 4            MR. BERNHARD:  Please stop speaking.  You are

 5       coercing the witness's testimony.

 6            MR. DELLORUSSO:  I'm not.

 7            THE WITNESS:  No.  I don't see any records.

 8  BY MR. BERNHARD:

 9       Q.   Okay.  So to your knowledge, you may have

10  talked to him a few times after October 2019, but you

11  don't know exactly what or when --

12       A.   You know, we talked on the phone, but I don't

13  see any -- you know, obviously, I don't have a call log,

14  you know, to show me what day we talked.  But I know we

15  did talk on the phone probably like, you know, once or

16  twice in a -- in a -- within that, you know, two years'

17  period.

18       Q.   Okay.  In the past two years, you talked once

19  or twice to Bernard Petite?

20       A.   I'm sorry.  Say that again.

21       Q.   In the past two years, meaning from October

22  2019 to today, you think you've talked to Bernard Petite

23  once or twice?

24       A.   Once or twice.

25       Q.   Okay.  In all that, did he mention to you that
```

EXHIBIT 5

1    you were being sued in a lawsuit here in Florida?

2        A.    He said he's -- he's getting sued, and he

3    says, "Did you get any documents or any service --

4    service?"  And I said, "I did not."

5        Q.    Did you understand by that question that

6    somebody was attempting to serve documents about a

7    lawsuit on you?

8        A.    Right.

9        Q.    Okay.  Did you do anything to investigate if

10   you were getting sued or what that was all about?

11           MR. DELLORUSSO:  Objection.

12           THE WITNESS:  No.  I did not because, you

13       know, usually when someone is suing you, you need

14       to obviously service you with the documents to know

15       what is going on with the lawsuit.

16   BY MR. BERNHARD:

17       Q.    Okay.  Did you hire an attorney to look into

18   it?

19       A.    No, because I was waiting to get serviced.

20       Q.    Okay.  Did you call anybody in Miami or in

21   Florida to find out what was going on with the lawsuit

22   against you?

23       A.    No.

24       Q.    So you're just waiting for somebody to service

25   summons on you?

# EXHIBIT 5

1        A.    Right.

2        Q.    Okay.

3            MR. BERNHARD:  I have no other questions.

4            MR. DELLORUSSO:  I have like a few questions.

5    Bassem, you can just proceed.  I'll be like five

6    minutes.

7            THE WITNESS:  Sure.

8                EXAMINATION BY MR. DELLORUSSO

9    BY MR. DELLORUSSO:

10       Q.    In the year of 2018, where was your primary

11   residence?

12       A.    525 Broadway, Santa Monica, Los Angeles.

13       Q.    In the year 2019, where was your --

14       A.    525 Broadway, Santa Monica, Los Angeles.

15       Q.    In the year 2020, where was your primary

16   residence?

17       A.    525 Broadway, Santa Monica, Los Angeles.

18       Q.    And is that the same for 2021?

19       A.    Yes.

20       Q.    Were you ever served with any documents

21   related to this lawsuit in 2000 -- between 2018 and

22   2020?

23       A.    No.  I have not -- never been served.

24       Q.    Have you ever seen a copy of the complaint --

25   have you ever seen a copy of the complaint before --

# EXHIBIT 5

1  before 2020?

2       A.   Before 2020 or before 2021?

3       Q.   Before -- before 2020.  Have you ever seen a

4  copy of the --

5       A.   No.  No, nothing.

6       Q.   Okay.  Were you aware of any attempts -- were

7  you aware of any attempts of service of process on you

8  -- on your sister, Reem Hanna?

9       A.   No.

10      Q.   Okay.

11      A.   I was never aware.

12      Q.   Okay.  And then I want to briefly discuss with

13 you -- let's see if I can -- the 116 Rockefeller,

14 Irvine, California, address.  Are you aware of that

15 address?

16      A.   Yes, I am.

17      Q.   Okay.  And who resides at that address?

18      A.   My sister, Reem Hanna.

19      Q.   And does she reside with anybody else?

20      A.   No.  She lives with her son.

21      Q.   Okay.  Do you reside at that address?

22      A.   I do not.

23      Q.   Okay.  And I think you testified earlier you

24 have a Mercedes?

25      A.   Yes, I do.

# EXHIBIT 5

# EXHIBIT "9"

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

CASE NO.: 18-28145 CA


BELGIUM INVESTMENTS 960 BAY DR, LLC,
A CALIFORNIA LLC, ET AL.,

    Plaintiff,

    -vs-

SPENCER BLANK, ET AL.,

    Defendant.
_____/


Deposition Taken via Zoom

2:10 p.m. to 4:40 p.m.


DEPOSITION OF

REEM HANNA


    Taken before Erica Hylton, Court Reporter, a

Notary Public for the State of Florida at Large,

pursuant to Notice of Taking Deposition Duces Tecum

filed in the above-styled cause.


EXHIBIT 21

2

```
 1                        APPEARANCES:

 2         On Behalf of the Plaintiff:

 3         BERNHARD LAW FIRM PLLC

 4         BY: ANDREW BERNHARD

 5         333 SE 2nd Avenue, Suite 2000

 6         Miami, Florida 33131

 7         (786) 871-3349

 8         abernhard@bernhardlawfirm.com

 9

10         On Behalf of the Defendant:

11         SOUTH FLORIDA LAW, PLLC

12         BY:  FRANK DELLORUSSO, ESQUIRE

13         1920 East Hallandale Beach Boulevard

14         Suite 702

15         Hallandale, Florida 33009

16

17

18

19

20

21

22

23

24

25
```

# EXHIBIT 21

1                              INDEX

2      TESTIMONY OF REEM HANNA                    PAGE

3      Examination by Mr. Bernhard               5

4      Examination by Mr. DelloRusso             88

5      Examination by Mr. Bernhard               95

6      Certificate of Oath                       101

7      Certificate of Reporter                   102

8

9                     INDEX OF EXHIBITS

10             DEFENDANT'S EXHIBITS MARKED

11     NUMBER            DESCRIPTION            PAGE

12     Exhibit 1         Affidavit of service   25

13     Exhibit 2         Photograph             52

14     Exhibit 3         Notice of deposition   82

15     Exhibit 4         Complaint              90

16     Exhibit 5         Motion                 91

17

18

19

20

21

22

23

24

25

EXHIBIT 21

4

1                P R O C E E D I N G S

2          THE REPORTER:  Can you raise your right hand?

3          (Witness sworn)

4          MR. RUSS:  Court reporter, can you check the

5      witness' license.  I know that's sort of standard

6      practice right now, especially on these.

7          THE REPORTER:  Yeah, absolutely.

8          THE WITNESS:  If you could hang on one second,

9      I'm going to go grab it.

10          THE REPORTER:  Okay.

11          (Non-related conversation not transcribed)

12          MR. BERNHARD:  I think you have to turn off

13      the background.

14          THE WITNESS:  Let me get rid of -- let me get

15      rid of the background thing.

16          THE REPORTER:  Little closer.  Yeah.  That

17      looks -- that looks good.

18          MR. BERNHARD:  All right, guys.

19          THE WITNESS:  You got it?

20          THE REPORTER:  Yeah.

21          MR. DELLORUSSO:  And, Bassem, if you could

22      just mute your mic, please.  Thank you.  Perfect.

23          MR. BERNHARD:  All right, guys.  So we're all

24      on the record.

25  THEREUPON:

# EXHIBIT 21

1                          REEM HANNA,

2              having been first duly sworn and responding,

3          "I do," was examined and testified as follows:

4                        DIRECT EXAMINATION

5    BY MR. BERNHARD:

6         Q.    My name is Andrew Bernhard.

7         Reem, Ms. Hanna.  What do you prefer that I call

8    you?

9         A.    Just call me Reem.

10        Q.    Like I said, my name is Andrew.  I'm taking

11   your deposition today.  Have you ever had your

12   deposition taken before?

13        A.    Just once.

14        Q.    Just once.  What were the circumstances?

15        A.    Something personal.

16        Q.    Sorry.  What?

17        A.    Do I need to -- I don't know that I feel

18   comfortable sharing that.

19        Q.    Well, sort of the deal is with these things

20   with -- with discovery in Florida, it's pretty wide open

21   unless you're in privileged areas, like your finances or

22   communications you've had with your attorney.  And so,

23   you know, my right here for my client is to test, you

24   know, your veracity, which means your truthfulness, your

25   background because you've voluntarily submitted an

EXHIBIT 21

1  affidavit and put it into this court case.

2         And so, you know, I don't know you, obviously,

3  but you know, it's really my job to figure this stuff

4  out.  And so for the most part, there are very few

5  things that are off limits for these discovery portions

6  of the case.  Does that make sense?  We have an order

7  that limits me to the motion to vacate, the affidavits,

8  the filings that are in it, and testing what you guys

9  said there, so this is part of it.  Does that make

10 sense?

11     A.   Yeah.  I just -- yeah.  Yeah, yeah.  It just

12 is -- you know, I just don't want to, you know, share

13 information about myself that is not necessary, so it's

14 for my divorce case; so I don't know how that's

15 relevant.  But there you go.

16     Q.   Okay.  So for your divorce.  I won't ask you

17 too many questions about your divorce.  Don't worry.

18         Okay.  So, you --

19     A.   Please don't.

20     Q.   You -- you understood that sort of the -- the

21 way this goes, right.  It's I ask a bunch of questions;

22 you give your answers, and our great court reporter

23 writes those down, right.

24     A.   Yeah.

25     Q.   Okay.  So perfect example, you know, when I

EXHIBIT 21

1  ask you questions, our court reporter is just writing it

2  down, so she can't interpret nodding of your head,

3  shrugging of your shoulders, movement of your hands.

4  She really needs you to say yes, no, or some other

5  verbal statement; is that okay?

6       A.    That's fine.

7       Q.    Okay.  Sometimes when I'm asking you a

8  question, I won't state it very well.  You'll not

9  understand; you're not sure how to answer.  That's okay.

10  It's my job is to ask you questions that you can

11  understand and answer.  And so if at any time you don't

12  get what I'm asking you, just say so, okay.

13       A.    Okay.

14       Q.    So just say to me something like, you know, I

15  don't understand what you're asking or can you say that

16  a different way.  All right.

17       A.    Okay.

18       Q.    All right.  Sometimes while we're going along

19  you're going to say, look, I need a break, I want to

20  grab a glass of water, I need to use the restroom.  All

21  that's great.  No big deal.  I only ask that you finish

22  whatever answer you're giving at the time and then just

23  let us know you need a break, okay.

24       A.    All right.  Sounds good.

25       Q.    Awesome.  Sometimes when you're going along

# EXHIBIT 21

1  you'll give an answer, and then later you'll think, you know

2  what, I could have answered that differently or I just

3  remembered something, or I want to, you know, more

4  clearly state out what I said before.  Look, this is

5  your testimony.  It's your deposition, and I want to

6  make sure whatever it is you're saying is your most

7  accurate, honest, complete answer possible, okay.

8      A.   Okay.

9      Q.   So if at any time you want to add to or

10 clarify a prior answer, just say so.  That's not a

11 problem at all.  All right.

12     A.   All right.

13     Q.   Okay.  And then sometimes you might be going

14 along and think, look, there's some documents that might

15 help me remember something about this question or answer

16 this question.  But any time you think there's a

17 document that can help you answer a question, just say

18 so.  We might have it here.  Your attorney might have

19 it.  Our job is to help you get to where you want to go,

20 okay.

21     A.   Okay.

22     Q.   All right.  These next questions are

23 formalities that make sure that you're, what we call,

24 legally competent to testify today.  All right.

25     A.   All right.  Go ahead.

# EXHIBIT 21

1    Q.   All right.   Thanks.   Like I said, I -- it's this

2    funny thing with the -- with the court reporter writing

3    it down.   We just need yes, no, and otherwise, I can't

4    really move forward.   All right.   So, one, are you

5    taking any medication or drugs of any kind that might

6    make it difficult for you to understand my questions and

7    answer honestly and accurately today?

8    A.   No.

9    Q.   Have you had any alcoholic to drink in the

10   last eight hours?

11   A.   No.

12   Q.   Are you sick at all today?

13   A.   No.

14   Q.   Are you currently under a doctor's care for

15   any illness?

16   A.   No.

17   Q.   Have you ever been arrested or --

18   A.   Routine.

19   Q.   Sorry?

20   A.   Routine.   Routine --

21   Q.   Routine stuff?

22   A.   Yeah.

23   Q.   Anything that would make it difficult for you

24   to understand my questions or answer honestly and

25   accurately today?

# EXHIBIT 21

1      A.    No.

2      Q.    Okay.  Have you ever been arrested or

3  convicted for any acts of fraud or other crimes

4  involving deceit?

5      A.    No.

6      Q.    Have you ever been accused of any acts of

7  fraud or other acts involving deceit in a court?

8      A.    No.  No.

9      Q.    Okay.  Is there any other reason you can think

10  of that you can't understand my questions and answer

11  fully and truthfully today?

12      A.    No.

13      Q.    You understand you're speaking under penalty

14  of perjury; is that correct?

15      A.    Correct.

16      Q.    Okay.  And that means that you've got to tell

17  the truth, the whole truth, nothing but the truth, and

18  if you don't, that it's considered perjury.  Do you

19  understand that?

20      A.    Yes.

21      Q.    In Florida, perjury is a third degree felony

22  under Florida Statutes 837.02 and 92.525, and it's

23  punishable by prison and fines with up to five years in

24  prison and 5K in fines.  Do you understand that?

25      A.    Yes.

# EXHIBIT 21

1    Q.   Okay.  And you've agreed to be sworn in and bound

2  under oath by our Florida notary; is that right?

3    A.   Yes.

4    Q.   And this -- this agreement to be under oath

5  and penalty of perjury applies the same to you out in

6  California; is that right?

7    A.   I don't understand.  I mean, I don't know the

8  legal system.

9    Q.   Sure.  Well, are you in Florida right now?

10    A.   No.

11    Q.   Okay.  Are you in California right now?

12    A.   Yes.

13    Q.   Okay.  So you understand that this rules that

14  -- that you're speaking under oath and penalty of

15  perjury, that those apply to you where you're sitting

16  today in California; is that right?

17    A.   Okay.  Yeah.  Thank you for explaining.  Yes.

18    Q.   Okay.  Yeah.  I know.  It's like this

19  technical thing about crossing state lines.  And we've

20  all been trying to figure it out with these -- with

21  these Zoom calls.  So I just always want to make sure

22  you get -- you know, you're not like in China, not

23  subject to extradition, and just free-willing it.  All

24  right.

25    A.   Got it.

# EXHIBIT 21

1      Q.   Okay.  Did you prepare at all for your deposition

2   today?

3      A.   Yeah.  A little bit.

4      Q.   Okay.  What'd you do?

5      A.   I took the -- the rest of the afternoon off.

6      Q.   Okay.  And how is that preparation, or how

7   does that involve preparation?

8      A.   Just to organize my day and to make sure that

9   I'm available to answer your questions.

10      Q.   Okay.  Did you review any documents to prepare

11   for your deposition?

12      A.   I did.  I looked through my phone to see some

13   old pictures.

14      Q.   And how would looking at your phone to see old

15   pictures help you prepare for this depo today?

16      A.   I just -- to be prepared --

17      Q.   Sure.

18      A.   -- depending on what you need to find

19   information about.

20      Q.   Okay.  Let's understand what you mean.  Were

21   you like looking up photos to see where you were on

22   certain dates or where you weren't, or something like

23   that?

24      A.   Yeah.  I wanted to see where I was on certain

25   dates.

# EXHIBIT 21

1   Q.   And what did you find?

2   A.   Where I was on those dates.

3   Q.   Okay.  What -- what -- what dates in

4   particular did -- did you go looking for?

5   A.   Why -- why don't we get to your questions

6   about what dates you're looking for just so I make sure

7   that I'm giving you what you need?

8   Q.   Sure.  I am right on the questions I'm looking

9   for.  I promise you.  You'll -- you'll know when I'm not

10  because I'll say I'm done.  So just tell me what you

11  were looking for when you were doing your preparation.

12  A.   I looked at a couple of dates that -- dates

13  September 15th and March 3rd.

14  Q.   Okay.  Is that September 15, 2020, 2021, 2019?

15  A.   2020.  And then March 3, 2019.

16  Q.   March 3, 2019?  And why did you look for those

17  particular dates?

18  A.   My understanding are those are the dates that

19  they claim they -- they were serving me or said that she

20  was serving me.

21  Q.   Okay.  So what did you find when you looked at

22  photos from March 3, 2019?

23  A.   I was not in Orange County.  I was in LA at a

24  different event.

25  Q.   What were you doing in LA on March 3, 2019?

# EXHIBIT 21

1      A.    I had a yoga class and a brunch with friends in

2    LA.

3      Q.    And what time was your yoga class on March 3,

4    2019?

5      A.    10:30?

6      Q.    Sorry?

7      A.    It was at 10:30.

8      Q.    10:30?

9      A.    10:30 a.m.

10      Q.    Where was that at?

11      A.    It was in -- I believe it was in -- hang on

12    one second -- it was in Hollywood Hills, I believe,

13    either Hollywood Hills or Bel Air.  But, you know, I can

14    get you -- yeah.  It was -- I think it was Hollywood

15    Hills.

16      Q.    Okay.  Was it -- was it like a particular

17    company?

18      A.    Yeah.  It was an organized event by a yoga

19    studio, and it was for charity; so they organized this

20    yoga event at the house in LA where the proceeds would

21    go to charity.

22      Q.    And who was it?  What house?

23      A.    Just some really nice house in LA.  So it was

24    a mansion in LA, and it was organized by a yoga studio

25    that my friend owns.

EXHIBIT 21

1      Q.   And which -- what's the name of the studio, and

2   what's the name of the friend?

3      A.   Aree Khodai.

4      Q.   How do you spell it?

5      A.   K-h-o-d-a-i.

6      Q.   Is that Z like Zed?

7      A.   K as in kilo, h as in hotel, o, d as in David,

8   a-i.

9      Q.   D as in David, a-i.  Okay.  And what's the

10  name of the yoga studio?

11     A.   Aree's Army is her business.

12     Q.   Okay.  So you go to do a trade event with

13  Aree's Army, and you said that was up in the hills or

14  Bel Air?

15     A.   Let me ask my brother.

16          THE WITNESS:  Do you remember where that house

17      was?  I think it was -- I have the photos of the

18      house.  I think it -- I mean, I'm not very familiar

19      with the area that it was in.  I think it was in

20      either Bel Air or Hollywood Hills.  I can find the

21      address.

22  BY MR. BERNHARD:

23     Q.   And just so we have a clear record, is your

24  brother with you right now while you're doing your

25  deposition?

# EXHIBIT 21

1    A.    He's on the phone.

2    Q.    Okay.  Is he with you physically?

3    A.    Yeah.

4    Q.    Okay.  And so this is sort of that weird

5  thing.  You know, there's a rule that we can invoke as

6  to witnesses having other witnesses in the room.  I

7  recognize that Bassem's a party, but I just want to make

8  sure -- I'm sure you guys saw this like on the news

9  today -- that there's some degree of -- of sense of

10  intimidation sometimes when a witness is talking and the

11  witness is in the room.

12        Are you saying that the witness -- are you

13  saying that Bassem is in the room with you, or are you

14  just saying he's on the phone?

15    A.    He's -- he's on the phone.  He was asked to

16  join.

17    Q.    Sure.  I didn't ask him to join, so I'm just

18  making sure that -- that he's not --

19    A.    Oh, yeah.

20    Q.    So I'm just making sure he's not in your room

21  with you observing you give your testimony.

22    A.    Okay.

23    Q.    So is he in the room with you observing you

24  give your testimony?

25    A.    He's in the house.  He's not in the room.

# EXHIBIT 21

1  He's in the house, but yeah.  If that's not okay, let me

2  know.

3      Q.   I would just say -- look, I just ask that you

4  guys stay just in separate rooms if possibly, and then

5  we'll just see how it goes.  Does that work for

6  everybody?

7      A.   That's fine with me.

8      Q.   Okay.  I apologize.  I don't know if you guys

9  saw that -- that news clip today -- or I'm sorry, this

10 week, where it was like a lady testifying in court, and

11 I guess like -- did you guys see this thing.  There was

12 like somebody like -- the defendant was in the other

13 room.  Did you guys see this at all?

14          THE REPORTER:  I did.

15          THE WITNESS:  No.

16          THE REPORTER:  I did.

17          MR. BERNHARD:  That was crazy, right, where

18      like the -- the like Court realizes that the guy is

19      in the other room, and they like freak out; and the

20      police go and arrest him.  I don't know.  It's --

21          THE REPORTER:  Yeah.  Yeah.  It was an assault

22      case, and the judge threw him out.  And -- but he

23      basically stalled them until the police showed up.

24          MR. BERNHARD:  Yeah.  Crazy.  Crazy to watch.

25          MR. DELLORUSSO:  Just -- just for the record,

# EXHIBIT 21

1        I just want to make sure Bassem's aware he's allowed

2        to be present since he is a party.  But, Bassem,

3        you know, just be in a separate room, please.

4        That's all he's asking for.

5             So for example, if she's in her -- her bedroom

6        or in the kitchen, just go in a separate room just

7        so, you know, technically you're not like giving

8        her answers.  That's kind of what -- what the --

9        the whole deal is.  So -- so Andrew is aware that

10       you're not feeding her answers.  That's the only --

11       that's the only issue.

12            MR. BERNHARD:  Does that make sense, guys?

13            MR. EL MALLAKH:  I understand.  I'm upstairs,

14       actually.  I'm in the top room.

15            MR. DELLORUSSO:  Perfect.  Perfect.  There we

16       go.  We're good.  Thank you.

17            MR. EL MALLAKH:  Is that okay?

18            MR. DELLORUSSO:  Yeah.  Yeah.  Of course.

19            MR. EL MALLAKH:  If you guys want me to leave

20  the house, I don't have a problem.

21            MR. DELLORUSSO:  No, no, no.  You don't have

22  to leave the house at all.  We just don't want you to be

23  in the same room.

24            MR. EL MALLAKH:  Oh, okay.

25            MR. BERNHARD:  Yeah, yeah.

# EXHIBIT 21

```
 1          MR. EL MALLAKH:  Okay.

 2          MR. BERNHARD:  I only said it because she'd

 3     asked a question.  And you get what I'm saying,

 4     right, guys.  I just want to make sure her

 5     testimony is her own.

 6          MR. EL MALLAKH:  Okay.  No problem.  I'm going

 7     to mute -- I'm going to go ahead and mute now.

 8          MR. BERNHARD:  Okay.

 9          THE WITNESS:  And, Andrew, I found the exact

10     address of the house if that's helpful to you in

11     any way.

12  BY MR. BERNHARD:

13     Q.   Yeah.  That'd be great.  Please.

14     A.   1536 Blue Jay Way, Los Angeles, California

15  90069.

16     Q.   90 what?

17     A.   069.

18     Q.   Okay.  All right.  So you're at this thing in

19  the morning.  At 10:30 at you're at this -- at this

20  charity event, and then you said you went to brunch.

21     A.   Yes.

22     Q.   And where did you go to brunch with your

23  friends?

24     A.   Hang on one second.  Hang on.  I can get the

25  name of the place.  My friend owns the restaurant.  Let
```

EXHIBIT 21

1   me see.  Los Angeles.  It was in Los Angeles.  It's called

2   Gwen.

3       Q.    Gwen, G-a-w?  Sorry, G-l-e --

4       A.    G-w-e-n.

5       Q.    G-w-e-n.  Okay.  And it's like a restaurant?

6   Where at?

7       A.    Yeah.  It's a restaurant.

8       Q.    Where is it at?

9       A.    In Los Angeles.

10      Q.    I know, but it's a big city, so is it like

11  north, central --

12      A.    Oh.  You want the address?  It's -- yeah.

13  6600 Sunset Boulevard.

14      Q.    Okay.  So you go to brunch at what -- what

15  about time is that?

16      A.    Probably around I'd say 12:30, maybe.

17      Q.    Okay.  So while you're looking there at your

18  phone --

19      A.    My phone?

20      Q.    Yeah.  While you're looking at your --

21      A.    Oh, to see my -- oh, to see if there was a

22  text message saying like time we went.  I'm trying to

23  get as accurate as you -- as I can for these answers.

24      Q.    Appreciate it.  Okay.  Well, what about April

25  17, 2019.  What does your phone tell you about that?

# EXHIBIT 21

1      A.   What date?

2      Q.   April 17, 2019.

3      A.   So I was also in LA doing a hike and

4  celebrating a friend's birthday.

5      Q.   Where was that?

6      A.   The hike was -- again, I believe it was in

7  Malibu.  I have a picture of the hike.  And the birthday

8  was at Waldorf Astoria in Beverly Hills.

9      Q.   And when did the hike start?

10     A.   When did what -- which one?  The hike?

11     Q.   The hike on April 17, 2019.

12     A.   It was possibly around 10:00 a.m.

13     Q.   Is that what your photos tell you, or is that

14  just guessing?

15     A.   No.  That's -- I mean, that's -- it's probably

16  around 10:00 a.m. because I took a photo of the end of

17  the hike, and it was a five mile hike; and I know my

18  pace, so probably around 10:00 a.m.  Could be like

19  10:05, 10:10, but like I -- just knowing my pace.

20     Q.   Okay.  And what's the photo say for the end of

21  the hike?  What's the time stamp for that?

22     A.   3:28.

23     Q.   3:28 is the end of the hike up in Malibu, and

24  then you go to Waldorf Astoria in Beverly Hills for a

25  party.

# EXHIBIT 21

1    A.    Correct.

2    Q.    What time did you go to the party?

3    A.    Let me look.  7 -- I was going to say maybe

4  7:30 because my photo stamp is at 8:30, but -- it was

5  probably 7:30 is when we got there.

6    Q.    7:30 you go to Waldorf, and your photo stamp

7  said what?  8:30 you said?

8    A.    8:30, yeah.

9    Q.    And in between the end of the hike at 3:30 and

10  the arrival at -- at Waldorf at 7:30, what did you do?

11    A.    I went to my best friend's house in Beverly

12  Hills to get ready there.

13    Q.    Who is your best friend?

14    A.    Her name is Jihan.

15    Q.    Yeah.  Jihan what?

16    A.    Shaw.

17    Q.    Is that G-i-h-a-n or J-i-h-a-n, or how is it

18  spelled?

19    A.    She spells it either way.

20    Q.    Okay.  Well, do you know which one is her

21  legal name?

22    A.    You can use G, use J, it doesn't matter.  But

23  she uses -- she -- it's different on each item that she

24  has.  Her passport has G; her ID says J.  She's not

25  relevant to the story.  So --

# EXHIBIT 21

1    Q.   She is relevant for -- for our purposes, right.

2  So Shaw, S-h-a-w?

3    A.   Yeah.

4    Q.   Okay.  And do you know her phone number?

5    A.   I do know her phone number, but I'm not

6  comfortable giving her -- you her phone number.

7    Q.   Why is that?

8    A.   Why would -- I mean, I could ask why you need

9  her phone number.

10    Q.   But that wouldn't be how the deposition works.

11  So as we sit here today, the court empowers me to ask

12  you questions.  It does not empower you to ask me any

13  questions.  And if necessary, I could just have you

14  subpoenaed, and then have a court compel you to do so.

15  And if you refuse, then they issue a warrant for your

16  arrest.

17    A.   Okay.

18    Q.   I don't want to go down that road.

19    A.   All right.  Why don't we go down that road

20  because I'm not comfortable giving you my best friend's

21  phone number.  She has nothing to do with this.  You're

22  already asking me a lot of questions, and I feel like

23  it's not necessary.

24    Q.   Okay.  Well, motion to compel and sanction the

25  witness for failure to comply.

EXHIBIT 21

1          Like -- like I said, I'm not trying to make this

2    crazy or difficult, it's just going to extend it out for

3    your brother.  I'm really trying to make this stuff

4    easy.  I have to check what you're saying, right,

5    because you, like I said, submitted testimony to the

6    court voluntarily.  That's something you chose to do.  I

7    had no part in that, and I'm obligated by my client.

8    I've got to check this stuff out, right.  So --

9          MR. DELLORUSSO:  Real -- real quick.  How is

10         -- how is the April date relevant?

11         MR. BERNHARD:  April date relevant is the date

12         that she was -- according to the testimony of a

13         process server, it's the date that she was served

14         -- she was processed.

15         MR. DELLORUSSO:  But she was given --

16         MR. BERNHARD:  It says right here, "On the

17         17th day of April 2019, I did as follows."

18         MR. DELLORUSSO:  Looking at -- looking at your

19         motion at -- for default, you advised that she was

20         served on March 3rd.  I think that's what -- that's

21         what it says in the affidavit.  So --

22         MR. BERNHARD:  It's -- I think you're just

23         reading it wrong.  It says, "Received a writ on

24         March 3rd."

25         MR. DELLORUSSO:  I can look at your motion to

# EXHIBIT 21

1     -- if you look at your motion for default -- do you

2     have it open?

3          MR. BERNHARD:  Sure, guys.  Look -- I'm

4     looking at the affidavit of service.

5          MR. DELLORUSSO:  Yeah.  I looked at -- I

6     looked at it too.

7          MR. BERNHARD:  Okay.  See --

8          MR. DELLORUSSO:  But I'm not sure if the

9     process server -- you know, we can go off the

10    record if you want.

11         MR. BERNHARD:  No, no.  Let's do it on -- on

12    the record.

13         MR. DELLORUSSO:  Okay.

14         MR. BERNHARD:  You see that -- I'm looking at

15    this affidavit of process.  It says --

16         MR. DELLORUSSO:  Yeah.  I'll pull it up.  It

17    says March 3rd.

18         MR. BERNHARD:  I'll make it easier, guys.

19    I'll pull it up for all of us.  We can all look at

20    the same thing on share screen, okay.

21         Can you guys all see the screen that I'm

22    looking at here?

23         MR. DELLORUSSO:  Uh-huh (affirmative).

24         MR. BERNHARD:  Does everybody see that?

25         THE REPORTER:  Yeah.

EXHIBIT 21

1      MR. BERNHARD:  Okay.  So you see here we have

2   this -- we'll mark this, Court Reporter, as Exhibit

3   1.

4      THE REPORTER:  Okay.

5      (Deposition Exhibit 1 marked)

6      MR. BERNHARD:  And I'll send it to you.  Is

7   this affidavit of service by Brittany Johnson

8   (phonetic) for summons in this case of BV Global

9   Investment Partners (phonetic), Belgium

10   Investments, case number 18-28145-CA, and the

11   address 116 Rockefeller, Irvine, California 92612.

12   And it says that she received this writ on the 3rd

13   day of March 2019.  "Served the same at 12:20 p.m.

14   on the 17th day of April 2019 upon Reem Hanna."  So

15   I'm just going by what she says here.

16      MR. DELLORUSSO:  Well, I also want to show

17   something for the record as well.

18      MR. BERNHARD:  Please don't because it's my

19   deposition.  When it comes to your time for cross,

20   you're welcome to do so.

21      MR. DELLORUSSO:  Okay.  Well, your -- your --

22   your motion for judicial default is --

23      MR. BERNHARD:  When you -- you -- when you go

24   beyond at speaking onto Rule 1.310, you're

25   prohibited from doing so because you're coaxing

EXHIBIT 21

1          testimony out of the witness.  Please refrain from

2          making -- other than objections to form.

3    BY MR. BERNHARD:

4          Q.    Okay, Reem.  So here you understand why I'm

5    asking you these questions.  There's an affidavit to

6    this effect saying that this person served you on this

7    date, and so I'm just trying to get an idea of where you

8    were and who else can verify that because you've

9    testified otherwise.  Do you understand that -- that --

10         A.    Yeah.

11         Q.    -- calls into question --

12         A.    So I'm trying to do my best job here in

13   answering all of your questions.  I'm also not trying to

14   be difficult.  You asked me exactly where I was, what

15   time.  I'm shared -- sharing that information with you,

16   you know.  I'm trying to also protect the privacy of my

17   friend.  She has no -- you know, there's no reason to

18   drag more people into this, so I'm trying to protect her

19   privacy.  You know, if you want her phone number, I'll

20   give you her phone number.  It's just like --

21         Q.    Great.  Yeah.

22         A.    I'm just starting to feel like this is a

23   little excessive.

24         Q.    That'd be great.  That'd be great.

25         A.    I'm giving you all the information that you're

# EXHIBIT 21

1    asking for as detailed as I -- as I can.

2         Q.   I appreciate that.  So what's her phone

3    number?

4         A.   (949) 878-1181.

5         Q.   1187 you said?

6         A.   81.

7         Q.   1181.  Okay.  So you go to Jihan's at 3:30.

8    You're there util, you think, 7:30 on April 17, 2019; is

9    that right?

10        A.   That's about right.

11        Q.   Okay.  And then do you know how long you were

12   at the -- the thing at -- at the Waldorf?

13        A.   We were probably there until like 10:30 or

14   11:00, and then I went back and spent the night at her

15   place.

16        Q.   Okay.  So turning to the time of around noon,

17   your feelings are that you were on this hike in Malibu;

18   is that right?

19        A.   That's correct.

20        Q.   Okay.  This is for April 17, 2019.  Is that

21   right?

22        A.   That's correct.

23        Q.   Okay.  Were you with anybody on this hike on

24   April 17, 2019?

25        A.   Yes.  With my friend, Jihan -- my best friend,

EXHIBIT 21

1  Jihan.

2      Q.   So you and Jihan are on the hike in Malibu.

3  You guys go back to Jihan's house and you get read for

4  the party.  Do you recall --

5      A.   Yes.

6      Q.   -- when you met first Jihan on April 17, 2019?

7      A.   I believe it was around 10:00 a.m.

8      Q.   So you met at the -- at the hike site?

9      A.   No.  We met at her house.

10     Q.   Okay.  So you meet at Jihan's house at 10:00

11 a.m.  And where is Jihan's house approximately?  I don't

12 need you to give me an exact address, but let's just say

13 it's --

14     A.   Beverly Hills.

15     Q.   -- a cross street or something.

16     A.   Beverly Hills.

17     Q.   What was that?

18     A.   Beverly Hills.

19     Q.   Beverly Hills.  And can you give me like a

20 cross street, not an exact number, just like a cross

21 street?

22     A.   Usher and Leslie.

23     Q.   Usher and Leslie.  Okay.  And where was the

24 hike site that you went to?

25     A.   I don't remember the exact site.  I'm not very

# EXHIBIT 21

1  savvy with LA towns.  Like I can't tell you exactly where

2  it was.  I can probably find out.  It was in LA.

3      Q.   LA.  So you're not sure if it was in Malibu or

4  maybe somewhere else in LA?

5      A.   It was in Los Angeles.

6      Q.   Okay.  Is, that Los Angeles County, City of

7  Los Angeles?

8      A.   Los Angeles County.

9      Q.   Okay.  And you don't know specifically where

10 in Los Angeles County this hike was, whether it be

11 farthest edge east, right up on the shore in Santa

12 Monica, all the way up Thousand Oaks, down almost the

13 border of the OC?  You have no idea where this hike

14 occurred --

15         MR. DELLORUSSO:  Objection.

16 BY MR. BERNHARD:

17     Q.   -- on April 17, 2019?

18     A.   It was in Los Angeles County.  I can show the

19 pictures of the hike.

20     Q.   That would be great if you could.  Is there

21 like a -- you know, usually phones have like a marker

22 that identifies where they are.  Do you think that you

23 could forward that to your attorney, and he can produce

24 it to me?

25     A.   Yeah.  Sure.

EXHIBIT 21

1    Q.    Okay.  So somewhere -- it looks like you're on a

2  hill, and it's looking down somewhere.  Does that sound

3  right?

4    A.    That sounds right.

5    Q.    Okay.  And at this time, on April 17, 2019,

6  where were you living?

7    A.    At 116 Rockefeller.

8    Q.    And where is that located?

9    A.    Irvine, California 92612.

10    Q.    Okay.  Is that where you are right now?

11    A.    That's correct.

12    Q.    Okay.  And how far is it from Irvine,

13  California at 116 Rockefeller to your friend Jihan's

14  house?

15    A.    About 50 miles.

16    Q.    Fifty miles.  And is it like up the 405 with

17  traffic, or is it something else?

18    A.    Up the 405 with traffic.

19    Q.    Okay.  And how long does it take you to do

20  that 50 miles up the 405 with traffic from Irvine to

21  Jihan's house?

22    A.    About two hours -- two hours and twenty

23  minutes.

24    Q.    All right.  So what time do you think you left

25  your house at 116 Rockefeller to do this hike on April

EXHIBIT 21

1   17, 2019?

2       A.   Probably no later than 9:00 a.m.

3       Q.   Okay.  Okay.  And then you said you looked up

4   another date.  You said September something; does that

5   sound right?

6       A.   I think those are the two that I looked at my

7   phone for.

8           MR. DELLORUSSO:  Andrew, let me know when

9       you're ready for me to send you the April 17, 2019,

10      photos.

11          MR. BERNHARD:  That would be great.  If you

12      can shoot them over, that'd be awesome.

13          MR. DELLORUSSO:  Sure.

14  BY MR. BERNHARD:

15      Q.   And then -- and you were saying that you also,

16  to prepare for this deposition, looked at a photo or

17  photos from September 15, 2020.  Do I understand that

18  right?

19      A.   No.  I don't think September 15th.  Why don't

20  -- Andrew, why don't you tell me what date you're

21  looking for.  It'll be easier.

22      Q.   Like I said, you are giving testimony.  You

23  previously testified that you looked up photos.  I said

24  what dates.  You said March 3, 2019 and September

25  something 2020, so I'm trying to understand what date

EXHIBIT 21

1   you --

2       A.   Yeah.  I'd rather just be more accurate about,

3   you know, what dates you're looking for, and then I can

4   help with whatever questions you have.

5       Q.   I'm sure you would, but again, like I said,

6   this is my deposition.  I ask questions; you give the

7   answers.  So please just testify --

8       A.   I don't remember what date -- I don't remember

9   what day in September.

10      Q.   Okay.  But you recall looking at some date in

11  September 2020 to look for photos; is that right?

12      A.   Yeah.  I looked through the whole month of

13  September.

14      Q.   Okay.  And what did you --

15      A.   If you want to narrow it --

16      Q.   What did you glean from -- from that -- doing

17  that -- looking?

18      A.   Again, lots of different things, like lots of

19  different activities, so if you can help me narrow down

20  a particular one, I'm happy to answer your questions.

21  But --

22          MR. DELLORUSSO:  I'm going to object to this

23      line of questioning.  We've already stipulated

24      according to your document that she was served on

25      April 17th -- allegedly served at that time.  So I

EXHIBIT 21

1       don't know why we're asking about September.

2           MR. BERNHARD:  Please -- please, if you do one

3       more time, a speaking objection, we're just going

4       to have to call the judge to have you comply with

5       the Rule --

6           MR. DELLORUSSO:  Let's call the judge.  This

7       is going outside the scope of the order.

8           MR. BERNHARD:  Not going outside the scope of

9       the order.  You don't have any right whatsoever to

10      have speaking objections.  If you want to instruct

11      your client not to answer because you feel like

12      where she was, what she did to prepare for this

13      deposition is outside the scope of this deposition,

14      please make a call to the judge and say, judge,

15      I've instructed the witness not to answer because

16      questions as to how she prepared for the deposition

17      I've determined are outside the scope of the

18      deposition.  And I can -- I'm happy to wait if you

19      want to instruct her not to answer.

20          MR. DELLORUSSO:  All right.  My objection is

21      outside the scope of the order.  That's my

22      objection.

23          MR. BERNHARD:  Okay.  Are you instructing your

24      client not to answer?

25          MR. DELLORUSSO:  No.  She can answer if she

# EXHIBIT 21

```
1        knows -- if she knows the answer.
2            MR. BERNHARD:  Great.  From here on forward,
3        please, unless you're instructing the client not to
4        answer, please don't make any more speaking
5        objections.  It coaxes the witness testimony.
6   BY MR. BERNHARD:
7        Q.   Okay.  So, Reem, I understood Jihan has
8   different names.  What's your full legal name?
9        A.   Reem Hanna.
10       Q.   Okay.  And was that your original name at
11  birth?
12       A.   No.  That's my marriage name.
13       Q.   Okay.  What was your name at birth?
14       A.   Reem El Mallakh.
15       Q.   So El Mallakh was your last name?
16       A.   Correct.
17       Q.   Do you have any other names or aliases that
18  you go around by besides Reem Hanna and Reem El Mallakh?
19       A.   No.
20       Q.   Do you have any, you know, middle names that
21  you would go by or anything like that?
22       A.   No.
23       Q.   Okay.  And you testified that you currently --
24  currently reside at 116 Rockefeller in Irvine,
25  California; is that right?
```

# EXHIBIT 21

1     A.   Correct.

2     Q.   Okay.  And how long have you lived there?

3     A.   I think since 2017.

4     Q.   Okay.  Are you sure of that date?  Did I --

5 sorry.  Was that a yes or a no?

6     A.   Yeah.  I think early 2017.

7     Q.   Okay.  Are you sure of that date, early 2017?

8        MR. DELLORUSSO:  Objection, form.

9 BY MR. BERNHARD:

10    Q.   Is that a yes?  Or sorry.  Whenever he says

11 objection, unless he instructs you not to answer, you

12 just have to answer.

13    A.   Yeah.  I think early 2017.

14    Q.   Okay.  And do you have any brothers or

15 sisters?

16    A.   Yes.  One brother.

17    Q.   What's your brother's full legal name?

18    A.   Bassem El Mallakh.

19    Q.   Bassem El Mallakh.  Does he go by any other

20 name?

21    A.   No.  Not that I know of.

22    Q.   Okay.  Have you ever heard him go by any other

23 name?

24    A.   No.

25    Q.   Does he have any middle names?

# EXHIBIT 21

1      A.   Essam.

2      Q.   So his middle name is Essam; his last name is

3  El Mallakh; is that right?

4      A.   Yes.

5      Q.   Okay.  And do you have -- sorry.  What are the

6  names of your mom and your dad?

7      A.   Mona (phonetic) and Essam.

8      Q.   You said Essam, E-s-s-a-m?

9      A.   Yes.  Yes.

10      Q.   And are both their last names El Mallakh?

11      A.   No.  My mom's last name is Soliman.

12      Q.   Say it again.  I'm sorry.

13      A.   Soliman.

14      Q.   How do you spell that?

15      A.   S-o-l-i-m-a-n.

16      Q.   Is your dad's last name El Mallakh?

17      A.   Yes.

18      Q.   Do they have any middle names that they go by?

19      A.   No.

20      Q.   Do they have any middle names at all?

21      A.   No.

22      Q.   Okay.  Okay.  So when you say you reside at

23  116 Rockefeller, what do you mean by that -- by the fact

24  that you reside there?

25      A.   I live there.

# EXHIBIT 21

1        Q.   Okay.  Does that mean you sleep the majority of

2   your nights there?

3        A.   Yes.

4        Q.   How many nights would you say on average you

5   sleep at 116 Rockefeller in 2020?

6        A.   The majority of them.  There's a pandemic.

7        Q.   So would you say like nearly 100 percent of

8   the nights?

9        A.   Apart from trips that I would take, I would

10  say yeah.

11       Q.   Okay.  What trips did you take in 2020?

12       A.   Several trips.  I can't remember them all off

13  the top of my head.

14       Q.   Did you take any trips in September 2020?

15       A.   I don't remember.

16       Q.   You don't remember at all if you took any

17  trips in September 2020 during the COVID quarantine?

18       A.   Yeah.  I took several trips in 2020.  I don't

19  remember if September was one of them.

20       Q.   Okay.  When did you take trips in 2020?

21       A.   December --

22            MR. DELLORUSSO:  I'm going to object -- I'm

23       going to object to that as well, outside the scope

24       of this deposition.

25            MR. BERNHARD:  Please stop making speaking

EXHIBIT 21

1    objections.

2         MR. DELLORUSSO:  I'm not.  I'm --

3         MR. BERNHARD:  Okay.  Objection to the form is

4    the only thing you're allowed by law to say.  Any

5    references to scope and otherwise is coercing the

6    witness.  Please stop doing it.

7  BY MR. BERNHARD:

8    Q.  Ms. Hanna, when did you take trips in 2020?

9    A.  Like I said, I don't remember all of them,

10  Andrew.  I took several trips.  I don't remember.

11   Q.  So you don't know when you took trips in 2020

12  at all.

13   A.  Not off the top of my head.

14   Q.  How about 2019, any trips?

15   A.  Yes.  I traveled quite a bit because I work in

16  -- in the line of work that requires me to travel quite

17  a bit.

18   Q.  Okay.  What is your line of work?

19   A.  I'm a consultant.

20   Q.  Consultant for what?

21   A.  I'm sorry?

22   Q.  A consultant for what?

23   A.  For healthcare consulting.

24   Q.  What's the name of your employer?

25   A.  Ernst & Young.

# EXHIBIT 21

1    Q.    Okay.  Are you an accountant?

2    A.    No.  I'm a healthcare consultant.  I'm not an

3    accountant.

4    Q.    And how long have you worked at Ernst & Young?

5    A.    2014 -- seven years.

6    Q.    Okay.  So you worked at Ernst & Young in 2019?

7    A.    Correct.

8    Q.    Okay.  Why does working for Ernst & Young

9    require you to travel?

10    A.    I have clients all over the United States.

11    Q.    Okay.  So sort of honing in on March and April

12    of 2019, like I said, we're sort of figuring out why

13    your testimony differs from the testimony of process

14    server's, who, you know, I don't know just like I don't

15    know you.

16    So in March 2019, was there any time that you

17    weren't residing at 116 Rockefeller?

18    A.    What do you mean by that?

19    Q.    I mean sleeping there at night?

20    A.    I -- yes.  Like I said, apart from trips that

21    I would take, that was my -- my residence that I would

22    come back to.  But I would take trips and not sleep

23    there.

24    Q.    Okay.  So --

25    A.    I'm not sure if your question is about the

# EXHIBIT 21

1   trips or where I sleep.

2       Q.   All right.  So -- and you've had great luck

3   with that phone so far.  In March 2019, was there any

4   time that you were not sleeping at 116 Rockefeller, any

5   dates that you were out of town, or otherwise not stay

6   the night at your own residence?

7       A.   I would have to go back and look.  I think I

8   may have gone on a trip or two in March.  I don't

9   remember exactly the date.  That was a long time ago,

10  Andrew.  If you have a specific date in mind, let me

11  know.  I can go do the -- the research.

12      Q.   Yeah.  If you can just take a peek, any time

13  in March 2019.  It shouldn't be too hard.  Just click

14  with the phone.  You've done it really well already.

15      A.   Yeah.  Like I said, give me a specific date.

16  I may have taken a trip.  I may have not.  It's like --

17  it was a long -- a long time ago.

18      Q.   Okay.  How about March 15th.

19      A.   March 15th.  Okay.  Give me a moment.

20           No.  March 15th I was in town.

21      Q.   Okay.  March 16th.

22      A.   Yeah.  I was in town.

23      Q.   March 17th.

24      A.   I was in town.

25      Q.   March 18th.

# EXHIBIT 21

1        A.    Yeah.  I was here.

2        Q.    March 19th.

3        A.    I was here.

4        Q.    March 28th.

5        A.    28th.  I was traveling.  I was traveling to

6    Hawaii for work.

7        Q.    What dates were you in Hawaii in March 2019?

8        A.    How is that related to those two days that

9    you're asking me about?  Andrew, this is like my life

10   that you're asking me about.  This is not related to the

11   process server.  This is my -- like I -- you know, this

12   is kind of excessive.

13          I do -- I don't think I need to provide you

14   with my entire calendar for 2019.  I'm not even party to

15   this lawsuit.  Like this is -- I'm sorry.  But it's --

16   you know, it's getting a little too much.  Like I said,

17   happy to like pinpoint specific things, but, you know,

18   you want me to go back and give you a play-by-play of my

19   entire year?  That's like -- it's not reasonable.

20       Q.    I appreciate your opinion.  Luckily, you're

21   not a lawyer.  Your lawyer is there, and the Court has

22   ordered you to sit for these depositions; and you have

23   to answer the questions.  They're within the scope, so

24   please, tell me.  End of March, traveling --

25       A.    I don't remember.

# EXHIBIT 21

1      Q.   -- to Hawaii, the dates.

2      A.   I don't -- I don't remember.  I don't remember

3  how many days I was in Hawaii, and I think that this is

4  a little too much.

5      Q.   Okay.  It is on the record.  Now, please,

6  March 29, 2019, were you in Hawaii or at 116 Rockefeller

7  or somewhere else?

8      A.   Are we going to go through like day-by-day

9  through the rest of the calendar?

10         MR. BERNHARD:  I'm going to strike as non-

11     esponsive.

12 BY MR. BERNHARD:

13     Q.   Please answer the question.

14     A.   Yeah.  I was in Hawaii.

15     Q.   Okay.  March 30, 2019, were you in Hawaii or

16 116 Rockefeller or somewhere else?

17     A.   Hawaii.

18     Q.   March 31, 2019 --

19     A.   On the 31st, and the 1st, and the 2nd, just so

20 we can get this over with.

21     Q.   So how about March 1, 2019.  Were you at 116

22 Rockefeller or somewhere else?

23     A.   We're going back now?

24         THE REPORTER:  Okay.  Who's thumping?  Who's

25     thumping?

# EXHIBIT 21

1        THE WITNESS:  I'm scrolling through -- I'm

2     scrolling through my phone to get to the -- the

3     dates that he's asking me to get to.

4        THE REPORTER:  Oh.

5        THE WITNESS:  I don't have -- I don't have

6     photos from the 1st.

7  BY MR. BERNHARD:

8     Q.   How about March 8, 2019, 116 Rockefeller, out

9  of town, something else?

10    A.   Mexico.

11    Q.   Okay.  Where were you in Mexico?

12        MR. DELLORUSSO:  Objection.

13        THE WITNESS:  Oaxaca.

14  BY MR. BERNHARD:

15    Q.   Okay.  How about March 9, 2019, Mexico, 116

16  Rockefeller, somewhere else?

17        MR. DELLORUSSO:  Objection.

18  BY MR. BERNHARD:

19    Q.   Or if you want to make it easier, you can just

20  tell me when you came back, and I can just save the

21  time.

22    A.   March -- March 13th is when I came back.

23    Q.   Okay.  And when did you come back more or less

24  on March 13, 2019?

25    A.   When?

EXHIBIT 21

1      Q.   Yeah.  Like morning --

2      A.   Like what --

3      Q.   -- afternoon, night?

4      A.   Oh, I don't remember.

5      Q.   It doesn't show that on your pictures?

6      A.   No.

7      Q.   Okay.  And then from March 14th until you went

8  to Hawaii, you were staying at 116 Rockefeller?

9      A.   Correct.

10     Q.   Okay.  So looking at that time, do you have

11  any idea why the process server would allege that they

12  were at your house on April 17, 2019?

13          MR. DELLORUSSO:  Objection, form.

14          THE WITNESS:  How do I know?  Why is that --

15     how would I know why they would say such a thing?

16  BY MR. BERNHARD:

17     Q.   Is it possible that there was someone else

18  staying at your house on April 17, 2019?

19     A.   No.

20          MR. DELLORUSSO:  Objection, form.

21  BY MR. BERNHARD:

22     Q.   Okay.  Did you live with anybody else at 116

23  Rockefeller, Irvine, California in April 2019?

24     A.   My son.

25     Q.   Okay.  How old is your son?

# EXHIBIT 21

1      A.   He's 15.

2      Q.   Okay.  So it's just you and your son at 116

3  Rockefeller, Irvine in March and April 2019?

4      A.   Yes.

5      Q.   Okay.  So on or about April 17, 2019, around

6  12:20 p.m., it's your testimony that no one knocked on

7  the door at your residence at 116 Rockefeller?

8      A.   Correct.

9      Q.   Okay.  And it's your testimony that on April

10  17, 2019, around 12:20 p.m., you did not answer the --

11  the -- the door at 116 Rockefeller?

12      A.   Correct.

13      Q.   Do you have a -- like a doorman at 116

14  Rockefeller?

15      A.   No.

16      Q.   Is there a camera system at 116 Rockefeller?

17      A.   There is a doorbell camera.

18      Q.   Okay.  Is it a doorbell camera for your

19  particular unit, or is it for the building, or something

20  else?

21      A.   For the unit.

22      Q.   Okay.  And is it your position that on April

23  17, 2019, around 12:20 p.m., nobody, to your knowledge,

24  buzzed your unit at 116 Rockefeller?

25      A.   I wasn't here, so if they rang the doorbell, I

EXHIBIT 21

1  wouldn't know if it -- I can't answer that for sure if

2  someone rang or didn't ring.

3      Q.   Okay.  So you'd have to be at 116 Rockefeller

4  when somebody rings the doorbell to know if they're

5  there; is that right?

6      A.   No.  You can know, but I don't have -- anyway.

7  I don't -- I didn't have the camera installed back then.

8  It was later, and it only holds the footage for 10 days;

9  so I don't know if they did or did not knock.

10     Q.   So as of April 17, 2019, you did not have like

11 a camera buzzer at 116 Rockefeller?

12     A.   No.

13     Q.   Okay.  So did you have like a buzzing intercom

14 at 116 Rockefeller in April 2019?

15     A.   No.

16     Q.   There was no intercom system whatsoever at 116

17 Rockefeller?

18          MR. DELLORUSSO:  Objection, form.

19          THE WITNESS:  No.

20 BY MR. BERNHARD:

21     Q.   Okay.  Is there access to -- to your door at

22 116 Rockefeller from the street?

23     A.   Yes.

24     Q.   Okay.  So somebody could just walk up from the

25 street and just knock on your door at 116 Rockefeller?

# EXHIBIT 21

48

1     A.   Yes.

2     Q.   Is there like a patio or a balcony or anything

3  at 116 Rockefeller?

4     A.   Yes.

5     Q.   Is that patio or balcony that -- that you can

6  see from standing outside your front door at 116

7  Rockefeller?

8     A.   What -- what -- what do you mean by that?

9  What could you see?

10    Q.   I mean, if I'm, you know, standing at the

11 front door, and turn left, right, up, or down, am I

12 looking at your patio or is it like behind the building?

13 I just -- you know, I don't know.  I'm not there.

14    A.   There are trees out front, so you -- it's not

15 like you can see visibly in or out.

16    Q.   Okay.  If I'm standing at your front door and

17 you're standing on your -- your -- you said it was a

18 patio or a balcony?

19    A.   Balcony.

20    Q.   Okay.  If I'm at your front door at 116

21 Rockefeller and you're standing on your balcony, can I

22 see you and you can see me, or is it somewhere else?

23    A.   Yes.  If I'm on my balcony, you can see.

24    Q.   Okay.  Okay.  How about April 6, 2019.  Were

25 you staying at 116 Rockefeller, or were you out of town,

# EXHIBIT 21

1  or doing something else?

2      A.   I don't remember.

3      Q.   Can you take a peek?  You've done a great job

4  so far, and I promise you I'm almost out of dates.

5      A.   I'm sorry.  I'm getting -- I'm getting really

6  tired of this.  I -- I'm not going to -- I'm not going

7  to go through every day of 2019.  I'm getting exhausted.

8      Q.   I'm sorry you feel exhausted, but this, again,

9  is what the law requires, so please just check April 6,

10  2019.  Let me know if you were at home, somewhere else.

11      A.   I do not remember specifically.

12      Q.   Well, can you do what you've done so far and

13  just check your phone and find out?

14      A.   No.  I'm sorry.  I'm getting tired.

15      Q.   Are you saying that you're going to refuse to

16  answer the questions during your deposition today?

17      A.   You said it's okay if I'm getting tired and I

18  need a break.  I mean, you're -- this is --

19      Q.   Do you want to take a break?

20      A.   You're asking me about a whole calendar year.

21      Q.   Do you need to take a break?  Do you want to

22  take five minutes?

23      A.   Yeah.  Let's take a break.

24          MR. BERNHARD:  Okay.  Let's take five minutes.

25      We'll go back on the record at let's say 3:15.

EXHIBIT 21

1      Okay, guys.

2          THE REPORTER:  Okay.  Off the record at 3:07

3   p.m.

4          (Recess taken from 3:07 p.m. to 3:16 p.m.)

5          THE REPORTER:  We're back on the record at

6      3:16 p.m.

7          MR. DELLORUSSO:  Before we start, Andrew,

8      about how long do you think you have left of Reem?

9          MR. BERNHARD:  I don't think very much.

10         MR. DELLORUSSO:  Okay.  No problem.

11         MR. BERNHARD:  For the record it's 3:16 in

12     Miami time.  That makes it 12:16 California time,

13     and I think Reem is just trying to get her camera

14     set back up.

15         And, Reem, you're still on mute too.  Okay.

16         No.  I think you just click the unmute button,

17     bottom left, it should be.  There you go.

18         THE WITNESS:  Can you hear me?

19         MR. BERNHARD:  Yep.

20  BY MR. BERNHARD:

21     Q.   And just for clarity of record, is Bassem

22  still outside of the room, not --

23     A.   Yeah.

24     Q.   -- influencing you?  Okay.

25     A.   Yep.

# EXHIBIT 21

1          MR. BERNHARD:  Bassem, are you still staying

2     upstairs, staying away from the witness?

3          MR. EL MALLAKH:  I'm upstairs.

4          MR. BERNHARD:  Okay.  Cool.  Thanks, guys.

5  BY MR. BERNHARD:

6     Q.   Okay.  Okay.  So we were talking about April

7  2019, where you were, whether you were staying at 116

8  Rockefeller or elsewhere.  You asked for a break.  Like

9  I said before, I'm almost done with these dates, so I

10 just need to test them because I've got somebody who

11 says different, and we have to clear up why that is.

12 Does that make sense?

13    A.   Sure.

14    Q.   Okay.  Okay.  So April 6, 2019, were you in

15 town, still staying at 116 Rockefeller, or were you out

16 of town for work, or something else?

17    A.   I don't remember.

18    Q.   Okay.  And April 17, 2019, were you staying at

19 116 Rockefeller, out of town, or something else?

20    A.   Didn't we already talk about April 17th?

21    Q.   I believe so.  I'm just confirming that's --

22 that's the date.

23    A.   Yeah.

24    Q.   That's the date that you said that you were

25 staying in town but that you were out hiking somewhere

# EXHIBIT 21

1  in LA County and then went to Waldorf with your friend,

2  Jihan; is that right?

3           MR. DELLORUSSO:  Objection, form.

4           THE WITNESS:  That's correct.

5  BY MR. BERNHARD:

6      Q.  Okay.  Your -- your attorney just forwarded

7  two photographs, which we'll mark as Exhibit 2 and

8  Exhibit 3.

9           (Deposition Exhibit 2 marked)

10     Q.  I just want to make sure these are what you

11 were referring to before.  We've got this one.  I'm

12 going to bring up -- mark this as Exhibit 2, and I'll

13 share screen to it.

14          Do you see this photo here?

15     A.  Yes.

16     Q.  Okay.  It says at the top, "April 17, 2019,

17 4:39 p.m."  Is that right?

18     A.  Correct.

19     Q.  And 4:39 p.m., that's California time; is that

20 right?

21     A.  Correct.

22     Q.  Okay.  And so is it your position that you

23 took this photograph while hiking in California in LA

24 County at 4:39 p.m. California time on April 17, 2019?

25     A.  No.  The photo was taken earlier.  This is

EXHIBIT 21

1  when I posted it to my social media.

2      Q.    Okay.  Is there any way to know from this

3  photograph when it was actually taken?

4      A.    Not from this photo.  No.

5      Q.    Is there anything that you have in -- in your

6  control or custody that would confirm when exactly the

7  photo itself was taken?

8      A.    The photo was taken at -- the photo was taken

9  at 3:30.

10     Q.    3:30 p.m. on April 17, 2019?

11     A.    Correct.

12     Q.    Do you have any photographs that show exactly

13  where you were from 11:00 a.m. to 1:00 p.m. on April 17,

14  2019?

15     A.    I was on the -- I don't have photos.  I only

16  took a picture at the end.

17     Q.    Okay.  So just for clarity of the record, no

18  photos showing exactly where you were from 11:00 a.m. to

19  1:00 p.m. on April 17, 2019?

20     A.    No.

21     Q.    Okay.  We have a process server who -- who

22  stated that she was at 116 Rockefeller, Irvine,

23  California at your property at 12:20 p.m. on April 17,

24  2019, and she claims that she spoke to you.  Do you have

25  any recollection of that whatsoever?

# EXHIBIT 21

1    A.    No.

2    Q.    Do you know who, besides you, could have

3  possibly answered the phone -- or sorry, answered the

4  door at 116 Rockefeller at 12:20 p.m. on April 17, 2019

5  besides you?

6    A.    No.

7    Q.    This process server has stated that the person

8  who came to the door identified herself as Reem.  Do you

9  have any idea how the process server could know your --

10 your name personally?

11   A.    No.

12   Q.    Okay.  This process server stated that you

13 told her that -- on April 17, 2019, at 12:20 p.m. at 116

14 Rockefeller that you did not know Mr. El Mallakh.  Does

15 any of this ring a bell at all?

16   A.    No.

17   Q.    Process server also stated that you -- that

18 you said you didn't want to accept service for Mr. El

19 Mallakh.  Does that sound familiar at all?

20   A.    No.

21   Q.    Is it your position that none of that

22 occurred?

23   A.    Yeah.

24   Q.    And that's your testimony as you sit here

25 today under penalty of perjury?

# EXHIBIT 21

1    A.    Correct.

2    Q.    Okay.  Reem, do you own a car?

3    A.    Yes.

4    Q.    What car do you own?

5    A.    My car?

6    Q.    Yeah.

7    A.    Can I ask why do you want to know what kind of

8    car that I have?

9    Q.    No, you can't.  You just have to answer the

10    questions.

11    A.    Why is my car relevant?

12        MR. BERNHARD:  Motion to strike as

13        nonresponsive.

14    BY MR. BERNHARD:

15    Q.    Reem, can you just answer -- answer the

16    question?

17    A.    I have a Mercedes.

18    Q.    Okay.  How long have you had that Mercedes?

19    A.    Oh my gosh, I don't remember.

20    Q.    Have you had it for a year, 2 years, 20 years?

21    A.    I don't know.  Probably more than two years,

22    probably less than four.

23    Q.    Okay.

24    A.    And I had another Mercedes before that.

25    Q.    Okay.  Is this a Mercedes that you lease or

EXHIBIT 21

1   that you own?

2        A.   I own it.

3        Q.   Okay.  You're saying -- so you purchased the

4   car sometime in the past four years?

5        A.   Correct.

6        Q.   And what type of Mercedes is it?

7             MR. DELLORUSSO:  I'm going to object.

8   BY MR. BERNHARD:

9        Q.   You can answer the question, Reem.

10       A.   Why is my -- I mean, sorry, Andrew.  I don't

11   see the relevance of my car.  I have a car.  I have a

12   Mercedes.  What -- what do you -- do you need the VIN

13   number?  Like I'm not -- again, like my financial --

14   financials and my property is my property.  I'm not

15   party to this case, so I don't see why my car is

16   relevant.

17            MR. BERNHARD:  Motion to strike as

18        nonresponsive.

19   BY MR. BERNHARD:

20       Q.   Please just answer the question, Reem.  What

21   type of Mercedes do you have?

22       A.   Do I need to answer this question?  I mean,

23   it's like -- I -- this is ridiculous.

24       Q.   Yes, you do.

25       A.   It's a -- it's a C-Class.

# EXHIBIT 21

1      Q.   It's a C-Class Mercedes that you bought.  Is the

2  C-Class Mercedes you own in your name, somebody else's

3  name?

4      A.   Yes.  It's in my name.

5      Q.   Okay.  Has that always been the case since the

6  date that you purchased it?

7      A.   Yes.

8      Q.   Did you purchase the Mercedes C-Class in your

9  name new or used?

10      A.   Used.

11          MR. DELLORUSSO:  Objection.

12  BY MR. BERNHARD:

13      Q.   Do you remember who you bought it from?

14      A.   Fletcher Jones.

15      Q.   Okay.  And is that Mercedes C-Class that you

16  own, is that registered in your name?

17          MR. DELLORUSSO:  Objection.

18          THE WITNESS:  Yes.

19  BY MR. BERNHARD:

20      Q.   Okay.  Is it -- is that Mercedes C-Class that

21  you own, bought from Fletcher Jones, registered at 116

22  Rockefeller?

23      A.   Yes.

24      Q.   Is that Mercedes C-Class that you own and

25  bought from Fletcher Jones insured at 116 Rockefeller?

# EXHIBIT 21

1    A.    Yes.

2    Q.    Okay.  Does your brother, Bassem, have a car?

3         MR. DELLORUSSO:  Objection.

4         THE WITNESS:  I'm sorry.  I -- look, you're --

5    now, you start -- you're going to ask me about me

6    and I can make a decision for myself.  I'm not

7    going to ask -- answer questions about my brother.

8    You can ask him what you want.

9         MR. BERNHARD:  Motion to strike as

10   nonresponsive.

11   BY MR. BERNHARD:

12   Q.    Reem, I, again, request that you just answer

13   the questions.  They are all relevant.

14   A.    You ask -- you ask him.  You can ask him when

15   you have -- you're asking me about my car.

16        MR. DELLORUSSO:  Andrew, you are going outside

17   the topics that were stated in your -- in your --

18        MR. BERNHARD:  Please, one more time I'm going

19   to move for sanctions against you.  Stop your

20   speaking objections.

21        MR. DELLORUSSO:  Tell me where --

22        MR. BERNHARD:  You are violating Florida law

23   Rule 1.310.  It's perfectly crystal clear that you

24   cannot -- unless you're instructing your client not

25   to answer, that you cannot make the --

# EXHIBIT 21

```
1          MR. DELLORUSSO:  You're going outside the scope

2     of the topics that you have, of course.

3          MR. BERNHARD:  Are you instructing your client

4     not to answer?

5          MR. DELLORUSSO:  No.  I'm asking you to show

6     me where --

7          MR. BERNHARD:  Are you instructing your client

8     not to answer?

9          MR. DELLORUSSO:  I'm --

10          MR. BERNHARD:  If the answer is no, then stop.

11     Your objection to form is noted and stop speaking.

12     There is nothing else you can do.

13          MR. DELLORUSSO:  Okay.

14          MR. BERNHARD:  So your objection -- your

15     objection to form is noted.

16 BY MR. BERNHARD:

17     Q.   Reem, your -- your attorney has not instructed

18 you not to answer, so please answer the question.  What

19 --

20     A.   I don't know.

21     Q.   You don't know what kind of car your brother,

22 Bassem, has?

23     A.   No.

24     Q.   Okay.  When was the last time you saw your

25 brother, Bassem?
```

EXHIBIT 21

1         A.    Today.

2         Q.    Today.  And how did Bassem come to arrive at

3    your house there at 116 Rockefeller?

4         A.    I don't know.

5         Q.    Okay.  You don't know if he came by car, by

6    plane, by helicopter, or something else?

7         A.    I didn't ask.

8         Q.    But do you know?  Did you see him -- see him

9    pull up?

10             MR. DELLORUSSO:  Objection.

11             THE WITNESS:  I don't know how he came.

12   BY MR. BERNHARD:

13        Q.    Okay.  Did you see Bassem when he approached

14   your house there at 116 Rockefeller today?

15             MR. DELLORUSSO:  Objection.

16             THE WITNESS:  I don't know how he came.

17             MR. BERNHARD:  Motion to strike as

18        nonresponsive.

19   BY MR. BERNHARD:

20        Q.    I'm not asking if you know how he came.  I'm

21   saying did you see him approach your house, meaning from

22   the outside coming in.

23        A.    No.  No.

24        Q.    Okay.  Did -- did your brother, Bassem, spend

25   the night at your house at 116 Rockefeller last night?

# EXHIBIT 21

1      A.    Yes.

2      Q.    Okay.  Did he spend yesterday night at 116

3   Rockefeller?

4      A.    Wait.  That's the same question, right?

5      Q.    Not last night.  The night before.  Did he

6   spend the night before at your place at 116 Rockefeller?

7      A.    No.

8      Q.    Okay.  So did you see your brother, Bassem,

9   when he approached yesterday when he arrived at your

10  place at 116 Rockefeller?

11     A.    No.

12     Q.    Has he ever mentioned to you in any way over

13  the past three years that he has a car?

14     A.    Not that I remember.

15     Q.    Have you ever ridden in a car with Bassem over

16  the past three years?

17     A.    I don't remember.

18     Q.    You have no recollection if you've ridden with

19  your brother in a car over the past three years?

20         MR. DELLORUSSO:  Objection.

21  BY MR. BERNHARD:

22     Q.    Please answer the question, Reem.

23     A.    I don't remember.

24     Q.    Okay.  Has your brother driven you anywhere at

25  all in a car in the past three years?

# EXHIBIT 21

62

1           MR. DELLORUSSO:  Objection.

2           THE WITNESS:  I don't -- I don't remember.  I

3      mean, this is --

4   BY MR. BERNHARD:

5      Q.   Okay.  Have you -- have you driven your

6   brother anywhere in a car in the past three years?

7      A.   I don't remember.

8      Q.   Okay.  How often do you see your brother?

9      A.   Not very often.

10      Q.   Okay.  In 2020, how many times would you say

11   you'd see your brother?

12           MR. DELLORUSSO:  Objection.

13           THE WITNESS:  I don't remember.

14   BY MR. BERNHARD:

15      Q.   Would you say it's more than five for the year

16   2020?

17      A.   I can't be certain.

18      Q.   Would you say it's less than five times you

19   seen your brother in 2020?

20      A.   I really do not remember.

21      Q.   Would you say that you seen your brother more

22   than 100 times in 2020?

23      A.   No.

24      Q.   Okay.  Would you say you saw your brother more

25   than 50 times in 2020?

# EXHIBIT 21

1      A.   No.

2      Q.   Would you say you saw your brother more than

3  20 times in 2020?

4      A.   Probably not.

5      Q.   Okay.  Would you say you saw your brother more

6  than 10 times in 2020?

7      A.   Probably not.

8      Q.   Okay.  So you see your brother -- you saw your

9  brother less than 10 times in 2020?

10          MR. DELLORUSSO:  Objection.

11          THE WITNESS:  Yeah.  Maybe even less.

12  BY MR. BERNHARD:

13     Q.   Okay.

14     A.   Very infrequent.

15     Q.   Okay.  What about 2019; same amount of time?

16  You saw your brother more or less than five times or so

17  in 2019?

18     A.   Probably.

19     Q.   Okay.  What about 2021; how often do you see

20  your brother?

21     A.   Very infrequent.

22     Q.   Okay.  So one of those where you say less than

23  five times in 2021?  It's only been three months.

24     A.   Oh, for sure.

25     Q.   Okay.

# EXHIBIT 21

1        A.    For sure less than five.

2        Q.    Is you seeing your brother today and yesterday

3    the first time you've seen your brother in 2021?

4        A.    Probably.  Yes.

5        Q.    Okay.  So in the five or so times you saw him

6    in 2020, the five or so times you saw him in 2019, did

7    you see him at all drive a car?

8        A.    I don't remember.

9              MR. DELLORUSSO:  Objection.

10   BY MR. BERNHARD:

11       Q.    Okay.  What about 2018?

12             MR. DELLORUSSO:  Objection.

13             THE WITNESS:  I don't know.

14   BY MR. BERNHARD:

15       Q.    Would it surprise you to know that your

16   brother has a Mercedes Benz C-Class registered in his

17   name at 116 Rockefeller?

18       A.    I don't know.

19       Q.    I'm not saying what you know.  I said would it

20   surprise you?

21       A.    I really don't know what his car situation is.

22       Q.    Okay.  When you park at 116 Rockefeller, do

23   you park in front of your property, or do you park like

24   down the road or somewhere else?

25       A.    In the garage.

EXHIBIT 21

1    Q.   Okay.  In the garage, is -- do you know of -- in

2    the garage at 116 Rockefeller, how many spaces do you

3    have?

4    A.   Two.

5    Q.   Okay.  You park in one space.  Is there

6    another car parked in the other space?

7    A.   No.

8    Q.   Okay.  Has that been the case over the past

9    three years?

10    A.   Correct.

11    Q.   Okay.  And the car that's parked in your

12    space, that's your Mercedes Benz C-Class.  That's in

13    your name that you bought from Fletcher Jones; is that

14    right?

15         MR. DELLORUSSO:  Objection.

16         THE WITNESS:  That's correct.

17    BY MR. BERNHARD:

18    Q.   And it's been that way over the past at least

19    three years; is that right?

20    A.   Yes.

21    Q.   And so you haven't seen another Mercedes Benz

22    C-Class sitting around there parked in one of your

23    spots; have you?

24    A.   No.

25    Q.   Okay.

# EXHIBIT 21

1    A.   No.

2    Q.   Did you notice another Mercedes Benz C-Class

3 sitting out in front of your house for the past three

4 years that didn't belong to you?

5    A.   No.  No.

6    Q.   Okay.

7    A.   You're not allowed to park in the street in

8 this community.  So, no.

9    Q.   Okay.  Did you give permission to Bassem to

10 register his vehicle at your property 116 Rockefeller

11 over the past two years at any time?

12    A.   I don't understand the question.

13    Q.   You live at this property.  You know, it would

14 surprise me if somebody else, you know, had a car

15 registered where I lived.  If they did, I would imagine

16 they would probably ask me about it.  So I'm asking you,

17 did Bassem ever ask you, hey, can I, you know, keep my

18 car registered at your home over the past two years at

19 any time?

20    A.   No.

21    Q.   You've had no knowledge whatsoever that

22 Bassem's had his car registered at your home, 116

23 Rockefeller, at any time over the past two years?

24    A.   No.

25         MR. DELLORUSSO:  Objection.

EXHIBIT 21

1  BY MR. BERNHARD:

2      Q.   Okay.  Okay.  I think you were talking about

3  September 2020, but I hadn't really got into it yet.

4  Were you, to your knowledge, in -- in California in LA

5  County in September 2020?

6      A.   What day?

7      Q.   September 5, 2020.

8      A.   Yeah, probably.

9      Q.   Did you say yeah, probably?  Sorry.  I

10 couldn't hear you.

11     A.   Yeah, probably.

12     Q.   Okay.  Were you in -- staying at 116

13 Rockefeller at that time?

14     A.   Yes.

15     Q.   Okay.  What about September 7, 2020.  Were you

16 still in LA staying at 116 Rockefeller in town?

17     A.   Yeah, probably.

18     Q.   Okay.  Can you be sure, or are you just

19 guessing?

20     A.   No.  I don't remember every single day of the

21 last years.  Tell me specific dates if you want.

22     Q.   Okay.  September 10, 2020.  Were you in town

23 staying at 116 Rockefeller on September 10, 2020?

24     A.   Yeah.

25     Q.   Okay.  How about September 11, 2020; were you

EXHIBIT 21

1  in town staying at 116 Rockefeller on September 11, 2020?

2      A.   I don't remember.

3      Q.   Okay.  Well, you seemed sure about September

4  10th.  What changed for September 11th?

5      A.   I don't remember September 11th.

6      Q.   Any way that you can check?

7      A.   I was --

8      Q.   You've been doing a great job with your phone.

9  Maybe that will cue you in, help you recollect.

10     A.   I do not (audio distortion) single day, by the

11 way, so yeah.  September 11th specifically is the day

12 you want to find out?

13     Q.   Yeah.

14     A.   Okay.  I was in LA.

15     Q.   Okay.

16          MR. BERNHARD:  For the record, the witness has

17     just scrolled through her phone to look at her

18     photos and confirmed where she was on September 11,

19     2020.

20 BY MR. BERNHARD:

21     Q.   What about September 12, 2020.  Same thing, in

22 LA, staying at 116 Rockefeller?

23     A.   Yeah.  I was in LA.

24     Q.   Were you staying at 116 Rockefeller?

25     A.   What -- what -- sorry.  What -- what's the

# EXHIBIT 21

1    question?

2        Q.    On September 12, 2020, were you at 116

3    Rockefeller?

4        A.    No.  I was in LA.

5        Q.    Okay.  Well, where were you staying if not at

6    116 Rockefeller?

7        A.    I was in Santa Monica.

8        Q.    Okay.  Were you staying with your brother,

9    Bassem, or just something else?

10       A.    That's correct.

11       Q.    Say again.  I'm sorry.

12       A.    That's correct.

13       Q.    That's correct you were staying with your

14   brother, Bassem?

15       A.    Yes.

16       Q.    Okay.  What about September 13, 2020.  Where

17   were you?

18       A.    I don't remember.  I think I was in LA.

19       Q.    So you -- you testified that you were staying

20   with your brother, Bassem El Mallakh, on September 12,

21   2020, and that you don't remember what happened just one

22   day later on September 13, 2020.  But you --

23       A.    I said was in LA.

24       Q.    You said you were what?

25       A.    I said I was in LA.

# EXHIBIT 21

1      Q.   Okay.

2      A.   Is that -- was that not audible or?

3      Q.   No.  It wasn't audible.  Did -- were you

4  staying at 116 Rockefeller?  Were you staying with your

5  brother, Bassem, in Santa Monica, or something else?

6      A.   Yeah.  I was -- I was in LA on the 12th and on

7  the 13th.

8           MR. BERNHARD:  Motion to strike as

9      nonresponsive.

10 BY MR. BERNHARD:

11     Q.   Were you staying on September 13th at 116

12 Rockefeller, with your brother, Bassem, in Santa Monica,

13 or something else?

14     A.   Are you talking about during the day or at

15 night?  Like where I slept?

16     Q.   Yeah.  Where you slept.

17     A.   I slept at 116 Rockefeller that night.

18     Q.   Okay.  What about in the morning?

19     A.   I was in LA.  I was in Santa Monica.

20     Q.   Okay.  What time do you think that you

21 returned back to 116 Rockefeller on September 13, 2020?

22     A.   I don't remember exactly.

23     Q.   It was early, late, afternoon, lunchtime?

24     A.   Late.

25     Q.   Okay.  Late like midnight, 10:00, 8:00?  I

EXHIBIT 21

1   don't know what late is for you.

2            MR. DELLORUSSO:  Objection, form.

3            THE WITNESS:  I don't remember.

4   BY MR. BERNHARD:

5       Q.   Okay.  Is there any way to -- to get that

6   information out of your phone?

7       A.   No.

8       Q.   Okay.  Do you recall if it was before or after

9   9 o'clock?

10      A.   I don't remember.

11      Q.   Is there any way for you to confirm?

12      A.   Nope.

13      Q.   On September 13, 2020, did you drive yourself

14  back in your Mercedes; did your brother, Bassem, give

15  you a ride, or something else?

16      A.   No.  I drove myself.

17      Q.   Do you recall why you were at your brother,

18  Bassem's, place on September 13, 2020, in particular?

19      A.   Visiting.

20      Q.   Okay.  Well, we've got a process server who's

21  stated that they came to 116 Rockefeller on September

22  13, 2020, around 9 o'clock p.m. and -- and spoke to you

23  in particular.  Does that sound familiar at all?

24      A.   Yeah.

25      Q.   Okay.  So did somebody talk to you on

EXHIBIT 21

1    September 13, 2020, around 9:00 p.m. at 116 Rockefeller?

2         A.    Yes.

3         Q.    Okay.  And tell me what happened.  Did

4    somebody come and knock on your door or something else?

5         A.    There was someone knocking on the door like

6    mad, very loud.  I opened the door, and they said, "Is

7    Bassem" -- I think I -- you know, obviously, not word-

8    for-word, but they said, "Is Bassem here?"  I said, "No,

9    he does not live here," and I closed the door.

10        Q.    Okay.  Was there anybody else with you at the

11   time at 116 Rockefeller on September 13, 2020?

12        A.    Probably my son.

13        Q.    And you said your son is 15 years old?

14        A.    Yes.

15        Q.    Anybody else with you besides your on

16   September 13 --

17        A.    No.

18        Q.    -- 2020, at 116 Rockefeller?

19        A.    No.

20        Q.    So your testimony here under penalty of

21   perjury is that only you and your 15-year-old son were

22   at 116 Rockefeller at 9 o'clock p.m. on September 13,

23   2020, when this process server came to your house; is

24   that right?

25        A.    Right.

# EXHIBIT 21

1      Q.   Okay.  And you said -- what you said to him?  I

2   -- sorry.  I just forgot.

3      A.   I said, "He doesn't live here," and I closed

4   the door.

5      Q.   Okay.  Did that -- did that process server say

6   anything else to you?

7      A.   No.

8      Q.   Did that process server try to give you

9   paperwork?

10     A.   No.

11     Q.   Is there any reason that you didn't ask what

12   the -- the person wanted?

13     A.   No.

14     Q.   Okay.  Is that your typical way of behaving

15   when somebody comes and asks for your brother that you

16   slam the door in their face?

17          MR. DELLORUSSO:  Objection, form.  You can

18       answer.

19          THE WITNESS:  Yeah.  I don't -- I don't have

20       an answer.

21   BY MR. BERNHARD:

22     Q.   Okay.  Have you ever done that to anybody else

23   who has come and asked for your brother?

24     A.   No.

25     Q.   Okay.  Why do you think you did it on this

EXHIBIT 21

1  particular night on September 13, 2020?

2      A.   I don't understand your question.

3      Q.   You said you've never slammed the door in

4  anybody else's face when they asked for your brother.

5  You said you slammed the door in this guy's face on

6  September 13, 2020.  I'm trying to understand why you

7  would change your behavior specifically for this

8  individual on September 13, 2020.

9      A.   By the way, that's not what I said.  That's

10  not what I said.  You're -- you're --

11      Q.   Okay.

12      A.   -- you're paraphrasing what I said.

13      Q.   Okay.

14      A.   All I said was -- (audio distortion) like mad

15  and really like being very loud and disruptive late at

16  night.  When I opened the door, he asked about is -- he

17  asked -- I don't remember -- I don't remember exactly

18  the words, but he said, "Is Bassem here?"  And I said,

19  "No.  He does not live here," and I closed the door.

20          So I don't know what's typical or atypical.

21  This is not a scenario that happens to be frequently in

22  life where someone knocks like mad (audio distortion).

23      Q.   Did you ask what it was about?

24      A.   No.

25      Q.   Were you concerned at all for your brother?

EXHIBIT 21

1       A.   No.

2       Q.   Okay.  Is that the first time you remember

3   anybody ever knocking on your door and asking for

4   Bassem?

5       A.   Yes.

6       Q.   Okay.  So that novelty of that situation

7   didn't peek your curiosity in any way?

8            MR. DELLORUSSO:  Objection.

9            THE WITNESS:  No.

10  BY MR. BERNHARD:

11      Q.   Okay.  Did you call your brother to see what

12  was going on?

13      A.   No.

14      Q.   Why is that?

15      A.   I mind my own business.

16      Q.   Well, I mean, I understand you might mind your

17  own business about, you know, some random schmoe you

18  don't know.  We're talking about your brother here.  Do

19  you mind your own business when it comes to your brother

20  too?

21           MR. DELLORUSSO:  Objection.

22           THE WITNESS:  Of course I mind my own

23       business.

24  BY MR. BERNARD:

25      Q.   Okay.  Did the person leave any documents at

EXHIBIT 21

1   your door or in your door or otherwise?

2        A.   No.

3        Q.   You saw no documents on your door at any time

4   on September 13, 2020?

5        A.   No.

6        Q.   You saw no documents on your door at any time

7   that week of September 13, 2020?

8        A.   No.

9        Q.   It's your testimony that a random individual

10  came to your door at 9 o'clock-ish, knocked on it

11  loudly, asked for Bassem, you said, "He doesn't live

12  here," closed the door, and that's the last you -- you

13  saw of this all together.

14       A.   Right.

15       Q.   And you never contacted your brother, Bassem,

16  about it whatsoever.

17       A.   No.

18       Q.   You had no concerns whatsoever that this

19  random person was coming to your door to ask for your

20  brother.

21       A.   No.  I did not find it concerning.

22       Q.   And that's the very first time to your memory

23  that anybody's come to your door at 116 Rockefeller

24  asking for Bassem El Mallakh.

25       A.   That's correct.

EXHIBIT 21

1    Q.    Has that ever happened again since?

2    A.    No.

3    Q.    Did you tell anybody at all about this

4    occurrence on September 13, 2020, that this person came

5    to your door asking for your brother, Bassem?

6    A.    No.

7    Q.    Okay.  Have you ever been accused in court of

8    making a false statement?

9    A.    No.

10    Q.    Have you ever been sued?

11    A.    No.

12    Q.    Have you ever been sued for slander, which is

13    the making of a false statement to damages a person's

14    reputation?

15    A.    No.

16    Q.    Have you ever been sued for conspiracy, which

17    is making of a secret plan by a group to do something

18    unlawful?

19    A.    No.

20    Q.    To your knowledge, has your brother, Bassem El

21    Mallakh, ever been sued in a court for making a false

22    statement?

23    A.    I don't know.

24    Q.    To your knowledge, has your brother, Bassem El

25    Mallakh, ever been sued, apart from this lawsuit by

EXHIBIT 21

1   Belgium Investments, ever been sued at all, to your

2   knowledge?

3              MR. DELLORUSSO:  Objection.

4              THE WITNESS:  Like I said, I -- you can ask

5       him what you want.

6   BY MR. BERNHARD:

7       Q.   I'm not asking him; I'm asking you.  To your

8   knowledge, has your brother, Bassem El Mallakh, ever

9   been sued, apart from this lawsuit by Belgium

10  Investments, to your knowledge?

11      A.   I don't know.

12      Q.   Okay.  To your knowledge, has your father,

13  Essam El Mallakh, ever been accused in court of making a

14  false statement?

15             MR. DELLORUSSO:  Objection.

16             THE WITNESS:  No.

17  BY MR. BERNHARD:

18      Q.   To your knowledge, has your father, Essam El

19  Mallakh, ever been sued, apart from this lawsuit by

20  Belgium Investments?

21             MR. DELLORUSSO:  Objection.

22             THE WITNESS: No.

23  BY MR. BERNHARD:

24      Q.   To your knowledge, has your father, Essam El

25  Mallakh, ever been sued for slander, which is the making

# EXHIBIT 21

1    of a false statement?

2              MR. DELLORUSSO:  Objection.

3              THE WITNESS:  (No audible response)

4    BY MR. BERNHARD:

5        Q.   To your knowledge, has your father, Essam El

6    Mallakh, ever been sued for conspiracy?

7        A.   No.

8              MR. DELLORUSSO:  Same objection.

9    BY MR. BERNHARD:

10       Q.   Okay.  To your knowledge, has your mother,

11   Mona McCale (phonetic), ever been accused in court of

12   making a false statement?

13             MR. DELLORUSSO:  Objection.

14             THE WITNESS:  No.

15   BY MR. BERNHARD:

16       Q.   To your knowledge, has your mother, Mona

17   McCale, ever been sued?

18             MR. DELLORUSSO:  Objection.

19             THE WITNESS:  No.

20   BY MR. BERNHARD:

21       Q.   To your knowledge, has your mother, Mona

22   McCale, ever been sued for slander?

23             MR. DELLORUSSO:  Objection.

24             THE WITNESS:  No.

25   BY MR. BERNHARD:

# EXHIBIT 21

1      Q.   Okay.  To your knowledge, has your mother, Mona,

2   ever been sued for conspiracy?

3           MR. DELLORUSSO:  Objection.

4           THE WITNESS:  No.

5   BY MR. BERNHARD:

6      Q.   Okay.  Have you ever been accused in court of

7   having participated in the commission of a fraud in any

8   way?

9      A.   No.

10          MR. DELLORUSSO:  Objection.

11  BY MR. BERNHARD:

12     Q.   Do you understand fraud to be an act of

13  dishonesty?

14          MR. DELLORUSSO:  Objection.

15          THE WITNESS:  If you say so.

16  BY MR. BERNHARD:

17     Q.   I'm just asking if you understand that.

18     A.   Is -- is that the legal explanation of it?

19     Q.   I'm just saying, do you understand fraud to be

20  an act of dishonesty?  Just your understanding.

21          MR. DELLORUSSO:  Objection.

22          THE WITNESS:  Like -- yeah.  Sure.

23  BY MR. BERNHARD:

24     Q.   Okay.  Have you ever been accused in court of

25  having an extramarital affair?

# EXHIBIT 21

1    A.    No.

2    Q.    And do you understand an extramarital affair

3  would be an act of dishonesty?

4    A.    Not going to answer that.

5    Q.    Sorry.  It just -- it broke up.  What did you

6  say?

7    A.    I -- I'm not going to answer that.

8    Q.    Well, your attorney has not instructed you not

9  to answer, and you're compelled to answer these

10 questions.  So this isn't anything too tricky.  I'm just

11 asking if you understand an extramarital affair to be an

12 act of dishonesty.

13    A.    I'm not going to answer that, so you can move

14 on.

15    Q.    Okay.  You're -- for the record, you're

16 refusing to answer the question.

17    A.    Yeah.  I'm not going to answer that.

18       MR. BERNHARD:  Serve motion to compel and

19    sanction the witness for refusing to answer under

20    oath without instruction from her attorney.

21       Okay.  Madam Court Reporter, do you know what

22    exhibit number we're up to?

23       THE REPORTER:  We were up to Exhibit 2.

24       MR. BERNHARD:  Okay.  So we had the one

25    declaration; we had the photograph.  So we're on 3;

# EXHIBIT 21

1       is that right?

2              THE REPORTER:  Correct.

3              MR. BERNHARD:  Okay.  Mark this as Exhibit 3.

4              (Deposition Exhibit 3 marked)

5              MR. BERNHARD:  Share the screen with you guys.

6       And I think, also, we'll be able to just go

7       straight through to Bassem, if that works for you

8       guys.  We'll just knock these out fast.  Does that

9       work?

10             THE REPORTER:  Sure.

11             MR. DELLORUSSO:  I have a few questions.

12             MR. BERNHARD:  One sec.  Let me pull this up.

13      Okay.  All right.  Can you guys see this document

14      here?

15  BY MR. BERNHARD:

16      Q.   At the top it says, "In the Circuit Court of

17  the 11th Judicial Circuit."  To the left it says,

18  "Belgium Investments versus Spencer Blank case number

19  18-28145."  Do you see that, Reem?

20      A.   Yeah.

21      Q.   Okay.  I'm going to mark this as Exhibit 3,

22  your notice of deposition.  Have you seen this document

23  before?

24      A.   No.

25      Q.   This was served to you through your attorney.

EXHIBIT 21

1  Did your attorney provide this to you?

2      A.   Can you scroll down?

3      Q.   Yeah.

4      A.   No.  I haven't seen this document.

5      Q.   Okay.

6          MR. BERNHARD:  Counsel, is there any reason

7      you didn't provide this to your client?

8          MR. DELLORUSSO:  I actually provided it to my

9      client, who is Bassem in this case, who then

10     provided -- I believe provided it to Reem, so, you

11     know, you can ask him about that.

12  BY MR. BERNHARD:

13     Q.   Okay.  Reem, did your brother, Bassem, provide

14  you with this document?

15     A.   No.

16     Q.   Okay.  So as you sit here today, you've never

17  seen this notice of deposition before.

18     A.   No.  He told me about it, but I didn't see

19  this document.

20     Q.   Okay.  Did he communicate to you that you were

21  required to produce certain documents for today?

22     A.   Yes.

23     Q.   Okay.  Did he explain to you that you'd need

24  to produce documents in your possession or control

25  evidencing the statements made in your affidavit and

EXHIBIT 21

 1  your declarations for California Court?  It says, "Lawsuit,

 2  service of process, and execution of judgment in

 3  California.

 4       A.   Something like that.

 5       Q.   Okay.  Do you have any documents like that?

 6       A.   What do you need from this list?  I showed you

 7  my ID already.

 8       Q.   Will you produce a copy of your photo ID?

 9  Obviously, you know, it was just put up for the court

10  reporter, so I don't have a snapshot of that.

11       A.   Do you want it again?

12       Q.   I just -- if you, you know, can take like a

13  photo picture if it and shoot it over to your counsel,

14  that would be great.  Can you do that?

15       A.   Yeah.  I'll send it to my brother.

16       Q.   Okay.  What about documents in your possession

17  or control evidencing where you were physically located

18  on September 13, 2020, between 8:30 p.m. and 9:30 p.m.

19  You've already testified that you talked to this

20  processor, so do you have any documents showing that or

21  just your testimony?

22       A.   No.

23       Q.   Okay.  How about documents in your possession

24  or control evidencing where you physically were located

25  on April 17, 2019, between 12:05 p.m. and 12:35 p.m.

# EXHIBIT 21

1    You've given us that one photograph from when you put it on

2    social media.  Do you have any other documents

3    evidencing where you were at that time?

4         A.    No.

5         Q.    Okay.  Documents in your possession or control

6    evidencing your payment of rent for the months of

7    February, March, and April 2019.  Do you have anything

8    like that?

9         A.    Yeah.  I have bank statements.

10        Q.    Did you pay rent to your brother, Bassem, for

11   February, March, and April 2019?

12        A.    Sure.

13        Q.    How much did you pay your brother for those

14   three months?

15        A.    I can send you the statement.

16        Q.    Okay.  Will you stipulate to do that?

17        A.    (No audible response)

18        Q.    It has to be yes or no.

19        A.    Well, I don't understand what's the -- what's

20   stipulate mean?

21        Q.    Will you agree to produce those?  Will you

22   send those over so that we can have them confirm what

23   you're saying?

24        A.    Yeah.

25        Q.    Okay.  How about documents in your possession

# EXHIBIT 21

1  or control evidencing your payment of rent for the months

2  of August, September, and October of 2020.  Do you have

3  those?

4      A.   Yeah.  I'll send you the statements.

5      Q.   Okay.  And you paid rent to your brother for

6  -- for 116 Rockefeller for those months?

7      A.   Yes.

8      Q.   Okay.  Documents in  your possession or

9  control evidencing your utility bills and invoices for

10  water, electric, gas, garbage, internet, and cable for

11  the months of February, March, and April 2019.  Do you

12  have those?

13      A.   Yes.

14      Q.   Did you pay for those utilities for those

15  months of 2019 at 116 Rockefeller?

16      A.   Yes.

17      Q.   Did your brother, Bassem, pay for any of those

18  utilities at 116 Rockefeller for those months of 2019?

19      A.   (No audible response)

20      Q.   Sorry, Reem.  I didn't hear you say an answer.

21      A.   I said no.  I don't know if you heard me.

22      Q.   I didn't hear you.  Sorry.

23           Okay.  And same, documents evidencing your --

24  your payment of utility bills and invoices for -- for

25  September, August, and October 2020.  Do you have those?

# EXHIBIT 21

1      A.   Yes.

2      Q.   And you'll produce those to us?

3      A.   Yes.

4      Q.   Okay.  And did Bassem, your brother, pay for

5  any of those utilities in August, September, October

6  2020?

7      A.   No.

8      Q.   No?  Okay.  Great.

9           MR. BERNHARD:  Okay.  I don't have any other

10          questions for you, Reem.  I appreciate it.

11          MR. DELLORUSSO:  Can we just take a five-

12          minute break?  I also have a few questions for her.

13          It should be no more than like 10 minutes.

14          MR. BERNHARD:  That's fine.  Let's do that, I

15          guess.

16          (Recess from 1:40:02)

17          THE REPORTER:  We're recording.

18          MR. BERNHARD:  And just --

19          THE REPORTER:  Now we're --

20          MR. BERNHARD:  Just for the record, Bassem,

21          you're still staying upstairs and -- and out of the

22          way of your sister?

23          MR. MAKKALH:  I am upstairs.

24          MR. BERNHARD:  Okay.  Great, guys.  Thanks.

25          MR. DELLORUSSO:  Madam Court Reporter, can we

# EXHIBIT 21

1    proceed?

2         THE REPORTER:  Yes.

3         MR. DELLORUSSO:  Okay.

4              EXAMINATION BY MR. DELLORUSSO

5    BY MR. DELLORUSSO:

6    Q.   All right.  Good afternoon.  I think it's

7    afternoon there now in California.  I think it's about 1

8    o'clock.  So I'm not going to take too much of your

9    time.  I know you've been going about two hours.  I'm

10   going to try be less than 10 minutes.  I just have a few

11   questions for you.  Are you ready to proceed?

12   A.   Yes.

13   Q.   Okay.  I want to go back to April 17, 2019.

14   Do you recall what time you left to go hiking in LA

15   County on that day?

16   A.   Probably before 9 o'clock.

17   Q.   Okay.  And approximately how long would you

18   have -- would you estimate that it took you that day or,

19   if you remember, how long it took you to get to the --

20   the site where you actually went hiking?

21   A.   I went to my friend's house first, so that

22   would probably be a couple of hours, and then from there

23   to the trail, probably another 30 minutes.

24   Q.   Okay.  What -- what time would you say you

25   started the hike?

EXHIBIT 21

1      A.    Probably around noon.

2      Q.    Noon.  Okay.  I'm going to share my screen

3   here.  Give me one second.  I'm not sure what exhibit it

4   -- this one was, but it's the photo.  Hold on.  Let me

5   just share.

6            MR. BERNHARD:  Exhibit 2.

7            MR. DELLORUSSO:  Exhibit 2.  Okay.

8   BY MR. DELLORUSSO:

9      Q.    Do you see Exhibit 2 on the screen?

10     A.    Yes.

11     Q.    All right.  And I believe you testified

12  earlier that this was a photo taken during the hike,

13  correct?

14     A.    Yeah.  At the end of the hike.

15     Q.    Okay.  At what time would you say you -- do

16  you recall taking this photo?

17     A.    Probably around 3:30.

18     Q.    Okay.  Is this the top of the mountain or the

19  hike?

20     A.    Yes.

21     Q.    Okay.  So to get from where you I guess parked

22  your car to this point when you took this photo, how

23  long would it have taken you to get to that point?

24     A.    Probably three or four hours.

25     Q.    Okay.

# EXHIBIT 21

1          MR. DELLORUSSO:  I'm going to go -- I don't --

2      this wasn't an exhibit yet, but I'm going to --

3      it's the complaint in this case.  What exhibit are

4      we on?

5          MR. BERNHARD:  We were -- 3 was the notice of

6      deposition, so it would be on 4.

7          MR. DELLORUSSO:  Okay.  I'll mark this as

8      Exhibit 4.  This is the complaint in this matter.

9          (Deposition Exhibit 4 marked)

10  BY MR. DELLORUSSO:

11      Q.   I'm going to go through these pages.  Take a

12  look at it.  Let me know once you're done reviewing it

13  briefly.  Can you -- can you see it?

14      A.   Yes.

15      Q.   I'll just go to the first page, actually.

16  Have you ever seen this document before?

17      A.   No.

18      Q.   Okay.  I'll go through it.  I'll go through

19  all the -- all the pages.  You don't recall ever seeing

20  this document?

21      A.   No.

22      Q.   Okay.

23          MR. DELLORUSSO:  I'm going to mark this one.

24      I'm going to mark as Exhibit 5 the motion for

25      judicial default as -- as Exhibit 5.

# EXHIBIT 21

1        (Deposition Exhibit 5 marked)

2   BY MR. DELLORUSSO:

3        Q.    Have you ever seen this document before?

4        A.    No.

5        Q.    Okay.  Now, I want to read for the record

6   here.  On the second line, it says, "Plaintiff served

7   Defendant, Bassem Essam El Mallakh, with the complaint

8   in this matter on March 3, 2019, at 116 Rockefeller,

9   Irvine, California 92612."  And his response was due on

10  March 23, 2019, which he failed to file an answer to the

11  complaint.  Do you see that?

12       A.    Yes.

13       Q.    Okay.  The 116 Rockefeller, Irvine, California

14  address, is that your residence?

15       A.    Yes.

16       Q.    You live there?

17       A.    Yes.

18       Q.    Does your brother, Bassem Essam El Mallakh,

19  live there?

20       A.    No.

21       Q.    Where does he live?

22       A.    In Santa Monica.

23       Q.    Were you ever served with any documents from a

24  process server in 2019 at 116 Rockefeller, Irvine,

25  California 92612?

# EXHIBIT 21

1      A.   No.

2      Q.   Were you ever served with any documents from

3  anybody in regards to a lawsuit at 116 Rockefeller,

4  Irvine, California 92612?

5      A.   No.

6      Q.   Has your brother, Bassem Essam El Mallakh,

7  ever resided or slept or stayed at your residence at 116

8  Rockefeller, Irvine, California, in March or April of

9  2019?

10      A.   No.

11      Q.   Okay.  I'm going to go to the next page of

12  this exhibit.  I'll actually go a little bit more than

13  that.

14          MR. BERNHARD:  Frank, just that Exhibit 4,

15      you're going to submit that to the court reporter

16      just so that it's in the record?

17          MR. DELLORUSSO:  Sure.  I don't have her email

18      address, but --

19          THE REPORTER:  I can put that in the chat.

20          MR. DELLORUSSO:  All right.

21          MR. BERNHARD:  Yeah.  Will you do that?

22      Great.

23          MR. DELLORUSSO:  Thank you.

24  BY MR. DELLORUSSO:

25      Q.   I just want to go through this alias summons,

# EXHIBIT 21

1   which is page 4 of Exhibit 5.  There's three addresses

2   here.  Are you familiar with -- with the 116

3   Rockefeller, Irvine, California 92612 address?

4        A.   Yes.

5        Q.   Okay.  Is that your residence?

6        A.   Yes.

7        Q.   When was that -- when did that become your

8   residence?

9        A.   In early 2017.

10       Q.   Okay.  Is that your primary residence?

11       A.   Yes.

12       Q.   Okay.  Are you familiar with the 606

13   Rockefeller, Irvine, California 92612 address?

14       A.   Yes.

15       Q.   Okay.  What address is that?

16       A.   That was my previous address.

17       Q.   Okay.  Did you -- were you the primary

18   residence of that address?

19       A.   No.

20       Q.   Okay.  And the 152 86th Street, Santa Monica,

21   California address, 90401; do you recall that address?

22       A.   No.

23       Q.   Okay.  And I just want to read for the record

24   that it states here, "Substitute service on Reem Hanna

25   on March 3, 2019, at 12:20 p.m."  Do you see that?

# EXHIBIT 21

1     A.   Sorry?

2     Q.   Do you -- do you see that where it says,

3  "Substitute service Reem Hanna on 3/3/19, at 12:20

4  p.m."?

5     A.   Yeah.  I see that.

6     Q.   If you go back, this is not as clear as a copy

7  as the one that Andrew had, but I guess we can work with

8  it.  I'm not very good with technology here.

9          I believe this was shown to you earlier.  I

10  don't know if it was on the record, but I believe it

11  was, where it says here that, "Received this writ on the

12  3rd of March 2019, and served same at 12:20 on the 17th

13  of April 2019."  Do you see that?

14     A.   Yeah.

15     Q.   And then it says, "Substitute service."  Do

16  you see that?

17     A.   Yes.

18     Q.   And it says, "By leaving a true copy" --

19  that's hard to read -- "together with a copy of the

20  pleading" -- I think I might need a better copy of this.

21  I'm going to -- I'm going to -- I'm going to strike

22  that.

23          MR. DELLORUSSO:  Andrew, do you have a better

24      copy?

25          MR. BERNHARD:  That's what I got.

# EXHIBIT 21

1           MR. DELLORUSSO:  Okay.  Yeah.  I can't really

2      zoom in.  All right.  That -- that's -- that's

3      fine.  Let me see if I can get that.  All right.

4      I'm going to stop sharing so you don't have to see

5      that.  Okay.

6  BY MR. DELLORUSSO:

7      Q.   I have a few more questions here.  Were you

8  ever served with documents for -- well, strike that.

9           Were documents ever placed on your front door

10 with regards to this lawsuit at your current residence?

11     A.   No.

12     Q.   When did you first hear about this lawsuit?

13     A.   When my brother told me about it.

14     Q.   When was that?

15     A.   In this last few days or last few weeks.

16     Q.   Okay.

17          MR. DELLORUSSO:  I have no more questions.

18          MR. BERNHARD:  Okay.  Quick follow-up.  I have

19 like three questions.

20                   EXAMINATION BY MR. BERNHARD

21 BY MR. BERNHARD:

22     Q.   All right.  So we're all looking at this

23 photo, Exhibit 2.  Do you see that here, Reem?

24     A.   Yeah.

25     Q.   It's the photo that's marked at the top "April

# EXHIBIT 21

1    17, 2019, at 4:39 p.m."  Is that right?

2         A.   Uh-huh (affirmative).

3         Q.   And see there's like this right here on the

4    right side.  In the middle it says, "Hiking up was fun,"

5    smiley face.  Do you see that?

6         A.   Yeah.

7         Q.   Is that something that you put on there, or is

8    that something that came with the photo, or how did that

9    get there?

10        A.   I put it on there.

11        Q.   Okay.  How does that -- how did you do that?

12        A.   On social media.

13        Q.   Okay.  Is there like a -- like software that

14   does that for you?  Is that something that Facebook

15   provides?  How does it work?

16        A.   On Instagram.

17        Q.   Instagram.  So when you're on Instagram, does

18   it let you just write anywhere you want, or how does it

19   work?

20        A.   Yes.  It lets you write captions about the

21   photo.

22        Q.   Okay.  And so when did you write that caption

23   on that photo?

24        A.   At 4:39.

25        Q.   Okay.  And were you just finishing a hike?

EXHIBIT 21

1  Were you back with your friend at her house?  When did you

2  do that?

3      A.   It was after the hike.

4      Q.   After the hike.  So were you like back at your

5  car, back at your friend, Jihan's house, or something

6  else?

7      A.   Don't remember exactly.

8      Q.   Okay.  But it was when the hike was done.  Is

9  that your testimony?

10         MR. DELLORUSSO:  Objection.

11         THE WITNESS:  Yes.

12 BY MR. BERNHARD:

13     Q.   Okay.  You had said 1526 6th Street, Santa

14 Monica, is an address you recognize; is that right?

15     A.   No.

16     Q.   What did you say was your --  your previous

17 residence in Santa Monica, something to that effect when

18 your attorney was just showing you that summons?

19         MR. DELLORUSSO:  Objection.

20         THE WITNESS:  I never lived there.

21 BY MR. BERNHARD:

22     Q.   You never lived in Santa Monica?

23     A.   No.

24     Q.   Okay.  Where did you live before your current

25 address of 116 Rockefeller?

# EXHIBIT 21

1          A.    606 Rockefeller.

2          Q.    Okay.  And you said at that -- were you the

3     only resident at 606 Rockefeller?

4          A.    No.

5          Q.    Who else was a resident at 606 Rockefeller?

6          A.    My friend.

7          Q.    Your what?  I'm sorry.

8          A.    My friend.

9          Q.    Your friend?  Who is your friend?

10         A.    That was before -- before 2017, so I think

11    it's not relevant.

12              MR. BERNHARD:  Motion to strike as

13         nonresponsive.

14    BY MR. BERNHARD:

15         Q.    Who was your friend, Reem, that you're

16    referring to?

17         A.    (Audio distortion)

18              MR. DELLORUSSO:  Objection.

19    BY MR. BERNHARD:

20         Q.    Sorry.  I just couldn't hear what you said,

21    Reem.

22         A.    Objection.

23         Q.    Well, you're not legally allowed to make

24    objections.  Your attorney makes them for you.  He has

25    not instructed you to answer, and so you're compelled to

EXHIBIT 21

1   answer.  So please just answer the question.

2       A.   No.  I'm not going to answer the question.

3       Q.   For the record, despite your attorney not

4   instructing you not to answer, you're refusing to answer

5   the questions today as to your residence and who you

6   lived with; is that right?

7           MR. DELLORUSSO:  Objection.

8   BY MR. BERNHARD:

9       Q.   Is that right, Reem?

10      A.   That -- I think the attorney just objected to

11  the question.  So --

12      Q.   Okay.  But he has not instructed you not to

13  answer, so, for the record, are you refusing to answer

14  the question as to your residency and who you lived

15  with?

16      A.   Didn't he just object to the question?

17          MR. DELLORUSSO:  If you know the answer, you

18      can say the answer.  If not --

19          THE WITNESS:  No.  I'm not going to.

20  BY MR. BERNHARD:

21      Q.   Okay.  So for the record, you're refusing to

22  answer; is that correct?

23      A.   Yes.

24      Q.   Okay.

25          MR. BERNHARD:  Reserve motion to compel and

EXHIBIT 21

1    sanction the witness.

2         No further questions.

3         I appreciate it, Reem.  Thank you for taking

4    the time today.  I know it's been long and

5    grueling.  I appreciate you taking the hours out of

6    your day and hopefully you can go on to better

7    things, okay.

8         THE WITNESS:  Thanks.  Bye.

9         (Thereupon, the deposition was concluded at

10   4:40 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 21

1                   CERTIFICATE OF OATH

2        STATE OF FLORIDA

3        COUNTY OF BROWARD

4

5            I, Erica Hylton, Court Reporter, Notary

6        Public, State of Florida, certify that Reem Hanna,

7        appeared before me via Zoom video on the 18th day

8        of March 2021, and was duly sworn.

9            Signed this 21st day of March 2021.

10

11

12

13        _____

14        Erica Hylton, Court Reporter

15        Notary Public, State of Florida

16        Commission No.:

17        Commission Expires:

18

19

20

21

22

23

24

25

# EXHIBIT 21

1                    CERTIFICATE OF REPORTER

2        STATE OF FLORIDA

3        COUNTY OF BROWARD

4

5            I, Erica Hylton, Court Reporter, certify that

6        I was authorized to and did report the Deposition

7        of Reem Hanna; that a review of the transcript was

8        waived; and that the transcript is a true and

9        correct record of my notes.

10           I further certify that I am not a relative,

11       employee, attorney, or counsel of any of the

12       parties, nor am I a relative or employee of any of

13       the parties' attorneys or counsel connected with

14       the action, nor am I financially interested in the

15       action.

16           Dated this 21st day of March 2021.

17

18

19       _____

20       Erica Hylton, Court Reporter

21

22

23

24

25

# EXHIBIT 21

# EXHIBIT
# "10"

1       knows -- if she knows the answer.

2         MR. BERNHARD:  Great.  From here on forward,

3       please, unless you're instructing the client not to

4       answer, please don't make any more speaking

5       objections.  It coaxes the witness testimony.

6   BY MR. BERNHARD:

7       Q.   Okay.  So, Reem, I understood Jihan has

8   different names.  What's your full legal name?

9       A.   Reem Hanna.

10      Q.   Okay.  And was that your original name at

11  birth?

12      A.   No.  That's my marriage name.

13      Q.   Okay.  What was your name at birth?

14      A.   Reem El Mallakh.

15      Q.   So El Mallakh was your last name?

16      A.   Correct.

17      Q.   Do you have any other names or aliases that

18  you go around by besides Reem Hanna and Reem El Mallakh?

19      A.   No.

20      Q.   Do you have any, you know, middle names that

21  you would go by or anything like that?

22      A.   No.

23      Q.   Okay.  And you testified that you currently --

24  currently reside at 116 Rockefeller in Irvine,

25  California; is that right?

EXHIBIT 21

1      A.   Correct.

2      Q.   Okay.  And how long have you lived there?

3      A.   I think since 2017.

4      Q.   Okay.  Are you sure of that date?  Did I --

5   sorry.  Was that a yes or a no?

6      A.   Yeah.  I think early 2017.

7      Q.   Okay.  Are you sure of that date, early 2017?

8          MR. DELLORUSSO:  Objection, form.

9   BY MR. BERNHARD:

10     Q.   Is that a yes?  Or sorry.  Whenever he says

11  objection, unless he instructs you not to answer, you

12  just have to answer.

13     A.   Yeah.  I think early 2017.

14     Q.   Okay.  And do you have any brothers or

15  sisters?

16     A.   Yes.  One brother.

17     Q.   What's your brother's full legal name?

18     A.   Bassem El Mallakh.

19     Q.   Bassem El Mallakh.  Does he go by any other

20  name?

21     A.   No.  Not that I know of.

22     Q.   Okay.  Have you ever heard him go by any other

23  name?

24     A.   No.

25     Q.   Does he have any middle names?

EXHIBIT 21

1      Q.    Yeah.  Like morning --

2      A.    Like what --

3      Q.    -- afternoon, night?

4      A.    Oh, I don't remember.

5      Q.    It doesn't show that on your pictures?

6      A.    No.

7      Q.    Okay.  And then from March 14th until you went

8  to Hawaii, you were staying at 116 Rockefeller?

9      A.    Correct.

10     Q.    Okay.  So looking at that time, do you have

11  any idea why the process server would allege that they

12  were at your house on April 17, 2019?

13          MR. DELLORUSSO:  Objection, form.

14          THE WITNESS:  How do I know?  Why is that --

15     how would I know why they would say such a thing?

16  BY MR. BERNHARD:

17     Q.    Is it possible that there was someone else

18  staying at your house on April 17, 2019?

19     A.    No.

20          MR. DELLORUSSO:  Objection, form.

21  BY MR. BERNHARD:

22     Q.    Okay.  Did you live with anybody else at 116

23  Rockefeller, Irvine, California in April 2019?

24     A.    My son.

25     Q.    Okay.  How old is your son?

# EXHIBIT 21

1    A.    He's 15.

2    Q.    Okay.  So it's just you and your son at 116

3  Rockefeller, Irvine in March and April 2019?

4    A.    Yes.

5    Q.    Okay.  So on or about April 17, 2019, around

6  12:20 p.m., it's your testimony that no one knocked on

7  the door at your residence at 116 Rockefeller?

8    A.    Correct.

9    Q.    Okay.  And it's your testimony that on April

10  17, 2019, around 12:20 p.m., you did not answer the --

11  the -- the door at 116 Rockefeller?

12    A.    Correct.

13    Q.    Do you have a -- like a doorman at 116

14  Rockefeller?

15    A.    No.

16    Q.    Is there a camera system at 116 Rockefeller?

17    A.    There is a doorbell camera.

18    Q.    Okay.  Is it a doorbell camera for your

19  particular unit, or is it for the building, or something

20  else?

21    A.    For the unit.

22    Q.    Okay.  And is it your position that on April

23  17, 2019, around 12:20 p.m., nobody, to your knowledge,

24  buzzed your unit at 116 Rockefeller?

25    A.    I wasn't here, so if they rang the doorbell, I

EXHIBIT 21

1          MR. DELLORUSSO:  Objection.

2          THE WITNESS:  I don't -- I don't remember.  I

3      mean, this is --

4  BY MR. BERNHARD:

5      Q.   Okay.  Have you -- have you driven your

6  brother anywhere in a car in the past three years?

7      A.   I don't remember.

8      Q.   Okay.  How often do you see your brother?

9      A.   Not very often.

10     Q.   Okay.  In 2020, how many times would you say

11 you'd see your brother?

12         MR. DELLORUSSO:  Objection.

13         THE WITNESS:  I don't remember.

14 BY MR. BERNHARD:

15     Q.   Would you say it's more than five for the year

16 2020?

17     A.   I can't be certain.

18     Q.   Would you say it's less than five times you

19 seen your brother in 2020?

20     A.   I really do not remember.

21     Q.   Would you say that you seen your brother more

22 than 100 times in 2020?

23     A.   No.

24     Q.   Okay.  Would you say you saw your brother more

25 than 50 times in 2020?

# EXHIBIT 21

1    A.   No.

2    Q.   Would you say you saw your brother more than

3  20 times in 2020?

4    A.   Probably not.

5    Q.   Okay.  Would you say you saw your brother more

6  than 10 times in 2020?

7    A.   Probably not.

8    Q.   Okay.  So you see your brother -- you saw your

9  brother less than 10 times in 2020?

10        MR. DELLORUSSO:  Objection.

11        THE WITNESS:  Yeah.  Maybe even less.

12  BY MR. BERNHARD:

13    Q.   Okay.

14    A.   Very infrequent.

15    Q.   Okay.  What about 2019; same amount of time?

16  You saw your brother more or less than five times or so

17  in 2019?

18    A.   Probably.

19    Q.   Okay.  What about 2021; how often do you see

20  your brother?

21    A.   Very infrequent.

22    Q.   Okay.  So one of those where you say less than

23  five times in 2021?  It's only been three months.

24    A.   Oh, for sure.

25    Q.   Okay.

# EXHIBIT 21

1        A.   For sure less than five.

2        Q.   Is you seeing your brother today and yesterday

3   the first time you've seen your brother in 2021?

4        A.   Probably.  Yes.

5        Q.   Okay.  So in the five or so times you saw him

6   in 2020, the five or so times you saw him in 2019, did

7   you see him at all drive a car?

8        A.   I don't remember.

9             MR. DELLORUSSO:  Objection.

10  BY MR. BERNHARD:

11       Q.   Okay.  What about 2018?

12            MR. DELLORUSSO:  Objection.

13            THE WITNESS:  I don't know.

14  BY MR. BERNHARD:

15       Q.   Would it surprise you to know that your

16  brother has a Mercedes Benz C-Class registered in his

17  name at 116 Rockefeller?

18       A.   I don't know.

19       Q.   I'm not saying what you know.  I said would it

20  surprise you?

21       A.   I really don't know what his car situation is.

22       Q.   Okay.  When you park at 116 Rockefeller, do

23  you park in front of your property, or do you park like

24  down the road or somewhere else?

25       A.   In the garage.

# EXHIBIT 21

1  don't know what late is for you.

2         MR. DELLORUSSO:  Objection, form.

3         THE WITNESS:  I don't remember.

4  BY MR. BERNHARD:

5     Q.   Okay.  Is there any way to -- to get that

6  information out of your phone?

7     A.   No.

8     Q.   Okay.  Do you recall if it was before or after

9  9 o'clock?

10    A.   I don't remember.

11    Q.   Is there any way for you to confirm?

12    A.   Nope.

13    Q.   On September 13, 2020, did you drive yourself

14  back in your Mercedes; did your brother, Bassem, give

15  you a ride, or something else?

16    A.   No.  I drove myself.

17    Q.   Do you recall why you were at your brother,

18  Bassem's, place on September 13, 2020, in particular?

19    A.   Visiting.

20    Q.   Okay.  Well, we've got a process server who's

21  stated that they came to 116 Rockefeller on September

22  13, 2020, around 9 o'clock p.m. and -- and spoke to you

23  in particular.  Does that sound familiar at all?

24    A.   Yeah.

25    Q.   Okay.  So did somebody talk to you on

# EXHIBIT 21

1    September 13, 2020, around 9:00 p.m. at 116 Rockefeller?

2        A.    Yes.

3        Q.    Okay.  And tell me what happened.  Did

4    somebody come and knock on your door or something else?

5        A.    There was someone knocking on the door like

6    mad, very loud.  I opened the door, and they said, "Is

7    Bassem" -- I think I -- you know, obviously, not word-

8    for-word, but they said, "Is Bassem here?"  I said, "No,

9    he does not live here," and I closed the door.

10        Q.    Okay.  Was there anybody else with you at the

11    time at 116 Rockefeller on September 13, 2020?

12        A.    Probably my son.

13        Q.    And you said your son is 15 years old?

14        A.    Yes.

15        Q.    Anybody else with you besides your on

16    September 13 --

17        A.    No.

18        Q.    -- 2020, at 116 Rockefeller?

19        A.    No.

20        Q.    So your testimony here under penalty of

21    perjury is that only you and your 15-year-old son were

22    at 116 Rockefeller at 9 o'clock p.m. on September 13,

23    2020, when this process server came to your house; is

24    that right?

25        A.    Right.

EXHIBIT 21

1      Q.   Okay.  And you said -- what you said to him?  I

2  -- sorry.  I just forgot.

3      A.   I said, "He doesn't live here," and I closed

4  the door.

5      Q.   Okay.  Did that -- did that process server say

6  anything else to you?

7      A.   No.

8      Q.   Did that process server try to give you

9  paperwork?

10     A.   No.

11     Q.   Is there any reason that you didn't ask what

12  the -- the person wanted?

13     A.   No.

14     Q.   Okay.  Is that your typical way of behaving

15  when somebody comes and asks for your brother that you

16  slam the door in their face?

17          MR. DELLORUSSO:  Objection, form.  You can

18      answer.

19          THE WITNESS:  Yeah.  I don't -- I don't have

20      an answer.

21  BY MR. BERNHARD:

22     Q.   Okay.  Have you ever done that to anybody else

23  who has come and asked for your brother?

24     A.   No.

25     Q.   Okay.  Why do you think you did it on this

EXHIBIT 21

1 | particular night on September 13, 2020?

2 |     A.    I don't understand your question.

3 |     Q.    You said you've never slammed the door in

4 | anybody else's face when they asked for your brother.

5 | You said you slammed the door in this guy's face on

6 | September 13, 2020.  I'm trying to understand why you

7 | would change your behavior specifically for this

8 | individual on September 13, 2020.

9 |     A.    By the way, that's not what I said.  That's

10 | not what I said.  You're -- you're --

11 |     Q.    Okay.

12 |     A.    -- you're paraphrasing what I said.

13 |     Q.    Okay.

14 |     A.    All I said was -- (audio distortion) like mad

15 | and really like being very loud and disruptive late at

16 | night.  When I opened the door, he asked about is -- he

17 | asked -- I don't remember -- I don't remember exactly

18 | the words, but he said, "Is Bassem here?"  And I said,

19 | "No.  He does not live here," and I closed the door.

20 |         So I don't know what's typical or atypical.

21 | This is not a scenario that happens to be frequently in

22 | life where someone knocks like mad (audio distortion).

23 |     Q.    Did you ask what it was about?

24 |     A.    No.

25 |     Q.    Were you concerned at all for your brother?

EXHIBIT 21

1        A.    No.

2        Q.    Okay.  Is that the first time you remember

3   anybody ever knocking on your door and asking for

4   Bassem?

5        A.    Yes.

6        Q.    Okay.  So that novelty of that situation

7   didn't peek your curiosity in any way?

8              MR. DELLORUSSO:  Objection.

9              THE WITNESS:  No.

10  BY MR. BERNHARD:

11       Q.    Okay.  Did you call your brother to see what

12  was going on?

13       A.    No.

14       Q.    Why is that?

15       A.    I mind my own business.

16       Q.    Well, I mean, I understand you might mind your

17  own business about, you know, some random schmoe you

18  don't know.  We're talking about your brother here.  Do

19  you mind your own business when it comes to your brother

20  too?

21             MR. DELLORUSSO:  Objection.

22             THE WITNESS:  Of course I mind my own

23       business.

24  BY MR. BERNARD:

25       Q.    Okay.  Did the person leave any documents at

EXHIBIT 21

1   your door or in your door or otherwise?

2       A.   No.

3       Q.   You saw no documents on your door at any time

4   on September 13, 2020?

5       A.   No.

6       Q.   You saw no documents on your door at any time

7   that week of September 13, 2020?

8       A.   No.

9       Q.   It's your testimony that a random individual

10  came to your door at 9 o'clock-ish, knocked on it

11  loudly, asked for Bassem, you said, "He doesn't live

12  here," closed the door, and that's the last you -- you

13  saw of this all together.

14      A.   Right.

15      Q.   And you never contacted your brother, Bassem,

16  about it whatsoever.

17      A.   No.

18      Q.   You had no concerns whatsoever that this

19  random person was coming to your door to ask for your

20  brother.

21      A.   No.  I did not find it concerning.

22      Q.   And that's the very first time to your memory

23  that anybody's come to your door at 116 Rockefeller

24  asking for Bassem El Mallakh.

25      A.   That's correct.

# EXHIBIT 21

1    Q.    Has that ever happened again since?

2    A.    No.

3    Q.    Did you tell anybody at all about this

4 occurrence on September 13, 2020, that this person came

5 to your door asking for your brother, Bassem?

6    A.    No.

7    Q.    Okay.  Have you ever been accused in court of

8 making a false statement?

9    A.    No.

10    Q.    Have you ever been sued?

11    A.    No.

12    Q.    Have you ever been sued for slander, which is

13 the making of a false statement to damages a person's

14 reputation?

15    A.    No.

16    Q.    Have you ever been sued for conspiracy, which

17 is making of a secret plan by a group to do something

18 unlawful?

19    A.    No.

20    Q.    To your knowledge, has your brother, Bassem El

21 Mallakh, ever been sued in a court for making a false

22 statement?

23    A.    I don't know.

24    Q.    To your knowledge, has your brother, Bassem El

25 Mallakh, ever been sued, apart from this lawsuit by

EXHIBIT 21

1   Belgium Investments, ever been sued at all, to your

2   knowledge?

3            MR. DELLORUSSO:  Objection.

4            THE WITNESS:  Like I said, I -- you can ask

5       him what you want.

6   BY MR. BERNHARD:

7       Q.   I'm not asking him; I'm asking you.  To your

8   knowledge, has your brother, Bassem El Mallakh, ever

9   been sued, apart from this lawsuit by Belgium

10  Investments, to your knowledge?

11      A.   I don't know.

12      Q.   Okay.  To your knowledge, has your father,

13  Essam El Mallakh, ever been accused in court of making a

14  false statement?

15           MR. DELLORUSSO:  Objection.

16           THE WITNESS:  No.

17  BY MR. BERNHARD:

18      Q.   To your knowledge, has your father, Essam El

19  Mallakh, ever been sued, apart from this lawsuit by

20  Belgium Investments?

21           MR. DELLORUSSO:  Objection.

22           THE WITNESS: No.

23  BY MR. BERNHARD:

24      Q.   To your knowledge, has your father, Essam El

25  Mallakh, ever been sued for slander, which is the making

EXHIBIT 21

```
 1   of a false statement?

 2              MR. DELLORUSSO:  Objection.

 3              THE WITNESS:  (No audible response)

 4   BY MR. BERNHARD:

 5       Q.   To your knowledge, has your father, Essam El

 6   Mallakh, ever been sued for conspiracy?

 7       A.   No.

 8              MR. DELLORUSSO:  Same objection.

 9   BY MR. BERNHARD:

10       Q.   Okay.  To your knowledge, has your mother,

11   Mona McCale (phonetic), ever been accused in court of

12   making a false statement?

13              MR. DELLORUSSO:  Objection.

14              THE WITNESS:  No.

15   BY MR. BERNHARD:

16       Q.   To your knowledge, has your mother, Mona

17   McCale, ever been sued?

18              MR. DELLORUSSO:  Objection.

19              THE WITNESS:  No.

20   BY MR. BERNHARD:

21       Q.   To your knowledge, has your mother, Mona

22   McCale, ever been sued for slander?

23              MR. DELLORUSSO:  Objection.

24              THE WITNESS:  No.

25   BY MR. BERNHARD:
```

EXHIBIT 21

```
 1        Q.   Okay.  To your knowledge, has your mother, Mona,

 2   ever been sued for conspiracy?

 3             MR. DELLORUSSO:  Objection.

 4             THE WITNESS:  No.

 5   BY MR. BERNHARD:

 6        Q.   Okay.  Have you ever been accused in court of

 7   having participated in the commission of a fraud in any

 8   way?

 9        A.   No.

10             MR. DELLORUSSO:  Objection.

11   BY MR. BERNHARD:

12        Q.   Do you understand fraud to be an act of

13   dishonesty?

14             MR. DELLORUSSO:  Objection.

15             THE WITNESS:  If you say so.

16   BY MR. BERNHARD:

17        Q.   I'm just asking if you understand that.

18        A.   Is -- is that the legal explanation of it?

19        Q.   I'm just saying, do you understand fraud to be

20   an act of dishonesty?  Just your understanding.

21             MR. DELLORUSSO:  Objection.

22             THE WITNESS:  Like -- yeah.  Sure.

23   BY MR. BERNHARD:

24        Q.   Okay.  Have you ever been accused in court of

25   having an extramarital affair?
```

# EXHIBIT 21

1          (Deposition Exhibit 5 marked)

2    BY MR. DELLORUSSO:

3          Q.    Have you ever seen this document before?

4          A.    No.

5          Q.    Okay.  Now, I want to read for the record

6    here.  On the second line, it says, "Plaintiff served

7    Defendant, Bassem Essam El Mallakh, with the complaint

8    in this matter on March 3, 2019, at 116 Rockefeller,

9    Irvine, California 92612."  And his response was due on

10   March 23, 2019, which he failed to file an answer to the

11   complaint.  Do you see that?

12         A.    Yes.

13         Q.    Okay.  The 116 Rockefeller, Irvine, California

14   address, is that your residence?

15         A.    Yes.

16         Q.    You live there?

17         A.    Yes.

18         Q.    Does your brother, Bassem Essam El Mallakh,

19   live there?

20         A.    No.

21         Q.    Where does he live?

22         A.    In Santa Monica.

23         Q.    Were you ever served with any documents from a

24   process server in 2019 at 116 Rockefeller, Irvine,

25   California 92612?

# EXHIBIT 21

1     A.   No.

2     Q.   Were you ever served with any documents from

3  anybody in regards to a lawsuit at 116 Rockefeller,

4  Irvine, California 92612?

5     A.   No.

6     Q.   Has your brother, Bassem Essam El Mallakh,

7  ever resided or slept or stayed at your residence at 116

8  Rockefeller, Irvine, California, in March or April of

9  2019?

10    A.   No.

11    Q.   Okay.  I'm going to go to the next page of

12  this exhibit.  I'll actually go a little bit more than

13  that.

14        MR. BERNHARD:  Frank, just that Exhibit 4,

15        you're going to submit that to the court reporter

16        just so that it's in the record?

17        MR. DELLORUSSO:  Sure.  I don't have her email

18        address, but --

19        THE REPORTER:  I can put that in the chat.

20        MR. DELLORUSSO:  All right.

21        MR. BERNHARD:  Yeah.  Will you do that?

22     Great.

23        MR. DELLORUSSO:  Thank you.

24  BY MR. DELLORUSSO:

25     Q.   I just want to go through this alias summons,

# EXHIBIT 21

1   which is page 4 of Exhibit 5.  There's three addresses

2   here.  Are you familiar with -- with the 116

3   Rockefeller, Irvine, California 92612 address?

4        A.   Yes.

5        Q.   Okay.  Is that your residence?

6        A.   Yes.

7        Q.   When was that -- when did that become your

8   residence?

9        A.   In early 2017.

10       Q.   Okay.  Is that your primary residence?

11       A.   Yes.

12       Q.   Okay.  Are you familiar with the 606

13  Rockefeller, Irvine, California 92612 address?

14       A.   Yes.

15       Q.   Okay.  What address is that?

16       A.   That was my previous address.

17       Q.   Okay.  Did you -- were you the primary

18  residence of that address?

19       A.   No.

20       Q.   Okay.  And the 152 86th Street, Santa Monica,

21  California address, 90401; do you recall that address?

22       A.   No.

23       Q.   Okay.  And I just want to read for the record

24  that it states here, "Substitute service on Reem Hanna

25  on March 3, 2019, at 12:20 p.m."  Do you see that?

# EXHIBIT 21

1          MR. DELLORUSSO:  Okay.  Yeah.  I can't really

2      zoom in.  All right.  That -- that's -- that's

3      fine.  Let me see if I can get that.  All right.

4      I'm going to stop sharing so you don't have to see

5      that.  Okay.

6  BY MR. DELLORUSSO:

7      Q.   I have a few more questions here.  Were you

8  ever served with documents for -- well, strike that.

9          Were documents ever placed on your front door

10 with regards to this lawsuit at your current residence?

11     A.   No.

12     Q.   When did you first hear about this lawsuit?

13     A.   When my brother told me about it.

14     Q.   When was that?

15     A.   In this last few days or last few weeks.

16     Q.   Okay.

17         MR. DELLORUSSO:  I have no more questions.

18         MR. BERNHARD:  Okay.  Quick follow-up.  I have

19 like three questions.

20              EXAMINATION BY MR. BERNHARD

21 BY MR. BERNHARD:

22     Q.   All right.  So we're all looking at this

23 photo, Exhibit 2.  Do you see that here, Reem?

24     A.   Yeah.

25     Q.   It's the photo that's marked at the top "April

EXHIBIT 21

# EXHIBIT
# "11"

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

BELGIUM INVESTMENTS 960 BAY DR,
LLC, a California LLC, et al.,

CASE NO.: 2018-28145 CA 44

     Plaintiffs,

v.

SPENCER BLANK, et al.,

     Defendants.

_____/

## ORDER ON DEFENDANT EL MALLAKH'S MOTION
## TO VACATE,

    **THIS MATTER** came before the Court on Defendant Bassem El Mallakh's Motion to

Quash Service and Vacate Final Judgment.    The Court having reviewed the motion, response,

having conducted an evidentiary hearing, heard argument of counsel and being otherwise advised

in the premises, Court makes the following findings:

    Belgium Investments filed this lawsuit on August 17, 2018, naming El Mallakh as

defendant. On August 29, 2018, the Clerk issued a summons for El Mallakh. On January 8, 2019,

Plaintiff ran a skip trace on El Mallakh, which showed that he resided at 116 Rockefeller, Irvine

CA. The skip trace showed that El Mallakh owned 116 Rockefeller, Irvine CA. The skip trace

showed that Equifax also showed 116 Rockefeller as El Mallakh's address. The 2019 skip trace

provided no other potential addresses for El Mallakh. The skip trace identified Reem Hanna as El

Mallakh's associate or relative, co-defendant in a business lawsuit, and co-resident of El Mallakh's

at 116 Rockefeller, along with previous addresses of 606 Rockefeller, 405 Rockefeller, and 34

Falkner Drive. The skip trace identified Mohamed Rostom as El Mallakh's associate or relative,

and co-resident of El Mallakh at 116 Rockefeller. The skip trace identified a 2014 lawsuit against

Bassem El Mallakh and Reem Hanna, along with Essam El Mallakh and Mona Mikhaeil, for

making false and slanderous representations, in Orange County Case No. 2014-00728897-CU-BT-CJC.

Given the information in the skip traces, Belgium Investments drafted an alias summons to serve El Mallakh at his house at 116 Rockefeller.  On January 25, 2019, the Clerk of Court issued an alias summons for El Mallakh for his 116 Rockefeller address.

Plaintiff hired a private investigator to further investigate El Mallakh at his 116 Rockefeller address. Private investigator Johnson performed a California DMV search on El Mallakh and found that his vehicle, a 2016 Mercedes Benz C Class was registered at 116 Rockefeller. Private investigator Johnson attempted service at 116 Rockefeller on March 19, 2019. Reem Hanna answered the door at 116 Rockefeller, identified herself as "Reem," and represented that she did not know El Mallakh. This was obviously not true.  Private investigator Johnson reviewed public database sources and identified the woman as Reem Hanna, co-resident at 116 Rockefeller. Private investigator Johnson returned on March 28, 2019, March 31, 2019 and April 6, 2019. However, no one answered the door.  On April 17, 2019, at 12:20 p.m., private investigator Johnson again returned to 116 Rockefeller.  Reem Hanna identified herself as "Reem Hanna," and investigator Johnson notified her that she had legal documents for El Mallakh and that she was being sub-served. Hanna again misrepresented that she did not know El Mallakh and refused to open the door to take the documents, for which the investigator placed the alias summons and complaint at the door of 116 Rockefeller.

On July 1, 2019, Plaintiff Belgium filed a return of service for El Mallakh, showing that he was sub-served at his 116 Rockefeller residence on April 17, 2019, through co-resident Reem Hanna.  On July 1, 2019, Belgium filed a motion for default against El Mallakh.

On October 9, 2019, El Mallakh contacted co-defendant Petit to advise that he was aware of Plaintiff Belgium's activity, that he believed Belgium was seeking to sell the Property at issue in this lawsuit, despite the pending lawsuit. As to October 9, 2019, El Mallakh recently testified that he was specifically aware of this lawsuit at that time, and specifically aware that Belgium was attempting service of summons upon him at that time.

On October 23, 2019, Belgium moved the Court for an order of judicial default against El Mallakh.  On November 18, 2019, the Court entered judicial default against El Mallakh, for his failure to respond or participate in this lawsuit in any way. On February 21, 2020, the Court entered default judgment against El Mallakh. Plaintiff initiated domestication of El Mallakh's February 25th judgment in California, in Orange County Case No. 2020-01148745.

In July 2020, Belgium engaged California process server Michael Danley to serve El Mallakh with Notice of Entry of Sister-State Judgment and related documents. Process server Danley attempted service on: September 12, 2020 at 10:50 a.m., September 13, 2020 at 9:10 a.m., September 13, 2020 at 8:27 p.m. However, no resident came to the door. On September 13, 2020 after 8:27 p.m., process server Hanley briefly staked out 116 Rockefeller.  Around 9:02 p.m., process server Danley witnessed lights come on at 116 Rockefeller and people began moving around inside. Process server Danley approached 116 Rockefeller and called out to a woman inside the apartment near the sliding glass door. Process server Danely called out "Reem Hanna" and the woman said "yes," confirming she was Reem Hanna. A middle-aged man came to the door of 116 Rockefeller but refused to identify himself. Reem Hanna came to the door and refused to identify the man or provide any information as to El Mallakh.  Process server Danely then served the court papers upon El Mallakh's co-resident Hanna. Process server Danely informed Hanna of the nature of the documents and mailed the documents thereafter to 116 Rockefeller.

On September 23, 2020, the Court dismissed the other defendants pursuant to an approved settlement agreement; the order and agreement expressly excluded El Mallakh because he had refused to participate and was under order of default.  On November 16, 2020, El Mallakh "became aware of a judgment against me [Mallakh] on November 16, 2020 when the County of Orange Clerk of Records sent a Courtesy Notice regarding a lien that was placed on my [El Mallakh's] property." El Mallakh failed to take any action or exercise his opportunity to be heard.   On February 19, 2021, El Mallakh filed an <u>unverified</u> motion to vacate default order and default judgment in this Florida case, with no exhibits or supporting evidence.  In the motion, El Mallakh advised the Court that Reem Hanna is his sister. El Mallakh also confirmed that the Court entered an order of judicial default on July 1, 2019—nearly two years beforehand.

El Mallakh alleged that he had resided at 525 Broadway, Apt 5037, Santa Monica, CA 90401, since 2017. El Mallakh included an affidavit by him, testifying: "I only became aware of a judgment against me on November 16, 2020 when the County of Orange Clerk of Records sent a Courtesy Notice regarding a lien that was placed on my property." El Mallakh also filed an affidavit of Reem Hanna, testifying that:

> [REEM HANNA]: I never received notice of this lawsuit or the judgment against my brother in this case. I am unaware of any service attempted to be made to me or my brother.

Mallakh testified as to when he learned of the judgment against him:

> [MALLAKH]: When I went to the bank in February . . . then they said that your account has been frozen; and they took all the money out based on a judgment. And I'm like—I was like 'What kind of judgment?' And they gave me a printout that says a judgment based on a Florida case. And that's when I actually found out that there is a lawsuit/judgment. So I found out about it in February of 2021 just from going to the bank.

> Q: And that's the very first time you heard anything about it.

CASE NO.: 2018-28145 CA 44

[MALLAKH]: First time. First time, February 2021.

The sum of Mallakh's prior testimony on when he learned of the Judgment is outline below:

| CA Affidavit of El Mallakh | FL. Affidavit of El Mallakh | Deposition of El Mallakh |
|---|---|---|
| "I had no idea that the Judgment Creditor had filed an Application for Entry of Sister State Judgment, the Notice of Entry of Sister State Judgment, or the Sister State Judgment . . . until I hired counsel to represent me and set the Sister State Judgment aside." | "I only became aware of a judgment against me on November 16, 2020 when the County of Orange Clerk of Records sent a Courtesy Notice regarding a lien that was placed on my property." | "And that's when I actually found out that there is a lawsuit/judgment. So I found out about it in February of 2021 just from going to the bank.<br><br>[Q: And that's the very first time you heard anything about it?]<br><br>"First time. First time, February 2021." |
| CA Affidavit at ¶ 8. | FL Affidavit at ¶ 7. | Depo. Tr. 48, ln. 25 – Tr. 49, ln. 11 |

Mallakh also testified that he had been in communications with co-defendant Bernard Petit, as to this Florida lawsuit and the property at issue on October 9, 2019, and that co-defendant Petit specifically asked El Mallakh if he had been served with summons yet for this lawsuit. Mallakh testified that he continued to talk to co-defendant Petit several times between October 2019 and February 2021.

Mallakh then testified that from October 2019 and after, he continued to be aware that he was sued in this Florida lawsuit, but that he intentionally and knowingly refused to investigate, hire an attorney, or exercise his multiple opportunities to participate in this lawsuit:

Q: from October 2019 to today, you think you've talked to [co-defendant] Bernard Petit once or twice?

[MALLAKH]: Once or twice.

Q: Okay. In all that, did he mention to you that you were being sued in a lawsuit here in Florida?

[MALLAKH]: He said he's – he's getting sued, and he says, 'Did you get any documents or any service – service?' And I said, 'I did not.'

Q: Did you understand by that question that somebody was attempting to serve documents about a lawsuit on you?

[MALLAKH]: Right.

Q: Okay. Did you do anything to investigate if you were getting sued or what that was all about?

[MALLAKH]: No. I did not because, you know, usually when someone is suing you, you need to obviously service you with the documents to know what is going on with the lawsuit.

Q: Okay. Did you hire an attorney to look into it?

[MALLAKH]: No, because I was waiting to get serviced.

Q: Okay. Did you call anybody in Miami or in Florida to find out what was going on with the lawsuit against you?

[MALLAKH]: No.

Q: So you're just waiting for somebody to service summons on you?

[MALLAKH]: Right.

Exhibit 5 (Transcript El Mallakh) at Tr. 59, ln. 18–Tr. 61, ln. 1.

Legal Standard

A process server's affidavit alone is sufficient to support a finding of valid service and creates a presumption of effective service of process. *Magazine v. Bedoya*, 475 So. 2d 1035, 1035 (Fla. 3d DCA 1985) (affirming order denying motion to vacate where defendant failed to show by clear and convincing evidence that service was defective); *Buttigieg v. Prunetti*, 610 So. 2d 667, (Fla. 4th DCA 1992) (same). A plaintiff need only substantially comply with service statutes to acquire personal jurisdiction and overcome a motion to quash service or vacate an order on service

of process. *Fernandez v. Chamberlain*, 201 So. 2d 781, 784–85 (Fla. 2d DCA 1967) (holding substantial compliance with service statute was sufficient to defeat motion to quash, despite inability to file return receipt). Where there is sufficient evidence from which it might be reasonably found that service of summons was sufficient, the Court may deny a motion to vacate service of process, notwithstanding that the return of service has technical variances or does not address every aspect of proper service. *Pentecostal Holiness Church, Inc. v. Mauney*, 220 So. 2d 25, 26 (Fla. 4th DCA 1969).

A defendant challenging service of process must prove invalidity of the service by clear and convincing evidence and failure to do so will have the service of process stand as effective. *Conde v. Professional Mediquip of Fla., Inc.*, 436 So. 2d 322, 323–24 (Fla. 4th DCA 1983) (holding that where defendant admits to having notice of lawsuit, and has not by clear and convincing evidence demonstrated the invalidity of the service, the service will stand as effective); *Travelers Ins. Co. v. Davis*, 371 So. 2d 702, 703 (Fla. 3d DCA 1979) (defendant must prove the invalidity of service of process by clear and convincing evidence). Where defendant does not provide clear and convincing record evidence to overturn presumption of valid service, the Court cannot grant a motion to vacate. *Magazine*, 475 So. 2d at 1035 (affirming order denying motion to vacate where defendant failed to show by clear and convincing evidence that service was defective); *Wadkin Ltd. v. Platt*, 545 So. 2d 314, 314 (Fla. 4th DCA 1989) (affirming order denying motion to quash service of process, where defendant failed to provide clear and convincing evidence to overturn presumption of effective service of process).

Florida Statutes § 48.031(1) provides that service of process can be made by leaving copies of summons at a defendant's usual place of abode with any person residing therein who is 15 years

of age or older. § 48.031(1), Fla. Stat. (2019). Under Florida Statutes s. 48.031(1)(a), the term "usual place of abode" means the place where the defendant is actually living at the time of service. *Shurman v. Atlantic Mortg. & Inv. Corp.*, 795 So. 2d 952, 954 (Fla. 2001).

Where a person to be served with process evades the presence of a process server in a deliberate attempt to avoid service of process, the delivery requirement may be satisfied if the process server leaves the papers at a place in which such person can easily retrieve them and takes reasonable steps to call such delivery to the attention of the person to be served. *Palamara v. World Class Yachts, Inc.*, 824 So. 2d 194, 194–95 (Fla. 4th DCA 2002); *Haney v. Olin Corp.*, 245 So. 2d 671(Fla. 4th DCA 1971); *Olin Corp. v. Haney*, 245 So. 2d 669(Fla. 4th DCA 1971); *Liberman v. Commercial Nat'l Bank of Broward Cnty.*, 256 So. 2d 63 (Fla. 4th DCA 1971); *Dowd Shipping, Inc. v. Lee*, 354 So. 2d 1252 (Fla. 4th DCA 1978); *see also Wendel v. Int'l Real Estate News, LLC,* 2020WL5803510 at *4 (S.D. Fla. Aug. 10, 2020) (denying motion to vacate default where defendant failed to meet burden to present strong and convincing evidence that she had not evaded service); *Kennedy v. Grova*, 2012WL1368139 at *3 (S.D. Fla. April 19, 2012); *U.S. S.E.C. v. Reinhard*, 352 Fed. App'x 309, 313 (11th Cir. 2009).

Here, the service of process at El Mallakh's home, which he owns and where his car was registered, upon his adult sister also residing there, sufficed Florida Statutes § 48.031 and gave due process notice and opportunity to be heard.

Authorized investigator Johnson served process upon El Mallakh through his sister Reem Hanna at 116 Rockefeller, Irvine CA, on April 17, 2019. Hanna had previously identified herself to investigator Johnson on March 19, 2019, and again identified herself as "Reem Hanna" on April 17, 2019. *Id.* at *1. Despite Hanna's misrepresentations that she did not know El Mallakh,

investigator Johnson notified Hanna that she had legal documents for El Mallakh and that she was

being sub-served, in compliance with Florida law. *Id*. at *2

A skip trace showed El Mallakh owned and resided at 116 Rockefeller, Irvine CA, with no

other possible addresses. Exhibit 1 (1/8/19 skip trace). The skip trace showed Reem Hanna was

his co-resident there, along with Mohamed Roston. *Id*. at *4, 6, 19–29 and 56.

Investigator Johnson performed a California DMV search on El Mallakh and found that

his vehicle, a 2016 Mercedes Benz C Class was currently registered at 116 Rockefeller. Exhibit 4

(Declaration of The Titan Group, Professional Investigations). The return of service is regular on

its face, creating the presumption of good service. This suffices and puts burden on El Mallakh to

prove by clear and convincing evidence that service was defective.  It is the finding of this Court

that El Mallakh and Hanna are not credible and have failed to provide clear and convincing

evidence that El Mallakh's usual place of abode is not 116 Rockefeller, Irvine CA.

The purpose of service of process is to provide the defendant due process notice and

opportunity to be heard. The Third District Court of Appeal has plainly stated:

> The purpose of service of process is to give a defendant proper notice that it is
> answerable to a plaintiff's claim, to advise the defendant of the nature of that claim,
> and to afford the defendant an opportunity to defend against it.

*Am. Hosp. of Miami, Inc. v. Nateman*, 498 So. 2d 444, 445 (Fla. 3d DCA 1986) (affirming denial

of motion to vacate despite defect in summons, where defendant received notice and opportunity

to be heard); *Davis*, 371 So. 2d at 703 (holding object of service of process is to give defendant

notice that legal proceeding has been instituted, and opportunity to defend against it); *Shurman*,

795 So. 2d at 954  ("the purpose of this jurisdictional scheme is to give the person affected notice

of the proceedings and an opportunity to defend his rights."); *Cruz v. Citimortgage, Inc*., 197 So.

3d 1185, 1189 (Fla. 4th DCA 2016) ("It is well-settled that the fundamental purpose of the service

CASE NO.: 2018-28145 CA 44

of process statute 'is to give the person affected notice of the proceedings and an opportunity to

defend his rights.'") (citing *Shurman*).

As the *Kozinski v. Phillips* court discussed:

> Further, cases addressing insufficient service of process have emphasized that <u>a defendant may not 'simply ignore the process, sit idly by, let default be entered against it,' and then successfully move to set aside</u> the judgment more than a year after it is rendered. *Craven v. J.M. Fields, Inc.*, 226 So. 2d 407, 410 (Fla. 4th DCA 1969). Instead, 'a party complaining of an irregular service or return is required to move diligently to effectuate those remedies available to the party by our rules of civil procedure <u>lest the party suffer the consequences.</u>' *Id.*

*Kathleen G. Kozinski, P.A. v. Phillips*, 126 So. 3d 1264, 1268 (Fla. 4th DCA 2013) (emphasis

added). Likewise, a defendant and his family cannot make deliberate attempts to avoid the presence

of a process server and service of process. *Palamara,* 824 So. 2d at 194–95; *Haney*, 245 So. 2d at

671; *Olin Corp.,* 245 So. 2d at 673–74; *Liberman*, 256 So. 2d at 63; *Dowd Shipping*, 354 So. 2d

at 1252; *Wendel*, 2020WL5803510 at *4; *Kennedy*, 2012WL1368139 at *3; *Reinhard,* 352 Fed.

App'x at 313.

Where defendants have notice and an opportunity to be heard prior to entry of a default

order or default judgment, the Court property denies their later motion to vacate and the Third

District Court of Appeal should affirm. *Estrada v. Estrada*, 274 So. 3d 426, 430 (Fla. 3d DCA

2019) (holding son and daughter-in-law had notice of action by father, and thus due process rights

were preserved and default order entered after they filed appearance and answer to complaint was

not void).

Additionally, irregularities or technical variances in service of process, summons, and

return of service which do not result in prejudice to defendant do not serve to invalidate service.

*Nateman*, 498 So. at 445–46 (affirming denial of motion to vacate despite defect in summons,

where defendant received notice and opportunity to be heard); *Buttigieg*, 610 So. 2d at 669–70

CASE NO.: 2018-28145 CA 44

("Irregularities in a writ or other process, where they do not prejudice a defendant, will not invalidate the service.").

Hyper-technical defects in summonses or returns of service do not require the Court to quash service, where the defendant did have notice and opportunity to be heard. *Nateman*, 498 So. 2d at 445–46 (affirming denial of motion to vacate despite defect in summons, where defendant received notice and opportunity to be heard).

Here, El Mallakh had repeated notice of this lawsuit and opportunity to be heard, over and over again for years. El Mallakh recently testified that he was specifically aware of this lawsuit as of October 9, 2019, and specifically aware that Belgium was attempting service of summons upon him at that time:

> [MALLAHK]: [A]t that time, also Bernard [Petit] asked me – I remember very well. He says 'Did anybody try to serve you any documents?'
>
> Q: from <u>October 2019</u> . . . did he mention to you that you were being sued in a lawsuit here in Florida? Did you understand by that question that somebody was attempting to serve documents about a lawsuit on you?
>
> [MALLAKH]: Right."

Exhibit 5 (Mallakh deposition) Tr. 55, ln. 17–20 and Tr. 59, ln. 18–Tr. 61, ln. 1. This was before Belgium moved for an order of judicial default against El Mallakh (motion filed 10/23/19). Between October 2019 and February 2020, El Mallakh continued to communicate with his co-defendant Petit as to this lawsuit, its stage of advance, and its impact on El Mallakh's interests.

Further, El Mallakh had notice by delivery of summons and complaint through his sister at his house on April 17, 2019. Exhibit 4 (declaration of investigator Johnson). El Mallakh had notice on September 13, 2020, when process server Hanley served notice of default judgment upon El Mallakh through Reem Hanna at El Mallakh's home. Exhibit 10 (Declaration of Michael Danley) at ¶¶ 8–14. It is undisputed that process server Hanley communicated with Hanna on September

11

13, 2020 to give service of process to El Mallakh at his home. Exhibit 21 (Transcript Hanna) at Tr. 71, ln. 17 –Tr. 73, ln. 20 ("Q: at 116 Rockefeller at 9 o'clock p.m. on September 13, 2020, when this process server came to your house; is that right?" "[HANNA]: Right.").

El Mallakh also testified that he received additional notice of the Florida judgment against him <u>on November 16, 2020</u> when the County of Orange Clerk of Records sent a Courtesy Notice regarding a lien that was placed on my property." Exhibit 13 (Mallakh CA affidavit) at ¶ 7. El Mallakh could not explain why he continued to delay his appearance in this Court to address this lawsuit against him.

Mallakh has testified that he knowingly and intentionally squandered his due process notice and opportunity to be heard for years, after he continued to be aware that he was sued in this Florida lawsuit, but that he intentionally and knowingly refused to investigate, hire an attorney, or exercise his multiple opportunities to participate in this lawsuit:

> Q: from October 2019 to today, you think you've talked to [co-defendant] Bernard Petit once or twice?

> [MALLAKH]: Once or twice.

> Q: Okay. In all that, did he mention to you that you were being sued in a lawsuit here in Florida?

> [MALLAKH]: He said he's – he's getting sued, and he says, 'Did you get any documents or any service – service?' And I said, 'I did not.'

> Q: Did you understand by that question that somebody was attempting to serve documents about a lawsuit on you?

> [MALLAKH]: Right.

> Q: Okay. Did you do anything to investigate if you were getting sued or what that was all about?

> [MALLAKH]: No. I did not because, you know, usually when someone is suing you, you need to obviously service you with the documents to know what is going on with the lawsuit.

Q: Okay. Did you hire an attorney to look into it?

[MALLAKH]: No, because I was waiting to get serviced.

Q: Okay. Did you call anybody in Miami or in Florida to find out what was going on with the lawsuit against you?

[MALLAKH]: No.

Q: So you're just waiting for somebody to service summons on you?

[MALLAKH]: Right.

Exhibit 5 (Transcript El Mallakh) at Tr. 59, ln. 18–Tr. 61, ln. 1.

This Court concludes the above notice and opportunity to be heard sufficed El Mallakh's due process rights. Florida law requires El Mallakh to diligently exercise his due process rights to participate in this lawsuit, upon such notice. *Kozinski*, 126 So. 3d  at 1268. Instead, El Mallakh chose to "simply ignore the process and let default be entered against [him]." *Id*. Florida law prohibits El Mallakh from now successfully moving to set aside the judgment more than a year after it is rendered. *Id*.; *Craven*, 226 So. 2d  at 410.

Additionally, the Court must differentiate between "defective" service and "total lack" of service. *Kozinski,* , 126 So. 3d at 1268. Total lack of service renders a judgment void, while defective service renders a judgment voidable. Under circumstances where service is irregular or defective but actually gives the defendant notice of the proceedings against him, a defendant has only one year to move to vacate a particular order, under Florida Rule of Civil Procedure 1.540(b). Id.  It is the finding of this Court that the record shows that El Mallakh had repeated notice of this lawsuit and opportunity to be heard.  Thus, El Mallakh only had one year from the November 19, 2019 order of judicial default to move to vacate that order—up to November 19, 2020. Fla. R. Civ. P. 1.540(b). Accordingly, it is

**ORDERED AND ADJUDGED** that the motion to vacate final judgment is **DENIED**.

DONE AND ORDERED in Chambers at Miami-Dade County, Florida, on 05/15/21.

WILLIAM THOMAS
CIRCUIT COURT JUDGE

**FINAL ORDERS AS TO ALL PARTIES**
**SRS DISPOSITION NUMBER    2**
**THE COURT DISMISSES THIS CASE AGAINST ANY PARTY NOT LISTED IN THIS FINAL ORDER OR PREVIOUS ORDER(S). THIS CASE IS CLOSED AS TO ALL PARTIES.**
**Judge's Initials    WT**

The parties served with this Order are indicated in the accompanying 11th Circuit email confirmation which includes all emails provided by the submitter.  The movant shall IMMEDIATELY serve a true and correct copy of this Order, by mail, facsimile, email or hand-delivery, to all parties/counsel of record for whom service is not indicated by the accompanying 11th Circuit confirmation, and file proof of service with the Clerk of Court.

Signed original order sent electronically to the Clerk of Courts for filing in the Court file.

# EXHIBIT
# "12"

# Third District Court of Appeal

## State of Florida

Opinion filed February 16, 2022.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D21-1295
Lower Tribunal No. 18-28145
_____

## Bassem Essam El Mallakh,

Appellant,

vs.

## Belgium Investments 960 Bay Dr,

Appellee.

An appeal from a non-final order from the Circuit Court for Miami-Dade County, William Thomas, Judge.

Frank Law Firm, P.A., and Cody L. Frank (Fort Lauderdale); South Florida Law, PLLC, and Frank DelloRusso (Hallandale Beach), for appellant.

Bernhard Law Firm, PLLC, and Andrew J. Bernhard, for appellee.

Before EMAS, LOGUE, and MILLER, JJ.

PER CURIAM.

Appellant, Bassem Essam El Mallakh, challenges an order denying his verified motion to vacate a default final judgment rendered in favor of appellee, Belgium Investments 960 Bay Drive.  The trial court conducted an extensive evidentiary hearing, resolved all disputed factual issues, and articulated legal conclusions in a carefully reasoned, fourteen-page opinion. Adhering to the presumptions codified in the Supreme Court's seminal decision, Koster v. Sullivan, 160 So. 3d 385 (Fla. 2015), the principles advanced in Lazcar International, Inc. v. Caraballo, 957 So. 2d 1191 (Fla. 3d DCA 2007), and the adage that we must decline to "substitute [our] judgment for that of the trial court on questions of fact, likewise of the credibility of the witnesses as well as the weight to be given to the evidence by the trial court," Goldfarb v. Robertson, 82 So. 2d 504, 506 (Fla. 1955), as this "is not the function of the appellate court," Shaw v. Shaw, 334 So. 2d 13, 16 (Fla. 1976), we affirm the order under review in all respects.

Affirmed.

IN THE DISTRICT COURT OF APPEAL

OF FLORIDA

THIRD DISTRICT

JUNE 28, 2022

BASSEM ESSAM EL MALLAKH,
Appellant(s)/Petitioner(s),
vs.
BELGIUM INVESTMENTS 960 BAY
DR, etc.,
Appellee(s)/Respondent(s),

CASE NO.: 3D**21-1295**

L.T. NO.:    18-28145

Appellee's Responses to the Motion for Rehearing, filed May
26, 2022, are noted.

Upon consideration, Appellant's Motion for Certification or,
Alternatively, for Rehearing or Clarification is hereby denied.

Appellant's Motion for Rehearing En Banc is denied.

EMAS, LOGUE and MILLER, JJ., concur.

A True Copy
ATTEST

CLERK
DISTRICT COURT OF APPEAL
THIRD DISTRICT

cc:    Andrew J. Bernhard    Cody L. Frank    Frank Dellorusso

la

# M A N D A T E

### from

## DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
## THIRD DISTRICT

This cause having been brought to the Court by appeal, and after due consideration the Court having issued its opinion;

YOU ARE HEREBY COMMANDED that such further proceedings be had in said cause as may be in accordance with the opinion of this Court, and with the rules of procedure and laws of the State of Florida.

WITNESS the Honorable Ivan F. Fernandez, Chief Judge of the District Court of Appeal of the State of Florida, Third District, and seal of the said Court at Miami, Florida on this day.

**DATE:**                July 18, 2022
**CASE NO.:**            **21-1295**
**COUNTY OF ORIGIN:**    **Dade**
**T.C. CASE NO.:**       **18-28145**

**STYLE:**    **BASSEM ESSAM EL**         v.    **BELGIUM INVESTMENTS 960 BAY**
              **MALLAKH,**                      **DR, etc.,**

A True Copy
ATTEST

*Mercedes M. Prieto*

CLERK
DISTRICT COURT OF APPEAL
THIRD DISTRICT

**ORIGINAL TO:**    **Miami-Dade Clerk**

cc:  Andrew J. Bernhard          Cody L. Frank                    Frank DelloRusso

la

# EXHIBIT
# "13"

T#41326110

FILED

SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

MAY 1 0 2022

DAVID H. YAMASAKI, Clerk of the Court

BY:_____,DEPUTY

1  Patrick Miller: State Bar # 301819
   P Miller Legal Services
2  121 S Oak Ave
   Pasadena, CA 91107
3  213-364-7581
   Patrick.miller@pmillerlegal.com
4

5

   Attorney for the Judgement Creditor
6  Belgium Investments 960 Bay Dr, LLC, a California Corp.

7

8        **IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9              **IN AND FOR THE COUNTY OF ORANGE**

10

11 **Belgium Investments 960 Bay Dr, LLC, a**      )   Case Number: 30-2020-01148745-CU-EN-
   **California Corp.**                            )   CJC
                                                   )
12            Plaintiff(s),                        )
                                                   )   **ORDER GRANTING APPLICATION**
13        vs.                                      )   **FOR ORDER OF SALE OF DWELLING**
                                                   )
14 **Bassem Essam El Mallakh**                     )   DATE:
                                                   )
15            Defendant(s).                        )   TIME:
                                                   )
16                                                 )   DEPARTMENT: C12
                                                   )
17                                                 )
                                                   )
18                                                 )
                                                   )
19                                                 )
                                                   )
20 _____        )

21

22 The application of Plaintiff Belgium Investments 960 Bay Dr, LLC, a California Corp. for an

23 order for sale of a certain dwelling, namely: the real property located at 116 Rockefeller, Irvine,

24 CA 92612 and owned by the Judgement Debtor, Bassem Essam El Mallakh, (hereinafter, the

25 "Rockefeller Property"), came on regularly for hearing by the court on 21 April 2022. Plaintiff

26 appeared by counsel Patrick Miller; opposing party, Defendant Bassem Essam El Mallakh,

27 appeared by counsel Michael Sayer.

28

        ORDER GRANTING APPLICATION FOR ORDER OF SALE OF DWELLING

1   On proof made to the satisfaction of the court that the property is not subject to any homestead

2   exemption and that the application ought to be granted,

3   IT IS ORDERED that the application be, and it hereby is, granted. The clerk shall forthwith

4   transmit a copy of the order in accordance with Code of Civil Procedure Section 704.780.

5

6   IT IS FURTHER ORDERED that the property be sold in the manner provided in Code of Civil

7   Procedure Sections 701.510-701.680.

8

9   Date: ___MAY 1 0 2022___

10                      Layne H. Metzer
                       JUDGE OF THE SUPERIOR COURT

ORDER GRANTING APPLICATION FOR ORDER OF SALE OF DWELLING

# EXHIBIT
# "14"

1  Michael Sayer, State Bar No. 141038
2  Debt Recovery Attorneys
   17595 Harvard Ave., Suite C-557
3  Irvine, CA 92614
   Tel. (949) 292-3511
4  Dra@dracollections.com

5  Attorneys for Defendant, BASSEM ESSAM EL MALLAKH

6

7                  SUPERIOR COURT OF CALIFORNIA

8                        COUNTY OF ORANGE

9

10 BELGIUM INVESTMENTS 960 BAY DR. ) CASE NO: 30-2020-01148745
   LLC, a California Corp.          )
11                                  )
      Plaintiff,                    )  OPPOSITION OF BASSEM ESSAM EL
12                                  )  MALLAKH TO PLAINTIFF'S APPLICATION
   v.                               )  FOR ORDER AUTHORIZING THE SALE OF
13                                  )  REAL PROPERTY
                                    )
14 BASSEM ESSAM EL MALLAKH          )
                                    )  Date:  4/21/22
15    Defendant.                    )  Time: 2:00pm
                                    )  Place: Dept. C12
16 _____  )
                                       Reservation No. Unknown
17

18    **TO ALL PARTIES AND THEIR ATTORNEY OF RECORD:**

19
      PLEASE TAKE NOTICE Defendant Bassem Essam El Mallakh hereby opposes Plaintiff's
20
   motion for an application for order authorizing the sale of real property pursuant to Cal Code Civ
21
   Proc § 704.750.
22
              **<u>MEMORANDUM OF POINTS AND AUTHORITIES</u>**
23
      Plaintiff has brought the application for order authorizing the sale of real property under Cal
24
   Code Civ Proc § 704.710(a). This statutory scheme requires Plaintiff comply with various time
25
   sensitive provisions and produce evidence to support the application. As argued below, Plaintiff has
26

27

28                              - 1 –
   OPPOSITION OF BASSEM ESSAM EL MALLAKH TO PLAINTIFF'S APPLICATION FOR ORDER
   AUTHORIZING THE SALE OF REAL PROPERTY

failed on every front to comply with the requirements.

**Plaintiff Has Failed To Comply With The Notice Requirement Under Code Civ Proc § 704.770(b).**

(b) Not later than 30 days before the time set for hearing, the judgment creditor shall do both of the following:

(1) Serve on the judgment debtor a copy of the order to show cause, a copy of the application of the judgment creditor, and a copy of the notice of the hearing in the form prescribed by the Judicial Council. Service shall be made personally or by mail.

(2) Personally serve a copy of each document listed in paragraph (1) on an occupant of the dwelling or, if there is no occupant present at the time service is attempted, post a copy of each document in a conspicuous place at the dwelling.

Here, Plaintiff has not served the judgment debtor as required. This statutory requires service be made **upon the judgment debtor.**  The code section does not provide for service on the judgment debtor's attorney, unless compliance with Code Civ Proc § 684.020.

a) Except as provided in subdivision (b), when a writ, notice, order, or other paper is required to be served under this title on the judgment debtor, it shall be served on the judgment debtor instead of the attorney for the judgment debtor.

(b) The writ, notice, order, or other paper shall be served on the attorney specified by the judgment debtor rather than on the judgment debtor if all of the following requirements are satisfied:

(1) The judgment debtor has filed with the court and served on the judgment creditor a request that service on the judgment debtor under this title be made by serving the attorney specified in the request. Service on the judgment creditor of the request shall be made personally or by mail. The request shall include a consent, signed by the attorney, to receive service under this title on behalf of the judgment debtor.

- 2 –
OPPOSITION OF BASSEM ESSAM EL MALLAKH TO PLAINTIFF'S APPLICATION FOR ORDER
AUTHORIZING THE SALE OF REAL PROPERTY

There is no evidence before the Court that Defendant judgment debtor has authorized

service upon counsel. Thus, Plaintiff has failed to comply with the service requirements under Code

Civ Proc § 704.770(b).

Therefore, on that basis alone the Court must deny Plaintiff's Application for Sale.

**Plaintiff Has Failed To Obtain A Writ Of Execution And Levy**

Plaintiff has failed to timely obtain a current writ of execution[1] and levy the subject

property. Specifically, Plaintiff has not obtained a current writ of execution, nor a levy, Cal Code

Civ Proc § 704.750(a).

Cal Code Civ Proc § 704.750(a):

> (a)  Promptly after a dwelling is levied upon (other than a dwelling described
> in subdivision (b) of Section 704.740), the levying officer shall serve
> notice on the judgment creditor that the levy has been made and that the
> property will be released unless the judgment creditor complies with the
> requirements of this section. Service shall be made personally or by mail.
> Within 20 days after service of the notice, the judgment creditor shall
> apply to the court for an order for sale of the dwelling and shall file a copy
> of the application with the levying officer. If the judgment creditor does
> not file the copy of the application for an order for sale of the dwelling
> within the allowed time, the levying officer shall release the dwelling.

Plaintiff is required to obtain a current writ of execution and levy the subject property prior

to filing the application for the sale. Then within 20 days after the levy the Plaintiff must file the

application for the sale of the subject property. Thereafter the Plaintiff must file a copy of the

application for the sale of the subject property with the levying officer. If Plaintiff does not file the

---

[1] Plaintiff obtained a writ on 11/13/20 and 12/9/20. Both writs have expired pursuant to Cal Code

OPPOSITION OF BASSEM ESSAM EL MALLAKH TO PLAINTIFF'S APPLICATION FOR ORDER
AUTHORIZING THE SALE OF REAL PROPERTY

copy of the application for an order for sale of the dwelling within the allowed time, the levying

officer shall release the dwelling.  Here, because no levy has been effectuated, and the subject

property has not been levied, the court has no jurisdiction to order a sale of the subject property.

Plaintiff has failed to comply with Cal Code Civ Proc § 704.750(a). The court's register of

actions, (Ex.1), indicates that no current writ of execution has been issued, and thus a matter of law

no levy can be created. The court cannot grant Plaintiff's application as Plaintiff has failed to

comply with Cal Code Civ Proc § 704.750(a).

Therefore, on that basis alone the Court must deny Plaintiff Application for Sale.

**Homestead Exemption Cal Code Civ Proc § 704.780:**

At the hearing set for 9/16/21, it is Plaintiff's burden to provide admissible evidence that the

records of the County Tax Assessor indicate that there is (or is not) a current homeowner's

exemption or disabled veteran's exemption. Cal Code Civ Proc § 704.780(a)(1). A distinction is

made between the requirements applicable to the homestead exemption statement in the Application

for Sale, and the burden of proof as to the existence of the homestead exemption to be submitted at

the time of the hearing. The Application only requires a, "...statement whether or not the records of

the county tax assessor indicate that there is a current homeowner's exemption or disabled veteran's

exemption for the dwelling and the person or persons who claimed any such exemption." Cal Code

Civ Proc § 704.760(a). However, at the hearing it is Plaintiff's burden of proof to establish, "If the

records of the county tax assessor indicate that there is a current homeowner's exemption or

disabled veteran's exemption for the dwelling claimed by the judgment debtor or the judgment

debtor's spouse, the judgment creditor has the burden of proof that the dwelling is not a

homestead." Cal Code Civ Proc § 704.760(a).

Civ Proc § 699.510(a).

- 4 –
OPPOSITION OF BASSEM ESSAM EL MALLAKH TO PLAINTIFF'S APPLICATION FOR ORDER
AUTHORIZING THE SALE OF REAL PROPERTY

Plaintiff has not presented any admissible evidence to confirm, "If the records of the county tax assessor indicate that there is or is not a current homeowner's exemption…" The Plaintiff has not produced a certified copy of the tax records from the County of Orange Tax Assessor.

Therefore, on that basis alone the Court must deny Plaintiff Application for Sale.

**Cal Code Civ Proc § 704.780 Prohibits The Sale Of The Subject Property**

Plaintiff has not presented any evidence to the court as to the fair market value of the subject property. Plaintiff has not had the property appraised, thus the court will be unable to determine the fair market value as required by Cal Code Civ Proc § 704.780(b). Moreover, Plaintiff has not identified the name and address of each lien holder, and the amount of any such liens. The plaintiff has not obtained a litigation guarantee that would establish the name and address of each lien holder, and the amount of any such liens.

Plaintiff's failure to establish the homestead exemption as required by Cal Code Civ Proc § 704.760(a), the failure to determine the fair market value, and providing the name and address of each lien holder and the amount of any such liens, the Court is precluded from ordering the sale of the subject property. The rational is that the Court cannot order the sale of the subject property unless the Court determines that the sale of the dwelling would be likely to produce a bid sufficient to satisfy any part of the amount due on the judgment pursuant to Cal Code Civ Proc § 704.800.

Plaintiff has not provided the Court with sufficient evidence for the Court to proceed to order the sale of the subject property.

Therefore, on that basis alone the court must deny Plaintiff Application for Sale.

## <u>CONCLUSION</u>

For all of the forgoing reasons the Plaintiff's application for order authorizing the sale of real property must be denied.

OPPOSITION OF BASSEM ESSAM EL MALLAKH TO PLAINTIFF'S APPLICATION FOR ORDER
AUTHORIZING THE SALE OF REAL PROPERTY

Dated: 4/1/2022

*Michael Sayer*
Michael Sayer, Attorney for Defendant

OPPOSITION OF BASSEM ESSAM EL MALLAKH TO PLAINTIFF'S APPLICATION FOR ORDER
AUTHORIZING THE SALE OF REAL PROPERTY

**PROOF OF ELECTRONIC SERVICE**

      I am employed in the County of Orange, State of California. I am over the age of 18 and not a party to the within action. My business address is, 17595 Harvard Ave, Suite C-557, Irvine, CA 92614.

      On the date indicated below, I served by ELECTRONIC SERVICE the foregoing document described as OPPOSITION OF BASSEM ESSAM EL MALLAKH TO PLAINTIFF'S APPLICATION FOR ORDER AUTHORIZING THE SALE OF REAL PROPERTY on all interested to the electronic address as listed for each party and attorney below, using the e-filing service pursuant to 2019 California Rules of Court Rule 2.251.(b), Electronic service

| | |
|---|---|
| Patrick Miller<br>P Miller Legal Services<br>285 E. California, Unite 201<br>Pasadena, CA 91106<br>Partick.miller@pmillerlegal.com | |

      I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

      Executed on this 4/1/2022, at Irvine, California.

*Michael Sayer*

Michael Sayer

OPPOSITION OF BASSEM ESSAM EL MALLAKH TO PLAINTIFF'S APPLICATION FOR ORDER
AUTHORIZING THE SALE OF REAL PROPERTY

Michael Sayer, State Bar No. 141038
Debt Recovery Attorneys
17595 Harvard Ave., Suite C-557
Irvine, CA 92614
Tel. (949) 292-3511
Dra@dracollections.com

Attorneys for Defendant, BASSEM ESSAM EL MALLAKH

SUPERIOR COURT OF CALIFORNIA

COUNTY OF ORANGE

| | |
|---|---|
| BELGIUM INVESTMENTS 960 BAY DR. LLC, a California Corp.<br><br>Plaintiff,<br><br>v.<br><br>BASSEM ESSAM EL MALLAKH<br><br>Defendant.<br>_____ | CASE NO: 30-2020-01148745<br><br>DEFENDANT BASSEM ESSAM EL MALLAKH EVIDENTIARY OBJECTIONS TO PLAINTIFF'S APPLICATION FOR ORDER AUTHORIZING THE SALE OF REAL PROPERTY<br><br>[Filed Concurrently with Opposition]<br><br>Date:  4/21/22<br>Time: 2:00pm<br>Place: Dept. C12<br><br>Reservation No. Unknown |

**TO ALL PARTIES AND THEIR ATTORNEY OF RECORD:**

Please take notice that defendant Bassem Essam El Mallakh submits the

following objections to the Application for Order Authorizing the Sale of Real

Property filed by Plaintiff Belgium Investments 960 Bay Dr, LLC.

- 1 –
DEFENDANT BASSEM ESSAM EL MALLAKH EVIDENTIARY OBJECTIONS TO PLAINTIFF'S
APPLICATION FOR ORDER AUTHORIZING THE SALE OF REAL PROPERTY

| Paragraph / Page / Line No. | Text | Objection | Sustained / Overruled |
|---|---|---|---|
| Para.1, Lines 24-28 | STANDING:  I am the attorney for BELGIUM INVESTMENTS 960 BAY DR, LLC,  A  CALIFORNIA CORPORATION  ("Belgium"),  the Judgement  Creditor Plaintiff in the above-entitled matter. | Belgium Investments 960 Bay Dr, LLC is a dissolved corporation as of 2/2/22, with its "…powers, rights and privileges.." terminated. (Ex.1), Thus, Plaintiff has no authority to prosecute the instant action. | |
| Para.3 Lines 6-7 | Cal CCP Section 704.750(a) requires that this Application be submitted within 20 days after service of the Notice of Levy on Real Property | Objection, hearsay, (EC § 1200), lacks foundation, (EC § 702), lacks admissible evidence. Plaintiff presented no evidence that the Sheriff served the notice of levy as required by CCP Section 704.750(a) | |
| Para.4 Lines 15-16 | …the real property located at 116 Rockefeller, Irvine, CA 92612 and owned by the Judgement Debtor, | Objection, hearsay, (EC § 1200), lacks foundation, (EC § 702), lacks admissible evidence. Plaintiff has not attached a certified deed evidencing ownership of the subject property. | |
| Para.5 Lines 25- | On 15 February 2021… the Sheriff of Orange County posted a notice of | hearsay, (EC § 1200), lacks foundation, (EC § 702), lacks | |

DEFENDANT BASSEM ESSAM EL MALLAKH EVIDENTIARY OBJECTIONS TO PLAINTIFF'S
APPLICATION FOR ORDER AUTHORIZING THE SALE OF REAL PROPERTY

| 28 to page 3 Lines 1-2 | levy on the interest of Defendant Bassem Essam El Mallakh… Notice of that levy was posted on the property by the Sheriff on about 10 February 2021. | admissible evidence. Plaintiff presented no evidence that the Sheriff served the notice of levy as required by CCP Section 704.750(a) | |
| Para.6 Lines 4-5 | The dwelling is subject to a court order for sale and execution because it is the property  of  defendant… | hearsay, (EC § 1200), lacks foundation, (EC § 702), lacks admissible evidence. Plaintiff has not attached a certified deed evidencing ownership of the subject property… | |
| Para.6 Lines 5-6 | … and  has  been  duly  levied  on… | hearsay, (EC § 1200), lacks foundation, (EC § 702), lacks admissible evidence. Plaintiff presented no evidence that the Sheriff served the notice of levy as required by CCP Section 704.750(a) | |
| Para.7 Lines 9-12 | A reasonable search of the records of THE ORANGE COUNTY TAX ASSESSOR do not indicate that there is a current homeowner's exemption or a disabled veteran's exemption for the Property, or that there are any persons who claim such exemption. | hearsay, (EC § 1200), lacks foundation, (EC § 702), lacks admissible evidence. Plaintiff has not provided a Litigation Guarantee or a certified Preliminary Title Report, nor inadmissible document from the County | |

DEFENDANT BASSEM ESSAM EL MALLAKH EVIDENTIARY OBJECTIONS TO PLAINTIFF'S
APPLICATION FOR ORDER AUTHORIZING THE SALE OF REAL PROPERTY

| | | | |
|---|---|---|---|
| | | Tax Collector or County Recorder to support the claim regarding the homeowner's exemption or a disabled veteran's exemption | |
| Para.8 Lines 14-16 | The Property is not the primary residence of the Judgment Debtor or of his spouse, and, therefore, is not a Homestead as defined under Cal CCP Section 704.710(c). | hearsay, (EC § 1200), lacks foundation, (EC § 702), lacks admissible evidence. The Application does not indicate how and when Plaintiff's counsel made the determination of "primary residence" | |
| Para.9 Lines 17-21 | Upon information and belief, the owner does not reside in the Property. This is supported by the written declaration of the Defendant, Bassem Essam El Mallakh, wherein he states that he has "been residing fulltime at [his] residence in Santa Monica since 11/21/16 | Objection. The cited declaration was executed 14 months ago. Plaintiff has not presented any timely evidence that Defendant is not currently residing in the subject property. | |
| Para.10 23-24 | There is no known homestead exemption filing against this Property. A search of the records of the ORANGE COUNTY RECORDER has been conducted. | hearsay, (EC § 1200), lacks foundation, (EC § 702), lacks admissible evidence. Plaintiff has not provided a Litigation Guarantee or a certified Preliminary Title Report, nor inadmissible document from the County | |

- 4 –

DEFENDANT BASSEM ESSAM EL MALLAKH EVIDENTIARY OBJECTIONS TO PLAINTIFF'S
APPLICATION FOR ORDER AUTHORIZING THE SALE OF REAL PROPERTY

| | | | |
|---|---|---|---|
| | | Tax Collector or County Recorder to support the claim regarding the homeowner's exemption or a disabled veteran's exemption | |
| Para.11 Lines 26-28 to page 3 Lines 1-4 | According to the records of the ORANGE COUNTY RECORDER, the following party has a recorded lien or encumbrance against the Property for the amount listed: FREEDOM MORTGAGE CORPORATION 907 Pleasant Valley Ave Ste 3 Mount Laurel, NJ 08054 $234,000 | hearsay, (EC § 1200), lacks foundation, (EC § 702), lacks admissible evidence. Plaintiff has not provided a Litigation Guarantee or a certified Preliminary Title Report, nor inadmissible document from the County Tax Collector or County Recorder to support the claim regarding liens recorded against the subject property. | |
| Page 4 | Verification | The Application fails to contain the required CCP 2015.5, "I certify (or declare) under penalty of perjury that the foregoing is true and correct" Therefore, the application is legally deficient. | |

Dated: 4/1/2022

*Michael Sayer*

Michael Sayer, Attorney for Defendant.

- 5 –

DEFENDANT BASSEM ESSAM EL MALLAKH EVIDENTIARY OBJECTIONS TO PLAINTIFF'S
APPLICATION FOR ORDER AUTHORIZING THE SALE OF REAL PROPERTY

**PROOF OF ELECTRONIC SERVICE**

     I am employed in the County of Orange, State of California. I am over the age of 18 and not a party to the within action. My business address is, 17595 Harvard Ave, Suite C-557, Irvine, CA 92614.

     On the date indicated below, I served by ELECTRONIC SERVICE the foregoing document described as DEFENDANT BASSEM ESSAM EL MALLAKH EVIDENTIARY OBJECTIONS TO PLAINTIFF'S APPLICATION FOR ORDER AUTHORIZING THE SALE OF REAL PROPERTY on all interested to the electronic address as listed for each party and attorney below, using the e-filing service pursuant to 2019 California Rules of Court Rule 2.251.(b), Electronic service

| | |
|---|---|
| Patrick Miller<br>P Miller Legal Services<br>285 E. California, Unite 201<br>Pasadena, CA 91106<br>Partick.miller@pmillerlegal.com | |

     I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

     Executed on this 4/1/2022, at Irvine, California.

*Michael Sayer*

Michael Sayer

DEFENDANT BASSEM ESSAM EL MALLAKH EVIDENTIARY OBJECTIONS TO PLAINTIFF'S
APPLICATION FOR ORDER AUTHORIZING THE SALE OF REAL PROPERTY

# EXHIBIT 1



## California Secretary of State
## Electronic Filing



## LLC Termination – ==Certificate of Cancellation==

| | |
|---|---|
| **Entity Name:** | BELGIUM INVESTMENTS 960 BAY DR, LLC |
| **Entity (File) Number:** | 201315010139 |
| **File Date:** | 02/01/2022 |

Detailed Filing Information

**==Dissolution==**

The Dissolution was made by a vote of ALL of the members of the California Limited Liability Company.

**Tax Liability Statement**

All final returns required pursuant to the California Revenue and Taxation Code have been or will be filed with the California Franchise Tax Board.

**Cancellation Statement**

Upon the effective date of this Certificate of Cancellation, the Limited Liability Company's registration is cancelled and its powers, rights and privileges will cease in California.

By signing this document, I certify that the information is true and correct and that I am authorized by California law to sign.

**Electronic Signature(s):**

Jean Ruche

# EXHIBIT
# "15"

**Nexus Bankruptcy**
Benjamin Heston (297798)
100 Bayview Circle, Suite 100
Newport Beach, CA 92660
Tel: 951.290.2827
Fax: 949.288.2054
*ben@nexusbk.com*

Attorney for Debtor

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SANTA ANA DIVISION

In re:

BASSEM ESSAM EL MALLAKH,

          Debtor.

Case No.: 8:22-bk-11158-TA

Chapter 13

**DECLARATIONS OF BASSEM EL MALLAKH AND BENJAMIN HESTON IN SUPPORT OF OPPOSITION TO MOTION FOR SANCTIONS BARRING SUBSEQUENT BANKRUPTCY FILING**

## DECLARATION OF BASSEM ESSAM EL MALLAKH

I, Bassem Essam El Mallakh, declare as follows:

1.  I am the Debtor in this bankruptcy case. I have personal knowledge of all facts stated

herein. As to all allegations stated on information and belief, I believe these allegations to

be true. I could competently testify to the allegations contained herein.

2.  I first met with my attorney, Benjamin Heston, in April of 2022. At that time, I was

involved in litigation with Belgium Investments in a case where I had a default judgment

entered against me for a lawsuit that I had never been served with. I was seeking advice

regarding a potential bankruptcy so that I could plan for the possibility that things might

not go well in the state court proceedings.

3.  After meeting with Mr. Heston, I continued my efforts to fight the default judgment. I

appealed the judgment to the Florida District Court, and then to the Florida Supreme Court

where the case is still pending. I also filed a motion in the Superior Court of California for

1

1    the County of Orange to stay the enforcement proceeding.

2    4.    On July 12, 2022, I received notice that the motion to stay the sale had been denied and that

3         the sale could move forward the following day.

4    5.    I then contacted Mr. Heston and we discussed my situation. Although we went over many

5         of the details about my financial situation. Mr. Heston advised me that we should file a

6         Chapter 13 petition and that we would do so as an "emergency case".

7    6.    Over the next two weeks, I had many discussions with Mr. Heston regarding my case.

8         Ultimately, we decided to request that my case be dismissed so that I could re-file under

9         Chapter 11.

10    7.    I have since retained Michael Berger to represent me in a Chapter 11 bankruptcy that I plan

11         to file within a few weeks.

12         I declare under penalty of perjury under the laws of the United States that the foregoing is

13    true and correct.

14

15    Date: September 7, 2022

16                                    BASSEM ESSAM EL MALLAKH

17

18

19

20

21

22

23

24

25

26

27

28