PATRICK MILLER
Email: Patrick.miller@impactadvocateslaw.com
Impact Advocates APC
121 S Oak Ave
Pasadena, CA 91107
Telephone:    213-364-7581

Attorney for Judgement Creditor
BELGIUM INVESTMENTS 960 BAY DR,
LLC A CALIFORNIA CORP.

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re Bassem Essam El Mallakh | Case No 8:22-bk-11605-TA<br>Chapter 7<br><br>**PRE-HEARING BRIEF FOR EVIDENTIARY HEARING ON HOMESTEAD EXEMPTION**<br><br>**Date**: 24 Aug 2023<br>**Time**: 11am<br>**Crtrm**: 5B |

Belgium Investments 960 Bay Dr, LLC, a California Corp. ("**Belgium**") hereby sets out its Pre-Hearing Brief to summarize its arguments in advance of the evidentiary hearing on Debtor's entitlement to claim a homestead exemption over the property located at 116 Rockefeller Dr, Irvine, CA, 92612 (the "**Rockefeller Property**") which is scheduled to take place on 24 Aug 2023

Dated:        10 Aug 2023

Patrick Miller – Impact Advocates APC
Attorney for Creditor Belgium Investments

# TABLE OF CONTENTS

| I | Introduction. | 3 |
|---|---|---|
| II. | Debtor has no legal basis to be granted his homestead exemption claim. | 5 |
| II.A | Belgium's Motion to Dismiss should be granted. | 6 |
| II.B | Debtor's perjury amounts to fraud on the court sufficient to warrant harsh sanctions. | 7 |
| II.C | The explanations in Debtor's recent filings do not explain away his perjury. | 10 |
| II.D | Res Judicata/Collateral Estoppel prevents Debtor from claiming the homestead exemption. | 13 |
| III | Debtor's evidence regarding his residency is littered with perjury, suspicious dates, and ultimately not persuasive. | 15 |
| III.A | Debtor's perjurious witness evidence is highly-compromised and unpersuasive. | 15 |
| III.A.1 | Debtor's first attempt to explain his perjurious evidence in March 2023 revealed numerous, blatant contradictions from his evidence in 2021. | 15 |
| III.A.2 | Debtor's second attempt to explain his perjurious evidence in August 2023 revealed numerous, blatant contradictions from his evidence in 2021 and from March 2023. | 20 |
| III.B | Debtor's documentary evidence is incomplete and indicates he moved into the Rockefeller Property months after the filing date. | 25 |
| IV | Objective evidence demonstrates that Debtor does not meet the residency requirements. | 31 |
| IV.A | The evidence indicates that Debtor did not physically reside in the subject property until months after the filing date (if ever). | 31 |
| IV.B | Debtor's having lived in Egypt since March 2023 shows he has not continuously resided in the Rockefeller Property since the filing date. | 33 |
| IV.C | Objective documentary evidence shows that Debtor did not have the requisite intent to reside in the subject property on the filing date or thereafter. | 35 |
| VI | Conclusion. | 36 |

**POINTS & AUTHORITIES**

**I.  Introduction.**

Debtor is unable to meet his burden of proof to claim an automatic homestead exemption because his witness evidence is irretrievably tainted and the documentary evidence indicates that he did not meet the legal requirements for intent or actual occupancy. If anything, the objective evidence indicates that Debtor lived in Santa Monica until January 2023 (which was months after the filing date) and then flew to Egypt a few weeks later, where he has remained since.

This Pre Hearing Brief addresses the legal arguments why this case should be dismissed and/or the homestead claim should be denied. It then addresses the factual/evidentiary issues regarding Debtor's residency in detail.

The case should be dismissed because there is no good faith purpose for it to have been brought. More starkly, it should be dismissed as a sanction for Debtor's admitted perjury.

To be clear, Debtor's perjury is not a matter of hyperbole or perspective. There is no gray area.

- In 2021, Debtor claimed that he resided in the Rockefeller Property until December 2016—then he moved into the Santa Monica Property[1] and resided only in Santa Monica thereafter. This was supported by numerous sworn statements to this effect.

- In 2023, Debtor now claims that he always resided in the Rockefeller Property, even during the period from Dec 2016 to 2021[2].

These two positions are in direct contradiction. There is no way that the statements he made in support of the contradictory positions are all true. It is irrefutable that Debtor was lying then—

---

[1] The apartment referred to in this Brief as the Santa Monica Property is located at 525 Broadway, Santa Monica, CA, 90410.

[2] For example, Debtor stated that the Santa Monica Property "*was never really my residence. My residence has always been the same.*" See pg 15, ln 5 of Debtor's BK Deposition dated 15 March 2023 at Depo 3.

and/or he is lying now. In either case, such egregious misconduct warrants rejection of the homestead claim and dismissal of this action.

Debtor will attempt to argue that these are somehow not contradictory and/or that he doesn't appreciate the legal meaning of the words he chose. But these were not one-off statements, Debtor and his sister made numerous statements in support of his claim to reside only in Santa Monica which are clearly perjurious and detailed below at Sections II.C & III.A. After reviewing the numerous instances of inconsistent statements, it is clear that Debtor made intentional false statements concerning a material issue. Our duty as officers of the court is to ensure appropriate sanctions are ordered given such egregious conduct by Debtor, and perhaps his legal counsel.

Res Judicata/Collateral Estoppel would also provide the legal basis for ruling against Debtor's homestead claim which is detailed below in Section II.D. In fact, Res Judicata has been invoked previously in cases of perjury to ensure the speaker of the perjury is not rewarded in subsequent proceedings.

Notwithstanding the implications of Debtor's perjury, if this Court were minded to consider the evidence regarding Debtor's residency, it would find that Debtor has not proven he is entitled to the homestead exemption because:

- Debtor's witness evidence regarding his residency is perjurious, wholly-unreliable, and frankly incredulous. In fact, he claims to have occupied the Rockefeller Property continuously since the filing in September 2022, but we're aware that he has been living in Egypt since at least March 2023.

- Debtor's documentary evidence is suspiciously incomplete, unconvincing, and actually indicates that Debtor moved into Rockefeller no earlier than January 2023 – and only remained there briefly (if at all) before moving to his parent's home in Egypt, where he has stayed until now.

- The problems with Debtor's documentary evidence are particularly noteworthy because these issues were already raised by Belgium in advance of the March 2023 evidentiary

hearing which was continued[3]. Debtor's failure to address the incomplete and unconvincing evidence further underscores why this evidence is unhelpful.

- There is additional objective evidence—primarily Debtor's lease agreement with his sister which prohibits him from residing in the property—that also proves why Debtor never had the requisite intent to reside in Rockefeller on the filing date, or thereafter.

Even Debtor's latest counsel, who has now since withdrawn from representing the Debtor, has stated that: "*I believe that if forced to continue as counsel of record and provide continued representation, I would be in breach of my ethical obligations under the Business and Professions Code and other applicable California Law.*"[4]. The clear implication is that Debtor has no interest in comporting himself in good faith or providing evidence which could somehow meet his burden of proof to this Court.

## II. Debtor has no legal basis to be granted his homestead exemption claim.

Given the extensive delay and costs incurred to undertake the evidentiary hearing, Belgium hopes that this Court grants its Objection to Debtor's Homestead Exemption ("**Belgium's HS Objection**") either on its own merits—or as a sanction due to Debtor's perjury.

Nonetheless, Belgium's primary position is that Debtor has no legal basis to even claim a homestead exemption since its bankruptcy case should be dismissed.

The primary purpose for the upcoming evidentiary hearing is to decide Belgium's Opposition to Debtor's Claimed Homestead Exemption. Additionally, Belgium has three other outstanding Motions which are scheduled to be heard on the same day as the evidentiary hearing: the Motion for Sanctions due to Debtor's Perjury (which requests dismissal as a sanction) ("**Belgium's Motion for Perjury Sanctions**")[5]; Belgium's Motion for Dismissal[6]; and the

---

[3] See Sections II.B to III.B of Belgium's earlier Pre Hearing Brief at Subs 5.
[4] See the Declaration of Bert Briones submitted in conjunction with his Motion to Withdraw as Counsel dated 27 June 2023 at Dec 9.
[5] See Subs 4.
[6] See Subs 8.

Motion for Relief from Stay of Enforcement[7]. The issues addressed during the evidentiary hearing will also be necessary to resolve these outstanding Motions.

If this Court grants either of the outstanding Motions which request dismissal, this should effectively resolve the matter because Debtor has no basis to claim the homestead exemption absent bankruptcy.

### A. Belgium's Motion to Dismiss should be granted.

As described in the Motion for Dismissal, the only apparent purpose for this bankruptcy to continue is Debtor's bad faith hope to perjuriously unwind his previous testimony regarding his residency. This previous testimony led to a ruling from the Orange County Superior Court that he is not entitled to claim the homestead exemption[8].

This is not a good faith effort to utilize the bankruptcy code and should not be allowed to continue. As such, this case should be dismissed without ever considering the homestead issue.

Debtor argues in its Opposition that this Court does not have the legal basis to grant dismissal[9]. However, it makes no attempt to explain how this case was brought in good faith and/or what the purpose is for this bankruptcy other than unwinding Debtor's previous perjury.

This is not business debt since Belgium's judgement was obtained against Debtor personally. This is why it is currently seeking to enforce against his personal property.

With regard to any deadline issues, they still do not overcome Debtor's duty of good faith. More importantly, the current Motion for Dismissal for the Ch 7 case was filed within 60 days of the 341 creditor meeting for Ch 7. The creditor meeting took place on 11 May 2023 and the Motion for Dismissal was filed on 5 June 2023[10].

---

[7] See Subs 7.
[8] See the California Court Order for Sale of the Rockefeller Property dated 10 May 2022 at Rulings 5.
[9] See Debtor's Opposition to Belgium's Motion for Sanctions due to Debtor's Perjury at Subs 9
[10] See Docket #s 175 and 190, respectively.

PRE-HEARING BRIEF FOR EVIDENTIARY HEARING ON HOMESTEAD EXEMPTION

**B.  Debtor's perjury amounts to fraud on the court sufficient to warrant harsh sanctions.**

As noted above, and described in detail below, Debtor's perjury is clear on its face. One implication of this perjury is that it should naturally caution the Court against relying on any testimony in the present matter regarding his residency. However, this is not the limit of sanctions necessary to redress such egregious and harmful conduct.

The appropriate sanctions for such clear and egregious perjury, which has caused excessive damage to Belgium in terms of both time and costs, should include: (i) upholding Belgium's HS Objection; (ii) dismissal of the present bankruptcy; (iii) a bar from further bankruptcy filings: and/or (iv) any other remedies this Court deems proper.

The Supreme Court of the United States has clearly explained the gravity of the harm caused to the judicial process by perjurious evidence, stating: *"[f]alse testimony in a formal proceeding is intolerable. We must neither reward nor condone such a flagrant 'affront' to the truth-seeking function of adversary proceedings*."[11] (emphasis added). It has also described perjury as "*a wrong against the institutions set up to protect and safeguard the public*."[12] (emphasis added).

Dismissal of these proceedings should be the minimum consequence for such egregious fraud on the court, particularly given Debtor's continued reliance on perjurious and/or bad faith explanations. ***"In numerous cases, a litigant's fabrication,*** *destruction, or suppression of evidence and related perjury **has led to dismissal of the perjuring plaintiff's claim** or default judgment against the perjuring defendant"*[13] (emphasis added). For example, while affirming the

[11] Jonathan M. Stern, Untangling a Tangled Web without Trial: Using the Court's Inherent Powers and Rules to Deny a Perjuring Litigant His Day in Court, 66 J. AIR L. & COM. 1251 (2001) https://scholar.smu.edu/jalc/vol66/iss3/7 (referencing ABF Freight Sys., Inc. v. NLRB, 510 U.S. 317, 323 (1994)).
[12] Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 246 (1944).
[13] Id (referencing e.g., Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 246 (1944); Aoude v. Mobil Oil Corp., 892 F.2d 1115 (1st Cir. 1989);Joza v. Million Air, Inc., No. 96-3165, slip op. at *8 (S.D. Fla. May 31, 2001); Anheuser-Busch, Inc. v. Natural Beverage Distrib., 151 F.R.D. 346 (N.D. Cal. 1993) affd, 69 F.3d 337 (9th Cir.

trial court's dismissal of an action for fraud on the court, the court in *Rockdale Mgmt* stated: *"[a]* ***fraud on the court" occurs where it can be demonstrated, clearly and convincingly***, *that a party has sentimentally set in motion some* **unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier** *or unfairly hampering the presentation of the opposing party's claim or defense*" (emphasis added )[14].

It should be noted that many courts have held that dismissal is warranted for fraud on the court even before issuing a formal ruling on perjury where a litigant's own testimony is irreconcilably inconsistent[15].

Courts have frequently invoked the 'clean hands" doctrine as a basis for dismissal[16]**.** The clean hands doctrine is an equitable doctrine which largely overlaps with fraud on the court analysis. Its basis was well-summarized by Professor Pomeroy as follows: "***whenever a party***, *who, as actor seeks to set the judicial machinery in motion and obtain some remedy*, **has violated conscience, or good faith,** *or other equitable principle,* **in his prior conduct, then the doors of the court will be shut against him in limine; the court will refuse to interfere on his behalf, to acknowledge his right, or to award him any remedy**." (emphasis added)[17].

---

1998); Sun World, Inc. v. Lizarazu Olivarria, 144 F.R.D. 384, 390-291 (E.D. Cal. 1992); Eppes v. Snowden, 656 F. Supp. 1267, 1279 (E.D. Ky. 1986); Rockdale Mgmt. Co. v. Shawmut Bank, N.A., 638 N.E.2d 29 (Mass. 1994).
[14] Id (referencing Rockdale Mgmt. Co. v. Shawmut Bank, N.A., 638 N.E.2d 29 (Mass. 1994) (quoting Aoude, 892 F.2d at 1118)).
[15] Id (referencing e.g., Aris-Isotoner Gloves, Inc. v. Berkshire Fashions, Inc., 792 F. Supp. 969 (S.D.N.Y. 1992), afffd without op., 983 F.2d 1048 (2d Cir. 1992). See also Rogal v. Am. Broad. Cos., No. 89-5235, 1994 U.S. Dist. LEXIS 3683, at *19 (E.D. Pa. Mar.29, 1994) (awarding sanctions after adverse verdict and judgment where contradictions and inconsistencies from defendant's own evidence reflected "utter contempt for the oath"), rev'd and remanded, 74 F.3d 40 (3d Cir. 1996) (finding trial court's failure to hold an evidentiary hearing was, under the specifics of the case, an abuse of discretion); Meador, 1995 U.S. Dist. LEXIS 11201, at *29-30 ("In the absence of inconsistent representations to the Court or evidence which shows that there is no genuine issue of material fact, the truthfulness of statements is necessarily a question for the finder of fact, and not properly resolvable on a motion for summary judgment.")).
[16] Id (referencing eg Smith v. Cessna Aircraft Co., 124 F.R.D. 103, 105 (D. Md. 1989)).
[17] Id (referencing John Norton Pomeroy, Equity Jurisprudence § 397 (5th ed. 1941)).

The court in *Vargas v Peltz* noted that "[t]*he federal case law is well established that dismissal is the appropriate sanction where a party manufactures evidence which purports to corroborate its substantive claims*."[18] (emphasis added). Several of the cases cited above have allowed for dismissal as the sanction for perjury, eg *Rockdale Mgmt.*

With respect to the 9th Circuit, in particular, many courts have found that perjury can form the basis for dismissal. For instance, the court in *Anheuser-Busch* stated: "[*i*]*t is **well settled that dismissal is warranted where**, as here, **a party has engaged deliberately in deceptive practices that undermine the integrity of judicial proceedings**: "courts have inherent power to **dismiss an action when a party has willfully deceived the court** and engaged in conduct utterly inconsistent with the orderly administration of justice.""*[19] (emphasis added). The ruling in *Anheuser-Busch* has been cited by over 1,000 cases since it was published and certainly reflects the relevant legal threshold for dismissal when perjury is discovered in the 9th Circuit.

When ordering the dismissal, the lower court in *Anheuser-Busch* noted that the violator: "***does not take her oath to tell the truth seriously** and ... will say anything at any time in order to prevail in this litigation. **There is little guarantee that if the court were to impose lesser sanctions [the violator's] misconduct would cease.**"* (emphasis added)[20]. This is eerily similar to the present case because this Debtor's conduct unequivocally shows that he will not take his oath to provide truthful information seriously—and this misconduct will continue until he is no longer provided with the protections granted to a bona fide debtor in bankruptcy.

---

[18] Id (referencing Vargas v. Peltz, 901 F. Supp. 1572, 1581 (S.D. Fla. 1995)).

[19] Anheuser-Busch, Inc. v. Nat. Beverage Distributors, 69 F.3d 337, 348 (9th Cir. 1995) (quoting *Wyle v. R.J. Reynolds Indus., Inc.,* 709 F.2d 585, 589 (9th Cir.1983) (upholding dismissal of complaint pursuant to court's inherent power where plaintiff's denials of material fact were knowingly false and plaintiff willfully failed to comply with discovery orders)).

[20] Id at 352.

It is noteworthy that Debtor's Opposition to the Motion for Perjury Sanctions does not even argue that the claimed perjury does not warrant the sanctions requested[21]. It merely consists of a weak attempt to explain away his evidence as somehow not perjurious. But this is to no avail, as Debtor's statements were clearly purposefully, material and contradictory.

He is now claiming that he spent time at both places but always kept Rockefeller as his primary residence. But that is plainly not what he claimed in 2021, where he made numerous statements in support of his claim that he had only one residency, the Santa Monica Property, and that he had not been to the Rockefeller Property in years.

### C.  The explanations in Debtor's recent filings do not explain away his perjury.

Unsurprisingly, Debtor has now attempted to claim that his evidence is somehow not contradictory; that he was confused by the legal meaning of terms like reside and dwell; and/or that he was simply following the advice of counsel. But this does not excuse his perjury.

As detailed further below in Section III.A, Debtor's statements remain in contradiction with the sworn testimony he gave in 2021. In fact, there are also several statements in his 8 August 2023 Declarations which contradict his sworn evidence from 15 March 2023.

To be clear, Debtor made a number of statements, which have no legal implication and are completely clear to the laymen, which still contradict his recent evidence. For example, he now says that he spent a lot of time in Santa Monica, slept there some nights, but consistently returned to the Rockefeller Property and considered it his primary residence.

However, he stated in deposition testimony in 2021 that he hadn't been to the Rockefeller Property, not once, in 2020 or 2019, and in 2018 was only in Irvine for Christmas celebrations[22]. This is not consistent with what he's claiming today and cannot be explained away through legal niceties.

In 2021, he referred to the Santa Monica Property as his "home" on several occasions and put forward substantial evidence to demonstrate why this was his one and only residence.

---

[21] See Subs 8.

[22] See the Debtor's FL Deposition transcripts at pg 36, ln 1 to pg 37, ln 6 (which can be found under Depo 1).

This perjurious evidence was not simply stated in written Declarations and Deposition testimony. Debtor appeared before a judge of the 11th Circuit Court in Florida and gave evidence to the same effect. There was never a moment where Debtor indicated that he lived, resided in, or in any way occupied the Rockefeller Property during the state court proceedings in 2021.

It's important to have some context for his previous statements to appreciate why he was making such a claim so adamantly—and why these were so harmful to Belgium and the judicial system. Belgium effected substitute service of the Florida Complaint upon Reem Hanna at the Rockefeller Property in April 2019. Belgium also effected substitute service of the California enforcement proceedings in September 2020 on Reem Hanna at the Rockefeller Property. In attempt to vacate these judgments, Debtor incredulously claimed that he was never made aware of the Florida lawsuit or the enforcement proceedings despite the service upon his sister at the Rockefeller Property. To do so, he made numerous statements detailing how he lives in Santa Monica; never returns to Rockefeller; and almost never sees his sister.

This completely contradicts his present claims that he maintained a residence at Rockefeller with his sister, he regularly slept at Rockefeller; and he left his belongings there.

Belgium's Florida counsel asked a multitude of questions testing this evidence in 2021 as it seemed unbelievable that Debtor would have no knowledge of the Florida action given the Summons & Complaint were left with his sister at the townhouse he owns. A full set of the Florida Deposition transcripts can be found under the Depo 1 tab as well as a series of extracts relevant to his residency at the Depo 1A tab. For example:

- Debtor states now in August 2023 that he was confused as to when he procured a Ring camera for the Rockefeller Property. While the confusion itself is curious, the more important matter is that Debtor stated in 2021 that the reason he was unsure as to the Ring camera was because: "*[t]o be -- to be honest with you, I have not been here in 116 Rockefeller for about probably like over two and a half years, maybe -- maybe more, you know.*"[23].

- Or when asked whether he was evading service and Debtor replied: "*no one ever knocked on my door in Santa Monica and said, hey, you are served; here's the*

---

[23] See the Debtor's FL Deposition transcripts at pg 36, ln 7 (which can be found under Depo 1).

*lawsuit document. Because if this -- if this would have ever been the case, I would*
*have called my attorney right away and said, hey, I just got served. **I never got***
***anybody in the -- you know, in Santa Monica to serve me since I lived there in --***
***since 2016 up until now.***

These are just some of several statements Debtor made to demonstrate he did not reside
in Rockefeller. After reviewing the numerous statements Debtor made in support of his claim of
residing only in Santa Monica at Depo 1A, this Court will find it inescapable that his evidence
contradicts the various statements he's made in the present proceedings and amounts to perjury,
in 2021 and/or 2023.

The contradiction is even more stark when comparing the testimony of his sister, Reem
Hanna. In 2021, she said unequivocally that Bassem is not, nor ever has been, a co-occupant of
hers at Rockefeller. She then contradicts herself completely in March 2023, stating that he "*has*
*always lived at the Rockefeller Property with me there*".

Debtor farcically claims now that he "*did not control his sister's statement*". But these
were written Declarations filed by Debtor, where his sister was not a party. He had no obligation
to file evidence which he knew was false. Filing such false evidence is itself perjurious.

As will be described further below, this is not a tangential issue which is unimportant to
the present dispute. Determining Debtor's residency over the past few years is essential because
Belgium's view is that the Debtor previously resided in Santa Monica and continued to reside
there until January 2023 (well after the filing of this bankruptcy). Notwithstanding his continued
residency in Santa Monica, Debtor made untrue statements about residing in Rockefeller due to
his lawyers' advice at the outset of this case.

This is the most logical conclusion given the evidence. In fact, Debtor admits that he
"*took [his] attorneys' advice on how to convey the facts to obtain the preferred legal result.*".
But that is not how our judicial system works. One cannot reshape facts to fit a preferred result.

One must state facts truthfully and then the law is applied to those truthful facts. Debtor's
continued insistence that such conduct is acceptable must give pause to any fact-finder when

considering the truth of his residency for the present homestead purposes, particularly given the numerous other deficiencies with his evidence such as: (i) his lease with his sister that prohibits him from occupying the premises; (ii) his having lived in Egypt for the past six months; and (iii) his incomplete documentary evidence (which actually points to him moving out of the Santa Monica Property in January 2023 before moving to Cairo).

### D.  Res Judicata/Collateral Estoppel prevents Debtor from claiming the homestead exemption in these proceedings.

It appears that Debtor has committed perjury in the present bankruptcy proceedings by lying about his intent and actual residency; as well as his untruthful evidence regarding his previous inconsistent testimony.

However, Debtor might argue that he is now being honest and that the perjury only occurred in the previous case, ie he previously lied about residing only in Santa Monica, but actually always maintained a residency in the Rockefeller Property. Nonetheless, Debtor cannot reap the benefits of such egregious & harmful conduct. His perjury would still amount to misconduct that must be sanctioned by this Court.

Courts have taken two approaches when considering perjury which took place in a previous case. Some courts find that the subsequent case cannot proceed because it is "*infected*" by the earlier perjury[24]. The other approach is to employ res judicata by acknowledging the earlier case did (or would have) resulted in a dismissal which would bar the subsequent litigation[25]. In this way, a perjurious litigant cannot prevail in a subsequent action simply because the perjury occurred earlier.

---

[24] See Jonathan M. Stern, Untangling a Tangled Web without Trial: Using the Court's Inherent Powers and Rules to Deny a Perjuring Litigant His Day in Court, 66 J. AIR L. & COM. 1251 (2001) https://scholar.smu.edu/jalc/vol66/iss3/7 (referencing Aoude v. Mobil Oil Corp., 892 F.2d 1115, 1121-1122 (1st Cir. 1989)).
[25] Id (referencing e.g., Massie v. Paul, 92 S.W.2d 11 (Ky. 1936)).

Even without a perjury finding, res judicata/collateral estoppel prohibit Debtor from claiming a homestead exemption in the present proceedings. As detailed at Section VII of Belgium's HS Objection, the homestead issue was specifically addressed at the hearing on the Order for Sale of the Rockefeller Property on 21 April 2022 (the "**Order for Sale**")—and this resulted in a ruling by the Orange County Superior Court that found that the Rockefeller Property was not subject to a homestead exemption.

At that time, Debtor's counsel argued against the Order for Sale because certain steps were not taken which would be applicable to selling real property subject to a homestead exemption, eg obtaining an estimate of the property's value. During the hearing, the court asked Debtor's counsel whether he had any basis to argue that this property qualified as a homestead. Debtor's counsel did not provide any evidence/basis and the resulting Order for Sale specifically noted that "*that the property is not subject to any homestead exemption*" based on proof made to the satisfaction of the court.

Section VII of Belgium's HS Objection explains how all the elements for claim preclusion and issue preclusion are met, because: (i) identical parties (Belgium and Debtor); (ii) actually litigated the merits of this identical issue (Debtor's ability to claim a homestead exemption); and (iii) this resulted in a final award in Belgium's favor (the Order for Sale).

There should be no controversy whether the parties are identical in both cases, or whether the issue was actually litigated. The "identity of claims" requirement is satisfied because the hearing on the Order of Sale and the Order itself involved the same nucleus of facts, the same rights (Debtor's right to claim a homestead exemption), and depend on substantially the same evidence. Additionally, the rights established through the Order of Sale would be destroyed or impaired if Debtor is allowed to claim a HS exemption in these proceedings. See Mpoyo v. Litton Eletrco-Optical Sys., 430 F.3d 985, 987 (9th Cir. 2005). The Order of Sale was a final

order which allowed for the sale of the subject property. It thus meets the requirements of finality

for the purposes of res judicata.

### III. Debtor's evidence regarding his residency is littered with perjury, suspicious dates, and ultimately not persuasive.

#### A. Debtor's perjurious witness evidence is highly-compromised and unpersuasive.

Debtor's perjury is detailed in Belgium's HS Objection; Belgium's Motion for Perjury

Sanctions; and its previously-filed Pre-Hearing Brief from March 2023[26]. Key points from the

foregoing documents are replicated in Section III.A.1 below so as to make the extent and degree

of Debtor's falsehoods apparent even before we sit for the evidentiary hearing.

It might seem unimportant to consider Debtor's evidence on where he lived prior to the

filing date. But it is a crucial issue because Belgium believes that Debtor continued to reside in

Santa Monica until after he moved out of the apartment in January 2023. This would show that

he did not continuously reside in Rockefeller on and/or after the filing date in September 2022.

This makes logical sense when considering his previous evidence to have lived in Santa Monica.

Debtor does not have a registered homestead. Therefore, he must prove his residency by

reference to where he actually occupied and where he intended to reside. Surely Debtor's

propensity to give false testimony in the past is relevant to assessing the credibility of his recent

testimony, particularly where it conflicts with so many other pieces of objective evidence.

##### 1. Debtor's first attempt to explain his perjurious evidence in March 2023 revealed numerous, blatant contradictions from his evidence in 2021.

Debtor's first attempt at explaining this perjurious testimony began during a deposition

conducted by Belgium's counsel on 15 March 2023. During this deposition, Debtor repeated his

---

[26] See Subs 1; Subs 4; and Subs 5, respectively.

claim that he resided in the Rockefeller Property since he purchased it in 2013[27]. Belgium's

counsel directed Debtor to his previous testimony in a sworn Declaration where he stated: "*I've*

*been residing full-time at my residence in Santa Monica since November 21st, 2016.*". Debtor

was asked to explain why he previously testified that he spent several years residing in Santa

Monica yet he now claims he resided in Irvine.  He responded "*[y]eah. That was my -- it's my*

*civil attorney advice that he said, you know, like we need to write this declaration.*"[28].

   After this deposition, Debtor and his sister filed Declarations in March 2023 reiterating

their claim that Debtor has resided in the Rockefeller Property since 2013. In a specious attempt

to explain his admitted perjury, Debtor stated to this Court in his Declaration that: "*the questions*

*Belgium's counsel asked me [during the previous proceedings in 2021] were in regards to*

*whether I was served at the Rockefeller Property.*"[29]. However, this is only further evidence of

Debtor's continued refusal to give truthful evidence before courts of law. This abuse of process

strikes to the very heart of the judicial system.

   Debtor's previous statements regarding residency were ostensibly used to support his

allegations that (i) substitute service of process at the Rockefeller Property in 2019 & 2020 was

not made at his *residence* (because he resided in Santa Monica); and (ii) he did not have

knowledge of the service made upon his sister (because he rarely saw her and resided elsewhere).

   Despite Debtor's recent explanation, there are numerous examples of statements made

which are clearly perjurious and are not "*in regards to whether [he] was served*". A few

illustrative examples are summarized below, but this Court must note that there are many more

examples of perjurious statements such as these.

---

[27] See page 7, line 18 to page 8, line 3 of the transcripts from Debtor's Deposition on 15 March 2023 at Depo 3
and/or Depo 3A.
[28] See page 27, line 4 to page 28, line 3 of the transcripts from Debtor's Deposition on 15 March 2023 at Depo 3
and/or Depo 3A.
[29] See Debtor's Declaration from 21 March 2023 at Dec 4.

PRE-HEARING BRIEF FOR EVIDENTIARY HEARING ON HOMESTEAD EXEMPTION

| Paragraphs 3-4 of Debtor's CA Declaration dated **17 Feb 2021** | Page 91 of Reem Hanna's FL Deposition dated **21 Mar 2021** | Paragraph 6 of Debtor's BK Declaration dated **21 Mar 2023** |
|---|---|---|
| I have **been residing fulltime at my residence in Santa Monica since 11/21/16.** … I have not occupied the real property located at 116 Rockefeller, Irvine CA. since 11/21/16. | Q. Okay. The [Rockefeller Property], is that your residence? A. Yes. … **Q. Does your brother, Bassem Essam El Mallakh, live there? A. No. Q. Where does he live? A. In Santa Monica.** | My **primary residence** where I live is the **Rockefeller Property** and it has been by primary residence **since I purchased it in 2013**... |

| Paragraph 6 of Reem Hanna's CA Declaration dated **17 Feb 2021** | Paragraph 3 of Reem Hanna's BK Declaration dated **21 Mar 2023** | Page 28, ln 22 to 29, ln 6 of Debtor's BK Deposition dated **15 March 2023** |
|---|---|---|
| **Bassem Essam El Mallakh is not nor ever has been a co-occupant at my residence** [the Rockefeller Property]. Since the inception of the lease Bassem Essam El | Since I started living at the Rockefeller Property on or about mid-2018, **Bassem has always lived at the Rockefeller Property with me there.** | Q. Okay. Was anyone living with you at the Rockefeller property in 2020? A. My sister. Q. She was your co- |

| | | |
|---|---|---|
| Mallakh has **never-been a co-occupant.** | | occupant at the time?<br><br>A. She was what?<br><br>**Q. She was your co-occupant at the time?**<br><br>**A. Yeah. Roommate. Co-occupant**. |

| **Page 25 of Debtor's FL Deposition dated 21 Mar 2021** | **Pages 10, ln 4 to ln 18 of Debtor's BK Deposition dated 15 March 2023** |
|---|---|
| Q. Okay. Where do you reside?<br><br>A. I live in Santa Monica.<br><br>Q. Okay. What address?<br><br>A. 525 Broadway.<br><br>Q. How long have you resided there?<br><br>A. Since November 1st of 2016.<br><br>Q. **And do you essentially sleep every night there in 525 Broadway in Santa Monica?**<br><br>**A. Yes.** | Q. When did you sign the lease for the Santa Monica apartment?<br><br>A. It was in November of 2016.<br><br>Q. Okay. November of 2016.<br><br>So -- so you always lived in the Rockefeller house.<br><br>**How many nights did you normally sleep there [at Rockefeller]?**<br><br>**A. Most of the week.** You know, I would be working between Santa Monica and Irvine. It just depends on the week. Some weeks I would just be in like, you know, Irvine for the whole week. Some weeks I would work in Santa Monica a few days, and then, you know, some weeks I would just work, you know, maybe Monday to Thursday, and I'll just go back to my house on the |

| | |
|---|---|
| | weekends. It was really all depending on the traffic. |

| Pages 36-37 of Debtor's FL Deposition dated **21 Mar 2021** | Pages 22, ln 5 to 23, ln 1 of Debtor's BK Deposition dated **15 March 2023** |
|---|---|
| Q. Yeah. **Was there a Ring camera system**[30] **at 116 Rockefeller in 2020**, to your knowledge?<br><br>[Debtor's FL Counsel]: Objection.<br><br>THE WITNESS: I'm not sure, Andrew, because, as I mentioned to you, **I have not been in the Irvine house, not even once in 2020, not even once in 2019.** I believe **even when I came to Orange County in 2018 it was just for Christmas** -- Christmas Eve at my cousin's house in Mission Viejo area, which is like south of Irvine. | Q. **Do you have any security cameras at the Rockefeller property?**<br><br>**A. I have a Ring camera.**<br><br>...<br><br>Q. Did you purchase the Ring camera system?<br><br>A. It was actually a Christmas gift from my -- from my father.<br><br>Q. Do you remember when you received it?<br><br>A. I think it was in 2017. 2017. Christmas of 2017. It's been awhile. |

There are several items included with this Pre-Hearing Brief which will be referenced during the upcoming hearing to further establish Debtor's perjury. This will make clear that the evidence from Debtor, and his sister Reem Hanna, is so tainted by their perjury that it should be wholly-disregarded for the purposes of deciding Belgium's HS Objection.

---

[30] Debtor's evasiveness on answering questions regarding a ring camera system at the Rockefeller Property were likely due to Debtor's spurious claims that multiple process servers were lying when they testified to having left documents with his sister at the Rockefeller Property. These encounters were likely captured on the Ring camera system and thus would provide evidence that comported with the process servers' testimony.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

We must also note that Ms Hanna's refusal to sit for depositions in March 2023 after having requested this several months in advance should cast further doubt on the credibility of her evidence—in addition to what appears to be her admitted perjury.

As to Debtor's father, his deposition testimony makes clear that he has little (if any) basis for providing evidence as to Debtor's residency because: (i) he lives in Egypt; (ii) his son did not tell him he was a signatory on the lease for the Santa Monica Property; (iii) he never discussed the Santa Monica Property with his son; (iv) he doesn't discuss finances with his son and rarely discusses personal matters; (v) he doesn't know much about the details of his son's life; and in fact, (vi) they never actually discussed where Debtor was living[31].

**2.    Debtor's second attempt to explain his perjurious evidence in August 2023 revealed numerous contradictions from his evidence in 2021 <u>and</u> from March 2023.**

Debtor filed two other Declarations on 8 August 2023 wherein he now says that he "*spent time at, slept at, and kept belongings in both locations*." But this is wholly-inconsistent with his testimony in 2021, where he stated that he only lived in Santa Monica.

The Depo 1A tab contains a number of extracts from Debtor's deposition in March 2021 which is wholly inconsistent with his recent evidence. We urge the Court to review the entirety of these extracts. However, we have set out a few illustrative examples below of instances where Debtor's previous testimony contradicts his sworn testimony from 8 August 2023:

---

[31] See page 11, line 5 to 25 and page 12, line 24 to page 13, line 17 of the transcripts from Debtor's Father's Deposition on 15 March 2023 at Depo 4.

PRE-HEARING BRIEF FOR EVIDENTIARY HEARING ON HOMESTEAD EXEMPTION

Page. 20

| **Pages 36-37 of Debtor's FL Deposition dated 21 Mar 2021** | **Para 4, ln 20 to 21 of Debtor's 3rd BK Declaration dated 8 August 2023** |
|---|---|
| Q. Yeah. **Was there a Ring camera system[32] at 116 Rockefeller in 2020**, to your knowledge?<br><br>[Debtor's FL Counsel]: Objection.<br><br>THE WITNESS: I'm not sure, Andrew, because, as I mentioned to you, **I have not been in the Irvine house, not even once in 2020, not even once in 2019.** I believe **even when I came to Orange County in 2018 it was just for Christmas** -- Christmas Eve at my cousin's house in Mission Viejo area, which is like south of Irvine. | During the past 10 years since I purchased the [Rockefeller Property], **I have spent 95% of the days there.** |

---

[32] Debtor's evasiveness on answering questions regarding a ring camera system at the Rockefeller Property were likely due to Debtor's spurious claims that multiple process servers were lying when they testified to having left documents with his sister at the Rockefeller Property. These encounters were likely captured on the Ring camera system and thus would provide evidence that comported with the process servers' testimony.

PRE-HEARING BRIEF FOR EVIDENTIARY HEARING ON HOMESTEAD EXEMPTION

| Paragraph 6 of Reem Hanna's CA Declaration dated <u>17 Feb 2021</u> | Pg 62, ln 12 to 63, ln 5 of Debtor's FL Deposition (Direct Exam) dated 2<u>1 Mar 2021</u> | Para 19, ln 15 to 17 of Debtor's 3rd BK Declaration dated <u>8 August 2023</u> |
|---|---|---|
| **Bassem Essam El Mallakh is not nor ever has been a co-occupant at my residence** [the Rockefeller Property]. Since the inception of the lease Bassem Essam El Mallakh has **never-been a co-occupant.** | Q. Okay. And **who resides at that [the Rockefeller Property]?** A. **My sister, Reem Hanna.** **Q. And does she reside with anybody else?** A. **No.** She lives with her son. Q. Okay. **Do you reside at that address?** **A. I do not.** … Q. Okay. Would [your] white Mercedes C-300 ever be at the [Rockefeller Property]? **A. No. It's parked in my garage at [the Santa Monica Property].** | **Reem and I always agreed that I would continue to live in the [Rockefeller Property] throughout the entire time** that Reem has leased the other two bedrooms **(2017 to present).** |

In addition to the examples above where Debtor's previous testimony from 2021 contradicts his recent August 2023 evidence, it's important to highlight that Debtor's August 2023 evidence even contradicts the evidence he swore to in March of this year. This underscores how Debtor is incapable of telling the truth about these issues because the truth would prevent him from claiming a homestead exemption.

Below, we set out two separate instances where Debtor claimed he slept in the guest bedroom and compare that against his latest evidence that he slept on the couch rather than the bed in the guest bedroom. It is highly suspicious for something this specific to be the subject of such clear contradiction.

| Pg 9, lns 18 to 22 and pg 14, lns 10 to 12 of Debtor's BK Deposition dated 15 Mar 2023 | Para 15, ln 24 to 27 of Debtor's 3rd BK Declaration dated 8 August 2023 |
|---|---|
| And then I cosigned for him to be able to like give him the apartment. And also **I've been able to use the guest bedroom in the apartment for any purposes of like**, you know, from -- just tired from working, **and I can just like crash in there** instead of driving back, you know, maybe sometimes two hours of traffic.<br><br>    ...<br><br>And then, **again, sometimes if I'm tired, I'll just crash in the guest bedroom** or just drive back to my house. | Sometimes, I would stay overnight at the Santa Monica Apartment and **sleep on the couch,** since the guest bedroom's bed was a small Twin bed, we had our 2 desks and computers in the guest bedroom so the space won't allow us to fit in a king or queen bed and I am tall **I won't be able to sleep in that bed regularl**y. |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

While the concept of the Debtor sleeping on the couch while the "guest bedroom" was vacant may seem unusual. It is also suspicious that Debtor continuously referred to Mr Rostom as his "roommate" on multiple occasions but now contends that he never actually resided in the Santa Monica Property himself. One doesn't normally refer to their business partner as their roommate when this is not the case.

| Pg 11, ln 8 and 16; and pg 32, ln 11 of Debtor's BK Deposition dated 15 Mar 2023 | Para 11, ln 7 to 8 of Debtor's 3rd BK Declaration dated 8 August 2023 |
|---|---|
| Q. So do you still use the apartment in Santa Monica as a work office?<br><br>A. You know, as a matter of fact, **my roommate,** he told me that, you know, he's not able to like stay in the apartment anymore...<br><br>    ...<br><br>Q. I'm sorry. What do you mean the apartment is not even there anymore?<br><br>A. I'm saying when **I told my roommate** that I wouldn't be able to like, you know, continue working on this like business venture that we were working together...<br><br>    ...<br><br>A. No. I don't think -- Yeah. Like I don't remember. I know **my roommate** was also trying to get a Ring camera… | One room in the Santa Monica apartment was Rostom's bedroom. The other room contained two desks that Rostom and I used for business. |

Another curious issue is that Debtor has never clearly explained when he stopped frequenting the Santa Monica Property. This conflicting evidence is one more indication that Debtor did not truly vacate the Santa Monica Property until January 2023.

| Pg 13, ln 23 of Debtor's BK Deposition dated <u>15 Mar 2023</u> | Paragraph 14 of Debtor's 3rd BK Declaration dated <u>8 Aug 2023</u> | Paragraph 5 of Debtor's 2nd BK Declaration dated <u>8 Aug 2023</u> |
|---|---|---|
| Q. And when did you communicate with him that you weren't going to be continuing with the business venture?<br>A. It was in **April of 2021.** | I decided to take my desk and computer and office belongings back to [the Rockefeller Property] **in April 2022.** | I also spent considerable time in the Santa Monica Property **between 2016 and 2023** while working on a startup company. |

**B. Debtor's documentary evidence is incomplete and indicates he moved into the Rockefeller Property months after the filing date.**

As stated in the HS Objection, and noted by this court in previous proceedings, Debtor has the burden of proof to demonstrate he meets the requirements to claim a homestead exemption under these circumstances. In the absence of credible witness evidence (due to Debtor and his sister's admitted perjury on this topic), Debtor holds the high burden of submitting extensive, complete, and trustworthy evidence to establish his residency on the filing date.

Debtor's documentary evidence falls far short of meeting this burden. In fact, as explained below, the documentary evidence, when considered with his March 2023 deposition testimony, actually indicates that Debtor did not move into the Rockefeller Property until January 2023 (if ever).

Debtor's documentary exhibits ("**Debtor's Exhibits**") are attached to his March 2023 Declaration and replicated in his latest filings in Opposition to the HS Objection. They can also be found in the Hearing Bundle tab under Debtor's Exhibits.

In summary, many of the sets of documentary evidence are suspiciously incomplete (see Debtor's Exhibits 2, 5, 6, 10, 13, and 14)— and all (or nearly all) of the evidence which has some indicia of credibility indicates Debtor did not reside in the Rockefeller Property until January 2023 (see Debtor's Exhibits 5, 6, 10, and 14).

Additionally, several of Debtor's Exhibits: (i) are difficult (or impossible) to read; (ii) contain objectionable redactions without any basis; and/or (iii) indicate dates when they were generated which appear suspicious. Belgium objects to the presentation of this evidence without having had any means to authenticate the same through inspection or otherwise. Notably, these documents have all been presented and authenticated through Declarations from the Debtor— whose evidence is littered with irredeemable perjury. As such, Belgium requests that this problematic evidence be accorded little (if any) weight.

Notwithstanding the above, Belgium wishes to note the following points with respect to this evidence:

Debtor's Exhibit 1 includes his Bankruptcy filing documents. However, he has already admitted that these contain grave inaccuracies, eg regarding his assets & liabilities. Furthermore, this evidence is not tested by any entity and is therefore simply a replication of Debtor's own compromised evidence.

As noted at page 9 of Belgium's Reply to Debtor's Opposition to the Homestead Objection ("**Belgium's HS Reply**")[33], the claim filed by TD Bank NA, which arises from Debtor's purchase of a Mercedes Benz automobile in August 2016, shows Debtor's address as

---

[33] See Subs 3.

405 Rockefeller, Unit A056, Irvine CA, 92612. This is despite his repeated claims to have resided in the Rockefeller Property and/or Santa Monica Property at this time. This either means Debtor has again testified falsely regarding his residency—or Debtor does not always provide accurate address information to third parties when it is not tested.

Debtor's Exhibit 2 erroneously claims to contain copies of Debtor's tax filings from 2019-2022. However, Debtor has not included his California filings or his federal tax filings for 2020 or 2022. This has already been highlighted at page 11 of Belgium's HS Reply and was again noted in the Pre-Hearing Brief from March 2023. Debtor's failure to correct this error can only mean that the information contained in the other filings would be prejudicial to his case. The absence of documents speaks quite loudly in this instance.

Debtor's Exhibits 3 & 4 have been addressed in Belgium's HS Reply. To repeat, these are also untested assertions by the Debtor which would likely replicate his false evidence. These should be given little, if any, weight, particularly given the more reliable evidence which points to his residency being elsewhere at the relevant time. We also note that Debtor also provided bank account information in the previous case indicating he resided in Santa Monica (see Creditor's Exhibit 1). The lease agreement with his sister also lists Debtor's mailing address at the Santa Monica Property; as does his previous Driver's license (see Creditor's Exhibit 2 at page 6 and Creditor Exhibit 3).

Debtor's Exhibit 5 is one of the first examples of a suspicious document which actually indicates Debtor may have moved into the Rockefeller Property in January 2023 (well after the filing date).

Debtor previously submitted a Driver's License which listed his address as the Santa Monica Property (see Creditor's Exhibit 3). The previously-submitted License expired on 21 August 2021 (Debtor's 40th birthday). However, Debtor has not submitted the Driver's License

he obtained after this one expired in August 2021. Instead, he has chosen to submit a copy of

what purports to be a Driver's License that was issued on <u>18 January 2023</u>. He has also chosen to

redact certain information from this Driver's License without any apparent basis—to which

Belgium objects.

Notwithstanding this objection, it's clear that Debtor had at least one (and likely more)

previously issued Driver's License(s) which list his address as the Santa Monica Property. He

then updated the address in January 2023. Far from proving that Debtor resided in the

Rockefeller Property on the filing date (18 Sept 2022), this evidence indicates that he did not

move into Rockefeller until at least January 2023, particularly when it is considered alongside

his other evidence.

This other evidence, which will be addressed below at Section II(A), includes the facts

that: (i) the lease to the Santa Monica Property was not terminated until about January 2023; (ii)

he alone moved out all of the furniture from the Santa Monica Property in January 2023; (iii) his

roommate at the Santa Monica Property has been regularly living in Dubai since late-2020; and

(iv) he admits to regularly staying at the Santa Monica Property and takes responsibility for the

care & maintenance of the apartment.

Debtor's Exhibit 6 purports to contain a copy of Debtor's vehicle registration listing his

address as the Rockefeller Property. However, this is another example of suspicious evidence

which actually indicates a January 2023 move in date.

The document shows that the prior expiry date was 26 August 2022. Again, we have not

been provided with the registration document that Debtor would have obtained upon the expiry

of the previous registration. Instead, he has provided a copy of a registration document that was

issued on <u>18 January 2023</u>. So again, Debtor chose not to provide a complete set of documents,

but the documents that have been provided indicate Debtor only changed his residency in January 2023.

Debtor's Exhibits 7 & 8 purport to contain water and gas bills for the Rockefeller Property addressed to the Debtor. These again have much less evidentiary value than other documents because they are not tested by the recipient. Furthermore, Debtor has not even explained who is responsible for, and who actually transmits, payment of these bills.

It is noteworthy that the only documents which might indicate his residing at Rockefeller before January 2023 are those which are untested by the recipient. Whereas, the more credible documents indicate a January 2023 move in date.

Debtor's Exhibit 9 purports to be a copy of Debtor's insurance card listing his address at Rockefeller. Again this information is unreliable since it is untested by the recipient—and there is no indication as to the date when this document was issued. Some Debtors may be granted the benefit of the doubt regarding documents such as this. However, this Court should accord very little weight to this type of unverified evidence given Debtor's perjury on this very topic.

Debtor's Exhibit 10 purports to show copies of 3 receipts for food delivery from restaurants near the Rockefeller Property. Again, all three receipts are from dates in <u>January 2023</u>. It is highly instructive that Debtor has chosen to submit a (presumably) incomplete set of documents which actually indicate his having moved into Rockefeller in January 2023, particularly after this issue was already flagged in the previous Pre-Hearing Brief from March 2023.

Debtor's Exhibit 11 purports to show evidence of instances where Debtor checked into an LA Fitness facility in Irvine from May-December 2022. However, nothing on the document indicates the actual location of the LA Fitness center and LA Fitness has a number of locations throughout Southern California, including Santa Monica. Additionally, the check-ins between

June and December are highly sporadic (9 check-ins over 23 weeks). Thus, even if these were at the Irvine location—which is disputed—it would indicate nothing more than Debtor having occasionally visited a gym near his sister's townhouse.

Debtor's Exhibit 12 purports to show a screenshot indicating that Debtor's phone was near the Rockefeller Property on the date of the bankruptcy filing. One isolated piece of evidence does not tend to show that Debtor actually resided—and intended to continuously reside—in the Rockefeller Property from the time he filed this case up to the present. It is more likely that Debtor was in Irvine briefly because his parents were visiting from Egypt but he continued residing in the Santa Monica Property until it was vacated in January 2023. Shortly thereafter, he moved to Egypt to live with his parents, where he has remained up to the present.

Debtor's Exhibit 13 purports to show a flight receipt for Debtor, and presumably his nephew, for a flight which departed from Santa Ana airport in early-September 2023. However, it's not exactly helpful to demonstrate Debtor's residency to show that he was actually in San Francisco just before the filing. More importantly, the flight originating from Santa Ana airport can be easily explained by the presence of his nephew because his nephew lives in Irvine. There are likely to be other flight receipts that Debtor could have provided which would indicate other residencies. For example, Debtor has not provided the flight receipt associated with his 2023 flight to Egypt.

Debtor's Exhibit 14 purports to contain receipts from Amazon purchases Debtor made on 14, 15, and 24 January 2023. Once again, Debtor has provided what appears to be an incomplete[34] set of documents that actually indicate he did not move into the Rockefeller Property until January 2023 (after the Santa Monica Property was vacated). This again was already flagged in the previous Pre-Hearing Brief from March 2023.

---

[34] We suspect that these are not the only Amazon purchases made by Debtor during the relevant time period.

Debtor's Exhibit 15 purports to contain a copy of a receipt from a Fedex location near the Rockefeller Property on the date of the filing. However, this does not necessarily prove that Debtor actually resided, or intended to reside, in the Rockefeller Property. As with Debtor's Exhibit 12, his presence in Irvine on that one day is much more likely due to his parents' visiting from Egypt. The other documents and witness evidence persuasively show that Debtor did not move out of the Santa Monica Property until at least January 2023, before moving to Cairo.

**IV. Objective evidence demonstrates that Debtor did not meet the residency requirements on the filing date for intent or actual occupancy.**

"*The essential factors in determining residency for homestead purposes are physical occupancy of the property and the intent to live there.*" (see In re Fisher, No. 09-91587-D-7, 2009 WL 9087842, at *2 (Bankr. E.D. Cal. Sept. 22, 2009), citing In re Dodge, 138 B.R. 602, 607 (Bankr.E.D.Cal.1992), citing Ellsworth v. Marshall, 196 Cal.App.2d 471, 474 (1961)). The sections below detail how the evidence actually demonstrates that Debtor does not meet the intent or actual occupancy requirements.

**A.  The evidence indicates that Debtor did not physically reside in the subject property until months after the filing date (if ever).**

As detailed above, many of the sets of documentary evidence are suspiciously incomplete (see Debtor's Exhibits 2, 5, 6, 10, 13, and 14)— and all (or nearly all) of the evidence which has some indicia of credibility indicates Debtor did not move into the Rockefeller Property until January 2023 (see Debtor's Exhibits 5, 6, 10, and 14).

Below we address Debtor's deposition testimony that helps to uncover where he was actually residing when taken together with the documentary evidence he has produced.

Debtor has testified that his "*roommate*", Mohamed Rostom, moved to Dubai in late-2020[35]. Presumably he would sometimes return to Santa Monica and Debtor would regularly stay with him overnight at the Santa Monica Property[36]. Debtor took sole responsibility for the care and maintenance of the Santa Monica Property when Mr Rostom was away[37]. The lease for the Santa Monica Property was terminated some time in late-2022 or early 2023; and Debtor eventually removed all of the furniture from the Santa Monica Property on his own in <u>January 2023</u>—since his roommate was now living in Dubai[38].

At the outset, it is notable that Debtor continuously refers to this individual as his roommate during depositions in 2021 & 2023. Furthermore, the evidence indicates that Debtor likely continued staying in the Santa Monica Property during the duration of their lease agreement since it would have otherwise been vacant. Debtor is asking this Court to believe that he chose to share a three-bedroom townhouse in Irvine with his sister and nephew rather than staying in a vacant apartment in Santa Monica, which is just five blocks from the Ocean, where he admits to regularly sleeping, where he was a signatory to an active lease, and which he was solely responsible for maintaining.

Debtor's evidence in February & March 2021 was that he had been residing in the Santa Monica Property for several years. There is no reason to suspect that this changed between 2021 and the filing date in September 2022.

The only indication where it appears that Debtor changed his residency was when they terminated their lease for the Santa Monica Property at some unspecified time in late-2022 or early-2023. He then took sole responsibility for vacating the apartment in January 2023.

---

[35] See Debtor's FL deposition transcripts at pg 30, lns 5-8 (Depo 1 and/or Depo1A). Oddly, Debtor later testified that Mr Rostom did not move to Dubai until some time in 2022 (see Debtor's BK deposition transcripts at pg 14, lns 1- pg 15, lns 3 (Depo 3 and/or Depo 3A)). Debtor's lack of clarity as to Mr Rostom's whereabouts is but one more suspicious issue.
[36] See Debtor's BK deposition transcripts at pg 14, ln 12 (Depo 3 and/or Depo 3A)).
[37] See Debtor's BK deposition transcripts at pg 12, lns 6-10 (Depo 3 and/or Depo 3A).
[38] See Debtor's BK deposition transcripts at pg 12, lns 11- pg 13, lns 12 (Depo 3 and/or Depo 3A).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Around this same time in January 2023, we see that Debtor updated his Driver's License and car registration to reflect a new address. He also began receiving Amazon packages and food deliveries in Irvine in January 2023.

This all tends to show that he did not move into the Rockefeller Property until the time when he vacated the Santa Monica Property—in January 2023.

This all makes even more sense when we note that Debtor has spent the past 6 months in Egypt. As one would imagine, Debtor's sister would not find it reasonable to pay $4,000/month to share a townhouse with her adult brother. In fact, their lease agreement specifically prohibits such an arrangement. Therefore, after the Santa Monica Property was vacated in January 2023, Debtor needed to find a new place to live, so he returned to Egypt with his parents. He has been residing in Egypt since then and will only be returning to California for this hearing (if at all) [39].

**B.  Debtor's having lived in Egypt since March 2023 shows he has not continuously resided in the Rockefeller Property since the filing date.**

Maintaining the automatic homestead exemption requires continuous physical occupancy and continuous intent to reside. There can be temporary absences for vacations or hospital stays; but long-term absences will break the chain of continuity, particularly where they reveal a lack of intent to make the subject premises a primary residency[40]. Debtor's having lived in Egypt since March 2023 breaks the chain of continuity required for intent and actual occupancy.

---

[39] His having lived in Egypt since at least March 2023 is clear as he gave evidence on 15 March 2023 that he had recently arrived in Cairo and his lawyer has verified that he remained in Cairo up to the present through his legal filings (see Depo 3 at pg 17, ln 13 and Dec 8). In fact, Debtor's Declaration dated 8 Aug 2023 was signed in Cairo.
[40] See *In re Bhangoo*, 634 B.R. 80, 87 (B.A.P. 9th Cir. 2021)

In *Bhangoo*, the 9th Circuit upheld the bankruptcy court's finding that the Debtor failed to demonstrate continuous intent and actual residency[41]. The *Bhangoo* court summarized the salient facts from a similar case, *Cal Coastal Comm'n v Allen*, noting:

> "*the debtor left the country to start a business in Australia. Although the debtor stated that the property was his principal dwelling and made much of the fact that he still had use of some of it, **the court found that the debtor "was not 'temporarily absent' while retaining the property as his principal dwelling."**. The debtor "was not temporarily absent from the property for work or vacation; **he apparently resided elsewhere while retaining the right to be temporarily present in a room on the property when he was in the Malibu area[,]" which "does not meet the continuous residence requirement for a principal dwelling under section 704.710."**"* (Emphasis added)[42].

This situation is similar to the cases in *Bhangoo* and *Allen*. In fact, at least the Debtor in *Allen* had a lease which allowed him to stay on the premises—which is unlike the present case, where the Debtor is prohibited from staying in the Rockefeller Property.

Even if it can be argued that his having lived in Egypt for the past six months does not break the chain of continuous occupancy, it also elucidates his lack of intent to ever make Rockefeller his primary residence. This is further supported by Debtor's lease agreement with his sister which prohibits him from living there.

---

[41] See *In re Bhangoo*, 634 B.R. 80, 87 (B.A.P. 9th Cir. 2021) referencing, *Cal. Coastal Comm'n v. Allen*, 167 Cal. App. 4th 322, 330-31, 83 Cal.Rptr.3d 906 (2008) and *Redwood Empire Production Credit Association v. Anderson (In re Anderson)*, 824 F.2d 754 (9th Cir. 1987),

[42] *In re Bhangoo*, 634 B.R. 80, 87 (B.A.P. 9th Cir. 2021) referencing *Cal. Coastal Comm'n v. Allen*, 167 Cal. App. 4th 322, 331, 83 Cal.Rptr.3d 906 (2008)

### C. Objective documentary evidence shows that Debtor did not have the requisite intent to reside in the subject property on the filing date or thereafter.

As noted above, Debtor must prove his intent to reside in the subject property on the filing date and he must continually maintain this intent if he is temporarily absent after the filing date[43]. Courts should rely on objective evidence wherever possible when making this determination of intent, particularly under circumstances where Debtor's witness evidence is so highly-compromised.

Belgium explains at Section V of its HS Objection how a key piece of objective evidence—the lease agreement for the Rockefeller Property—unequivocally prohibits Debtor from residing in the property. It states: *"[t]he Premises is to be occupied strictly as a residential dwelling with only the Tenant(s) mentioned above [Reem Hanna] as the Occupant(s)."*[44].

Debtor has confirmed that the lease agreement covers the entirety of the Rockefeller Property[45]; and Debtor is not listed as a Tenant in the lease agreement. In fact, he is identified as Landlord in the lease agreement. It is to be expected that the owner of the property who is leasing it out as a landlord would be prohibited from having unrestricted access to the premises.

Debtor has confirmed that there have been no changes to the lease agreement other than an increase in the monthly rental payments[46]. Debtor therefore cannot claim that there is some undisclosed separate agreement between he and his sister which allows him to reside there.

---

[43] Debtor may attempt to argue that the only relevant date is the filing date of 18 September 2023. However, analysis of Debtor's whereabouts during the preceding, and subsequent, dates are essential for this Court to determine Debtor's intentions. Particularly, given Debtor's compromised witness evidence and the evidence we have highlighted indicating that he resided elsewhere.
[44] See page 1 of the lease agreement at Creditor's Exhibit 2 (the lease agreement was originally provided by the Debtor and attached to Debtor's CA Declaration dated 17 February 2021).
[45] See Debtor's BK Declaration dated 21 March 2023 at Dec 4.
[46] See pg 36, lns 10-12 of Debtor's BK Deposition transcripts at Depo 3 and/or Depo 3A.

PRE-HEARING BRIEF FOR EVIDENTIARY HEARING ON HOMESTEAD EXEMPTION

Debtor cannot legally maintain he has the requisite intent to reside in a dwelling which he has no legal right to occupy—because someone cannot reasonably intend to make a place their primary residency if they can be removed at-will due to their lack of rights to occupy.

Debtor cannot claim to have the legal intent to reside at the Rockefeller Property anymore than he can claim to have the objective, legal intent to reside in Dodger's Stadium.

**V. Conclusion**

Debtor has given perjurious evidence regarding his actual residency and tried to explain away this perjury with further bad faith misrepresentations. His, and his witnesses', evidence should be given zero weight.

His documentary evidence contains suspicious irregularities, gaps, and redactions. None of these were addressed despite having been raised by Belgium in the previous Pre Hearing Brief from March 2023.

Perhaps more importantly, the objective pieces of evidence that have been presented point to his residing in the Santa Monica Property well after the filing date—in January 2023—before moving to Egypt to live with his parents.

This also comports with Debtor's lease agreement, which does not allow him the legal right to reside in the Rockefeller Property.

Notwithstanding the above factual issues, Debtor's admitted perjury and continued bad faith should warrant dismissal of these proceedings. If necessary, the doctrine of res judicata/collateral estoppel can be invoked in order to ensure that Debtor remains tied to his perjurious testimony.

It is irrefutable that Debtor has submitted a number of perjurious statements over the years. But this still begs the question, why would he lie so frequently and brazenly? The most logical explanation is because he did not meet the residency requirements on the filing date. He

continued residing in the vacant Santa Monica Property through to January 2023—he then moved to Cairo to live with his parents.

Despite his desire to claim a homestead exemption, he cannot alter the facts to secure his desired legal outcome.

This Debtor has been afforded repeated indulgences over the past year of bankruptcy proceedings. At every turn, Debtor has abused these indulgences and continued to cause damage to his victim, Belgum Investments. At this final stage, we urge this Court to focus not on the perpetrator of misconduct, but on its victim. Do not allow the scant evidence produced by a perjurious Debtor to overcome the weight of evidence we have put forward.

Dated:          10 August 2023                                   Impact Advocates APC

By_____
Patrick Miller
Attorney for
Judgement Creditor

Patrick Miller, Esq., SBN 301819
Impact Advocates APC
121 S. Oak Ave.
Pasadena, CA 91107
213-364-7581
Patrick.miller@impactadvocateslaw.com

Attorney for the Creditor
Belgium Investments 960 Bay Dr,
LLC, a California Corp

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA

IN RE BASSEM VICTOR EL MALLAKH

)  Case No.: 8:22-bk-11605-TA
)  Ch 11
)
)  **DECLARATION OF PATRICK MILLER**
)  **IN SUPPORT OF THE PRE-HEARING**
)  **BRIEF**
)
)
)  _____
)
)  **Hearing Date:  24 August 2023**
)  **Hearing Time: 11:00 AM**
)  **Dept.: 5B**
)
)
)
)

DECLARATION

1. I, Patrick Miller, am counsel for the Creditor Belgium Investments 960 Bay Dr, LLC, a California Corp. ("**Belgium**"). I have read Belgium's Pre Hearing Brief and know the contents thereof. The same is true of my own knowledge, except as those matters that are stated on information and belief, and as to these matters, I believe them to be true.

2. I am over the age of 18 years and am fully familiar with the facts and circumstances surrounding my declaration and could and would competently testify thereto if called upon to do so.

3. I was engaged as counsel for the Defendant in April 2020 in order to enforce the judgement obtained in the Florida courts against the Debtor, Bassem Essam Victor El Mallakh.

4. The Debtor's Exhibits Section of the Hearing Bundle contains 14 Exhibits which have been submitted and authenticated by the Debtor through his Declaration dated 21 March 2023. Belgium has not confirmed the authenticity of such documents, but they have been included within the Hearing Bundle it has compiled for the Court's benefit.

5. The Creditor's Exhibits Section of the Hearing Bundle contains true and accurate copies of documents which have been previously submitted by the Debtor during state court proceedings. Belgium cannot confirm whether the documents from which they were copied are authentic; but it can confirm that the copies are true and accurate copies of what was provided by the Debtor.

6. The Deposition Transcripts Section of the Hearing Bundle contains true and accurate copies of deposition transcripts involving the Debtor and other related parties taken during these proceedings as well as previous state court proceedings.

7. The Declarations Section of the Hearing Bundle contains true and accurate copies of written Declarations by the Debtor and other related parties submitted during these proceedings as well as previous state court proceedings.

8. The Legal Submissions Section of the Hearing Bundle contains true and accurate copies of legal submissions by Belgium and Debtor submitted during these proceedings as well as previous state court proceedings.

9. The Legal Rulings Section of the Hearing Bundle contains true and accurate copies of legal rulings by Courts during these proceedings as well as previous state court proceedings.

10. I declare under penalty of perjury that the foregoing is true and correct.

PRE-HEARING BRIEF FOR EVIDENTIARY HEARING ON HOMESTEAD EXEMPTION

1

Executed on this 8/10/2023, at Pasadena, California.

2

3

4

Patrick Miller

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PROOF OF ELECTRONIC SERVICE

I am employed in the County of LOS ANGELES, State of California. I am over the age of 18 and not a party to the within action. My business address is, 121 S Oak Ave, Pasadena, CA 91107.

A true and correct copy of the foregoing described as **PRE-HEARING BRIEF FOR EVIDENTIARY HEARING ON HOMESTEAD EXEMPTION** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d) (through electronic filing); and **(b)** in the manner stated below:

**TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On 8/10/23, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

Bert Briones on behalf of Other Professional Bert Briones
bb@redhilllawgroup.com,
helpdesk@redhilllawgroup.com;RedHillLawGroup@jubileebk.net

Michael Jay Berger on behalf of Debtor Bassem Victor El Mallakh
michael.berger@bankruptcypower.com,
yathida.nipha@bankruptcypower.com;michael.berger@ecf.inforuptcy.com

Chad L Butler on behalf of Interested Party Courtesy NEF
caecf@tblaw.com

Nancy S Goldenberg on behalf of U.S. Trustee United States Trustee (SA)

nancy.goldenberg@usdoj.gov


Benjamin Heston on behalf of Interested Party Benjamin Heston

bhestonecf@gmail.com,

benheston@recap.email,NexusBankruptcy@jubileebk.net


Patrick Miller on behalf of Creditor Belgium Investments 960 Bay Dr,

LLC A California Corp.

patrick.miller@impactadvocateslaw.com


Randall P Mroczynski on behalf of Creditor TD Bank, N.A., successor in

interest to TD Auto Finance LLC

randym@cookseylaw.com


United States Trustee (SA)

ustpregion16.sa.ecf@usdoj.gov


I declare under penalty of perjury under the laws of the State of California that the above is true

and correct.

Executed on this 8/10/2023, at Pasadena, California.

Patrick Miller

## HEARING BUNDLE

### Evidentiary Hearing: 24 August 2023

| Debtor's Exhibits | |
|---|---|
| Debtor Exhibit 1 | Purported copy of Debtor's Ch 13 filing |
| Debtor Exhibit 2 | Purported copy of Debtor's tax documents (missing 2021) |
| Debtor Exhibit 3 | Purported copy of Debtor's insurance documents |
| Debtor Exhibit 4 | Purported copy of Debtor's bank statements |
| Debtor Exhibit 5 | Purported copy of Debtor's recent Driver's license |
| Debtor Exhibit 6 | Purported copy of Debtor's recent car registration |
| Debtor Exhibit 7 | Purported copy of Debtor's gas bills for Rockefeller Property |
| Debtor Exhibit 8 | Purported copy of Debtor's water bills for Rockefeller Property |
| Debtor Exhibit 9 | Purported copy of Debtor's health insurance card |
| Debtor Exhibit 10 | Purported copy of Debtor's Uber Eats receipts from January 2023 |
| Debtor Exhibit 11 | Debtor's purported screenshots of LA Fitness Gym Check-ins |
| Debtor Exhibit 12 | Debtor's purported screenshot from his IPhone GPS locator on 18 Sept 2022 |
| Debtor Exhibit 13 | Purported copy of Debtor's receipt for air travel from Santa Ana airport |
| Debtor Exhibit 14 | Purported copy of Debtor's Amazon receipts from January 2023 |
| Debtor Exhibit 15 | Purported copy of FedEx receipt |

| Creditor's Exhibits | |
|---|---|
| Creditor Exhibit 1 | Copy of Debtor's Chase bank account statement showing Santa Monica Property address |
| Creditor Exhibit 2 | Copy of Debtor's lease agreement with Reem Hanna showing Santa Monica Property address |
| Creditor Exhibit 3 | Copy of Debtor's previous Driver's License showing Santa Monica Property address |

| Deposition Transcripts | |
|---|---|
| Depo 1 | Transcripts of the Deposition of Debtor dated 18 March 2021 ("**Debtor FL Deposition**") |
| Depo 1A | Extracts from Transcripts of the Deposition of Debtor dated 18 March 2021 |
| Depo 2 | Transcripts of the Deposition of Reem Hanna dated 18 March 2021 ("**Reem FL Deposition**") |
| Depo 2A | Extracts from Transcripts of the Deposition of Reem Hanna dated 18 March 2021 |
| Depo 3 | Transcripts of the Deposition of Debtor dated 15 March 2023 ("**Debtor BK Deposition**") |
| Depo 3A | Extracts from Transcripts of the Deposition of Debtor dated 15 March 2023 |
| Depo 4 | Transcripts of the Deposition of Essam El Mallakh dated 15 March 2023 ("**Essam BK Deposition**") |

| Declarations | |
|---|---|
| Dec 1 | Declaration filed by Debtor in support of his motion to vacate entry of default judgement in California dated 17 Feb 2021 ("**Debtor CA Declaration**") |
| Dec 2 | Declaration filed by Reem Hanna in support of his motion to vacate entry of default judgement in California dated 17 Feb 2021 ("**Reem CA Declaration**") |
| Dec 3 | Debtor's Motion to Vacate in Florida with supporting Declarations attached ("**Debtor FL Declaration**") |
| Dec 4 | Declaration filed by Debtor on 21 Mar 2023 in support of his homestead exemption ("**Debtor 1st BK Declaration**") |
| Dec 5 | Declaration filed by Reem Hanna on 21 Mar 2023 in support of Debtor's homestead exemption ("**Reem BK Declaration**") |
| Dec 6 | Declaration filed by Essam El Mallakh on 21 Mar 2023 in support of Debtor's homestead exemption ("**Essam BK Declaration**") |
| Dec 7 | Declaration filed by Debtor on 8 Aug 2023 in support of his homestead exemption ("**Debtor 2nd BK Declaration**") |
| Dec 8 | Declaration filed by Debtor on 8 Aug 2023 in support of his Opposition to Belgium's Motion for Perjury Sanctions ("**Debtor 3rd BK Declaration**") |
| Dec 9 | Declaration of Bert Briones filed in conjunction with his Motion to Withdraw as Counsel dated 27 July 2023 |

| Legal Submissions | |
|---|---|
| Subs 1 | Belgium's Objection to Debtor's Homestead Exemption ("**HS Objection**") |
| Subs 2 | Debtor's Opposition to Belgium's Objection to Debtor's Homestead Exemption |
| Subs 3 | Belgium's Reply to Debtor's Opposition to Belgium's Objection to Debtor's Homestead Exemption ("**HS Reply**") |
| Subs 4 | Belgium's Motion for Sanctions due to Debtor's Perjury |
| Subs 5 | Belgium's Pre Hearing Brief for the March 2023 hearing (continued to Aug 2023) |
| Subs 6 | Belgium's Motion to for Relief from Automatic Stay of Enforcement |
| Subs 7 | Belgium's Motion to Dismiss |
| Subs 8 | Debtor's Opposition to Belgium's Motion for Sanctions due to Debtor's Perjury |
| Subs 9 | Debtor's Opposition to Belgium's Motion for Relief from Automatic Stay of Enforcement |
| Subs 10 | Debtor's Opposition to Belgium's Motion to Dismiss |
| Subs 11 | Debtor's Supplemental Brief in Support of its Opposition to Belgium's Objection to Homestead |

| Legal Rulings | |
|---|---|
| Rul 1 | Florida Judgment dated 21 February 2020 |
| Rul 2 | Florida Order Denying Debtor's Motion to Vacate Default Judgement dated 15 May 2021 |
| Rul 3 | Florida 3rd Dist Court of Appeal Ruling affirming Order Denying Debtor's Motion to Vacate Default Judgement dated 16 February 2022 |
| Rul 4 | Florida 3rd Dist Court of Appeal Order Denying Rehearing on Debtor's Motion to Vacate Default Judgment dated 28 Jun 2022 |
| Rul 5 | California Court Order for Sale of the Rockefeller Property dated 10 May 2022 |

**DEBTOR**

**EXHIBIT**

**1**

Fill in this information to identify your case:

United States Bankruptcy Court for the:

CENTRAL DISTRICT OF CALIFORNIA

Case number *(if known)*

Chapter you are filing under:

☐ Chapter 7

☐ Chapter 11

☐ Chapter 12

■ Chapter 13

☐ Check if this is an amended filing

## Official Form 101
# Voluntary Petition for Individuals Filing for Bankruptcy
**02/20**

The bankruptcy forms use *you* and *Debtor 1* to refer to a debtor filing alone. A married couple may file a bankruptcy case together—called a *joint case*—and in joint cases, these forms use *you* to ask for information from both debtors. For example, if a form asks, "Do you own a car," the answer would be *yes* if either debtor owns a car. When information is needed about the spouses separately, the form uses *Debtor 1* and *Debtor 2* to distinguish between them. In joint cases, one of the spouses must report information as *Debtor 1* and the other as *Debtor 2*. The same person must be *Debtor 1* in all of the forms.

Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write your name and case number (if known). Answer every question.

### Part 1:  Identify Yourself

|  | About Debtor 1: | About Debtor 2 (Spouse Only in a Joint Case): |
|---|---|---|
| **1. Your full name**<br>Write the name that is on your government-issued picture identification (for example, your driver's license or passport).<br><br>Bring your picture identification to your meeting with the trustee. | **Bassem**<br>First name<br><br>**Essam**<br>Middle name<br><br>**El Mallakh**<br>Last name and Suffix (Sr., Jr., II, III) | First name<br><br>Middle name<br><br>Last name and Suffix (Sr., Jr., II, III) |
| **2. All other names you have used in the last 8 years**<br>Include your married or maiden names. |  |  |
| **3. Only the last 4 digits of your Social Security number or federal Individual Taxpayer Identification number (ITIN)** | xxx-xx-3012 |  |

Debtor 1    **Bassem Essam El Mallakh**    Case number (if known)

| | | About Debtor 1: | About Debtor 2 (Spouse Only In a Joint Case): |
|---|---|---|---|
| 4. | Any business names and Employer Identification Numbers (EIN) you have used in the last 8 years | ■ I have not used any business name or EINs. | ☐ I have not used any business name or EINs. |
| | Include trade names and *doing business as* names | Business name(s) | Business name(s) |
| | | EIN | EIN |

| | | | If Debtor 2 lives at a different address: |
|---|---|---|---|
| 5. | Where you live | **116 Rockefeller**<br>**Irvine, CA 92612**<br>Number, Street, City, State & ZIP Code | Number, Street, City, State & ZIP Code |
| | | **Orange**<br>County | County |
| | | If your mailing address is different from the one above, fill it in here. Note that the court will send any notices to you at this mailing address. | If Debtor 2's mailing address is different from yours, fill it in here. Note that the court will send any notices to this mailing address. |
| | | Number, P.O. Box, Street, City, State & ZIP Code | Number, P.O. Box, Street, City, State & ZIP Code |

| | | Check one: | Check one: |
|---|---|---|---|
| 6. | Why you are choosing *this district* to file for bankruptcy | ■ Over the last 180 days before filing this petition, I have lived in this district longer than in any other district. | ☐ Over the last 180 days before filing this petition, I have lived in this district longer than in any other district. |
| | | ☐ I have another reason.<br>Explain. (See 28 U.S.C. § 1408.) | ☐ I have another reason.<br>Explain. (See 28 U.S.C. § 1408.) |

Debtor 1   **Bassem Essam El Mallakh**                                    Case number *(if known)*

**Part 2:   Tell the Court About Your Bankruptcy Case**

**7.   The chapter of the Bankruptcy Code you are choosing to file under**

*Check one.* (For a brief description of each, see *Notice Required by 11 U.S.C. § 342(b) for Individuals Filing for Bankruptcy (Form 2010)).* Also, go to the top of page 1 and check the appropriate box.

☐ Chapter 7
☐ Chapter 11
☐ Chapter 12
☑ Chapter 13

**8.   How you will pay the fee**

☑ I will pay the entire fee when I file my petition. Please check with the clerk's office in your local court for more details about how you may pay. Typically, if you are paying the fee yourself, you may pay with cash, cashier's check, or money order. If your attorney is submitting your payment on your behalf, your attorney may pay with a credit card or check with a pre-printed address.

☐ I need to pay the fee in installments. If you choose this option, sign and attach the *Application for Individuals to Pay The Filing Fee in Installments* (Official Form 103A).

☐ I request that my fee be waived (You may request this option only if you are filing for Chapter 7. By law, a judge may, but is not required to, waive your fee, and may do so only if your income is less than 150% of the official poverty line that applies to your family size and you are unable to pay the fee in installments). If you choose this option, you must fill out the *Application to Have the Chapter 7 Filing Fee Waived* (Official Form 103B) and file it with your petition.

**9.   Have you filed for bankruptcy within the last 8 years?**

☑ No.
☐ Yes.

| District | When | Case number |
| District | When | Case number |
| District | When | Case number |

**10.   Are any bankruptcy cases pending or being filed by a spouse who is not filing this case with you, or by a business partner, or by an affiliate?**

☑ No
☐ Yes

| Debtor | | Relationship to you |
| District | When | Case number, if known |
| Debtor | | Relationship to you |
| District | When | Case number, if known |

**11.   Do you rent your residence?**

☑ No.   Go to line 12.
☐ Yes.   Has your landlord obtained an eviction judgment against you?

   ☐   No. Go to line 12.
   ☐   Yes. Fill out *Initial Statement About an Eviction Judgment Against You* (Form 101A) and file it as part of this bankruptcy petition.

Debtor 1    **Bassem Essam El Mallakh**                                          Case number *(if known)*

**Part 3**  **Report About Any Businesses You Own as a Sole Proprietor**

**12. Are you a sole proprietor of any full- or part-time business?**

A sole proprietorship is a business you operate as an individual, and is not a separate legal entity such as a corporation, partnership, or LLC.

If you have more than one sole proprietorship, use a separate sheet and attach it to this petition.

- ■ **No.**      Go to Part 4.
- ☐ **Yes.**     Name and location of business

  Name of business, if any

  Number, Street, City, State & ZIP Code

  *Check the appropriate box to describe your business:*
  - ☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))
  - ☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))
  - ☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))
  - ☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))
  - ☐ None of the above

**13. Are you filing under Chapter 11 of the Bankruptcy Code and are you a *small business debtor*?**

For a definition of *small business debtor*, see 11 U.S.C. § 101(51D).

*If you are filing under Chapter 11, the court must know whether you are a small business debtor so that it can set appropriate deadlines. If you indicate that you are a small business debtor, you must attach your most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if any of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).*

- ■ **No.**      I am not filing under Chapter 11.
- ☐ **No.**      I am filing under Chapter 11, but I am NOT a small business debtor according to the definition in the Bankruptcy Code.
- ☐ **Yes.**     I am filing under Chapter 11, I am a small business debtor according to the definition in the Bankruptcy Code, and I do not choose to proceed under Subchapter V of Chapter 11.
- ☐ **Yes.**     I am filing under Chapter 11, I am a small business debtor according to the definition in the Bankruptcy Code, and I choose to proceed under Subchapter V of Chapter 11.

**Part 4**  **Report If You Own or Have Any Hazardous Property or Any Property That Needs Immediate Attention**

**14. Do you own or have any property that poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety? Or do you own any property that needs immediate attention?**

*For example, do you own perishable goods, or livestock that must be fed, or a building that needs urgent repairs?*

- ■ **No.**
- ☐ **Yes.**     What is the hazard?

  If immediate attention is needed, why is it needed?

  Where is the property?

  Number, Street, City, State & Zip Code

Official Form 101                    Voluntary Petition for Individuals Filing for Bankruptcy                    page 4

**Debtor 1    Bassem Essam El Mallakh**                                              Case number (if known)

<span style="background:black;color:white;">Part 5:</span>    **Explain Your Efforts to Receive a Briefing About Credit Counseling**

**16. Tell the court whether you have received a briefing about credit counseling.**

The law requires that you receive a briefing about credit counseling before you file for bankruptcy. You must truthfully check one of the following choices. If you cannot do so, you are not eligible to file.

If you file anyway, the court can dismiss your case, you will lose whatever filing fee you paid, and your creditors can begin collection activities again.

**About Debtor 1:**

*You must check one:*

☑ I received a briefing from an approved credit counseling agency within the 180 days before I filed this bankruptcy petition, and I received a certificate of completion.

Attach a copy of the certificate and the payment plan, if any, that you developed with the agency.

☐ I received a briefing from an approved credit counseling agency within the 180 days before I filed this bankruptcy petition, but I do not have a certificate of completion.

Within 14 days after you file this bankruptcy petition, you MUST file a copy of the certificate and payment plan, if any.

☐ I certify that I asked for credit counseling services from an approved agency, but was unable to obtain those services during the 7 days after I made my request, and exigent circumstances merit a 30-day temporary waiver of the requirement.

To ask for a 30-day temporary waiver of the requirement, attach a separate sheet explaining what efforts you made to obtain the briefing, why you were unable to obtain it before you filed for bankruptcy, and what exigent circumstances required you to file this case.

Your case may be dismissed if the court is dissatisfied with your reasons for not receiving a briefing before you filed for bankruptcy. If the court is satisfied with your reasons, you must still receive a briefing within 30 days after you file. You must file a certificate from the approved agency, along with a copy of the payment plan you developed, if any. If you do not do so, your case may be dismissed.

Any extension of the 30-day deadline is granted only for cause and is limited to a maximum of 15 days.

☐ I am not required to receive a briefing about credit counseling because of:

☐ **Incapacity.**
I have a mental illness or a mental deficiency that makes me incapable of realizing or making rational decisions about finances.

☐ **Disability.**
My physical disability causes me to be unable to participate in a briefing in person, by phone, or through the internet, even after I reasonably tried to do so.

☐ **Active duty.**
I am currently on active military duty in a military combat zone.

If you believe you are not required to receive a briefing about credit counseling, you must file a motion for waiver credit counseling with the court.

**About Debtor 2 (Spouse Only in a Joint Case):**

*You must check one:*

☐ I received a briefing from an approved credit counseling agency within the 180 days before I filed this bankruptcy petition, and I received a certificate of completion.

Attach a copy of the certificate and the payment plan, if any, that you developed with the agency.

☐ I received a briefing from an approved credit counseling agency within the 180 days before I filed this bankruptcy petition, but I do not have a certificate of completion.

Within 14 days after you file this bankruptcy petition, you MUST file a copy of the certificate and payment plan, if any.

☐ I certify that I asked for credit counseling services from an approved agency, but was unable to obtain those services during the 7 days after I made my request, and exigent circumstances merit a 30-day temporary waiver of the requirement.

To ask for a 30-day temporary waiver of the requirement, attach a separate sheet explaining what efforts you made to obtain the briefing, why you were unable to obtain it before you filed for bankruptcy, and what exigent circumstances required you to file this case.

Your case may be dismissed if the court is dissatisfied with your reasons for not receiving a briefing before you filed for bankruptcy.

If the court is satisfied with your reasons, you must still receive a briefing within 30 days after you file. You must file a certificate from the approved agency, along with a copy of the payment plan you developed, if any. If you do not do so, your case may be dismissed.

Any extension of the 30-day deadline is granted only for cause and is limited to a maximum of 15 days.

☐ I am not required to receive a briefing about credit counseling because of:

☐ **Incapacity.**
I have a mental illness or a mental deficiency that makes me incapable of realizing or making rational decisions about finances.

☐ **Disability.**
My physical disability causes me to be unable to participate in a briefing in person, by phone, or through the internet, even after I reasonably tried to do so.

☐ **Active duty.**
I am currently on active military duty in a military combat zone.

If you believe you are not required to receive a briefing about credit counseling, you must file a motion for waiver of credit counseling with the court.

Case 8:22-bk-11158-TA    Doc 1    Filed 07/12/22   Entered 07/12/22 22:35:39   Desc
Main Document    Page 6 of 12

Debtor 1  **Bassem El Mallakh**                                    Case number (if known)

### Part 6:  Answer These Questions for Reporting Purposes

**16. What kind of debts do you have?**

16a. Are your debts primarily consumer debts? *Consumer debts* are defined in 11 U.S.C. § 101(8) as "incurred by an individual primarily for a personal, family, or household purpose."

☐ No. Go to line 16b.
☒ Yes. Go to line 17.

16b. Are your debts primarily business debts? *Business debts* are debts that you incurred to obtain money for a business or investment or through the operation of the business or investment.

☐ No. Go to line 16c.
☐ Yes. Go to line 17.

16c. State the type of debts you owe that are not consumer debts or business debts

**17. Are you filing under Chapter 7?**

☒ No. I am not filing under Chapter 7. Go to line 18.

Do you estimate that after any exempt property is excluded and administrative expenses are paid that funds will be available for distribution to unsecured creditors?

☐ Yes. I am filing under Chapter 7. Do you estimate that after any exempt property is excluded and administrative expenses are paid that funds will be available to distribute to unsecured creditors?

☐ No
☐ Yes

**18. How many Creditors do you estimate that you owe?**

☒ 1-49  ☐ 1,000-5,000  ☐ 25,001-50,000
☐ 50-99  ☐ 5001-10,000  ☐ 50,001-100,000
☐ 100-199  ☐ 10,001-25,000  ☐ More than100,000
☐ 200-999

**19. How much do you estimate your assets to be worth?**

☐ $0 - $50,000  ☐ $1,000,001 - $10 million  ☐ $500,000,001 - $1 billion
☐ $50,001 - $100,000  ☐ $10,000,001 - $50 million  ☐ $1,000,000,001 - $10 billion
☐ $100,001 - $500,000  ☐ $50,000,001 - $100 million  ☐ $10,000,000,001 - $50 billion
☐ $500,001 - $1 million  ☐ $100,000,001 - $500 million  ☐ More than $50 billion

**20. How much do you estimate your liabilities to be?**

☐ $0 - $50,000  ☐ $1,000,001 - $10 million  ☐ $500,000,001 - $1 billion
☐ $50,001 - $100,000  ☐ $10,000,001 - $50 million  ☐ $1,000,000,001 - $10 billion
☐ $100,001 - $500,000  ☐ $50,000,001 - $100 million  ☐ $10,000,000,001 - $50 billion
☐ $500,001 - $1 million  ☐ $100,000,001 - $500 million  ☐ More than $50 billion

### Part 7:  Sign Below

**For you**

I have examined this petition, and I declare under penalty of perjury that the information provided is true and correct.

If I have chosen to file under Chapter 7, I am aware that I may proceed, if eligible, under Chapter 7, 11,12, or 13 of title 11, United States Code. I understand the relief available under each chapter, and I choose to proceed under Chapter 7.

If no attorney represents me and I did not pay or agree to pay someone who is not an attorney to help me fill out this document, I have obtained and read the notice required by 11 U.S.C. § 342(b).

I request relief in accordance with the chapter of title 11, United States Code, specified in this petition.

I understand making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $250,000, or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

**Bassem Essam El Mallakh**
Signature of Debtor 1

Executed on  7/12/2022
MM / DD / YYYY

Signature of Debtor 2

Executed on _____
MM / DD / YYYY

Official Form 101          Voluntary Petition for Individuals Filing for Bankruptcy          page 6

Debtor 1    **Bassem Essam El Mallakh**                                              Case number (if known)

For your attorney, if you are represented by one

If you are not represented by an attorney, you do not need to file this page.

I, the attorney for the debtor(s) named in this petition, declare that I have informed the debtor(s) about eligibility to proceed under Chapter 7, 11, 12, or 13 of title 11, United States Code, and have explained the relief available under each chapter for which the person is eligible. I also certify that I have delivered to the debtor(s) the notice required by 11 U.S.C. § 342(b) and, in a case in which § 707(b)(4)(D) applies, certify that I have no knowledge after an inquiry that the information in the schedules filed with the petition is incorrect.

Signature of Attorney for Debtor

Date    7/12/2022
MM / DD / YYYY

**Benjamin Heston**
Printed name

Firm name

100 Bayview Circle, Suite 100
Newport Beach, CA 92660
Number, Street, City, State & ZIP Code

Contact phone    951-290-2827          Email address    bheston.ecf@gmail.com

297798 CA
Bar number & State

# DEBTOR

# EXHIBIT

# 2

| Form **1040** | Department of the Treasury — Internal Revenue Service (99) | | **2021** | OMB No. 1545-0074 | | IRS Use Only — Do not write or staple in this space. |
|---|---|---|---|---|---|---|
| | U.S. Individual Income Tax Return | | | | | |

**Filing Status**
Check only one box.

[X] Single    [ ] Married filing jointly    [ ] Married filing separately (MFS)    [ ] Head of household (HOH)    [ ] Qualifying widow(er) (QW)

If you checked the MFS box, enter the name of your spouse. If you checked the HOH or QW box, enter the child's name if the qualifying person is a child but not your dependent ▶

| Your first name and middle initial | Last name | Your social security number |
|---|---|---|
| Bassem El Mallakh | | 3012 |

| If joint return, spouse's first name and middle initial | Last name | Spouse's social security number |
|---|---|---|
| | | |

Home address (number and street) If you have a P.O. box, see instructions.    Apt. no.

116 Rockefeller

City, town, or post office. If you have a foreign address, also complete spaces below.    State    ZIP code

Irvine, CA 92612

Foreign country name      Foreign province/state/county      Foreign postal code

**Presidential Election Campaign**
Check here if you, or your spouse if filing jointly, want $3 to go to this fund. Checking a box below will not change your tax or refund.

[ ] You    [ ] Spouse

At any time during 2021, did you receive, sell, exchange, or otherwise dispose of any financial interest in any virtual currency?    [ ] Yes   [X] No

**Standard Deduction**

Someone can claim:   [ ] You as a dependent    [ ] Your spouse as a dependent

[ ] Spouse itemizes on a separate return or you were a dual-status alien

**Age/Blindness**    You: [ ] Were born before January 2, 1957   [ ] Are blind    Spouse: [ ] Was born before January 2, 1957   [ ] Is blind

**Dependents** (see instructions):

| (1) First name    Last name | (2) Social security number | (3) Relationship to you | (4) ✓ if qualifies for (see instructions): Child tax credit | Credit for other dependents |
|---|---|---|---|---|
| | | | | |

If more than four dependents, see instructions and check here ▶ [ ]

| | | | | | | |
|---|---|---|---|---|---|---|
| **1** | Wages, salaries, tips, etc. Attach Form(s) W-2 | | | **1** | |
| **2a** | Tax-exempt interest . | **2a** | **b** Taxable interest | **2b** | 3. |
| **3a** | Qualified dividends . | **3a** | **b** Ordinary dividends | **3b** | |
| **4a** | IRA distributions | **4a** | **b** Taxable amount | **4b** | |
| **5a** | Pensions and annuities | **5a** | **b** Taxable amount | **5b** | |
| **6a** | Social security benefits | **6a** | **b** Taxable amount | **6b** | |
| **7** | Capital gain or (loss). Attach Schedule D if required. If not required, check here . . . . . . . . ▶ [ ] | | | **7** | |
| **8** | Other income from Schedule 1, line 10 | | | **8** | |
| **9** | Add lines 1, 2b, 3b, 4b, 5b, 6b, 7, and 8. This is your **total income** . . . . . . . . . . . . . ▶ | | | **9** | 3. |
| **10** | Adjustments to income from Schedule 1, line 26 | | | **10** | |
| **11** | Subtract line 10 from line 9. This is your **adjusted gross income** . . . . . . . . . . . . . ▶ | | | **11** | 3. |
| **12a** | Standard deduction or itemized deductions (from Schedule A) . . . . | **12a** | 12,550. | | |
| **b** | Charitable contributions if you take the standard deduction (see instructions) . . | **12b** | | | |
| **c** | Add lines 12a and 12b | | | **12c** | 12,550. |
| **13** | Qualified business income deduction from Form 8995 or Form 8995-A . . . . . . . . . . . . . | | | **13** | |
| **14** | Add lines 12c and 13 | | | **14** | 12,550. |
| **15** | **Taxable income.** Subtract line 14 from line 11. If zero or less, enter -0- . . . . . . . . . . . . . | | | **15** | 0. |

Attach Sch. B if required.

Standard Deduction for —
• Single or Married filing separately, $12,550
• Married filing jointly or Qualifying widow(er), $25,100
• Head of household, $18,800
• If you checked any box under Standard Deduction, see instructions.

BAA For Disclosure, Privacy Act, and Paperwork Reduction Act Notice, see separate instructions.      Form **1040** (2021)

FDIA0112L   12/10/21

| Form **1040** | Department of the Treasury — Internal Revenue Service (99)<br>**U.S. Individual Income Tax Return** | **2019** | OMB No. 1545-0074 | IRS Use Only — Do not write or staple in this space. | |

**Filing Status**
Check only one box.

[X] Single    [ ] Married filing jointly    [ ] Married filing separately (MFS)    [ ] Head of household (HOH)    [ ] Qualifying widow(er) (QW)

If you checked the MFS box, enter the name of spouse. If you checked the HOH or QW box, enter the child's name if the qualifying person is a child but not your dependent. ▶

| Your first name and middle initial | Last name | Your social security number |
|---|---|---|
| Bassem El Mallakh | | 3012 |

| If joint return, spouse's first name and middle initial | Last name | Spouse's social security number |

Home address (number and street). If you have a P.O. box, see instructions.    Apt. no.

116 Rockefeller

City, town or post office, state, and ZIP code. If you have a foreign address, also complete spaces below (see instructions).

Irvine, CA 92612

| Foreign country name | Foreign province/state/county | Foreign postal code |

**Presidential Election Campaign**
Check here if you, or your spouse if filing jointly, want $3 to go to this fund. Checking a box below will not change your tax or refund.    [ ] You    [ ] Spouse

If more than four dependents, see instructions and ✓ here ▶ [ ]

**Standard Deduction**

Someone can claim:    [ ] You as a dependent    [ ] Your spouse as a dependent

[ ] Spouse itemizes on a separate return or you were a dual-status alien

**Age/Blindness**    You:    [ ] Were born before January 2, 1955    [ ] Are blind    Spouse:    [ ] Was born before January 2, 1955    [ ] Is blind

**Dependents** (see instructions):

| (1) First name    Last name | (2) Social security number | (3) Relationship to you | (4) ✓ if qualifies for (see instructions): | |
|---|---|---|---|---|
| | | | Child tax credit | Credit for other dependents |
| | | | [ ] | [ ] |
| | | | [ ] | [ ] |
| | | | [ ] | [ ] |
| | | | [ ] | [ ] |

| | | | | | |
|---|---|---|---|---|---|
| | 1 | Wages, salaries, tips, etc. Attach Form(s) W-2 | | 1 | |
| | 2a | Tax-exempt interest . . . . . . . | 2a | b Taxable int. Att. Sch. B if reqd. . . . . | 2b | 5. |
| | 3a | Qualified dividends . . . . . . . . . | 3a | b Ordinary div. Att. Sch. B if reqd. . . . . | 3b | |
| | 4a | IRA distributions . . .  . . . . . | 4a | b Taxable amount . . . . . . . . . . . . | 4b | |
| | c | Pensions and annuities . . . . . . | 4c | d Taxable amount . . . . . . . . . . . . | 4d | |
| | 5a | Social security benefits . . . . . . . . . | 5a | b Taxable amount . . . . . . . . . . . . | 5b | |

**Standard Deduction for —**
• Single or Married filing separately, $12,200
• Married filing jointly or Qualifying widow(er), $24,400
• Head of household, $18,350
• If you checked any box under Standard Deduction, see instructions.

| | | | | |
|---|---|---|---|---|
| 6 | Capital gain or (loss). Attach Schedule D if required. If not required, check here ▶ [ ] | | 6 | |
| 7a | Other income from Schedule 1, line 9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 7a | |
| b | Add lines 1, 2b, 3b, 4b, 4d, 5b, 6, and 7a. This is your **total income** . . . . . . . . . . ▶ | | 7b | 5. |
| 8a | Adjustments to income from Schedule 1, line 22 . . . . . . . . . . . . . . . . . . . | | 8a | |
| b | Subtract line 8a from line 7b. This is your **adjusted gross income** . . . . . . . . . . . . . ▶ | | 8b | 5. |
| 9 | Standard deduction or itemized deductions (from Schedule A) . . . . . . . . . | 9 | 12,200. | |
| 10 | Qualified business income deduction. Attach Form 8995 or Form 8995-A . . . . | 10 | | |
| 11a | Add lines 9 and 10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 11a | 12,200. |
| b | **Taxable income.** Subtract line 11a from line 8b. If zero or less, enter -0- . . . . . . . . . . . . | | 11b | 0. |

**BAA  For Disclosure, Privacy Act, and Paperwork Reduction Act Notice, see separate instructions.**                Form **1040** (2019)

FDIA0112L  10/07/19

# Tax Returns

Tax Returns 2022

IRS Department of the Treasury
Internal Revenue Service
PO BOX 236
MEMPHIS TN 38101-0236

In reply refer to: 0539300000
Dec. 13, 2022 LTR 2645C K0
***-**-3012 201912 30
Input Op: 0309926218 00014802
BODC: WI

BASSEM EL MALLAKH
116 ROCKEFELLER
IRVINE CA 92612-8114

Taxpayer identification number: ***-**-3012
Tax periods: Dec. 31, 2019
Form: 1040

Dear Taxpayer:

Thank you for your inquiry of Oct. 05, 2022.

We're working on your account. However, we need an additional 60 days to send you a complete response on what action we are taking on your account. We don't need any further information from you right now.

If you prefer, you can write to that office at the address we provided in this letter.

If you have questions, you can call 1-800-829-0922.

If you prefer, you can write to the address at the top of the first page of this letter.

Find tax forms or publications by visiting www.irs.gov/forms or calling 800-TAX-FORM (800-829-3676).

Whenever you write, include a copy of this letter and your telephone numbers along with the hours we can reach you.

Keep a copy of this letter for your records.

Thank you for your cooperation.



# Tax Returns

CPA letter confirming Tax Returns was filed

September 15, 2022

**SHENOUDA & ASSOCIATES, LLP**
16377 BEACH BLVD., SUITE 222
HUNTINGTON BEACH, CA 92648
(714) 842-5045

Beverri El-Maliah
116 Rockefeller
Irvine, CA 92612

Dear Beverri,

Your 2021 Federal Income Tax Return was acknowledged as accepted by the Internal Revenue Service. No tax is payable with the filing of this return. The refund of $1,400 will be directly deposited into your checking account.

Your 2021 California Individual Income Tax Return was acknowledged as accepted by the State of California on . There is a balance due of $3,300. The balance due will be directly withdrawn from your bank account once the State of California has processed the return.

Please be sure to call if you have any questions.

Sincerely,

Helan Shenouda, MBA

Visit us online:

www.shenoudallp.com
www.facebook.com/ShenoudaLLP
www.twitter.com/ShenoudaLLP

Access Your Tax Returns and Tax Documents Securely Anytime:

https://shenoudallp.smartvault.com

(Request Invite From Our Office)

# DEBTOR

# EXHIBIT

# 3



# INTERINSURANCE EXCHANGE OF THE AUTOMOBILE CLUB

## MEMBERS' CONDOMINIUM OWNERS POLICY – FORM 6
## PROPERTY INSURANCE POLICY DECLARATIONS

### Evidence of Insurance
Policy contains 438BFU, printed on next page, in favor of Mortgagee shown.

**MORTGAGEE**
ADDITIONAL OWNERS INTEREST
US TRUSTEE
UNITED STATES TRUSTEE (SA)
411 W FOURTH ST SUITE 7160
SANTA ANA CA 92701

**LOAN NUMBER**

**POLICY NUMBER**
~~~~~20189

**NAMED INSURED AND MAILING ADDRESS**
BASSEM EL MALLAKH
116 ROCKEFELLER
IRVINE CA 92612

**LOCATION OF PREMISES (IF DIFFERENT FROM MAILING ADDRESS)**

☐ **PROPERTY INSURANCE POLICY DECLARATIONS**
EFFECTIVE DATE OF THIS POLICY 10262022    12:01 A.M.
                                (PACIFIC STANDARD TIME)
EXPIRATION DATE OF THIS POLICY10262023    12:01 A.M.
                                (PACIFIC STANDARD TIME)

**ANNUAL PREMIUM $**

☐ **AMENDMENT OF PROPERTY INSURANCE DECLARATIONS**
**ENDORSEMENT**
EFFECTIVE DATE                   12:01 A.M
                                (PACIFIC STANDARD TIME)
EXPIRATION DATE OF THE POLICY    12.01 A.M.
                                (PACIFIC STANDARD TIME)

**COVERAGES AND LIMITS OF LIABILITY**

PART I - PROPERTY COVERAGES

COVERAGE A – BUILDING PROPERTY              82000

OTHER PERILS DEDUCTIBLE                      5000

WATER DEDUCTIBLE                             5000

**PROVISIONS**
This form is not a contract of insurance  The provisions of the policy shall prevail in all respects. All premiums for the insurance policy shall be computed in accordance with the Interinsurance Exchange of the Automobile Club rules, forms, premiums and minimum premiums applicable to the insurance afforded which are in effect at the inception of the insurance policy and upon each anniversary thereof, including the date of interim changes. The insurance policy does not become effective unless and until escrow closes, the named insured has an ownership interest in the residence premises, and the premium is paid or reserved in an escrow account. If the insurance protection evidenced herein terminates, the mortgagee will be given notice in accordance with the standard mortgagee clause (438BFU)

*ACSC Management Services, Inc.*
**ATTORNEY-IN-FACT**

**FOR QUESTIONS OR CHANGES CALL**
8720  01/16

.............................................. **DETACH HERE AND RETURN WITH PREMIUM PAYMENT** ..................................................

**INTERINSURANCE EXCHANGE of the**
Automobile Club of Southern California
MAILING ADDRESS: P.O. Box 25446 SANTA ANA, CALIFORNIA 92799-5446

**NOTICE OF
PREMIUM DUE**

**LOAN NUMBER**

**POLICY NUMBER**
CHO183020189

**DUE DATE**

**PLEASE PAY THE PREMIUM
DUE BEFORE OR ON THE
DUE DATE**

BASSEM EL MALLAKH
116 ROCKEFELLER

**PREMIUM DUE**

**MAKE CHECK PAYABLE TO
ACSC**

Insurance



Car and Home Insurance 2023

# Insurance

Medical Insurance 2022



**DEBTOR**

**EXHIBIT**

**4**

# Wells Fargo Combined Statement of Accounts

September 30, 2022  ■ Page 1 of 6



BASSEM VICTOR EL MALLAKH
116 ROCKEFELLER
IRVINE CA 92612-6114

**Questions?**

Available by phone 24 hours a day, 7 days a week.
We accept all relay calls, including 711
**1-800-742-4932**
En español: 1-877-727-2932

Online: wellsfargo.com

Write: Wells Fargo Bank, N.A. (114)
P.O. Box 6995
Portland, OR 97228-6995

## You and Wells Fargo

Thank you for being a loyal Wells Fargo customer. We value your trust in our
company and look forward to continuing to serve you with your financial needs.

## Account options

A check mark in the box indicates you have these
convenient services with your account(s). Go to
wellsfargo.com or call the number above if you have
questions or if you would like to add new services.

| | | | |
|---|---|---|---|
| Online Banking | ☐ | Direct Deposit | ☐ |
| Online Bill Pay | ☐ | Auto Transfer/Payment | ☐ |
| Online Statements | ☐ | Overdraft Protection | ☐ |
| Mobile Banking | ☐ | Debit Card | ☐ |
| My Spending Report | ☐ | Overdraft Service | ☑ |

**Other Wells Fargo Benefits**

**From Wells Fargo Home Mortgage**

Is a home purchase in your future? Competitive rates and low down payment options make now a great time to buy a home. Plus, as a
Wells Fargo customer, you can count on personalized guidance and streamlined service every step of the way.

Get started with an online mortgage application that can pre-fill your Wells Fargo account information and save you time. Use your
Wells Fargo Online® username and password at the start of the application. Go to wellsfargo.com/homepurchase or contact your local
home mortgage consultant.

Sheet Seq # 0100191
Sheet 00091 of 00003

Created With Tiny Scanner

**CHASE ◻**

JP Morgan Chase Bank, N.A.
PO Box 659754
San Antonio, TX 78285-9754

**Questions?**
✉ chase.com
☎ 1-800-935-9935
We accept operator relay calls

10/28/2022

**BASSEM V ELMALLAKH**
**116 ROCKEFELLER**
**IRVINE, CA 92612-6114**

## Update: We closed your account

Your account ending in 7332

*Dear Bassem Elmallakh*

Thank you for your recent inquiry about your account. We closed your account above on 09/20/2022.
If you have questions, please call us at 1-800-935-9935 or visit any of our branches.

Sincerely,

Customer Service

©2019 JPMorgan Chase Bank, N.A. Member FDIC
M1006-01 (09/19)

Created With Tiny Scanner

**DEBTOR**

**EXHIBIT**

**5**

California Driver License



**DEBTOR**

**EXHIBIT**

**6**

# Car Registration

DMV
DEPARTMENT OF MOTOR VEHICLES
A Public Service Agency

REGISTRATION CARD VALID FROM: 08/26/2022 TO: 08/26/2023

| MAKE | YR MODEL | YR 1ST SOLD | VLF CLASS | YR | TYPE VEH | TYPE LIC | LICENSE NUMBER |
|---|---|---|---|---|---|---|---|
| MERZ | 2016 | 0000 | JC | 2016 | 170 | 11 | [redacted] |

| BODY TYPE MODEL | MP | MO | VEHICLE ID NUMBER |
|---|---|---|---|
| 4D | G | EA | [redacted] |

| TYPE VEHICLE USE | DATE ISSUED | CC/ALCO | DT FEE RECVD | PIC | STICKER ISSUED |
|---|---|---|---|---|---|
| AUTOMOBILE | 01/18/23 | 30 | 01/18/23 | 8 | J3286246 |

PR EXP DATE: 08/26/2022

AMOUNT PAID
$ 376.00

REGISTERED OWNER
ELMALLAKH BASSEM E
116 ROCKEFELLER

IRVINE
CA 92612

LIENHOLDER
TD AUTO FIN LLC
PO BX 997551

SACRAMENTO
CA 95899

AMOUNT DUE
$ 376.00 CAS

AMOUNT RECVD

THE GREAT SEAL OF THE STATE OF CALIFORNIA

CA 2023 ACTM
J 3286246

CALIFORNIA
1SAM123

H01 616 B5 0037600 0015 CS H01 011823 11 7VIM280 746



**DEBTOR**

**EXHIBIT**

**7**

# Gas Bills



Gas Bills



# DEBTOR

# EXHIBIT

# 7

# Water Bills

Water bill for August 2022



# Water Bills



Water bill for September 2022

# Water Bills



Water bill for October 2022

# Water Bills

Water bill for November 2022



# Water Bills



Water bill for January 2023

**DEBTOR**

**EXHIBIT**

**9**

Insurance

Medical Insurance Card



**DEBTOR**

**EXHIBIT**

**10**

# Food Delivery

Uber Eats receipts



# Food Delivery

Uber Eats receipts
Examples





**DEBTOR**

**EXHIBIT**
**11**

# Gym Check in's

Gym Check-ins at LA fitness location: 3021 Michelson Dr, Irvine, CA September to December 2022 dates





Gym Check in's

Gym Check-ins at LA fitness location: 3021 Michelson Dr, Irvine, CA May to August 2022 dates

# DEBTOR

# EXHIBIT

# 12

# Find my iPhone GPS device



Find my iPhone GPS
locator device on the
iPhone IOS

**DEBTOR**

**EXHIBIT**

**13**

# Travel

From Orange county to San Fran on September 08 2022



22/8/23 1:41 AM

Find Your confirmation receipt (#PNV0T) for your flight to San Francisco on 9/8/22

| Thu, Sep 08 | | Thu, Sep 08 |
| 04:00 PM | | 05:25 PM |
| **SNA** | ✈ ........... | **SFO** |
| Orange County/Santa Ana | | San Francisco |

## Summary of airfare charges

**Basem Elmallakh**
*Mileage Plan # Join Mileage Plan not add to reservation*
Ticket 0272310620554

| Base fare and surcharges | $14.65 |
| Taxes and other fees | $15.70 |
| Per person total | $30.35 |

**Alexander Hanna**
*Mileage Plan # Join Mileage Plan and add to reservation*
Ticket 0272310620556

| Base fare and surcharges | $14.65 |
| Taxes and other fees | $15.70 |
| Per person total | $30.35 |

**Total charges for air travel**    **$60.70**

Non-refundable fare of $60.70 was charged to the American Express card with number •••••••3032 held by Basem Hanna on Sep 8, 2022.

Coupon code ECXRGSNLLB119ZZ5 was applied to this purchase. Click for restrictions

# Travel

2/28/23  1:41 AM

Find: Your confirmation receipt IRPWOT for your flight to San Francisco on 9/8/22

✈

## Bassem,
## you're all set.

We can't wait to see you on board. Before you fly, view full reservation details or make changes to your flight online. With Mileage Plan™, you earn a mile for every mile flown. Don't miss out on miles, join Mileage Plan now.

MANAGE TRIP

Confirmation code
**IRPWOT**

From Orange county to San Fran on September 08 2022

**Alaska**
Flight 3454
Embraer ERJ 175

**Traveler(s)**
Bassem Elmallkhi
Seat 19A, Class L (Coach)

Alexander Hanna
Seat 19B, Class L (Coach)

Flight Operated by SkyWest Airlines as AlaskaSkyWest. Check in with Alaska Airlines

# DEBTOR

# EXHIBIT

# 14





Amazon packages

Amazon Prime family
account receipts

# Amazon packages

## Amazon Prime family account receipts





Amazon packages

Amazon Prime family
account receipts

# Amazon packages

Amazon Personal account- ( non-Prime Service ) takes longer time to deliver packages



**DEBTOR**

**EXHIBIT**

**15**



**FedEx Office**

3992 Barranca Pkwy Ste A
Irvine, CA 92606
(949) 552-1717

Terminal: 059GMIK04
9/19/2022 19:22
Receipt #: 059461W2952
Type: Purchase

| Qty | Description | Amount |
|-----|-------------|--------|
| 18 | Self Serve Scan 8.5x11/14, 11x17 | 8.82 |

| | | |
|---|---|---|
| SubTotal | | 8.82 |
| District tax | | 0.04 |
| City tax | | 0.00 |
| County tax | | 0.11 |
| State tax | | 0.53 |
| **Total** | | **USD $9.50** |

Acct #:***********1451
VISA DEBIT
Chip Read
Auth No.: 011522
Mode: Issuer
AID: A000000031010
NO CVM
CVM Result: 5F0002
TVR: 8000008000
IAD: 06011203608000
TSI: 6800
ARC: 00
APPROVED

The Cardholder agrees to pay the Issuer
of the charge card in accordance with
the agreement between the Issuer and
the Cardholder.

**FedEx Office**

Tell us how we're doing and
receive $5 off your next $30
print order* Complete our survey
by scanning the QR code below,
visit fedex.com/wellisten

Offer expires 12/31/2022

*$5 off print order of $30.00 or more. Discount applies to orders placed
in a FedEx Office store or online through FedEx Office® Print Online.
Offer is valid at time of purchase only, on cash value and may not be
discounted or credited toward past or future purchases, discount cannot
be used in combination with custom-bid orders, other coupons, or
discounts, including account pricing. Discount not valid on the following
products and services: finishing only orders, self-service print, photo
station, fax or scan, direct mail, COD®* or postage. Does not apply to
shipping, Custom Branded boxes, rush or delivery charges. Does not
apply to retail products. No cash value. Offer void where prohibited or
restricted by law. Products, services and hours may vary by location.
© 2021 FedEx. All rights reserved. Offer expires 12/31/2022.

By submitting your project to FedEx Office
or by making a purchase in a FedEx Office
store, you agree to all FedEx Office terms
and conditions, including limitations
of liability.

Request a copy of our terms and
conditions from a team member or visit
fedex.com/officeservice/terms for details.

# CREDITOR

# EXHIBIT

# 1

 CHASE

PO Box 183164
Columbus, OH 43218-3164

**Questions?**
 **1-866-578-7022**

00420 COL 703 020 04121 NNNNNNNNNNNNN CL1 E
**BASSEM ELMALLAKH**
525 BROADWAY APT 5037
SANTA MONICA CA 90401-2964

February 10, 2021

**Amended**

**Important:** **Federal/state law required us to place a hold on your Chase account(s), which may include safe deposit box(es)**

Dear BASSEM ELMALLAKH:

We recently received the enclosed court order, which either enforces a legal judgment against you or secures a possible judgment in a lawsuit that's been filed against you. As a result, federal or state law required us to immediately place a hold on your Chase account(s). This means that you aren't able to use or withdraw any amount(s) less than or equal to the amount of the hold until the hold is released.

| Date We Placed Hold | Account Number (Last Four Digits) | Amount of Hold* |
|---|---|---|
| 02/10/2021 | 3252 | $16809.64 |
| 02/10/2021 | 0395 | $0.27 |
| 02/10/2021 | 7332 | $736.89 |

*The hold amount may be greater or less than the balance in your Chase accounts.

We know this situation is difficult because you can't access these funds in your account. Although we're not permitted to give you legal advice, we are providing some information in this letter to explain how your account is affected and to help you understand your options.

**Here's how this affects your account**
The following may apply based on your account type.

The amount that has a hold on it stays in your account, but you cannot use it for withdrawals, payments or any other reason.

Additionally, please note the following:
- If withdrawals are returned because your account doesn't have available funds, we may charge you Overdraft or Insufficient Funds Fee(s).
- We may have disconnected your Overdraft Protection service.
- We may charge you a Legal Processing Fee of $0.00.
- In certain states, you may also be responsible for the bank's fees if we are required to obtain outside counsel.

COAL-08Feb21-894
JPMorgan Chase Bank, N.A.

**Understanding your options**
You may have options to access some funds or to have the hold on your account released. These options are outlined below.

**Getting your money back**
You may be able to reduce the amount of the hold. Federal and state laws protect certain money from being used to pay most judgments or court orders, including:

- Social Security
- Supplemental Security Income (SSI)
- Veterans benefits

Depending on where you live, protected money may also include:

- Funds from public assistance (welfare)
- Alimony or child support
- Unemployment benefits
- Disability benefits
- Public or private pensions
- Workers' compensation benefits

These protections generally don't apply to business accounts. If you think your funds may be protected, contact the judgment creditor's attorney.

**Releasing the hold on your account(s)**
We can only release the hold on your account if we receive a written release of the court order signed by the judgment creditor's attorney or the court. In most situations, you're the only one who can ask the judgment creditor's attorney or the court to release your funds.

If you have questions or would like to request a written release of your funds, please call the judgment creditor's attorney at 1-213-364-7581 or the court at the number on the enclosed order. If they agree to send us a written release, they can mail it to us at the address listed on the first page of this letter.

Otherwise, we're required by law to hold the funds in your account(s) until:

- We send the funds to the issuer as required by law; or
- The hold expiration date, if applicable. If there's a hold expiration date, you'll see it on the enclosed court order. We recommend you review it carefully.

**Getting legal advice**
If you need legal advice, you should consult an attorney. If you're unable to afford a private attorney, you can visit the Legal Services Corporation's website at lsc.gov to find out where to go in your area for help.

**We're here to help**
If you have questions, please call us at 1-866-578-7022. We're here to help you Monday through Friday from 8 a.m. to 9 p.m. and Saturday from 8 a.m. to 7 p.m. Eastern Time.

Sincerely,

*Steven J. Criswell*

Steven J. Criswell
Executive Director
Customer Service

Enclosure

CL1

# CREDITOR

# EXHIBIT

# 2

# LEASE WITH OPTION TO PURCHASE

This Agreement, dated January 1 2017, by and between an individual known as Bassem Elmallakh of 525 Broadway, Santa Monica, California, 90401, hereinafter known as the "Landlord",

**AND**

An individual known as Reem Hanna, hereinafter known as the "Tenant(s)", agree to the following:

**OCCUPANT(S)**: The Premises is to be occupied strictly as a residential dwelling with only the Tenant(s) mentioned above as the Occupant(s).

**OFFER TO RENT**: The Landlord hereby rents to the Tenant(s), subject to the following terms and conditions of this Agreement, a condominium with the address of 116 Rockefeller , Irvine, California, 92612 consisting of 3.5 bathroom(s) and 3 bedroom(s) hereinafter known as the "Premises". The Landlord may also use the address for notices sent to the Tenant(s).

**PURPOSE**: The Tenant(s) and any Occupant(s) may only use the Premises as a residential dwelling. It may not be used for storage, manufacturing of any type of food or product, professional service(s), or for any commercial use unless otherwise stated in this Agreement.

**FURNISHINGS**: The Premises is furnished with the following:

Bedroom Set(s), Dining Room Set(s), Kitchen Set (Including Pots, Pans, Glasses, Mugs, Dishes, etc.), Living Room Set(s) and all other furnishings to be provided by the Tenant(s). Any damage to the Landlord's furnishings shall be the liability of the Tenant(s), reasonable wear-and-tear excepted, to be billed directly or less the Security Deposit.

**APPLIANCES**: The Landlord shall provide the following appliances:

Air Conditioner(s), Dishwasher, Dryer (for Laundry), Fan(s), Hot Water Heater, HVAC, Iron (for Clothes), Microwave, Oven(s), Refrigerator, Stove(s), Television(s), Washer (for Laundry), with all other appliances to be provided by the Tenant(s). Any damage to the Landlord's appliances shall be the liability of the Tenant(s), reasonable wear-and-tear excepted, to be billed directly or less the Security Deposit.

**LEASE TERM**: This Agreement shall be a fixed-period arrangement beginning on January 1 2017 and ending on December 31 2024 with the Tenant(s) having the option to continue to occupy the Premises under the same terms and conditions of this Agreement under a Month-to-Month arrangement (Tenancy at Will) with either the Landlord or Tenant having the option to cancel the tenancy with at least thirty (30) days notice or the minimum time-period set by the State, whichever is shorter. For the Tenant to continue under Month-to-Month tenancy at the expiration of the Lease Term, the Landlord must be notified within sixty (60) days before the end of the Lease Term. Hereinafter known as the "Lease Term".

**RENT**: Tenant(s) shall pay the Landlord in equal monthly installments of $3,000.00 (US Dollars) hereinafter known as the "Rent". The Rent will be due on the First (1st) of every month and be paid via the following instructions:

Money Wire

**NON-SUFFICIENT FUNDS (NSF CHECKS)**: If the Tenant(s) attempts to pay the rent with a check that is not honored or an electronic transaction (ACH) due to insufficient funds (NSF) there shall be no fee (US Dollars).

**LATE FEE**: If rent is not paid on the due date, there shall be a late fee assessed by the Landlord in the amount of:

Calculated as 10% percent of the monthly rent per occurrence for each month payment that is late after the 4th Day rent is due.

**FIRST (1ST) MONTH'S RENT**: First (1st) month's rent shall be due by the Tenant(s) upon the execution of this Agreement.

**PRE-PAYMENT**: The Landlord shall not require any pre-payment of rent by the Tenant(s).

**PRORATION PERIOD**: The Tenant(s) will not move into the Premises before the start of the Lease Term.

**SECURITY DEPOSIT**: The Tenant(s) shall not be obligated to pay a Security Deposit as part of this Agreement.

**POSSESSION**: Tenant(s) has examined the condition of the Premises and by taking possession acknowledges that they have accepted the Premises in good order and in its current condition except as herein otherwise stated. Failure of the Landlord to deliver possession of the Premises at the start of the Lease Term to the Tenant(s) shall terminate this Agreement at the option of the Tenant(s). Furthermore, under such failure to deliver possession by the Landlord, and if the Tenant(s) cancels this Agreement, the Security Deposit (if any) shall be returned to the Tenant(s) along with any other pre-paid rent, fees, including if the Tenant(s) paid a fee during the application process before the execution of this Agreement.

**OPTION TO PURCHASE**. The Tenant(s) shall have the right to purchase the Premises described herein for 1,000,000.00 at any time during the course of the Lease Term, along with any renewal periods or extensions, by providing written notice to the Landlord along with a deposit of $50,000.00 that is subject to the terms and conditions of a Purchase and Sale Agreement to be negotiated, in "good faith", between the Landlord and Tenant(s).

If the Landlord and Tenant(s) cannot produce a signed Purchase and Sale Agreement within a reasonable time period then the deposit shall be refunded to the Tenant(s) and this Lease Agreement shall continue under its terms and conditions.

If the option to purchase is exercised by the Tenant(s) all Rent that is paid to the Landlord shall remain separate from any and all deposits, consideration, or payments, made to the Landlord in regards to the purchase of the Premises.

**RECORDING**. The Tenant(s) shall be withheld from recording this Option to Purchase unless the Tenant(s) has the written consent from the Landlord.

**ACCESS**: Upon the beginning of the Proration Period or the start of the Lease Term, whichever is earlier, the Landlord agrees to give access to the Tenant(s) in the form of keys, fobs, cards, or any type of keyless security entry as needed to enter the common areas and the Premises. Duplicate copies of the access provided may only be authorized under the consent of the Landlord and, if any

Page 2

replacements are needed, the Landlord may provide them for a fee. At the end of this Agreement all access provided to the Tenant(s) shall be returned to the Landlord or a fee will be charged to the Tenant(s) or the fee will be subtracted from the Security Deposit.

**MOVE-IN INSPECTION**: Before, at the time of the Tenant(s) accepting possession, or shortly thereafter, the Landlord and Tenant(s) shall perform an inspection documenting the present condition of all appliances, fixtures, furniture, and any existing damage within the Premises.

**SUBLETTING**: The Tenant(s) shall not have the right to sub-let the Premises or any part thereof without the prior written consent of the Landlord. If consent is granted by the Landlord, the Tenant(s) will be responsible for all actions and liabilities of the Sublessee including but not limited to: damage to the Premises, non-payment of rent, and any eviction process (In the event of an eviction the Tenant(s) shall be responsible for all court filing fee(s), representation, and any other fee(s) associated with removing the Sublessee). The consent by the Landlord to one sub-let shall not be deemed to be consent to any subsequent subletting.

**ABANDONMENT**: If the Tenant(s) vacates or abandons the property for a time-period that is the minimum set by State law or seven (7) days, whichever is less, the Landlord shall have the right to terminate this Agreement immediately and remove all belongings including any personal property off of the Premises. If the Tenant(s) vacates or abandons the property, the Landlord shall immediately have the right to terminate this Agreement.

**ASSIGNMENT**: Tenant(s) shall not assign this Lease without the prior written consent of the Landlord. The consent by the Landlord to one assignment shall not be deemed to be consent to any subsequent assignment.

**PARKING**: The Landlord shall provide the Tenant(s) 2 Parking Spaces.

The Landlord shall not charge a fee for the 2 Parking Spaces.

**RIGHT OF ENTRY**: The Landlord shall have the right to enter the Premises during normal working hours by providing notice in accordance with the minimum State requirement in order for inspection, make necessary repairs, alterations or improvements, to supply services as agreed or for any reasonable purpose. The Landlord may exhibit the Premises to prospective purchasers, mortgagees, or lessees upon reasonable notice.

**SALE OF PROPERTY**: If the Premises is sold, the Tenant(s) is to be notified of the new Owner, and if there is a new Manager, their contact details for repairs and maintenance shall be forwarded. If the Premises is conveyed to another party, the new owner shall not have the right to terminate this Agreement and it shall continue under the terms and conditions agreed upon by the Landlord and Tenant(s).

**UTILITIES**: The Landlord shall not pay for any of the utilities and services and will be the responsibility of the Tenant(s).

**MAINTENANCE, REPAIRS, OR ALTERATIONS**: The Tenant(s) shall, at their own expense and at all times, maintain premises in a clean and sanitary manner, and shall surrender the same at termination hereof, in as good condition as received, normal wear and tear excepted. The Tenant(s) may not make any alterations to the leased premises without the consent in writing of the Landlord. The Landlord shall be responsible for repairs to the interior and exterior of the building. If the Premises includes a washer, dryer, freezer, dehumidifier unit and/or air conditioning unit, the Landlord makes no warranty as to the repair or replacement of units if one or all shall fail to

operate. The Landlord will place fresh batteries in all battery-operated smoke detectors when the Tenant(s) moves into the premises. After the initial placement of the fresh batteries it is the responsibility of the Tenant(s) to replace batteries when needed. A monthly "cursory" inspection may be required for all fire extinguishers to make sure they are fully charged.

**EARLY TERMINATION**: The Tenant(s) may be allowed to cancel this Agreement under the following conditions:
The Tenant(s) must provide at least 30 days' notice. During the notice period of 30 days the rent shall be paid in accordance with this Agreement.

**PETS**: The Tenant(s) shall not be allowed to have pets on the Premises or common areas except those that are necessary for individuals with disabilities.

**NOISE/WASTE**: The Tenant(s) agrees not to commit waste on the premises, maintain, or permit to be maintained, a nuisance thereon, or use, or permit the premises to be used, in an unlawful manner. The Tenant(s) further agrees to abide by any and all local, county, and State noise ordinances.

**GUESTS**: There shall be no other persons living on the Premises other than the Tenant(s) and any Occupant(s). Guests of the Tenant(s) are allowed for periods not lasting for more than forty-eight hours unless otherwise approved by the Landlord.

**SMOKING POLICY**: Smoking on the Premises is prohibited on the entire property, including individual units, common areas, every building and adjoining properties.

**COMPLIANCE WITH LAW**: The Tenant(s) agrees that during the term of the Agreement, to promptly comply with any present and future laws, ordinances, orders, rules, regulations, and requirements of the Federal, State, County, City, and Municipal government or any of their departments, bureaus, boards, commissions and officials thereof with respect to the premises, or the use or occupancy thereof, whether said compliance shall be ordered or directed to or against the Tenant(s), the Landlord, or both.

**DEFAULT**: If the Tenant(s) fails to comply with any of the financial or material provisions of this Agreement, or of any present rules and regulations or any that may be hereafter prescribed by the Landlord, or materially fails to comply with any duties imposed on the Tenant(s) by statute or State laws, within the time period after delivery of written notice by the Landlord specifying the non-compliance and indicating the intention of the Landlord to terminate the Agreement by reason thereof, the Landlord may terminate this Agreement. If the Tenant(s) fails to pay rent when due and the default continues for the time-period specified in the written notice thereafter, the Landlord may, at their option, declare the entire balance (compiling all months applicable to this Agreement) of rent payable hereunder to be immediately due and payable and may exercise any and all rights and remedies available to the Landlord at law or in equity and may immediately terminate this Agreement.

The Tenant(s) will be in default if: (a) Tenant(s) does not pay rent or other amounts that are owed in accordance with respective State laws; (b) Tenant(s), their guests, or the Occupant(s) violate this Agreement, rules, or fire, safety, health, or criminal laws, regardless of whether arrest or conviction occurs; (c) Tenant(s) abandons the Premises; (d) Tenant(s) gives incorrect or false information in the rental application; (e) Tenant(s), or any Occupant(s) is arrested, convicted, or given deferred adjudication for a criminal offense involving actual or potential physical harm to a person, or involving possession, manufacture, or delivery of a controlled substance, marijuana, or drug paraphernalia under state statute; (f) any illegal drugs or paraphernalia are found in the Premises or

on the person of the Tenant(s), guests, or Occupant(s) while on the Premises and/or; (g) as otherwise allowed by law.

**MULTIPLE TENANT(S) OR OCCUPANT(S)**: Each individual that is considered a Tenant(s) is jointly and individually liable for all of this Agreement's obligations, including but not limited to rent monies. If any Tenant(s), guest, or Occupant(s) violates this Agreement, the Tenant(s) is considered to have violated this Agreement. Landlord's requests and notices to the Tenant(s) or any of the Occupant(s) of legal age constitutes notice to the Tenant(s). Notices and requests from the Tenant(s) or any one of the Occupant(s) (including repair requests and entry permissions) constitutes notice from the Tenant(s). In eviction suits, the Tenant(s) is considered the agent of the Premise for the service of process.

**DISPUTES**: If a dispute arises during or after the term of this Agreement between the Landlord and Tenant(s), they shall agree to hold negotiations amongst themselves, in "good faith", before any litigation.

**SEVERABILITY**: If any provision of this Agreement or the application thereof shall, for any reason and to any extent, be invalid or unenforceable, neither the remainder of this Agreement nor the application of the provision to other persons, entities or circumstances shall be affected thereby, but instead shall be enforced to the maximum extent permitted by law.

**SURRENDER OF PREMISES**: The Tenant(s) has surrendered the Premises when (a) the move-out date has passed and no one is living in the Premise within the Landlord's reasonable judgment; or (b) Access to the Premise have been turned in to Landlord – whichever comes first. Upon the expiration of the term hereof, the Tenant(s) shall surrender the Premise in better or equal condition as it were at the commencement of this Agreement, reasonable use, wear and tear thereof, and damages by the elements excepted.

**RETALIATION**: The Landlord is prohibited from making any type of retaliatory acts against the Tenant(s) including but not limited to restricting access to the Premises, decreasing or cancelling services or utilities, failure to repair appliances or fixtures, or any other type of act that could be considered unjustified.

**WAIVER**: A Waiver by the Landlord for a breach of any covenant or duty by the Tenant(s), under this Agreement is not a waiver for a breach of any other covenant or duty by the Tenant(s), or of any subsequent breach of the same covenant or duty. No provision of this Agreement shall be considered waived unless such a waiver shall be expressed in writing as a formal amendment to this Agreement and executed by the Tenant(s) and Landlord.

**EQUAL HOUSING**: If the Tenant(s) possess(es) any mental or physical impairment, the Landlord shall provide reasonable modifications to the Premises unless the modifications would be too difficult or expensive for the Landlord to provide. Any impairment of the Tenant(s) is/are encouraged to be provided and presented to the Landlord in writing in order to seek the most appropriate route for providing the modifications to the Premises.

**HAZARDOUS MATERIALS**: The Tenant(s) agrees to not possess any type of personal property that could be considered a fire hazard such as a substance having flammable or explosive characteristics on the Premises. Items that are prohibited to be brought into the Premises, other than for everyday cooking or the need of an appliance, includes but is not limited to gas (compressed), gasoline, fuel, propane, kerosene, motor oil, fireworks, or any other related content in the form of a liquid, solid, or gas.

**WATERBEDS**: The Tenant(s) is not permitted to furnish the Premises with waterbeds.

**INDEMNIFICATION**: The Landlord shall not be liable for any damage or injury to the Tenant(s), or any other person, or to any property, occurring on the Premises, or any part thereof, or in common areas thereof, and the Tenant(s) agrees to hold the Landlord harmless from any claims or damages unless caused solely by the Landlord's negligence. It is recommended that renter's insurance be purchased at the Tenant(s)'s expense.

**COVENANTS**: The covenants and conditions herein contained shall apply to and bind the heirs, legal representatives, and assigns of the parties hereto, and all covenants are to be construed as conditions of this Agreement.

**NOTICES**: Any notice to be sent by the Landlord or the Tenant(s) to each other shall use the following mailing addresses:

**Landlord's/Agent's Mailing Address**

Bassem Elmallakh
525 Broadway, Santa Monica, California, 90401

**Tenant(s)'s Mailing Address**

Reem Hanna
116 Rockefeller , Irvine, California, 92612

**AGENT/MANAGER**: The Landlord does not have an Agent or Manager and all contact in regards to any repair, maintenance, or complaint must go through the Landlord through the following contact information:

Landlord's Phone Number: (949) 413-7074 Email: bassemelmallakh@gmail.com.

**PREMISES DEEMED UNINHABITABLE**: If the Property is deemed uninhabitable due to damage beyond reasonable repair the Tenant(s) will be able to terminate this Agreement by written notice to the Landlord. If said damage was due to the negligence of the Tenant(s), the Tenant(s) shall be liable to the Landlord for all repairs and for the loss of income due to restoring the Premises back to a livable condition in addition to any other losses that can be proved by the Landlord.

**ACCESS BY LANDLORD**: The Landlord must grant at least twenty-four (24) hours notice to the Tenant(s) prior to entry for maintenance or any non-emergency reason. For any move-out inspection forty-eight (48) hours notice by Landlord shall be required.

**BED BUGS**: The Landlord acknowledges that there is no existence of bed bugs on the Premises. In addition, there shall be an addendum attached to this agreement that certifies the Tenant(s) have inspected the Premises and any existing furniture and confirm that bed bugs do not exist on the Premises.

**MEGAN'S LAW**: Notice: Pursuant to Section 290.46 of the Penal Code, information about specified registered sex offenders is made available to the public via an Internet Web site maintained by the Department of Justice at www.meganslaw.ca.gov. Depending on an offender's criminal history, this information will include either the address at which the offender resides or the community of residence and ZIP Code in which he or she resides.

**SERVICEMEMBERS CIVIL RELIEF ACT:** In the event the Tenant(s) is or hereafter becomes, a member of the United States Armed Forces on extended active duty and hereafter the Tenant(s) receives permanent change of station (PCS) orders to depart from the area where the Premises are located, or is relieved from active duty, retires or separates from the military, is ordered into military housing, or receives deployment orders, then in any of these events, the Tenant may terminate this lease upon giving thirty (30) days written notice to the Landlord. The Tenant shall also provide to the Landlord a copy of the official orders or a letter signed by the Tenant's commanding officer, reflecting the change which warrants termination under this clause. The Tenant will pay prorated rent for any days which he/she occupies the dwelling past the beginning of the rental period.

The damage/security deposit will be promptly returned to Tenant, provided there are no damages to the Premises.

**LEAD PAINT:** The Premises was not constructed before 1978 and therefore does not contain lead-based paint.

**GOVERNING LAW:** This Agreement is to be governed under the laws located in the State of California.

**ADDITIONAL TERMS AND CONDITIONS:** There are no further terms or conditions that will be added to this Agreement other than any attachments or addendums attached.

**ENTIRE AGREEMENT:** This Agreement contains all the terms agreed to by the parties relating to its subject matter including any attachments or addendums. This Agreement replaces all previous discussions, understandings, and oral agreements. The Landlord and Tenant(s) agree to the terms and conditions and shall be bound until the end of the Lease Term.

The parties have agreed and executed this agreement on January 1 2017.

**LANDLORD(S) SIGNATURE**

**Landlord's Signature** _____
By Bassem ElMallakh

**TENANT(S) SIGNATURE**

**Tenant's Signature** _____

Page 7

# CREDITOR

# EXHIBIT

# 3

EXHIBIT 3



**DEPO**

**1**

```
                IN THE CIRCUIT COURT OF THE
              11TH JUDICIAL CIRCUIT IN AND FOR
                 MIAMI-DADE COUNTY, FLORIDA

                  CASE NO.: 18-28145 CA


BELGIUM INVESTMENTS 960 BAY DR, LLC,
A CALIFORNIA LLC, ET AL.,

     Plaintiff,

     -vs-

SPENCER BLANK, ET AL.,

     Defendant.
_____/


              Deposition Taken via Zoom

               4:40 p.m. to 6:01 p.m.


                   DEPOSITION OF

                 BASSEM EL MALLAKH


     Taken before Erica Hylton, Court Reporter, a

Notary Public for the State of Florida at Large,

pursuant to Notice of Taking Deposition Duces Tecum

filed in the above-styled cause.
```

EXHIBIT 5

2

```
 1                    APPEARANCES:

 2        On Behalf of the Plaintiff:

 3        BERNHARD LAW FIRM PLLC

 4        BY: ANDREW BERNHARD

 5        333 SE 2nd Avenue, Suite 2000

 6        Miami, Florida 33131

 7        (786) 871-3349

 8        abernhard@bernhardlawfirm.com

 9

10        On Behalf of the Defendant:

11        SOUTH FLORIDA LAW, PLLC

12        BY:  FRANK DELLORUSSO, ESQUIRE

13        1920 East Hallandale Beach Boulevard

14        Suite 702

15        Hallandale, Florida 33009

16

17

18

19

20

21

22

23

24

25
```

# EXHIBIT 5

3

1                              INDEX

2       TESTIMONY OF BASSEM EL MALLAKH          PAGE

3       Examination by Mr. Bernhard             5

4       Examination by Mr. DelloRusso           61

5       Certificate of Oath                     68

6       Certificate of Reporter                 69

7

8                       INDEX OF EXHIBITS

9                 DEFENDANT'S EXHIBITS MARKED

10      NUMBER          DESCRIPTION             PAGE

11      Exhibit 6       39-page document        20

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 5

4

1          MR. BERNHARD:  I can see, Bassem, that you're now

2     where Reem was previously sitting.  We're invoking

3     the rule, which means that I don't want the other

4     witness' testimony to be modified by what you have

5     to say.  Can you confirm that Reem is not in the

6     room with you and not listening to your testimony?

7          MR. EL MALLAKH:  Yes.  She is not.  We just

8     switched rooms.  She went upstairs, and I came

9     downstairs.

10          MR. BERNHARD:  Okay.  I appreciate that.

11     Thank you.  And we're all just going to rely in

12     good faith that you're going to adhere to that,

13     right?

14          MR. EL MALLAKH:  Uh-huh (affirmative).

15          MR. BERNHARD:  Okay.

16  THEREUPON:

17                    BASSEM EL MALLAKH,

18          was examined and testified as follows:

19                    DIRECT EXAMINATION

20  BY MR. BERNHARD:

21     Q.   So as I'm sure you've already heard, my name

22  is Andrew.  I'm taking your deposition.  You've seen how

23  it worked with Reem.  But I'll just go over the ground

24  rules really fast with you.  Have you ever had your

25  deposition taken before?

# EXHIBIT 5

1      A.   Yes, I have.

2      Q.   Okay.  When was that?

3      A.   Back in 2013, 2014.

4      Q.   Okay.  What were the circumstances?

5      A.   Oh.  One in like 2010 too like for some

6  accident in the street that I had to like go and be the

7  deposed for for some stranger, you know.

8      Q.   Okay.  So deposition 2010 for an accident you

9  witnessed, and a deposition in 2013 and 2014.  What was

10 that for?

11     A.   I had a lawsuit.  The previous company that I

12 worked for were suing me.  And then I won that lawsuit.

13     Q.   Okay.  Where was that lawsuit?

14     A.   It was in Irvine, California.

15     Q.   Okay.  And -- and what was the name of the

16 company suing you?

17     A.   It was Global Premier Development.

18     Q.   Global Premier Development?

19     A.   Uh-huh (affirmative).

20     Q.   Okay.  And what were they suing you for?

21     A.   They were suing me for -- they thought that I

22 took clients from their company and used them to benefit

23 my own new business, but then it was all incorrect; and

24 you know, that was -- that was settled.

25     Q.   So was it settled or did you win?

# EXHIBIT 5

6

1      A.   I won, actually.  I won.  I won at -- at the

2   actual court on the hearing date.  Their attorneys, you

3   know, said, "Hey" -- they told the judge, "We're going

4   to go ahead and -- and -- and remove the -- the -- the

5   lawsuit, you know, the claim, and -- and just settle."

6      Q.   Okay.  So I just -- you know, forgive me

7   because I might just have a different understanding of

8   -- of the difference between won and settled.  What do

9   you mean when you say you won?

10     A.   So basically they -- they -- they couldn't

11  produce any documents that shows that I really took any

12  clients from them.

13     Q.   Okay.  Did you have an adjudication by a judge

14  that said that the other side lost and you won?

15     A.   No.  Right when the hearing started, the

16  lawyer -- the plaintiff lawyer told the judge that we

17  are going to go ahead and -- and decline the -- the

18  lawsuit.

19     Q.   Okay.  So for the record, you settled the case

20  before there was an adjudication; is that right?

21     A.   Yeah.

22     Q.   Okay.  And did you enter into like a

23  settlement agreement?  Without telling me the contents,

24  did you enter into a settlement agreement?

25     A.   Yeah.  We had a settlement agreement.

# EXHIBIT 5

1    Q.   Okay.  And so the -- the court there never made a

2  final determination as to who won or who lost; instead,

3  you just settled the case?

4    A.   I'm not sure.  I'm not sure how it worked

5  after.  I just know that, you know, we signed the

6  settlement agreement.

7    Q.   Okay.  Was that -- you said that was right

8  before things were going to be produced to the judge; is

9  that right?

10    A.   Yeah.  They didn't have any documents to -- to

11  show or prove that I really did take any of their

12  clients.

13    Q.   Okay.  And when did that case settle out?

14    A.   Sometime in 2014, I believe.

15    Q.   Okay.  And that was *Global Premier Development

16  versus Bassem El Mallakh*.  Is that the name of it?

17    A.   That -- my name is -- I have -- I grew up in

18  Egypt, and in Egypt you actually have to have four

19  names.  So my name on my ID is my first name, my dad's

20  name, my grandfather's name, and then my last name.  So

21  my name is Bassem Essam Victor El Mallakh.

22    Q.   Okay.  So in that -- your first name is

23  Bassem; your last name is El Mallakh; and your middle

24  names are Essam and Victor.

25    A.   You can call it middle name, but it's actually

# EXHIBIT 5

1  technically my dad's name, and Victor is my grandfather's

2  name.

3       Q.   Okay.

4       A.   It's a different system in Egypt.

5       Q.   Is everybody's last name -- for your

6  grandfather, your father, and you, is everybody's last

7  name El Mallakh.

8       A.   Usually the last name, it could be like -- you

9  know, it could be 20 generations back.  It could be like

10 your great, great, great grandfather, you know.  So some

11 people just use a short of, obviously, first dad's,

12 grandfather, and then the last name it could be your

13 fourth grandfather, it could be 20, you know,

14 grandfather's back.

15      Q.   Okay.  My question was just whether you, your

16 father, your grandfather all use the last name El

17 Mallakh.

18      A.   Yes.  We all use the same last name, El

19 Mallakh.

20      Q.   Okay.  Now, so that case, the 2013 case --

21 2014 case in Irvine was *Global Premier Development*

22 *versus Bassem Essam Victor El Mallakh*?

23      A.   Yes.

24      Q.   Okay.

25      A.   And also, you know, a few LLCs.

# EXHIBIT 5

1    Q.    And a few LLCs.  Any LLCs from this case?

2    A.    Yeah.  Actually, it was this -- this LLC as

3   well.

4    Q.    Which LLC?

5    A.    Belgium Investments 960 Bay Drive LLC.

6    Q.    Okay.  And was that -- was Belgium Investments

7   a plaintiff, a defendant?

8    A.    Defendant.

9    Q.    And do you know whether Jean Claude Reusche

10   (phonetic) was involved in that case?

11    A.    They sued the LLCs -- they sued all the LLCs,

12   so Jean Claude Reusche is actually the -- the larger

13   partner in that LLC.  So I basically, obviously, had to

14   defend everybody and -- and defend the case.  I don't

15   want -- I don't want the company to sue my partners.

16    Q.    Okay.  So the question was: was Jean Claude

17   Reusche involved in that case?

18    A.    He was not.

19    Q.    Okay.  Did you notify Jean Claude Reusche of

20   that lawsuit?

21    A.    I notified my other partner about it, and I

22   told him, you know, "We're getting sued, and it could --

23   I don't think it's a big matter.  It could finish in a

24   month.  It could finish in two.  I'll let you when it's

25   settled."  And, you know, it was not -- I guess it was

EXHIBIT 5

```
 1  not like some big deal that I thought it was going to, you

 2  know, take some time.

 3       Q.   Okay.  Who is your other partner?

 4       A.   His name is Bernard Petite (phonetic).

 5       Q.   Okay.  So you notified Bernard Petite.  Did

 6  you notify Jean Claude Reusche?

 7       A.   Yeah.  I notified, but not -- because Bernard

 8  was my partner in the B. B. Global Investment Partners.

 9       Q.   But --

10       A.   Jean Claude was not part of that.  Basically,

11  it's the general managing partner of the LLCs, and 950

12  Bay Drive is one of them.

13       Q.   Did you notify Jean Claude Reusche is my

14  question.

15       A.   I did not.

16       Q.   And do you recall when that lawsuit began?

17       A.   I believe early 2014.

18       Q.   Do you believe it also settled in 2014?

19       A.   I believe what you said?

20       Q.   Do you think it settled also in 2014?

21       A.   Oh, yeah.  It is -- it is -- it is settled in

22  -- either in late 2014 or early 2015.  I don't know the

23  exact dates.

24       Q.   Okay.  And you said that you sat for

25  deposition in that case?
```

EXHIBIT 5

1    A.    Yes, I did.

2    Q.    Okay.  And any reason specifically that you

3  did not notify Jean Claude Reusche of that lawsuit?

4    A.    I just didn't think it was -- again, I just --

5  you know, know it's like, you know, I was -- I'm the

6  manager of the LLCs, so then I obviously have to take,

7  you know, the -- the managerial decisions when it comes

8  to anything related to the business, and I didn't think

9  -- it's like, you know, you can have an apartment

10  building and someone fall and break their leg, and then

11  they go and sue the LLC.  I have to be the one

12  responding.  I don't have to bother my silent partners

13  with any of the -- you know, these issues, especially

14  that I didn't think it was a big issue.

15         MR. DELLORUSSO:  Andrew, I'm being quiet here,

16      but I'm going to start instructing my client not to

17      answer if you don't stop getting -- you know, start

18      getting to the scope of the order.

19         MR. BERNHARD:  Sure.  Well, you know, in a

20      deposition, a person's previous experience in a

21      deposition is unquestionably within the scope of

22      their experience to a deposition.  It's standard

23      question.  Every single deposition I've ever sat in

24      is what depos have you sat through before and what

25      happened in them, so we have an understanding of

EXHIBIT 5

1        his comfort level and his experience with those

2        depositions.  So I'm literally just going off of

3        what your client's saying, right.

4              MR. DELLORUSSO:  Okay.

5              MR. BERNHARD:  Okay.

6              MR. DELLORUSSO:  Keep going.

7    BY MR. BERNHARD:

8        Q.   And at that time, 2014, your understanding was

9    that Jean Claude Reusche was the majority owner of

10   Belgium Investments, correct?

11       A.   Yes.  Uh-huh (affirmative).  Yes.

12       Q.   So there is the 2013, 2014 lawsuit you just

13   talked about against you and Belgium Investments in

14   Irvine by Global Premier Development.  There is a 2010

15   accident in which you were just a witness and were not a

16   party; is that right?

17       A.   Yeah.  It was -- I was driving to work in the

18   morning, and then I literally saw like a car almost kind

19   of flying; and then it hit the car in front of me.  And

20   then I got out of the car, and then I started to help

21   the person that was in the car, you know, just to kind

22   of get him out of the car and whatnot.

23              And then when the -- when the cops came to --

24   to report it, you know, they took my information, and

25   then I was later deposed to give my witness deposition,

# EXHIBIT 5

```
 1  you know, tell them exactly what happened with that case --

 2       Q.   Okay.

 3       A.   -- when they asked.

 4       Q.   Any other time you sat for a deposition?

 5       A.   No.  That was it.

 6       Q.   Okay.  Have you ever witnessed any other

 7  deposition besides those two and --

 8       A.   No.

 9       Q.   -- the one for Ms. Hanna here today?

10       A.   No.

11       Q.   Okay.  So as you've seen now, your experience

12  and with Reem, I ask you questions; you give the

13  answers, and the court reporter writes everything down,

14  right.

15       A.   Absolutely.

16       Q.   Okay.  So like I said with Reem, I need you to

17  give oral answers because the court reporter can't write

18  down shrugs, uh-huhs, nods, anything like that, okay.

19  Can you give full verbal answers?

20       A.   Absolutely.

21       Q.   Okay.  If I don't state any question very

22  well, you don't understand what I say, just let us know.

23  I want to make sure you fully understand the question

24  before you answer, okay.

25       A.   I will ask you to repeat if I didn't hear you
```

EXHIBIT 5

1  well.

2      Q.   Perfect.  And if you don't understand it, ask

3  me to clarify.  My job is to -- is to make sure you get

4  what I'm asking, all right.

5      A.   Correct.

6      Q.   All right.  I want to make sure that whatever

7  you're telling us is the most accurate, exact, and

8  truthful answer you can provide, okay.

9      A.   I will do my absolute best.

10     Q.   Awesome.  If you want to take a break at any

11  time, just let us know.  I just ask you finish your

12  answer, and we'll take a break, all right.

13     A.   Will do.  I'll let you know if I need a break.

14     Q.   If at any time you are answering a question

15  and you realize that something you said before needs to

16  be clarified, elaborated on, modified in any way, please

17  let us know right then, all right.

18     A.   Sure.  I will.

19     Q.   I want to make sure that whatever answer

20  you're giving, they're your fullest, most honest,

21  exactly what you want to say for your deposition, all

22  right.

23     A.   I will.

24     Q.   If any time you think of any documents that

25  might help you, let me and your attorney know.  We might

EXHIBIT 5

1 | be able to find them and help you with your answers, all

2 | right.

3 |      A.   I will share them on my screen.

4 |      Q.   Okay.  The next questions are formalities that

5 | make sure that you're competent to testify today.

6 | First, are you taking any medication or drugs of any

7 | kind that might make it difficult for you to understand

8 | and answer my questions honestly and accurately today?

9 |      A.   I'm not taking any drugs.

10 |      Q.   Okay.  Have you had any -- anything alcoholic

11 | to drink in the last eight hours?

12 |      A.   I have not.

13 |      Q.   Are you sick at all today?

14 |      A.   I am not.

15 |      Q.   Are you currently under a doctor's care for

16 | any illness?

17 |      A.   I am not.  I just have a sore throat that just

18 | happened like three, four days ago.

19 |      Q.   Okay.

20 |      A.   It's in my left tonsil.

21 |      Q.   Will that sore throat in any way affect your

22 | ability to understand my questions and answer truthfully

23 | and honestly today?

24 |      A.   No.  It wouldn't affect my -- my answer or --

25 | I mean, understanding the question, but if -- if my

EXHIBIT 5

1    voice started getting a little rusty, I'm going to have some

2    water.

3         Q.   Okay.  Perfect.

4              Have you ever been arrested or convicted for

5    any acts of fraud or other crimes involving deceit?

6         A.   I have not.

7         Q.   Have you ever been accused in court of any

8    acts of fraud or other acts of deceit?

9         A.   I have not.

10        Q.   Okay.  Have you ever been sued for any act of

11   fraud, misrepresentation, or deceit?

12        A.   I have not.  No.  I have not.

13        Q.   To your knowledge, have you been sued for that

14   by Belgium Investments in this lawsuit today?

15        A.   I have -- I don't know anything about the

16   lawsuit of Belgium Investments.

17        Q.   You don't know anything about it whatsoever.

18        A.   Not -- I never received anything.  I guess

19   they were trying to serve me in the address that I don't

20   -- I don't live in anymore.

21        Q.   Is there any reason you can think of why you

22   would not be able to answer my questions fully and

23   truthfully today?

24        A.   No.  There's no reason.

25        Q.   And you understand you're speaking under

EXHIBIT 5

1  penalty of perjury; is that right?

2      A.   Yes.

3      Q.   And that means that you're sworn to tell the

4  truth, the whole truth, nothing but the truth, and that

5  your failure to do so may be held as perjury; you

6  understand?

7      A.   Yes.

8      Q.   Okay.  And you understand that perjury is a

9  third degree felony under Florida statutes 837.02 and

10 92.525 punishable by prison and a fine?

11     A.   Yes.

12     Q.   And you agree to be sworn in and bound by

13 Florida notary; is that correct?

14     A.   I was sworn by a California notary.

15     Q.   Okay.

16         MR. BERNHARD:  Madam Court Reporter, are you a

17     California notary or a Florida notary?

18         THE REPORTER:  Florida.

19         THE WITNESS:  (Audio distortion)

20 BY MR. BERNHARD:

21     Q.   Okay.  So do you understand you've been sworn

22 in by a Florida notary, Bassem?

23     A.   Okay.  I did.  I wasn't sure if the -- the

24 court reporter was in California or in Florida.

25     Q.   Now do you understand that the court reporter

EXHIBIT 5

1    is in Florida and has sworn you in in Florida?

2        A.   Yes.

3        Q.   Do you agree to be bound by your oath and the

4    penalty of perjury in California the same?

5        A.   Yes.

6        Q.   Okay.  Now, I understood -- just again, for

7    clarity of the record since now you're under oath --

8    that you are at Reem's house at 116 Rockefeller, but

9    that you have assured she outside of the room and is not

10   listening to your testimony; is that correct?

11       A.   Yes.

12       Q.   Okay.  And have you prepared to speak or to

13   give your deposition at all today?

14       A.   I did last night.

15       Q.   Okay.  What did you do to prepare?

16       A.   I got an email from my counsel with all the

17   exhibits.  I just put them all together.

18       Q.   Okay.

19            MR. DELLORUSSO:  I just want to object.

20       Anything that we spoke about is attorney-client

21       privilege, but you may let him know about any

22       preparations you've done.

23            THE WITNESS:  Okay.

24   BY MR. BERNHARD:

25       Q.   Okay.  And that's for sure, Bassem.  I want to

# EXHIBIT 5

19

1  make sure, anything you talk about directly with your

2  attorney is entirely confidential, and I don't want you

3  to tell us about it.  If you feel like you're coming

4  upon a moment where you might divulge something that you

5  communicated confidentially to your attorney, please

6  stop yourself, consult with your attorney.  Do not tell

7  us, okay.

8      A.   Sure.  Andrew, can you speak up a bit?  I'm

9  noticing you're not sometimes -- I don't know if it's my

10 computer.  I'm not -- the volume is not as loud.  Let me

11 put the volume a little bit louder.

12     Q.   Sure.

13     A.   I'm going to try that.  Okay.  I think this is

14 better.  Go ahead.

15     Q.   So did you hear what I said about not telling

16 us about your --

17     A.   Yes.

18     Q.   -- confidential communications?  Okay.  Good.

19     A.   Yes.

20     Q.   Make sure you don't do that.  I want to make

21 sure you maintain your privilege.

22     A.   Yes.

23     Q.   Okay.  And the documents that you said you put

24 together, are those the ones that you submitted to your

25 attorney?

# EXHIBIT 5

20

1        A.   Yes.

2             MR. BERNHARD:  And, Frank, are those the ones

3    that you submitted to me?

4             MR. DELLORUSSO:  Correct.

5             MR. BERNHARD:  Okay.  We'll mark those as

6    Exhibit -- Madam Court Reporter, what number are we on?

7             THE REPORTER:  We were on 5.

8             MR. BERNHARD:  5?

9             THE REPORTER:  Well, I think in the last when

10   we were still talking to her, Frank had marked it as 5,

11   so.

12            MR. BERNHARD:  Okay.  So then we'll call this

13   Exhibit 6, which I'll send to you with the other

14   documents submitted by your attorney.  We'll pull those

15   up, make sure we're looking at the same thing, okay.

16   Let me share my screen right now.  And are we all

17   looking at this thing that says at the top left,

18   "Michael Sayer State Bar Number 141038"?

19            THE WITNESS:  Yes.

20            MR. BERNHARD:  Okay.

21            (Deposition Exhibit 6 marked)

22   BY MR. BERNHARD:

23        Q.   I've got here a 39-page series of documents.

24   Is this the 39-page set of documents that you gave to

25   your attorney?

# EXHIBIT 5

1    A.   Yes.

2    Q.   Okay.  Great.  Okay.

3         Okay.  So I understood your full name is

4  Bassem Essam Victor El Mallakh; is that right?

5    A.   Yeah.  I attached my ID in the exhibits, and I

6  do have a -- the hardcopy of my ID if you guys want to

7  maybe zoom in and see it.

8    Q.   I got it with the exhibit, so I think it's

9  there.

10   A.   Oh, perfect.

11   Q.   Okay.

12        MR. DELLORUSSO:  You can share the screen if

13      you want, just to make it clearer for me.

14        THE WITNESS:  Okay.

15        MR. BERNHARD:  I got it.  We have it.

16        THE WITNESS:  Oh.  You got it?  Okay.  Yeah.

17  BY MR. BERNHARD:

18   Q.   Do you ever go by any other name or alias?

19   A.   I go by either Bassem Essam or Bassem El

20  Mallakh or Bassem Victor, really, you know, just --

21   Q.   Why do you do that?

22   A.   Huh?

23   Q.   Why do you do that?

24   A.   I don't know.  I mean, these are my names.

25   Q.   Well, sure.  I've got lots of names, but in

# EXHIBIT 5

1  the United States, we have a legal last name and a legal

2  first name; and we're legally not supposed to

3  interchange them with other names.  So I'm trying to

4  understand why you might do that, if you do.

5      A.   I mean, it's just like I can go to the bank

6  and try to open an account, and then they can write my

7  name on the bank card as Bassem El Mallakh; another bank

8  they can write it as Bassem Essam.  Using at an

9  apartment, they can write it as Bassem Victor.  It's

10 just -- I don't really pick it.  Whoever -- it's like my

11 AT&T bill, they put it as Bassem El Mallakh, but based

12 on my internet, they had it as Bassem Victor.  It's just

13 -- I don't even pick it.  They just -- when I show them

14 my ID, they are the ones that are inputting the

15 information.

16      But usually when anybody ask me, I just say

17 Bassem El Mallakh.

18     Q.   Okay.  When somebody writes down your middle

19 name as your last name, you don't correct them?

20     A.   I mean, it is my name, same as like when I

21 lived in Egypt.  I would just use, you know, any -- any

22 of these names.  These are all your names on -- on my

23 birth certificate.

24      MR. BERNHARD:  Motion to strike as

25      nonresponsive.

# EXHIBIT 5

23

```
 1   BY MR. BERNHARD:
 2       Q.   And you've already testified that your last
 3   name is El Mallakh, correct?
 4       A.   Yes.
 5       Q.   Okay.  That's your last name, correct?
 6       A.   That is my last name.
 7       Q.   You understand that in the United States of
 8   America, when somebody asks you what your last name is,
 9   that's what they're referring to?
10       A.   Yes.
11       Q.   Okay.  And you've testified that your first
12   name is Bassem; is that right?
13       A.   Yes.
14       Q.   You understand that in the United States of
15   America, when somebody asks your first name, that's what
16   they're referring to, correct?
17       A.   Yes.
18       Q.   Okay.
19       A.   Bassem is my first name.
20       Q.   And you understand that in -- under United
21   States standards, Essam and Victor would be considered
22   middle names; is that right?
23       A.   They -- they could be considered here middle
24   names, but I -- in my country they're not considered
25   middle names.
```

EXHIBIT 5

1      Q.   Right.  My question is only if you understand that

2   in the United States of America those are considered

3   middle names, Bassem Essam -- or I'm sorry, Essam

4   Victor.

5      A.   Yes.

6      Q.   Okay.  So when somebody in the United States

7   of America puts your middle name as your last name, do

8   you correct them?

9           MR. DELLORUSSO:  Objection.  You can answer.

10          THE WITNESS:  Yeah.  I sure.  I can correct

11       them if they do that.

12   BY MR. BERNHARD:

13      Q.   Do you do that regularly, or do you just let

14   people use your middle name as your last name?

15          MR. DELLORUSSO:  Objection.

16          THE WITNESS:  I don't -- I don't do that

17       regularly, no, because it -- it doesn't really

18       happen to me often at all.

19   BY MR. BERNHARD:

20      Q.   Okay.  I thought you were just describing that

21   that did happen to you rather frequently with different

22   things that you do.  Is that not true anymore?

23      A.   No.  I'm saying when I would go to sign up for

24   any type of billing or any type of a subscription, I

25   just put my name, and then whoever, how they insert it

# EXHIBIT 5

25

1  in their system, I don't really -- I don't really care, you

2  know.  That doesn't change the fact that this is my

3  name.

4       Q.   Okay.  But whenever you fill out forms, you

5  put your first name as Bassem as your last name as El

6  Mallakh.

7       A.   Yes.

8       Q.   Okay.  And you say you're currently located

9  116 Rockefeller but you reside somewhere else; is that

10 right?

11      A.   Yes.

12      Q.   Okay.  Where do you reside?

13      A.   I live in Santa Monica.

14      Q.   Okay.  What address?

15      A.   525 Broadway.

16      Q.   How long have you resided there?

17      A.   Since November 1st of 2016.

18      Q.   And do you essentially sleep every night there

19 in 525 Broadway in Santa Monica?

20      A.   Yes.

21      Q.   Do you regularly take vacations or trips that

22 would have you not sleeping at that property?

23      A.   Yeah.  I do usually take some vacations.

24      Q.   Okay.  How frequently do you vacation?

25      A.   Probably like maybe three or four times a

# EXHIBIT 5

1  year.

2      Q.   Okay.  Those vacations, are they long, short,

3  a week?

4      A.   Sometimes it could be a week, and the longest

5  vacation, it could be like a month.

6      Q.   Okay.  Have you been on any vacations lately?

7      A.   Not in 2021.  Like I mean, just Santa Barbara,

8  you know, Palm Springs, like stuff like that, not like

9  out of the state.

10     Q.   Well, have you been away from your home at --

11 at your residence at 525 Broadway for any period more

12 than two nights in 2021?

13     A.   Yeah, of course.

14     Q.   Okay.  Well, it's not of course to me.  So --

15     A.   Sorry.  I just wasn't understanding your

16 question.

17     Q.   So when have you been away from your residence

18 at 525 Broadway for more than two days in 2021?

19     A.   Most of -- most of the -- most of like the

20 first week of February.  Most of the first week of

21 February, and that's -- that's about it.  Yeah.

22     Q.   Okay.  That's 2021?

23     A.   2021, yeah.

24     Q.   Where were you for the first week of February

25 in 2021?

# EXHIBIT 5

```
 1        A.    I was just like spending some time with my
 2   girlfriend.
 3        Q.    Okay.  Was that someplace out in Santa Monica?
 4        A.    Santa Monica.
 5        Q.    In Santa Monica, just not at 525 Broadway?
 6        A.    No.
 7        Q.    What's the name of your girlfriend?
 8        A.    Ally (phonetic).
 9        Q.    What's Ally's last name?
10        A.    Chambers.
11        Q.    C-h-a-m-b --
12        A.    C-h-a-m-b-e-r-s.
13        Q.    Okay.  And does she reside in Santa Monica
14   too?
15        A.    She does.
16        Q.    Okay.  What about 2019.  Were you -- sorry,
17   2020.  Were you away from 525 Broadway for any
18   protracted period of time, more than two days?
19        A.    2020 was the pandemic, so I was -- I was
20   pretty much at home throughout the whole year pretty
21   much, you know.  I don't know if you guys are familiar
22   with the LA cases that we had the highest COVID cases in
23   the -- I mean, not in just the country -- I the world.
24   So it was very dangerous for me to get out of the house.
25        Q.    Okay.  So is there any time you were away from
```

EXHIBIT 5

28

1   525 Broadway sleeping somewhere else for more than two days

2   in 2020?

3        A.   No.  No.  Just either between my house or my

4   girlfriend's house.  That's about it.  Nothing --

5        Q.   Okay.  What about 2019.  Any time you were

6   away from the house, 525 Broadway, for more than two

7   nights?

8        A.   2019 I traveled quite a bit.  I traveled quite

9   a bit in 2019.  Yeah.  2019 I traveled quite a bit.

10       Q.   Okay.  Where did you go?

11       A.   I went to Puerto Rico, the Caribbean.  I went

12   to Europe for about like three weeks.  Yeah.  I traveled

13   quite a bit in 2019.

14       Q.   Okay.  For -- for 525 Broadway, is that the

15   address that USPS has for you?  Is that where you're

16   registered as your residence?

17       A.   Yeah.  That's my -- that's my address of mail

18   because -- I mean, I only have Amazon.  I don't really

19   get mail.  I just have Amazon and the DMV.  That's about

20   it.

21       Q.   Okay.  Has 525 Broadway been your registered

22   address with the DMV since when?

23       A.   Since -- let me look at my ID -- 10/19/2017.

24   You'll see it at the very bottom right.

25       Q.   Okay.  And why don't you get any mail?

EXHIBIT 5

29

1      A.   I'm sorry, what?  My bank statements are all

2   paperless.  My phone bill is paperless.  You know, just

3   Amazon and DMV.  That's about it.

4      Q.   You don't get any junk mail?

5      A.   Yeah.  I do get junk mail, but I -- you know,

6   a bunch of magazines and, you know, coupons and offers;

7   and I just like throw them in the trash.

8      Q.   Okay.  Do you get that junk mail to 525

9   Broadway in your name?

10     A.   Yes.

11     Q.   Okay.  What's your current job?

12     A.   I am currently unemployed.

13     Q.   How long have you been unemployed?

14     A.   Since the pandemic.

15     Q.   And does that mean since March 2019?

16     A.   Yeah.

17     Q.   Okay.  At 525 Broadway, do you pay rent?

18     A.   I do.

19     Q.   Do you have a roommate?

20     A.   I used to -- I used to have a roommate.  Yeah.

21     Q.   Who was that?

22     A.   His name is Mohammad Rostom.

23     Q.   How do you spell his last name?

24     A.   R-o-s-t-o-m.

25     Q.   And when was he your roommate?

# EXHIBIT 5

1      A.    When?

2      Q.    Yeah.

3      A.    Since we moved -- we moved in in November of

4    2016.

5      Q.    And when did he stop being your roommate?

6      A.    He moved -- he actually moved out of the

7    country and moved to Dubai in late December, like, you

8    know, a week before Christmas of -- of 2020.

9      Q.    And since then you've just been covering rent

10   yourself?

11     A.    Actually, since -- so I -- the last check I

12   paid for the rent was in January, and then I did not pay

13   February and March just yet because of, you know, the

14   judgment.  They froze all my bank accounts.

15     Q.    Okay.  And were you working in March and April

16   2019?

17     A.    I was.

18     Q.    Okay.  Where did you work then?

19     A.    I was working on some, you know, technology

20   project still under the, you know, R&D phase, and then

21   that stopped when the pandemic, you know, start.

22     Q.    Did you work for a company, or did you have a

23   boss?

24     A.    No, no.  It was self -- no.  It was just self-

25   employed.

# EXHIBIT 5

31

1        Q.    So what was the name of your employer?

2        A.    I didn't -- I didn't register an LLC for it

3    yet.  It was just all within the, you know, R&D

4    research, you know, period and, you know, all the

5    brainstorming and all the -- you know, it's -- the

6    technology business can be a bit -- a bit difficult, you

7    know.  It takes -- takes a while before you a product.

8        Q.    Okay.  So --

9        A.    But I was not making any income.

10       Q.    Before you started doing this R&D thing for

11   yourself with no LLC, self-employed, what -- what was

12   your job before that?

13       A.    Before that, I was in real estate investments.

14       Q.    Who was your boss there?

15       A.    Self-employed.

16       Q.    Okay.  Are you a citizen of the US?

17       A.    I am a permanent resident.

18       Q.    Okay.  Is that the same for your sister?

19       A.    My sister is a US citizen.

20       Q.    Okay.  And your sister is Reem Hanna?

21       A.    Yeah.  My sister is Reem Hanna.

22       Q.    Okay.  Do you recall where you were in March

23   2019?

24       A.    Let me look on my phone.

25             Okay.  I opened all my March photos, so just

EXHIBIT 5

32

1    tell me which date, and I can look.

2        Q.    Sure.  How about just, you know, towards the

3    end of March 2019.  Were you --

4        A.    End of March.

5        Q.    Were you in California, or were you somewhere

6    else?

7        A.    I'm looking right now.  So I'm going to start

8    from March 31st, and then I will go back.

9        Q.    Okay.

10       A.    So Santa Monica, Santa Monica, Santa Monica.

11   I take a lot of pictures, almost every day.  Santa

12   Monica, Santa Monica, Santa Monica, Malibu, Santa

13   Monica.  Okay.  This is the LA Marathon.  That was March

14   24th.  We were watching it with our friends from a

15   rooftop.  Again, all -- just all Santa Monica really.

16   Yeah.  All the way to March 16th all Santa Monica,

17   Malibu.

18       Q.    How about --

19       A.    How much back do you want me to go for March?

20       Q.    That's fine.

21       A.    Oh.

22       Q.    How about the first -- first two weeks of

23   April 2019.  Were you in California?  I'm just trying to

24   see if you were out of California.

25       A.    Yeah, sure.  Yeah, yeah, yeah.  I got -- oh.

EXHIBIT 5

1  So you want April.  Okay.  Hold on.  April 2019.  Santa

2  Monica, Santa Monica, Santa Monica all the way to April

3  -- these are all -- these are all Santa Monica.  Let me

4  see.  These are all Santa Monica.  As you can see also

5  on the iPhone it says the -- the location and the day.

6  And then Pacific Palisades, Santa Monica.

7          MR. BERNHARD:  Witness is showing the camera

8      the phone, showing us some photos to show that

9      April 2019 and March 2019, photos which -- you

10     know, just to contribute to the record -- put in

11     the record.

12         THE WITNESS:  Malibu, Malibu.  I remember in

13     Hollywood, this is the Hollywood, you know, sign.

14 BY MR. BERNHARD:

15     Q.   Yeah.

16     A.   And then on April 13th, I went (audio

17 distortion) and I was there --

18     Q.   Where is that?

19     A.   A music conference in California.  It's called

20 Coachella.

21     Q.   Sure.  Okay.

22     A.   So you usually have two weekends.  I went the

23 first weekend and the second weekend.  So the first

24 weekend was April 13th to April 15th.  And me and my

25 girlfriend are -- you know, I'm there.  And then on

EXHIBIT 5

1    April -- let's see.  Coachella is in a city called Indio,

2    which is about -- it's like two hours away from LA.  And

3    then April 17, I was in Santa Monica.  Just disregard

4    that picture.

5             April 18, Pacific Palisades, which is like --

6    like next door to Malibu.  I want to say Venice.  This

7    is the second weekend of Coachella April 19.  UCLA,

8    Westview Mall, Beverly Hills.  And then Easter on the

9    21st was in Beverly Hills.  Hollywood Hills -- I mean,

10   Hollywood.  I was in the church for Easter, April 25th.

11   April 26th.

12            And then I went to Hawaii on April 26th, and I

13   was in Hawaii just for the weekend.  Then I came back to

14   LA, Beverly Hills.  And then I went to London on --

15   wait, I don't know on this one.  Yeah.  No.  This is

16   still LA, but I don't know why my phone -- and then

17   Santa Monica 27th; 28th, Hollywood Hills.  Yeah.

18        Q.   Okay.  Got it.  Not, you got this place at --

19   at 116 Rockefeller at Irvine.  That's something that you

20   own; is that correct?

21        A.   Yes.

22        Q.   Okay.  Do you own any other properties in --

23   in Irvine, California?

24        A.   No.  I do not.

25        Q.   Okay.  Is this 116 Rockefeller -- is that a

# EXHIBIT 5

35

```
 1   condo?

 2        A.   It's a townhome.

 3        Q.   It's a townhome.  How many rooms is it?

 4        A.   Three bedrooms.

 5        Q.   Okay.  And how much rent -- sorry.  Does Reem

 6   Hanna pay you rent for --

 7        A.   She does.  She does.

 8        Q.   How much rent does she pay you?

 9        A.   She's paying $3000 a month.

10        Q.   Okay.  Did she pay you that in 2019 every

11   moth?

12        A.   Yes.  I have all the bank statements.

13        Q.   Same for 2020?

14        A.   Same for 2020.

15        Q.   Same for 2021?

16        A.   2021, she only paid me January and February.

17   Yeah.  And then after that, I can't access my bank

18   accounts anymore.

19        Q.   Okay.  So at 116 Rockefeller, is there -- are

20   there any cameras on the outside for security?

21        A.   I believe there's a camera that I saw when I

22   came yesterday at the door -- at the front door.  It's

23   one of these like Ring, you know, Amazon cameras --

24        Q.   Yeah.

25        A.   -- at the front door, but that's about it.
```

# EXHIBIT 5

1    Q.   Okay.  Is there an intercom system?

2    A.   No.  There's not.

3    Q.   Okay.  Is there a doorman?

4    A.   No.  It's a -- it's a house.

5    Q.   Was there a Ring camera at your property at

6  116 Rockefeller in 2019?

7    A.   To be -- to be honest with you, I have not

8  been here in 116 Rockefeller for about probably like

9  over two and a half years, maybe -- maybe more, you

10  know.

11    Q.   Okay.

12    A.   It's been a while.

13    Q.   Does that mean you don't know whether there

14  was a Ring doorbell system in 2019 at 116 Rockefeller?

15       MR. DELLORUSSO:  Objection.

16       THE WITNESS:  I'm not sure.  I'm not sure, to

17    be honest with you.

18  BY MR. BERNHARD:

19    Q.   Do you know if there was a Ring intercom

20  system in 2020 at 116 Rockefeller?

21    A.   Can you -- can you raise your voice a bit?

22    Q.   Yeah.  Was there a Ring camera system at 116

23  Rockefeller in 2020, to your knowledge?

24       MR. DELLORUSSO:  Objection.

25       THE WITNESS:  I'm not sure, Andrew, because,

EXHIBIT 5

1    as I mentioned to you, I have not been in the Irvine

2    house, not even once in 2020, not even once in

3    2019.  I believe even when I came to Orange County

4    in 2018 it was just for Christmas -- Christmas Eve

5    at my cousin's house in Mission Viejo area, which

6    is like south of Irvine.

7    BY MR. BERNHARD:

8        Q.   Okay.  I saw that you testified that you're

9    not evading service and made -- have made no attempts to

10   evade service in this lawsuit; is that correct?

11       A.   I have not serviced what you said?

12       Q.   That you -- that you are not attempting to

13   evade service -- a processor?

14       A.   What do you mean by evade service?

15       Q.   I think that's in your affidavit, that you

16   made no attempts to evade service.  Does that sound

17   familiar at all?

18       A.   You mean I was serviced?  Is that what you're

19   saying?

20       Q.   So there is a lawsuit --

21       A.   Uh-huh (affirmative).

22       Q.   -- yeah, right, pending called Belgium

23   Investments versus Blank.  Are you aware of that

24   lawsuit?

25       A.   Yeah.  I didn't know anything about the

# EXHIBIT 5

38

1  lawsuit.  I was never served.

2      Q.   Okay.  Have you done anything whatsoever to

3  avoid getting handed a summons for this lawsuit?

4      A.   Absolutely not because no one ever knocked on

5  my door in Santa Monica and said, hey, you are served;

6  here's the lawsuit document.  Because if this -- if this

7  would have ever been the case, I would have called my

8  attorney right away and said, hey, I just got served.  I

9  never got anybody in the -- you know, in Santa Monica

10 serve me since I lived there in -- since 2016 up until

11 now.

12     Q.   Okay.  Have you -- do you have any -- are you

13 currently avoiding service of process of the summons?

14     A.   No.  I am not.

15     Q.   Okay.  Do you have any problem just accepting

16 service of process for the summons for this lawsuit now?

17         MR. DELLORUSSO:  Objection.  Do not answer

18     that question.

19         THE WITNESS:  Okay.  I object.

20         MR. BERNHARD:  Is there a basis for that?

21     It's not privileged?

22         MR. DELLORUSSO:  Well, yes, it has to do with

23     communications that I had with him in regard to

24     that, and you're asking him to do something that is

25     -- that I spoke to him about.  So --

# EXHIBIT 5

1  BY MR. BERNHARD:

2      Q.   Okay.  I'm not asking you about your

3  conversations with your attorney whatsoever.  I'm asking

4  you right now, do you accept or will you accept service

5  of process of the summons?

6          MR. DELLORUSSO:  I'm going to object.  Do not

7      answer that.

8          MR. BERNHARD:  Okay.  On what basis?

9          MR. DELLORUSSO:  I just told you why.  I spoke

10     to him in regard to this, and I have given him some

11     legal advice that I do not want to come out in

12     regard to that question.

13         MR. BERNHARD:  Okay.  Well, he --

14 BY MR. BERNHARD:

15     Q.   -- don't -- don't tell me any legal advice

16 that your attorney has given you.  You can say I don't

17 accept.  You can say I do accept.  That doesn't reflect

18 on legal advice your -- your attorney has given you.  If

19 the answer is no, just say, no, I will not accept it.

20         MR. DELLORUSSO:  If you can say it without

21     giving your -- any legal advice, then go ahead and

22     answer.

23         THE WITNESS:  As I mentioned to you, Andrew,

24     you know, I'm like why would I not accept service.

25     If anybody came to my door and -- and knock on my

EXHIBIT 5

40

1      door, which is where I live in Santa Monica, and said,

2      hey, you're serviced, I would not have an issue

3      with it at all.  But nobody had -- nobody ever

4      came.

5  BY MR. BERNHARD:

6      Q.   Do you agree just to accept service now?

7           MR. DELLORUSSO:  Same objection.

8  BY MR. BERNHARD:

9      Q.   You can answer.

10     A.   I don't think I should answer that question

11 because, again, you -- you know, do you want to talk

12 about servicing me on a lawsuit?

13     Q.   Yeah.  I'm asking will you just agree to

14 accept service now for this lawsuit.

15     A.   I will have to talk with my attorney.

16          MR. DELLORUSSO:  (Audio distortion)

17 BY MR. BERNHARD:

18     Q.   So is that a no?

19     A.   I will have to consult with my counsel.  I'll

20 have to consult with my counsel first.

21          MR. BERNHARD:  Do you guys want to take a

22      five-minute break and let you consult, and you can

23      come up with a yes or no?

24          MR. DELLORUSSO:  That's fine.

25          MR. BERNHARD:  Okay.  Let's take a quick five.

# EXHIBIT 5

```
 1        We'll be back at 27, okay.  So 2:27.

 2              THE WITNESS:  Okay.

 3              THE REPORTER:  Okay.

 4              MR. BERNHARD:  Okay.

 5              THE REPORTER:  All right.  We are off the

 6        record.

 7              (Recess taken)

 8              THE REPORTER:  Okay.  We are back on the

 9        record at 5:29 p.m. Florida time.

10              THE WITNESS:  All right.

11              MR. BERNHARD:  Okay.  We're back on the

12        record.

13  BY MR. BERNHARD:

14      Q.   Bassem, do you realize you're still under

15  oath?

16      A.   Yes.

17      Q.   Okay.  We just took a break so you could talk

18  to your attorney.  I want to make sure you don't tell me

19  anything that you talked about with your attorney or

20  told your attorney or he told you.  My question was: do

21  you agree to accept service process now just voluntarily

22  in this depo.

23      A.   I do not.  I do not accept service now.

24      Q.   Okay.  To your knowledge, has Reem Hanna ever

25  received mail for you or deliveries for you at 116
```

# EXHIBIT 5

1    Rockefeller in --

2         A.   No, never.

3         Q.   -- 2019?  Never?

4         A.   Never.

5         Q.   Never at all?

6         A.   No.

7         Q.   Not in 2019?

8         A.   No, never.

9         Q.   Not in 2020?

10        A.   No.

11        Q.   Not in 2021.

12        A.   I don't even have a mail -- I don't even -- my

13   mail is not going to this house.  It goes to Santa

14   Monica.

15        Q.   Okay.  And do you pay utilities at 525

16   Broadway, Apartment 5037?

17        A.   I do not pay the utilities.

18        Q.   Okay.  How do those utilities get paid?

19        A.   It's  -- it's like all included.  The only

20   thing that was paid was the internet, and that was paid

21   by my roommate, and then when he moved out, I switched

22   account under my name, and I'm paying for it.

23        Q.   Okay.  So in 2019, there were no utilities in

24   your name whatsoever at 525 Broadway?

25        A.   No.  Just the rent.

# EXHIBIT 5

```
 1        Q.    Same for 2020.  No utilities whatsoever in your
 2   name --
 3        A.    Same for 2020.  Same since 2016 and '17 and
 4   '18.
 5        Q.    Okay.  Do you own a car?
 6        A.    I do.
 7        Q.    Okay.  What car do you own?
 8        A.    A Mercedes C-Class.
 9        Q.    Okay.  What year is that car?
10        A.    2016.
11        Q.    And where is that car registered?
12        A.    It's in Santa Monica, as well, and it's in my
13   garage in Santa Monica, as well.
14        Q.    Okay.  Is it registered to your address 525
15   Broadway, Santa Monica?
16        A.    You know what, I'm not sure because I bought
17   the car at a dealership in Inland Empire in August of
18   2016, and then at that time I was still living in Irvine
19   address, so they probably like registered it for me in
20   the 116 address.  But I'm not sure if I paid the new
21   registration -- the new registration back in I believe
22   2018 at the 525 Broadway.  I mean, it should be because
23   that's where my ID is also showing, so I think it's now
24   switched to the Santa Monica from 2018.
25        Q.    And is your Mercedes insured as being at 525
```

EXHIBIT 5

44

1    Broadway or at --

2        A.   Yeah.  It did up until my insurance expired

3    last year in -- again, right before the pandemic.

4    Obviously, nobody's driving anymore, so then I just

5    didn't get a new insurance.

6        Q.   Okay.  So was your car registered as insured

7    at your Santa Monica address?

8        A.   525 Broadway.  Yeah.  525 Broadway.

9        Q.   Is that the same for 2019?

10       A.   Same as '19 and '18, and I believe '17, yeah,

11   as well.

12       Q.   Okay.  Do you have any documentation

13   reflecting having your car insured at 525 Broadway

14   rather than at --

15       A.   I can check with my insurance agent.

16       Q.   Okay.  Do you agree to produce that to us?

17       A.   Yeah, yeah.  I'll call him, and then I will

18   have him send me some kind of an email.  It's Farmer's

19   Insurance.  I'll have him send me some kind of an email

20   showing the insurance address.

21       Q.   Okay.

22       A.   Let me write that in my notes.  Just give me a

23   second.

24            Obtain an insurance for my -- my Mercedes at

25   525 Broadway from Farmer's Insurance.  Okay.  Got it.

# EXHIBIT 5

1    Q.   And so is it your position that your sister, Reem

2    Hanna, has never mentioned anything about receiving

3    service of process, a summons, mail, delivery, or even a

4    person knocking at her door for you at any time in the

5    past three years?

6    A.   No, never.

7    Q.   Okay.  Have you ever been accused in court of

8    making a false statement?

9    A.   No.

10    Q.   Okay.  Have you ever been sued for slander,

11    which is the making of a false statement that damages a

12    person's reputation?

13    A.   No.

14    Q.   Okay.  Have you ever been sued for conspiracy,

15    which is a secret planned by a group to do something

16    unlawful?

17    A.   No.

18    Q.   To your knowledge, has your sister, Reem

19    Hanna, ever been accused in court of making a false

20    statement?

21         MR. DELLORUSSO:  Objection.

22         THE WITNESS:  No.

23    BY MR. BERNHARD:

24    Q.   To your knowledge --

25    A.   No.  I don't have any knowledge to that.  No.

EXHIBIT 5

1      Q.   To your knowledge, has your sister, Reem Hanna,

2   ever been sued?

3      A.   I don't have a knowledge of that.  No.

4      Q.   To your knowledge, has your sister, Reem

5   Hanna, ever been sued for slander, which is the making

6   of a false statement that damages of a person's

7   reputation?

8           MR. DELLORUSSO:  Objection.

9           THE WITNESS:  Not to my knowledge.  No.

10  BY MR. BERNHARD:

11     Q.   To your knowledge, has your sister, Reem

12  Hanna, ever been sued for conspiracy, which is a secret

13  planned by a group to do something unlawful?

14          MR. DELLORUSSO:  Objection.

15          THE WITNESS:  Not to my knowledge at all.

16  BY MR. BERNHARD:

17     Q.   To your knowledge, has your father, Essam El

18  Mallakh, ever been accused in court of making a false

19  statement?

20     A.   No.

21     Q.   To your knowledge, has your father, Essam El

22  Mallakh, ever been sued?

23     A.   No.

24     Q.   To your knowledge, has your father, Essam El

25  Mallakh, ever been sued for slander, which is the making

# EXHIBIT 5

```
 1   of a false statement that damages a person's reputation?

 2        A.   No.

 3             MR. DELLORUSSO:   Objection.

 4   BY MR. BERNHARD:

 5        Q.   To your knowledge, has your father, Sam El

 6   Mallakh, ever been sued for conspiracy, which is a

 7   secret planned by a group to do something unlawful?

 8        A.   No.

 9        Q.   And to your knowledge, has your mother, Mona

10   Mallakh, ever been accused in court of --

11        A.   Mona Soliman.

12        Q.   Mona Soliman, sorry.   Mona Soliman ever been

13   accused in court of making a false statement?

14        A.   No.

15        Q.   Have you -- has your mother ever gone by the

16   name Mona McCale?

17        A.   I believe so.   Yeah.

18        Q.   Is that like a maiden name?

19        A.   Dad's name.

20        Q.   Okay.   To your knowledge, has your mother,

21   Mona Soliman, also known as Mona McCale, ever been sued?

22        A.   No.

23        Q.   To your knowledge, has your mother, Mona

24   Soliman, also known as Mona McCale, ever been sued for

25   slander, which is the making of a false statement for
```

EXHIBIT 5

```
 1   damages --

 2        A.   No.

 3        Q.   -- that damage a person's reputation?

 4             MR. DELLORUSSO:  Objection.

 5             THE WITNESS:  No.

 6   BY MR. BERNHARD:

 7        Q.   To your knowledge, has your mother, Mona

 8   Soliman, also known as Mona McCale, ever been sued for

 9   conspiracy, which is a secret planned by a group to do

10   something unlawful?

11        A.   No.

12        Q.   Have you ever been accused in court of having

13   participated in the commission of a fraud?

14        A.   No.

15        Q.   Do you understand that fraud is -- is an act

16   of dishonesty?

17        A.   Yes.

18        Q.   When do you say you first became a lawsuit

19   that there was a lawsuit pending against you in Florida

20   as to Belgium Investments?

21        A.   I'm sorry.  Say that again.

22        Q.   When did you first -- very first become aware

23   that there was a lawsuit pending against you in Florida

24   from Belgium --

25        A.   When I went to the bank in February to try to
```

EXHIBIT 5

49

1   coordinate to pay my rent at Wells Fargo, and then they said

2   that your account has been frozen; and they took all the

3   money out based on a judgment.  And I'm like -- I was

4   like, "What kind of judgment?"  And the -- they gave me

5   a printout that says a judgment based on a Florida case.

6   And that's when I actually found out that there is a

7   lawsuit/judgment.  So I found out about it in February

8   of 2021 just from going to the bank.

9       Q.   And that's the very first time you heard

10  anything about it.

11      A.   First time.  First time, February 2021.

12      Q.   And when was the last time you spoke with

13  Spencer Blank or his attorneys Eric Jackwin or Michael

14  Caramadre?

15      A.   Spencer, he used to be the construction

16  company for the project at -- over at 960 Bay Drive, and

17  the last time we spoke was probably somewhere --

18  somewhere in the 2016 -- 2016 period because I was the

19  -- the manager of the LLC.

20          And then based on the partners, they just

21  didn't like my performance.  So they -- my partner

22  called me and he said, "Hey, the partners just do not

23  want you to manage the property anymore."  So that was

24  back in 2016.  And they said, "We wanted to remove you

25  from management."  And they were -- basically Spencer

EXHIBIT 5

50

1  and Bernard were going to be the ones actually managing the

2  project.

3      Q.   By Bernard, you mean Bernard Petite?

4      A.   Bernard Petite.  Yeah.

5      Q.   And since 2016, you have not spoken or heard

6  from Spencer Blank?

7      A.   No.  No.  I don't think so.  He just came one

8  time to LA somewhere in the 2016 time.  He was visiting

9  his -- his brother, and then we just met at a nightclub

10 in Hollywood, just going out and drinking and, you know,

11 having fun.  But that's about it.  We didn't talk about

12 anything business related.

13     Q.   And that time in 2016 when you went to a

14 nightclub in Hollywood with Spencer Blank is the last

15 time you spoke to Spencer Blank in any way?

16     A.   Yeah.

17     Q.   By email, telephone, text message, or anything

18 else?

19     A.   I believe so.  I don't think I had any

20 communication with Spencer ever since Bernard told me

21 that they wanted to remove me from managing the

22 property.

23     Q.   Which you've testified is 2016?

24     A.   2016.

25     Q.   Okay.  Is that the same answer for Spencer

# EXHIBIT 5

1   Blank's attorneys, Eric Jackwin or Michael Caramadre?

2       A.    I don't know who Eric Jackwin or Mark -- or

3   Mark -- or -- or -- I don't know who those -- who those

4   people are.

5       Q.    Okay.  What about Bernard Petite.  When was

6   the last time you heard from Bernard Petite in any way?

7       A.    The last time I heard from him was -- I was --

8   I was checking, you know, how are things going with the

9   project, you know, if they finished the construction,

10  what's happening.  And, yeah, that was about -- that was

11  about it.

12      Q.    When was that?

13      A.    Maybe early 2019.  Either early 2019 or early

14  2018 because what happened is I got a call from the --

15  the real estate agent that actually helped us buying and

16  acquiring that building in Miami.  And then he says,

17  "Hey, I just found out that you guys are listing the

18  property for sale."

19          And I was like, "I'm not aware of  -- of

20  anything like that."  And that's when I called Bernard

21  and I said, "Hey, are you guys selling the property?"

22          He's like, "No.  I'm to aware of it, but it

23  seems like Jean Claude is actually trying to sell the

24  property like without telling us, you know."  And that's

25  when him and -- and Jean Claude were supposed to figure

EXHIBIT 5

1  out what's -- what's happening with the property.

2      Q.   And when was that communication with Bernard

3  Petite?

4      A.   I have to check my phone, but I'm thinking

5  either early 2019 or early 2018.  It was the beginning

6  of the year, early 2019 maybe, or -- early 2019 when I

7  found out that they were -- they were listing the

8  property.  I can all look at the MLS, see when they

9  listed the property initially.  That's when I got a call

10 from the agent.

11     Q.   Do you keep a call log with Bernard Petite, or

12 is he in your contact list in your phone?

13     A.   Yeah, he is.

14     Q.   Okay.  Does it say there on your phone the

15 last time you spoke to him?

16     A.   Let me -- let me look.  Honestly, just -- I

17 have one message from him on April 13.  He goes, "Make

18 sure he does."  I think that's when he was replying me

19 -- because I called him on the phone when that happened.

20 I didn't text him.  I just called him, you know, quick,

21 and I said, "Hey, they are trying to sell the property.

22 What's happening?"  Because Bernard and I were -- we

23 have a shareholding interest in the LLC.

24          And so, again, you know -- you know, we don't

25 need to get into a long story, but basically we had

EXHIBIT 5

1  another deal where actually Jean Claude was able to sell

2  that investment and not give Bernard and I any of our

3  profits at a project in another state -- in Colorado.

4        So that's why him and I, we kind of felt like

5  we -- you know, we can't feel like we can trust, you

6  know, what he can do, so we thought he was going to sell

7  the property without telling us.  So that's when I

8  called Bernard.  I said, "Hey, you know, I heard that

9  they're listing the property.  The agent told me."  And

10 then I told him, "I'm going to make sure -- you know,

11 hey, tell me if -- if -- if anything is -- is under

12 contract."

13       So then that's when he replied to me.  He

14 says, "Make sure he doesn't."  That was April -- I don't

15 know if you can see -- April 13, 2019.

16    Q.   Okay.  So that's April 2019?

17    A.   Yeah.  April 13, 2019, at 1:14 p.m.

18    Q.   Okay.  Is that the very last time that you

19 spoke to Bernard Petite in any way?

20    A.   You know, I can check my newer phone that I --

21 because this phone just, you know, broke, so then I

22 bought a new phone.  So I can check on my new phone when

23 was the last text from him on the new phone.

24    Q.   Is that something that you got there, or is

25 that something that you need to get?

# EXHIBIT 5

54

1        A.    What is it?  Something what?

2        Q.    -- you can do now?

3        A.    Yeah, yeah.  I'm looking at my phone right now

4   as we speak.  Yeah.  October of -- October 9, 2019, I

5   was texting him, and I said, "Do you know that the

6   property on Bay Drive was sold February 19th this year

7   for $2.8 million?"  And he goes, "No.  I don't know

8   that, and it's not possible as I had -- as I had a

9   mediation with Jean Claude on Monday on this."  And then

10  he goes, "What makes you say that?"  And then I said,

11  "Look at the listing."

12       Q.    Okay.  Anything else?

13       A.    No.  And then he goes -- I said -- and then I

14  told him, "Because I got a call from Dennis, the agent

15  in Miami that sold us the property, and he said that he

16  heard that the property was sold."  He goes, "Let's

17  check, but highly impossible."

18            I can check -- and I -- and I told him, "I can

19  check with -- with the title companies, you know, that I

20  can call and -- but I thought that he wouldn't have been

21  able to do that without our signature since we're all a

22  part of LLC."  And then this is his reply.  He goes,

23  "You're kidding.  He sold Denver without -- without us."

24       Q.    Okay.

25       A.    And, yeah, that was about it.

# EXHIBIT 5

55

1      Q.    So was October 9, 2019, the last time you spoke

2    with Bernard Petite?

3      A.    Yeah, yeah.

4      Q.    Okay.  And when he's referencing mediation

5    there, did you not understand that he's talking about

6    mediating the lawsuit?

7      A.    Him and -- him and Jean Claude.  He never

8    mentioned to me ever that I'm a part of any -- any type

9    of a mediation or any type of a lawsuit.

10     Q.    So you understood at that time that he was in

11   a lawsuit with Jean Claude over this other Belgium

12   Investments?

13     A.    Right.  I understand that Bernard and -- and

14   Jean Claude were having some -- some type of a, you

15   know, legal battle between each other.

16     Q.    And did you ever think --

17     A.    And then at that -- and then at that time,

18   also Bernard asked me -- I remember very well.  He says,

19   "Did anybody try to serve you any documents?"  And said

20   that I have not gotten any documents.

21           And as a matter of fact, Bernard, he came to

22   visit me in my Santa Monica house and -- I'll tell you

23   the exact date because, you know, he spent like a few

24   days with me, and we went to have like some lunch in

25   Malibu and, you know, just kind of spend some time.  So

EXHIBIT 5

56

1  that's actually the last time I saw him, and I can tell you.

2  And then he was actually staying in my -- my Santa

3  Monica address.  So I don't like if -- if -- I'm --

4  honestly, I don't even know who's suing me, if it's like

5  Jean Claude or Spencer.  I'm, you know, confused who is

6  suing me.

7          So then they are all talking to each other.

8  So if someone, like my partner, came and stayed at my

9  house in Santa Monica and they are suing me, why don't

10  they go and tell the service person to come to the Santa

11  Monica to serve -- to serve me?  And they all know that

12  I've been living in LA since 2016.

13      Q.   Okay.  So when did Bernard Petite come to your

14  -- stay with --

15      A.   Yeah.  Let me look.  I'll tell you right now.

16          (Pause)

17          You know, I'll have to look more on my phone

18  because we have pictures of the places that we had lunch

19  at and stuff.  I just -- I have to look more on my

20  phone.  I have so many pictures.

21      Q.   Do you think it was after October 2019 or

22  before?

23      A.   I'm actually -- now I keep going back with the

24  dates, so many pictures.  Yeah.  I will have to look

25  again.  I know it's -- I know I have the pictures on the

EXHIBIT 5

```
 1  phone, and I can tell you exactly what date.  One second.

 2  Yeah.  I will have to check.

 3      Q.   Okay.  Do you think it was after October of

 4  2019 that --

 5      A.   After October what?

 6      Q.   2019.

 7      A.   Oh, no, no, no.  It was way before.

 8      Q.   Okay.  So it was April 2019 that you contacted

 9  Bernard Petite about, you know, the -- the property

10  sale, the money of each property from Belgium

11  Investments from --

12      A.   Right.

13      Q.   -- 2019.  You said that you're -- you're

14  talking and he -- and Bernard Petite is talking about

15  being in mediation in -- in these lawsuits.  Does that

16  sound right so far?

17      A.   Right.  He was mentioning that him and -- and

18  -- and Jean Claude are going through some kind of a

19  mediation.

20      Q.   And so it was after that that he came and

21  stayed at your house -- that Bernard Petite came and

22  stayed at your house in Santa Monica?

23      A.   No, no, no.  He came before -- before that.

24      Q.   Okay.  Do you think it was sometime in 2019?

25      A.   No, no.  Not in '19.  That was -- he came and
```

# EXHIBIT 5

58

1  visit me I believe sometime in 2018, maybe -- either 2018 or

2  2017.  I will look through my phone.  I will get you the

3  exact picture with Bernard and I in Malibu having

4  champagne.

5       Q.   So after you October 2019, did you ever heard

6  from -- communicate with Bernard Petite in any way?

7       A.   After October 2019?

8       Q.   Yep.

9       A.   No.  Not necessarily, just maybe just seeing

10  how he is, you know.  Not like any -- anything special.

11       Q.   Well, I'm not asking for special.  I'm just

12  asking for any contact whatsoever.

13       A.   Yes.

14       Q.   Okay.  When else did you talk to him after

15  October 2019?

16       A.   Let me look again.

17            MR. DELLORUSSO:  Andrew, how is this relevant

18       to service?

19            MR. BERNHARD:  Please, you know the -- the

20       rules.

21            MR. DELLORUSSO:  Well, I know.  I'm asking

22       you.

23            MR. BERNHARD:  Speaking objections -- don't

24       ask me.  Just either say objection to form,

25       instruct your client not to answer.

# EXHIBIT 5

```
 1              MR. DELLORUSSO:  I'm going to do that very shortly
 2         if you don't stop with these questions.  You've got
 3         to stick the service.
 4              MR. BERNHARD:  Please stop speaking.  You are
 5         coercing the witness's testimony.
 6              MR. DELLORUSSO:  I'm not.
 7              THE WITNESS:  No.  I don't see any records.
 8    BY MR. BERNHARD:
 9         Q.   Okay.  So to your knowledge, you may have
10    talked to him a few times after October 2019, but you
11    don't know exactly what or when --
12         A.   You know, we talked on the phone, but I don't
13    see any -- you know, obviously, I don't have a call log,
14    you know, to show me what day we talked.  But I know we
15    did talk on the phone probably like, you know, once or
16    twice in a -- in a -- within that, you know, two years'
17    period.
18         Q.   Okay.  In the past two years, you talked once
19    or twice to Bernard Petite?
20         A.   I'm sorry.  Say that again.
21         Q.   In the past two years, meaning from October
22    2019 to today, you think you've talked to Bernard Petite
23    once or twice?
24         A.   Once or twice.
25         Q.   Okay.  In all that, did he mention to you that
```

EXHIBIT 5

60

1  you were being sued in a lawsuit here in Florida?

2      A.   He said he's -- he's getting sued, and he

3  says, "Did you get any documents or any service --

4  service?"  And I said, "I did not."

5      Q.   Did you understand by that question that

6  somebody was attempting to serve documents about a

7  lawsuit on you?

8      A.   Right.

9      Q.   Okay.  Did you do anything to investigate if

10 you were getting sued or what that was all about?

11         MR. DELLORUSSO:  Objection.

12         THE WITNESS:  No.  I did not because, you

13     know, usually when someone is suing you, you need

14     to obviously service you with the documents to know

15     what is going on with the lawsuit.

16 BY MR. BERNHARD:

17     Q.   Okay.  Did you hire an attorney to look into

18 it?

19     A.   No, because I was waiting to get serviced.

20     Q.   Okay.  Did you call anybody in Miami or in

21 Florida to find out what was going on with the lawsuit

22 against you?

23     A.   No.

24     Q.   So you're just waiting for somebody to service

25 summons on you?

EXHIBIT 5

1       A.   Right.

2       Q.   Okay.

3            MR. BERNHARD:  I have no other questions.

4            MR. DELLORUSSO:  I have like a few questions.

5    Bassem, you can just proceed.  I'll be like five

6    minutes.

7            THE WITNESS:  Sure.

8                 EXAMINATION BY MR. DELLORUSSO

9    BY MR. DELLORUSSO:

10      Q.   In the year of 2018, where was your primary

11   residence?

12      A.   525 Broadway, Santa Monica, Los Angeles.

13      Q.   In the year 2019, where was your --

14      A.   525 Broadway, Santa Monica, Los Angeles.

15      Q.   In the year 2020, where was your primary

16   residence?

17      A.   525 Broadway, Santa Monica, Los Angeles.

18      Q.   And is that the same for 2021?

19      A.   Yes.

20      Q.   Were you ever served with any documents

21   related to this lawsuit in 2000 -- between 2018 and

22   2020?

23      A.   No.  I have not -- never been served.

24      Q.   Have you ever seen a copy of the complaint --

25   have you ever seen a copy of the complaint before --

EXHIBIT 5

1  before 2020?

2       A.   Before 2020 or before 2021?

3       Q.   Before -- before 2020.  Have you ever seen a

4  copy of the --

5       A.   No.  No, nothing.

6       Q.   Okay.  Were you aware of any attempts -- were

7  you aware of any attempts of service of process on you

8  -- on your sister, Reem Hanna?

9       A.   No.

10      Q.   Okay.

11      A.   I was never aware.

12      Q.   Okay.  And then I want to briefly discuss with

13  you -- let's see if I can -- the 116 Rockefeller,

14  Irvine, California, address.  Are you aware of that

15  address?

16      A.   Yes, I am.

17      Q.   Okay.  And who resides at that address?

18      A.   My sister, Reem Hanna.

19      Q.   And does she reside with anybody else?

20      A.   No.  She lives with her son.

21      Q.   Okay.  Do you reside at that address?

22      A.   I do not.

23      Q.   Okay.  And I think you testified earlier you

24  have a Mercedes?

25      A.   Yes, I do.

# EXHIBIT 5

1    Q.   Okay.   What color is your Mercedes?

2    A.   It's a white Mercedes C-300.

3    Q.   Okay.   Would that white Mercedes C-300 ever be

4    at the 116 Rockefeller, Irvine, California, address?

5    A.   No.   It's parked in my garage at 525 Broadway.

6    Q.   Okay.   Were you ever served with -- were --

7    strike that.

8         If there was ever attempt to provide service

9    upon you, would you accept service?

10   A.   If there was a service that someone was trying

11   to attempt to service me?

12   Q.   Correct.   Would you accept?

13   A.   Yeah.   If -- yeah.   If someone will come and

14   service me, I will accept service.

15   Q.   Okay.   Would you ever attempt to avoid

16   service?

17   A    No, never.

18   Q.   Okay.   Have you ever attempted to evade

19   service of process?

20   A.   No.

21   Q.   Okay.   Have you instructed anyone in your

22   family to evade service of process on this lawsuit?

23   A.   No, never.

24   Q.   Okay.   Have you had any other residences in

25   the years between 2018 and 2020 besides the residence

EXHIBIT 5

64

1    that you're living in now?

2         A.    No.    Just the -- the same Santa Monica address

3    since November 1, 2016.

4         Q.    Okay.   And you've been sued before, correct?

5         A.    Yes, I have.

6         Q.    You're aware of how lawsuits work, correct?

7         A.    Absolutely.

8         Q.    You're aware that they have to actually serve

9    you with papers, correct?

10        A.    Of course, especially here in California.

11        Q.    Okay.

12             MR. DELLORUSSO:   No further questions.

13             THE WITNESS:   Okay.

14             MR. BERNHARD:   No further questions.   I really

15   appreciate it, Bassem.   Thanks for taking the time.   I

16   know you guys had a long day.   I appreciate you coming

17   in.

18             THE WITNESS:   Oh, no problem.   I'm -- I have

19   this all day if you guys have any questions.

20             MR. BERNHARD:   Nope.   Thanks so much, guys.

21             MR. DELLORUSSO:   Andrew, real quick since I

22   have you here.   I had my assistant call for -- for

23   dates.   I believe we talked about the 23rd and 24th.

24             MR. BERNHARD:   Yeah.

25             MR. DELLORUSSO:   The only availability right

# EXHIBIT 5

1  now -- I know we talked about the afternoon, so I just want

2  to do the notice.  The date that -- I mean, the time

3  that she told me was -- let me pull it up.

4          THE REPORTER:  Did you want to order?

5          MR. BERNHARD:  I do want to order.  Rush

6  delivery for mine.

7          THE REPORTER:  Okay.  Rush.

8          MR. BERNHARD:  And, Frank, if you just send me

9  the date and time, I will have to check with my wife

10 because of the kid.  We have to do this joint thing.

11 But I will respond to you tonight if you just shoot me

12 the dates by email.

13          MR. DELLORUSSO:  Okay.

14          THE WITNESS:  And also, sorry for -- sorry,

15 Frank.  I just wanted to -- to just let everybody know

16 that, you know, with the judgment that they have against

17 me now, I cannot literally live.  I'm already having so

18 much damages.  I'm going to actually put a whole list of

19 all the damages I've been going through by not able to

20 access any of my bank accounts.  We need to like rush

21 this as -- as -- you know, remove this judgment as much

22 -- as soon as possible.

23          MR. DELLORUSSO:  We have an order to that

24 effect.

25          Andrew, I'll email you, but it's -- it's the

EXHIBIT 5

```
 1  24th at 3:15 for 45 minutes.

 2          MR. BERNHARD:  Okay.  Well, I'll find out

 3  tonight.

 4          MR. DELLORUSSO:  Okay.  I'll email you.

 5          MR. BERNHARD:  All right.  Thanks, guys.  All

 6  right.

 7          THE WITNESS:  All right.  Thank you, guys.

 8  Thank you, Frank.

 9          MR. BERNHARD:  Thank you, guys.

10          MR. DELLORUSSO:  And also, Madam Court

11  Reporter?

12          THE REPORTER:  Yes.

13          MR. DELLORUSSO:  Can you just send me the cost

14  of -- of -- of a copy if I wanted a copy of that, what

15  the cost would be?  Can you just email me?

16          THE REPORTER:  Yeah.  Well, if you have my --

17  you have my email address, right?  I put it in the chat.

18          MR. DELLORUSSO:  Okay.  Well -- well, I think

19  --

20          MR. BERNHARD:  I copied you -- I coped you

21  too, Frank, so you can just email her.

22          MR. DELLORUSSO:  Okay.  I'll email you.

23          MR. BERNHARD:  All right, guys.

24          THE REPORTER:  Okay.  And did you want -- you

25  wanted a copy also rushed?
```

EXHIBIT 5

1          MR. DELLORUSSO:  I don't know yet.  I need to talk

2     to my client.  I just wanted to get prices first --

3          THE REPORTER:  Okay.

4          MR. DELLORUSSO:  -- for a copy.

5          THE REPORTER:  I don't have the prices.  My

6     boss sets those prices.

7          MR. DELLORUSSO:  Sure.  Whenever you have

8     them, just let me know.

9          THE REPORTER:  Okay.  Thank you.

10         MR. DELLORUSSO:  Thank you.

11         MR. BERNHARD:  Guys, all right.

12         THE WITNESS:  Thank you, guys.

13         THE REPORTER:  Bye.

14         THE WITNESS:  Bye-bye.

15         (Thereupon, the deposition was concluded at

16    6:01 p.m.)

17

18

19

20

21

22

23

24

25

# EXHIBIT 5

68

1                    CERTIFICATE OF OATH

2        STATE OF FLORIDA

3        COUNTY OF BROWARD

4

5            I, Erica Hylton, Court Reporter, Notary

6        Public, State of Florida, certify that Bassem El

7        Mallakh, appeared before me via Zoom video on the

8        18th day of March 2021, and was duly sworn.

9            Signed this 21st day of March 2021.

10

11

12

13        _____

14        Erica Hylton, Court Reporter

15        Notary Public, State of Florida

16        Commission No.:

17        Commission Expires:

18

19

20

21

22

23

24

25

# EXHIBIT 5

69

1                    CERTIFICATE OF REPORTER

2        STATE OF FLORIDA

3        COUNTY OF BROWARD

4

5            I, Erica Hylton, Court Reporter, certify that

6        I was authorized to and did report the Deposition

7        of Bassem El Mallakh; that a review of the

8        transcript was waived; and that the transcript is a

9        true and correct record of my notes.

10           I further certify that I am not a relative,

11       employee, attorney, or counsel of any of the

12       parties, nor am I a relative or employee of any of

13       the parties' attorneys or counsel connected with

14       the action, nor am I financially interested in the

15       action.

16           Dated this 21st day of March 2021.

17

18

19       _____

20       Erica Hylton, Court Reporter

21

22

23

24

25

# EXHIBIT 5

# DEPO
# 1A

1  voice started getting a little rusty, I'm going to have some

2  water.

3       Q.   Okay.  Perfect.

4            Have you ever been arrested or convicted for

5  any acts of fraud or other crimes involving deceit?

6       A.   I have not.

7       Q.   Have you ever been accused in court of any

8  acts of fraud or other acts of deceit?

9       A.   I have not.

10      Q.   Okay.  Have you ever been sued for any act of

11  fraud, misrepresentation, or deceit?

12      A.   I have not.  No.  I have not.

13      Q.   To your knowledge, have you been sued for that

14  by Belgium Investments in this lawsuit today?

15      A.   I have -- I don't know anything about the

16  lawsuit of Belgium Investments.

17      Q.   You don't know anything about it whatsoever.

18      A.   Not -- I never received anything.  I guess

19  they were trying to serve me in the address that I don't

20  -- I don't live in anymore.

21      Q.   Is there any reason you can think of why you

22  would not be able to answer my questions fully and

23  truthfully today?

24      A.   No.  There's no reason.

25      Q.   And you understand you're speaking under

EXHIBIT 5

26

1   year.

2        Q.   Okay.  Those vacations, are they long, short,

3   a week?

4        A.   Sometimes it could be a week, and the longest

5   vacation, it could be like a month.

6        Q.   Okay.  Have you been on any vacations lately?

7        A.   Not in 2021.  Like I mean, just Santa Barbara,

8   you know, Palm Springs, like stuff like that, not like

9   out of the state.

10       Q.   Well, have you been away from your home at --

11   at your residence at 525 Broadway for any period more

12   than two nights in 2021?

13       A.   Yeah, of course.

14       Q.   Okay.  Well, it's not of course to me.  So --

15       A.   Sorry.  I just wasn't understanding your

16   question.

17       Q.   So when have you been away from your residence

18   at 525 Broadway for more than two days in 2021?

19       A.   Most of -- most of the -- most of like the

20   first week of February.  Most of the first week of

21   February, and that's -- that's about it.  Yeah.

22       Q.   Okay.  That's 2021?

23       A.   2021, yeah.

24       Q.   Where were you for the first week of February

25   in 2021?

# EXHIBIT 5

1      A.   I was just like spending some time with my

2   girlfriend.

3      Q.   Okay.  Was that someplace out in Santa Monica?

4      A.   Santa Monica.

5      Q.   In Santa Monica, just not at 525 Broadway?

6      A.   No.

7      Q.   What's the name of your girlfriend?

8      A.   Ally (phonetic).

9      Q.   What's Ally's last name?

10      A.   Chambers.

11      Q.   C-h-a-m-b --

12      A.   C-h-a-m-b-e-r-s.

13      Q.   Okay.  And does she reside in Santa Monica

14   too?

15      A.   She does.

16      Q.   Okay.  What about 2019.  Were you -- sorry,

17   2020.  Were you away from 525 Broadway for any

18   protracted period of time, more than two days?

19      A.   2020 was the pandemic, so I was -- I was

20   pretty much at home throughout the whole year pretty

21   much, you know.  I don't know if you guys are familiar

22   with the LA cases that we had the highest COVID cases in

23   the -- I mean, not in just the country -- I the world.

24   So it was very dangerous for me to get out of the house.

25      Q.   Okay.  So is there any time you were away from

# EXHIBIT 5

1   525 Broadway sleeping somewhere else for more than two days

2   in 2020?

3        A.   No.   No.   Just either between my house or my

4   girlfriend's house.   That's about it.   Nothing --

5        Q.   Okay.   What about 2019.   Any time you were

6   away from the house, 525 Broadway, for more than two

7   nights?

8        A.   2019 I traveled quite a bit.   I traveled quite

9   a bit in 2019.   Yeah.   2019 I traveled quite a bit.

10       Q.   Okay.   Where did you go?

11       A.   I went to Puerto Rico, the Caribbean.   I went

12   to Europe for about like three weeks.   Yeah.   I traveled

13   quite a bit in 2019.

14       Q.   Okay.   For -- for 525 Broadway, is that the

15   address that USPS has for you?   Is that where you're

16   registered as your residence?

17       A.   Yeah.   That's my -- that's my address of mail

18   because -- I mean, I only have Amazon.   I don't really

19   get mail.   I just have Amazon and the DMV.   That's about

20   it.

21       Q.   Okay.   Has 525 Broadway been your registered

22   address with the DMV since when?

23       A.   Since -- let me look at my ID -- 10/19/2017.

24   You'll see it at the very bottom right.

25       Q.   Okay.   And why don't you get any mail?

EXHIBIT 5

29

1      A.   I'm sorry, what?  My bank statements are all

2  paperless.  My phone bill is paperless.  You know, just

3  Amazon and DMV.  That's about it.

4      Q.   You don't get any junk mail?

5      A.   Yeah.  I do get junk mail, but I -- you know,

6  a bunch of magazines and, you know, coupons and offers;

7  and I just like throw them in the trash.

8      Q.   Okay.  Do you get that junk mail to 525

9  Broadway in your name?

10      A.   Yes.

11      Q.   Okay.  What's your current job?

12      A.   I am currently unemployed.

13      Q.   How long have you been unemployed?

14      A.   Since the pandemic.

15      Q.   And does that mean since March 2019?

16      A.   Yeah.

17      Q.   Okay.  At 525 Broadway, do you pay rent?

18      A.   I do.

19      Q.   Do you have a roommate?

20      A.   I used to -- I used to have a roommate.  Yeah.

21      Q.   Who was that?

22      A.   His name is Mohammad Rostom.

23      Q.   How do you spell his last name?

24      A.   R-o-s-t-o-m.

25      Q.   And when was he your roommate?

EXHIBIT 5

1      A.    When?

2      Q.    Yeah.

3      A.    Since we moved -- we moved in in November of

4   2016.

5      Q.    And when did he stop being your roommate?

6      A.    He moved -- he actually moved out of the

7   country and moved to Dubai in late December, like, you

8   know, a week before Christmas of -- of 2020.

9      Q.    And since then you've just been covering rent

10  yourself?

11     A.    Actually, since -- so I -- the last check I

12  paid for the rent was in January, and then I did not pay

13  February and March just yet because of, you know, the

14  judgment.  They froze all my bank accounts.

15     Q.    Okay.  And were you working in March and April

16  2019?

17     A.    I was.

18     Q.    Okay.  Where did you work then?

19     A.    I was working on some, you know, technology

20  project still under the, you know, R&D phase, and then

21  that stopped when the pandemic, you know, start.

22     Q.    Did you work for a company, or did you have a

23  boss?

24     A.    No, no.  It was self -- no.  It was just self-

25  employed.

EXHIBIT 5

31

1       Q.   So what was the name of your employer?

2       A.   I didn't -- I didn't register an LLC for it

3   yet.  It was just all within the, you know, R&D

4   research, you know, period and, you know, all the

5   brainstorming and all the -- you know, it's -- the

6   technology business can be a bit -- a bit difficult, you

7   know.  It takes -- takes a while before you a product.

8       Q.   Okay.  So --

9       A.   But I was not making any income.

10      Q.   Before you started doing this R&D thing for

11  yourself with no LLC, self-employed, what -- what was

12  your job before that?

13      A.   Before that, I was in real estate investments.

14      Q.   Who was your boss there?

15      A.   Self-employed.

16      Q.   Okay.  Are you a citizen of the US?

17      A.   I am a permanent resident.

18      Q.   Okay.  Is that the same for your sister?

19      A.   My sister is a US citizen.

20      Q.   Okay.  And your sister is Reem Hanna?

21      A.   Yeah.  My sister is Reem Hanna.

22      Q.   Okay.  Do you recall where you were in March

23  2019?

24      A.   Let me look on my phone.

25           Okay.  I opened all my March photos, so just

# EXHIBIT 5

1  tell me which date, and I can look.

2      Q.    Sure.  How about just, you know, towards the

3  end of March 2019.  Were you --

4      A.    End of March.

5      Q.    Were you in California, or were you somewhere

6  else?

7      A.    I'm looking right now.  So I'm going to start

8  from March 31st, and then I will go back.

9      Q.    Okay.

10     A.    So Santa Monica, Santa Monica, Santa Monica.

11  I take a lot of pictures, almost every day.  Santa

12  Monica, Santa Monica, Santa Monica, Malibu, Santa

13  Monica.  Okay.  This is the LA Marathon.  That was March

14  24th.  We were watching it with our friends from a

15  rooftop.  Again, all -- just all Santa Monica really.

16  Yeah.  All the way to March 16th all Santa Monica,

17  Malibu.

18     Q.    How about --

19     A.    How much back do you want me to go for March?

20     Q.    That's fine.

21     A.    Oh.

22     Q.    How about the first -- first two weeks of

23  April 2019.  Were you in California?  I'm just trying to

24  see if you were out of California.

25     A.    Yeah, sure.  Yeah, yeah, yeah.  I got -- oh.

EXHIBIT 5

1    So you want April.  Okay.  Hold on.  April 2019.  Santa

2    Monica, Santa Monica, Santa Monica all the way to April

3    -- these are all -- these are all Santa Monica.  Let me

4    see.  These are all Santa Monica.  As you can see also

5    on the iPhone it says the -- the location and the day.

6    And then Pacific Palisades, Santa Monica.

7              MR. BERNHARD:  Witness is showing the camera

8         the phone, showing us some photos to show that

9         April 2019 and March 2019, photos which -- you

10        know, just to contribute to the record -- put in

11        the record.

12             THE WITNESS:  Malibu, Malibu.  I remember in

13        Hollywood, this is the Hollywood, you know, sign.

14   BY MR. BERNHARD:

15        Q.    Yeah.

16        A.    And then on April 13th, I went (audio

17   distortion) and I was there --

18        Q.    Where is that?

19        A.    A music conference in California.  It's called

20   Coachella.

21        Q.    Sure.  Okay.

22        A.    So you usually have two weekends.  I went the

23   first weekend and the second weekend.  So the first

24   weekend was April 13th to April 15th.  And me and my

25   girlfriend are -- you know, I'm there.  And then on

# EXHIBIT 5

1   April -- let's see.  Coachella is in a city called Indio,

2   which is about -- it's like two hours away from LA.  And

3   then April 17, I was in Santa Monica.  Just disregard

4   that picture.

5          April 18, Pacific Palisades, which is like --

6   like next door to Malibu.  I want to say Venice.  This

7   is the second weekend of Coachella April 19.  UCLA,

8   Westview Mall, Beverly Hills.  And then Easter on the

9   21st was in Beverly Hills.  Hollywood Hills -- I mean,

10  Hollywood.  I was in the church for Easter, April 25th.

11  April 26th.

12         And then I went to Hawaii on April 26th, and I

13  was in Hawaii just for the weekend.  Then I came back to

14  LA, Beverly Hills.  And then I went to London on --

15  wait, I don't know on this one.  Yeah.  No.  This is

16  still LA, but I don't know why my phone -- and then

17  Santa Monica 27th; 28th, Hollywood Hills.  Yeah.

18       Q.   Okay.  Got it.  Not, you got this place at --

19  at 116 Rockefeller at Irvine.  That's something that you

20  own; is that correct?

21       A.   Yes.

22       Q.   Okay.  Do you own any other properties in --

23  in Irvine, California?

24       A.   No.  I do not.

25       Q.   Okay.  Is this 116 Rockefeller -- is that a

EXHIBIT 5

36

1      Q.   Okay.  Is there an intercom system?

2      A.   No.  There's not.

3      Q.   Okay.  Is there a doorman?

4      A.   No.  It's a -- it's a house.

5      Q.   Was there a Ring camera at your property at

6  116 Rockefeller in 2019?

7      A.   To be -- to be honest with you, I have not

8  been here in 116 Rockefeller for about probably like

9  over two and a half years, maybe -- maybe more, you

10 know.

11     Q.   Okay.

12     A.   It's been a while.

13     Q.   Does that mean you don't know whether there

14 was a Ring doorbell system in 2019 at 116 Rockefeller?

15         MR. DELLORUSSO:  Objection.

16         THE WITNESS:  I'm not sure.  I'm not sure, to

17     be honest with you.

18 BY MR. BERNHARD:

19     Q.   Do you know if there was a Ring intercom

20 system in 2020 at 116 Rockefeller?

21     A.   Can you -- can you raise your voice a bit?

22     Q.   Yeah.  Was there a Ring camera system at 116

23 Rockefeller in 2020, to your knowledge?

24         MR. DELLORUSSO:  Objection.

25         THE WITNESS:  I'm not sure, Andrew, because,

# EXHIBIT 5

1     as I mentioned to you, I have not been in the Irvine

2     house, not even once in 2020, not even once in

3     2019.  I believe even when I came to Orange County

4     in 2018 it was just for Christmas -- Christmas Eve

5     at my cousin's house in Mission Viejo area, which

6     is like south of Irvine.

7   BY MR. BERNHARD:

8       Q.   Okay.  I saw that you testified that you're

9   not evading service and made -- have made no attempts to

10  evade service in this lawsuit; is that correct?

11      A.   I have not serviced what you said?

12      Q.   That you -- that you are not attempting to

13  evade service -- a processor?

14      A.   What do you mean by evade service?

15      Q.   I think that's in your affidavit, that you

16  made no attempts to evade service.  Does that sound

17  familiar at all?

18      A.   You mean I was serviced?  Is that what you're

19  saying?

20      Q.   So there is a lawsuit --

21      A.   Uh-huh (affirmative).

22      Q.   -- yeah, right, pending called Belgium

23  Investments versus Blank.  Are you aware of that

24  lawsuit?

25      A.   Yeah.  I didn't know anything about the

# EXHIBIT 5

1  lawsuit.  I was never served.

2      Q.   Okay.  Have you done anything whatsoever to

3  avoid getting handed a summons for this lawsuit?

4      A.   Absolutely not because no one ever knocked on

5  my door in Santa Monica and said, hey, you are served;

6  here's the lawsuit document.  Because if this -- if this

7  would have ever been the case, I would have called my

8  attorney right away and said, hey, I just got served.  I

9  never got anybody in the -- you know, in Santa Monica to

10  serve me since I lived there in -- since 2016 up until

11  now.

12      Q.   Okay.  Have you -- do you have any -- are you

13  currently avoiding service of process of the summons?

14      A.   No.  I am not.

15      Q.   Okay.  Do you have any problem just accepting

16  service of process for the summons for this lawsuit now?

17          MR. DELLORUSSO:  Objection.  Do not answer

18      that question.

19          THE WITNESS:  Okay.  I object.

20          MR. BERNHARD:  Is there a basis for that?

21      It's not privileged?

22          MR. DELLORUSSO:  Well, yes, it has to do with

23      communications that I had with him in regard to

24      that, and you're asking him to do something that is

25      -- that I spoke to him about.  So --

# EXHIBIT 5

1  BY MR. BERNHARD:

2      Q.   Okay.  I'm not asking you about your

3  conversations with your attorney whatsoever.  I'm asking

4  you right now, do you accept or will you accept service

5  of process of the summons?

6          MR. DELLORUSSO:  I'm going to object.  Do not

7      answer that.

8          MR. BERNHARD:  Okay.  On what basis?

9          MR. DELLORUSSO:  I just told you why.  I spoke

10      to him in regard to this, and I have given him some

11      legal advice that I do not want to come out in

12      regard to that question.

13          MR. BERNHARD:  Okay.  Well, he --

14  BY MR. BERNHARD:

15      Q.   -- don't -- don't tell me any legal advice

16  that your attorney has given you.  You can say I don't

17  accept.  You can say I do accept.  That doesn't reflect

18  on legal advice your -- your attorney has given you.  If

19  the answer is no, just say, no, I will not accept it.

20          MR. DELLORUSSO:  If you can say it without

21      giving your -- any legal advice, then go ahead and

22      answer.

23          THE WITNESS:  As I mentioned to you, Andrew,

24      you know, I'm like why would I not accept service.

25      If anybody came to my door and -- and knock on my

EXHIBIT 5

40

1       door, which is where I live in Santa Monica, and said,

2       hey, you're serviced, I would not have an issue

3       with it at all.  But nobody had -- nobody ever

4       came.

5   BY MR. BERNHARD:

6       Q.   Do you agree just to accept service now?

7            MR. DELLORUSSO:  Same objection.

8   BY MR. BERNHARD:

9       Q.   You can answer.

10      A.   I don't think I should answer that question

11  because, again, you -- you know, do you want to talk

12  about servicing me on a lawsuit?

13      Q.   Yeah.  I'm asking will you just agree to

14  accept service now for this lawsuit.

15      A.   I will have to talk with my attorney.

16           MR. DELLORUSSO:  (Audio distortion)

17  BY MR. BERNHARD:

18      Q.   So is that a no?

19      A.   I will have to consult with my counsel.  I'll

20  have to consult with my counsel first.

21           MR. BERNHARD:  Do you guys want to take a

22      five-minute break and let you consult, and you can

23      come up with a yes or no?

24           MR. DELLORUSSO:  That's fine.

25           MR. BERNHARD:  Okay.  Let's take a quick five.

EXHIBIT 5

```
 1        We'll be back at 27, okay.  So 2:27.

 2             THE WITNESS:  Okay.

 3             THE REPORTER:  Okay.

 4             MR. BERNHARD:  Okay.

 5             THE REPORTER:  All right.  We are off the

 6     record.

 7             (Recess taken)

 8             THE REPORTER:  Okay.  We are back on the

 9     record at 5:29 p.m. Florida time.

10             THE WITNESS:  All right.

11             MR. BERNHARD:  Okay.  We're back on the

12     record.

13  BY MR. BERNHARD:

14     Q.   Bassem, do you realize you're still under

15  oath?

16     A.   Yes.

17     Q.   Okay.  We just took a break so you could talk

18  to your attorney.  I want to make sure you don't tell me

19  anything that you talked about with your attorney or

20  told your attorney or he told you.  My question was: do

21  you agree to accept service process now just voluntarily

22  in this depo.

23     A.   I do not.  I do not accept service now.

24     Q.   Okay.  To your knowledge, has Reem Hanna ever

25  received mail for you or deliveries for you at 116
```

# EXHIBIT 5

1   Rockefeller in --

2        A.   No, never.

3        Q.   -- 2019?  Never?

4        A.   Never.

5        Q.   Never at all?

6        A.   No.

7        Q.   Not in 2019?

8        A.   No, never.

9        Q.   Not in 2020?

10       A.   No.

11       Q.   Not in 2021.

12       A.   I don't even have a mail -- I don't even -- my

13  mail is not going to this house.  It goes to Santa

14  Monica.

15       Q.   Okay.  And do you pay utilities at 525

16  Broadway, Apartment 5037?

17       A.   I do not pay the utilities.

18       Q.   Okay.  How do those utilities get paid?

19       A.   It's -- it's like all included.  The only

20  thing that was paid was the internet, and that was paid

21  by my roommate, and then when he moved out, I switched

22  account under my name, and I'm paying for it.

23       Q.   Okay.  So in 2019, there were no utilities in

24  your name whatsoever at 525 Broadway?

25       A.   No.  Just the rent.

# EXHIBIT 5

43

1      Q.    Same for 2020.  No utilities whatsoever in your

2   name --

3      A.    Same for 2020.  Same since 2016 and '17 and

4   '18.

5      Q.    Okay.  Do you own a car?

6      A.    I do.

7      Q.    Okay.  What car do you own?

8      A.    A Mercedes C-Class.

9      Q.    Okay.  What year is that car?

10      A.    2016.

11      Q.    And where is that car registered?

12      A.    It's in Santa Monica, as well, and it's in my

13   garage in Santa Monica, as well.

14      Q.    Okay.  Is it registered to your address 525

15   Broadway, Santa Monica?

16      A.    You know what, I'm not sure because I bought

17   the car at a dealership in Inland Empire in August of

18   2016, and then at that time I was still living in Irvine

19   address, so they probably like registered it for me in

20   the 116 address.  But I'm not sure if I paid the new

21   registration -- the new registration back in I believe

22   2018 at the 525 Broadway.  I mean, it should be because

23   that's where my ID is also showing, so I think it's now

24   switched to the Santa Monica from 2018.

25      Q.    And is your Mercedes insured as being at 525

EXHIBIT 5

1   Broadway or at --

2        A.   Yeah.   It did up until my insurance expired

3   last year in -- again, right before the pandemic.

4   Obviously, nobody's driving anymore, so then I just

5   didn't get a new insurance.

6        Q.   Okay.   So was your car registered as insured

7   at your Santa Monica address?

8        A.   525 Broadway.   Yeah.   525 Broadway.

9        Q.   Is that the same for 2019?

10       A.   Same as '19 and '18, and I believe '17, yeah,

11  as well.

12       Q.   Okay.   Do you have any documentation

13  reflecting having your car insured at 525 Broadway

14  rather than at --

15       A.   I can check with my insurance agent.

16       Q.   Okay.   Do you agree to produce that to us?

17       A.   Yeah, yeah.   I'll call him, and then I will

18  have him send me some kind of an email.   It's Farmer's

19  Insurance.   I'll have him send me some kind of an email

20  showing the insurance address.

21       Q.   Okay.

22       A.   Let me write that in my notes.   Just give me a

23  second.

24            Obtain an insurance for my -- my Mercedes at

25  525 Broadway from Farmer's Insurance.   Okay.   Got it.

# EXHIBIT 5

1    Q.   So was October 9, 2019, the last time you spoke

2   with Bernard Petite?

3    A.   Yeah, yeah.

4    Q.   Okay.  And when he's referencing mediation

5   there, did you not understand that he's talking about

6   mediating the lawsuit?

7    A.   Him and -- him and Jean Claude.  He never

8   mentioned to me ever that I'm a part of any -- any type

9   of a mediation or any type of a lawsuit.

10    Q.   So you understood at that time that he was in

11   a lawsuit with Jean Claude over this other Belgium

12   Investments?

13    A.   Right.  I understand that Bernard and -- and

14   Jean Claude were having some -- some type of a, you

15   know, legal battle between each other.

16    Q.   And did you ever think --

17    A.   And then at that -- and then at that time,

18   also Bernard asked me -- I remember very well.  He says,

19   "Did anybody try to serve you any documents?"  And said

20   that I have not gotten any documents.

21        And as a matter of fact, Bernard, he came to

22   visit me in my Santa Monica house and -- I'll tell you

23   the exact date because, you know, he spent like a few

24   days with me, and we went to have like some lunch in

25   Malibu and, you know, just kind of spend some time.  So

EXHIBIT 5

56

```
 1  that's actually the last time I saw him, and I can tell you.

 2  And then he was actually staying in my -- my Santa

 3  Monica address.  So I don't like if -- if -- I'm --

 4  honestly, I don't even know who's suing me, if it's like

 5  Jean Claude or Spencer.  I'm, you know, confused who is

 6  suing me.

 7          So then they are all talking to each other.

 8  So if someone, like my partner, came and stayed at my

 9  house in Santa Monica and they are suing me, why don't

10  they go and tell the service person to come to the Santa

11  Monica to serve -- to serve me?  And they all know that

12  I've been living in LA since 2016.

13      Q.   Okay.  So when did Bernard Petite come to your

14  -- stay with --

15      A.   Yeah.  Let me look.  I'll tell you right now.

16          (Pause)

17          You know, I'll have to look more on my phone

18  because we have pictures of the places that we had lunch

19  at and stuff.  I just -- I have to look more on my

20  phone.  I have so many pictures.

21      Q.   Do you think it was after October 2019 or

22  before?

23      A.   I'm actually -- now I keep going back with the

24  dates, so many pictures.  Yeah.  I will have to look

25  again.  I know it's -- I know I have the pictures on the
```

EXHIBIT 5

1          A.    Right.

2          Q.    Okay.

3               MR. BERNHARD:  I have no other questions.

4               MR. DELLORUSSO:  I have like a few questions.

5     Bassem, you can just proceed.  I'll be like five

6     minutes.

7               THE WITNESS:  Sure.

8                    EXAMINATION BY MR. DELLORUSSO

9     BY MR. DELLORUSSO:

10         Q.    In the year of 2018, where was your primary

11    residence?

12         A.    525 Broadway, Santa Monica, Los Angeles.

13         Q.    In the year 2019, where was your --

14         A.    525 Broadway, Santa Monica, Los Angeles.

15         Q.    In the year 2020, where was your primary

16    residence?

17         A.    525 Broadway, Santa Monica, Los Angeles.

18         Q.    And is that the same for 2021?

19         A.    Yes.

20         Q.    Were you ever served with any documents

21    related to this lawsuit in 2000 -- between 2018 and

22    2020?

23         A.    No.  I have not -- never been served.

24         Q.    Have you ever seen a copy of the complaint --

25    have you ever seen a copy of the complaint before --

EXHIBIT 5

1  before 2020?

2       A.   Before 2020 or before 2021?

3       Q.   Before -- before 2020.  Have you ever seen a

4  copy of the --

5       A.   No.  No, nothing.

6       Q.   Okay.  Were you aware of any attempts -- were

7  you aware of any attempts of service of process on you

8  -- on your sister, Reem Hanna?

9       A.   No.

10       Q.   Okay.

11       A.   I was never aware.

12       Q.   Okay.  And then I want to briefly discuss with

13  you -- let's see if I can -- the 116 Rockefeller,

14  Irvine, California, address.  Are you aware of that

15  address?

16       A.   Yes, I am.

17       Q.   Okay.  And who resides at that address?

18       A.   My sister, Reem Hanna.

19       Q.   And does she reside with anybody else?

20       A.   No.  She lives with her son.

21       Q.   Okay.  Do you reside at that address?

22       A.   I do not.

23       Q.   Okay.  And I think you testified earlier you

24  have a Mercedes?

25       A.   Yes, I do.

# EXHIBIT 5

1    Q.   Okay.  What color is your Mercedes?

2    A.   It's a white Mercedes C-300.

3    Q.   Okay.  Would that white Mercedes C-300 ever be

4 at the 116 Rockefeller, Irvine, California, address?

5    A.   No.  It's parked in my garage at 525 Broadway.

6    Q.   Okay.  Were you ever served with -- were --

7 strike that.

8         If there was ever attempt to provide service

9 upon you, would you accept service?

10    A.   If there was a service that someone was trying

11 to attempt to service me?

12    Q.   Correct.  Would you accept?

13    A.   Yeah.  If -- yeah.  If someone will come and

14 service me, I will accept service.

15    Q.   Okay.  Would you ever attempt to avoid

16 service?

17    A    No, never.

18    Q.   Okay.  Have you ever attempted to evade

19 service of process?

20    A.   No.

21    Q.   Okay.  Have you instructed anyone in your

22 family to evade service of process on this lawsuit?

23    A.   No, never.

24    Q.   Okay.  Have you had any other residences in

25 the years between 2018 and 2020 besides the residence

# EXHIBIT 5

1      Q.   Okay.   What color is your Mercedes?

2      A.   It's a white Mercedes C-300.

3      Q.   Okay.   Would that white Mercedes C-300 ever be

4   at the 116 Rockefeller, Irvine, California, address?

5      A.   No.   It's parked in my garage at 525 Broadway.

6      Q.   Okay.   Were you ever served with -- were --

7   strike that.

8           If there was ever attempt to provide service

9   upon you, would you accept service?

10      A.   If there was a service that someone was trying

11   to attempt to service me?

12      Q.   Correct.   Would you accept?

13      A.   Yeah.   If -- yeah.   If someone will come and

14   service me, I will accept service.

15      Q.   Okay.   Would you ever attempt to avoid

16   service?

17      A   No, never.

18      Q.   Okay.   Have you ever attempted to evade

19   service of process?

20      A.   No.

21      Q.   Okay.   Have you instructed anyone in your

22   family to evade service of process on this lawsuit?

23      A.   No, never.

24      Q.   Okay.   Have you had any other residences in

25   the years between 2018 and 2020 besides the residence

# EXHIBIT 5

```
 1  that you're living in now?
 2       A.   No.   Just the -- the same Santa Monica address
 3  since November 1, 2016.
 4       Q.   Okay.  And you've been sued before, correct?
 5       A.   Yes, I have.
 6       Q.   You're aware of how lawsuits work, correct?
 7       A.   Absolutely.
 8       Q.   You're aware that they have to actually serve
 9  you with papers, correct?
10       A.   Of course, especially here in California.
11       Q.   Okay.
12            MR. DELLORUSSO:  No further questions.
13            THE WITNESS:  Okay.
14            MR. BERNHARD:  No further questions.  I really
15  appreciate it, Bassem.  Thanks for taking the time.  I
16  know you guys had a long day.  I appreciate you coming
17  in.
18            THE WITNESS:  Oh, no problem.  I'm -- I have
19  this all day if you guys have any questions.
20            MR. BERNHARD:  Nope.  Thanks so much, guys.
21            MR. DELLORUSSO:  Andrew, real quick since I
22  have you here.  I had my assistant call for -- for
23  dates.  I believe we talked about the 23rd and 24th.
24            MR. BERNHARD:  Yeah.
25            MR. DELLORUSSO:  The only availability right
```

EXHIBIT 5

# DEPO
# 2

```
           IN THE CIRCUIT COURT OF THE
         11TH JUDICIAL CIRCUIT IN AND FOR
            MIAMI-DADE COUNTY, FLORIDA

               CASE NO.: 18-28145 CA


BELGIUM INVESTMENTS 960 BAY DR, LLC,
A CALIFORNIA LLC, ET AL.,

     Plaintiff,

     -vs-

SPENCER BLANK, ET AL.,

     Defendant.
_____/


             Deposition Taken via Zoom

             2:10 p.m. to 4:40 p.m.


                 DEPOSITION OF

                  REEM HANNA


         Taken before Erica Hylton, Court Reporter, a

Notary Public for the State of Florida at Large,

pursuant to Notice of Taking Deposition Duces Tecum

filed in the above-styled cause.
```

EXHIBIT 21

2

```
 1                    APPEARANCES:

 2        On Behalf of the Plaintiff:

 3        BERNHARD LAW FIRM PLLC

 4        BY: ANDREW BERNHARD

 5        333 SE 2nd Avenue, Suite 2000

 6        Miami, Florida 33131

 7        (786) 871-3349

 8        abernhard@bernhardlawfirm.com

 9

10        On Behalf of the Defendant:

11        SOUTH FLORIDA LAW, PLLC

12        BY:  FRANK DELLORUSSO, ESQUIRE

13        1920 East Hallandale Beach Boulevard

14        Suite 702

15        Hallandale, Florida 33009

16

17

18

19

20

21

22

23

24

25
```

EXHIBIT 21

```
1                         INDEX

2     TESTIMONY OF REEM HANNA              PAGE

3     Examination by Mr. Bernhard          5

4     Examination by Mr. DelloRusso        88

5     Examination by Mr. Bernhard          95

6     Certificate of Oath                  101

7     Certificate of Reporter              102

8

9                  INDEX OF EXHIBITS

10          DEFENDANT'S EXHIBITS MARKED

11    NUMBER          DESCRIPTION          PAGE

12    Exhibit 1       Affidavit of service 25

13    Exhibit 2       Photograph           52

14    Exhibit 3       Notice of deposition 82

15    Exhibit 4       Complaint            90

16    Exhibit 5       Motion               91

17

18

19

20

21

22

23

24

25
```

# EXHIBIT 21

4

```
 1                  P R O C E E D I N G S

 2          THE REPORTER:  Can you raise your right hand?

 3          (Witness sworn)

 4          MR. RUSS:  Court reporter, can you check the

 5      witness' license.  I know that's sort of standard

 6      practice right now, especially on these.

 7          THE REPORTER:  Yeah, absolutely.

 8          THE WITNESS:  If you could hang on one second,

 9      I'm going to go grab it.

10          THE REPORTER:  Okay.

11          (Non-related conversation not transcribed)

12          MR. BERNHARD:  I think you have to turn off

13      the background.

14          THE WITNESS:  Let me get rid of -- let me get

15      rid of the background thing.

16          THE REPORTER:  Little closer.  Yeah.  That

17      looks -- that looks good.

18          MR. BERNHARD:  All right, guys.

19          THE WITNESS:  You got it?

20          THE REPORTER:  Yeah.

21          MR. DELLORUSSO:  And, Bassem, if you could

22      just mute your mic, please.  Thank you.  Perfect.

23          MR. BERNHARD:  All right, guys.  So we're all

24      on the record.

25  THEREUPON:
```

EXHIBIT 21

1               REEM HANNA,

2          having been first duly sworn and responding,

3      "I do," was examined and testified as follows:

4                    DIRECT EXAMINATION

5   BY MR. BERNHARD:

6          Q.    My name is Andrew Bernhard.

7          Reem, Ms. Hanna.  What do you prefer that I call

8   you?

9          A.    Just call me Reem.

10          Q.    Like I said, my name is Andrew.  I'm taking

11   your deposition today.  Have you ever had your

12   deposition taken before?

13          A.    Just once.

14          Q.    Just once.  What were the circumstances?

15          A.    Something personal.

16          Q.    Sorry.  What?

17          A.    Do I need to -- I don't know that I feel

18   comfortable sharing that.

19          Q.    Well, sort of the deal is with these things

20   with -- with discovery in Florida, it's pretty wide open

21   unless you're in privileged areas, like your finances or

22   communications you've had with your attorney.  And so,

23   you know, my right here for my client is to test, you

24   know, your veracity, which means your truthfulness, your

25   background because you've voluntarily submitted an

# EXHIBIT 21

1  affidavit and put it into this court case.

2          And so, you know, I don't know you, obviously,

3  but you know, it's really my job to figure this stuff

4  out.  And so for the most part, there are very few

5  things that are off limits for these discovery portions

6  of the case.  Does that make sense?  We have an order

7  that limits me to the motion to vacate, the affidavits,

8  the filings that are in it, and testing what you guys

9  said there, so this is part of it.  Does that make

10  sense?

11     A.   Yeah.  I just -- yeah.  Yeah, yeah.  It just

12  is -- you know, I just don't want to, you know, share

13  information about myself that is not necessary, so it's

14  for my divorce case; so I don't know how that's

15  relevant.  But there you go.

16     Q.   Okay.  So for your divorce.  I won't ask you

17  too many questions about your divorce.  Don't worry.

18          Okay.  So, you --

19     A.   Please don't.

20     Q.   You -- you understood that sort of the -- the

21  way this goes, right.  It's I ask a bunch of questions;

22  you give your answers, and our great court reporter

23  writes those down, right.

24     A.   Yeah.

25     Q.   Okay.  So perfect example, you know, when I

EXHIBIT 21

1   ask you questions, our court reporter is just writing it

2   down, so she can't interpret nodding of your head,

3   shrugging of your shoulders, movement of your hands.

4   She really needs you to say yes, no, or some other

5   verbal statement; is that okay?

6       A.   That's fine.

7       Q.   Okay.   Sometimes when I'm asking you a

8   question, I won't state it very well.   You'll not

9   understand; you're not sure how to answer.   That's okay.

10  It's my job is to ask you questions that you can

11  understand and answer.   And so if at any time you don't

12  get what I'm asking you, just say so, okay.

13      A.   Okay.

14      Q.   So just say to me something like, you know, I

15  don't understand what you're asking or can you say that

16  a different way.   All right.

17      A.   Okay.

18      Q.   All right.   Sometimes while we're going along

19  you're going to say, look, I need a break, I want to

20  grab a glass of water, I need to use the restroom.   All

21  that's great.   No big deal.   I only ask that you finish

22  whatever answer you're giving at the time and then just

23  let us know you need a break, okay.

24      A.   All right.   Sounds good.

25      Q.   Awesome.   Sometimes when you're going along

# EXHIBIT 21

 1  you'll give an answer, and then later you'll think, you know

 2  what, I could have answered that differently or I just

 3  remembered something, or I want to, you know, more

 4  clearly state out what I said before.  Look, this is

 5  your testimony.  It's your deposition, and I want to

 6  make sure whatever it is you're saying is your most

 7  accurate, honest, complete answer possible, okay.

 8      A.   Okay.

 9      Q.   So if at any time you want to add to or

10  clarify a prior answer, just say so.  That's not a

11  problem at all.  All right.

12      A.   All right.

13      Q.   Okay.  And then sometimes you might be going

14  along and think, look, there's some documents that might

15  help me remember something about this question or answer

16  this question.  But any time you think there's a

17  document that can help you answer a question, just say

18  so.  We might have it here.  Your attorney might have

19  it.  Our job is to help you get to where you want to go,

20  okay.

21      A.   Okay.

22      Q.   All right.  These next questions are

23  formalities that make sure that you're, what we call,

24  legally competent to testify today.  All right.

25      A.   All right.  Go ahead.

EXHIBIT 21

1    Q.   All right.  Thanks.  Like I said, I -- it's this

2    funny thing with the -- with the court reporter writing

3    it down.  We just need yes, no, and otherwise, I can't

4    really move forward.  All right.  So, one, are you

5    taking any medication or drugs of any kind that might

6    make it difficult for you to understand my questions and

7    answer honestly and accurately today?

8    A.   No.

9    Q.   Have you had any alcoholic to drink in the

10   last eight hours?

11   A.   No.

12   Q.   Are you sick at all today?

13   A.   No.

14   Q.   Are you currently under a doctor's care for

15   any illness?

16   A.   No.

17   Q.   Have you ever been arrested or --

18   A.   Routine.

19   Q.   Sorry?

20   A.   Routine.  Routine --

21   Q.   Routine stuff?

22   A.   Yeah.

23   Q.   Anything that would make it difficult for you

24   to understand my questions or answer honestly and

25   accurately today?

# EXHIBIT 21

1      A.    No.

2      Q.    Okay.  Have you ever been arrested or

3  convicted for any acts of fraud or other crimes

4  involving deceit?

5      A.    No.

6      Q.    Have you ever been accused of any acts of

7  fraud or other acts involving deceit in a court?

8      A.    No.  No.

9      Q.    Okay.  Is there any other reason you can think

10  of that you can't understand my questions and answer

11  fully and truthfully today?

12      A.    No.

13      Q.    You understand you're speaking under penalty

14  of perjury; is that correct?

15      A.    Correct.

16      Q.    Okay.  And that means that you've got to tell

17  the truth, the whole truth, nothing but the truth, and

18  if you don't, that it's considered perjury.  Do you

19  understand that?

20      A.    Yes.

21      Q.    In Florida, perjury is a third degree felony

22  under Florida Statutes 837.02 and 92.525, and it's

23  punishable by prison and fines with up to five years in

24  prison and 5K in fines.  Do you understand that?

25      A.    Yes.

EXHIBIT 21

1    Q.   Okay.  And you've agreed to be sworn in and bound

2  under oath by our Florida notary; is that right?

3    A.   Yes.

4    Q.   And this -- this agreement to be under oath

5  and penalty of perjury applies the same to you out in

6  California; is that right?

7    A.   I don't understand.  I mean, I don't know the

8  legal system.

9    Q.   Sure.  Well, are you in Florida right now?

10    A.   No.

11    Q.   Okay.  Are you in California right now?

12    A.   Yes.

13    Q.   Okay.  So you understand that this rules that

14  -- that you're speaking under oath and penalty of

15  perjury, that those apply to you where you're sitting

16  today in California; is that right?

17    A.   Okay.  Yeah.  Thank you for explaining.  Yes.

18    Q.   Okay.  Yeah.  I know.  It's like this

19  technical thing about crossing state lines.  And we've

20  all been trying to figure it out with these -- with

21  these Zoom calls.  So I just always want to make sure

22  you get -- you know, you're not like in China, not

23  subject to extradition, and just free-willing it.  All

24  right.

25    A.   Got it.

# EXHIBIT 21

1      Q.    Okay.  Did you prepare at all for your deposition

2  today?

3      A.    Yeah.  A little bit.

4      Q.    Okay.  What'd you do?

5      A.    I took the -- the rest of the afternoon off.

6      Q.    Okay.  And how is that preparation, or how

7  does that involve preparation?

8      A.    Just to organize my day and to make sure that

9  I'm available to answer your questions.

10      Q.    Okay.  Did you review any documents to prepare

11  for your deposition?

12      A.    I did.  I looked through my phone to see some

13  old pictures.

14      Q.    And how would looking at your phone to see old

15  pictures help you prepare for this depo today?

16      A.    I just -- to be prepared --

17      Q.    Sure.

18      A.    -- depending on what you need to find

19  information about.

20      Q.    Okay.  Let's understand what you mean.  Were

21  you like looking up photos to see where you were on

22  certain dates or where you weren't, or something like

23  that?

24      A.    Yeah.  I wanted to see where I was on certain

25  dates.

EXHIBIT 21

1    Q.    And what did you find?

2    A.    Where I was on those dates.

3    Q.    Okay.  What -- what -- what dates in

4 particular did -- did you go looking for?

5    A.    Why -- why don't we get to your questions

6 about what dates you're looking for just so I make sure

7 that I'm giving you what you need?

8    Q.    Sure.  I am right on the questions I'm looking

9 for.  I promise you.  You'll -- you'll know when I'm not

10 because I'll say I'm done.  So just tell me what you

11 were looking for when you were doing your preparation.

12    A.    I looked at a couple of dates that -- dates

13 September 15th and March 3rd.

14    Q.    Okay.  Is that September 15, 2020, 2021, 2019?

15    A.    2020.  And then March 3, 2019.

16    Q.    March 3, 2019?  And why did you look for those

17 particular dates?

18    A.    My understanding are those are the dates that

19 they claim they -- they were serving me or said that she

20 was serving me.

21    Q.    Okay.  So what did you find when you looked at

22 photos from March 3, 2019?

23    A.    I was not in Orange County.  I was in LA at a

24 different event.

25    Q.    What were you doing in LA on March 3, 2019?

EXHIBIT 21

1      A.   I had a yoga class and a brunch with friends in

2  LA.

3      Q.   And what time was your yoga class on March 3,

4  2019?

5      A.   10:30?

6      Q.   Sorry?

7      A.   It was at 10:30.

8      Q.   10:30?

9      A.   10:30 a.m.

10      Q.   Where was that at?

11      A.   It was in -- I believe it was in -- hang on

12  one second -- it was in Hollywood Hills, I believe,

13  either Hollywood Hills or Bel Air.  But, you know, I can

14  get you -- yeah.  It was -- I think it was Hollywood

15  Hills.

16      Q.   Okay.  Was it -- was it like a particular

17  company?

18      A.   Yeah.  It was an organized event by a yoga

19  studio, and it was for charity; so they organized this

20  yoga event at the house in LA where the proceeds would

21  go to charity.

22      Q.   And who was it?  What house?

23      A.   Just some really nice house in LA.  So it was

24  a mansion in LA, and it was organized by a yoga studio

25  that my friend owns.

EXHIBIT 21

```
 1         Q.   And which -- what's the name of the studio, and

 2    what's the name of the friend?

 3         A.   Aree Khodai.

 4         Q.   How do you spell it?

 5         A.   K-h-o-d-a-i.

 6         Q.   Is that Z like Zed?

 7         A.   K as in kilo, h as in hotel, o, d as in David,

 8    a-i.

 9         Q.   D as in David, a-i.  Okay.  And what's the

10    name of the yoga studio?

11         A.   Aree's Army is her business.

12         Q.   Okay.  So you go to do a trade event with

13    Aree's Army, and you said that was up in the hills or

14    Bel Air?

15         A.   Let me ask my brother.

16              THE WITNESS:  Do you remember where that house

17         was?  I think it was -- I have the photos of the

18         house.  I think it -- I mean, I'm not very familiar

19         with the area that it was in.  I think it was in

20         either Bel Air or Hollywood Hills.  I can find the

21         address.

22    BY MR. BERNHARD:

23         Q.   And just so we have a clear record, is your

24    brother with you right now while you're doing your

25    deposition?
```

# EXHIBIT 21

1       A.   He's on the phone.

2       Q.   Okay.  Is he with you physically?

3       A.   Yeah.

4       Q.   Okay.  And so this is sort of that weird

5  thing.  You know, there's a rule that we can invoke as

6  to witnesses having other witnesses in the room.  I

7  recognize that Bassem's a party, but I just want to make

8  sure -- I'm sure you guys saw this like on the news

9  today -- that there's some degree of -- of sense of

10 intimidation sometimes when a witness is talking and the

11 witness is in the room.

12       Are you saying that the witness -- are you

13 saying that Bassem is in the room with you, or are you

14 just saying he's on the phone?

15      A.   He's -- he's on the phone.  He was asked to

16 join.

17      Q.   Sure.  I didn't ask him to join, so I'm just

18 making sure that -- that he's not --

19      A.   Oh, yeah.

20      Q.   So I'm just making sure he's not in your room

21 with you observing you give your testimony.

22      A.   Okay.

23      Q.   So is he in the room with you observing you

24 give your testimony?

25      A.   He's in the house.  He's not in the room.

# EXHIBIT 21

 1  He's in the house, but yeah.  If that's not okay, let me

 2  know.

 3       Q.   I would just say -- look, I just ask that you

 4  guys stay just in separate rooms if possibly, and then

 5  we'll just see how it goes.  Does that work for

 6  everybody?

 7       A.   That's fine with me.

 8       Q.   Okay.  I apologize.  I don't know if you guys

 9  saw that -- that news clip today -- or I'm sorry, this

10  week, where it was like a lady testifying in court, and

11  I guess like -- did you guys see this thing.  There was

12  like somebody like -- the defendant was in the other

13  room.  Did you guys see this at all?

14            THE REPORTER:  I did.

15            THE WITNESS:  No.

16            THE REPORTER:  I did.

17            MR. BERNHARD:  That was crazy, right, where

18       like the -- the like Court realizes that the guy is

19       in the other room, and they like freak out; and the

20       police go and arrest him.  I don't know.  It's --

21            THE REPORTER:  Yeah.  Yeah.  It was an assault

22       case, and the judge threw him out.  And -- but he

23       basically stalled them until the police showed up.

24            MR. BERNHARD:  Yeah.  Crazy.  Crazy to watch.

25            MR. DELLORUSSO:  Just -- just for the record,

# EXHIBIT 21

```
 1        I just want to make sure Bassem's aware he's allowed

 2        to be present since he is a party.  But, Bassem,

 3        you know, just be in a separate room, please.

 4        That's all he's asking for.

 5            So for example, if she's in her -- her bedroom

 6        or in the kitchen, just go in a separate room just

 7        so, you know, technically you're not like giving

 8        her answers.  That's kind of what -- what the --

 9        the whole deal is.  So -- so Andrew is aware that

10        you're not feeding her answers.  That's the only --

11        that's the only issue.

12            MR. BERNHARD:  Does that make sense, guys?

13            MR. EL MALLAKH:  I understand.  I'm upstairs,

14        actually.  I'm in the top room.

15            MR. DELLORUSSO:  Perfect.  Perfect.  There we

16        go.  We're good.  Thank you.

17            MR. EL MALLAKH:  Is that okay?

18            MR. DELLORUSSO:  Yeah.  Yeah.  Of course.

19            MR. EL MALLAKH:  If you guys want me to leave

20 the house, I don't have a problem.

21            MR. DELLORUSSO:  No, no, no.  You don't have

22 to leave the house at all.  We just don't want you to be

23 in the same room.

24            MR. EL MALLAKH:  Oh, okay.

25            MR. BERNHARD:  Yeah, yeah.
```

EXHIBIT 21

```
 1            MR. EL MALLAKH:  Okay.

 2            MR. BERNHARD:  I only said it because she'd

 3       asked a question.  And you get what I'm saying,

 4       right, guys.  I just want to make sure her

 5       testimony is her own.

 6            MR. EL MALLAKH:  Okay.  No problem.  I'm going

 7       to mute -- I'm going to go ahead and mute now.

 8            MR. BERNHARD:  Okay.

 9            THE WITNESS:  And, Andrew, I found the exact

10       address of the house if that's helpful to you in

11       any way.

12  BY MR. BERNHARD:

13       Q.   Yeah.  That'd be great.  Please.

14       A.   1536 Blue Jay Way, Los Angeles, California

15  90069.

16       Q.   90 what?

17       A.   069.

18       Q.   Okay.  All right.  So you're at this thing in

19  the morning.  At 10:30 at you're at this -- at this

20  charity event, and then you said you went to brunch.

21       A.   Yes.

22       Q.   And where did you go to brunch with your

23  friends?

24       A.   Hang on one second.  Hang on.  I can get the

25  name of the place.  My friend owns the restaurant.  Let
```

EXHIBIT 21

1  me see.  Los Angeles.  It was in Los Angeles.  It's called

2  Gwen.

3      Q.   Gwen, G-a-w?  Sorry, G-l-e --

4      A.   G-w-e-n.

5      Q.   G-w-e-n.  Okay.  And it's like a restaurant?

6  Where at?

7      A.   Yeah.  It's a restaurant.

8      Q.   Where is it at?

9      A.   In Los Angeles.

10     Q.   I know, but it's a big city, so is it like

11 north, central --

12     A.   Oh.  You want the address?  It's -- yeah.

13 6600 Sunset Boulevard.

14     Q.   Okay.  So you go to brunch at what -- what

15 about time is that?

16     A.   Probably around I'd say 12:30, maybe.

17     Q.   Okay.  So while you're looking there at your

18 phone --

19     A.   My phone?

20     Q.   Yeah.  While you're looking at your --

21     A.   Oh, to see my -- oh, to see if there was a

22 text message saying like time we went.  I'm trying to

23 get as accurate as you -- as I can for these answers.

24     Q.   Appreciate it.  Okay.  Well, what about April

25 17, 2019.  What does your phone tell you about that?

EXHIBIT 21

1    A.   What date?

2    Q.   April 17, 2019.

3    A.   So I was also in LA doing a hike and

4  celebrating a friend's birthday.

5    Q.   Where was that?

6    A.   The hike was -- again, I believe it was in

7  Malibu.  I have a picture of the hike.  And the birthday

8  was at Waldorf Astoria in Beverly Hills.

9    Q.   And when did the hike start?

10    A.   When did what -- which one?  The hike?

11    Q.   The hike on April 17, 2019.

12    A.   It was possibly around 10:00 a.m.

13    Q.   Is that what your photos tell you, or is that

14  just guessing?

15    A.   No.  That's -- I mean, that's -- it's probably

16  around 10:00 a.m. because I took a photo of the end of

17  the hike, and it was a five mile hike; and I know my

18  pace, so probably around 10:00 a.m.  Could be like

19  10:05, 10:10, but like I -- just knowing my pace.

20    Q.   Okay.  And what's the photo say for the end of

21  the hike?  What's the time stamp for that?

22    A.   3:28.

23    Q.   3:28 is the end of the hike up in Malibu, and

24  then you go to Waldorf Astoria in Beverly Hills for a

25  party.

# EXHIBIT 21

1      A.   Correct.

2      Q.   What time did you go to the party?

3      A.   Let me look.  7 -- I was going to say maybe

4  7:30 because my photo stamp is at 8:30, but -- it was

5  probably 7:30 is when we got there.

6      Q.   7:30 you go to Waldorf, and your photo stamp

7  said what?  8:30 you said?

8      A.   8:30, yeah.

9      Q.   And in between the end of the hike at 3:30 and

10  the arrival at -- at Waldorf at 7:30, what did you do?

11      A.   I went to my best friend's house in Beverly

12  Hills to get ready there.

13      Q.   Who is your best friend?

14      A.   Her name is Jihan.

15      Q.   Yeah.  Jihan what?

16      A.   Shaw.

17      Q.   Is that G-i-h-a-n or J-i-h-a-n, or how is it

18  spelled?

19      A.   She spells it either way.

20      Q.   Okay.  Well, do you know which one is her

21  legal name?

22      A.   You can use G, use J, it doesn't matter.  But

23  she uses -- she -- it's different on each item that she

24  has.  Her passport has G; her ID says J.  She's not

25  relevant to the story.  So --

# EXHIBIT 21

1      Q.   She is relevant for -- for our purposes, right.

2  So Shaw, S-h-a-w?

3      A.   Yeah.

4      Q.   Okay.  And do you know her phone number?

5      A.   I do know her phone number, but I'm not

6  comfortable giving her -- you her phone number.

7      Q.   Why is that?

8      A.   Why would -- I mean, I could ask why you need

9  her phone number.

10     Q.   But that wouldn't be how the deposition works.

11 So as we sit here today, the court empowers me to ask

12 you questions.  It does not empower you to ask me any

13 questions.  And if necessary, I could just have you

14 subpoenaed, and then have a court compel you to do so.

15 And if you refuse, then they issue a warrant for your

16 arrest.

17     A.   Okay.

18     Q.   I don't want to go down that road.

19     A.   All right.  Why don't we go down that road

20 because I'm not comfortable giving you my best friend's

21 phone number.  She has nothing to do with this.  You're

22 already asking me a lot of questions, and I feel like

23 it's not necessary.

24     Q.   Okay.  Well, motion to compel and sanction the

25 witness for failure to comply.

# EXHIBIT 21

```
 1            Like -- like I said, I'm not trying to make this

 2   crazy or difficult, it's just going to extend it out for

 3   your brother.  I'm really trying to make this stuff

 4   easy.  I have to check what you're saying, right,

 5   because you, like I said, submitted testimony to the

 6   court voluntarily.  That's something you chose to do.  I

 7   had no part in that, and I'm obligated by my client.

 8   I've got to check this stuff out, right.  So --

 9            MR. DELLORUSSO:  Real -- real quick.  How is

10        -- how is the April date relevant?

11            MR. BERNHARD:  April date relevant is the date

12        that she was -- according to the testimony of a

13        process server, it's the date that she was served

14        -- she was processed.

15            MR. DELLORUSSO:  But she was given --

16            MR. BERNHARD:  It says right here, "On the

17        17th day of April 2019, I did as follows."

18            MR. DELLORUSSO:  Looking at -- looking at your

19        motion at -- for default, you advised that she was

20        served on March 3rd.  I think that's what -- that's

21        what it says in the affidavit.  So --

22            MR. BERNHARD:  It's -- I think you're just

23        reading it wrong.  It says, "Received a writ on

24        March 3rd."

25            MR. DELLORUSSO:  I can look at your motion to
```

EXHIBIT 21

1      -- if you look at your motion for default -- do you

2      have it open?

3          MR. BERNHARD:  Sure, guys.  Look -- I'm

4      looking at the affidavit of service.

5          MR. DELLORUSSO:  Yeah.  I looked at -- I

6      looked at it too.

7          MR. BERNHARD:  Okay.  See --

8          MR. DELLORUSSO:  But I'm not sure if the

9      process server -- you know, we can go off the

10     record if you want.

11         MR. BERNHARD:  No, no.  Let's do it on -- on

12     the record.

13         MR. DELLORUSSO:  Okay.

14         MR. BERNHARD:  You see that -- I'm looking at

15     this affidavit of process.  It says --

16         MR. DELLORUSSO:  Yeah.  I'll pull it up.  It

17     says March 3rd.

18         MR. BERNHARD:  I'll make it easier, guys.

19     I'll pull it up for all of us.  We can all look at

20     the same thing on share screen, okay.

21         Can you guys all see the screen that I'm

22     looking at here?

23         MR. DELLORUSSO:  Uh-huh (affirmative).

24         MR. BERNHARD:  Does everybody see that?

25         THE REPORTER:  Yeah.

# EXHIBIT 21

1          MR. BERNHARD:  Okay.  So you see here we have

2     this -- we'll mark this, Court Reporter, as Exhibit

3     1.

4          THE REPORTER:  Okay.

5          (Deposition Exhibit 1 marked)

6          MR. BERNHARD:  And I'll send it to you.  Is

7     this affidavit of service by Brittany Johnson

8     (phonetic) for summons in this case of BV Global

9     Investment Partners (phonetic), Belgium

10    Investments, case number 18-28145-CA, and the

11    address 116 Rockefeller, Irvine, California 92612.

12    And it says that she received this writ on the 3rd

13    day of March 2019.  "Served the same at 12:20 p.m.

14    on the 17th day of April 2019 upon Reem Hanna."  So

15    I'm just going by what she says here.

16         MR. DELLORUSSO:  Well, I also want to show

17    something for the record as well.

18         MR. BERNHARD:  Please don't because it's my

19    deposition.  When it comes to your time for cross,

20    you're welcome to do so.

21         MR. DELLORUSSO:  Okay.  Well, your -- your --

22    your motion for judicial default is --

23         MR. BERNHARD:  When you -- you -- when you go

24    beyond at speaking onto Rule 1.310, you're

25    prohibited from doing so because you're coaxing

# EXHIBIT 21

27

 1 │       testimony out of the witness.  Please refrain from

 2 │       making -- other than objections to form.

 3 │ BY MR. BERNHARD:

 4 │    Q.    Okay, Reem.  So here you understand why I'm

 5 │ asking you these questions.  There's an affidavit to

 6 │ this effect saying that this person served you on this

 7 │ date, and so I'm just trying to get an idea of where you

 8 │ were and who else can verify that because you've

 9 │ testified otherwise.  Do you understand that -- that --

10 │    A.    Yeah.

11 │    Q.    -- calls into question --

12 │    A.    So I'm trying to do my best job here in

13 │ answering all of your questions.  I'm also not trying to

14 │ be difficult.  You asked me exactly where I was, what

15 │ time.  I'm shared -- sharing that information with you,

16 │ you know.  I'm trying to also protect the privacy of my

17 │ friend.  She has no -- you know, there's no reason to

18 │ drag more people into this, so I'm trying to protect her

19 │ privacy.  You know, if you want her phone number, I'll

20 │ give you her phone number.  It's just like --

21 │    Q.    Great.  Yeah.

22 │    A.    I'm just starting to feel like this is a

23 │ little excessive.

24 │    Q.    That'd be great.  That'd be great.

25 │    A.    I'm giving you all the information that you're

# EXHIBIT 21

1  asking for as detailed as I -- as I can.

2       Q.   I appreciate that.  So what's her phone

3  number?

4       A.   (949) 878-1181.

5       Q.   1187 you said?

6       A.   81.

7       Q.   1181.  Okay.  So you go to Jihan's at 3:30.

8  You're there util, you think, 7:30 on April 17, 2019; is

9  that right?

10      A.   That's about right.

11      Q.   Okay.  And then do you know how long you were

12 at the -- the thing at -- at the Waldorf?

13      A.   We were probably there until like 10:30 or

14 11:00, and then I went back and spent the night at her

15 place.

16      Q.   Okay.  So turning to the time of around noon,

17 your feelings are that you were on this hike in Malibu;

18 is that right?

19      A.   That's correct.

20      Q.   Okay.  This is for April 17, 2019.  Is that

21 right?

22      A.   That's correct.

23      Q.   Okay.  Were you with anybody on this hike on

24 April 17, 2019?

25      A.   Yes.  With my friend, Jihan -- my best friend,

# EXHIBIT 21

29

1   Jihan.

2        Q.   So you and Jihan are on the hike in Malibu.

3   You guys go back to Jihan's house and you get read for

4   the party.  Do you recall --

5        A.   Yes.

6        Q.   -- when you met first Jihan on April 17, 2019?

7        A.   I believe it was around 10:00 a.m.

8        Q.   So you met at the -- at the hike site?

9        A.   No.  We met at her house.

10       Q.   Okay.  So you meet at Jihan's house at 10:00

11  a.m.  And where is Jihan's house approximately?  I don't

12  need you to give me an exact address, but let's just say

13  it's --

14       A.   Beverly Hills.

15       Q.   -- a cross street or something.

16       A.   Beverly Hills.

17       Q.   What was that?

18       A.   Beverly Hills.

19       Q.   Beverly Hills.  And can you give me like a

20  cross street, not an exact number, just like a cross

21  street?

22       A.   Usher and Leslie.

23       Q.   Usher and Leslie.  Okay.  And where was the

24  hike site that you went to?

25       A.   I don't remember the exact site.  I'm not very

EXHIBIT 21

1  savvy with LA towns.  Like I can't tell you exactly where

2  it was.  I can probably find out.  It was in LA.

3      Q.   LA.  So you're not sure if it was in Malibu or

4  maybe somewhere else in LA?

5      A.   It was in Los Angeles.

6      Q.   Okay.  Is, that Los Angeles County, City of

7  Los Angeles?

8      A.   Los Angeles County.

9      Q.   Okay.  And you don't know specifically where

10  in Los Angeles County this hike was, whether it be

11  farthest edge east, right up on the shore in Santa

12  Monica, all the way up Thousand Oaks, down almost the

13  border of the OC?  You have no idea where this hike

14  occurred --

15          MR. DELLORUSSO:  Objection.

16  BY MR. BERNHARD:

17      Q.   -- on April 17, 2019?

18      A.   It was in Los Angeles County.  I can show the

19  pictures of the hike.

20      Q.   That would be great if you could.  Is there

21  like a -- you know, usually phones have like a marker

22  that identifies where they are.  Do you think that you

23  could forward that to your attorney, and he can produce

24  it to me?

25      A.   Yeah.  Sure.

EXHIBIT 21

1      Q.   Okay.  So somewhere -- it looks like you're on a

2  hill, and it's looking down somewhere.  Does that sound

3  right?

4      A.   That sounds right.

5      Q.   Okay.  And at this time, on April 17, 2019,

6  where were you living?

7      A.   At 116 Rockefeller.

8      Q.   And where is that located?

9      A.   Irvine, California 92612.

10     Q.   Okay.  Is that where you are right now?

11     A.   That's correct.

12     Q.   Okay.  And how far is it from Irvine,

13  California at 116 Rockefeller to your friend Jihan's

14  house?

15     A.   About 50 miles.

16     Q.   Fifty miles.  And is it like up the 405 with

17  traffic, or is it something else?

18     A.   Up the 405 with traffic.

19     Q.   Okay.  And how long does it take you to do

20  that 50 miles up the 405 with traffic from Irvine to

21  Jihan's house?

22     A.   About two hours -- two hours and twenty

23  minutes.

24     Q.   All right.  So what time do you think you left

25  your house at 116 Rockefeller to do this hike on April

EXHIBIT 21

1  17, 2019?

2      A.  Probably no later than 9:00 a.m.

3      Q.  Okay.  Okay.  And then you said you looked up

4  another date.  You said September something; does that

5  sound right?

6      A.  I think those are the two that I looked at my

7  phone for.

8          MR. DELLORUSSO:  Andrew, let me know when

9      you're ready for me to send you the April 17, 2019,

10     photos.

11         MR. BERNHARD:  That would be great.  If you

12     can shoot them over, that'd be awesome.

13         MR. DELLORUSSO:  Sure.

14 BY MR. BERNHARD:

15     Q.  And then -- and you were saying that you also,

16 to prepare for this deposition, looked at a photo or

17 photos from September 15, 2020.  Do I understand that

18 right?

19     A.  No.  I don't think September 15th.  Why don't

20 -- Andrew, why don't you tell me what date you're

21 looking for.  It'll be easier.

22     Q.  Like I said, you are giving testimony.  You

23 previously testified that you looked up photos.  I said

24 what dates.  You said March 3, 2019 and September

25 something 2020, so I'm trying to understand what date

EXHIBIT 21

1  you --

2       A.   Yeah.  I'd rather just be more accurate about,

3  you know, what dates you're looking for, and then I can

4  help with whatever questions you have.

5       Q.   I'm sure you would, but again, like I said,

6  this is my deposition.  I ask questions; you give the

7  answers.  So please just testify --

8       A.   I don't remember what date -- I don't remember

9  what day in September.

10       Q.   Okay.  But you recall looking at some date in

11  September 2020 to look for photos; is that right?

12       A.   Yeah.  I looked through the whole month of

13  September.

14       Q.   Okay.  And what did you --

15       A.   If you want to narrow it --

16       Q.   What did you glean from -- from that -- doing

17  that -- looking?

18       A.   Again, lots of different things, like lots of

19  different activities, so if you can help me narrow down

20  a particular one, I'm happy to answer your questions.

21  But --

22            MR. DELLORUSSO:  I'm going to object to this

23       line of questioning.  We've already stipulated

24       according to your document that she was served on

25       April 17th -- allegedly served at that time.  So I

# EXHIBIT 21

```
1    don't know why we're asking about September.

2         MR. BERNHARD:  Please -- please, if you do one

3    more time, a speaking objection, we're just going

4    to have to call the judge to have you comply with

5    the Rule --

6         MR. DELLORUSSO:  Let's call the judge.  This

7    is going outside the scope of the order.

8         MR. BERNHARD:  Not going outside the scope of

9    the order.  You don't have any right whatsoever to

10   have speaking objections.  If you want to instruct

11   your client not to answer because you feel like

12   where she was, what she did to prepare for this

13   deposition is outside the scope of this deposition,

14   please make a call to the judge and say, judge,

15   I've instructed the witness not to answer because

16   questions as to how she prepared for the deposition

17   I've determined are outside the scope of the

18   deposition.  And I can -- I'm happy to wait if you

19   want to instruct her not to answer.

20        MR. DELLORUSSO:  All right.  My objection is

21   outside the scope of the order.  That's my

22   objection.

23        MR. BERNHARD:  Okay.  Are you instructing your

24   client not to answer?

25        MR. DELLORUSSO:  No.  She can answer if she
```

EXHIBIT 21

1    knows -- if she knows the answer.

2         MR. BERNHARD:  Great.  From here on forward,

3    please, unless you're instructing the client not to

4    answer, please don't make any more speaking

5    objections.  It coaxes the witness testimony.

6 BY MR. BERNHARD:

7    Q.   Okay.  So, Reem, I understood Jihan has

8 different names.  What's your full legal name?

9    A.   Reem Hanna.

10    Q.   Okay.  And was that your original name at

11 birth?

12    A.   No.  That's my marriage name.

13    Q.   Okay.  What was your name at birth?

14    A.   Reem El Mallakh.

15    Q.   So El Mallakh was your last name?

16    A.   Correct.

17    Q.   Do you have any other names or aliases that

18 you go around by besides Reem Hanna and Reem El Mallakh?

19    A.   No.

20    Q.   Do you have any, you know, middle names that

21 you would go by or anything like that?

22    A.   No.

23    Q.   Okay.  And you testified that you currently --

24 currently reside at 116 Rockefeller in Irvine,

25 California; is that right?

# EXHIBIT 21

1    A.   Correct.

2    Q.   Okay.  And how long have you lived there?

3    A.   I think since 2017.

4    Q.   Okay.  Are you sure of that date?  Did I --

5 sorry.  Was that a yes or a no?

6    A.   Yeah.  I think early 2017.

7    Q.   Okay.  Are you sure of that date, early 2017?

8        MR. DELLORUSSO:  Objection, form.

9 BY MR. BERNHARD:

10   Q.   Is that a yes?  Or sorry.  Whenever he says

11 objection, unless he instructs you not to answer, you

12 just have to answer.

13   A.   Yeah.  I think early 2017.

14   Q.   Okay.  And do you have any brothers or

15 sisters?

16   A.   Yes.  One brother.

17   Q.   What's your brother's full legal name?

18   A.   Bassem El Mallakh.

19   Q.   Bassem El Mallakh.  Does he go by any other

20 name?

21   A.   No.  Not that I know of.

22   Q.   Okay.  Have you ever heard him go by any other

23 name?

24   A.   No.

25   Q.   Does he have any middle names?

# EXHIBIT 21

1        A.    Essam.

2        Q.    So his middle name is Essam; his last name is

3  El Mallakh; is that right?

4        A.    Yes.

5        Q.    Okay.  And do you have -- sorry.  What are the

6  names of your mom and your dad?

7        A.    Mona (phonetic) and Essam.

8        Q.    You said Essam, E-s-s-a-m?

9        A.    Yes.  Yes.

10       Q.    And are both their last names El Mallakh?

11       A.    No.  My mom's last name is Soliman.

12       Q.    Say it again.  I'm sorry.

13       A.    Soliman.

14       Q.    How do you spell that?

15       A.    S-o-l-i-m-a-n.

16       Q.    Is your dad's last name El Mallakh?

17       A.    Yes.

18       Q.    Do they have any middle names that they go by?

19       A.    No.

20       Q.    Do they have any middle names at all?

21       A.    No.

22       Q.    Okay.  Okay.  So when you say you reside at

23  116 Rockefeller, what do you mean by that -- by the fact

24  that you reside there?

25       A.    I live there.

EXHIBIT 21

1      Q.   Okay.  Does that mean you sleep the majority of

2  your nights there?

3      A.   Yes.

4      Q.   How many nights would you say on average you

5  sleep at 116 Rockefeller in 2020?

6      A.   The majority of them.  There's a pandemic.

7      Q.   So would you say like nearly 100 percent of

8  the nights?

9      A.   Apart from trips that I would take, I would

10  say yeah.

11      Q.   Okay.  What trips did you take in 2020?

12      A.   Several trips.  I can't remember them all off

13  the top of my head.

14      Q.   Did you take any trips in September 2020?

15      A.   I don't remember.

16      Q.   You don't remember at all if you took any

17  trips in September 2020 during the COVID quarantine?

18      A.   Yeah.  I took several trips in 2020.  I don't

19  remember if September was one of them.

20      Q.   Okay.  When did you take trips in 2020?

21      A.   December --

22          MR. DELLORUSSO:  I'm going to object -- I'm

23      going to object to that as well, outside the scope

24      of this deposition.

25          MR. BERNHARD:  Please stop making speaking

EXHIBIT 21

```
 1        objections.
 2             MR. DELLORUSSO:  I'm not.  I'm --
 3             MR. BERNHARD:  Okay.  Objection to the form is
 4        the only thing you're allowed by law to say.  Any
 5        references to scope and otherwise is coercing the
 6        witness.  Please stop doing it.
 7   BY MR. BERNHARD:
 8        Q.   Ms. Hanna, when did you take trips in 2020?
 9        A.   Like I said, I don't remember all of them,
10   Andrew.  I took several trips.  I don't remember.
11        Q.   So you don't know when you took trips in 2020
12   at all.
13        A.   Not off the top of my head.
14        Q.   How about 2019, any trips?
15        A.   Yes.  I traveled quite a bit because I work in
16   -- in the line of work that requires me to travel quite
17   a bit.
18        Q.   Okay.  What is your line of work?
19        A.   I'm a consultant.
20        Q.   Consultant for what?
21        A.   I'm sorry?
22        Q.   A consultant for what?
23        A.   For healthcare consulting.
24        Q.   What's the name of your employer?
25        A.   Ernst & Young.
```

EXHIBIT 21

40

1    Q.    Okay.  Are you an accountant?

2    A.    No.  I'm a healthcare consultant.  I'm not an

3  accountant.

4    Q.    And how long have you worked at Ernst & Young?

5    A.    2014 -- seven years.

6    Q.    Okay.  So you worked at Ernst & Young in 2019?

7    A.    Correct.

8    Q.    Okay.  Why does working for Ernst & Young

9  require you to travel?

10    A.    I have clients all over the United States.

11    Q.    Okay.  So sort of honing in on March and April

12  of 2019, like I said, we're sort of figuring out why

13  your testimony differs from the testimony of process

14  server's, who, you know, I don't know just like I don't

15  know you.

16         So in March 2019, was there any time that you

17  weren't residing at 116 Rockefeller?

18    A.    What do you mean by that?

19    Q.    I mean sleeping there at night?

20    A.    I -- yes.  Like I said, apart from trips that

21  I would take, that was my -- my residence that I would

22  come back to.  But I would take trips and not sleep

23  there.

24    Q.    Okay.  So --

25    A.    I'm not sure if your question is about the

EXHIBIT 21

1  trips or where I sleep.

2       Q.   All right.  So -- and you've had great luck

3  with that phone so far.  In March 2019, was there any

4  time that you were not sleeping at 116 Rockefeller, any

5  dates that you were out of town, or otherwise not stay

6  the night at your own residence?

7       A.   I would have to go back and look.  I think I

8  may have gone on a trip or two in March.  I don't

9  remember exactly the date.  That was a long time ago,

10 Andrew.  If you have a specific date in mind, let me

11 know.  I can go do the -- the research.

12      Q.   Yeah.  If you can just take a peek, any time

13 in March 2019.  It shouldn't be too hard.  Just click

14 with the phone.  You've done it really well already.

15      A.   Yeah.  Like I said, give me a specific date.

16 I may have taken a trip.  I may have not.  It's like --

17 it was a long -- a long time ago.

18      Q.   Okay.  How about March 15th.

19      A.   March 15th.  Okay.  Give me a moment.

20           No.  March 15th I was in town.

21      Q.   Okay.  March 16th.

22      A.   Yeah.  I was in town.

23      Q.   March 17th.

24      A.   I was in town.

25      Q.   March 18th.

# EXHIBIT 21

1      A.   Yeah.  I was here.

2      Q.   March 19th.

3      A.   I was here.

4      Q.   March 28th.

5      A.   28th.  I was traveling.  I was traveling to

6  Hawaii for work.

7      Q.   What dates were you in Hawaii in March 2019?

8      A.   How is that related to those two days that

9  you're asking me about?  Andrew, this is like my life

10 that you're asking me about.  This is not related to the

11 process server.  This is my -- like I -- you know, this

12 is kind of excessive.

13      I do -- I don't think I need to provide you

14 with my entire calendar for 2019.  I'm not even party to

15 this lawsuit.  Like this is -- I'm sorry.  But it's --

16 you know, it's getting a little too much.  Like I said,

17 happy to like pinpoint specific things, but, you know,

18 you want me to go back and give you a play-by-play of my

19 entire year?  That's like -- it's not reasonable.

20      Q.   I appreciate your opinion.  Luckily, you're

21 not a lawyer.  Your lawyer is there, and the Court has

22 ordered you to sit for these depositions; and you have

23 to answer the questions.  They're within the scope, so

24 please, tell me.  End of March, traveling --

25      A.   I don't remember.

# EXHIBIT 21

1    Q.   -- to Hawaii, the dates.

2    A.   I don't -- I don't remember.  I don't remember

3 how many days I was in Hawaii, and I think that this is

4 a little too much.

5    Q.   Okay.  It is on the record.  Now, please,

6 March 29, 2019, were you in Hawaii or at 116 Rockefeller

7 or somewhere else?

8    A.   Are we going to go through like day-by-day

9 through the rest of the calendar?

10        MR. BERNHARD:  I'm going to strike as non-

11    esponsive.

12 BY MR. BERNHARD:

13    Q.   Please answer the question.

14    A.   Yeah.  I was in Hawaii.

15    Q.   Okay.  March 30, 2019, were you in Hawaii or

16 116 Rockefeller or somewhere else?

17    A.   Hawaii.

18    Q.   March 31, 2019 --

19    A.   On the 31st, and the 1st, and the 2nd, just so

20 we can get this over with.

21    Q.   So how about March 1, 2019.  Were you at 116

22 Rockefeller or somewhere else?

23    A.   We're going back now?

24        THE REPORTER:  Okay.  Who's thumping?  Who's

25    thumping?

# EXHIBIT 21

1          THE WITNESS:  I'm scrolling through -- I'm

2      scrolling through my phone to get to the -- the

3      dates that he's asking me to get to.

4          THE REPORTER:  Oh.

5          THE WITNESS:  I don't have -- I don't have

6      photos from the 1st.

7  BY MR. BERNHARD:

8      Q.   How about March 8, 2019, 116 Rockefeller, out

9  of town, something else?

10     A.   Mexico.

11     Q.   Okay.  Where were you in Mexico?

12         MR. DELLORUSSO:  Objection.

13         THE WITNESS:  Oaxaca.

14  BY MR. BERNHARD:

15     Q.   Okay.  How about March 9, 2019, Mexico, 116

16  Rockefeller, somewhere else?

17         MR. DELLORUSSO:  Objection.

18  BY MR. BERNHARD:

19     Q.   Or if you want to make it easier, you can just

20  tell me when you came back, and I can just save the

21  time.

22     A.   March -- March 13th is when I came back.

23     Q.   Okay.  And when did you come back more or less

24  on March 13, 2019?

25     A.   When?

# EXHIBIT 21

1      Q.   Yeah.  Like morning --

2      A.   Like what --

3      Q.   -- afternoon, night?

4      A.   Oh, I don't remember.

5      Q.   It doesn't show that on your pictures?

6      A.   No.

7      Q.   Okay.  And then from March 14th until you went

8  to Hawaii, you were staying at 116 Rockefeller?

9      A.   Correct.

10     Q.   Okay.  So looking at that time, do you have

11  any idea why the process server would allege that they

12  were at your house on April 17, 2019?

13          MR. DELLORUSSO:  Objection, form.

14          THE WITNESS:  How do I know?  Why is that --

15      how would I know why they would say such a thing?

16  BY MR. BERNHARD:

17     Q.   Is it possible that there was someone else

18  staying at your house on April 17, 2019?

19     A.   No.

20          MR. DELLORUSSO:  Objection, form.

21  BY MR. BERNHARD:

22     Q.   Okay.  Did you live with anybody else at 116

23  Rockefeller, Irvine, California in April 2019?

24     A.   My son.

25     Q.   Okay.  How old is your son?

EXHIBIT 21

46

1        A.   He's 15.

2        Q.   Okay.  So it's just you and your son at 116

3    Rockefeller, Irvine in March and April 2019?

4        A.   Yes.

5        Q.   Okay.  So on or about April 17, 2019, around

6    12:20 p.m., it's your testimony that no one knocked on

7    the door at your residence at 116 Rockefeller?

8        A.   Correct.

9        Q.   Okay.  And it's your testimony that on April

10   17, 2019, around 12:20 p.m., you did not answer the --

11   the -- the door at 116 Rockefeller?

12       A.   Correct.

13       Q.   Do you have a -- like a doorman at 116

14   Rockefeller?

15       A.   No.

16       Q.   Is there a camera system at 116 Rockefeller?

17       A.   There is a doorbell camera.

18       Q.   Okay.  Is it a doorbell camera for your

19   particular unit, or is it for the building, or something

20   else?

21       A.   For the unit.

22       Q.   Okay.  And is it your position that on April

23   17, 2019, around 12:20 p.m., nobody, to your knowledge,

24   buzzed your unit at 116 Rockefeller?

25       A.   I wasn't here, so if they rang the doorbell, I

EXHIBIT 21

1    wouldn't know if it -- I can't answer that for sure if

2    someone rang or didn't ring.

3        Q.    Okay.  So you'd have to be at 116 Rockefeller

4    when somebody rings the doorbell to know if they're

5    there; is that right?

6        A.    No.  You can know, but I don't have -- anyway.

7    I don't -- I didn't have the camera installed back then.

8    It was later, and it only holds the footage for 10 days;

9    so I don't know if they did or did not knock.

10       Q.    So as of April 17, 2019, you did not have like

11   a camera buzzer at 116 Rockefeller?

12       A.    No.

13       Q.    Okay.  So did you have like a buzzing intercom

14   at 116 Rockefeller in April 2019?

15       A.    No.

16       Q.    There was no intercom system whatsoever at 116

17   Rockefeller?

18            MR. DELLORUSSO:  Objection, form.

19            THE WITNESS:  No.

20   BY MR. BERNHARD:

21       Q.    Okay.  Is there access to -- to your door at

22   116 Rockefeller from the street?

23       A.    Yes.

24       Q.    Okay.  So somebody could just walk up from the

25   street and just knock on your door at 116 Rockefeller?

# EXHIBIT 21

1      A.   Yes.

2      Q.   Is there like a patio or a balcony or anything

3  at 116 Rockefeller?

4      A.   Yes.

5      Q.   Is that patio or balcony that -- that you can

6  see from standing outside your front door at 116

7  Rockefeller?

8      A.   What -- what -- what do you mean by that?

9  What could you see?

10     Q.   I mean, if I'm, you know, standing at the

11  front door, and turn left, right, up, or down, am I

12  looking at your patio or is it like behind the building?

13  I just -- you know, I don't know.  I'm not there.

14     A.   There are trees out front, so you -- it's not

15  like you can see visibly in or out.

16     Q.   Okay.  If I'm standing at your front door and

17  you're standing on your -- your -- you said it was a

18  patio or a balcony?

19     A.   Balcony.

20     Q.   Okay.  If I'm at your front door at 116

21  Rockefeller and you're standing on your balcony, can I

22  see you and you can see me, or is it somewhere else?

23     A.   Yes.  If I'm on my balcony, you can see.

24     Q.   Okay.  Okay.  How about April 6, 2019.  Were

25  you staying at 116 Rockefeller, or were you out of town,

# EXHIBIT 21

1   or doing something else?

2       A.   I don't remember.

3       Q.   Can you take a peek?  You've done a great job

4   so far, and I promise you I'm almost out of dates.

5       A.   I'm sorry.  I'm getting -- I'm getting really

6   tired of this.  I -- I'm not going to -- I'm not going

7   to go through every day of 2019.  I'm getting exhausted.

8       Q.   I'm sorry you feel exhausted, but this, again,

9   is what the law requires, so please just check April 6,

10  2019.  Let me know if you were at home, somewhere else.

11      A.   I do not remember specifically.

12      Q.   Well, can you do what you've done so far and

13  just check your phone and find out?

14      A.   No.  I'm sorry.  I'm getting tired.

15      Q.   Are you saying that you're going to refuse to

16  answer the questions during your deposition today?

17      A.   You said it's okay if I'm getting tired and I

18  need a break.  I mean, you're -- this is --

19      Q.   Do you want to take a break?

20      A.   You're asking me about a whole calendar year.

21      Q.   Do you need to take a break?  Do you want to

22  take five minutes?

23      A.   Yeah.  Let's take a break.

24          MR. BERNHARD:  Okay.  Let's take five minutes.

25      We'll go back on the record at let's say 3:15.

EXHIBIT 21

50

1          Okay, guys.

2               THE REPORTER:  Okay.  Off the record at 3:07

3    p.m.

4               (Recess taken from 3:07 p.m. to 3:16 p.m.)

5               THE REPORTER:  We're back on the record at

6          3:16 p.m.

7               MR. DELLORUSSO:  Before we start, Andrew,

8          about how long do you think you have left of Reem?

9               MR. BERNHARD:  I don't think very much.

10              MR. DELLORUSSO:  Okay.  No problem.

11              MR. BERNHARD:  For the record it's 3:16 in

12         Miami time.  That makes it 12:16 California time,

13         and I think Reem is just trying to get her camera

14         set back up.

15              And, Reem, you're still on mute too.  Okay.

16              No.  I think you just click the unmute button,

17         bottom left, it should be.  There you go.

18              THE WITNESS:  Can you hear me?

19              MR. BERNHARD:  Yep.

20   BY MR. BERNHARD:

21       Q.  And just for clarity of record, is Bassem

22   still outside of the room, not --

23       A.  Yeah.

24       Q.  -- influencing you?  Okay.

25       A.  Yep.

# EXHIBIT 21

1            MR. BERNHARD:  Bassem, are you still staying

2       upstairs, staying away from the witness?

3            MR. EL MALLAKH:  I'm upstairs.

4            MR. BERNHARD:  Okay.  Cool.  Thanks, guys.

5    BY MR. BERNHARD:

6       Q.   Okay.  Okay.  So we were talking about April

7    2019, where you were, whether you were staying at 116

8    Rockefeller or elsewhere.  You asked for a break.  Like

9    I said before, I'm almost done with these dates, so I

10   just need to test them because I've got somebody who

11   says different, and we have to clear up why that is.

12   Does that make sense?

13      A.   Sure.

14      Q.   Okay.  Okay.  So April 6, 2019, were you in

15   town, still staying at 116 Rockefeller, or were you out

16   of town for work, or something else?

17      A.   I don't remember.

18      Q.   Okay.  And April 17, 2019, were you staying at

19   116 Rockefeller, out of town, or something else?

20      A.   Didn't we already talk about April 17th?

21      Q.   I believe so.  I'm just confirming that's --

22   that's the date.

23      A.   Yeah.

24      Q.   That's the date that you said that you were

25   staying in town but that you were out hiking somewhere

# EXHIBIT 21

1  in LA County and then went to Waldorf with your friend,

2  Jihan; is that right?

3         MR. DELLORUSSO:  Objection, form.

4         THE WITNESS:  That's correct.

5  BY MR. BERNHARD:

6     Q.   Okay.  Your -- your attorney just forwarded

7  two photographs, which we'll mark as Exhibit 2 and

8  Exhibit 3.

9         (Deposition Exhibit 2 marked)

10    Q.   I just want to make sure these are what you

11  were referring to before.  We've got this one.  I'm

12  going to bring up -- mark this as Exhibit 2, and I'll

13  share screen to it.

14         Do you see this photo here?

15    A.   Yes.

16    Q.   Okay.  It says at the top, "April 17, 2019,

17  4:39 p.m."  Is that right?

18    A.   Correct.

19    Q.   And 4:39 p.m., that's California time; is that

20  right?

21    A.   Correct.

22    Q.   Okay.  And so is it your position that you

23  took this photograph while hiking in California in LA

24  County at 4:39 p.m. California time on April 17, 2019?

25    A.   No.  The photo was taken earlier.  This is

# EXHIBIT 21

1  when I posted it to my social media.

2      Q.   Okay.  Is there any way to know from this

3  photograph when it was actually taken?

4      A.   Not from this photo.  No.

5      Q.   Is there anything that you have in -- in your

6  control or custody that would confirm when exactly the

7  photo itself was taken?

8      A.   The photo was taken at -- the photo was taken

9  at 3:30.

10     Q.   3:30 p.m. on April 17, 2019?

11     A.   Correct.

12     Q.   Do you have any photographs that show exactly

13 where you were from 11:00 a.m. to 1:00 p.m. on April 17,

14 2019?

15     A.   I was on the -- I don't have photos.  I only

16 took a picture at the end.

17     Q.   Okay.  So just for clarity of the record, no

18 photos showing exactly where you were from 11:00 a.m. to

19 1:00 p.m. on April 17, 2019?

20     A.   No.

21     Q.   Okay.  We have a process server who -- who

22 stated that she was at 116 Rockefeller, Irvine,

23 California at your property at 12:20 p.m. on April 17,

24 2019, and she claims that she spoke to you.  Do you have

25 any recollection of that whatsoever?

# EXHIBIT 21

1    A.   No.

2    Q.   Do you know who, besides you, could have

3 possibly answered the phone -- or sorry, answered the

4 door at 116 Rockefeller at 12:20 p.m. on April 17, 2019

5 besides you?

6    A.   No.

7    Q.   This process server has stated that the person

8 who came to the door identified herself as Reem.  Do you

9 have any idea how the process server could know your --

10 your name personally?

11    A.   No.

12    Q.   Okay.  This process server stated that you

13 told her that -- on April 17, 2019, at 12:20 p.m. at 116

14 Rockefeller that you did not know Mr. El Mallakh.  Does

15 any of this ring a bell at all?

16    A.   No.

17    Q.   Process server also stated that you -- that

18 you said you didn't want to accept service for Mr. El

19 Mallakh.  Does that sound familiar at all?

20    A.   No.

21    Q.   Is it your position that none of that

22 occurred?

23    A.   Yeah.

24    Q.   And that's your testimony as you sit here

25 today under penalty of perjury?

EXHIBIT 21

```
 1        A.   Correct.

 2        Q.   Okay.  Reem, do you own a car?

 3        A.   Yes.

 4        Q.   What car do you own?

 5        A.   My car?

 6        Q.   Yeah.

 7        A.   Can I ask why do you want to know what kind of

 8   car that I have?

 9        Q.   No, you can't.  You just have to answer the

10   questions.

11        A.   Why is my car relevant?

12             MR. BERNHARD:  Motion to strike as

13        nonresponsive.

14   BY MR. BERNHARD:

15        Q.   Reem, can you just answer -- answer the

16   question?

17        A.   I have a Mercedes.

18        Q.   Okay.  How long have you had that Mercedes?

19        A.   Oh my gosh, I don't remember.

20        Q.   Have you had it for a year, 2 years, 20 years?

21        A.   I don't know.  Probably more than two years,

22   probably less than four.

23        Q.   Okay.

24        A.   And I had another Mercedes before that.

25        Q.   Okay.  Is this a Mercedes that you lease or
```

EXHIBIT 21

1  that you own?

2      A.   I own it.

3      Q.   Okay.  You're saying -- so you purchased the

4  car sometime in the past four years?

5      A.   Correct.

6      Q.   And what type of Mercedes is it?

7          MR. DELLORUSSO:  I'm going to object.

8  BY MR. BERNHARD:

9      Q.   You can answer the question, Reem.

10     A.   Why is my -- I mean, sorry, Andrew.  I don't

11 see the relevance of my car.  I have a car.  I have a

12 Mercedes.  What -- what do you -- do you need the VIN

13 number?  Like I'm not -- again, like my financial --

14 financials and my property is my property.  I'm not

15 party to this case, so I don't see why my car is

16 relevant.

17         MR. BERNHARD:  Motion to strike as

18     nonresponsive.

19 BY MR. BERNHARD:

20     Q.   Please just answer the question, Reem.  What

21 type of Mercedes do you have?

22     A.   Do I need to answer this question?  I mean,

23 it's like -- I -- this is ridiculous.

24     Q.   Yes, you do.

25     A.   It's a -- it's a C-Class.

# EXHIBIT 21

1      Q.   It's a C-Class Mercedes that you bought.  Is the

2   C-Class Mercedes you own in your name, somebody else's

3   name?

4      A.   Yes.  It's in my name.

5      Q.   Okay.  Has that always been the case since the

6   date that you purchased it?

7      A.   Yes.

8      Q.   Did you purchase the Mercedes C-Class in your

9   name new or used?

10     A.   Used.

11          MR. DELLORUSSO:  Objection.

12  BY MR. BERNHARD:

13     Q.   Do you remember who you bought it from?

14     A.   Fletcher Jones.

15     Q.   Okay.  And is that Mercedes C-Class that you

16  own, is that registered in your name?

17          MR. DELLORUSSO:  Objection.

18          THE WITNESS:  Yes.

19  BY MR. BERNHARD:

20     Q.   Okay.  Is it -- is that Mercedes C-Class that

21  you own, bought from Fletcher Jones, registered at 116

22  Rockefeller?

23     A.   Yes.

24     Q.   Is that Mercedes C-Class that you own and

25  bought from Fletcher Jones insured at 116 Rockefeller?

EXHIBIT 21

1      A.    Yes.

2      Q.    Okay.  Does your brother, Bassem, have a car?

3            MR. DELLORUSSO:  Objection.

4            THE WITNESS:  I'm sorry.  I -- look, you're --

5      now, you start -- you're going to ask me about me

6      and I can make a decision for myself.  I'm not

7      going to ask -- answer questions about my brother.

8      You can ask him what you want.

9            MR. BERNHARD:  Motion to strike as

10     nonresponsive.

11   BY MR. BERNHARD:

12     Q.    Reem, I, again, request that you just answer

13   the questions.  They are all relevant.

14     A.    You ask -- you ask him.  You can ask him when

15   you have -- you're asking me about my car.

16           MR. DELLORUSSO:  Andrew, you are going outside

17     the topics that were stated in your -- in your --

18           MR. BERNHARD:  Please, one more time I'm going

19     to move for sanctions against you.  Stop your

20     speaking objections.

21           MR. DELLORUSSO:  Tell me where --

22           MR. BERNHARD:  You are violating Florida law

23     Rule 1.310.  It's perfectly crystal clear that you

24     cannot -- unless you're instructing your client not

25     to answer, that you cannot make the --

EXHIBIT 21

```
 1              MR. DELLORUSSO:  You're going outside the scope

 2        of the topics that you have, of course.

 3              MR. BERNHARD:  Are you instructing your client

 4        not to answer?

 5              MR. DELLORUSSO:  No.  I'm asking you to show

 6        me where --

 7              MR. BERNHARD:  Are you instructing your client

 8        not to answer?

 9              MR. DELLORUSSO:  I'm --

10              MR. BERNHARD:  If the answer is no, then stop.

11        Your objection to form is noted and stop speaking.

12        There is nothing else you can do.

13              MR. DELLORUSSO:  Okay.

14              MR. BERNHARD:  So your objection -- your

15        objection to form is noted.

16   BY MR. BERNHARD:

17        Q.   Reem, your -- your attorney has not instructed

18   you not to answer, so please answer the question.  What

19   --

20        A.   I don't know.

21        Q.   You don't know what kind of car your brother,

22   Bassem, has?

23        A.   No.

24        Q.   Okay.  When was the last time you saw your

25   brother, Bassem?
```

EXHIBIT 21

1      A.   Today.

2      Q.   Today.  And how did Bassem come to arrive at

3  your house there at 116 Rockefeller?

4      A.   I don't know.

5      Q.   Okay.  You don't know if he came by car, by

6  plane, by helicopter, or something else?

7      A.   I didn't ask.

8      Q.   But do you know?  Did you see him -- see him

9  pull up?

10         MR. DELLORUSSO:  Objection.

11         THE WITNESS:  I don't know how he came.

12  BY MR. BERNHARD:

13     Q.   Okay.  Did you see Bassem when he approached

14  your house there at 116 Rockefeller today?

15         MR. DELLORUSSO:  Objection.

16         THE WITNESS:  I don't know how he came.

17         MR. BERNHARD:  Motion to strike as

18     nonresponsive.

19  BY MR. BERNHARD:

20     Q.   I'm not asking if you know how he came.  I'm

21  saying did you see him approach your house, meaning from

22  the outside coming in.

23     A.   No.  No.

24     Q.   Okay.  Did -- did your brother, Bassem, spend

25  the night at your house at 116 Rockefeller last night?

EXHIBIT 21

61

```
 1       A.    Yes.

 2       Q.    Okay.  Did he spend yesterday night at 116

 3  Rockefeller?

 4       A.    Wait.  That's the same question, right?

 5       Q.    Not last night.  The night before.  Did he

 6  spend the night before at your place at 116 Rockefeller?

 7       A.    No.

 8       Q.    Okay.  So did you see your brother, Bassem,

 9  when he approached yesterday when he arrived at your

10  place at 116 Rockefeller?

11       A.    No.

12       Q.    Has he ever mentioned to you in any way over

13  the past three years that he has a car?

14       A.    Not that I remember.

15       Q.    Have you ever ridden in a car with Bassem over

16  the past three years?

17       A.    I don't remember.

18       Q.    You have no recollection if you've ridden with

19  your brother in a car over the past three years?

20          MR. DELLORUSSO:  Objection.

21  BY MR. BERNHARD:

22       Q.    Please answer the question, Reem.

23       A.    I don't remember.

24       Q.    Okay.  Has your brother driven you anywhere at

25  all in a car in the past three years?
```

# EXHIBIT 21

1          MR. DELLORUSSO:  Objection.

2          THE WITNESS:  I don't -- I don't remember.  I

3     mean, this is --

4  BY MR. BERNHARD:

5     Q.   Okay.  Have you -- have you driven your

6  brother anywhere in a car in the past three years?

7     A.   I don't remember.

8     Q.   Okay.  How often do you see your brother?

9     A.   Not very often.

10    Q.   Okay.  In 2020, how many times would you say

11 you'd see your brother?

12         MR. DELLORUSSO:  Objection.

13         THE WITNESS:  I don't remember.

14 BY MR. BERNHARD:

15    Q.   Would you say it's more than five for the year

16 2020?

17    A.   I can't be certain.

18    Q.   Would you say it's less than five times you

19 seen your brother in 2020?

20    A.   I really do not remember.

21    Q.   Would you say that you seen your brother more

22 than 100 times in 2020?

23    A.   No.

24    Q.   Okay.  Would you say you saw your brother more

25 than 50 times in 2020?

# EXHIBIT 21

```
1        A.   No.

2        Q.   Would you say you saw your brother more than

3   20 times in 2020?

4        A.   Probably not.

5        Q.   Okay.  Would you say you saw your brother more

6   than 10 times in 2020?

7        A.   Probably not.

8        Q.   Okay.  So you see your brother -- you saw your

9   brother less than 10 times in 2020?

10            MR. DELLORUSSO:  Objection.

11            THE WITNESS:  Yeah.  Maybe even less.

12   BY MR. BERNHARD:

13       Q.   Okay.

14       A.   Very infrequent.

15       Q.   Okay.  What about 2019; same amount of time?

16   You saw your brother more or less than five times or so

17   in 2019?

18       A.   Probably.

19       Q.   Okay.  What about 2021; how often do you see

20   your brother?

21       A.   Very infrequent.

22       Q.   Okay.  So one of those where you say less than

23   five times in 2021?  It's only been three months.

24       A.   Oh, for sure.

25       Q.   Okay.
```

# EXHIBIT 21

1        A.    For sure less than five.

2        Q.    Is you seeing your brother today and yesterday

3   the first time you've seen your brother in 2021?

4        A.    Probably.  Yes.

5        Q.    Okay.  So in the five or so times you saw him

6   in 2020, the five or so times you saw him in 2019, did

7   you see him at all drive a car?

8        A.    I don't remember.

9             MR. DELLORUSSO:  Objection.

10  BY MR. BERNHARD:

11       Q.    Okay.  What about 2018?

12            MR. DELLORUSSO:  Objection.

13            THE WITNESS:  I don't know.

14  BY MR. BERNHARD:

15       Q.    Would it surprise you to know that your

16  brother has a Mercedes Benz C-Class registered in his

17  name at 116 Rockefeller?

18       A.    I don't know.

19       Q.    I'm not saying what you know.  I said would it

20  surprise you?

21       A.    I really don't know what his car situation is.

22       Q.    Okay.  When you park at 116 Rockefeller, do

23  you park in front of your property, or do you park like

24  down the road or somewhere else?

25       A.    In the garage.

EXHIBIT 21

65

```
 1        Q.   Okay.  In the garage, is -- do you know of -- in

 2   the garage at 116 Rockefeller, how many spaces do you

 3   have?

 4        A.   Two.

 5        Q.   Okay.  You park in one space.  Is there

 6   another car parked in the other space?

 7        A.   No.

 8        Q.   Okay.  Has that been the case over the past

 9   three years?

10        A.   Correct.

11        Q.   Okay.  And the car that's parked in your

12   space, that's your Mercedes Benz C-Class.  That's in

13   your name that you bought from Fletcher Jones; is that

14   right?

15             MR. DELLORUSSO:  Objection.

16             THE WITNESS:  That's correct.

17   BY MR. BERNHARD:

18        Q.   And it's been that way over the past at least

19   three years; is that right?

20        A.   Yes.

21        Q.   And so you haven't seen another Mercedes Benz

22   C-Class sitting around there parked in one of your

23   spots; have you?

24        A.   No.

25        Q.   Okay.
```

EXHIBIT 21

1    A.   No.

2    Q.   Did you notice another Mercedes Benz C-Class

3 sitting out in front of your house for the past three

4 years that didn't belong to you?

5    A.   No.  No.

6    Q.   Okay.

7    A.   You're not allowed to park in the street in

8 this community.  So, no.

9    Q.   Okay.  Did you give permission to Bassem to

10 register his vehicle at your property 116 Rockefeller

11 over the past two years at any time?

12    A.   I don't understand the question.

13    Q.   You live at this property.  You know, it would

14 surprise me if somebody else, you know, had a car

15 registered where I lived.  If they did, I would imagine

16 they would probably ask me about it.  So I'm asking you,

17 did Bassem ever ask you, hey, can I, you know, keep my

18 car registered at your home over the past two years at

19 any time?

20    A.   No.

21    Q.   You've had no knowledge whatsoever that

22 Bassem's had his car registered at your home, 116

23 Rockefeller, at any time over the past two years?

24    A.   No.

25    MR. DELLORUSSO:  Objection.

# EXHIBIT 21

 1 | BY MR. BERNHARD:

 2 |     Q.   Okay.  Okay.  I think you were talking about

 3 | September 2020, but I hadn't really got into it yet.

 4 | Were you, to your knowledge, in -- in California in LA

 5 | County in September 2020?

 6 |     A.   What day?

 7 |     Q.   September 5, 2020.

 8 |     A.   Yeah, probably.

 9 |     Q.   Did you say yeah, probably?  Sorry.  I

10 | couldn't hear you.

11 |     A.   Yeah, probably.

12 |     Q.   Okay.  Were you in -- staying at 116

13 | Rockefeller at that time?

14 |     A.   Yes.

15 |     Q.   Okay.  What about September 7, 2020.  Were you

16 | still in LA staying at 116 Rockefeller in town?

17 |     A.   Yeah, probably.

18 |     Q.   Okay.  Can you be sure, or are you just

19 | guessing?

20 |     A.   No.  I don't remember every single day of the

21 | last years.  Tell me specific dates if you want.

22 |     Q.   Okay.  September 10, 2020.  Were you in town

23 | staying at 116 Rockefeller on September 10, 2020?

24 |     A.   Yeah.

25 |     Q.   Okay.  How about September 11, 2020; were you

EXHIBIT 21

```
 1   in town staying at 116 Rockefeller on September 11, 2020?

 2       A.   I don't remember.

 3       Q.   Okay.  Well, you seemed sure about September

 4   10th.  What changed for September 11th?

 5       A.   I don't remember September 11th.

 6       Q.   Any way that you can check?

 7       A.   I was --

 8       Q.   You've been doing a great job with your phone.

 9   Maybe that will cue you in, help you recollect.

10       A.   I do not (audio distortion) single day, by the

11   way, so yeah.  September 11th specifically is the day

12   you want to find out?

13       Q.   Yeah.

14       A.   Okay.  I was in LA.

15       Q.   Okay.

16            MR. BERNHARD:  For the record, the witness has

17       just scrolled through her phone to look at her

18       photos and confirmed where she was on September 11,

19       2020.

20   BY MR. BERNHARD:

21       Q.   What about September 12, 2020.  Same thing, in

22   LA, staying at 116 Rockefeller?

23       A.   Yeah.  I was in LA.

24       Q.   Were you staying at 116 Rockefeller?

25       A.   What -- what -- sorry.  What -- what's the
```

EXHIBIT 21

1  question?

2      Q.   On September 12, 2020, were you at 116

3  Rockefeller?

4      A.   No.  I was in LA.

5      Q.   Okay.  Well, where were you staying if not at

6  116 Rockefeller?

7      A.   I was in Santa Monica.

8      Q.   Okay.  Were you staying with your brother,

9  Bassem, or just something else?

10      A.   That's correct.

11      Q.   Say again.  I'm sorry.

12      A.   That's correct.

13      Q.   That's correct you were staying with your

14  brother, Bassem?

15      A.   Yes.

16      Q.   Okay.  What about September 13, 2020.  Where

17  were you?

18      A.   I don't remember.  I think I was in LA.

19      Q.   So you -- you testified that you were staying

20  with your brother, Bassem El Mallakh, on September 12,

21  2020, and that you don't remember what happened just one

22  day later on September 13, 2020.  But you --

23      A.   I said was in LA.

24      Q.   You said you were what?

25      A.   I said I was in LA.

# EXHIBIT 21

1    Q.   Okay.

2    A.   Is that -- was that not audible or?

3    Q.   No.  It wasn't audible.  Did -- were you

4  staying at 116 Rockefeller?  Were you staying with your

5  brother, Bassem, in Santa Monica, or something else?

6    A.   Yeah.  I was -- I was in LA on the 12th and on

7  the 13th.

8         MR. BERNHARD:  Motion to strike as

9     nonresponsive.

10  BY MR. BERNHARD:

11    Q.   Were you staying on September 13th at 116

12  Rockefeller, with your brother, Bassem, in Santa Monica,

13  or something else?

14    A.   Are you talking about during the day or at

15  night?  Like where I slept?

16    Q.   Yeah.  Where you slept.

17    A.   I slept at 116 Rockefeller that night.

18    Q.   Okay.  What about in the morning?

19    A.   I was in LA.  I was in Santa Monica.

20    Q.   Okay.  What time do you think that you

21  returned back to 116 Rockefeller on September 13, 2020?

22    A.   I don't remember exactly.

23    Q.   It was early, late, afternoon, lunchtime?

24    A.   Late.

25    Q.   Okay.  Late like midnight, 10:00, 8:00?  I

# EXHIBIT 21

1   don't know what late is for you.

2          MR. DELLORUSSO:  Objection, form.

3          THE WITNESS:  I don't remember.

4   BY MR. BERNHARD:

5      Q.   Okay.  Is there any way to -- to get that

6   information out of your phone?

7      A.   No.

8      Q.   Okay.  Do you recall if it was before or after

9   9 o'clock?

10     A.   I don't remember.

11     Q.   Is there any way for you to confirm?

12     A.   Nope.

13     Q.   On September 13, 2020, did you drive yourself

14  back in your Mercedes; did your brother, Bassem, give

15  you a ride, or something else?

16     A.   No.  I drove myself.

17     Q.   Do you recall why you were at your brother,

18  Bassem's, place on September 13, 2020, in particular?

19     A.   Visiting.

20     Q.   Okay.  Well, we've got a process server who's

21  stated that they came to 116 Rockefeller on September

22  13, 2020, around 9 o'clock p.m. and -- and spoke to you

23  in particular.  Does that sound familiar at all?

24     A.   Yeah.

25     Q.   Okay.  So did somebody talk to you on

# EXHIBIT 21

1    September 13, 2020, around 9:00 p.m. at 116 Rockefeller?

2         A.   Yes.

3         Q.   Okay.  And tell me what happened.  Did

4    somebody come and knock on your door or something else?

5         A.   There was someone knocking on the door like

6    mad, very loud.  I opened the door, and they said, "Is

7    Bassem" -- I think I -- you know, obviously, not word-

8    for-word, but they said, "Is Bassem here?"  I said, "No,

9    he does not live here," and I closed the door.

10        Q.   Okay.  Was there anybody else with you at the

11   time at 116 Rockefeller on September 13, 2020?

12        A.   Probably my son.

13        Q.   And you said your son is 15 years old?

14        A.   Yes.

15        Q.   Anybody else with you besides your on

16   September 13 --

17        A.   No.

18        Q.   -- 2020, at 116 Rockefeller?

19        A.   No.

20        Q.   So your testimony here under penalty of

21   perjury is that only you and your 15-year-old son were

22   at 116 Rockefeller at 9 o'clock p.m. on September 13,

23   2020, when this process server came to your house; is

24   that right?

25        A.   Right.

EXHIBIT 21

1    Q.   Okay.  And you said -- what you said to him?  I

2  -- sorry.  I just forgot.

3    A.   I said, "He doesn't live here," and I closed

4  the door.

5    Q.   Okay.  Did that -- did that process server say

6  anything else to you?

7    A.   No.

8    Q.   Did that process server try to give you

9  paperwork?

10    A.   No.

11    Q.   Is there any reason that you didn't ask what

12  the -- the person wanted?

13    A.   No.

14    Q.   Okay.  Is that your typical way of behaving

15  when somebody comes and asks for your brother that you

16  slam the door in their face?

17         MR. DELLORUSSO:  Objection, form.  You can

18      answer.

19         THE WITNESS:  Yeah.  I don't -- I don't have

20      an answer.

21  BY MR. BERNHARD:

22    Q.   Okay.  Have you ever done that to anybody else

23  who has come and asked for your brother?

24    A.   No.

25    Q.   Okay.  Why do you think you did it on this

# EXHIBIT 21

1  particular night on September 13, 2020?

2      A.   I don't understand your question.

3      Q.   You said you've never slammed the door in

4  anybody else's face when they asked for your brother.

5  You said you slammed the door in this guy's face on

6  September 13, 2020.  I'm trying to understand why you

7  would change your behavior specifically for this

8  individual on September 13, 2020.

9      A.   By the way, that's not what I said.  That's

10 not what I said.  You're -- you're --

11     Q.   Okay.

12     A.   -- you're paraphrasing what I said.

13     Q.   Okay.

14     A.   All I said was -- (audio distortion) like mad

15 and really like being very loud and disruptive late at

16 night.  When I opened the door, he asked about is -- he

17 asked -- I don't remember -- I don't remember exactly

18 the words, but he said, "Is Bassem here?"  And I said,

19 "No.  He does not live here," and I closed the door.

20         So I don't know what's typical or atypical.

21 This is not a scenario that happens to be frequently in

22 life where someone knocks like mad (audio distortion).

23     Q.   Did you ask what it was about?

24     A.   No.

25     Q.   Were you concerned at all for your brother?

EXHIBIT 21

75

```
 1        A.   No.

 2        Q.   Okay.  Is that the first time you remember

 3   anybody ever knocking on your door and asking for

 4   Bassem?

 5        A.   Yes.

 6        Q.   Okay.  So that novelty of that situation

 7   didn't peek your curiosity in any way?

 8             MR. DELLORUSSO:  Objection.

 9             THE WITNESS:  No.

10   BY MR. BERNHARD:

11        Q.   Okay.  Did you call your brother to see what

12   was going on?

13        A.   No.

14        Q.   Why is that?

15        A.   I mind my own business.

16        Q.   Well, I mean, I understand you might mind your

17   own business about, you know, some random schmoe you

18   don't know.  We're talking about your brother here.  Do

19   you mind your own business when it comes to your brother

20   too?

21             MR. DELLORUSSO:  Objection.

22             THE WITNESS:  Of course I mind my own

23        business.

24   BY MR. BERNARD:

25        Q.   Okay.  Did the person leave any documents at
```

EXHIBIT 21

1  your door or in your door or otherwise?

2      A.   No.

3      Q.   You saw no documents on your door at any time

4  on September 13, 2020?

5      A.   No.

6      Q.   You saw no documents on your door at any time

7  that week of September 13, 2020?

8      A.   No.

9      Q.   It's your testimony that a random individual

10  came to your door at 9 o'clock-ish, knocked on it

11  loudly, asked for Bassem, you said, "He doesn't live

12  here," closed the door, and that's the last you -- you

13  saw of this all together.

14      A.   Right.

15      Q.   And you never contacted your brother, Bassem,

16  about it whatsoever.

17      A.   No.

18      Q.   You had no concerns whatsoever that this

19  random person was coming to your door to ask for your

20  brother.

21      A.   No.  I did not find it concerning.

22      Q.   And that's the very first time to your memory

23  that anybody's come to your door at 116 Rockefeller

24  asking for Bassem El Mallakh.

25      A.   That's correct.

EXHIBIT 21

1      Q.    Has that ever happened again since?

2      A.    No.

3      Q.    Did you tell anybody at all about this

4   occurrence on September 13, 2020, that this person came

5   to your door asking for your brother, Bassem?

6      A.    No.

7      Q.    Okay.  Have you ever been accused in court of

8   making a false statement?

9      A.    No.

10      Q.    Have you ever been sued?

11      A.    No.

12      Q.    Have you ever been sued for slander, which is

13   the making of a false statement to damages a person's

14   reputation?

15      A.    No.

16      Q.    Have you ever been sued for conspiracy, which

17   is making of a secret plan by a group to do something

18   unlawful?

19      A.    No.

20      Q.    To your knowledge, has your brother, Bassem El

21   Mallakh, ever been sued in a court for making a false

22   statement?

23      A.    I don't know.

24      Q.    To your knowledge, has your brother, Bassem El

25   Mallakh, ever been sued, apart from this lawsuit by

EXHIBIT 21

```
 1   Belgium Investments, ever been sued at all, to your
 2   knowledge?
 3            MR. DELLORUSSO:  Objection.
 4            THE WITNESS:  Like I said, I -- you can ask
 5       him what you want.
 6   BY MR. BERNHARD:
 7       Q.   I'm not asking him; I'm asking you.  To your
 8   knowledge, has your brother, Bassem El Mallakh, ever
 9   been sued, apart from this lawsuit by Belgium
10   Investments, to your knowledge?
11       A.   I don't know.
12       Q.   Okay.  To your knowledge, has your father,
13   Essam El Mallakh, ever been accused in court of making a
14   false statement?
15            MR. DELLORUSSO:  Objection.
16            THE WITNESS:  No.
17   BY MR. BERNHARD:
18       Q.   To your knowledge, has your father, Essam El
19   Mallakh, ever been sued, apart from this lawsuit by
20   Belgium Investments?
21            MR. DELLORUSSO:  Objection.
22            THE WITNESS: No.
23   BY MR. BERNHARD:
24       Q.   To your knowledge, has your father, Essam El
25   Mallakh, ever been sued for slander, which is the making
```

EXHIBIT 21

1    of a false statement?

2              MR. DELLORUSSO:  Objection.

3              THE WITNESS:  (No audible response)

4    BY MR. BERNHARD:

5         Q.   To your knowledge, has your father, Essam El

6    Mallakh, ever been sued for conspiracy?

7         A.   No.

8              MR. DELLORUSSO:  Same objection.

9    BY MR. BERNHARD:

10        Q.   Okay.  To your knowledge, has your mother,

11   Mona McCale (phonetic), ever been accused in court of

12   making a false statement?

13             MR. DELLORUSSO:  Objection.

14             THE WITNESS:  No.

15   BY MR. BERNHARD:

16        Q.   To your knowledge, has your mother, Mona

17   McCale, ever been sued?

18             MR. DELLORUSSO:  Objection.

19             THE WITNESS:  No.

20   BY MR. BERNHARD:

21        Q.   To your knowledge, has your mother, Mona

22   McCale, ever been sued for slander?

23             MR. DELLORUSSO:  Objection.

24             THE WITNESS:  No.

25   BY MR. BERNHARD:

# EXHIBIT 21

```
 1        Q.   Okay.  To your knowledge, has your mother, Mona,
 2   ever been sued for conspiracy?
 3             MR. DELLORUSSO:  Objection.
 4             THE WITNESS:  No.
 5   BY MR. BERNHARD:
 6        Q.   Okay.  Have you ever been accused in court of
 7   having participated in the commission of a fraud in any
 8   way?
 9        A.   No.
10             MR. DELLORUSSO:  Objection.
11   BY MR. BERNHARD:
12        Q.   Do you understand fraud to be an act of
13   dishonesty?
14             MR. DELLORUSSO:  Objection.
15             THE WITNESS:  If you say so.
16   BY MR. BERNHARD:
17        Q.   I'm just asking if you understand that.
18        A.   Is -- is that the legal explanation of it?
19        Q.   I'm just saying, do you understand fraud to be
20   an act of dishonesty?  Just your understanding.
21             MR. DELLORUSSO:  Objection.
22             THE WITNESS:  Like -- yeah.  Sure.
23   BY MR. BERNHARD:
24        Q.   Okay.  Have you ever been accused in court of
25   having an extramarital affair?
```

# EXHIBIT 21

81

1        A.    No.

2        Q.    And do you understand an extramarital affair

3   would be an act of dishonesty?

4        A.    Not going to answer that.

5        Q.    Sorry.  It just -- it broke up.  What did you

6   say?

7        A.    I -- I'm not going to answer that.

8        Q.    Well, your attorney has not instructed you not

9   to answer, and you're compelled to answer these

10  questions.  So this isn't anything too tricky.  I'm just

11  asking if you understand an extramarital affair to be an

12  act of dishonesty.

13       A.    I'm not going to answer that, so you can move

14  on.

15       Q.    Okay.  You're -- for the record, you're

16  refusing to answer the question.

17       A.    Yeah.  I'm not going to answer that.

18            MR. BERNHARD:  Serve motion to compel and

19       sanction the witness for refusing to answer under

20       oath without instruction from her attorney.

21            Okay.  Madam Court Reporter, do you know what

22       exhibit number we're up to?

23            THE REPORTER:  We were up to Exhibit 2.

24            MR. BERNHARD:  Okay.  So we had the one

25       declaration; we had the photograph.  So we're on 3;

# EXHIBIT 21

1          is that right?

2               THE REPORTER:  Correct.

3               MR. BERNHARD:  Okay.  Mark this as Exhibit 3.

4               (Deposition Exhibit 3 marked)

5               MR. BERNHARD:  Share the screen with you guys.

6          And I think, also, we'll be able to just go

7          straight through to Bassem, if that works for you

8          guys.  We'll just knock these out fast.  Does that

9          work?

10              THE REPORTER:  Sure.

11              MR. DELLORUSSO:  I have a few questions.

12              MR. BERNHARD:  One sec.  Let me pull this up.

13         Okay.  All right.  Can you guys see this document

14         here?

15    BY MR. BERNHARD:

16         Q.   At the top it says, "In the Circuit Court of

17    the 11th Judicial Circuit."  To the left it says,

18    "Belgium Investments versus Spencer Blank case number

19    18-28145."  Do you see that, Reem?

20         A.   Yeah.

21         Q.   Okay.  I'm going to mark this as Exhibit 3,

22    your notice of deposition.  Have you seen this document

23    before?

24         A.   No.

25         Q.   This was served to you through your attorney.

# EXHIBIT 21

1    Did your attorney provide this to you?

2         A.   Can you scroll down?

3         Q.   Yeah.

4         A.   No.  I haven't seen this document.

5         Q.   Okay.

6              MR. BERNHARD:  Counsel, is there any reason

7         you didn't provide this to your client?

8              MR. DELLORUSSO:  I actually provided it to my

9         client, who is Bassem in this case, who then

10        provided -- I believe provided it to Reem, so, you

11        know, you can ask him about that.

12    BY MR. BERNHARD:

13        Q.   Okay.  Reem, did your brother, Bassem, provide

14   you with this document?

15        A.   No.

16        Q.   Okay.  So as you sit here today, you've never

17   seen this notice of deposition before.

18        A.   No.  He told me about it, but I didn't see

19   this document.

20        Q.   Okay.  Did he communicate to you that you were

21   required to produce certain documents for today?

22        A.   Yes.

23        Q.   Okay.  Did he explain to you that you'd need

24   to produce documents in your possession or control

25   evidencing the statements made in your affidavit and

# EXHIBIT 21

1  your declarations for California Court?  It says, "Lawsuit,

2  service of process, and execution of judgment in

3  California.

4        A.    Something like that.

5        Q.    Okay.  Do you have any documents like that?

6        A.    What do you need from this list?  I showed you

7  my ID already.

8        Q.    Will you produce a copy of your photo ID?

9  Obviously, you know, it was just put up for the court

10  reporter, so I don't have a snapshot of that.

11        A.    Do you want it again?

12        Q.    I just -- if you, you know, can take like a

13  photo picture if it and shoot it over to your counsel,

14  that would be great.  Can you do that?

15        A.    Yeah.  I'll send it to my brother.

16        Q.    Okay.  What about documents in your possession

17  or control evidencing where you were physically located

18  on September 13, 2020, between 8:30 p.m. and 9:30 p.m.

19  You've already testified that you talked to this

20  processor, so do you have any documents showing that or

21  just your testimony?

22        A.    No.

23        Q.    Okay.  How about documents in your possession

24  or control evidencing where you physically were located

25  on April 17, 2019, between 12:05 p.m. and 12:35 p.m.

# EXHIBIT 21

1  You've given us that one photograph from when you put it on

2  social media.  Do you have any other documents

3  evidencing where you were at that time?

4      A.   No.

5      Q.   Okay.  Documents in your possession or control

6  evidencing your payment of rent for the months of

7  February, March, and April 2019.  Do you have anything

8  like that?

9      A.   Yeah.  I have bank statements.

10     Q.   Did you pay rent to your brother, Bassem, for

11 February, March, and April 2019?

12     A.   Sure.

13     Q.   How much did you pay your brother for those

14 three months?

15     A.   I can send you the statement.

16     Q.   Okay.  Will you stipulate to do that?

17     A.   (No audible response)

18     Q.   It has to be yes or no.

19     A.   Well, I don't understand what's the -- what's

20 stipulate mean?

21     Q.   Will you agree to produce those?  Will you

22 send those over so that we can have them confirm what

23 you're saying?

24     A.   Yeah.

25     Q.   Okay.  How about documents in your possession

# EXHIBIT 21

1  or control evidencing your payment of rent for the months

2  of August, September, and October of 2020.  Do you have

3  those?

4       A.    Yeah.  I'll send you the statements.

5       Q.    Okay.  And you paid rent to your brother for

6  -- for 116 Rockefeller for those months?

7       A.    Yes.

8       Q.    Okay.  Documents in  your possession or

9  control evidencing your utility bills and invoices for

10  water, electric, gas, garbage, internet, and cable for

11  the months of February, March, and April 2019.  Do you

12  have those?

13       A.    Yes.

14       Q.    Did you pay for those utilities for those

15  months of 2019 at 116 Rockefeller?

16       A.    Yes.

17       Q.    Did your brother, Bassem, pay for any of those

18  utilities at 116 Rockefeller for those months of 2019?

19       A.    (No audible response)

20       Q.    Sorry, Reem.  I didn't hear you say an answer.

21       A.    I said no.  I don't know if you heard me.

22       Q.    I didn't hear you.  Sorry.

23            Okay.  And same, documents evidencing your --

24  your payment of utility bills and invoices for -- for

25  September, August, and October 2020.  Do you have those?

EXHIBIT 21

1    A.   Yes.

2    Q.   And you'll produce those to us?

3    A.   Yes.

4    Q.   Okay.  And did Bassem, your brother, pay for

5  any of those utilities in August, September, October

6  2020?

7    A.   No.

8    Q.   No?  Okay.  Great.

9         MR. BERNHARD:  Okay.  I don't have any other

10        questions for you, Reem.  I appreciate it.

11        MR. DELLORUSSO:  Can we just take a five-

12        minute break?  I also have a few questions for her.

13        It should be no more than like 10 minutes.

14        MR. BERNHARD:  That's fine.  Let's do that, I

15        guess.

16        (Recess from 1:40:02)

17        THE REPORTER:  We're recording.

18        MR. BERNHARD:  And just --

19        THE REPORTER:  Now we're --

20        MR. BERNHARD:  Just for the record, Bassem,

21        you're still staying upstairs and -- and out of the

22        way of your sister?

23        MR. MAKKALH:  I am upstairs.

24        MR. BERNHARD:  Okay.  Great, guys.  Thanks.

25        MR. DELLORUSSO:  Madam Court Reporter, can we

# EXHIBIT 21

1   proceed?

2          THE REPORTER:  Yes.

3          MR. DELLORUSSO:  Okay.

4              EXAMINATION BY MR. DELLORUSSO

5   BY MR. DELLORUSSO:

6      Q.   All right.  Good afternoon.  I think it's

7   afternoon there now in California.  I think it's about 1

8   o'clock.  So I'm not going to take too much of your

9   time.  I know you've been going about two hours.  I'm

10  going to try be less than 10 minutes.  I just have a few

11  questions for you.  Are you ready to proceed?

12     A.   Yes.

13     Q.   Okay.  I want to go back to April 17, 2019.

14  Do you recall what time you left to go hiking in LA

15  County on that day?

16     A.   Probably before 9 o'clock.

17     Q.   Okay.  And approximately how long would you

18  have -- would you estimate that it took you that day or,

19  if you remember, how long it took you to get to the --

20  the site where you actually went hiking?

21     A.   I went to my friend's house first, so that

22  would probably be a couple of hours, and then from there

23  to the trail, probably another 30 minutes.

24     Q.   Okay.  What -- what time would you say you

25  started the hike?

EXHIBIT 21

89

1        A.    Probably around noon.

2        Q.    Noon.  Okay.  I'm going to share my screen

3   here.  Give me one second.  I'm not sure what exhibit it

4   -- this one was, but it's the photo.  Hold on.  Let me

5   just share.

6              MR. BERNHARD:  Exhibit 2.

7              MR. DELLORUSSO:  Exhibit 2.  Okay.

8   BY MR. DELLORUSSO:

9        Q.    Do you see Exhibit 2 on the screen?

10       A.    Yes.

11       Q.    All right.  And I believe you testified

12   earlier that this was a photo taken during the hike,

13   correct?

14       A.    Yeah.  At the end of the hike.

15       Q.    Okay.  At what time would you say you -- do

16   you recall taking this photo?

17       A.    Probably around 3:30.

18       Q.    Okay.  Is this the top of the mountain or the

19   hike?

20       A.    Yes.

21       Q.    Okay.  So to get from where you I guess parked

22   your car to this point when you took this photo, how

23   long would it have taken you to get to that point?

24       A.    Probably three or four hours.

25       Q.    Okay.

EXHIBIT 21

1          MR. DELLORUSSO:  I'm going to go -- I don't --

2      this wasn't an exhibit yet, but I'm going to --

3      it's the complaint in this case.  What exhibit are

4      we on?

5          MR. BERNHARD:  We were -- 3 was the notice of

6      deposition, so it would be on 4.

7          MR. DELLORUSSO:  Okay.  I'll mark this as

8      Exhibit 4.  This is the complaint in this matter.

9          (Deposition Exhibit 4 marked)

10  BY MR. DELLORUSSO:

11     Q.   I'm going to go through these pages.  Take a

12  look at it.  Let me know once you're done reviewing it

13  briefly.  Can you -- can you see it?

14     A.   Yes.

15     Q.   I'll just go to the first page, actually.

16  Have you ever seen this document before?

17     A.   No.

18     Q.   Okay.  I'll go through it.  I'll go through

19  all the -- all the pages.  You don't recall ever seeing

20  this document?

21     A.   No.

22     Q.   Okay.

23          MR. DELLORUSSO:  I'm going to mark this one.

24      I'm going to mark as Exhibit 5 the motion for

25      judicial default as -- as Exhibit 5.

# EXHIBIT 21

```
 1              (Deposition Exhibit 5 marked)

 2    BY MR. DELLORUSSO:

 3         Q.   Have you ever seen this document before?

 4         A.   No.

 5         Q.   Okay.  Now, I want to read for the record

 6    here.  On the second line, it says, "Plaintiff served

 7    Defendant, Bassem Essam El Mallakh, with the complaint

 8    in this matter on March 3, 2019, at 116 Rockefeller,

 9    Irvine, California 92612."  And his response was due on

10    March 23, 2019, which he failed to file an answer to the

11    complaint.  Do you see that?

12         A.   Yes.

13         Q.   Okay.  The 116 Rockefeller, Irvine, California

14    address, is that your residence?

15         A.   Yes.

16         Q.   You live there?

17         A.   Yes.

18         Q.   Does your brother, Bassem Essam El Mallakh,

19    live there?

20         A.   No.

21         Q.   Where does he live?

22         A.   In Santa Monica.

23         Q.   Were you ever served with any documents from a

24    process server in 2019 at 116 Rockefeller, Irvine,

25    California 92612?
```

EXHIBIT 21

```
 1        A.   No.

 2        Q.   Were you ever served with any documents from

 3   anybody in regards to a lawsuit at 116 Rockefeller,

 4   Irvine, California 92612?

 5        A.   No.

 6        Q.   Has your brother, Bassem Essam El Mallakh,

 7   ever resided or slept or stayed at your residence at 116

 8   Rockefeller, Irvine, California, in March or April of

 9   2019?

10        A.   No.

11        Q.   Okay.  I'm going to go to the next page of

12   this exhibit.  I'll actually go a little bit more than

13   that.

14             MR. BERNHARD:  Frank, just that Exhibit 4,

15        you're going to submit that to the court reporter

16        just so that it's in the record?

17             MR. DELLORUSSO:  Sure.  I don't have her email

18        address, but --

19             THE REPORTER:  I can put that in the chat.

20             MR. DELLORUSSO:  All right.

21             MR. BERNHARD:  Yeah.  Will you do that?

22        Great.

23             MR. DELLORUSSO:  Thank you.

24   BY MR. DELLORUSSO:

25        Q.   I just want to go through this alias summons,
```

# EXHIBIT 21

1   which is page 4 of Exhibit 5.  There's three addresses

2   here.  Are you familiar with -- with the 116

3   Rockefeller, Irvine, California 92612 address?

4        A.   Yes.

5        Q.   Okay.  Is that your residence?

6        A.   Yes.

7        Q.   When was that -- when did that become your

8   residence?

9        A.   In early 2017.

10       Q.   Okay.  Is that your primary residence?

11       A.   Yes.

12       Q.   Okay.  Are you familiar with the 606

13   Rockefeller, Irvine, California 92612 address?

14       A.   Yes.

15       Q.   Okay.  What address is that?

16       A.   That was my previous address.

17       Q.   Okay.  Did you -- were you the primary

18   residence of that address?

19       A.   No.

20       Q.   Okay.  And the 152 86th Street, Santa Monica,

21   California address, 90401; do you recall that address?

22       A.   No.

23       Q.   Okay.  And I just want to read for the record

24   that it states here, "Substitute service on Reem Hanna

25   on March 3, 2019, at 12:20 p.m."  Do you see that?

EXHIBIT 21

1      A.   Sorry?

2      Q.   Do you -- do you see that where it says,

3  "Substitute service Reem Hanna on 3/3/19, at 12:20

4  p.m."?

5      A.   Yeah.  I see that.

6      Q.   If you go back, this is not as clear as a copy

7  as the one that Andrew had, but I guess we can work with

8  it.  I'm not very good with technology here.

9           I believe this was shown to you earlier.  I

10  don't know if it was on the record, but I believe it

11  was, where it says here that, "Received this writ on the

12  3rd of March 2019, and served same at 12:20 on the 17th

13  of April 2019."  Do you see that?

14     A.   Yeah.

15     Q.   And then it says, "Substitute service."  Do

16  you see that?

17     A.   Yes.

18     Q.   And it says, "By leaving a true copy" --

19  that's hard to read -- "together with a copy of the

20  pleading" -- I think I might need a better copy of this.

21  I'm going to -- I'm going to -- I'm going to strike

22  that.

23          MR. DELLORUSSO:  Andrew, do you have a better

24      copy?

25          MR. BERNHARD:  That's what I got.

# EXHIBIT 21

1          MR. DELLORUSSO:  Okay.  Yeah.  I can't really

2     zoom in.  All right.  That -- that's -- that's

3     fine.  Let me see if I can get that.  All right.

4     I'm going to stop sharing so you don't have to see

5     that.  Okay.

6  BY MR. DELLORUSSO:

7     Q.   I have a few more questions here.  Were you

8  ever served with documents for -- well, strike that.

9          Were documents ever placed on your front door

10  with regards to this lawsuit at your current residence?

11     A.   No.

12     Q.   When did you first hear about this lawsuit?

13     A.   When my brother told me about it.

14     Q.   When was that?

15     A.   In this last few days or last few weeks.

16     Q.   Okay.

17          MR. DELLORUSSO:  I have no more questions.

18          MR. BERNHARD:  Okay.  Quick follow-up.  I have

19  like three questions.

20               EXAMINATION BY MR. BERNHARD

21  BY MR. BERNHARD:

22     Q.   All right.  So we're all looking at this

23  photo, Exhibit 2.  Do you see that here, Reem?

24     A.   Yeah.

25     Q.   It's the photo that's marked at the top "April

EXHIBIT 21

1   17, 2019, at 4:39 p.m."  Is that right?

2       A.   Uh-huh (affirmative).

3       Q.   And see there's like this right here on the

4   right side.  In the middle it says, "Hiking up was fun,"

5   smiley face.  Do you see that?

6       A.   Yeah.

7       Q.   Is that something that you put on there, or is

8   that something that came with the photo, or how did that

9   get there?

10      A.   I put it on there.

11      Q.   Okay.  How does that -- how did you do that?

12      A.   On social media.

13      Q.   Okay.  Is there like a -- like software that

14  does that for you?  Is that something that Facebook

15  provides?  How does it work?

16      A.   On Instagram.

17      Q.   Instagram.  So when you're on Instagram, does

18  it let you just write anywhere you want, or how does it

19  work?

20      A.   Yes.  It lets you write captions about the

21  photo.

22      Q.   Okay.  And so when did you write that caption

23  on that photo?

24      A.   At 4:39.

25      Q.   Okay.  And were you just finishing a hike?

EXHIBIT 21

```
 1  Were you back with your friend at her house?  When did you

 2  do that?

 3       A.   It was after the hike.

 4       Q.   After the hike.  So were you like back at your

 5  car, back at your friend, Jihan's house, or something

 6  else?

 7       A.   Don't remember exactly.

 8       Q.   Okay.  But it was when the hike was done.  Is

 9  that your testimony?

10            MR. DELLORUSSO:  Objection.

11            THE WITNESS:  Yes.

12  BY MR. BERNHARD:

13       Q.   Okay.  You had said 1526 6th Street, Santa

14  Monica, is an address you recognize; is that right?

15       A.   No.

16       Q.   What did you say was your --  your previous

17  residence in Santa Monica, something to that effect when

18  your attorney was just showing you that summons?

19            MR. DELLORUSSO:  Objection.

20            THE WITNESS:  I never lived there.

21  BY MR. BERNHARD:

22       Q.   You never lived in Santa Monica?

23       A.   No.

24       Q.   Okay.  Where did you live before your current

25  address of 116 Rockefeller?
```

# EXHIBIT 21

1       A.   606 Rockefeller.

2       Q.   Okay.  And you said at that -- were you the

3  only resident at 606 Rockefeller?

4       A.   No.

5       Q.   Who else was a resident at 606 Rockefeller?

6       A.   My friend.

7       Q.   Your what?  I'm sorry.

8       A.   My friend.

9       Q.   Your friend?  Who is your friend?

10      A.   That was before -- before 2017, so I think

11  it's not relevant.

12           MR. BERNHARD:  Motion to strike as

13      nonresponsive.

14  BY MR. BERNHARD:

15      Q.   Who was your friend, Reem, that you're

16  referring to?

17      A.   (Audio distortion)

18           MR. DELLORUSSO:  Objection.

19  BY MR. BERNHARD:

20      Q.   Sorry.  I just couldn't hear what you said,

21  Reem.

22      A.   Objection.

23      Q.   Well, you're not legally allowed to make

24  objections.  Your attorney makes them for you.  He has

25  not instructed you to answer, and so you're compelled to

# EXHIBIT 21

1  answer.  So please just answer the question.

2      A.   No.  I'm not going to answer the question.

3      Q.   For the record, despite your attorney not

4  instructing you not to answer, you're refusing to answer

5  the questions today as to your residence and who you

6  lived with; is that right?

7          MR. DELLORUSSO:  Objection.

8  BY MR. BERNHARD:

9      Q.   Is that right, Reem?

10     A.   That -- I think the attorney just objected to

11 the question.  So --

12     Q.   Okay.  But he has not instructed you not to

13 answer, so, for the record, are you refusing to answer

14 the question as to your residency and who you lived

15 with?

16     A.   Didn't he just object to the question?

17         MR. DELLORUSSO:  If you know the answer, you

18     can say the answer.  If not --

19         THE WITNESS:  No.  I'm not going to.

20 BY MR. BERNHARD:

21     Q.   Okay.  So for the record, you're refusing to

22 answer; is that correct?

23     A.   Yes.

24     Q.   Okay.

25         MR. BERNHARD:  Reserve motion to compel and

EXHIBIT 21

1      sanction the witness.

2           No further questions.

3           I appreciate it, Reem.  Thank you for taking

4      the time today.  I know it's been long and

5      grueling.  I appreciate you taking the hours out of

6      your day and hopefully you can go on to better

7      things, okay.

8           THE WITNESS:  Thanks.  Bye.

9           (Thereupon, the deposition was concluded at

10   4:40 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 21

1                    CERTIFICATE OF OATH

2        STATE OF FLORIDA

3        COUNTY OF BROWARD

4

5            I, Erica Hylton, Court Reporter, Notary

6        Public, State of Florida, certify that Reem Hanna,

7        appeared before me via Zoom video on the 18th day

8        of March 2021, and was duly sworn.

9            Signed this 21st day of March 2021.

10

11

12

13        _____

14        Erica Hylton, Court Reporter

15        Notary Public, State of Florida

16        Commission No.:

17        Commission Expires:

18

19

20

21

22

23

24

25

# EXHIBIT 21

CERTIFICATE OF REPORTER

STATE OF FLORIDA

COUNTY OF BROWARD


        I, Erica Hylton, Court Reporter, certify that

I was authorized to and did report the Deposition

of Reem Hanna; that a review of the transcript was

waived; and that the transcript is a true and

correct record of my notes.

        I further certify that I am not a relative,

employee, attorney, or counsel of any of the

parties, nor am I a relative or employee of any of

the parties' attorneys or counsel connected with

the action, nor am I financially interested in the

action.

        Dated this 21st day of March 2021.




_____

Erica Hylton, Court Reporter

# EXHIBIT 21

# DEPO

# 2A

1        knows -- if she knows the answer.

2            MR. BERNHARD:  Great.  From here on forward,

3        please, unless you're instructing the client not to

4        answer, please don't make any more speaking

5        objections.  It coaxes the witness testimony.

6   BY MR. BERNHARD:

7        Q.   Okay.  So, Reem, I understood Jihan has

8   different names.  What's your full legal name?

9        A.   Reem Hanna.

10       Q.   Okay.  And was that your original name at

11  birth?

12       A.   No.  That's my marriage name.

13       Q.   Okay.  What was your name at birth?

14       A.   Reem El Mallakh.

15       Q.   So El Mallakh was your last name?

16       A.   Correct.

17       Q.   Do you have any other names or aliases that

18  you go around by besides Reem Hanna and Reem El Mallakh?

19       A.   No.

20       Q.   Do you have any, you know, middle names that

21  you would go by or anything like that?

22       A.   No.

23       Q.   Okay.  And you testified that you currently --

24  currently reside at 116 Rockefeller in Irvine,

25  California; is that right?

EXHIBIT 21

```
 1        A.   Correct.

 2        Q.   Okay.  And how long have you lived there?

 3        A.   I think since 2017.

 4        Q.   Okay.  Are you sure of that date?  Did I --

 5   sorry.  Was that a yes or a no?

 6        A.   Yeah.  I think early 2017.

 7        Q.   Okay.  Are you sure of that date, early 2017?

 8             MR. DELLORUSSO:  Objection, form.

 9   BY MR. BERNHARD:

10        Q.   Is that a yes?  Or sorry.  Whenever he says

11   objection, unless he instructs you not to answer, you

12   just have to answer.

13        A.   Yeah.  I think early 2017.

14        Q.   Okay.  And do you have any brothers or

15   sisters?

16        A.   Yes.  One brother.

17        Q.   What's your brother's full legal name?

18        A.   Bassem El Mallakh.

19        Q.   Bassem El Mallakh.  Does he go by any other

20   name?

21        A.   No.  Not that I know of.

22        Q.   Okay.  Have you ever heard him go by any other

23   name?

24        A.   No.

25        Q.   Does he have any middle names?
```

EXHIBIT 21

```
 1        Q.    Yeah.  Like morning --

 2        A.    Like what --

 3        Q.    -- afternoon, night?

 4        A.    Oh, I don't remember.

 5        Q.    It doesn't show that on your pictures?

 6        A.    No.

 7        Q.    Okay.  And then from March 14th until you went

 8   to Hawaii, you were staying at 116 Rockefeller?

 9        A.    Correct.

10        Q.    Okay.  So looking at that time, do you have

11   any idea why the process server would allege that they

12   were at your house on April 17, 2019?

13              MR. DELLORUSSO:  Objection, form.

14              THE WITNESS:  How do I know?  Why is that --

15        how would I know why they would say such a thing?

16   BY MR. BERNHARD:

17        Q.    Is it possible that there was someone else

18   staying at your house on April 17, 2019?

19        A.    No.

20              MR. DELLORUSSO:  Objection, form.

21   BY MR. BERNHARD:

22        Q.    Okay.  Did you live with anybody else at 116

23   Rockefeller, Irvine, California in April 2019?

24        A.    My son.

25        Q.    Okay.  How old is your son?
```

# EXHIBIT 21

1        A.    He's 15.

2        Q.    Okay.  So it's just you and your son at 116

3    Rockefeller, Irvine in March and April 2019?

4        A.    Yes.

5        Q.    Okay.  So on or about April 17, 2019, around

6    12:20 p.m., it's your testimony that no one knocked on

7    the door at your residence at 116 Rockefeller?

8        A.    Correct.

9        Q.    Okay.  And it's your testimony that on April

10   17, 2019, around 12:20 p.m., you did not answer the --

11   the -- the door at 116 Rockefeller?

12       A.    Correct.

13       Q.    Do you have a -- like a doorman at 116

14   Rockefeller?

15       A.    No.

16       Q.    Is there a camera system at 116 Rockefeller?

17       A.    There is a doorbell camera.

18       Q.    Okay.  Is it a doorbell camera for your

19   particular unit, or is it for the building, or something

20   else?

21       A.    For the unit.

22       Q.    Okay.  And is it your position that on April

23   17, 2019, around 12:20 p.m., nobody, to your knowledge,

24   buzzed your unit at 116 Rockefeller?

25       A.    I wasn't here, so if they rang the doorbell, I

EXHIBIT 21

62

```
 1          MR. DELLORUSSO:  Objection.

 2          THE WITNESS:  I don't -- I don't remember.  I

 3     mean, this is --

 4  BY MR. BERNHARD:

 5     Q.  Okay.  Have you -- have you driven your

 6  brother anywhere in a car in the past three years?

 7     A.  I don't remember.

 8     Q.  Okay.  How often do you see your brother?

 9     A.  Not very often.

10     Q.  Okay.  In 2020, how many times would you say

11  you'd see your brother?

12          MR. DELLORUSSO:  Objection.

13          THE WITNESS:  I don't remember.

14  BY MR. BERNHARD:

15     Q.  Would you say it's more than five for the year

16  2020?

17     A.  I can't be certain.

18     Q.  Would you say it's less than five times you

19  seen your brother in 2020?

20     A.  I really do not remember.

21     Q.  Would you say that you seen your brother more

22  than 100 times in 2020?

23     A.  No.

24     Q.  Okay.  Would you say you saw your brother more

25  than 50 times in 2020?
```

# EXHIBIT 21

```
 1        A.    No.

 2        Q.    Would you say you saw your brother more than

 3  20 times in 2020?

 4        A.    Probably not.

 5        Q.    Okay.   Would you say you saw your brother more

 6  than 10 times in 2020?

 7        A.    Probably not.

 8        Q.    Okay.   So you see your brother -- you saw your

 9  brother less than 10 times in 2020?

10              MR. DELLORUSSO:   Objection.

11              THE WITNESS:   Yeah.   Maybe even less.

12  BY MR. BERNHARD:

13        Q.    Okay.

14        A.    Very infrequent.

15        Q.    Okay.   What about 2019; same amount of time?

16  You saw your brother more or less than five times or so

17  in 2019?

18        A.    Probably.

19        Q.    Okay.   What about 2021; how often do you see

20  your brother?

21        A.    Very infrequent.

22        Q.    Okay.   So one of those where you say less than

23  five times in 2021?   It's only been three months.

24        A.    Oh, for sure.

25        Q.    Okay.
```

EXHIBIT 21

```
 1        A.    For sure less than five.

 2        Q.    Is you seeing your brother today and yesterday

 3   the first time you've seen your brother in 2021?

 4        A.    Probably.  Yes.

 5        Q.    Okay.  So in the five or so times you saw him

 6   in 2020, the five or so times you saw him in 2019, did

 7   you see him at all drive a car?

 8        A.    I don't remember.

 9              MR. DELLORUSSO:  Objection.

10   BY MR. BERNHARD:

11        Q.    Okay.  What about 2018?

12              MR. DELLORUSSO:  Objection.

13              THE WITNESS:  I don't know.

14   BY MR. BERNHARD:

15        Q.    Would it surprise you to know that your

16   brother has a Mercedes Benz C-Class registered in his

17   name at 116 Rockefeller?

18        A.    I don't know.

19        Q.    I'm not saying what you know.  I said would it

20   surprise you?

21        A.    I really don't know what his car situation is.

22        Q.    Okay.  When you park at 116 Rockefeller, do

23   you park in front of your property, or do you park like

24   down the road or somewhere else?

25        A.    In the garage.
```

EXHIBIT 21

1   don't know what late is for you.

2          MR. DELLORUSSO:  Objection, form.

3          THE WITNESS:  I don't remember.

4   BY MR. BERNHARD:

5      Q.   Okay.  Is there any way to -- to get that

6   information out of your phone?

7      A.   No.

8      Q.   Okay.  Do you recall if it was before or after

9   9 o'clock?

10     A.   I don't remember.

11     Q.   Is there any way for you to confirm?

12     A.   Nope.

13     Q.   On September 13, 2020, did you drive yourself

14  back in your Mercedes; did your brother, Bassem, give

15  you a ride, or something else?

16     A.   No.  I drove myself.

17     Q.   Do you recall why you were at your brother,

18  Bassem's, place on September 13, 2020, in particular?

19     A.   Visiting.

20     Q.   Okay.  Well, we've got a process server who's

21  stated that they came to 116 Rockefeller on September

22  13, 2020, around 9 o'clock p.m. and -- and spoke to you

23  in particular.  Does that sound familiar at all?

24     A.   Yeah.

25     Q.   Okay.  So did somebody talk to you on

EXHIBIT 21

1   September 13, 2020, around 9:00 p.m. at 116 Rockefeller?

2       A.   Yes.

3       Q.   Okay.  And tell me what happened.  Did

4   somebody come and knock on your door or something else?

5       A.   There was someone knocking on the door like

6   mad, very loud.  I opened the door, and they said, "Is

7   Bassem" -- I think I -- you know, obviously, not word-

8   for-word, but they said, "Is Bassem here?"  I said, "No,

9   he does not live here," and I closed the door.

10      Q.   Okay.  Was there anybody else with you at the

11  time at 116 Rockefeller on September 13, 2020?

12      A.   Probably my son.

13      Q.   And you said your son is 15 years old?

14      A.   Yes.

15      Q.   Anybody else with you besides your on

16  September 13 --

17      A.   No.

18      Q.   -- 2020, at 116 Rockefeller?

19      A.   No.

20      Q.   So your testimony here under penalty of

21  perjury is that only you and your 15-year-old son were

22  at 116 Rockefeller at 9 o'clock p.m. on September 13,

23  2020, when this process server came to your house; is

24  that right?

25      A.   Right.

EXHIBIT 21

1    Q.   Okay.  And you said -- what you said to him?  I

2  -- sorry.  I just forgot.

3    A.   I said, "He doesn't live here," and I closed

4  the door.

5    Q.   Okay.  Did that -- did that process server say

6  anything else to you?

7    A.   No.

8    Q.   Did that process server try to give you

9  paperwork?

10    A.   No.

11    Q.   Is there any reason that you didn't ask what

12  the -- the person wanted?

13    A.   No.

14    Q.   Okay.  Is that your typical way of behaving

15  when somebody comes and asks for your brother that you

16  slam the door in their face?

17        MR. DELLORUSSO:  Objection, form.  You can

18    answer.

19        THE WITNESS:  Yeah.  I don't -- I don't have

20    an answer.

21  BY MR. BERNHARD:

22    Q.   Okay.  Have you ever done that to anybody else

23  who has come and asked for your brother?

24    A.   No.

25    Q.   Okay.  Why do you think you did it on this

EXHIBIT 21

1  particular night on September 13, 2020?

2      A.   I don't understand your question.

3      Q.   You said you've never slammed the door in

4  anybody else's face when they asked for your brother.

5  You said you slammed the door in this guy's face on

6  September 13, 2020.  I'm trying to understand why you

7  would change your behavior specifically for this

8  individual on September 13, 2020.

9      A.   By the way, that's not what I said.  That's

10 not what I said.  You're -- you're --

11     Q.   Okay.

12     A.   -- you're paraphrasing what I said.

13     Q.   Okay.

14     A.   All I said was -- (audio distortion) like mad

15 and really like being very loud and disruptive late at

16 night.  When I opened the door, he asked about is -- he

17 asked -- I don't remember -- I don't remember exactly

18 the words, but he said, "Is Bassem here?"  And I said,

19 "No.  He does not live here," and I closed the door.

20          So I don't know what's typical or atypical.

21 This is not a scenario that happens to be frequently in

22 life where someone knocks like mad (audio distortion).

23     Q.   Did you ask what it was about?

24     A.   No.

25     Q.   Were you concerned at all for your brother?

EXHIBIT 21

```
 1        A.    No.

 2        Q.    Okay.  Is that the first time you remember

 3   anybody ever knocking on your door and asking for

 4   Bassem?

 5        A.    Yes.

 6        Q.    Okay.  So that novelty of that situation

 7   didn't peek your curiosity in any way?

 8              MR. DELLORUSSO:  Objection.

 9              THE WITNESS:  No.

10   BY MR. BERNHARD:

11        Q.    Okay.  Did you call your brother to see what

12   was going on?

13        A.    No.

14        Q.    Why is that?

15        A.    I mind my own business.

16        Q.    Well, I mean, I understand you might mind your

17   own business about, you know, some random schmoe you

18   don't know.  We're talking about your brother here.  Do

19   you mind your own business when it comes to your brother

20   too?

21              MR. DELLORUSSO:  Objection.

22              THE WITNESS:  Of course I mind my own

23        business.

24   BY MR. BERNARD:

25        Q.    Okay.  Did the person leave any documents at
```

EXHIBIT 21

1    your door or in your door or otherwise?

2        A.    No.

3        Q.    You saw no documents on your door at any time

4    on September 13, 2020?

5        A.    No.

6        Q.    You saw no documents on your door at any time

7    that week of September 13, 2020?

8        A.    No.

9        Q.    It's your testimony that a random individual

10    came to your door at 9 o'clock-ish, knocked on it

11    loudly, asked for Bassem, you said, "He doesn't live

12    here," closed the door, and that's the last you -- you

13    saw of this all together.

14        A.    Right.

15        Q.    And you never contacted your brother, Bassem,

16    about it whatsoever.

17        A.    No.

18        Q.    You had no concerns whatsoever that this

19    random person was coming to your door to ask for your

20    brother.

21        A.    No.    I did not find it concerning.

22        Q.    And that's the very first time to your memory

23    that anybody's come to your door at 116 Rockefeller

24    asking for Bassem El Mallakh.

25        A.    That's correct.

EXHIBIT 21

1    Q.    Has that ever happened again since?

2    A.    No.

3    Q.    Did you tell anybody at all about this

4    occurrence on September 13, 2020, that this person came

5    to your door asking for your brother, Bassem?

6    A.    No.

7    Q.    Okay.  Have you ever been accused in court of

8    making a false statement?

9    A.    No.

10    Q.    Have you ever been sued?

11    A.    No.

12    Q.    Have you ever been sued for slander, which is

13    the making of a false statement to damages a person's

14    reputation?

15    A.    No.

16    Q.    Have you ever been sued for conspiracy, which

17    is making of a secret plan by a group to do something

18    unlawful?

19    A.    No.

20    Q.    To your knowledge, has your brother, Bassem El

21    Mallakh, ever been sued in a court for making a false

22    statement?

23    A.    I don't know.

24    Q.    To your knowledge, has your brother, Bassem El

25    Mallakh, ever been sued, apart from this lawsuit by

# EXHIBIT 21

1  Belgium Investments, ever been sued at all, to your

2  knowledge?

3              MR. DELLORUSSO:  Objection.

4              THE WITNESS:  Like I said, I -- you can ask

5        him what you want.

6  BY MR. BERNHARD:

7      Q.   I'm not asking him; I'm asking you.  To your

8  knowledge, has your brother, Bassem El Mallakh, ever

9  been sued, apart from this lawsuit by Belgium

10  Investments, to your knowledge?

11      A.   I don't know.

12      Q.   Okay.  To your knowledge, has your father,

13  Essam El Mallakh, ever been accused in court of making a

14  false statement?

15              MR. DELLORUSSO:  Objection.

16              THE WITNESS:  No.

17  BY MR. BERNHARD:

18      Q.   To your knowledge, has your father, Essam El

19  Mallakh, ever been sued, apart from this lawsuit by

20  Belgium Investments?

21              MR. DELLORUSSO:  Objection.

22              THE WITNESS: No.

23  BY MR. BERNHARD:

24      Q.   To your knowledge, has your father, Essam El

25  Mallakh, ever been sued for slander, which is the making

EXHIBIT 21

1   of a false statement?

2           MR. DELLORUSSO:  Objection.

3           THE WITNESS:  (No audible response)

4   BY MR. BERNHARD:

5       Q.   To your knowledge, has your father, Essam El

6   Mallakh, ever been sued for conspiracy?

7       A.   No.

8           MR. DELLORUSSO:  Same objection.

9   BY MR. BERNHARD:

10      Q.   Okay.  To your knowledge, has your mother,

11  Mona McCale (phonetic), ever been accused in court of

12  making a false statement?

13          MR. DELLORUSSO:  Objection.

14          THE WITNESS:  No.

15  BY MR. BERNHARD:

16      Q.   To your knowledge, has your mother, Mona

17  McCale, ever been sued?

18          MR. DELLORUSSO:  Objection.

19          THE WITNESS:  No.

20  BY MR. BERNHARD:

21      Q.   To your knowledge, has your mother, Mona

22  McCale, ever been sued for slander?

23          MR. DELLORUSSO:  Objection.

24          THE WITNESS:  No.

25  BY MR. BERNHARD:

# EXHIBIT 21

```
 1        Q.   Okay.  To your knowledge, has your mother, Mona,
 2   ever been sued for conspiracy?
 3            MR. DELLORUSSO:  Objection.
 4            THE WITNESS:  No.
 5   BY MR. BERNHARD:
 6        Q.   Okay.  Have you ever been accused in court of
 7   having participated in the commission of a fraud in any
 8   way?
 9        A.   No.
10            MR. DELLORUSSO:  Objection.
11   BY MR. BERNHARD:
12        Q.   Do you understand fraud to be an act of
13   dishonesty?
14            MR. DELLORUSSO:  Objection.
15            THE WITNESS:  If you say so.
16   BY MR. BERNHARD:
17        Q.   I'm just asking if you understand that.
18        A.   Is -- is that the legal explanation of it?
19        Q.   I'm just saying, do you understand fraud to be
20   an act of dishonesty?  Just your understanding.
21            MR. DELLORUSSO:  Objection.
22            THE WITNESS:  Like -- yeah.  Sure.
23   BY MR. BERNHARD:
24        Q.   Okay.  Have you ever been accused in court of
25   having an extramarital affair?
```

# EXHIBIT 21

1          (Deposition Exhibit 5 marked)

2    BY MR. DELLORUSSO:

3          Q.   Have you ever seen this document before?

4          A.   No.

5          Q.   Okay.  Now, I want to read for the record

6    here.  On the second line, it says, "Plaintiff served

7    Defendant, Bassem Essam El Mallakh, with the complaint

8    in this matter on March 3, 2019, at 116 Rockefeller,

9    Irvine, California 92612."  And his response was due on

10   March 23, 2019, which he failed to file an answer to the

11   complaint.  Do you see that?

12         A.   Yes.

13         Q.   Okay.  The 116 Rockefeller, Irvine, California

14   address, is that your residence?

15         A.   Yes.

16         Q.   You live there?

17         A.   Yes.

18         Q.   Does your brother, Bassem Essam El Mallakh,

19   live there?

20         A.   No.

21         Q.   Where does he live?

22         A.   In Santa Monica.

23         Q.   Were you ever served with any documents from a

24   process server in 2019 at 116 Rockefeller, Irvine,

25   California 92612?

# EXHIBIT 21

92

```
1        A.   No.
2        Q.   Were you ever served with any documents from
3   anybody in regards to a lawsuit at 116 Rockefeller,
4   Irvine, California 92612?
5        A.   No.
6        Q.   Has your brother, Bassem Essam El Mallakh,
7   ever resided or slept or stayed at your residence at 116
8   Rockefeller, Irvine, California, in March or April of
9   2019?
10       A.   No.
11       Q.   Okay.  I'm going to go to the next page of
12  this exhibit.  I'll actually go a little bit more than
13  that.
14            MR. BERNHARD:  Frank, just that Exhibit 4,
15       you're going to submit that to the court reporter
16       just so that it's in the record?
17            MR. DELLORUSSO:  Sure.  I don't have her email
18       address, but --
19            THE REPORTER:  I can put that in the chat.
20            MR. DELLORUSSO:  All right.
21            MR. BERNHARD:  Yeah.  Will you do that?
22       Great.
23            MR. DELLORUSSO:  Thank you.
24  BY MR. DELLORUSSO:
25       Q.   I just want to go through this alias summons,
```

# EXHIBIT 21

1  which is page 4 of Exhibit 5.  There's three addresses

2  here.  Are you familiar with -- with the 116

3  Rockefeller, Irvine, California 92612 address?

4      A.   Yes.

5      Q.   Okay.  Is that your residence?

6      A.   Yes.

7      Q.   When was that -- when did that become your

8  residence?

9      A.   In early 2017.

10     Q.   Okay.  Is that your primary residence?

11     A.   Yes.

12     Q.   Okay.  Are you familiar with the 606

13 Rockefeller, Irvine, California 92612 address?

14     A.   Yes.

15     Q.   Okay.  What address is that?

16     A.   That was my previous address.

17     Q.   Okay.  Did you -- were you the primary

18 residence of that address?

19     A.   No.

20     Q.   Okay.  And the 152 86th Street, Santa Monica,

21 California address, 90401; do you recall that address?

22     A.   No.

23     Q.   Okay.  And I just want to read for the record

24 that it states here, "Substitute service on Reem Hanna

25 on March 3, 2019, at 12:20 p.m."  Do you see that?

EXHIBIT 21

1              MR. DELLORUSSO:  Okay.  Yeah.  I can't really

2        zoom in.  All right.  That -- that's -- that's

3        fine.  Let me see if I can get that.  All right.

4        I'm going to stop sharing so you don't have to see

5        that.  Okay.

6  BY MR. DELLORUSSO:

7        Q.   I have a few more questions here.  Were you

8  ever served with documents for -- well, strike that.

9              Were documents ever placed on your front door

10 with regards to this lawsuit at your current residence?

11       A.   No.

12       Q.   When did you first hear about this lawsuit?

13       A.   When my brother told me about it.

14       Q.   When was that?

15       A.   In this last few days or last few weeks.

16       Q.   Okay.

17             MR. DELLORUSSO:  I have no more questions.

18             MR. BERNHARD:  Okay.  Quick follow-up.  I have

19 like three questions.

20                  EXAMINATION BY MR. BERNHARD

21 BY MR. BERNHARD:

22       Q.   All right.  So we're all looking at this

23 photo, Exhibit 2.  Do you see that here, Reem?

24       A.   Yeah.

25       Q.   It's the photo that's marked at the top "April

EXHIBIT 21

**DEPO**

**3**

In the Matter of:

## re BASSEM VICTOR EL MALLAKH

---

## BASSEM MALLAKH

### *March 15, 2023*

---



Swivel Legal Solutions  |  Phone: 800.540.9099  |  www.swivellegal.com

1           UNITED STATES BANKRUPTCY COURT

2           CENTRAL DISTRICT OF CALIFORNIA

3

4  In re BASSEM VICTOR EL MALLAKH        )
                                         )
5                                        )
                                         )
6                                        )
                                         ) Case No. 8:22-BK-11605-TA
7                                        ) Chapter 11
                                         )
8                                        )
                                         )
9                                        )
   _____)

10

11

12

13

14

15       VIDEOCONFERENCE DEPOSITION OF BASSEM EL MALLAKH

16        WEDNESDAY, MARCH 15, 2023, 11:19 P.M. (PST)

17

18

19

20

21

22

   STENOGRAPHICALLY REPORTED BY:
23

   LORI S. TURNER
24 CSR NO. 9102

25 Job No.  2299A

1              UNITED STATES BANKRUPTCY COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3

4
In re BASSEM VICTOR EL MALLAKH      )
5                                   )
                                    )
6                                   )
                                    )
7                                   ) Case No. 8:22-BK-11605-TA
                                    ) Chapter 11
8                                   )
                                    )
9                                   )
                                    )
10  _____)

11

12

13

14

15

16

17

18

19

20      DEPOSITION OF BASSEM EL MALLAKH, the debtor

21      herein, taken on behalf of judgment creditor

22      via videoconference, beginning at 11:19 a.m. and

23      ending at 12:24 p.m., on Wednesday, March 15, 2023,

24      before Lori S. Turner, Certified Shorthand

25      Reporter, CSR No. 9102

Case 8:22-bk-11605-TA   Doc 254   Filed 08/10/23   Entered 08/10/23 21:07:20   Desc
re BASSEM VICTOR EL MALLAKH   Main Document   Page 339 of 872
BASSEM MALLAKH on 03-15-2023

Job 2299A
Page 3

```
1    APPEARANCES OF COUNSEL:

2

     For Judgment Creditor BELGIUM INVESTMENTS 960 BAY DR,
3    LLC A CALIFORNIA CORPORATION:

4
             IMPACT ADVOCATES APC
5            BY PATRICK MILLER, ESQ.
             121 South Oak Avenue
6            Pasadena, California 91107
             213.364.7581
7            patrick.miller@impactadvocateslaw.com
             (APPEARING VIA VIDEOCONFERENCE)
8

9
     For Debtor BASSEM VICTOR EL MALLAKH:
10

11           AFARI LAW FIRM
             BY CAROLYN AFARI, ESQ.
12           269 South Beverly Drive, Suite 643
             Beverly Hills, California 90212
13           424.274.1099
             afarilawfirm@gmail.com
14           (APPEARING VIA VIDEOCONFERENCE)

15

16   Also Present:  ANTHONY CASTANEDA - Exhibit Technician
                    (APPEARING VIA VIDEOCONFERENCE)
17

18

19

20

21

22

23

24

25
```

```
1                          I N D E X

2

3    WITNESS:   BASSEM EL MALLAKH
               (APPEARING VIA VIDEO CONFERENCE)
4

5    EXAMINATION:                                    PAGE

6    BY MR. MILLER                                      5

7

8                       E X H I B I T S

9                    (No exhibits offered)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              WEDNESDAY, MARCH 15, 2023 - 11:19 A.M.

 2                            ***

 3

 4                    BASSEM EL MALLAKH,

 5              HAVING BEEN DULY ADMINISTERED AN

 6              OATH BY THE REPORTER, WAS EXAMINED

 7                  AND TESTIFIED AS FOLLOWS:

 8

 9                       -EXAMINATION-

10

11   BY MR. MILLER:

12      Q.  Okay.  Thank you for taking the time to be here

13   with us today, Mr. El Mallakh.

14          I understand you've been involved in previous

15   depositions.

16          Is that correct?

17      A.  Yes.

18      Q.  Yeah.  So you understand that you're under oath

19   today?

20      A.  Yes.

21      Q.  Are you currently -- where are you currently

22   located?

23      A.  I'm in Egypt right now.

24      Q.  Where in Egypt?

25      A.  Cairo.
```

```
1        Q.  Okay.  Where are you staying right now?

2        A.  I'm staying at my parents' house.

3        Q.  Okay.  And is your father in the room with you

4   right now?

5        A.  No, he's not.

6        Q.  Okay.  Can he hear you right now?

7        A.  No.  No.  No.  I'm in a different room.

8        Q.  So you've been involved in depositions before,

9   but I'll remind you of a few of the ground rules.

10            The purpose for this deposition is to

11   understand the truth of these issues.  So if there's any

12   questions that I ask that you don't quite understand,

13   please feel free to stop and ask me to rephrase them.

14            I want to be sure you understand what I'm

15   asking and that you can answer accurately and

16   truthfully.

17        A.  Yes.

18        Q.  If you'd like to take a break, please let us

19   know, and we can facilitate that.  If you need anything

20   clarified or restated, that's fine.

21            Are you feeling sick at all today?

22        A.  No, I'm not.

23        Q.  You're not under the care of any doctors or

24   under any -- the influence of any prescription drugs or

25   other chemical substances?
```

1      A.  No, I'm not.

2      Q.  Okay.  So first of all, I'd like to talk a bit

3  about where -- first, where did you reside in 2016?

4      A.  I've always lived in my house in Irvine.

5      MS. AFARI:  Just really quickly.  I just want to --

6  I just want to clarify that the purpose of this

7  deposition is regarding the debtor's homestead

8  exemption.

9          So I guess I'm going to raise an objection to

10  relevance because the question of debtor's homestead

11  exemption, it doesn't matter where he was living at any

12  point in time before the debtor's case was filed.

13          What's relevant in determining the debtor's

14  homestead exemption is where the debtor was living on

15  the day the case was filed.

16          So you can go ahead and answer the question.

17  BY MR. MILLER:

18      Q.  Okay.  Mr. El Mallakh, can you tell me where

19  did you reside in 2016?

20      A.  I've been always living in the same house since

21  I purchased it.

22      Q.  And what house is that?

23      A.  It's 116 Rockefeller, Irvine.

24      Q.  Okay.  And so in 2016 you were living in the

25  Rockefeller house then.

```
1            When did you purchase the Rockefeller house?

2       A.   October 2013.

3       Q.   And you always resided there.

4            Did you ever have any roommates while you lived

5  there?

6       A.   In Irvine, I've never had a roommate.

7       Q.   In Irvine, you've never had a roommate.

8            Have you ever had anyone else that lived in the

9  Irvine house?

10      A.   Well, you mentioned in 2016.  Right?

11      Q.   Okay.  So -- Well, from 2103 to 2016 --

12      A.   When I purchased the place in 2016, I didn't

13 have a roommate.

14      Q.   So 2016 no roommate.

15           But have you had roommates at the Rockefeller

16 house?

17      A.   Now I do, which is my sister and her son.

18      Q.   And when did your sister and son -- her son

19 move in?

20      A.   They fully moved in December of 2018.  That's

21 when, you know, my sister actually fully moved.

22           She kind of started moving slowly in the

23 beginning of 2017, and then that's when I did a lease

24 with her.

25           And then her and her roommate, I guess they
```

```
 1    solved -- resolved the issues they had so then she

 2    continued living in -- it's in the same community,

 3    actually.  So she stayed in, you know, the place she was

 4    living in, but just moved some of her valuables at my

 5    place and some of her son's furniture.

 6            And then when the issue -- when my sister and

 7    her roommate issue started raising again, then she's

 8    like, I'm just going to fully move in with you, which

 9    was in the summer of 2018.

10        Q.  Okay.  Okay.  That's helpful.

11            And have you ever signed a lease for any other

12    apartments while you -- between 2013 and today?

13        A.  Yeah.  I did sign a lease to help my friend who

14    is a Canadian citizenship.  He wanted to get an

15    apartment in Santa Monica that we can both use as an

16    office, and then he needed someone to cosign for him.

17            And then I cosigned for him to be able to like

18    give him the apartment.  And also I've been able to use

19    the guest bedroom in the apartment for any purposes of

20    like, you know, from -- just tired from working, and I

21    can just like crash in there instead of driving back,

22    you know, maybe sometimes two hours of traffic.

23        Q.  All right.  Driving back -- driving back to

24    where?

25        A.  To our house.
```

1       Q.   And the house you're referring to is the

2   Rockefeller house?

3       A.   Yeah.   My house.   My own house.

4       Q.   When did you sign the lease for the Santa

5   Monica apartment?

6       A.   It was in November of 2016.

7       Q.   Okay.   November of 2016.

8            So -- so you always lived in the Rockefeller

9   house.

10           How many nights did you normally sleep there?

11      A.   Most of the week.   You know, I would be working

12   between Santa Monica and Irvine.   It just depends on the

13   week.   Some weeks I would just be in like, you know,

14   Irvine for the whole week.   Some weeks I would work in

15   Santa Monica a few days, and then, you know, some weeks

16   I would just work, you know, maybe Monday to Thursday,

17   and I'll just go back to my house on the weekends.

18           It was really all depending on the traffic.

19   You know, if there was no traffic when I finished work,

20   I'd go back home.   If there was traffic, then I would

21   just like crash and I go the next morning.

22      Q.   That makes sense, yeah.   The traffic.

23           What is it, the 405 that you --

24      A.   If you're familiar with the LA and Orange

25   County traffic, it gets really bad.   If you have the

1   same work opportunity and you can have a place to crash

2   if you're tired so you don't have to drive in the

3   traffic and also saving some of the gas costs.

4           (Reporter clarifies.)

5   BY MR. MILLER:

6       Q.  So do you still use the apartment in Santa

7   Monica as a work office?

8       A.  You know, as a matter of fact, my roommate, he

9   told me that, you know, he's not able to like stay in

10  the apartment anymore and if I can just like help him

11  move all his stuff out.

12          And I actually moved all his stuff out and, you

13  know, the apartment's not even there anymore.

14      Q.  I'm sorry.  What do you mean the apartment is

15  not even there anymore?

16      A.  I'm saying when I told my roommate that I

17  wouldn't be able to like, you know, continue working on

18  this like business venture that we were working

19  together, and I said, you know, like "Hey, I'm going to

20  tell the leasing office that I'm" -- "I'm" -- you know,

21  "I'm going to just like leave."  You know, I want to

22  basically leave the -- take my lease off, you know, and

23  it will be just all his responsibility.

24          And he said, "Yeah, that's fine.  I'll take

25  care of the responsibility," you know, "by myself," you

1   know, since I already had to cosign on his behalf, you

2   know.

3           And then, you know, he said, "Yeah, I'm just

4   going to," you know, "keep the apartment myself under,"

5   you know, his name.

6           And then -- and then at one point he's like,

7   you know, "Hey, like I have to go check on my family in

8   Dubai.  Would you be able to maybe go," you know, "check

9   on some of my mail," or, you know, sometimes he would

10  say like, you know, "water my plants" or whatever.

11          And then at one point he says like, you know,

12  "Hey, I'm just like maybe just busy with my business in

13  Dubai, would you be able to just like go ahead and just

14  like" -- you know, "just take all my stuff to a storage

15  unit and move them or tell the leasing office that I'm

16  not able to come to LA myself to," you know, "finish

17  this apartment.  So can you just help me with that," and

18  I did that for him.

19          I'm sorry.  Was that your question?

20     Q.   When was it that you moved the remaining

21  furniture out of the apartment?

22     A.   Like mine or his?

23     Q.   Well, sure.  When did you move your furniture

24  out?

25     A.   So I didn't really have furniture.  I just had

1  some like clothing, and I had just like my tennis

2  rackets, and then, you know, just my laptop, which is

3  not like -- you know, not really a furniture.

4          But then he had like, you know, his beds and,

5  you know, his couch and TV and, you know, a bunch of

6  stuff.  So I had to help him like, you know, move that

7  stuff.

8      Q.  And when did you help him move that stuff out

9  of the apartment?

10     A.  I did that in January of, you know, this year.

11     Q.  So in January 2023?

12     A.  Yeah.

13     Q.  But your friend -- And when did you -- is the

14  lease still operative?

15     A.  No, it's gone.  It's cancelled now.

16     Q.  When was the lease cancelled?

17     A.  I have to check with him.  You know, I'm not

18  sure.  I mean I haven't, obviously, been, you know,

19  following what he's been doing with the apartment since

20  I -- I just didn't continue that business venture

21  anymore.

22     Q.  And when did you communicate with him that you

23  weren't going to be continuing with the business

24  venture?

25     A.  It was in April of 2021.

1     Q.   Okay.  Did you continue to use the prop- -- use

2     the Santa Monica house after April 2021?

3     A.   No.  I would just like -- you know, just go to

4     meet him.  Like, you know, we're still also friends,

5     but, you know, a side interest, the business we were --

6     we're friends, you know, so I would sometimes go hang

7     out with him or go bike or go hang out at the beach and

8     just hang out in LA.

9           And then, again, sometimes if I'm tired, I'll

10    just crash in the guest bedroom or just drive back to my

11    house.

12    Q.   So in 2022 you would sometimes stay at the

13    Santa Monica apartment?

14    A.   Only when he's there and stuff and just hang

15    out together.

16    Q.   And how frequently would you say that you spent

17    time at the Santa Monica apartment --

18    A.   Well, I --

19    Q.   -- in 2022?

20    A.   In 2022, I would just go visit him.  Sometimes

21    I'll see him once a month.  You know, sometimes I'll see

22    him, you know, every two weeks.

23    Q.   But you lived at his apartment?

24    A.   Yeah.  It's been his apartment since Day One.

25    I just helped him as a friend to cosign since he's not a

1  U.S. resident and didn't have any credit history here to

2  be able to get an apartment on his own.  So just as a

3  friend, I just help him cosign.

4        Q.  So did you -- was that ever your residence?

5        A.  No.  Was never really my residence.  My

6  residence has always been the same.

7        Q.  Did you ever pay the rent at the Santa Monica

8  apartment?

9        A.  Yeah.  I was paying, you know, like a small

10 contribution from the amount while we were in that, you

11 know, just business.

12            And then I stopped, you know, paying, but I

13 obviously told him I'm not able to continue this

14 business anymore.

15            It was a start-up.

16       Q.  Are there any -- are there any other apartments

17 or houses where you regularly sleep?

18       A.  No.  Just my house.

19       Q.  Do you have any girlfriends or boyfriends or

20 anything?  A significant other?

21       A.  I'm currently seeing no one.

22            When I had a girlfriend, I would have her, you

23 know, just come to my place or I would go to her place.

24 Like -- it was not like -- I wasn't living at my

25 girlfriend's house.  I would just mainly be spending

1    sometime with each other.

2         Q.  Yeah, understood.

3              Did you use movers -- did you use a moving

4    service when you helped move the furniture out of your

5    friend's apartment?

6         A.  No, I just did it with, you know, like a friend

7    of mine, because he didn't really have much stuff.

8              And I just literally -- I asked him, you know,

9    "Do you need the couch?  Do you need the table?"

10             He's like "Just dump all them in the street and

11   put 'Free couch,' 'Free table'" for anybody that could

12   use them.

13        Q.  Okay.  So did you move things into a storage

14   unit or leave them on the street?

15        A.  No.  I literally just took -- he says, "You can

16   have my TV."  He says, "You can have" like, you know,

17   some kitchen stuff, some blender.  Some -- it was

18   just -- he just wanted to kind of -- he didn't think

19   that his furniture had any value.

20             He's like "Yeah, just dump them," you know, the

21   things I didn't want to take, "or give it to a friend."

22             Or I actually called some friends.  I said,

23   "Hey, do you guys want some extra towels," you know,

24   "extra bathroom," you know, "stuff," you know.

25        Q.  And you mentioned you're in Egypt today.  Do

1   you frequently -- do you stay in Egypt?

2       A.  I haven't actually been to Egypt since, you

3   know, one of my cousins weddings in 2016.  So it's been

4   awhile.

5           I was supposed to go in early 2020, but then

6   COVID happened, and then it just kind of got really

7   pushed, you know.

8       Q.  But -- and how long have you been in Egypt --

9   Sorry.

10          So you have -- this is the first time you've

11  been in Egypt since 2016?

12      A.  Yeah.  First time since 2016.

13      Q.  And when did you -- when did you first arrive

14  in Egypt?

15      A.  I came -- was it last Thursday, I think.  I

16  have to check on my boarding pass.  I took a picture of

17  it.  It's on my phone somewhere.

18      Q.  About last Thursday though?

19      A.  Yeah.  I can just check on my boarding pass,

20  see what dates, I think.

21      Q.  Yeah.  So --

22      A.  It was actually my parents were visiting me,

23  and -- in California, and then when they were leaving

24  back, you know, I said, "Well, let me come back with you

25  guys."  Because I actually have to also, you know, have

1    some meetings in Egypt, you know, some work-related

2    meetings.

3          And they said "Yeah, maybe we can all go on the

4    same plane."

5          Q.   What kind of work-related meetings?

6          A.   Just meeting with some software companies just

7    to talk about some opportunities, like some job

8    opportunities in the U.S., between the U.S. and Egypt.

9          Q.   What would be the nature of the job

10   opportunities?

11         What type of jobs would they be?

12         A.   It would be like me managing a -- a software

13   service.  You know, it's almost kind of like a bridge

14   between the two countries, and I would be managing

15   the U.S. operation and trying to sell the software in

16   the U.S.

17         Q.   Okay.  And where would your work be conducted

18   for this job?

19         A.   Yeah, in Orange County.  In Irvine.

20         Q.   Yeah.  That's Orange County.

21         Right?

22         A.   Because I know in Florida you guys also have

23   Orange County.  So I'm not sure if you're familiar with

24   the one here, the one in California.

25         Q.   Okay.  Yeah.  Yeah.

```
1              So I'm based in California.

2        A.   Okay.  Great.

3        Q.   Yeah.  So I'm based up in Pasadena, in LA.

4        A.   That's a nice area.

5        Q.   Yeah.  Some days.  It's cold right now.

6        A.   Yeah.  It's raining; I saw that.

7              It's a very family area.

8        Q.   Yeah.

9        A.   Very clean.

10       Q.   So how many nights on average would you say you

11   sleep at the Rockefeller property?

12       A.   I mean like maybe 28 days a month, you know.

13       Q.   Yeah.  Okay.

14             So you -- so where -- who's responsible for

15   the -- paying the utility bills at the Rockefeller

16   property?

17       A.   The bills on Rockefeller?  What about it?

18       Q.   So who pays the bills at the Rockefeller

19   property?

20       A.   I -- I do, between my sister and I.

21       Q.   And so you live in the Rockefeller property

22   with your sister.

23             How many bedrooms does the Rockefeller property

24   have?

25       A.   Three bedrooms.
```

1        Q.   And is it you have a bedroom, your sister has a

2    bedroom, and her son has a bedroom?

3        A.   Yes.

4        Q.   And who actually transmits payment to the

5    utility companies?  Is it you, and your sister gives you

6    money?  Or how does that process work?

7        A.   Yeah, I pay -- I pay all the utilities.

8             So sometimes, you know, my sister, will, you

9    know, give me like from the rent I'll be able be to pay

10   some of the -- the bills.

11            Sometimes I'll give her cash.  You know, due to

12   some of my banking issues, you know, because of the

13   case, I'll give her cash and, you know, it will pay the

14   bill.

15            The bill is still under my name.

16       Q.   So the bill is under your name --

17       A.   Uh-huh.

18       Q.   -- then you're always the one who sends the

19   payment.

20            Do you use auto payment, or what's your usual

21   method?

22       A.   Well, you know, so my sister pays obviously the

23   rent, and I pay the utilities from the rent.

24       Q.   So do you usually send a check, for instance,

25   for your gas bill?  Do you pay a gas bill?

1      A.  It's an auto pay.  It's an auto pay.

2      Q.  Yeah.  And it comes from one of your bank

3   accounts?

4      A.  It comes from -- Well, it comes from my --

5   my -- Well, I have the issue with the bankruptcy.  I

6   don't do bank accounts anymore.

7      MS. AFARI:  Let me just interject here because if

8   you're not sure of the answer, we can look it up and

9   provide that answer to Mr. Miller.

10      THE WITNESS:  Yeah, sure.

11   BY MR. MILLER:

12      Q.  Yeah, certainly.  If you're not sure, please

13   feel free to say that you're not sure.

14      MS. AFARI:  Yeah.  If you're not sure about an

15   answer, don't, like, guess.

16          Just say "I'm not sure," and we can confirm

17   that information.

18          Because Mr. Miller can provide us with his list

19   of the questions arising from this deposition and we can

20   provide those responses to him.

21          Okay?

22      THE WITNESS:  Oh, yeah.  Sure.

23   BY MR. MILLER:

24      Q.  So your typical bill usually, it comes out of

25   her -- your accounts?

1    A.  Yes.

2        I mean I can actually just, you know, get back

3    with you just exactly which payment is going on which

4    bill and then, you know, I'll get that to you.

5    Q.  Do you have any security cameras at the

6    Rockefeller property?

7    A.  I have a Ring camera.

8    Q.  Ring camera.

9        Can you tell me, what's a Ring camera?

10    A.  It's a camera that, you know, allows you to see

11    who comes to the door.  If someone like knocks or

12    someone delivers the package, it has as sensor.

13        Because in the past I had some issues with

14    people stealing my Amazon packages, and that's why I got

15    the, you know, Ring camera so I could just see like --

16    you know, see who comes and sometimes steals the

17    packages, and then I can report it to the association.

18    So just for security purposes.

19        But, yeah, I have a Ring camera for that

20    reason.

21    Q.  Did you purchase the Ring camera system?

22    A.  It was actually a Christmas gift from my --

23    from my father.

24    Q.  Do you remember when you received it?

25    A.  I think it was in 2017.  2017.  Christmas of

```
 1   2017.  It's been awhile.

 2        Q.  Yeah.  Yeah.

 3            About 2017, 2016, 2018, something along those

 4   lines?

 5        A.  Yeah, I think so.

 6        Q.  Where is the Ring camera installed?

 7        A.  It's at the front of the door.

 8        Q.  How many doors do you have at the Rockefeller

 9   property to enter the townhouse?

10        A.  I have the front door, and I have the garage.

11        Q.  How do you normally enter the property?

12        A.  Usually from the garage.

13        Q.  Okay.  How -- Does the Ring camera store

14   footage or --

15        A.  Yeah.

16        Q.  -- for a period of days?

17        A.  It does, yeah.

18        Q.  How many days does it store footage for?

19        A.  60 days.  It's 60 days.

20            It's an Amazon cloud type of a plan, you know.

21   And if you wanted to get something older, you -- you'd

22   have to call them.  I've done that before for some other

23   issue with a, you know, package that was stolen.  Then

24   they said like they don't store anything over 60 days.

25            And then I just learned how to save them
```

1  myself.  You know, anytime I have like a video of

2  something that, you know, I want to save, I save them on

3  my phone.

4       Q.  Do you have any Ring camera footage saved for

5  the past year?

6       A.  I have -- Yeah.  I can look on my phone.  You

7  know, I have like, you know, a bunch that I saved.

8  Yeah.

9       Q.  Okay.  Yeah.

10          And, of course, I don't expect you to remember

11  every single piece of footage you have saved on your

12  phone.

13      A.  No.  No.  Yeah.

14          You know, I have a bunch -- I have a bunch of

15  them, you know.

16      Q.  Okay.  So -- so you mentioned that you use

17  Amazon.

18          Do your Amazon packages normally get delivered

19  to the Rockefeller house?

20      A.  Yes.

21      Q.  Any other places where you receive Amazon

22  purchases?

23      A.  No.

24      Q.  Okay.  And what about, do you use Uber Eats or

25  any of the food delivery services?

```
 1         A.   Yeah, I do.

 2         Q.   Which -- do you have one that you regularly

 3    use?  Uber Eats?  Or Grubhub?  Or --

 4         A.   I use -- I use Uber Eats, yeah.

 5         Q.   And where do you normally get your Uber Eats

 6    deliveries?

 7         A.   At the Rockefeller house.

 8         Q.   Do you remember being involved in some

 9    proceedings in Florida a couple of years ago relating to

10    this case?

11         A.   Like what kind of proceedings?

12         MS. AFARI:  I'm sorry.  I just want to interject.

13         MR. MILLER:  Yeah.

14         MS. AFARI:  Please clarify that for the witness.

15    Because in these proceedings, you mean the bankruptcy

16    proceedings?

17              So can you clarify that.

18         MR. MILLER:  Yeah.  Certainly, yeah.

19    BY MR. MILLER:

20         Q.   So there was -- there was a case filed by

21    Belgium Investments in Florida.  I believe it was in

22    2019.

23              In 2021, you filed a motion to have a default

24    judgment vacated.

25              Do you remember that?
```

1      A.  Yes.

2          Q.  Do you remember giving evidence in support of

3   that motion?

4          A.  I'm not -- I don't remember much, you know.

5   Can you maybe remind me of what evidence you're

6   referring to?

7          Q.  Well, first, do you remember submitting a

8   written declaration?

9          A.  Yes.

10         Q.  Okay.  Do you remember where -- do you remember

11   where you said that you were residing in that

12   declaration?

13         A.  Do you have a copy of the declaration that I

14   can see?  I mean it's been awhile.

15         Q.  Sure.  Sure.  Sure.

16             So right now I don't have a copy of the

17   declaration from the Florida case, but do you remember

18   that there was also a motion in a case in California to

19   set aside a default judgment?

20         A.  Yes.

21         Q.  Okay.  And do you remember filing a declaration

22   in that case as well?

23         A.  Yes.

24         Q.  Okay.  So at paragraph three of the declaration

25   it stated, "I've been residing full-time at my residence

1    in Santa Monica since November 21st, 2016."

2        A.    Uh-huh.

3        Q.    Do you remember writing that statement?

4        A.    Yeah.    That was my -- it's my civil attorney

5    advice that he said, you know, like we need to write

6    this declaration.

7        Q.    Okay.    And then at paragraph four it said, "I

8    have not occupied the real property located at 116

9    Rockefeller since November 21st, 2016."

10        A.    Yes.

11        Q.    Do you remember writing that?

12        A.    Yeah.    I remember.

13        Q.    Can you explain why you wrote that at the time?

14        A.    Well, because I think they were just a bit

15    confused.    Because the -- you know, the server who I

16    guess was trying to serve me for this case, he was at

17    the Irvine house trying to serve me on a specific day,

18    and I wasn't actually at the house on that specific day.

19            And I told -- and then when we talked to the

20    judge, I was -- the server was on the Zoom video as

21    well, and he says "Oh, yeah.    I did serve you on that

22    day.    You were at the house."

23            And I said, "I wasn't," and I showed them the

24    proof, and nobody believed me.

25            But that doesn't mean that, you know, my house

1   in Irvine is not my residence.  It is my residence, but

2   on that specific day I wasn't there, on the day when the

3   person claimed he served me.

4       Q.  You wrote in paragraph seven, "I had no idea

5   that the judgment creditor had filed an application for

6   an entry of sister state judgment.  I had never seen the

7   documents until I hired counsel to represent me, and set

8   the sister state judgment aside."

9           Do you remember writing that?

10      A.  Yeah, actually.  Because I was never served in

11  person with the case or the judgment.  I was never

12  served in person.

13      Q.  Were those documents ever delivered to the

14  Rockefeller property?

15      A.  I never received it.

16      Q.  Okay.  Yes.  But do you know, were they ever

17  delivered to the Rockefeller property?

18      A.  I've never seen it.  I never received it.  I

19  have -- no, I've never seen it.  I have no idea.

20      Q.  You don't know whether they were delivered to

21  the Rockefeller property.  Okay.

22          Were you living at the Rockefeller property at

23  the time?

24      A.  Yes.

25      Q.  Okay.  Was anyone living with you at the

```
 1   Rockefeller property in 2020?

 2        A.  My sister.

 3        Q.  She was your co-occupant at the time?

 4        A.  She was what?

 5        Q.  She was your co-occupant at the time?

 6        A.  Yeah.  Roommate.  Co-occupant.

 7        Q.  Okay.  Had she ever talked to you about

 8   documents she had received in connection with any cases

 9   against you?

10        A.  No.  Because she never received anything

11   herself.

12        Q.  She's told you that she's never received

13   anything?

14        A.  Yeah.  She told me she hasn't received

15   anything.

16            Because when the case happened, I asked her

17   "Have you received anything on my behalf?"

18            And she said "No, I haven't received anything."

19        Q.  Okay.  Okay.  So there have -- so you resided

20   at the Rockefeller property since you purchased it in

21   2013.

22            Correct?

23        A.  Yes.

24        Q.  And the only person who's also occupied the

25   Rockefeller property has been your sister and her son?
```

```
 1        A.   And her son.

 2        Q.   Let me check.

 3        A.   Do you mind if I get my bottle of water?  I

 4   just put it somewhere.

 5             Here.

 6        Q.   Yeah.  Sure.  Sure.

 7        A.   Never mind.  It is here.

 8             I just had a spicy soup.  I just needed some

 9   water.

10        Q.   Fair enough.  Fair enough.

11             What's the name of the type of bread, Egyptian

12   bread --

13        A.   It's just so heavy.  I've been drinking so much

14   water since I came here.  All the food is really spicy,

15   but it's really good though.

16        MR. MILLER:  I think that's about the list of the

17   questions I have --

18        THE WITNESS:  Okay.

19        MR. MILLER:  -- but if I could -- maybe we can take

20   about ten minutes, break, and then we can just confirm.

21        THE WITNESS:  Yeah.  Sure.

22        MS. AFARI:  That's fine.  Shall we all hold and be

23   on mute?

24             (A recess is taken.)

25        MR. MILLER:  Back on the record.
```

```
 1   BY MR. MILLER:

 2        Q.   Just a few more questions, Bassem.

 3             If -- you don't mind if I call you "Bassem"?  I

 4   feel like I'm going to brutalize "El Mallakh."

 5        A.   Yeah, it's a long name.

 6        Q.   I want to ask you a few questions about your

 7   father because it may be that he may not need to give

 8   evidence today, deposition evidence.

 9        A.   Okay.  He was ready for the deposition.

10        Q.   Yeah.  Where was your father living in

11   September of 2022?

12        A.   September of 2022, he was in Egypt.

13             And then he came to visit us, I want to say,

14   like the first week of September or so.  Maybe the 9th

15   of September he came, and he stayed with us 'til the end

16   of September.

17             He usually come visit us like at least twice a

18   year.

19        Q.   Okay.  And where does he stay when he -- when

20   he comes and visits?

21        A.   He stays with me at my house.

22        Q.   Who's room does he stay in usually?

23        A.   I'm sorry?

24        Q.   Whose room does he usually stay in?

25        A.   So, usually, like my nephew go and sleep with
```

1 | my sister, and they sleep in his room.

2 |      Q.  So you stay in your bedroom and your father

3 | stays --

4 |      A.  I always stay in my bedroom, yeah.

5 |      Q.  Okay.  So I wanted to ask a bit about the

6 | security camera footage from the Santa Monica apartment.

7 |          Well, first, do you know, does the Santa Monica

8 | apartment have a security camera?

9 |      A.  No.  I don't think -- Yeah.  Like I don't

10 | remember.

11 |          I know my roommate was also trying to get a

12 | Ring camera, but he ended up not getting one.

13 |      Q.  So there's no Ring camera at the Santa Monica

14 | apartment?

15 |      A.  Yeah.  No, he didn't get one.

16 |      Q.  Yeah.  Do you know, are there any other

17 | security cameras around the apartment in the common

18 | areas, perhaps?

19 |      A.  In Santa Monica?

20 |      Q.  Yeah.

21 |      A.  Like in the apartment building?

22 |      Q.  Yes.

23 |      A.  I'm not -- I'm sure they have some, you know.

24 | I'm not sure.  I don't really pay attention to the

25 | cameras.

1        Q.   Yeah.  Just to be clear, I think your answer is

2   that you're not sure whether they have some?

3        A.   Yeah.  Really -- or I'm not even sure if they

4   really work, you know.

5        Q.   Okay.  You're not sure if you have them, and

6   even if they did, you're not sure if they work?

7        A.   Right.

8        Q.   All right.  Do you expect to continue living in

9   the Rockefeller property?

10        A.   On what?  Sorry.

11        Q.   Do you expect that you'll continue living in

12   the Rockefeller property?

13        A.   Yes.

14        Q.   Why do you live -- why do you live in Irvine if

15   your business is in Los Angeles?

16        A.   Well, my business was never in Los Angeles, but

17   the reason why we picked Los Angeles is because we

18   wanted to hire or work with, you know, tech savvy

19   talent, which is hard to find in Orange County.

20            You know, usually people in the technology

21   field are mainly in LA.  It's actually called the

22   "Silicon Beach," which is Venice, Santa Monica, Marina

23   del Rey.  All those areas that you find people that

24   you're looking to work with.

25        Q.   So the reason why you chose to -- the reason

1   why you and your partner -- what's your partner's name?

2       A.   His name is Mohamed.

3       Q.   Mohamed Roston.   Correct?

4       A.   Yeah.

5       Q.   So you chose to rent the Santa Monica apartment

6   because you wanted to be close to people who work in the

7   technology industry?

8       A.   Right.

9            That was actually his idea.  Because he also

10  have a lot of, you know, like people that he worked with

11  in the past in the LA area.  So he wanted to also be

12  close.

13           It was mainly his idea about like being close

14  to the talent, you know, instead of going up to Silicone

15  Valley to find talent of people you want to work with.

16      Q.   What type of work do you expect -- Are you

17  applying for any jobs lately?

18      A.   Well, you know, what I'm focusing on now is

19  the -- just like -- just, you know, interviewing with,

20  you know, some software companies as well out in Egypt,

21  because Egypt is also very large in software arena, and

22  that's where I'm focusing on now.

23           And just get back in, you know, in this

24  business.

25      Q.   So are you still -- do you -- what kind of --

1    you mentioned your -- the one software company that

2    you're planning to interview with during this trip.

3        A.   Yeah.

4             And I also have some other, you know, like

5    companies I'm going to be meeting with to discuss

6    different op- -- I'm just trying to see my options, you

7    know, before I decide on one company.

8        Q.   Would you be -- would those positions require

9    you to spend time in Egypt?

10       A.   Maybe at least like two visits a year in Egypt.

11       Q.   And would they also be technology companies?

12       A.   Right.

13       Q.   So would you have a similar motivation to be

14   near the technology center in Southern California?

15       A.   Well, you know, like recently that has changed

16   in the last like, you know, three years.  Actually,

17   since COVID, you know, when everybody obviously started

18   working at home.

19            So everybody moved away from the cities to go

20   work at -- you know, at home in the suburbs, you know.

21            Also a lot of my friends, they used to live in

22   "San Fran," they moved out of -- they moved to Austin,

23   Texas and Dallas and Kansas.  A lot of people moved to

24   Miami.  Now we live in a very work environment, you

25   know, so I guess you can find people everywhere, you

1   know.

2          And I've actually been meeting tech people in

3   Irvine.

4          Irvine is actually trying to get -- to be the

5   kind of a tech bubble as well, which is very

6   interesting.

7       Q.  And did you prepare the lease agreement between

8   you and your sister?

9       A.  Yes.

10      Q.  And have there been any changes to the lease

11  agreement?

12      A.  Just the price changed from 3,000 to 4,000.

13      Q.  When did the price change from 3,000 to 4,000?

14      A.  I believe it was in mid of 2021.  I -- I'll

15  have to check exactly the day and get back to you.

16          But it was mainly because of just the

17  inflation, everything was getting more expensive, you

18  know.

19      Q.  You think it was during middle of 2021?

20      A.  I would actually have to just check, exactly.

21          You know, it's my sister so it's kind of like

22  it was more of an easy kind of a change.

23          It's like, you know, we -- sometimes, you know,

24  we make some kind of an agreement.  We don't have to go

25  and put it in writing with her, you know, since she's

1    not like a stranger.

2         Q.  Why did you sign the lease agreement?

3         A.  Well, so, again, you know, just to process.  So

4    she is my sister, which, obviously, you know, gives her

5    different advantages and things.

6              But at the same time, also, you know, like we

7    grew up like as siblings knowing that we also have to do

8    things the right way in every aspect, you know, and she

9    was also comfortable about having, you know, a lease in

10   place.

11        Q.  Uh-huh.  And when she moved in, were you also

12   residing in the Rockefeller property?

13        A.  Yes.

14        Q.  So you helped her move in?

15        A.  I helped her move in, yeah.  I had like back

16   pain for a week.

17        Q.  Yeah.  I have sisters as well --

18              (Simultaneous speaking.)

19              (Reporter clarifies.)

20        MR. MILLER:  I think that's all the questions I

21   have for you, Mr. El Mallakh.

22              I thank you for taking the time today.

23              I would like to talk -- speak with your father

24   for a bit.

25        THE WITNESS:  Yeah.  Yeah.  He'll be more than

1    happy to talk with you as well.

2          THE REPORTER:  Off the record?

3          MR. MILLER:  Off the record.

4                (The proceedings concluded at 12:24 p.m.)

5                              ***

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                **DECLARATION UNDER PENALTY OF PERJURY**

2

3       I, Bassem El Mallakh, do hereby certify under

4    penalty of perjury that I have reviewed the foregoing

5    transcript of my deposition taken on March 15, 2023 that

6    I have made such corrections as appear noted herein in

7    ink; that my testimony as contained herein, as

8    corrected, is true and correct.

9

10      DATED this _____ day of _____,

11   20_____, at _____, _____.

12

13

14

15

16                    _____

17                              **Bassem El Mallakh**

18

19

20

21

22

23

24

25

1

### ERRATA SHEET

2    Printed Name_____Date_____

3    Signature_____

4    Page/Line    Correction                    Reason

5    _____        _____        _____

6    _____        _____        _____

7    _____        _____        _____

8    _____        _____        _____

9    _____        _____        _____

10   _____        _____        _____

11   _____        _____        _____

12   _____        _____        _____

13   _____        _____        _____

14   _____        _____        _____

15   _____        _____        _____

16   _____        _____        _____

17   _____        _____        _____

18   _____        _____        _____

19   _____        _____        _____

20   _____        _____        _____

21   _____        _____        _____

22   _____        _____        _____

23   _____        _____        _____

24   _____        _____        _____

25   _____        _____        _____

1          I, LORI S. TURNER, a Certified Shorthand

2     Reporter of the State of California, do hereby certify:

3          That the foregoing proceedings were taken

4     before me at the time and place herein set forth; that

5     any witnesses in the foregoing proceedings, prior to

6     testifying, were administered an oath; that a record

7     of the proceedings was made by me using machine

8     shorthand which was thereafter transcribed under my

9     direction; that the foregoing transcript is a true

10     record of the testimony given.

11          Further, that if the foregoing pertains to

12     the original transcript of a deposition in a Federal

13     Case, before completion of the proceedings, review of

14     the transcript [    ] was [X] was not requested.

15          I further certify I am neither financially

16     interested in the action nor a relative or employee of

17     any attorney or any party to this action.

18          IN WITNESS WHEREOF, I have this date

19     subscribed my name.

20

21     Dated:  March 19th, 2023

22     _____

23                    LORI S. TURNER

24                    CSR No. 9102

25

**-**

**-EXAMINATION-** 5:9

**1**

**116** 7:23 27:8
**11:19** 5:1
**12:24** 38:4
**15** 5:1

**2**

**2013** 8:2 9:12 29:21
**2016** 7:3,19,24 8:10,11, 12,14 10:6,7 17:3,11,12 23:3 27:1,9
**2017** 8:23 22:25 23:1,3
**2018** 8:20 9:9 23:3
**2019** 25:22
**2020** 17:5 29:1
**2021** 13:25 14:2 25:23 36:14,19
**2022** 14:12,19,20 31:11, 12
**2023** 5:1 13:11
**2103** 8:11
**21st** 27:1,9
**28** 19:12

**3**

**3,000** 36:12,13

**4**

**4,000** 36:12,13
**405** 10:23

**6**

**60** 23:19,24

**9**

**9th** 31:14

**A**

**A.M.** 5:1
**able** 9:17,18 11:9,17 12:8,13,16 15:2,13 20:9
**about** 7:3 17:18 18:7 19:17 21:14 23:3 24:24 29:7 30:16,20 31:6 32:5 34:13 37:9
**accounts** 21:3,6,25
**accurately** 6:15
**actually** 8:21 9:3 11:12 16:22 17:2,22,25 20:4 22:2,22 27:18 28:10 33:21 34:9 35:16 36:2, 4,20
**ADMINISTERED** 5:5
**advantages** 37:5
**advice** 27:5
**AFARI** 7:5 21:7,14 25:12,14 30:22
**after** 14:2
**again** 9:7 14:9 37:3
**against** 29:9
**ago** 25:9
**agreement** 36:7,11,24 37:2
**ahead** 7:16 12:13
**allows** 22:10
**almost** 18:13
**along** 23:3
**already** 12:1
**also** 9:18 11:3 14:4 17:25 18:22 26:18 29:24 32:11 34:9,11,21 35:4,11,21 37:6,7,9,11
**always** 7:4,20 8:3 10:8 15:6 20:18 32:4

**Amazon** 22:14 23:20 24:17,18,21
**amount** 15:10
**Angeles** 33:15,16,17
**answer** 6:15 7:16 21:8, 9,15 33:1
**any** 6:11,23,24 7:11 8:4 9:11,19 15:1,16,19 16:19 22:5 24:4,21,25 29:8 32:16 34:17 36:10
**anybody** 16:11
**anymore** 11:10,13,15 13:21 15:14 21:6
**anyone** 8:8 28:25
**anything** 6:19 15:20 23:24 29:10,13,15,17, 18
**anytime** 24:1
**apartment** 9:15,18,19 10:5 11:6,10,14 12:4, 17,21 13:9,19 14:13,17, 23,24 15:2,8 16:5 32:6, 8,14,17,21 34:5
**apartment's** 11:13
**apartments** 9:12 15:16
**application** 28:5
**applying** 34:17
**April** 13:25 14:2
**are** 5:21 6:1,21 15:16 32:16 33:21 34:16,25
**area** 19:4,7 34:11
**areas** 32:18 33:23
**arena** 34:21
**arising** 21:19
**around** 32:17
**arrive** 17:13
**aside** 26:19 28:8
**ask** 6:12,13 31:6 32:5
**asked** 16:8 29:16
**asking** 6:15

**aspect** 37:8
**association** 22:17
**attention** 32:24
**attorney** 27:4
**Austin** 35:22
**auto** 20:20 21:1
**average** 19:10
**away** 35:19
**awhile** 17:4 23:1 26:14

**B**

**back** 9:21,23 10:17,20 14:10 17:24 22:2 30:25 34:23 36:15 37:15
**bad** 10:25
**bank** 21:2,6
**banking** 20:12
**bankruptcy** 21:5 25:15
**based** 19:1,3
**basically** 11:22
**Bassem** 5:4 31:2,3
**bathroom** 16:24
**beach** 14:7 33:22
**because** 7:10 16:7 17:25 18:22 20:12 21:7, 18 22:13 25:15 27:14, 15 28:10 29:10,16 31:7 33:17 34:6,9,21 36:16
**bedroom** 9:19 14:10 20:1,2 32:2,4
**bedrooms** 19:23,25
**beds** 13:4
**been** 5:5,14 6:8 7:20 9:18 13:18,19 14:24 15:6 17:2,3,8,11 23:1 26:14,25 29:25 30:13 36:2,10
**before** 6:8 7:12 23:22 35:7
**beginning** 8:23

**behalf** 12:1 29:17

**being** 25:8 34:13

**Belgium** 25:21

**believe** 25:21 36:14

**believed** 27:24

**between** 9:12 10:12 18:8,14 19:20 36:7

**bike** 14:7

**bill** 20:14,15,16,25 21:24 22:4

**bills** 19:15,17,18 20:10

**bit** 7:2 27:14 32:5 37:24

**blender** 16:17

**boarding** 17:16,19

**both** 9:15

**bottle** 30:3

**boyfriends** 15:19

**bread** 30:11,12

**break** 6:18 30:20

**bridge** 18:13

**brutalize** 31:4

**bubble** 36:5

**building** 32:21

**bunch** 13:5 24:7,14

**business** 11:18 12:12 13:20,23 14:5 15:11,14 33:15,16 34:24

**busy** 12:12

---

**C**

**Cairo** 5:25

**California** 17:23 18:24 19:1 26:18 35:14

**call** 23:22 31:3

**called** 16:22 33:21

**came** 17:15 30:14 31:13,15

**camera** 22:7,8,9,10,15, 19,21 23:6,13 24:4

32:6,8,12,13

**cameras** 22:5 32:17,25

**can** 6:6,15,19 7:16,18 9:15,21 11:1,10 12:17 16:15,16 17:19 18:3 21:8,16,18,19 22:2,9,17 24:6 25:17 26:5,14 27:13 30:19,20 35:25

**Canadian** 9:14

**cancelled** 13:15,16

**care** 6:23 11:25

**case** 7:12,15 20:13 25:10,20 26:17,18,22 27:16 28:11 29:16

**cases** 29:8

**cash** 20:11,13

**center** 35:14

**certainly** 21:12 25:18

**change** 36:13,22

**changed** 35:15 36:12

**changes** 36:10

**check** 12:7,8 13:17 17:16,19 20:24 30:2 36:15,20

**chemical** 6:25

**chose** 33:25 34:5

**Christmas** 22:22,25

**cities** 35:19

**citizenship** 9:14

**civil** 27:4

**claimed** 28:3

**clarified** 6:20

**clarifies** 11:4 37:19

**clarify** 7:6 25:14,17

**clean** 19:9

**clear** 33:1

**close** 34:6,12,13

**clothing** 13:1

**cloud** 23:20

**co-occupant** 29:3,5,6

**cold** 19:5

**come** 12:16 15:23 17:24 31:17

**comes** 21:2,4,24 22:11, 16 31:20

**comfortable** 37:9

**common** 32:17

**communicate** 13:22

**community** 9:2

**companies** 18:6 20:5 34:20 35:5,11

**company** 35:1,7

**concluded** 38:4

**conducted** 18:17

**confirm** 21:16 30:20

**confused** 27:15

**connection** 29:8

**continue** 11:17 13:20 14:1 15:13 33:8,11

**continued** 9:2

**continuing** 13:23

**contribution** 15:10

**copy** 26:13,16

**correct** 5:16 29:22 34:3

**cosign** 9:16 12:1 14:25 15:3

**cosigned** 9:17

**costs** 11:3

**couch** 13:5 16:9,11

**could** 16:11 22:15 30:19

**counsel** 28:7

**countries** 18:14

**County** 10:25 18:19,20, 23 33:19

**couple** 25:9

**course** 24:10

**cousins** 17:3

**COVID** 17:6 35:17

**crash** 9:21 10:21 11:1 14:10

**credit** 15:1

**creditor** 28:5

**currently** 5:21 15:21

---

**D**

**Dallas** 35:23

**dates** 17:20

**day** 7:15 14:24 27:17, 18,22 28:2 36:15

**days** 10:15 19:5,12 23:16,18,19,24

**debtor** 7:14

**debtor's** 7:7,10,12,13

**December** 8:20

**decide** 35:7

**declaration** 26:8,12, 13,17,21,24 27:6

**default** 25:23 26:19

**del** 33:23

**delivered** 24:18 28:13, 17,20

**deliveries** 25:6

**delivers** 22:12

**delivery** 24:25

**depending** 10:18

**depends** 10:12

**deposition** 6:10 7:7 21:19 31:8,9

**depositions** 5:15 6:8

**determining** 7:13

**did** 7:3,19 8:1,4,18,23 9:13 10:4,10 12:18,23 13:8,10,13,22 14:1 15:4,7 16:3,6,13 17:13 22:21 27:21 33:6 36:7, 13 37:2

**didn't** 8:12 12:25 13:20 15:1 16:7,18,21 32:15

**different** 6:7 35:6 37:5

**discuss** 35:5

**doctors** 6:23

**documents** 28:7,13 29:8

**door** 22:11 23:7,10

**doors** 23:8

**drinking** 30:13

**drive** 11:2 14:10

**driving** 9:21,23

**drugs** 6:24

**Dubai** 12:8,13

**due** 20:11

**DULY** 5:5

**dump** 16:10,20

**during** 35:2 36:19

---

**E**

**early** 17:5

**easy** 36:22

**Eats** 24:24 25:3,4,5

**Egypt** 5:23,24 16:25 17:1,2,8,11,14 18:1,8 31:12 34:20,21 35:9,10

**Egyptian** 30:11

**El** 5:4,13 7:18 31:4 37:21

**else** 8:8

**end** 31:15

**ended** 32:12

**enough** 30:10

**enter** 23:9,11

**entry** 28:6

**environment** 35:24

**even** 11:13,15 33:3,6

**ever** 8:4,8 9:11 15:4,7

**every** 14:22 24:11 37:8

**everybody** 35:17,19

**everything** 36:17

**everywhere** 35:25

**evidence** 26:2,5 31:8

**exactly** 22:3 36:15,20

**EXAMINED** 5:6

**exemption** 7:8,11,14

**expect** 24:10 33:8,11 34:16

**expensive** 36:17

**explain** 27:13

**extra** 16:23,24

---

**F**

**facilitate** 6:19

**fact** 11:8

**Fair** 30:10

**familiar** 10:24 18:23

**family** 12:7 19:7

**father** 6:3 22:23 31:7, 10 32:2 37:23

**feel** 6:13 21:13 31:4

**feeling** 6:21

**field** 33:21

**filed** 7:12,15 25:20,23 28:5

**filing** 26:21

**find** 33:19,23 34:15 35:25

**fine** 6:20 11:24 30:22

**finish** 12:16

**finished** 10:19

**first** 7:2,3 17:10,12,13 26:7 31:14 32:7

**Florida** 18:22 25:9,21 26:17

**focusing** 34:18,22

**following** 13:19

**FOLLOWS** 5:7

**food** 24:25 30:14

**footage** 23:14,18 24:4, 11 32:6

**four** 27:7

**Fran** 35:22

**free** 6:13 16:11 21:13

**frequently** 14:16 17:1

**friend** 9:13 13:13 14:25 15:3 16:6,21

**friend's** 16:5

**friends** 14:4,6 16:22 35:21

**front** 23:7,10

**full-time** 26:25

**fully** 8:20,21 9:8

**furniture** 9:5 12:21,23, 25 13:3 16:4,19

---

**G**

**garage** 23:10,12

**gas** 11:3 20:25

**gift** 22:22

**girlfriend** 15:22

**girlfriend's** 15:25

**girlfriends** 15:19

**give** 9:18 16:21 20:9, 11,13 31:7

**gives** 20:5 37:4

**giving** 26:2

**good** 30:15

**Great** 19:2

**grew** 37:7

**ground** 6:9

**Grubhub** 25:3

**guess** 7:9 8:25 21:15

27:16 35:25

**guest** 9:19 14:10

**guys** 16:23 17:25 18:22

---

**H**

**hang** 14:6,7,8,14

**happened** 17:6 29:16

**happy** 38:1

**hard** 33:19

**he** 6:6 7:11 9:14,16 11:8,24 12:3,9,11 13:4 16:7,15,16,18 27:5,16, 21 28:3 31:7,9,12,13, 15,17,19,20,21,22,24 32:12,15 34:9,10,11

**He'll** 37:25

**he's** 6:5 11:9 12:6 13:19 14:14,25 16:10, 20

**hear** 6:6

**heavy** 30:13

**help** 9:13 11:10 12:17 13:6,8 15:3

**helped** 14:25 16:4 37:14,15

**helpful** 9:10

**her** 8:17,18,24,25 9:4,5, 7 15:22,23 20:2,11,13 21:25 29:16,25 30:1 36:25 37:4,14,15

**here** 5:12 15:1 18:24 21:7 30:5,7,14

**herself** 29:11

**Hey** 11:19 12:7,12 16:23

**him** 9:16,17,18 11:10 12:18 13:6,8,17,22 14:4,7,20,21,22,25 15:3,13 16:8 21:20

**hire** 33:18

**hired** 28:7

**his** 11:11,12,23 12:1,5,

---

22 13:4,5 14:23,24 15:2
16:19 21:18 32:1 34:2,
9,13

**history** 15:1

**hold** 30:22

**home** 10:20 35:18,20

**homestead** 7:7,10,14

**hours** 9:22

**house** 6:2 7:4,20,22,25
8:1,9,16 9:25 10:1,2,3,
9,17 14:2,11 15:18,25
24:19 25:7 27:17,18,22,
25 31:21

**houses** 15:17

---

**I**

**idea** 28:4,19 34:9,13

**industry** 34:7

**inflation** 36:17

**influence** 6:24

**information** 21:17

**installed** 23:6

**instance** 20:24

**instead** 9:21 34:14

**interest** 14:5

**interesting** 36:6

**interject** 21:7 25:12

**interview** 35:2

**interviewing** 34:19

**Investments** 25:21

**involved** 5:14 6:8 25:8

**Irvine** 7:4,23 8:6,7,9
10:12,14 18:19 27:17
28:1 33:14 36:3,4

**issue** 9:6,7 21:5 23:23

**issues** 6:11 9:1 20:12
22:13

---

**J**

**January** 13:10,11

**job** 18:7,9,18

**jobs** 18:11 34:17

**judge** 27:20

**judgment** 25:24 26:19
28:5,6,8,11

---

**K**

**Kansas** 35:23

**keep** 12:4

**kind** 8:22 16:18 17:6
18:5,13 25:11 34:25
36:5,21,22,24

**kitchen** 16:17

**knocks** 22:11

**know** 6:19 8:21 9:3,20,
22 10:11,13,15,16,19
11:8,9,13,17,19,20,21,
22,25 12:1,2,3,4,5,7,8,
9,10,11,14,16 13:2,3,4,
5,6,10,17,18 14:3,4,5,6,
21,22 15:9,11,12,23
16:6,8,16,20,23,24
17:3,7,24,25 18:1,13,22
19:12 20:8,9,11,12,13,
22 22:2,4,10,15,16
23:20,23 24:1,2,7,14,15
26:4 27:5,15,25 28:16,
20 32:7,11,16,23 33:4,
18,20 34:10,14,18,19,
20,23 35:4,7,15,16,17,
20,25 36:1,18,21,23,25
37:3,4,6,8,9

**knowing** 37:7

---

**L**

**LA** 10:24 12:16 14:8
19:3 33:21 34:11

**laptop** 13:2

**large** 34:21

**last** 17:15,18 35:16

---

**lately** 34:17

**learned** 23:25

**lease** 8:23 9:11,13 10:4
11:22 13:14,16 36:7,10
37:2,9

**leasing** 11:20 12:15

**least** 31:17 35:10

**leave** 11:21,22 16:14

**leaving** 17:23

**like** 6:18 7:2 9:8,17,20,
21 10:13,21 11:9,10,17,
18,19,21 12:6,7,10,11,
12,13,14,22 13:1,3,4,6
14:3,4 15:9,24 16:6,10,
16,20 18:7,12,13 19:12
20:9 21:15 22:11,15
23:24 24:1,7 25:11 27:5
31:4,14,17,25 32:9,21
34:10,13,19 35:4,10,15,
16 36:21,23 37:1,6,7,
15,23

**lines** 23:4

**list** 21:18 30:16

**literally** 16:8,15

**live** 19:21 33:14 35:21,
24

**lived** 7:4 8:4,8 10:8
14:23

**living** 7:11,14,20,24
9:2,4 15:24 28:22,25
31:10 33:8,11

**located** 5:22 27:8

**long** 17:8 31:5

**look** 21:8 24:6

**looking** 33:24

**Los** 33:15,16,17

**lot** 34:10 35:21,23

---

**M**

**mail** 12:9

**mainly** 15:25 33:21
34:13 36:16

---

**make** 36:24

**makes** 10:22

**Mallakh** 5:4,13 7:18
31:4 37:21

**managing** 18:12,14

**many** 10:10 19:10,23
23:8,18

**MARCH** 5:1

**Marina** 33:22

**matter** 7:11 11:8

**maybe** 9:22 10:16 12:8,
12 18:3 19:12 26:5
30:19 31:14 35:10

**me** 6:13 7:18 11:9 12:17
17:22,24 18:12 20:9
21:7 22:9 26:5 27:16,
17,24 28:3,7 29:14 30:2
31:21

**mean** 11:14 13:18
19:12 22:2 25:15 26:14
27:25

**meet** 14:4

**meeting** 18:6 35:5 36:2

**meetings** 18:1,2,5

**mentioned** 8:10 16:25
24:16 35:1

**method** 20:21

**Miami** 35:24

**mid** 36:14

**middle** 36:19

**Miller** 5:11 7:17 11:5
21:9,11,18,23 25:13,18,
19 30:16,19,25 31:1
37:20 38:3

**mind** 30:3,7 31:3

**mine** 12:22 16:7

**minutes** 30:20

**Mohamed** 34:2,3

**Monday** 10:16

**money** 20:6

**Monica** 9:15 10:5,12,15

11:7 14:2,13,17 15:7
27:1 32:6,7,13,19 33:22
34:5

**month**  14:21 19:12

**more**  31:2 36:17,22
37:25

**morning**  10:21

**Most**  10:11

**motion**  25:23 26:3,18

**motivation**  35:13

**move**  8:19 9:8 11:11
12:15,23 13:6,8 16:4,13
37:14,15

**moved**  8:20,21 9:4
11:12 12:20 35:19,22,
23 37:11

**movers**  16:3

**moving**  8:22 16:3

**mute**  30:23

---

### N

**name**  12:5 20:15,16
30:11 31:5 34:1,2

**nature**  18:9

**near**  35:14

**need**  6:19 16:9 27:5
31:7

**needed**  9:16 30:8

**nephew**  31:25

**never**  8:6,7 15:5 28:6,
10,11,15,18,19 29:10,
12 30:7 33:16

**next**  10:21

**nice**  19:4

**nights**  10:10 19:10

**nobody**  27:24

**normally**  10:10 23:11
24:18 25:5

**November**  10:6,7 27:1,
9

---

### O

**oath**  5:6,18

**objection**  7:9

**obviously**  13:18 15:13
20:22 35:17 37:4

**occupied**  27:8 29:24

**October**  8:2

**office**  9:16 11:7,20
12:15

**older**  23:21

**once**  14:21

**one**  12:6,11 14:24
15:21 17:3 18:24 20:18
21:2 25:2 32:12,15
35:1,7

**only**  14:14 29:24

**op-**  35:6

**operation**  18:15

**operative**  13:14

**opportunities**  18:7,8,
10

**opportunity**  11:1

**options**  35:6

**Orange**  10:24 18:19,
20,23 33:19

**other**  6:25 9:11 15:16,
20 16:1 23:22 24:21
32:16 35:4

**our**  9:25

**out**  11:11,12 12:21,24
13:8 14:7,8,15 16:4
21:24 34:20 35:22

**over**  23:24

**own**  10:3 15:2

---

### P

**p.m.**  38:4

**package**  22:12 23:23

**packages**  22:14,17

---

24:18

**pain**  37:16

**paragraph**  26:24 27:7
28:4

**parents**  17:22

**parents'**  6:2

**partner**  34:1

**partner's**  34:1

**Pasadena**  19:3

**pass**  17:16,19

**past**  22:13 24:5 34:11

**pay**  15:7 20:7,9,13,23,
25 21:1 32:24

**paying**  15:9,12 19:15

**payment**  20:4,19,20
22:3

**pays**  19:18 20:22

**people**  22:14 33:20,23
34:6,10,15 35:23,25
36:2

**perhaps**  32:18

**period**  23:16

**person**  28:3,11,12
29:24

**phone**  17:17 24:3,6,12

**picked**  33:17

**picture**  17:16

**piece**  24:11

**place**  8:12 9:3,5 11:1
15:23 37:10

**places**  24:21

**plan**  23:20

**plane**  18:4

**planning**  35:2

**plants**  12:10

**please**  6:13,18 21:12
25:14

**point**  7:12 12:6,11

**positions**  35:8

---

**prepare**  36:7

**prescription**  6:24

**previous**  5:14

**price**  36:12,13

**proceedings**  25:9,11,
15,16 38:4

**process**  20:6 37:3

**proof**  27:24

**prop-**  14:1

**property**  19:11,16,19,
21,23 22:6 23:9,11 27:8
28:14,17,21,22 29:1,20,
25 33:9,12 37:12

**provide**  21:9,18,20

**purchase**  8:1 22:21

**purchased**  7:21 8:12
29:20

**purchases**  24:22

**purpose**  6:10 7:6

**purposes**  9:19 22:18

**pushed**  17:7

**put**  16:11 30:4 36:25

---

### Q

**question**  7:10,16 12:19

**questions**  6:12 21:19
30:17 31:2,6 37:20

**quickly**  7:5

**quite**  6:12

---

### R

**rackets**  13:2

**raining**  19:6

**raise**  7:9

**raising**  9:7

**ready**  31:9

**real**  27:8

**really**  7:5 10:18,25

12:25 13:3 15:5 16:7 17:6 30:14,15 32:24 33:3,4

**reason** 22:20 33:17,25

**receive** 24:21

**received** 22:24 28:15, 18 29:8,10,12,14,17,18

**recently** 35:15

**recess** 30:24

**record** 30:25 38:2,3

**referring** 10:1 26:6

**regarding** 7:7

**regularly** 15:17 25:2

**relating** 25:9

**relevance** 7:10

**relevant** 7:13

**remaining** 12:20

**remember** 22:24 24:10 25:8,25 26:2,4,7,10,17, 21 27:3,11,12 28:9 32:10

**remind** 6:9 26:5

**rent** 15:7 20:9,23 34:5

**rephrase** 6:13

**report** 22:17

**reporter** 5:6 11:4 37:19 38:2

**represent** 28:7

**require** 35:8

**reside** 7:3,19

**resided** 8:3 29:19

**residence** 15:4,5,6 26:25 28:1

**resident** 15:1

**residing** 26:11,25 37:12

**resolved** 9:1

**responses** 21:20

**responsibility** 11:23, 25

**responsible** 19:14

**restated** 6:20

**Rey** 33:23

**right** 5:23 6:1,4,6 8:10 9:23 18:21 19:5 26:16 33:7,8 34:8 35:12 37:8

**Ring** 22:7,8,9,15,19,21 23:6,13 24:4 32:12,13

**Rockefeller** 7:23,25 8:1,15 10:2,8 19:11,15, 17,18,21,23 22:6 23:8 24:19 25:7 27:9 28:14, 17,21,22 29:1,20,25 33:9,12 37:12

**room** 6:3,7 31:22,24 32:1

**roommate** 8:6,7,13,14, 25 9:7 11:8,16 29:6 32:11

**roommates** 8:4,15

**Roston** 34:3

**rules** 6:9

---

**S**

**said** 11:19,24 12:3 16:22 17:24 18:3 23:24 26:11 27:5,7,23 29:18

**same** 7:20 9:2 11:1 15:6 18:4 37:6

**San** 35:22

**Santa** 9:15 10:4,12,15 11:6 14:2,13,17 15:7 27:1 32:6,7,13,19 33:22 34:5

**save** 23:25 24:2

**saved** 24:4,7,11

**saving** 11:3

**savvy** 33:18

**saw** 19:6

**say** 12:10 14:16 19:10 21:13,16 31:13

**saying** 11:16

**says** 12:11 16:15,16 27:21

**security** 22:5,18 32:6, 8,17

**see** 14:21 17:20 22:10, 15,16 26:14 35:6

**seeing** 15:21

**seen** 28:6,18,19

**sell** 18:15

**send** 20:24

**sends** 20:18

**sense** 10:22

**sensor** 22:12

**September** 31:11,12, 14,15,16

**serve** 27:16,17,21

**served** 28:3,10,12

**server** 27:15,20

**service** 16:4 18:13

**services** 24:25

**set** 26:19 28:7

**seven** 28:4

**Shall** 30:22

**she** 8:22 9:1,3 29:3,4,5, 7,8,10,14,18 37:4,8,11

**she's** 9:7 29:12 36:25

**showed** 27:23

**siblings** 37:7

**sick** 6:21

**side** 14:5

**sign** 9:13 10:4 37:2

**signed** 9:11

**significant** 15:20

**Silicon** 33:22

**Silicone** 34:14

**similar** 35:13

**simultaneous** 37:18

**since** 7:20 12:1 13:19

14:24,25 17:2,11,12 27:1,9 29:20 30:14 35:17 36:25

**single** 24:11

**sister** 8:17,18,21 9:6 19:20,22 20:1,5,8,22 28:6,8 29:2,25 32:1 36:8,21 37:4

**sisters** 37:17

**sleep** 10:10 15:17 19:11 31:25 32:1

**slowly** 8:22

**small** 15:9

**software** 18:6,12,15 34:20,21 35:1

**solved** 9:1

**some** 9:4,5 10:13,14,15 11:3 12:9 13:1 16:17, 22,23 18:1,6,7 19:5 20:10,12 22:13 23:22 25:8 30:8 32:23 33:2 34:20 35:4 36:24

**someone** 9:16 22:11, 12

**something** 23:3,21 24:2

**sometime** 16:1

**sometimes** 9:22 12:9 14:6,9,12,20,21 20:8,11 22:16 36:23

**somewhere** 17:17 30:4

**son** 8:17,18 20:2 29:25 30:1

**son's** 9:5

**sorry** 11:14 12:19 17:9 25:12 31:23 33:10

**soup** 30:8

**Southern** 35:14

**speak** 37:23

**speaking** 37:18

**specific** 27:17,18 28:2

**spend** 35:9

spending 15:25

spent 14:16

spicy 30:8,14

start-up 15:15

started 8:22 9:7 35:17

state 28:6,8

stated 26:25

statement 27:3

stay 11:9 14:12 17:1 31:19,22,24 32:2,4

stayed 9:3 31:15

staying 6:1,2

stays 31:21 32:3

stealing 22:14

steals 22:16

still 11:6 13:14 14:4 20:15 34:25

stolen 23:23

stop 6:13

stopped 15:12

storage 12:14 16:13

store 23:13,18,24

stranger 37:1

street 16:10,14

stuff 11:11,12 12:14 13:6,7,8 14:14 16:7,17,24

submitting 26:7

substances 6:25

suburbs 35:20

summer 9:9

support 26:2

supposed 17:5

sure 6:14 12:23 13:18 18:23 21:8,10,12,13,14, 16,22 26:15 30:6,21 32:23,24 33:2,3,5,6

system 22:21

**T**

table 16:9

table' 16:11

take 6:18 11:22,24 12:14 16:21 30:19

taken 30:24

taking 5:12 37:22

talent 33:19 34:14,15

talk 7:2 18:7 37:23 38:1

talked 27:19 29:7

tech 33:18 36:2,5

technology 33:20 34:7 35:11,14

tell 7:18 11:20 12:15 22:9

ten 30:20

tennis 13:1

TESTIFIED 5:7

Texas 35:23

things 16:13,21 37:5,8

think 16:18 17:15,20 22:25 23:5 27:14 30:16 32:9 33:1 36:19 37:20

three 19:25 26:24 35:16

Thursday 10:16 17:15, 18

til 31:15

time 5:12 7:12 14:17 17:10,12 27:13 28:23 29:3,5 35:9 37:6,22

tired 9:20 11:2 14:9

today 5:13,19 6:21 9:12 16:25 31:8 37:22

together 11:19 14:15

told 11:9,16 15:13 27:19 29:12,14

towels 16:23

townhouse 23:9

traffic 9:22 10:18,19, 20,22,25 11:3

transmits 20:4

trip 35:2

truth 6:11

truthfully 6:16

TV 13:5 16:16

twice 31:17

two 9:22 14:22 18:14 35:10

type 18:11 23:20 30:11 34:16

typical 21:24

**U**

U.S. 15:1 18:8,15,16

Uber 24:24 25:3,4,5

Uh-huh 20:17 27:2 37:11

under 5:18 6:23,24 12:4 20:15,16

understand 5:14,18 6:11,12,14

understood 16:2

unit 12:15 16:14

until 28:7

up 19:3 21:8 32:12 34:14 37:7

use 9:15,18 11:6 14:1 16:3,12 20:20 24:16,24 25:3,4

used 35:21

usual 20:20

usually 20:24 21:24 23:12 31:17,22,24,25 33:20

utilities 20:7,23

utility 19:15 20:5

**V**

vacated 25:24

Valley 34:15

valuables 9:4

value 16:19

Venice 33:22

venture 11:18 13:20,24

video 24:1 27:20

visit 14:20 31:13,17

visiting 17:22

visits 31:20 35:10

**W**

wanted 9:14 16:18 23:21 32:5 33:18 34:6, 11

water 12:10 30:3,9,14

weddings 17:3

WEDNESDAY 5:1

week 10:11,13,14 31:14 37:16

weekends 10:17

weeks 10:13,14,15 14:22

well 8:10,11 12:23 14:18 17:24 20:22 21:4, 5 26:7,22 27:14,21 32:7 33:16 34:18,20 35:15 36:5 37:3,17 38:1

whole 10:14

work 10:14,16,19 11:1, 7 18:17 20:6 33:4,6,18, 24 34:6,15,16 35:20,24

work-related 18:1,5

worked 34:10

working 9:20 10:11 11:17,18 35:18

write 27:5

writing 27:3,11 28:9

36:25

**written** 26:8

**wrote** 27:13 28:4

---

### Y

**year** 13:10 24:5 31:18
35:10

**years** 25:9 35:16

---

### Z

**Zoom** 27:20

**DEPO**

**3A**

```
 1    solved -- resolved the issues they had so then she

 2    continued living in -- it's in the same community,

 3    actually.  So she stayed in, you know, the place she was

 4    living in, but just moved some of her valuables at my

 5    place and some of her son's furniture.

 6           And then when the issue -- when my sister and

 7    her roommate issue started raising again, then she's

 8    like, I'm just going to fully move in with you, which

 9    was in the summer of 2018.

10        Q.  Okay.  Okay.  That's helpful.

11           And have you ever signed a lease for any other

12    apartments while you -- between 2013 and today?

13        A.  Yeah.  I did sign a lease to help my friend who

14    is a Canadian citizenship.  He wanted to get an

15    apartment in Santa Monica that we can both use as an

16    office, and then he needed someone to cosign for him.

17           And then I cosigned for him to be able to like

18    give him the apartment.  And also I've been able to use

19    the guest bedroom in the apartment for any purposes of

20    like, you know, from -- just tired from working, and I

21    can just like crash in there instead of driving back,

22    you know, maybe sometimes two hours of traffic.

23        Q.  All right.  Driving back -- driving back to

24    where?

25        A.  To our house.
```

1        Q.  And the house you're referring to is the

2   Rockefeller house?

3        A.  Yeah.  My house.  My own house.

4        Q.  When did you sign the lease for the Santa

5   Monica apartment?

6        A.  It was in November of 2016.

7        Q.  Okay.  November of 2016.

8            So -- so you always lived in the Rockefeller

9   house.

10           How many nights did you normally sleep there?

11       A.  Most of the week.  You know, I would be working

12   between Santa Monica and Irvine.  It just depends on the

13   week.  Some weeks I would just be in like, you know,

14   Irvine for the whole week.  Some weeks I would work in

15   Santa Monica a few days, and then, you know, some weeks

16   I would just work, you know, maybe Monday to Thursday,

17   and I'll just go back to my house on the weekends.

18           It was really all depending on the traffic.

19   You know, if there was no traffic when I finished work,

20   I'd go back home.  If there was traffic, then I would

21   just like crash and I go the next morning.

22       Q.  That makes sense, yeah.  The traffic.

23           What is it, the 405 that you --

24       A.  If you're familiar with the LA and Orange

25   County traffic, it gets really bad.  If you have the

1   same work opportunity and you can have a place to crash

2   if you're tired so you don't have to drive in the

3   traffic and also saving some of the gas costs.

4            (Reporter clarifies.)

5   BY MR. MILLER:

6        Q.   So do you still use the apartment in Santa

7   Monica as a work office?

8        A.   You know, as a matter of fact, my roommate, he

9   told me that, you know, he's not able to like stay in

10  the apartment anymore and if I can just like help him

11  move all his stuff out.

12           And I actually moved all his stuff out and, you

13  know, the apartment's not even there anymore.

14       Q.   I'm sorry.  What do you mean the apartment is

15  not even there anymore?

16       A.   I'm saying when I told my roommate that I

17  wouldn't be able to like, you know, continue working on

18  this like business venture that we were working

19  together, and I said, you know, like "Hey, I'm going to

20  tell the leasing office that I'm" -- "I'm" -- you know,

21  "I'm going to just like leave."  You know, I want to

22  basically leave the -- take my lease off, you know, and

23  it will be just all his responsibility.

24           And he said, "Yeah, that's fine.  I'll take

25  care of the responsibility," you know, "by myself," you

 1   know, since I already had to cosign on his behalf, you

 2   know.

 3          And then, you know, he said, "Yeah, I'm just

 4   going to," you know, "keep the apartment myself under,"

 5   you know, his name.

 6          And then -- and then at one point he's like,

 7   you know, "Hey, like I have to go check on my family in

 8   Dubai.  Would you be able to maybe go," you know, "check

 9   on some of my mail," or, you know, sometimes he would

10   say like, you know, "water my plants" or whatever.

11          And then at one point he says like, you know,

12   "Hey, I'm just like maybe just busy with my business in

13   Dubai, would you be able to just like go ahead and just

14   like" -- you know, "just take all my stuff to a storage

15   unit and move them or tell the leasing office that I'm

16   not able to come to LA myself to," you know, "finish

17   this apartment.  So can you just help me with that," and

18   I did that for him.

19          I'm sorry.  Was that your question?

20     Q.  When was it that you moved the remaining

21   furniture out of the apartment?

22     A.  Like mine or his?

23     Q.  Well, sure.  When did you move your furniture

24   out?

25     A.  So I didn't really have furniture.  I just had

1    some like clothing, and I had just like my tennis

2    rackets, and then, you know, just my laptop, which is

3    not like -- you know, not really a furniture.

4            But then he had like, you know, his beds and,

5    you know, his couch and TV and, you know, a bunch of

6    stuff.  So I had to help him like, you know, move that

7    stuff.

8        Q.  And when did you help him move that stuff out

9    of the apartment?

10       A.  I did that in January of, you know, this year.

11       Q.  So in January 2023?

12       A.  Yeah.

13       Q.  But your friend -- And when did you -- is the

14   lease still operative?

15       A.  No, it's gone.  It's cancelled now.

16       Q.  When was the lease cancelled?

17       A.  I have to check with him.  You know, I'm not

18   sure.  I mean I haven't, obviously, been, you know,

19   following what he's been doing with the apartment since

20   I -- I just didn't continue that business venture

21   anymore.

22       Q.  And when did you communicate with him that you

23   weren't going to be continuing with the business

24   venture?

25       A.  It was in April of 2021.

1      Q.  Okay.  Did you continue to use the prop- -- use

2  the Santa Monica house after April 2021?

3      A.  No.  I would just like -- you know, just go to

4  meet him.  Like, you know, we're still also friends,

5  but, you know, a side interest, the business we were --

6  we're friends, you know, so I would sometimes go hang

7  out with him or go bike or go hang out at the beach and

8  just hang out in LA.

9          And then, again, sometimes if I'm tired, I'll

10  just crash in the guest bedroom or just drive back to my

11  house.

12      Q.  So in 2022 you would sometimes stay at the

13  Santa Monica apartment?

14      A.  Only when he's there and stuff and just hang

15  out together.

16      Q.  And how frequently would you say that you spent

17  time at the Santa Monica apartment --

18      A.  Well, I --

19      Q.  -- in 2022?

20      A.  In 2022, I would just go visit him.  Sometimes

21  I'll see him once a month.  You know, sometimes I'll see

22  him, you know, every two weeks.

23      Q.  But you lived at his apartment?

24      A.  Yeah.  It's been his apartment since Day One.

25  I just helped him as a friend to cosign since he's not a

 1       A.  Yes.

 2            I mean I can actually just, you know, get back

 3  with you just exactly which payment is going on which

 4  bill and then, you know, I'll get that to you.

 5       Q.  Do you have any security cameras at the

 6  Rockefeller property?

 7       A.  I have a Ring camera.

 8       Q.  Ring camera.

 9            Can you tell me, what's a Ring camera?

10       A.  It's a camera that, you know, allows you to see

11  who comes to the door.  If someone like knocks or

12  someone delivers the package, it has as sensor.

13            Because in the past I had some issues with

14  people stealing my Amazon packages, and that's why I got

15  the, you know, Ring camera so I could just see like --

16  you know, see who comes and sometimes steals the

17  packages, and then I can report it to the association.

18  So just for security purposes.

19            But, yeah, I have a Ring camera for that

20  reason.

21       Q.  Did you purchase the Ring camera system?

22       A.  It was actually a Christmas gift from my --

23  from my father.

24       Q.  Do you remember when you received it?

25       A.  I think it was in 2017.  2017.  Christmas of

1      **2017.  It's been awhile.**

2           Q.   Yeah.  Yeah.

3                **About 2017, 2016, 2018, something along those**

4      **lines?**

5           A.   Yeah, I think so.

6           Q.   Where is the Ring camera installed?

7           A.   It's at the front of the door.

8           Q.   How many doors do you have at the Rockefeller

9      property to enter the townhouse?

10          A.   I have the front door, and I have the garage.

11          Q.   How do you normally enter the property?

12          A.   Usually from the garage.

13          Q.   Okay.  How -- Does the Ring camera store

14     footage or --

15          A.   Yeah.

16          Q.   -- for a period of days?

17          A.   It does, yeah.

18          Q.   How many days does it store footage for?

19          A.   60 days.  It's 60 days.

20               It's an Amazon cloud type of a plan, you know.

21     And if you wanted to get something older, you -- you'd

22     have to call them.  I've done that before for some other

23     issue with a, you know, package that was stolen.  Then

24     they said like they don't store anything over 60 days.

25               And then I just learned how to save them

1        A.  Yes.

2        Q.  Do you remember giving evidence in support of

3   that motion?

4        A.  I'm not -- I don't remember much, you know.

5   Can you maybe remind me of what evidence you're

6   referring to?

7        Q.  Well, first, do you remember submitting a

8   written declaration?

9        A.  Yes.

10       Q.  Okay.  Do you remember where -- do you remember

11  where you said that you were residing in that

12  declaration?

13       A.  Do you have a copy of the declaration that I

14  can see?  I mean it's been awhile.

15       Q.  Sure.  Sure.  Sure.

16            So right now I don't have a copy of the

17  declaration from the Florida case, but do you remember

18  that there was also a motion in a case in California to

19  set aside a default judgment?

20       A.  Yes.

21       Q.  Okay.  And do you remember filing a declaration

22  in that case as well?

23       A.  Yes.

24       Q.  Okay.  So at paragraph three of the declaration

25  it stated, "I've been residing full-time at my residence

 1  in Santa Monica since November 21st, 2016."

 2       A.   Uh-huh.

 3       Q.   Do you remember writing that statement?

 4       A.   Yeah.  That was my -- it's my civil attorney

 5  advice that he said, you know, like we need to write

 6  this declaration.

 7       Q.   Okay.  And then at paragraph four it said, "I

 8  have not occupied the real property located at 116

 9  Rockefeller since November 21st, 2016."

10       A.   Yes.

11       Q.   Do you remember writing that?

12       A.   Yeah.  I remember.

13       Q.   Can you explain why you wrote that at the time?

14       A.   Well, because I think they were just a bit

15  confused.  Because the -- you know, the server who I

16  guess was trying to serve me for this case, he was at

17  the Irvine house trying to serve me on a specific day,

18  and I wasn't actually at the house on that specific day.

19            And I told -- and then when we talked to the

20  judge, I was -- the server was on the Zoom video as

21  well, and he says "Oh, yeah.  I did serve you on that

22  day.  You were at the house."

23            And I said, "I wasn't," and I showed them the

24  proof, and nobody believed me.

25            But that doesn't mean that, you know, my house

1  in Irvine is not my residence.  It is my residence, but

2  on that specific day I wasn't there, on the day when the

3  person claimed he served me.

4      Q.  You wrote in paragraph seven, "I had no idea

5  that the judgment creditor had filed an application for

6  an entry of sister state judgment.  I had never seen the

7  documents until I hired counsel to represent me, and set

8  the sister state judgment aside."

9          Do you remember writing that?

10     A.  Yeah, actually.  Because I was never served in

11 person with the case or the judgment.  I was never

12 served in person.

13     Q.  Were those documents ever delivered to the

14 Rockefeller property?

15     A.  I never received it.

16     Q.  Okay.  Yes.  But do you know, were they ever

17 delivered to the Rockefeller property?

18     A.  I've never seen it.  I never received it.  I

19 have -- no, I've never seen it.  I have no idea.

20     Q.  You don't know whether they were delivered to

21 the Rockefeller property.  Okay.

22         Were you living at the Rockefeller property at

23 the time?

24     A.  Yes.

25     Q.  Okay.  Was anyone living with you at the

1    Rockefeller property in 2020?

2        A.   My sister.

3        Q.   She was your co-occupant at the time?

4        A.   She was what?

5        Q.   She was your co-occupant at the time?

6        A.   Yeah.  Roommate.  Co-occupant.

7        Q.   Okay.  Had she ever talked to you about

8    documents she had received in connection with any cases

9    against you?

10        A.   No.  Because she never received anything

11    herself.

12        Q.   She's told you that she's never received

13    anything?

14        A.   Yeah.  She told me she hasn't received

15    anything.

16             Because when the case happened, I asked her

17    "Have you received anything on my behalf?"

18             And she said "No, I haven't received anything."

19        Q.   Okay.  Okay.  So there have -- so you resided

20    at the Rockefeller property since you purchased it in

21    2013.

22             Correct?

23        A.   Yes.

24        Q.   And the only person who's also occupied the

25    Rockefeller property has been your sister and her son?

1 | my sister, and they sleep in his room.

2 |     Q.  So you stay in your bedroom and your father

3 | stays --

4 |     A.  I always stay in my bedroom, yeah.

5 |     Q.  Okay.  So I wanted to ask a bit about the

6 | security camera footage from the Santa Monica apartment.

7 |     Well, first, do you know, does the Santa Monica

8 | apartment have a security camera?

9 |     A.  No.  I don't think -- Yeah.  Like I don't

10 | remember.

11 |     I know my roommate was also trying to get a

12 | Ring camera, but he ended up not getting one.

13 |     Q.  So there's no Ring camera at the Santa Monica

14 | apartment?

15 |     A.  Yeah.  No, he didn't get one.

16 |     Q.  Yeah.  Do you know, are there any other

17 | security cameras around the apartment in the common

18 | areas, perhaps?

19 |     A.  In Santa Monica?

20 |     Q.  Yeah.

21 |     A.  Like in the apartment building?

22 |     Q.  Yes.

23 |     A.  I'm not -- I'm sure they have some, you know.

24 | I'm not sure.  I don't really pay attention to the

25 | cameras.

```
1    know.

2            And I've actually been meeting tech people in

3    Irvine.

4            Irvine is actually trying to get -- to be the

5    kind of a tech bubble as well, which is very

6    interesting.

7        Q.   And did you prepare the lease agreement between

8    you and your sister?

9        A.   Yes.

10       Q.   And have there been any changes to the lease

11   agreement?

12       A.   Just the price changed from 3,000 to 4,000.

13       Q.   When did the price change from 3,000 to 4,000?

14       A.   I believe it was in mid of 2021.  I -- I'll

15   have to check exactly the day and get back to you.

16           But it was mainly because of just the

17   inflation, everything was getting more expensive, you

18   know.

19       Q.   You think it was during middle of 2021?

20       A.   I would actually have to just check, exactly.

21           You know, it's my sister so it's kind of like

22   it was more of an easy kind of a change.

23           It's like, you know, we -- sometimes, you know,

24   we make some kind of an agreement.  We don't have to go

25   and put it in writing with her, you know, since she's
```

**DEPO**

**4**

In the Matter of:

## re BASSEM VICTOR EL MALLAKH

---

## ESSAM MALLAKH

### *March 15, 2023*

---



Swivel Legal Solutions  |  Phone: 800.540.9099  |  www.swivellegal.com

1              UNITED STATES BANKRUPTCY COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3

4   In re BASSEM VICTOR EL MALLAKH       )
                                         )
5                                        )
                                         )
6                                        )
                                         ) Case No. 8:22-BK-11605-TA
7                                        ) Chapter 11
                                         )
8                                        )
                                         )
9                                        )
    _____)

10

11

12

13

14

15      VIDEOCONFERENCE DEPOSITION OF ESSAM EL MALLAKH

16        WEDNESDAY, MARCH 15, 2023, 12:37 P.M. (PST)

17

18

19

20

21

22

STENOGRAPHICALLY REPORTED BY:
23

LORI S. TURNER
24  CSR NO. 9102

25  Job No.  2299B

1                    UNITED STATES BANKRUPTCY COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3

4    In re BASSEM VICTOR EL MALLAKH        )
                                          )
5                                         )
                                          )
6                                         )
                                          ) Case No. 8:22-BK-11605-TA
7                                         ) Chapter 11
                                          )
8                                         )
                                          )
9                                         )
     _____)

10

11

12

13

14

15

16

17

18

19

20        DEPOSITION OF ESSAM EL MALLAKH, a witness

21        herein, taken on behalf of judgment creditor

22        via videoconference, beginning at 12:37 p.m. and

23        ending at 12:51 p.m., on Wednesday, March 15, 2023,

24        before Lori S. Turner, Certified Shorthand

25        Reporter, CSR No. 9102

Case 8:22-bk-11605-TA   Doc 254   Filed 08/10/23   Entered 08/10/23 21:07:20   Desc
re BASSEM VICTOR EL MALLAKH   Main Document   Page 405 of 872
ESSAM MALLAKH on 03-15-2023

Job 2299B
Page 3

```
 1    APPEARANCES OF COUNSEL:

 2

      For Judgment Creditor BELGIUM INVESTMENTS 960 BAY DR,
 3    LLC A CALIFORNIA CORPORATION:

 4
              IMPACT ADVOCATES APC
 5            BY PATRICK MILLER, ESQ.
              121 South Oak Avenue
 6            Pasadena, California 91107
              213.364.7581
 7            patrick.miller@impactadvocateslaw.com
              (APPEARING VIA VIDEOCONFERENCE)
 8

 9
      For Debtor BASSEM VICTOR EL MALLAKH:
10

11            AFARI LAW FIRM
              BY CAROLYN AFARI, ESQ.
12            269 South Beverly Drive, Suite 643
              Beverly Hills, California 90212
13            424.274.1099
              afarilawfirm@gmail.com
14            (APPEARING VIA VIDEOCONFERENCE)

15

16    Also Present:   ANTHONY CASTANEDA - Exhibit Technician
                       (APPEARING VIA VIDEOCONFERENCE)
17

18

19

20

21

22

23

24

25
```

1                        I N D E X

2

3    WITNESS:   ESSAM EL MALLAKH
                 (APPEARING VIA VIDEO CONFERENCE)
4

5    EXAMINATION:                                      PAGE

6    BY MR. MILLER                                        5

7

8                      E X H I B I T S

9                 (No exhibits offered)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          WEDNESDAY, MARCH 15, 2023 - 12:37 P.M.

2                          ***

3

4                    ESSAM EL MALLAKH,

5            HAVING BEEN DULY ADMINISTERED AN

6            OATH BY THE REPORTER, WAS EXAMINED

7               AND TESTIFIED AS FOLLOWS:

8

9                     -EXAMINATION-

10

11   BY MR. MILLER:

12       Q.  So thank you for taking the time, Mr. El

13   Mallakh.  I would imagine it's relatively late where you

14   are right now.

15           You're in Cairo?

16       A.  Yeah.

17       Q.  What time is it in Cairo right now?

18       A.  It's 9:38 p.m.

19       Q.  Okay.  But are you still able to understand my

20   questions well and --

21       A.  Yes.

22       Q.  -- respond to the questions?

23       A.  Yeah.

24       Q.  We appreciate that English is not your first

25   language, so please feel free to let me know if you'd

```
 1  like me to rephrase anything.

 2       A.  Okay.

 3       Q.  Okay?

 4       A.  I'll do that.

 5       Q.  Have you ever been involved in a deposition

 6  before?

 7       A.  No.

 8       Q.  So this is the first time you're giving

 9  evidence in a deposition?

10       A.  Yeah.

11       Q.  Okay.  All right.  You understand that even

12  though this is considered informal since we're all in

13  different areas, that this is under oath.

14           Correct?

15       A.  Yeah.  Yeah.

16       Q.  Okay.

17       A.  Yeah.

18       Q.  And -- Okay.  And if you need any breaks or

19  anything like that, please feel free to let us know.

20       A.  Okay.

21       Q.  I don't think you'll need a break because I

22  don't have very many questions for you, Mr. El Mallakh.

23       A.  Okay.

24       Q.  But if you do, that's okay.

25           Do you remember visiting the U.S. in September
```

1   of 2022?

2        A.   September of 2022, yes.

3        Q.   Okay.  And did you visit your children in

4   Irvine?

5        A.   Exactly.  I went there on the 9th of September,

6   '22.

7        Q.   And how long do you remember staying in Irvine?

8        A.   Normally, it's between two weeks or three

9   weeks.  That's my normal stay period, you know.

10       Q.   So you don't remember exactly how many days,

11  but if you had to guess, it would probably be about two

12  to three weeks?

13       A.   Mostly like that, yeah.

14       Q.   Okay.  Okay.  Do you remember, were you -- do

15  you remember your son Bassem filing for bankruptcy in

16  September of '22?

17       A.   Yeah, I remember that day in particular because

18  he -- he was very much, I mean, worried about the -- I

19  mean all that.  So I wanted to get him support to him

20  when he was going to the FedEx store.

21            I think he had to do some scanning, printing,

22  and sending out emails or something like that.  So I was

23  with him when he was driving going to this FedEx office.

24            And I remember even by coincidence I like two

25  pens over there, they were displaying them.  So I bought

1   two pens from the store on that day, and I think I gave

2   him a copy of the receipt.

3        Q.   Okay.  Do you remember visiting the -- you

4   normally reside in Egypt.

5        Correct?

6        A.   Correct.

7        Q.   Do you remember visiting California in 2021?

8        A.   Yeah.  Normally I go two times a year, you

9   know.

10       Q.   Okay.  So in 2021, do you remember the month

11  that you visited?

12       A.   No.  That's difficult.  If you would have told

13  me before I would have looked at my passport and seen

14  the days, you know.  I don't remember now.

15       Q.   That's all right.  Do you remember --

16       A.   It always has to be like every six months, you

17  know.

18       Q.   Of course during the COVID pandemic it was

19  probably more difficult?

20       A.   Right.  That is true.  Very true, yeah.

21       Q.   Do you remember -- do you remember where your

22  son was living during the COVID pandemic during 2020 and

23  2021?

24       A.   As far as I know Bassem is always living in

25  Irvine.  This is where I always know that that's his

1    house and he always lives there.

2            And whenever I used to talk to him, he was

3    always there in the house.

4        Q.  And do you remember how long his sister -- is

5    his sister your daughter?

6        A.  Yeah.  Yeah.  She's my daughter, yeah.

7        Q.  Yes.  Do you remember how long she's been

8    living in Irvine?

9        A.  A few years, but I don't know exact dates also.

10   But three years, yeah.

11       Q.  But you don't know exactly.

12       A.  Yeah.

13       Q.  Okay.  Did you -- do you remember -- do you

14   remember visiting in September 2022?

15       A.  Yeah.

16       Q.  Do you remember visiting another time in 2022

17   earlier in 2022?

18       A.  Yeah.  That has to be six months before, you

19   know.

20       Q.  Yeah.  Yeah.

21            And did you stay in the Irvine property?

22       A.  Yeah, all the time.

23       Q.  Yeah.

24       A.  All my visits were all the times for the past,

25   the whole years, I've always been, whenever I go there,

1    I stay in Irvine in the Rockefeller house.

2         Q.   In the Rockefeller house.

3              And all the time that you've been visiting,

4    both Bassem --

5         A.   All the time.

6         Q.   -- and his sister have been living there?

7         A.   Yeah.

8              Also, it was a good chance when they joined --

9    when my daughter joined in the house in the past few

10   years, that's a good chance for me to be staying with

11   both of them, you know.  That's why I go.  I go just to

12   visit them and my grandson.

13        Q.   Your grandson, of course.

14        A.   Yes, he's always there.  I'm taking his room.

15        Q.   Yes, of course.  I'm sure.

16             Okay.  Do you remember why his sister moved in

17   with him?

18        A.   I remember that my -- my daughter was not happy

19   with her roommate in the previous house.  Of course, I

20   don't know the details, but she told me that she decided

21   to -- to go and stay with Bassem.  It's better for him

22   as well, you know, to support each other.

23        Q.   Okay.  Were you involved in the business

24   venture that Bassem had with Mohamed Roston?

25        A.   No, I don't even know what type of business he

1   had.  I don't really go into very much -- in details

2   with my son and daughter not to enforce myself, unless

3   they want to tell me something, you know.

4        Q.  Okay.  That makes sense.

5        Okay.  Were you aware that your son was a

6   signatory on a lease in an apartment in Santa Monica?

7        A.  No, I have no idea about that.

8        Q.  Have you ever been to an apartment in Santa

9   Monica --

10       A.  No.

11       Q.  -- that your son was renting?

12       A.  No.

13       Q.  No.  Okay.  And you've never discussed that

14  with him.

15       Do you discuss finances with your son?

16       A.  No.

17       I mean normally Bassem doesn't like to talk

18  much about his own personal issues, you know.  And I

19  don't want to enforce myself.

20       If he wants to say something, let him say.  If

21  he doesn't want, I don't want to just enforce myself on

22  him, you know.  He's grown up enough so I don't want to

23  really be -- How can I say?  He just inform me.  I don't

24  want to be enforcing myself into his personal life, you

25  know.

1        Q.   Yes.  Yeah, I understand that.

2             Did -- did you know anything about the case

3   that he was involved with in Florida?

4        A.   No.

5             But -- only I knew that he had some cases and

6   he was disappointed about those cases, but what are the

7   things about, that he didn't really want to speak about

8   it, you know.

9             The fact that -- only that the main part that,

10  you know, there was a case and he was upset about it.

11       Q.   Yes.  Yes.

12            Did you know that in February 2021 he stated in

13  a declaration that he resided -- that he lived in Santa

14  Monica?

15       A.   Yeah.  Bassem said so.

16       Q.   Yes.  So were you -- are you aware that he

17  stated in a declaration --

18       A.   No.

19       Q.   -- that he filed in February --

20       A.   No.

21       Q.   -- 2021?

22       A.   No, I don't know.

23       Q.   That's okay.  Yeah.

24            Would it surprise you to hear that he stated he

25  lived in Santa Monica in 2021?

Case 8:22-bk-11605-TA   Doc 254   Filed 08/10/23   Entered 08/10/23 21:07:20   Desc
re BASSEM VICTOR ELMALAKH   Main Document   Page 415 of 872
ESSAM MALLAKH on 03-15-2023

Job 2299B
Page 13

1          A.  As I told you, I don't know much about his

2     details in life, you know.  I only come visit, try to

3     enjoy time with my son and daughter.  Make their life in

4     a loving atmosphere to keep the relationship between

5     parents and son, but we don't go into personal details,

6     you know.

7          Q.  So there are many personal details about your

8     son and your daughter that you wouldn't be aware of?

9          A.  No.  No.  Unless they want to tell me.

10         Q.  Yeah, of course.  That would make sense.

11         A.  Yeah.

12         Q.  And he never told you that he was living

13    anywhere other than the Rockefeller place?

14         A.  We didn't discuss things like that, you know.

15         Q.  Yeah.  You didn't discuss where he was living?

16         A.  Uh-huh.

17             (Nods head in the affirmative.)

18         Q.  Just to be clear, I think sometimes it's very

19    natural, Mr. El Mallakh, for people to just nod their

20    heads.

21             For instance, I think the last question you

22    nodded your head, but you also said "Yes."

23         A.  Can you repeat the question, please.

24         Q.  What I was trying to explain is that if you nod

25    your head "Yes" --

1        A.   Yeah.

2        Q.   -- it's very unlikely that our court reporter

3   will be able to capture that.

4             (Simultaneous speaking.)

5   BY MR. MILLER:

6        Q.   So you need you to say "Yes" or "No."

7        A.   Okay.

8        Q.   And I think the last answer -- the last

9   question I asked was --

10       MR. MILLER:  Is there a way for you to refer to the

11  transcript so I can repeat the last question, perhaps.

12            (Off record discussion held wherein the record

13  was read by the reporter.)

14       MR. MILLER:  I think -- I think that's about the

15  number of questions I have, Mr. El Mallakh.

16       THE REPORTER:  Off the record?

17       MR. MILLER:  Yes.

18            I think you're trying to say something,

19  Carolyn, but we can't hear you.

20       MS. AFARI:  Yes, I was trying to unmute myself, but

21  what I was tying to say is the court reporter can go

22  ahead and do the closing part of the deposition.

23            (The proceedings concluded at 12:51 p.m.)

24                              ***

25

1
### DECLARATION UNDER PENALTY OF PERJURY

2

3      I, Essam El Mallakh, do hereby certify under

4   penalty of perjury that I have reviewed the foregoing

5   transcript of my deposition taken on March 15, 2023 that

6   I have made such corrections as appear noted herein in

7   ink; that my testimony as contained herein, as

8   corrected, is true and correct.

9

10      DATED this _____ day of _____,

11   20_____, at _____, _____.

12

13

14

15

16                      _____

17                           **Essam El Mallakh**

18

19

20

21

22

23

24

25

1                          **ERRATA SHEET**

2      **Printed Name**_____**Date**_____

3      **Signature**_____

4      **Page/Line   Correction            Reason**

5      _____     _____    _____

6      _____     _____    _____

7      _____     _____    _____

8      _____     _____    _____

9      _____     _____    _____

10     _____     _____    _____

11     _____     _____    _____

12     _____     _____    _____

13     _____     _____    _____

14     _____     _____    _____

15     _____     _____    _____

16     _____     _____    _____

17     _____     _____    _____

18     _____     _____    _____

19     _____     _____    _____

20     _____     _____    _____

21     _____     _____    _____

22     _____     _____    _____

23     _____     _____    _____

24     _____     _____    _____

25     _____     _____    _____

1      I, LORI S. TURNER, a Certified Shorthand

2   Reporter of the State of California, do hereby certify:

3      That the foregoing proceedings were taken

4   before me at the time and place herein set forth; that

5   any witnesses in the foregoing proceedings, prior to

6   testifying, were administered an oath; that a record

7   of the proceedings was made by me using machine

8   shorthand which was thereafter transcribed under my

9   direction; that the foregoing transcript is a true

10   record of the testimony given.

11      Further, that if the foregoing pertains to

12   the original transcript of a deposition in a Federal

13   Case, before completion of the proceedings, review of

14   the transcript [    ] was [X] was not requested.

15      I further certify I am neither financially

16   interested in the action nor a relative or employee of

17   any attorney or any party to this action.

18      IN WITNESS WHEREOF, I have this date

19   subscribed my name.

20

21   Dated:  March 19th, 2023

22   _____

23   LORI S. TURNER

24   CSR No. 9102

25

---

**-**

**-EXAMINATION-** 5:9

---

**1**

**12:37** 5:1

**12:51** 14:23

**15** 5:1

---

**2**

**2020** 8:22

**2021** 8:7,10,23 12:12, 21,25

**2022** 7:1,2 9:14,16,17

**2023** 5:1

**22** 7:6,16

---

**9**

**9:38** 5:18

**9th** 7:5

---

**A**

**able** 5:19 14:3

**about** 7:11,18 11:7,18 12:2,6,7,10 13:1,7 14:14

**ADMINISTERED** 5:5

**AFARI** 14:20

**affirmative** 13:17

**ahead** 14:22

**also** 9:9 10:8 13:22

**always** 8:16,24,25 9:1, 3,25 10:14

**another** 9:16

**answer** 14:8

**any** 6:18

**anything** 6:1,19 12:2

**anywhere** 13:13

**apartment** 11:6,8

**appreciate** 5:24

**are** 5:14,19 12:6,16 13:7

**areas** 6:13

**asked** 14:9

**atmosphere** 13:4

**aware** 11:5 12:16 13:8

---

**B**

**bankruptcy** 7:15

**Bassem** 7:15 8:24 10:4,21,24 11:17 12:15

**because** 6:21 7:17

**been** 5:5 6:5 9:7,25 10:3,6 11:8

**before** 6:6 8:13 9:18

**better** 10:21

**between** 7:8 13:4

**both** 10:4,11

**bought** 7:25

**break** 6:21

**breaks** 6:18

**business** 10:23,25

---

**C**

**Cairo** 5:15,17

**California** 8:7

**can** 11:23 13:23 14:11, 21

**can't** 14:19

**capture** 14:3

**Carolyn** 14:19

**case** 12:2,10

**cases** 12:5,6

**chance** 10:8,10

**children** 7:3

**clear** 13:18

**closing** 14:22

**coincidence** 7:24

**come** 13:2

**concluded** 14:23

**considered** 6:12

**copy** 8:2

**Correct** 6:14 8:5,6

**course** 8:18 10:13,15, 19 13:10

**court** 14:2,21

**COVID** 8:18,22

---

**D**

**dates** 9:9

**daughter** 9:5,6 10:9,18 11:2 13:3,8

**day** 7:17 8:1

**days** 7:10 8:14

**decided** 10:20

**declaration** 12:13,17

**deposition** 6:5,9 14:22

**details** 10:20 11:1 13:2, 5,7

**did** 7:3 9:13,21 12:2,12

**didn't** 12:7 13:14,15

**different** 6:13

**difficult** 8:12,19

**disappointed** 12:6

**discuss** 11:15 13:14,15

**discussed** 11:13

**discussion** 14:12

**displaying** 7:25

**driving** 7:23

**DULY** 5:5

**during** 8:18,22

---

**E**

**earlier** 9:17

**Egypt** 8:4

**El** 5:4,12 6:22 13:19 14:15

**emails** 7:22

**enforce** 11:2,19,21

**enforcing** 11:24

**English** 5:24

**enjoy** 13:3

**enough** 11:22

**ESSAM** 5:4

**even** 6:11 7:24 10:25

**ever** 6:5 11:8

**every** 8:16

**evidence** 6:9

**exact** 9:9

**exactly** 7:5,10 9:11

**EXAMINED** 5:6

**explain** 13:24

---

**F**

**fact** 12:9

**February** 12:12,19

**Fedex** 7:20,23

**feel** 5:25 6:19

**filed** 12:19

**filing** 7:15

**finances** 11:15

**first** 5:24 6:8

**Florida** 12:3

**FOLLOWS** 5:7

**free** 5:25 6:19

## G

**gave** 8:1

**giving** 6:8

**good** 10:8,10

**grandson** 10:12,13

**grown** 11:22

**guess** 7:11

## H

**happy** 10:18

**he** 7:18,20,21,23 9:1,2 10:25 11:20,21,23 12:3, 5,6,7,10,12,13,16,19,24 13:12,15

**he's** 10:14 11:22

**head** 13:17,22,25

**heads** 13:20

**hear** 12:24 14:19

**held** 14:12

**her** 10:19

**him** 7:19,23 8:2 9:2 10:17,21 11:14,20,22

**his** 8:25 9:4,5 10:6,14, 16 11:18,24 13:1

**house** 9:1,3 10:1,2,9,19

## I

**idea** 11:7

**imagine** 5:13

**inform** 11:23

**informal** 6:12

**instance** 13:21

**involved** 6:5 10:23 12:3

**Irvine** 7:4,7 8:25 9:8,21 10:1

**issues** 11:18

## J

**joined** 10:8,9

## K

**keep** 13:4

**knew** 12:5

**know** 5:25 6:19 7:9 8:9, 14,17,24,25 9:9,11,19 10:11,20,22,25 11:3,18, 22,25 12:2,8,10,12,22 13:1,2,6,14

## L

**language** 5:25

**last** 13:21 14:8,11

**late** 5:13

**lease** 11:6

**life** 11:24 13:2,3

**like** 6:1,19 7:13,22,24 8:16 11:17 13:14

**lived** 12:13,25

**lives** 9:1

**living** 8:22,24 9:8 10:6 13:12,15

**long** 7:7 9:4,7

**looked** 8:13

**loving** 13:4

## M

**main** 12:9

**make** 13:3,10

**makes** 11:4

**Mallakh** 5:4,13 6:22 13:19 14:15

**many** 6:22 7:10 13:7

**MARCH** 5:1

**me** 5:25 6:1 8:13 10:10, 20 11:3,23 13:9

**mean** 7:18,19 11:17

**MILLER** 5:11 14:5,10, 14,17

**Mohamed** 10:24

**Monica** 11:6,9 12:14,25

**month** 8:10

**months** 8:16 9:18

**more** 8:19

**Mostly** 7:13

**moved** 10:16

## N

**natural** 13:19

**need** 6:18,21 14:6

**never** 11:13 13:12

**nod** 13:19,24

**nodded** 13:22

**nods** 13:17

**normal** 7:9

**normally** 7:8 8:4,8 11:17

**number** 14:15

## O

**oath** 5:6 6:13

**office** 7:23

**only** 12:5,9 13:2

**other** 10:22 13:13

**our** 14:2

**out** 7:22

**over** 7:25

**own** 11:18

## P

**p.m.** 5:1,18 14:23

**pandemic** 8:18,22

**parents** 13:5

**part** 12:9 14:22

**particular** 7:17

**passport** 8:13

**past** 9:24 10:9

**pens** 7:25 8:1

**people** 13:19

**perhaps** 14:11

**period** 7:9

**personal** 11:18,24 13:5,7

**place** 13:13

**please** 5:25 6:19 13:23

**previous** 10:19

**printing** 7:21

**probably** 7:11 8:19

**proceedings** 14:23

**property** 9:21

## Q

**question** 13:21,23 14:9,11

**questions** 5:20,22 6:22 14:15

## R

**read** 14:13

**really** 11:1,23 12:7

**receipt** 8:2

**record** 14:12,16

**refer** 14:10

**relationship** 13:4

**relatively** 5:13

**remember** 6:25 7:7,10, 14,15,17,24 8:3,7,10, 14,15,21 9:4,7,13,14,16 10:16,18

**renting** 11:11

**repeat** 13:23 14:11

**rephrase** 6:1

**reporter** 5:6 14:2,13, 16,21

**reside** 8:4

**resided** 12:13

**respond** 5:22

**right** 5:14,17 6:11 8:15, 20

**Rockefeller** 10:1,2 13:13

**room** 10:14

**roommate** 10:19

**Roston** 10:24

---

**S**

**said** 12:15 13:22

**Santa** 11:6,8 12:13,25

**say** 11:20,23 14:6,18,21

**scanning** 7:21

**seen** 8:13

**sending** 7:22

**sense** 11:4 13:10

**September** 6:25 7:2,5, 16 9:14

**she** 10:20

**she's** 9:6,7

**signatory** 11:6

**simultaneous** 14:4

**since** 6:12

**sister** 9:4,5 10:6,16

**six** 8:16 9:18

**some** 7:21 12:5

**something** 7:22 11:3, 20 14:18

**sometimes** 13:18

**son** 7:15 8:22 11:2,5, 11,15 13:3,5,8

**speak** 12:7

**speaking** 14:4

**stated** 12:12,17,24

**stay** 7:9 9:21 10:1,21

**staying** 7:7 10:10

**still** 5:19

**store** 7:20 8:1

**support** 7:19 10:22

**sure** 10:15

**surprise** 12:24

---

**T**

**taking** 5:12 10:14

**talk** 9:2 11:17

**tell** 11:3 13:9

**TESTIFIED** 5:7

**things** 12:7 13:14

**think** 6:21 7:21 8:1 13:18,21 14:8,14,18

**three** 7:8,12 9:10

**time** 5:12,17 6:8 9:16, 22 10:3,5 13:3

**times** 8:8 9:24

**told** 8:12 10:20 13:1,12

**transcript** 14:11

**true** 8:20

**two** 7:8,11,24 8:1,8

**tying** 14:21

**type** 10:25

---

**U**

**U.S.** 6:25

**Uh-huh** 13:16

**under** 6:13

**understand** 5:19 6:11 12:1

**unless** 11:2 13:9

**unlikely** 14:2

**unmute** 14:20

**up** 11:22

**upset** 12:10

**used** 9:2

---

**V**

**venture** 10:24

**visit** 7:3 10:12 13:2

**visited** 8:11

**visiting** 6:25 8:3,7 9:14,16 10:3

**visits** 9:24

---

**W**

**wanted** 7:19

**WEDNESDAY** 5:1

**weeks** 7:8,9,12

**well** 5:20 10:22

**went** 7:5

**whole** 9:25

**worried** 7:18

---

**Y**

**year** 8:8

**years** 9:9,10,25 10:10

**DEC
1**

Michael Sayer, State Bar No. 141038
Debt Recovery Attorneys
17595 Harvard Ave., Suite C-557
Irvine, CA 92614
Tel. (949) 292-3511
Dra@dracollections.com

Attorneys for Defendant, BASSEM ESSAM EL MALLAKH

SUPERIOR COURT OF CALIFORNIA

COUNTY OF ORANGE

| | |
|---|---|
| BELGIUM INVESTMENTS 960 BAY DR., LLC, a California Corp.<br><br>    Plaintiff,<br><br>    v.<br><br>SPENCE BANK ET AL<br><br>    Defendant.<br>_____ | ) CASE NO: 30-2020-01148745<br>)<br>)<br>) DECLARATION OF DEFENDANT BASSEM<br>) ESSAM EL MALLAKH IN SUPPORT OF MOTION<br>) TO SET ASIDE AND VACATE  SISTER STATE<br>) JUDGMENT AND TO VACATE THE ABSTRACT<br>) OF JUDGMENT AND WRIT OF EXECUTION<br>)<br>) Date:<br>) Time:<br>) Place:<br><br>Reservation No. |

**DECLARATION OF BASSEM ESSAM EL MALLAKH**

1.      I, BASSEM ESSAM EL MALLAKH, hereby declare as follows:

2.      I am over the age of 18 years and am fully familiar with the facts and circumstances

surrounding this litigation and could and would competently testify thereto if called upon to do so.

3.      I have been residing fulltime at my residence in Santa Monica since 11/21/16. Attached hereto

as Ex.6 is a true and correct copy of the lease I executed for my residence in Santa Monica.

- 1 –
DECLARATION OF DEFENDANT BASSEM ESSAM EL MALLAKH IN SUPPORT OF MOTION TO SET
ASIDE AND VACATE  SISTER STATE JUDGMENT AND TO VACATE THE ABSTRACT OF JUDGMENT
AND WRIT OF EXECUTION

4.      I have not occupied the real property located at 116 Rockefeller, Irvine CA. since 11/21/16.

5.      Although I own the property at 116 Rockefeller, Irvine CA, I leased the property to Reem Hanna, commencing 1/17/17. Attached hereto is as Ex.7, is true and correct copy of the lease as between myself and Reem Hanna.

6.      I have never been served with the Application For Entry of Sister State Judgment, the Notice of Entry of Sister State Judgment, or the Sister State Judgment.

7.      I had no idea that the Judgment Creditor had filed an Application For Entry of Sister State Judgment, the Notice of Entry of Sister State Judgment, or the Sister State Judgment. I had never seen the documents until I hired counsel to represent me and set the Sister State Judgment aside.

8.      I took absolutely no steps to hide, hinder or sequester myself to avoid service of the herein noted Application For Entry of Sister State Judgment, the Notice of Entry of Sister State Judgment, or the Sister State Judgment.

9.      Attached hereto as Ex.8 is a true and correct copy of my Wells Frago bank statement showing that the judgment creditor levied my account in the sum of $29,271.76.

10.     Attached hereto as Ex.9 is a true and correct copy of my JP Morgan Chase statement showing the active levy.

        I declare under penalty of perjury that the forgoing is true and correct.


Dated: 2/17/2021

dotloop verified
02/17/21 4:51 PM PST
VW9R-DUKE-VHUW-E0FW

Bassem Essam El Mallakh

- 2 –
DECLARATION OF DEFENDANT BASSEM ESSAM EL MALLAKH IN SUPPORT OF MOTION TO SET
ASIDE AND VACATE  SISTER STATE JUDGMENT AND TO VACATE THE ABSTRACT OF JUDGMENT
AND WRIT OF EXECUTION

**PROOF OF ELECTRONIC SERVICE**

I am employed in the County of ORANGE, State of California.  I am over the age of 18 and not a party to the within action.  My business address is, 17595 Harvard, Suite C-557, Irvine, CA 92614.

On the date indicated below, I served by ELECTRONIC SERVICE the foregoing document described as DECLARATION OF DEFENDANT BASSEM ESSAM EL MALLAKH IN SUPPORT OF MOTION TO SET ASIDE AND VACATE  SISTER STATE JUDGMENT AND TO VACATE THE ABSTRACT OF JUDGMENT AND WRIT OF EXECUTION on all interested to the electronic address as listed for each party and attorney below, using the e-filing service pursuant to   2019 California Rules of Court Rule 2.251.(b), Electronic service.

| | |
|---|---|
| Patrick Miller<br>P Miller Legal Services<br>285 E. California, Unite 201<br>Pasadena, CA 91106<br>Partick.miller@pmillerlegal.com | |

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on this 2/17/2021, at Irvine, California.

*Michael Sayer*
Michael Sayer

- 3 –

DECLARATION OF DEFENDANT BASSEM ESSAM EL MALLAKH IN SUPPORT OF MOTION TO SET ASIDE AND VACATE  SISTER STATE JUDGMENT AND TO VACATE THE ABSTRACT OF JUDGMENT AND WRIT OF EXECUTION

# EXHIBIT 6

Mohamed Rostom and Bassem Essam
525 Broadway #5037

🖨 Print    Close ✕

**Scroll** to the bottom of each page. **Click** in the colored box above each colored signature or initials box to sign. Use the navigation at the bottom to click to the next page. This is a legally binding document.

Sway                                                                     ALLIANCE

## CALIFORNIA LEASE AGREEMENT

1.
| | |
|---|---|
| **LANDLORD NAME:** | PRIII/Broadstone Trino, LLC |
| **LANDLORD'S AGENT:** | Alliance Communities Inc. |
| **LANDLORD ADDRESS:** | 525 Broadway, Santa Monica, CA 90401 |
| **PHONE/E-MAIL:** | (310) 393-9696 / sway@allresco.com |

2.
| | |
|---|---|
| **RESIDENT NAME:** | Mohamed Rostom and Bassem Essam |
| **OTHER OCCUPANTS:** | |
| **RESIDENT ADDRESS:** | |
| | UNIT          PARKING SPACE:          MAILBOX: |

3.
| **LEASE TERM:** | 1 year | ☐ Lease Renewal: |
|---|---|---|
| | START DATE: November 1, 2016 | END DATE: October 31, 2017 |
| | MOVE-IN DATE: November 1, 2016 | |

4. / 5.
| **MONTHLY CHARGES** | | | | **DEPOSITS** | |
|---|---|---|---|---|---|
| Base Rent | $6,075.00 | | Deposit | | $3,000.00 |
| **TOTAL** | $6,075.00 | | **TOTAL** | | $3,000.00 |

6.
| **KEYS:** | | | | | |
|---|---|---|---|---|---|
| | ☐ APARTMENT | 2 | ☐ MAIL | | 2 |
| | ☐ REMOTE | 2 | ☐ POOL | | 0 |
| | ☐ GARAGE | 0 | ☐ STORAGE | | 0 |
| | ☐ CARD | 0 | ☐ COMMON AREA | | 0 |

This Lease is entered into on the date signed, by and between the above named parties herein after called respectively LANDLORD and RESIDENT. In the event of more than one Resident, each Resident is jointly and severally liable for each provision of this Lease and service of any notice or demand upon one shall constitute notice to each other Resident.

Each Resident states that they are of legal age to enter into a binding Lease for lodging. All obligations hereunder are to be performed in the county and state where the Community is located. No oral agreements have been entered into with respect to this Lease. This Lease shall not be modified unless by an instrument in writing signed by Resident and an Agent of Landlord. Landlord hereby leases and Resident hereby hires and takes the premises as defined in Section 2 outlining the leased premises for the term specified herein and subject to all of the terms and provisions set forth.

## A. TERM OF LEASE

7. **INITIAL TERM:** The initial term of this Lease shall commence and end as outlined in Section 3 and shall **automatically continue as a tenancy from month-to-month upon expiration of the term.**

8. **LEASE EXPIRATION:** Either party, Landlord or Resident, may terminate this Lease after the initial term by giving the other party at least **thirty (30) days'** written notice of its intention to terminate the tenancy; provided that if Resident has been residing in the Community for more than one (1) year, Landlord shall give Resident at least sixty (60) days written notice of its intention to termination the tenancy. In the absence of written notice of termination, or a new lease, after the expiration of the initial term, the tenancy shall become month-to-month subject to a rental increase and applicable fees as allowed under state law. Resident agrees to pay all rent up to and including the end of any **thirty (30) day** (or, as applicable, sixty (60) day) notice period (which may not occur before the end of the Lease term) or until the premises are re-occupied, whichever occurs first.
Initials: MR  BE

9. **FAILURE TO VACATE AFTER NOTICE:** If Resident gives written notice to vacate the premises and fails to completely vacate prior to the expiration of the notice, Resident shall be liable, unless otherwise prohibited by law, in addition to all other damages provided for under this Lease, for the daily rental based on a pro-ration of the monthly rental provided for in the Lease for each day Resident remains in the premises. In addition, Landlord may collect cost for loss suffered from future resident losses, legal costs, lost rent, and other expenses, and any other amount allowed by law.

10. **OPTION FOR EARLY TERMINATION:** Resident is expected to remain a Resident for the entire term specified in the Lease. If Resident fails to do so, Resident will be responsible to Landlord for all damages provided by law, including (but not limited to) rent due through the end of the contract term, minus rents paid by a replacement resident (if any). This amount will vary depending upon how long it takes Landlord to find a replacement resident which typically cannot be determined in advance of move-out.

To avoid this uncertainty, Resident may choose to exercise an Early Termination Option. Resident understands and acknowledges that Landlord is not legally obligated to allow early termination of the Lease unless provided for pursuant to statutory or common law. To exercise this option, Resident must deliver to Landlord:

   **i.** A written notice stating that Resident has elected to exercise the Early Termination Option;
   **ii.** An early termination option payment of **$6,075.00**;
   **iii.** An executed agreement for repayment of concessions received prior to the early termination (if applicable, see Concession Section); and
   **iv.** Payment of rent and other amounts due through the new Lease end date.

When Landlord has (1) received the written notice and the Early Termination Option payment and (2) signed the notice, the Lease end date will be amended. The new Lease end date will be the date specified in the notice which must be at least **thirty** days after the written election and payment are given to Landlord. Exercise of the Early Termination Option will affect only Resident's rent obligations after the new Lease end date. Resident must comply with all other Lease obligations.

  Initials: MR  BE

1



Mohamed Rostom and Bassem Essam
525 Broadway #5037

 Print    Close ✕

**Scroll** to the bottom of each page. **Click** in the colored box above each colored signature or initials box to sign. Use the navigation at the bottom to click to the next page. This is a legally binding document.

Sway

 ALLIANCE

responsibility of the Resident to check regularly that each permit is secured on the appropriate vehicle and visible. Failure to properly display parking permits may result in the vehicle towed at Resident's own expense.

18. **Solicitors and Salespeople:**  Solicitors are not allowed in the Community. Residents shall report all solicitors or salespeople to the Landlord immediately.

19. **Car Wash and Repair:**  Vehicle repairs, including oil changes, and washing of vehicles are prohibited unless there is a designated area provided by Landlord.

20. **Moving of Furniture:**  Landlord may designate the time and method for moving items to and from the Unit such as any furniture, merchandise, goods, freight or other such items. Residents may not move furniture to and from the Unit through the lobby, patio doors, or through the use of elevators (if available) without Landlord's permission. If elevators are installed at the Community, Landlord does not guaranty that the elevators will be available for use by Resident nor shall Landlord be liable for any loss resulting from the unavailability of elevator service.

21. **Parking:**  Resident shall report in writing to Landlord any changes to the make, model and license plate number of every vehicle authorized to park at the Community. Commercial vehicles, boats and recreational vehicles are not authorized to park on the Premises unless Landlord has a designated location.

22. **Notification of Changes:**  Resident shall notify Landlord immediately in writing with any change to Resident's employer, employer telephone number, alternate phone numbers, emergency contact and other pertinent information.

Resident(s) acknowledges to have read this Addendum and understands the terms and conditions contained herein.

10/29/2016 01:41 PM PDT | 10/31/2016 03:26 PM PDT

Mohamed Rostom *(Resident)*                Date        Bassem Essam *(Resident)*                Date

**Signed by Chellie Stinson**
Mon Oct 31 2016 15:58:09 PM PDT
Key: D9A84B6C; IP Address: 71.177.221.208
*(Owner/Agent)*                Date

 Initials: MR  BE             15             

Mohamed Rostom and Bassem Essam
525 Broadway #5037

 Print     Close ✕

**Scroll** to the bottom of each page. **Click** in the colored box above each colored signature or initials box to sign. Use the navigation at the bottom to click to the next page. This is a legally binding document.



Sway                                                          ✦ **ALLIANCE**

| 1 | Animal Addendum |
|---|---|
| 2 | Community Policies |
| 3 | Construction Release and Waiver of Liability Agreement |
| 4 | Crime Free/Drug Free Addendum |
| 5 | Maintenance of Stainless Steel Appliances |
| 6 | Mold/Mildew Addendum |
| 7 | Move-In/Move-Out Inspection Form |
| 8 | New Construction Addendum |
| 9 | Pest, Insect and Bed Bug Addendum |
| 10 | Resident Communication Log |
| 11 | Garage/Parking Space Addendum |
| 12 | Smoke-Free Addendum |
| 13 | Utility Addendum |
| 14 | Acknowledgement RE Use of Medical Marijuana |
| 15 | Addendum Re Use of Medical Marijuana |

**SIGNATURES:**

The undersigned expressly understands that the "TERM OF LEASE" Section above contains provisions under which the tenancy may automatically continue as a tenancy from month to month upon expiration of the Lease term.

10/29/2016
01:40 PM PDT

10/31/2016
03:25 PM PDT

Mohamed Rostom *(Resident)*                    Date          Bassem Essam *(Resident)*                    Date

**Signed by Chellie Stinson**
Mon Oct 31 2016 15:58:09 PM PDT
Key: D9A84B6C; IP Address: 71.177.221.208

*(Owner/Agent)*                                                  Date

Initials: MR  BE                              10                         On-Site

# EXHIBIT 7

# LEASE WITH OPTION TO PURCHASE

This Agreement, dated January 1 2017, by and between an individual known as Bassem Elmallakh of 525 Broadway, Santa Monica, California, 90401, hereinafter known as the "Landlord",

**AND**

An individual known as Reem Hanna, hereinafter known as the "Tenant(s)", agree to the following:

**OCCUPANT(S)**: The Premises is to be occupied strictly as a residential dwelling with only the Tenant(s) mentioned above as the Occupant(s).

**OFFER TO RENT**: The Landlord hereby rents to the Tenant(s), subject to the following terms and conditions of this Agreement, a condominium with the address of 116 Rockefeller , Irvine, California, 92612 consisting of 3.5 bathroom(s) and 3 bedroom(s) hereinafter known as the "Premises". The Landlord may also use the address for notices sent to the Tenant(s).

**PURPOSE**: The Tenant(s) and any Occupant(s) may only use the Premises as a residential dwelling. It may not be used for storage, manufacturing of any type of food or product, professional service(s), or for any commercial use unless otherwise stated in this Agreement.

**FURNISHINGS**: The Premises is furnished with the following:

Bedroom Set(s), Dining Room Set(s), Kitchen Set (Including Pots, Pans, Glasses, Mugs, Dishes, etc.), Living Room Set(s) and all other furnishings to be provided by the Tenant(s). Any damage to the Landlord's furnishings shall be the liability of the Tenant(s), reasonable wear-and-tear excepted, to be billed directly or less the Security Deposit.

**APPLIANCES**: The Landlord shall provide the following appliances:

Air Conditioner(s), Dishwasher, Dryer (for Laundry), Fan(s), Hot Water Heater, HVAC, Iron (for Clothes), Microwave, Oven(s), Refrigerator, Stove(s), Television(s), Washer (for Laundry), with all other appliances to be provided by the Tenant(s). Any damage to the Landlord's appliances shall be the liability of the Tenant(s), reasonable wear-and-tear excepted, to be billed directly or less the Security Deposit.

**LEASE TERM**: This Agreement shall be a fixed-period arrangement beginning on January 1 2017 and ending on December 31 2024 with the Tenant(s) having the option to continue to occupy the Premises under the same terms and conditions of this Agreement under a Month-to-Month arrangement (Tenancy at Will) with either the Landlord or Tenant having the option to cancel the tenancy with at least thirty (30) days notice or the minimum time-period set by the State, whichever is shorter. For the Tenant to continue under Month-to-Month tenancy at the expiration of the Lease Term, the Landlord must be notified within sixty (60) days before the end of the Lease Term. Hereinafter known as the "Lease Term".

**RENT**: Tenant(s) shall pay the Landlord in equal monthly installments of $3,000.00 (US Dollars) hereinafter known as the "Rent". The Rent will be due on the First (1st) of every month and be paid via the following instructions:

Money Wire

**NON-SUFFICIENT FUNDS (NSF CHECKS)**: If the Tenant(s) attempts to pay the rent with a check that is not honored or an electronic transaction (ACH) due to insufficient funds (NSF) there shall be no fee (US Dollars).

**LATE FEE**: If rent is not paid on the due date, there shall be a late fee assessed by the Landlord in the amount of:

Calculated as 10% percent of the monthly rent per occurrence for each month payment that is late after the 4th Day rent is due.

**FIRST (1ST) MONTH'S RENT**: First (1st) month's rent shall be due by the Tenant(s) upon the execution of this Agreement.

**PRE-PAYMENT**: The Landlord shall not require any pre-payment of rent by the Tenant(s).

**PRORATION PERIOD**: The Tenant(s) will not move into the Premises before the start of the Lease Term.

**SECURITY DEPOSIT**: The Tenant(s) shall not be obligated to pay a Security Deposit as part of this Agreement.

**POSSESSION**: Tenant(s) has examined the condition of the Premises and by taking possession acknowledges that they have accepted the Premises in good order and in its current condition except as herein otherwise stated. Failure of the Landlord to deliver possession of the Premises at the start of the Lease Term to the Tenant(s) shall terminate this Agreement at the option of the Tenant(s). Furthermore, under such failure to deliver possession by the Landlord, and if the Tenant(s) cancels this Agreement, the Security Deposit (if any) shall be returned to the Tenant(s) along with any other pre-paid rent, fees, including if the Tenant(s) paid a fee during the application process before the execution of this Agreement.

**OPTION TO PURCHASE**. The Tenant(s) shall have the right to purchase the Premises described herein for 1,000,000.00 at any time during the course of the Lease Term, along with any renewal periods or extensions, by providing written notice to the Landlord along with a deposit of $50,000.00 that is subject to the terms and conditions of a Purchase and Sale Agreement to be negotiated, in "good faith", between the Landlord and Tenant(s).

If the Landlord and Tenant(s) cannot produce a signed Purchase and Sale Agreement within a reasonable time period then the deposit shall be refunded to the Tenant(s) and this Lease Agreement shall continue under its terms and conditions.

If the option to purchase is exercised by the Tenant(s) all Rent that is paid to the Landlord shall remain separate from any and all deposits, consideration, or payments, made to the Landlord in regards to the purchase of the Premises.

**RECORDING**. The Tenant(s) shall be withheld from recording this Option to Purchase unless the Tenant(s) has the written consent from the Landlord.

**ACCESS**: Upon the beginning of the Proration Period or the start of the Lease Term, whichever is earlier, the Landlord agrees to give access to the Tenant(s) in the form of keys, fobs, cards, or any type of keyless security entry as needed to enter the common areas and the Premises. Duplicate copies of the access provided may only be authorized under the consent of the Landlord and, if any

Page 2

replacements are needed, the Landlord may provide them for a fee. At the end of this Agreement all access provided to the Tenant(s) shall be returned to the Landlord or a fee will be charged to the Tenant(s) or the fee will be subtracted from the Security Deposit.

**MOVE-IN INSPECTION**: Before, at the time of the Tenant(s) accepting possession, or shortly thereafter, the Landlord and Tenant(s) shall perform an inspection documenting the present condition of all appliances, fixtures, furniture, and any existing damage within the Premises.

**SUBLETTING**: The Tenant(s) shall not have the right to sub-let the Premises or any part thereof without the prior written consent of the Landlord. If consent is granted by the Landlord, the Tenant(s) will be responsible for all actions and liabilities of the Sublessee including but not limited to: damage to the Premises, non-payment of rent, and any eviction process (In the event of an eviction the Tenant(s) shall be responsible for all court filing fee(s), representation, and any other fee(s) associated with removing the Sublessee). The consent by the Landlord to one sub-let shall not be deemed to be consent to any subsequent subletting.

**ABANDONMENT**: If the Tenant(s) vacates or abandons the property for a time-period that is the minimum set by State law or seven (7) days, whichever is less, the Landlord shall have the right to terminate this Agreement immediately and remove all belongings including any personal property off of the Premises. If the Tenant(s) vacates or abandons the property, the Landlord shall immediately have the right to terminate this Agreement.

**ASSIGNMENT**: Tenant(s) shall not assign this Lease without the prior written consent of the Landlord. The consent by the Landlord to one assignment shall not be deemed to be consent to any subsequent assignment.

**PARKING**: The Landlord shall provide the Tenant(s) 2 Parking Spaces.

The Landlord shall not charge a fee for the 2 Parking Spaces.

**RIGHT OF ENTRY**: The Landlord shall have the right to enter the Premises during normal working hours by providing notice in accordance with the minimum State requirement in order for inspection, make necessary repairs, alterations or improvements, to supply services as agreed or for any reasonable purpose. The Landlord may exhibit the Premises to prospective purchasers, mortgagees, or lessees upon reasonable notice.

**SALE OF PROPERTY**: If the Premises is sold, the Tenant(s) is to be notified of the new Owner, and if there is a new Manager, their contact details for repairs and maintenance shall be forwarded. If the Premises is conveyed to another party, the new owner shall not have the right to terminate this Agreement and it shall continue under the terms and conditions agreed upon by the Landlord and Tenant(s).

**UTILITIES**: The Landlord shall not pay for any of the utilities and services and will be the responsibility of the Tenant(s).

**MAINTENANCE, REPAIRS, OR ALTERATIONS**: The Tenant(s) shall, at their own expense and at all times, maintain premises in a clean and sanitary manner, and shall surrender the same at termination hereof, in as good condition as received, normal wear and tear excepted. The Tenant(s) may not make any alterations to the leased premises without the consent in writing of the Landlord. The Landlord shall be responsible for repairs to the interior and exterior of the building. If the Premises includes a washer, dryer, freezer, dehumidifier unit and/or air conditioning unit, the Landlord makes no warranty as to the repair or replacement of units if one or all shall fail to

operate. The Landlord will place fresh batteries in all battery-operated smoke detectors when the Tenant(s) moves into the premises. After the initial placement of the fresh batteries it is the responsibility of the Tenant(s) to replace batteries when needed. A monthly "cursory" inspection may be required for all fire extinguishers to make sure they are fully charged.

**EARLY TERMINATION**: The Tenant(s) may be allowed to cancel this Agreement under the following conditions:
The Tenant(s) must provide at least 30 days' notice. During the notice period of 30 days the rent shall be paid in accordance with this Agreement.

**PETS**: The Tenant(s) shall not be allowed to have pets on the Premises or common areas except those that are necessary for individuals with disabilities.

**NOISE/WASTE**: The Tenant(s) agrees not to commit waste on the premises, maintain, or permit to be maintained, a nuisance thereon, or use, or permit the premises to be used, in an unlawful manner. The Tenant(s) further agrees to abide by any and all local, county, and State noise ordinances.

**GUESTS**: There shall be no other persons living on the Premises other than the Tenant(s) and any Occupant(s). Guests of the Tenant(s) are allowed for periods not lasting for more than forty-eight hours unless otherwise approved by the Landlord.

**SMOKING POLICY**: Smoking on the Premises is prohibited on the entire property, including individual units, common areas, every building and adjoining properties.

**COMPLIANCE WITH LAW**: The Tenant(s) agrees that during the term of the Agreement, to promptly comply with any present and future laws, ordinances, orders, rules, regulations, and requirements of the Federal, State, County, City, and Municipal government or any of their departments, bureaus, boards, commissions and officials thereof with respect to the premises, or the use or occupancy thereof, whether said compliance shall be ordered or directed to or against the Tenant(s), the Landlord, or both.

**DEFAULT**: If the Tenant(s) fails to comply with any of the financial or material provisions of this Agreement, or of any present rules and regulations or any that may be hereafter prescribed by the Landlord, or materially fails to comply with any duties imposed on the Tenant(s) by statute or State laws, within the time period after delivery of written notice by the Landlord specifying the non-compliance and indicating the intention of the Landlord to terminate the Agreement by reason thereof, the Landlord may terminate this Agreement. If the Tenant(s) fails to pay rent when due and the default continues for the time-period specified in the written notice thereafter, the Landlord may, at their option, declare the entire balance (compiling all months applicable to this Agreement) of rent payable hereunder to be immediately due and payable and may exercise any and all rights and remedies available to the Landlord at law or in equity and may immediately terminate this Agreement.

The Tenant(s) will be in default if: (a) Tenant(s) does not pay rent or other amounts that are owed in accordance with respective State laws; (b) Tenant(s), their guests, or the Occupant(s) violate this Agreement, rules, or fire, safety, health, or criminal laws, regardless of whether arrest or conviction occurs; (c) Tenant(s) abandons the Premises; (d) Tenant(s) gives incorrect or false information in the rental application; (e) Tenant(s), or any Occupant(s) is arrested, convicted, or given deferred adjudication for a criminal offense involving actual or potential physical harm to a person, or involving possession, manufacture, or delivery of a controlled substance, marijuana, or drug paraphernalia under state statute; (f) any illegal drugs or paraphernalia are found in the Premises or

on the person of the Tenant(s), guests, or Occupant(s) while on the Premises and/or; (g) as otherwise allowed by law.

**MULTIPLE TENANT(S) OR OCCUPANT(S)**: Each individual that is considered a Tenant(s) is jointly and individually liable for all of this Agreement's obligations, including but not limited to rent monies. If any Tenant(s), guest, or Occupant(s) violates this Agreement, the Tenant(s) is considered to have violated this Agreement. Landlord's requests and notices to the Tenant(s) or any of the Occupant(s) of legal age constitutes notice to the Tenant(s). Notices and requests from the Tenant(s) or any one of the Occupant(s) (including repair requests and entry permissions) constitutes notice from the Tenant(s). In eviction suits, the Tenant(s) is considered the agent of the Premise for the service of process.

**DISPUTES**: If a dispute arises during or after the term of this Agreement between the Landlord and Tenant(s), they shall agree to hold negotiations amongst themselves, in "good faith", before any litigation.

**SEVERABILITY**: If any provision of this Agreement or the application thereof shall, for any reason and to any extent, be invalid or unenforceable, neither the remainder of this Agreement nor the application of the provision to other persons, entities or circumstances shall be affected thereby, but instead shall be enforced to the maximum extent permitted by law.

**SURRENDER OF PREMISES**: The Tenant(s) has surrendered the Premises when (a) the move-out date has passed and no one is living in the Premise within the Landlord's reasonable judgment; or (b) Access to the Premise have been turned in to Landlord – whichever comes first. Upon the expiration of the term hereof, the Tenant(s) shall surrender the Premise in better or equal condition as it were at the commencement of this Agreement, reasonable use, wear and tear thereof, and damages by the elements excepted.

**RETALIATION**: The Landlord is prohibited from making any type of retaliatory acts against the Tenant(s) including but not limited to restricting access to the Premises, decreasing or cancelling services or utilities, failure to repair appliances or fixtures, or any other type of act that could be considered unjustified.

**WAIVER**: A Waiver by the Landlord for a breach of any covenant or duty by the Tenant(s), under this Agreement is not a waiver for a breach of any other covenant or duty by the Tenant(s), or of any subsequent breach of the same covenant or duty. No provision of this Agreement shall be considered waived unless such a waiver shall be expressed in writing as a formal amendment to this Agreement and executed by the Tenant(s) and Landlord.

**EQUAL HOUSING**: If the Tenant(s) possess(es) any mental or physical impairment, the Landlord shall provide reasonable modifications to the Premises unless the modifications would be too difficult or expensive for the Landlord to provide. Any impairment of the Tenant(s) is/are encouraged to be provided and presented to the Landlord in writing in order to seek the most appropriate route for providing the modifications to the Premises.

**HAZARDOUS MATERIALS**: The Tenant(s) agrees to not possess any type of personal property that could be considered a fire hazard such as a substance having flammable or explosive characteristics on the Premises. Items that are prohibited to be brought into the Premises, other than for everyday cooking or the need of an appliance, includes but is not limited to gas (compressed), gasoline, fuel, propane, kerosene, motor oil, fireworks, or any other related content in the form of a liquid, solid, or gas.

**WATERBEDS**: The Tenant(s) is not permitted to furnish the Premises with waterbeds.

**INDEMNIFICATION**: The Landlord shall not be liable for any damage or injury to the Tenant(s), or any other person, or to any property, occurring on the Premises, or any part thereof, or in common areas thereof, and the Tenant(s) agrees to hold the Landlord harmless from any claims or damages unless caused solely by the Landlord's negligence. It is recommended that renter's insurance be purchased at the Tenant(s)'s expense.

**COVENANTS**: The covenants and conditions herein contained shall apply to and bind the heirs, legal representatives, and assigns of the parties hereto, and all covenants are to be construed as conditions of this Agreement.

**NOTICES**: Any notice to be sent by the Landlord or the Tenant(s) to each other shall use the following mailing addresses:

**Landlord's/Agent's Mailing Address**

Bassem Elmallakh
525 Broadway, Santa Monica, California, 90401

**Tenant(s)'s Mailing Address**

Reem Hanna
116 Rockefeller , Irvine, California, 92612

**AGENT/MANAGER**: The Landlord does not have an Agent or Manager and all contact in regards to any repair, maintenance, or complaint must go through the Landlord through the following contact information:

Landlord's Phone Number: (949) 413-7074 Email: bassemelmallakh@gmail.com.

**PREMISES DEEMED UNINHABITABLE**: If the Property is deemed uninhabitable due to damage beyond reasonable repair the Tenant(s) will be able to terminate this Agreement by written notice to the Landlord. If said damage was due to the negligence of the Tenant(s), the Tenant(s) shall be liable to the Landlord for all repairs and for the loss of income due to restoring the Premises back to a livable condition in addition to any other losses that can be proved by the Landlord.

**ACCESS BY LANDLORD**: The Landlord must grant at least twenty-four (24) hours notice to the Tenant(s) prior to entry for maintenance or any non-emergency reason. For any move-out inspection forty-eight (48) hours notice by Landlord shall be required.

**BED BUGS**: The Landlord acknowledges that there is no existence of bed bugs on the Premises. In addition, there shall be an addendum attached to this agreement that certifies the Tenant(s) have inspected the Premises and any existing furniture and confirm that bed bugs do not exist on the Premises.

**MEGAN'S LAW**: Notice: Pursuant to Section 290.46 of the Penal Code, information about specified registered sex offenders is made available to the public via an Internet Web site maintained by the Department of Justice at www.meganslaw.ca.gov. Depending on an offender's criminal history, this information will include either the address at which the offender resides or the community of residence and ZIP Code in which he or she resides.

**SERVICEMEMBERS CIVIL RELIEF ACT:** In the event the Tenant(s) is or hereafter becomes, a member of the United States Armed Forces on extended active duty and hereafter the Tenant(s) receives permanent change of station (PCS) orders to depart from the area where the Premises are located, or is relieved from active duty, retires or separates from the military, is ordered into military housing, or receives deployment orders, then in any of these events, the Tenant may terminate this lease upon giving thirty (30) days written notice to the Landlord. The Tenant shall also provide to the Landlord a copy of the official orders or a letter signed by the Tenant's commanding officer, reflecting the change which warrants termination under this clause. The Tenant will pay prorated rent for any days which he/she occupies the dwelling past the beginning of the rental period.

The damage/security deposit will be promptly returned to Tenant, provided there are no damages to the Premises.

**LEAD PAINT:** The Premises was not constructed before 1978 and therefore does not contain lead-based paint.

**GOVERNING LAW:** This Agreement is to be governed under the laws located in the State of California.

**ADDITIONAL TERMS AND CONDITIONS:** There are no further terms or conditions that will be added to this Agreement other than any attachments or addendums attached.

**ENTIRE AGREEMENT:** This Agreement contains all the terms agreed to by the parties relating to its subject matter including any attachments or addendums. This Agreement replaces all previous discussions, understandings, and oral agreements. The Landlord and Tenant(s) agree to the terms and conditions and shall be bound until the end of the Lease Term.

The parties have agreed and executed this agreement on January 1 2017.

**LANDLORD(S) SIGNATURE**

**Landlord's Signature** _____
By Bassem ElMallakh

**TENANT(S) SIGNATURE**

**Tenant's Signature** _____

Page 7

# EXHIBIT 8

# Checking/Savings Account History

**STATEMENT MAILING NAME:   BASSEM E ELMALLAKH**

Show 10 entries

Search:

| Date | Description | Image Available | Check Number | Amount | Balance |
|------|-------------|-----------------|--------------|--------|---------|
| 02/08/2021 | OVERDRAFT XFER FROM CREDIT CARD OR LINE | No | | +69.88 | |
| 02/08/2021 | ATT Payment 020621 217902014EPAYX BASSEM ELMALLAKH 9864031004 217902014EPAYX 0R00000091004231871889 | No | | 69.88 | -69.88 |
| 02/05/2021 | OVERDRAFT XFER FROM CREDIT CARD OR LINE | No | | +150.00 | |
| 02/05/2021 | AMERICAN EXPRESS ACH PMT 210205 A0020 BASSEM E ELMALLAKH 6133133497 A0020 0O00000091003736781926 | No | | 150.00 | -150.00 |
| 02/03/2021 | LEGAL ORDER DEBIT - CONTACT OC SHERIFF (480) 724-2000 - Case# 4792621 | No | | 569.00 | |
| 02/02/2021 | PORTFOLIO MONTHLY SERVICE FEE REVERSAL | No | | +30.00 | 569.00 |
| 02/02/2021 | PORTFOLIO BY WELLS FARGO MNTHLY SRVC FEE | No | | 30.00 | 539.00 |
| 01/07/2021 | ATT Payment 010621 776777011EPAYS BASSEM ELMALLAKH 9864031004 776777011EPAYS 0R00000091003957942166 | No | | 69.80 | 569.00 |
| 01/05/2021 | PORTFOLIO MONTHLY SERVICE FEE REVERSAL | No | | +30.00 | 638.80 |
| 01/05/2021 | PORTFOLIO BY WELLS FARGO MNTHLY SRVC FEE | No | | 30.00 | 608.80 |

Showing 1 to 10 of 14 entries

Previous **1** 2 Next

CLOSE

# Checking/Savings Account History

**STATEMENT MAILING NAME:  BASSEM E ELMALLAKH**

Regulation D Withdrawals:    0 (Current Service Charge Cycle)

Show 10 ⌄ entries                                          Search: [          ]

| Date | Description | Image Available | Check Number | Amount | Balance |
|------|-------------|-----------------|--------------|--------|---------|
| 02/03/2021 | LEGAL ORDER FEE DEBIT CASE# 4792621 | No | | 125.00 | |
| 02/03/2021 | LEGAL ORDER DEBIT - CONTACT OC SHERIFF (480) 724-2000 - Case# 4792621 | No | | 2,083.40 | 125.00 |
| 01/29/2021 | MONTHLY SERVICE FEE REVERSAL | No | | +10.00 | 2,208.40 |
| 01/29/2021 | MONTHLY SERVICE FEE | No | | 10.00 | 2,198.40 |
| 01/29/2021 | INTEREST PAYMENT | No | | +0.03 | 2,208.40 |
| 12/31/2020 | MONTHLY SERVICE FEE REVERSAL | No | | +10.00 | 2,208.37 |
| 12/31/2020 | MONTHLY SERVICE FEE | No | | 10.00 | 2,198.37 |
| 12/31/2020 | INTEREST PAYMENT | No | | +0.04 | 2,208.37 |
| 11/30/2020 | MONTHLY SERVICE FEE REVERSAL | No | | +10.00 | 2,208.33 |
| 11/30/2020 | MONTHLY SERVICE FEE | No | | 10.00 | 2,198.33 |

Showing 1 to 10 of 11 entries                        Previous  | 1 |  2   Next

CLOSE

# Checking/Savings Account History

STATEMENT MAILING NAME:   **BASSEM E ELMALLAKH**

Show 10 ⌄ entries                                               Search: [                    ]

| Date | Description | Image Available | Check Number | Amount | Balance |
|------|-------------|-----------------|--------------|--------|---------|
| 02/03/2021 | LEGAL ORDER DEBIT - CONTACT OC SHERIFF (480) 724-2000 - Case# 4792621 | No | | 12,006.97 | 1,788.00 |
| 01/29/2021 | INTEREST PAYMENT | No | | +0.12 | 13,794.97 |
| 12/31/2020 | INTEREST PAYMENT | No | | +0.11 | 13,794.85 |
| 11/30/2020 | INTEREST PAYMENT | No | | +0.12 | 13,794.74 |

Showing 1 to 4 of 4 entries                                    Previous   1   Next

CLOSE

# Checking/Savings Account History

**STATEMENT MAILING NAME: BASSEM E ELMALLAKH**

Show 10 ⌄ entries

Search: [            ]

| Date | Description | Image Available | Check Number | Amount | Balance |
|------|-------------|-----------------|--------------|--------|---------|
| 02/03/2021 | LEGAL ORDER DEBIT - CONTACT OC SHERIFF (480) 724-2000 - Case# 4792621 | No | | 7,634.49 | |
| 01/27/2021 | MONTHLY SERVICE FEE REVERSAL | No | | +15.00 | 7,634.49 |
| 01/27/2021 | MONTHLY SERVICE FEE | No | | 15.00 | 7,619.49 |
| 01/27/2021 | INTEREST PAYMENT | No | | +0.07 | 7,634.49 |
| 12/23/2020 | MONTHLY SERVICE FEE REVERSAL | No | | +15.00 | 7,634.42 |
| 12/23/2020 | MONTHLY SERVICE FEE | No | | 15.00 | 7,619.42 |
| 12/23/2020 | INTEREST PAYMENT | No | | +0.06 | 7,634.42 |
| 11/25/2020 | MONTHLY SERVICE FEE REVERSAL | No | | +15.00 | 7,634.36 |
| 11/25/2020 | MONTHLY SERVICE FEE | No | | 15.00 | 7,619.36 |
| 11/25/2020 | INTEREST PAYMENT | No | | +0.06 | 7,634.36 |

Showing 1 to 10 of 10 entries

Previous [ 1 ] Next

CLOSE

# Checking/Savings Account History

**STATEMENT MAILING NAME:    BASSEM E ELMALLAKH**

Show 10 ⌄ entries                                                        Search: ☐

| Date | Description | Image Available | Check Number | Amount | Balance |
|------|-------------|-----------------|--------------|--------|---------|
| 02/03/2021 | LEGAL ORDER DEBIT - CONTACT OC SHERIFF (480) 724-2000 - Case# 4792621 | No | | 6,852.90 | |
| 01/29/2021 | INTEREST PAYMENT | No | | +0.06 | 6,852.90 |
| 12/31/2020 | INTEREST PAYMENT | No | | +0.05 | 6,852.84 |
| 11/30/2020 | INTEREST PAYMENT | No | | +0.06 | 6,852.79 |

Showing 1 to 4 of 4 entries                                    Previous  1  Next

CLOSE

# EXHIBIT 9



PO Box 183164
Columbus, OH 43218-3164

**Questions?**
📞 **1-866-578-7022**

00420 COL 703 020 04121 NNNNNNNNNNNN CL1 E
**BASSEM ELMALLAKH**
525 BROADWAY APT 5037
SANTA MONICA CA 90401-2964

February 10, 2021

**Amended**

**Important:** **Federal/state law required us to place a hold on your Chase account(s), which may include safe deposit box(es)**

Dear BASSEM ELMALLAKH:

We recently received the enclosed court order, which either enforces a legal judgment against you or secures a possible judgment in a lawsuit that's been filed against you. As a result, federal or state law required us to immediately place a hold on your Chase account(s). This means that you aren't able to use or withdraw any amount(s) less than or equal to the amount of the hold until the hold is released.

| Date We Placed Hold | Account Number (Last Four Digits) | Amount of Hold* |
|---|---|---|
| 02/10/2021 | 3252 | $16809.64 |
| 02/10/2021 | 0395 | $0.27 |
| 02/10/2021 | 7332 | $736.89 |

*The hold amount may be greater or less than the balance in your Chase accounts.

We know this situation is difficult because you can't access these funds in your account. Although we're not permitted to give you legal advice, we are providing some information in this letter to explain how your account is affected and to help you understand your options.

**Here's how this affects your account**
The following may apply based on your account type.

The amount that has a hold on it stays in your account, but you cannot use it for withdrawals, payments or any other reason.

Additionally, please note the following:
- If withdrawals are returned because your account doesn't have available funds, we may charge you Overdraft or Insufficient Funds Fee(s).
- We may have disconnected your Overdraft Protection service.
- We may charge you a Legal Processing Fee of $0.00.
- In certain states, you may also be responsible for the bank's fees if we are required to obtain outside counsel.

COAL-08Feb21-894
JPMorgan Chase Bank, N.A.

**Understanding your options**
You may have options to access some funds or to have the hold on your account released. These options are outlined below.

**Getting your money back**
You may be able to reduce the amount of the hold. Federal and state laws protect certain money from being used to pay most judgments or court orders, including:
- Social Security
- Supplemental Security Income (SSI)
- Veterans benefits

Depending on where you live, protected money may also include:
- Funds from public assistance (welfare)
- Alimony or child support
- Unemployment benefits
- Disability benefits
- Public or private pensions
- Workers' compensation benefits

These protections generally don't apply to business accounts. If you think your funds may be protected, contact the judgment creditor's attorney.

**Releasing the hold on your account(s)**
We can only release the hold on your account if we receive a written release of the court order signed by the judgment creditor's attorney or the court. In most situations, you're the only one who can ask the judgment creditor's attorney or the court to release your funds.

If you have questions or would like to request a written release of your funds, please call the judgment creditor's attorney at 1-213-364-7581 or the court at the number on the enclosed order. If they agree to send us a written release, they can mail it to us at the address listed on the first page of this letter.

Otherwise, we're required by law to hold the funds in your account(s) until:
- We send the funds to the issuer as required by law; or
- The hold expiration date, if applicable. If there's a hold expiration date, you'll see it on the enclosed court order. We recommend you review it carefully.

**Getting legal advice**
If you need legal advice, you should consult an attorney. If you're unable to afford a private attorney, you can visit the Legal Services Corporation's website at lsc.gov to find out where to go in your area for help.

**We're here to help**
If you have questions, please call us at 1-866-578-7022. We're here to help you Monday through Friday from 8 a.m. to 9 p.m. and Saturday from 8 a.m. to 7 p.m. Eastern Time.

Sincerely,

*Steven J. Criswell*

Steven J. Criswell
Executive Director
Customer Service

Enclosure

CL1

**DEC**

**2**

1   Michael Sayer, State Bar No. 141038
2   Debt Recovery Attorneys
    17595 Harvard Ave., Suite C-557
3   Irvine, CA 92614
    Tel. (949) 292-3511
4   Dra@dracollections.com

5   Attorneys for Defendant, BASSEM ESSAM EL MALLAKH

6

7

8                   SUPERIOR COURT OF CALIFORNIA

9                       COUNTY OF ORANGE

10

11  BELGIUM INVESTMENTS 960 BAY      ) CASE NO: 30-2020-01148745
    DR., LLC, a California Corp.      )
12                                    )
13      Plaintiff,                    ) DECLARATION OF REEM HANNA IN SUPPORT
                                      ) OF DEFENDANT'S MOTION TO SET ASIDE AND
14      v.                            ) VACATE SISTER STATE JUDGMENT AND TO
                                      ) VACATE THE ABSTRACT OF JUDGMENT AND
15  SPENCE BANK ET AL                 ) WRIT OF EXECUTION
                                      )
16      Defendant.                    ) Date:
                                      ) Time:
17                                    ) Place:
18  _____  )
                                       Reservation No.
19

20                  **DECLARATION OF REEM HANNA**

21  1.      I, REEM HANNA, hereby declare as follows:

22  2.      I am over the age of 18 years and am fully familiar with the facts and circumstances
23
    surrounding this litigation and could and would competently testify thereto if called upon to do so.
24
25  3.      I have been residing fulltime at my residence at 116 Rockefeller, Irvine CA since
26  since 1/1/17. Attached hereto is as Ex.7 is a true and correct copy of the lease I executed for my
27
                                      – 1 –
28  DECLARATION OF REEM HANNA IN SUPPORT OF DEFENDANT'S MOTION TO SET ASIDE AND VACATE
    SISTER STATE JUDGMENT AND TO VACATE THE ABSTRACT OF JUDGMENT AND WRIT OF EXECUTION

residence.

4.      I have never been served with the Application For Entry of Sister State Judgment, the Notice of Entry of Sister State Judgment or the Sister State Judgment.

5.      The process server never served me as claimed in the proof of service attached as Ex.5.

6.      The proof of serve states at section 5.b. that the process server left a copy of the documents with, "Hanna Reem *co-occupant* to Bassem Essam El Mallakh." (Emphases added).  This is a complete untruth.  First, I was never served, and second Bassem Essam El Mallakh is not nor ever has been a co-occupant at my residence. Since the inception of the lease Bassem Essam El Mallakh has never been a co-occupant.

    I declare under penalty of perjury that the forgoing is true and correct.

Dated: 2/17/2021

Reem Hanna

DECLARATION OF REEM HANNA IN SUPPORT OF DEFENDANT'S MOTION TO SET ASIDE AND VACATE SISTER STATE JUDGMENT AND TO VACATE THE ABSTRACT OF JUDGMENT AND WRIT OF EXECUTION

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### PROOF OF ELECTRONIC SERVICE

I am employed in the County of ORANGE, State of California. I am over the age of 18 and not a party to the within action. My business address is, 17595 Harvard, Suite C-557, Irvine, CA 92614.

On the date indicated below, I served by ELECTRONIC SERVICE the foregoing document described as DECLARATION OF REEM HANNA IN SUPPORT OF DEFENDANT'S MOTION TO SET ASIDE AND VACATE SISTER STATE JUDGMENT AND TO VACATE THE ABSTRACT OF JUDGMENT AND WRIT OF EXECUTION all interested to the electronic address as listed for each party and attorney below, using the e-filing service pursuant to 2019 California Rules of Court Rule 2.251.(b), Electronic service

| Patrick Miller<br>P Miller Legal Services<br>285 E. California, Unite 201<br>Pasadena, CA 91106<br>Partick.miller@pmillerlegal.com | |

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on this 2/17/2021, at Irvine, California.

*Michael Sayer*
Michael Sayer

– 3 –
DECLARATION OF REEM HANNA IN SUPPORT OF DEFENDANT'S MOTION TO SET ASIDE AND VACATE
SISTER STATE JUDGMENT AND TO VACATE THE ABSTRACT OF JUDGMENT AND WRIT OF EXECUTION

# EXHIBIT 5

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*
P MILLER LEGAL SERVICES
PATRICK MILLER
285 E CALIFORNIA BLVD UNIT 102
PASADENA, CA 91106
   TELEPHONE NO: 213 364 7581     FAX NO *(Optional)*:
E-MAIL ADDRESS *(Optional)*: patrick.miller@pmillerlegal.com
   ATTORNEY FOR *(Name)*:

**POS-010**

FOR COURT USE ONLY

SUPERIOR COURT OF CALIFORNIA, COUNTY OF  Orange
   STREET ADDRESS: 700 Civic Center Drive West
   MAILING ADDRESS:
   CITY AND ZIP CODE: Santa Ana, 92701-4045
   BRANCH NAME: Superior Court of California, County of Orange

PLAINTIFF / PETITIONER: Belgium Investments 960 Bay Dr, LLC, a California Corp.
DEFENDANT / RESPONDENT: Bassem Essam El Mallakh

| | |
|---|---|
| **PROOF OF SERVICE OF SUMMONS** | CASE NUMBER:<br>30-2020-01148745-CU-EN-CJC |
| | Ref. No. or File No.:<br>4697271 |

*(Separate proof of service is required for each party served.)*

1. At the time of service I was at least 18 years of age and not a party to this action.
2. I served copies of:
   a. ☐ summons
   b. ☐ complaint
   c. ☐ Alternative Dispute Resolution (ADR) package
   d. ☐ Civil Case Cover Sheet *(served in complex cases only)*
   e. ☐ cross-complaint
   f. ☒ other *(specify documents)*: NOTICE OF ENTRY OF JUDGMENT ON SISTER-STATE JUDGMENT (EJ-110) , Conformed APPLICATION FOR ENTRY OF JUDGMENT ON SISTER-STATE JUDGMENT (EJ-105) , Conformed Copy FINAL JUDGMENT AGAINST BASSEM ESSAM EL MALLAKH dated February 21, 2020

3. a. Party served *(specify name of party as shown on documents served)*:
   BASSEM ESSAM EL MALLAKH
   b. ☐ Person (other than the party in item 3a) served on behalf of an entity or as an authorized agent (and not a person under item 5b on whom substituted service was made) *(specify name and relationship to the party named in item 3a)*:

4. Address where the party was served:
   116 ROCKEFELLER, IRVINE, CA 92612

5. I served the party *(check proper box)*
   a. ☐ **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on *(date)*:    (2) at *(time)*:
   b. ☒ **by substituted service.** On *(date)*: Sun, Sep 13 2020   at *(time)*: 09:20 PM   I left the documents listed in item 2 with or in the presence of *(name and title or relationship to person indicated in item 3)*:
   by leaving copies with Hanna Reem co-occupant to BASSEM ESSAM EL MALLAKH
      (1) ☐ **(business)** a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served. I informed him or her of the general nature of the papers.
      (2) ☐ **(home)** a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party. I informed him or her of the general nature of the papers.
      (3) ☒ **(physical address unknown)** a person at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box. I informed him or her of the general nature of the papers.
      (4) ☒ I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ. Proc., § 415.20). I mailed the documents on *(date)*: Sep 14 2020 from *(city)*: Santa ana   or ☐ a declaration of mailing is attached.
      (5) ☒ I attach a **declaration of diligence** stating actions taken first to attempt personal service.

Form Adopted for Mandatory Use
Judicial Council of California
POS-010 [Rev. January 1, 2007]

**PROOF OF SERVICE OF SUMMONS**

Page 1 of 2
Code of Civil Procedure, § 417.10

| PLAINTIFF / PETITIONER: Belgium Investments 960 Bay Dr, LLC, a California Corp | CASE NUMBER: |
|---|---|
| DEFENDANT / RESPONDENT: Bassem Essam El Mallakh | 30-2020-01148745-CU-EN-CJC |

5.  c.  ☐   **by mail and acknowledgment of receipt of service.** I mailed the documents listed in item 2 to the party, to the address shown in item 4, by first-class mail, postage prepaid,

      (1)  on *(date):*                (2)  from *(city):*

      (3)  ☐   with two copies of the *Notice and Acknowledgment of Receipt* and a postage-paid return envelope addressed to me. *(Attach completed Notice and Acknowledgement of Receipt.)* (Code Civ. Proc., § 415.30.)

      (4)  ☐   to an address outside California with return receipt requested. (Code Civ. Proc., § 415.40.)

  d.  ☐   **by other means** *(specify means of service and authorizing code section):*

      ☐   Additional page describing service is attached.

6.  The "Notice to the Person Served" (on the summons) was completed as follows:

  a.  ☒   as an individual defendant.

  b.  ☐   as the person sued under the fictitious name of *(specify):*

  c.  ☐   as occupant.

  d.  ☐   On behalf of *(specify):*

      under the following Code of Civil Procedure section:

| | |
|---|---|
| ☐ 416.10 (corporation) | ☐ 415.95 (business organization, form unknown) |
| ☐ 416.20 (defunct corporation) | ☐ 416.60 (minor) |
| ☐ 416.30 (joint stock company/association) | ☐ 416.70 (ward or conservatee) |
| ☐ 416.40 (association or partnership) | ☐ 416.90 (authorized person) |
| ☐ 416.50 (public entity) | ☐ 415.46 (occupant) |
| ☐ other: | |

7.  **Person who served papers**

  a.  Name:          Michael Danley

  b.  Address:       333 City Blvd 17th Flr, Orange, Ca 92868

  c.  Telephone number:  714-971-2217

  d.  **The fee** for service was:  $71.98

  e.  I am:

      (1)  ☐   not a registered California process server.

      (2)  ☐   exempt from registration under Business and Professions Code section 22350(b).

      (3)  ☒   a registered California process server:

          (i)  ☐ owner  ☐ employee  ☐ independent contractor

          (ii)  Registration No:  Reg Orange Co. 1782

          (iii)  County:

8.  ☒   **I declare** under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

    or

9.  ☐   **I am a California sheriff or marshal and** I certify that the foregoing is true and correct.

Date:  9/15/20

Michael Danley                                             _____

_____                       (SIGNATURE)

(NAME OF PERSON WHO SERVED PAPERS / SHERIFF OR MARSHAL)

| | | MC-031 |
|---|---|---|
| PLAINTIFF / PETITIONER: Belgium Investments 960 Bay Dr, LLC, a California Corp. | | |
| DEFENDANT / RESPONDENT: Bassem Essam El Mallakh | CASE NUMBER:<br>30-2020-01148745-CU-EN-CJC | |

## DECLARATION OF DILIGENCE

(This form must be attached to another form or court paper before it can be filed in court.)

1) Unsuccessful Attempt: Sep 12, 2020, 10:05 am PDT at 116 ROCKEFELLER, IRVINE, CA 92612

I received this service last week of July I made many attempts to serve the defendant, several of the attempts were at other address such as 405 Rockefeller Irvine Occupant never hear of the defendant. Also 606 Rockefeller Irvine again occupant never heard of the defendant.

2) Unsuccessful Attempt: Sep 13, 2020, 9:10 am PDT at 116 ROCKEFELLER, IRVINE, CA 92612
No answer at door

3) Unsuccessful Attempt: Sep 13, 2020, 8:27 pm PDT at 116 ROCKEFELLER, IRVINE, CA 92612
No answer at door

4) Successful Attempt: Sep 13, 2020, 9:20 pm PDT at 116 ROCKEFELLER, IRVINE, CA 92612 received by Hanna Reem co-occupant to BASSEM ESSAM EL MALLAKH

**I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.**

Date:   9/15/20

Michael Danley
_____
(TYPE OR PRINT NAME)

_____
(SIGNATURE OF DECLARANT)

☐ Attorney for   ☐ Plaintiff   ☐ Petitioner   ☐ Defendant
☐ Respondent   ☐ Other (Specify):

# EXHIBIT 7

# LEASE WITH OPTION TO PURCHASE

This Agreement, dated January 1 2017, by and between an individual known as Bassem Elmallakh of 525 Broadway, Santa Monica, California, 90401, hereinafter known as the "Landlord",

**AND**

An individual known as Reem Hanna, hereinafter known as the "Tenant(s)", agree to the following:

**OCCUPANT(S)**: The Premises is to be occupied strictly as a residential dwelling with only the Tenant(s) mentioned above as the Occupant(s).

**OFFER TO RENT**: The Landlord hereby rents to the Tenant(s), subject to the following terms and conditions of this Agreement, a condominium with the address of 116 Rockefeller , Irvine, California, 92612 consisting of 3.5 bathroom(s) and 3 bedroom(s) hereinafter known as the "Premises". The Landlord may also use the address for notices sent to the Tenant(s).

**PURPOSE**: The Tenant(s) and any Occupant(s) may only use the Premises as a residential dwelling. It may not be used for storage, manufacturing of any type of food or product, professional service(s), or for any commercial use unless otherwise stated in this Agreement.

**FURNISHINGS**: The Premises is furnished with the following:

Bedroom Set(s), Dining Room Set(s), Kitchen Set (Including Pots, Pans, Glasses, Mugs, Dishes, etc.), Living Room Set(s) and all other furnishings to be provided by the Tenant(s). Any damage to the Landlord's furnishings shall be the liability of the Tenant(s), reasonable wear-and-tear excepted, to be billed directly or less the Security Deposit.

**APPLIANCES**: The Landlord shall provide the following appliances:

Air Conditioner(s), Dishwasher, Dryer (for Laundry), Fan(s), Hot Water Heater, HVAC, Iron (for Clothes), Microwave, Oven(s), Refrigerator, Stove(s), Television(s), Washer (for Laundry), with all other appliances to be provided by the Tenant(s). Any damage to the Landlord's appliances shall be the liability of the Tenant(s), reasonable wear-and-tear excepted, to be billed directly or less the Security Deposit.

**LEASE TERM**: This Agreement shall be a fixed-period arrangement beginning on January 1 2017 and ending on December 31 2024 with the Tenant(s) having the option to continue to occupy the Premises under the same terms and conditions of this Agreement under a Month-to-Month arrangement (Tenancy at Will) with either the Landlord or Tenant having the option to cancel the tenancy with at least thirty (30) days notice or the minimum time-period set by the State, whichever is shorter. For the Tenant to continue under Month-to-Month tenancy at the expiration of the Lease Term, the Landlord must be notified within sixty (60) days before the end of the Lease Term. Hereinafter known as the "Lease Term".

**RENT**: Tenant(s) shall pay the Landlord in equal monthly installments of $3,000.00 (US Dollars) hereinafter known as the "Rent". The Rent will be due on the First (1st) of every month and be paid via the following instructions:

Money Wire

**NON-SUFFICIENT FUNDS (NSF CHECKS)**: If the Tenant(s) attempts to pay the rent with a check that is not honored or an electronic transaction (ACH) due to insufficient funds (NSF) there shall be no fee (US Dollars).

**LATE FEE**: If rent is not paid on the due date, there shall be a late fee assessed by the Landlord in the amount of:

Calculated as 10% percent of the monthly rent per occurrence for each month payment that is late after the 4th Day rent is due.

**FIRST (1ST) MONTH'S RENT**: First (1st) month's rent shall be due by the Tenant(s) upon the execution of this Agreement.

**PRE-PAYMENT**: The Landlord shall not require any pre-payment of rent by the Tenant(s).

**PRORATION PERIOD**: The Tenant(s) will not move into the Premises before the start of the Lease Term.

**SECURITY DEPOSIT**: The Tenant(s) shall not be obligated to pay a Security Deposit as part of this Agreement.

**POSSESSION**: Tenant(s) has examined the condition of the Premises and by taking possession acknowledges that they have accepted the Premises in good order and in its current condition except as herein otherwise stated. Failure of the Landlord to deliver possession of the Premises at the start of the Lease Term to the Tenant(s) shall terminate this Agreement at the option of the Tenant(s). Furthermore, under such failure to deliver possession by the Landlord, and if the Tenant(s) cancels this Agreement, the Security Deposit (if any) shall be returned to the Tenant(s) along with any other pre-paid rent, fees, including if the Tenant(s) paid a fee during the application process before the execution of this Agreement.

**OPTION TO PURCHASE**. The Tenant(s) shall have the right to purchase the Premises described herein for 1,000,000.00 at any time during the course of the Lease Term, along with any renewal periods or extensions, by providing written notice to the Landlord along with a deposit of $50,000.00 that is subject to the terms and conditions of a Purchase and Sale Agreement to be negotiated, in "good faith", between the Landlord and Tenant(s).

If the Landlord and Tenant(s) cannot produce a signed Purchase and Sale Agreement within a reasonable time period then the deposit shall be refunded to the Tenant(s) and this Lease Agreement shall continue under its terms and conditions.

If the option to purchase is exercised by the Tenant(s) all Rent that is paid to the Landlord shall remain separate from any and all deposits, consideration, or payments, made to the Landlord in regards to the purchase of the Premises.

**RECORDING**. The Tenant(s) shall be withheld from recording this Option to Purchase unless the Tenant(s) has the written consent from the Landlord.

**ACCESS**: Upon the beginning of the Proration Period or the start of the Lease Term, whichever is earlier, the Landlord agrees to give access to the Tenant(s) in the form of keys, fobs, cards, or any type of keyless security entry as needed to enter the common areas and the Premises. Duplicate copies of the access provided may only be authorized under the consent of the Landlord and, if any

replacements are needed, the Landlord may provide them for a fee. At the end of this Agreement all access provided to the Tenant(s) shall be returned to the Landlord or a fee will be charged to the Tenant(s) or the fee will be subtracted from the Security Deposit.

**MOVE-IN INSPECTION**: Before, at the time of the Tenant(s) accepting possession, or shortly thereafter, the Landlord and Tenant(s) shall perform an inspection documenting the present condition of all appliances, fixtures, furniture, and any existing damage within the Premises.

**SUBLETTING**: The Tenant(s) shall not have the right to sub-let the Premises or any part thereof without the prior written consent of the Landlord. If consent is granted by the Landlord, the Tenant(s) will be responsible for all actions and liabilities of the Sublessee including but not limited to: damage to the Premises, non-payment of rent, and any eviction process (In the event of an eviction the Tenant(s) shall be responsible for all court filing fee(s), representation, and any other fee(s) associated with removing the Sublessee). The consent by the Landlord to one sub-let shall not be deemed to be consent to any subsequent subletting.

**ABANDONMENT**: If the Tenant(s) vacates or abandons the property for a time-period that is the minimum set by State law or seven (7) days, whichever is less, the Landlord shall have the right to terminate this Agreement immediately and remove all belongings including any personal property off of the Premises. If the Tenant(s) vacates or abandons the property, the Landlord shall immediately have the right to terminate this Agreement.

**ASSIGNMENT**: Tenant(s) shall not assign this Lease without the prior written consent of the Landlord. The consent by the Landlord to one assignment shall not be deemed to be consent to any subsequent assignment.

**PARKING**: The Landlord shall provide the Tenant(s) 2 Parking Spaces.

The Landlord shall not charge a fee for the 2 Parking Spaces.

**RIGHT OF ENTRY**: The Landlord shall have the right to enter the Premises during normal working hours by providing notice in accordance with the minimum State requirement in order for inspection, make necessary repairs, alterations or improvements, to supply services as agreed or for any reasonable purpose. The Landlord may exhibit the Premises to prospective purchasers, mortgagees, or lessees upon reasonable notice.

**SALE OF PROPERTY**: If the Premises is sold, the Tenant(s) is to be notified of the new Owner, and if there is a new Manager, their contact details for repairs and maintenance shall be forwarded. If the Premises is conveyed to another party, the new owner shall not have the right to terminate this Agreement and it shall continue under the terms and conditions agreed upon by the Landlord and Tenant(s).

**UTILITIES**: The Landlord shall not pay for any of the utilities and services and will be the responsibility of the Tenant(s).

**MAINTENANCE, REPAIRS, OR ALTERATIONS**: The Tenant(s) shall, at their own expense and at all times, maintain premises in a clean and sanitary manner, and shall surrender the same at termination hereof, in as good condition as received, normal wear and tear excepted. The Tenant(s) may not make any alterations to the leased premises without the consent in writing of the Landlord. The Landlord shall be responsible for repairs to the interior and exterior of the building. If the Premises includes a washer, dryer, freezer, dehumidifier unit and/or air conditioning unit, the Landlord makes no warranty as to the repair or replacement of units if one or all shall fail to

operate. The Landlord will place fresh batteries in all battery-operated smoke detectors when the Tenant(s) moves into the premises. After the initial placement of the fresh batteries it is the responsibility of the Tenant(s) to replace batteries when needed. A monthly "cursory" inspection may be required for all fire extinguishers to make sure they are fully charged.

**EARLY TERMINATION**: The Tenant(s) may be allowed to cancel this Agreement under the following conditions:
The Tenant(s) must provide at least 30 days' notice. During the notice period of 30 days the rent shall be paid in accordance with this Agreement.

**PETS**: The Tenant(s) shall not be allowed to have pets on the Premises or common areas except those that are necessary for individuals with disabilities.

**NOISE/WASTE**: The Tenant(s) agrees not to commit waste on the premises, maintain, or permit to be maintained, a nuisance thereon, or use, or permit the premises to be used, in an unlawful manner. The Tenant(s) further agrees to abide by any and all local, county, and State noise ordinances.

**GUESTS**: There shall be no other persons living on the Premises other than the Tenant(s) and any Occupant(s). Guests of the Tenant(s) are allowed for periods not lasting for more than forty-eight hours unless otherwise approved by the Landlord.

**SMOKING POLICY**: Smoking on the Premises is prohibited on the entire property, including individual units, common areas, every building and adjoining properties.

**COMPLIANCE WITH LAW**: The Tenant(s) agrees that during the term of the Agreement, to promptly comply with any present and future laws, ordinances, orders, rules, regulations, and requirements of the Federal, State, County, City, and Municipal government or any of their departments, bureaus, boards, commissions and officials thereof with respect to the premises, or the use or occupancy thereof, whether said compliance shall be ordered or directed to or against the Tenant(s), the Landlord, or both.

**DEFAULT**: If the Tenant(s) fails to comply with any of the financial or material provisions of this Agreement, or of any present rules and regulations or any that may be hereafter prescribed by the Landlord, or materially fails to comply with any duties imposed on the Tenant(s) by statute or State laws, within the time period after delivery of written notice by the Landlord specifying the non-compliance and indicating the intention of the Landlord to terminate the Agreement by reason thereof, the Landlord may terminate this Agreement. If the Tenant(s) fails to pay rent when due and the default continues for the time-period specified in the written notice thereafter, the Landlord may, at their option, declare the entire balance (compiling all months applicable to this Agreement) of rent payable hereunder to be immediately due and payable and may exercise any and all rights and remedies available to the Landlord at law or in equity and may immediately terminate this Agreement.

The Tenant(s) will be in default if: (a) Tenant(s) does not pay rent or other amounts that are owed in accordance with respective State laws; (b) Tenant(s), their guests, or the Occupant(s) violate this Agreement, rules, or fire, safety, health, or criminal laws, regardless of whether arrest or conviction occurs; (c) Tenant(s) abandons the Premises; (d) Tenant(s) gives incorrect or false information in the rental application; (e) Tenant(s), or any Occupant(s) is arrested, convicted, or given deferred adjudication for a criminal offense involving actual or potential physical harm to a person, or involving possession, manufacture, or delivery of a controlled substance, marijuana, or drug paraphernalia under state statute; (f) any illegal drugs or paraphernalia are found in the Premises or

on the person of the Tenant(s), guests, or Occupant(s) while on the Premises and/or; (g) as otherwise allowed by law.

**MULTIPLE TENANT(S) OR OCCUPANT(S)**: Each individual that is considered a Tenant(s) is jointly and individually liable for all of this Agreement's obligations, including but not limited to rent monies. If any Tenant(s), guest, or Occupant(s) violates this Agreement, the Tenant(s) is considered to have violated this Agreement. Landlord's requests and notices to the Tenant(s) or any of the Occupant(s) of legal age constitutes notice to the Tenant(s). Notices and requests from the Tenant(s) or any one of the Occupant(s) (including repair requests and entry permissions) constitutes notice from the Tenant(s). In eviction suits, the Tenant(s) is considered the agent of the Premise for the service of process.

**DISPUTES**: If a dispute arises during or after the term of this Agreement between the Landlord and Tenant(s), they shall agree to hold negotiations amongst themselves, in "good faith", before any litigation.

**SEVERABILITY**: If any provision of this Agreement or the application thereof shall, for any reason and to any extent, be invalid or unenforceable, neither the remainder of this Agreement nor the application of the provision to other persons, entities or circumstances shall be affected thereby, but instead shall be enforced to the maximum extent permitted by law.

**SURRENDER OF PREMISES**: The Tenant(s) has surrendered the Premises when (a) the move-out date has passed and no one is living in the Premise within the Landlord's reasonable judgment; or (b) Access to the Premise have been turned in to Landlord – whichever comes first. Upon the expiration of the term hereof, the Tenant(s) shall surrender the Premise in better or equal condition as it were at the commencement of this Agreement, reasonable use, wear and tear thereof, and damages by the elements excepted.

**RETALIATION**: The Landlord is prohibited from making any type of retaliatory acts against the Tenant(s) including but not limited to restricting access to the Premises, decreasing or cancelling services or utilities, failure to repair appliances or fixtures, or any other type of act that could be considered unjustified.

**WAIVER**: A Waiver by the Landlord for a breach of any covenant or duty by the Tenant(s), under this Agreement is not a waiver for a breach of any other covenant or duty by the Tenant(s), or of any subsequent breach of the same covenant or duty. No provision of this Agreement shall be considered waived unless such a waiver shall be expressed in writing as a formal amendment to this Agreement and executed by the Tenant(s) and Landlord.

**EQUAL HOUSING**: If the Tenant(s) possess(es) any mental or physical impairment, the Landlord shall provide reasonable modifications to the Premises unless the modifications would be too difficult or expensive for the Landlord to provide. Any impairment of the Tenant(s) is/are encouraged to be provided and presented to the Landlord in writing in order to seek the most appropriate route for providing the modifications to the Premises.

**HAZARDOUS MATERIALS**: The Tenant(s) agrees to not possess any type of personal property that could be considered a fire hazard such as a substance having flammable or explosive characteristics on the Premises. Items that are prohibited to be brought into the Premises, other than for everyday cooking or the need of an appliance, includes but is not limited to gas (compressed), gasoline, fuel, propane, kerosene, motor oil, fireworks, or any other related content in the form of a liquid, solid, or gas.

**WATERBEDS**: The Tenant(s) is not permitted to furnish the Premises with waterbeds.

**INDEMNIFICATION**: The Landlord shall not be liable for any damage or injury to the Tenant(s), or any other person, or to any property, occurring on the Premises, or any part thereof, or in common areas thereof, and the Tenant(s) agrees to hold the Landlord harmless from any claims or damages unless caused solely by the Landlord's negligence. It is recommended that renter's insurance be purchased at the Tenant(s)'s expense.

**COVENANTS**: The covenants and conditions herein contained shall apply to and bind the heirs, legal representatives, and assigns of the parties hereto, and all covenants are to be construed as conditions of this Agreement.

**NOTICES**: Any notice to be sent by the Landlord or the Tenant(s) to each other shall use the following mailing addresses:

**Landlord's/Agent's Mailing Address**

Bassem Elmallakh
525 Broadway, Santa Monica, California, 90401

**Tenant(s)'s Mailing Address**

Reem Hanna
116 Rockefeller , Irvine, California, 92612

**AGENT/MANAGER**: The Landlord does not have an Agent or Manager and all contact in regards to any repair, maintenance, or complaint must go through the Landlord through the following contact information:

Landlord's Phone Number: (949) 413-7074 Email: bassemelmallakh@gmail.com.

**PREMISES DEEMED UNINHABITABLE**: If the Property is deemed uninhabitable due to damage beyond reasonable repair the Tenant(s) will be able to terminate this Agreement by written notice to the Landlord. If said damage was due to the negligence of the Tenant(s), the Tenant(s) shall be liable to the Landlord for all repairs and for the loss of income due to restoring the Premises back to a livable condition in addition to any other losses that can be proved by the Landlord.

**ACCESS BY LANDLORD**: The Landlord must grant at least twenty-four (24) hours notice to the Tenant(s) prior to entry for maintenance or any non-emergency reason. For any move-out inspection forty-eight (48) hours notice by Landlord shall be required.

**BED BUGS**: The Landlord acknowledges that there is no existence of bed bugs on the Premises. In addition, there shall be an addendum attached to this agreement that certifies the Tenant(s) have inspected the Premises and any existing furniture and confirm that bed bugs do not exist on the Premises.

**MEGAN'S LAW**: Notice: Pursuant to Section 290.46 of the Penal Code, information about specified registered sex offenders is made available to the public via an Internet Web site maintained by the Department of Justice at www.meganslaw.ca.gov. Depending on an offender's criminal history, this information will include either the address at which the offender resides or the community of residence and ZIP Code in which he or she resides.

**SERVICEMEMBERS CIVIL RELIEF ACT:** In the event the Tenant(s) is or hereafter becomes, a member of the United States Armed Forces on extended active duty and hereafter the Tenant(s) receives permanent change of station (PCS) orders to depart from the area where the Premises are located, or is relieved from active duty, retires or separates from the military, is ordered into military housing, or receives deployment orders, then in any of these events, the Tenant may terminate this lease upon giving thirty (30) days written notice to the Landlord. The Tenant shall also provide to the Landlord a copy of the official orders or a letter signed by the Tenant's commanding officer, reflecting the change which warrants termination under this clause. The Tenant will pay prorated rent for any days which he/she occupies the dwelling past the beginning of the rental period.

The damage/security deposit will be promptly returned to Tenant, provided there are no damages to the Premises.

**LEAD PAINT:** The Premises was not constructed before 1978 and therefore does not contain lead-based paint.

**GOVERNING LAW:** This Agreement is to be governed under the laws located in the State of California.

**ADDITIONAL TERMS AND CONDITIONS:** There are no further terms or conditions that will be added to this Agreement other than any attachments or addendums attached.

**ENTIRE AGREEMENT:** This Agreement contains all the terms agreed to by the parties relating to its subject matter including any attachments or addendums. This Agreement replaces all previous discussions, understandings, and oral agreements. The Landlord and Tenant(s) agree to the terms and conditions and shall be bound until the end of the Lease Term.

The parties have agreed and executed this agreement on January 1 2017.

**LANDLORD(S) SIGNATURE**

**Landlord's Signature** _____
By Bassem ElMallakh

**TENANT(S) SIGNATURE**

**Tenant's Signature** _____

Page 7

**DEC**

**3**

IN THE CIRCUIT COURT OF THE 11TH
JUDICIAL CIRCUIT IN AND FOR MIAMI-
DADE COUNTY, FLORIDA

BELGIUM INVESTMENTS 960 BAY
DR, LLC, a California LLC, et al.,
           Plaintiffs,

vs.

SPENCER BLANK, et al.,
           Defendants.
_____/

CASE NO: 18-28145 CA


## NOTICE OF FILING EXHIBITS TO DEFENDANT, BASSEM ESSEM EL MALLAKH'S VERIFIED MOTION TO SET ASIDE ENTRY OF JUDICIAL DEFAULT AND VACATE FINAL JUDGMENT

Defendant, BASSEM ESSAM EL MALLAKH, (hereinafter "Defendant"), through

council, gives Notice of Filing Exhibits A through C referenced within to its Verified Motion to

Set Aside Entry of Judicial Default and Vacate Final Judgment.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFIED** that a true and correct copy of the foregoing has been filed and
served via the Court's eFiling Portal and served via E-mail on this 22nd day of February 2021, to
all counsel on record.

**SOUTH FLORIDA LAW, PLLC**
1920 E. Hallandale Beach Blvd., Ste. 702
Hallandale Beach, FL 33009
Direct: (917) 442-4085
Office: (954) 900-8885
Fax: (954) 900-8886

*/s/ Frank DelloRusso*_____
FRANK DELLORUSSO
Florida Bar No. 111949
*fdellorusso@southfloridalawpllc.com*

**EXHIBIT A**

Mohamed Rostom and Bassem Essam
525 Broadway #5037

🖶 Print    Close ✖

Scroll to the bottom of each page. **Click** in the colored box above each colored signature or initials box to sign. Use the navigation at the bottom to click to the next page. This is a legally binding document.

Sway

🔷 **ALLIANCE**

## CALIFORNIA LEASE AGREEMENT

| 1. | LANDLORD NAME: | PRIII/Broadstone Trino, LLC |
|---|---|---|
| | LANDLORD'S AGENT: | Alliance Communities Inc. |
| | LANDLORD ADDRESS: | 525 Broadway, Santa Monica, CA 90401 |
| | PHONE/E-MAIL: | (310) 393-9696 / sway@allresco.com |

| 2. | RESIDENT NAME: | Mohamed Rostom and Bassem Essam |
|---|---|---|
| | OTHER OCCUPANTS: | |
| | RESIDENT ADDRESS: | 525 Broadway, Santa Monica, CA 90401 |
| | | UNIT: #5037    PARKING SPACE: #P2 84, P2 86    MAILBOX: #5037 |

| 3. | LEASE TERM: | 1 year | ☐ Lease Renewal: |
|---|---|---|---|
| | | START DATE: November 1, 2018 | END DATE: October 31, 2019 |
| | | MOVE-IN DATE: November 1, 2016 | |

| 4. | MONTHLY CHARGES | | 5. | DEPOSITS | |
|---|---|---|---|---|---|
| | Base Rent | $6,250.00 | | Deposit | $3,000.00 |
| | TOTAL | $6,250.00 | | TOTAL | $3,000.00 |

| 6. | KEYS: | ☐ APARTMENT | 2 | ☐ MAIL | 2 |
|---|---|---|---|---|---|
| | | ☐ REMOTE | 2 | ☐ POOL | 0 |
| | | ☐ GARAGE | 0 | ☐ STORAGE | 0 |
| | | ☐ CARD | 0 | ☐ COMMON AREA | 0 |

This Lease is entered into on the date signed, by and between the above named parties herein after called respectively LANDLORD and RESIDENT. In the event of more than one Resident, each Resident is jointly and severally liable for each provision of this Lease and service of any notice or demand upon one shall constitute notice to each other Resident.

Each Resident states that they are of legal age to enter into a binding Lease for lodging. All obligations hereunder are to be performed in the county and state where the Community is located. No oral agreements have been entered into with respect to this Lease. This Lease shall not be modified unless by an instrument in writing signed by Resident and an Agent of Landlord. Landlord hereby leases and Resident hereby hires and takes the premises as defined in Section 2 outlining the leased premises for the term specified herein and subject to all of the terms and provisions set forth.

## A. TERM OF LEASE

7.  **INITIAL TERM:**   The initial term of this Lease shall commence and end as outlined in Section 3 and shall **automatically continue as a tenancy from month-to-month upon expiration of the term.**

8.  **LEASE EXPIRATION:**   Either party, Landlord or Resident, may terminate this Lease after the initial term by giving the other party at least **thirty (30) days'** written notice of its intention to terminate the tenancy; provided that if Resident has been residing in the Community for more than one (1) year, Landlord shall give Resident at least sixty (60) days written notice of its intention to termination the tenancy. In the absence of written notice of termination, or a new lease, after the expiration of the initial term, the tenancy shall become month-to-month subject to a rental increase and applicable fees as allowed under state law. Resident agrees to pay all rent up to and including the end of any **thirty (30) day** (or, as applicable, sixty (60) day) notice period (which may not occur before the end of the Lease term) or until the premises are re-occupied, whichever occurs first.
    Initials:  M.R. B.E.

9.  **FAILURE TO VACATE AFTER NOTICE:**   If Resident gives written notice to vacate the premises and fails to completely vacate prior to the expiration of the notice, Resident shall be liable, unless otherwise prohibited by law, in addition to all other damages provided for under this Lease, for the daily rental based on a pro-ration of the monthly rental provided for in the Lease for each day Resident remains in the premises. In addition, Landlord may collect cost for loss suffered from future resident losses, legal costs, lost rent, and other expenses, and any other amount allowed by law.

10. **OPTION FOR EARLY TERMINATION:**   Resident is expected to remain a Resident for the entire term specified in the Lease. If Resident fails to do so, Resident will be responsible to Landlord for all damages provided by law, including (but not limited to) rent due through the end of the contract term, minus rents paid by a replacement resident (if any). This amount will vary depending upon how long it takes Landlord to find a replacement resident which typically cannot be determined in advance of move-out.

    To avoid this uncertainty, Resident may choose to exercise an Early Termination Option. Resident understands and acknowledges that Landlord is not legally obligated to allow early termination of the Lease unless provided for pursuant to statutory or common law. To exercise this option, Resident must deliver to Landlord:

    i.    A written notice stating that Resident has elected to exercise the Early Termination Option;
    ii.   An early termination option payment of **$12,500.00**;
    iii.  An executed agreement for repayment of concessions received prior to the early termination (if applicable, see Concession Section); and
    iv.   Payment of rent and other amounts due through the new Lease end date.

    When Landlord has (1) received the written notice and the Early Termination Option payment and (2) signed the notice, the Lease end date will be amended. The new Lease end date will be the date specified in the notice which must be at least **thirty** days after the written election and payment are given to Landlord. Exercise of the Early Termination Option will affect only Resident's rent obligations after the new Lease end date. Resident must comply with all other Lease obligations.

♿    Initials:  M.R. B.E.

1



Mohamed Rostom and Bassem Essam
525 Broadway #5037

Print    Close ✕

**Scroll** to the bottom of each page. **Click** in the colored box above each colored signature or initials box to sign. Use the navigation at the bottom to click to the next page. This is a legally binding document.

Sway

 ALLIANCE

15. Assistive Animals (including companion animals): Management will accept and evaluate a request for reasonable accommodation to allow Resident to have an assistive animal. Assistive animals for persons with disabilities are not considered pets and are not subject to the following requirements:

   a.  Spayed/Neutered requirement;

   b.  Breed restriction (if particular animal is required because of disability);

   c.  Age restriction (if particular animal is required because of disability);

   d.  Weight restriction (if particular animal is required because of disability);

   e.  The number of assistive animals per apartment shall be evaluated on case by case basis;

   f.  Monthly pet rent;

   g.  Pet fees and/or deposits.

A request for a Reasonable Accommodation must be submitted for Landlord's review and Landlord shall not unreasonably withhold its written approval for an assistive animal or animals. Resident hereby agrees to comply with the terms and conditions of this Animal Addendum, except for the exceptions set forth in this paragraph 15 for assistive animals. If additional modifications to the rules set forth in this Animal Addendum are required because of a disability, Resident should make an accommodation request to Landlord.

16. This addendum shall terminate without affecting the Lease or Resident's responsibilities under the lease and Resident shall remove the animal immediately if any of the following occurs:

   a.  Payment of Pet Rent is delinquent

   b.  The animal displays aggressive behavior

   c.  Landlord perceives the animal to be dangerous or disruptive to Premises, other residents, guest or employees.

   d.  The animal does not have all current and required vaccinations.

   e.  Upon thirty (30) day notice by either party to the other of intent to terminate this Addendum

17. Resident agrees to hold harmless and indemnify Landlord from all liability pertaining to animals on the property and Resident shall hold Landlord harmless and indemnify Landlord for any and all damages or costs in connection with this Addendum.

Resident(s) acknowledges to have read this Addendum and understands the terms and conditions contained herein.

 **Signed by Mohamed Rostom**
Tue Oct 23 2018 13:54:57 PM PDT
Key: 0C381E54; IP Address: 172.91.138.181

Mohamed Rostom (Resident)        Date

 **Signed by Bassem Essam**
Thu Nov 8 2018 13:53:57 PM PST
Key: E9BA82E6; IP Address: 172.91.138.181

Bassem Essam (Resident)        Date

 **Signed by Matthew Gray**
Fri Nov 9 2018 09:10:01 AM PST
Key: 16DAD42C; IP Address: 71.177.221.208

(Owner/Agent)        Date

  

Mohamed Rostom and Bassem Essam

525 Broadway #5037



**Scroll** to the bottom of each page. **Click** in the colored box above each colored signature or initials box to sign. Use the navigation at the bottom to click to the next page. This is a legally binding document.

Sway

 ALLIANCE

Failure to abide by parking requirements, rules, regulations or guidelines, including, but not limited to properly display parking permits, may result in the vehicle being towed with or without notice at Resident's own expense.

Resident understands and agrees that parking privileges may be revoked at any time for not abiding by all of the rules and regulations, which may be adopted from time to time by Landlord to promote the safe and accessible use of the parking facility.

| Violations that will be towed without notice: | no permit, stolen or forged permit, improperly displayed permit |
| --- | --- |
| | parked in a non-designated parking area, blocking trash enclosure and/or entry/exit driveways, parked in walkway, parked along a curb, parked in a visitor space for over 24 hours. |
| | prohibited vehicle parked |
| Violations that will be towed with notice: | parked in same location for over 72 hours, parked in visitor parking, expired registration |
| Violations that will be fined $50.00: | Washing vehicle within the community area, automotive improvement or repairs |
| Violations that may be booted or towed at the vehicle owner's expense: | vehicle must be parked completely within the lines painted on the ground and must not extend beyond the end of the lines. |

17. **Guest Parking Permits:** Resident understands that Resident will be issued **zero (0)** parking permits for guests and replacement permits will be **$0.00** each. Each permit is required to be clearly visible at all times through the front windshield of the vehicle, and it is the sole responsibility of the Resident to check regularly that each permit is secured on the appropriate vehicle and visible. Failure to properly display parking permits may result in the vehicle towed at Resident's own expense.

18. **Solicitors and Salespeople:** Solicitors are not allowed in the Community. Residents shall report all solicitors or salespeople to the Landlord immediately.

19. **Car Wash and Repair:** Vehicle repairs, including oil changes, and washing of vehicles are prohibited unless there is a designated area provided by Landlord.

20. **Moving of Furniture:** Landlord may designate the time and method for moving items to and from the Unit such as any furniture, merchandise, goods, freight or other such items. Residents may not move furniture to and from the Unit through the lobby, patio doors, or through the use of elevators (if available) without Landlord's permission. If elevators are installed at the Community, Landlord does not guaranty that the elevators will be available for use by Resident nor shall Landlord be liable for any loss resulting from the unavailability of elevator service.

21. **Parking:** Resident shall report in writing to Landlord any changes to the make, model and license plate number of every vehicle authorized to park at the Community. Commercial vehicles, boats and recreational vehicles are not authorized to park on the Premises unless Landlord has a designated location.

22. **Notification of Changes:** Resident shall notify Landlord immediately in writing with any change to Resident's employer, employer telephone number, alternate phone numbers, emergency contact and other pertinent information.

Resident(s) acknowledges to have read this Addendum and understands the terms and conditions contained herein.



Mohamed Rostom (Resident)                           Date



Bassem Essam (Resident)                           Date

(Owner/Agent)                           Date

 Initials:  

15



EXHIBIT B

BELGIUM INVESTMENTS 960 BAY
DR, LLC, a California LLC, et al.,

               Plaintiffs,

vs.

SPENCER BLANK, et al.,

               Defendants.

/

IN THE CIRCUIT COURT OF THE 11TH
JUDICIAL CIRCUIT IN AND FOR MIAMI-
DADE COUNTY, FLORIDA

CASE NO: 18-28145 CA

## AFFIDAVIT IN SUPPORT OF MOTION TO VACATE FOR FINAL JUDGMENT

STATE OF __California__ )
                       ) ss:
COUNTY OF __Los Angeles__ )

      **BEFORE ME**, the undersigned authority, on this day personally appeared BASSEM ES-SAM EL MALLAKH who, upon being duly sworn, deposes and says (List statements in numerical order that Affiant is swearing to)

      1.     I am the Defendant in this case and authorized to make this affidavit.

      2.     I am over the age of 18 years and have personal knowledge of the facts contained in this Affidavit.

      3.     On March 3, 2019, Process Server claimed Substitute Service was made to my sister, Reem Hanna ("Hanna") at 116 Rockefeller, Irvine, CA 92612.

      4.     Hanna was never served and was unaware of any attempts made by Process Server.

      5.     I never received notice of this lawsuit or the judgment against me in this case.

      6.     I am unaware of any service attempted to be made to me or my sister.

      7.     I only became aware of a judgment against me on November 16, 2020 when the County of Orange Clerk of Records sent a Courtesy Notice regarding a lien that was placed on my property.

I understand that I am swearing or affirming under oath to the truthfulness of the claims made in this petition and that the punishment for knowingly making a false statement includes fines and/or imprisonment.

Signature of Petitioner

Mailing Address _525 Broadway_
_Santa Monica, CA_

Telephone _949-413-7074_

STATE OF _Calif_ )
)  ss:
COUNTY OF _Los Angeles_ )

The instrument was acknowledged before me on this _15_ day of _Feb_, 20_21_,
by _Bassam Essam Elmallakh_

____ Personally Known
_X_ Produced Identification
_X_ Drivers License No. _CA D797337_

NOTARY PUBLIC/DEPUTY CLERK

_Kelly Charpenet_

Print, type, or stamp commissioned name of
notary or deputy clerk.

_Calif Jurat_

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA   COUNTY OF _Los Angeles_
Subscribed and sworn to (or affirmed) before me on this _15_ day of _Feb_
20_21_ by _Bassam Essam Elmallakh_

proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

_Kelly Charpenet_
(Signature of Notary)



KELLY CHARPENET
COMM. 2164890
NOTARY PUBLIC · CALIFORNIA
LOS ANGELES COUNTY
My Comm. Expires Oct. 24, 2020

The notary commission extended
pursuant to Executive Order N-63-20.

IN THE CIRCUIT COURT OF THE 11TH
JUDICIAL CIRCUIT IN AND FOR MIAMI-
DADE COUNTY, FLORIDA

BELGIUM INVESTMENTS 960 BAY
DR, LLC, a California LLC, et al.,

CASE NO: 18-28145 CA

        Plaintiffs,

vs.

SPENCER BLANK, et al.,

        Defendants.

_____/

## AFFIDAVIT IN SUPPORT OF MOTION TO VACATE FOR FINAL JUDGMENT

STATE OF ___Califsrnia___ )
                    ) ss:
COUNTY OF ___Orange___ )

        BEFORE ME, the undersigned authority, on this day personally appeared REEM HANANA
who, upon being duly sworn, deposes and says (List statements in numerical order that Affiant is
swearing to)

        1.      I am the Defendant's sister in this case and I am authorized to make this
affidavit.

        2.      I am over the age of 18 years and have personal knowledge of the facts
contained in this Affidavit.

        3.      On March 3, 2019, Process Server claimed Substitute Service was made to me,
on behalf of my brother, BASSEM ESSAM EL MALLAKH, at 116 Rockefeller, Irvine, CA
92612.

        4.      I was never served and was unaware of any attempts made by Process Server.

        5.      I never received notice of this lawsuit or the judgment against my brother in this
case.

        6.      I am unaware of any service attempted to be made to me or my brother.

**I understand that I am swearing or affirming under oath to the truthfulness of the claims
made in this petition and that the punishment for knowingly making a false statement
includes fines and/or imprisonment.**

Signature of Petitioner
Mailing Address 116 Rockefeller
Irvine CA 92612
Telephone _____

**STATE OF** _____ )

                     ) ss:

**COUNTY OF** _____ )

The instrument was acknowledged before me on this _____ day of _____, 20_____, _____
by _____.

_____ **Personally Known**

_____ **Produced Identification**          **NOTARY PUBLIC/DEPUTY CLERK**

_____ **Drivers License No.**

SEE ATTACHED FOR NOTARY

2-18-2021

           **Print, type, or stamp commissioned name of**

           **notary or deputy clerk.**

# CALIFORNIA ALL- PURPOSE
# CERTIFICATE OF ACKNOWLEDGMENT

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of ___California___ }

County of ___Orange___ }

On _FEBRUARY 15, 2021_ before me, ___Rose L. Newman, Notary Public___,
(Here insert name and title of the officer)

personally appeared ___REEM HANNA___,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

___[signature]___
Notary Public Signature          (Notary Public Seal)

**ROSE L. NEWMAN**
COMM...2251921
NOTARY PUBLIC-CALIFORNIA
ORANGE COUNTY
My Term Exp. August 28, 2022

---

**ADDITIONAL OPTIONAL INFORMATION**

DESCRIPTION OF THE ATTACHED DOCUMENT
_AFFIDAVIT IN SUPPORT OF MOTION_
_TO VACATE FOR FINAL JUDGMENT_
(Title or description of attached document)

_____
(Title or description of attached document continued)

Number of Pages _2H_  Document Date _2-15-202_

CAPACITY CLAIMED BY THE SIGNER
☐ Individual (s)
☐ Corporate Officer
_____
      (Title)
☐ Partner(s)
☐ Attorney-in-Fact
☐ Trustee(s)
☐ Other _____

INSTRUCTIONS FOR COMPLETING THIS FORM
*This form complies with current California statutes regarding notary wording and, if needed, should be completed and attached to the document. Acknowledgments from other states may be completed for documents being sent to that state so long as the wording does not require the California notary to violate California notary law.*

- State and County information must be the State and County where the document signer(s) personally appeared before the notary public for acknowledgment.
- Date of notarization must be the date that the signer(s) personally appeared which must also be the same date the acknowledgment is completed.
- The notary public must print his or her name as it appears within his or her commission followed by a comma and then your title (notary public).
- Print the name(s) of document signer(s) who personally appear at the time of notarization.
- Indicate the correct singular or plural forms by crossing off incorrect forms (i.e. he/she/they, is /are ) or circling the correct forms. Failure to correctly indicate this information may lead to rejection of document recording.
- The notary seal impression must be clear and photographically reproducible. Impression must not cover text or lines. If seal impression smudges, re-seal if a sufficient area permits, otherwise complete a different acknowledgment form.
- Signature of the notary public must match the signature on file with the office of the county clerk.
  - ❖ Additional information is not required but could help to ensure this acknowledgment is not misused or attached to a different document.
  - ❖ Indicate title or type of attached document, number of pages and date.
  - ❖ Indicate the capacity claimed by the signer. If the claimed capacity is a corporate officer, indicate the title (i.e. CEO, CFO, Secretary).
- Securely attach this document to the signed document with a staple.

**DEC**

**4**

MICHAEL JAY BERGER (State Bar # 100291)
LAW OFFICES OF MICHAEL JAY BERGER
9454 Wilshire Blvd. 6<sup>th</sup> Floor
Beverly Hills, CA 90212-2929
Telephone:    (310) 271-6223
Facsimile:    (310) 271-9805
michael.berger@bankruptcypower.com

Counsel for Debtor,
Bassem Victor El Mallakh

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

SANTA ANA DIVISION

In re:

BASSEM VICTOR EL MALLAKH,

        Debtor and Debtor-in-Possession.

CASE NO.: 8:22-bk-11605-TA

Chapter 11

**SUPPLEMENTAL DECLARATION
OF BASSEM VICTOR EL MALLAKH
IN SUPPORT OF DEBTOR'S
OPPOSITION TO BELGIUM
INVESTMENTS 960 BAY DR, LLC'S
OBJECTION TO DEBTOR'S
CLAIMED HOMESTEAD
EXEMPTION**

Date:    March 30, 2023
Time:    11:00 a.m.
Place:    411 West Fourth Street
        Courtroom 5B
        Santa Ana, CA 92701

Via Tele/Videoconference on Zoom

## <u>SUPPLEMENTAL DECLARATION OF BASSEM VICTOR EL MALLAKH</u>

    I, Bassem Victor El Mallakh, declare and state as follows:

    1.    I am the Debtor. I am over the age of 18. I have personal knowledge of the facts set forth below and if called to testify as to those facts, I could and would competently do so.

1

SUPPLEMENTAL DECLARATION OF BASSEM VICTOR EL MALLAKH IN SUPPORT OF DEBTOR'S OPPOSITION TO BELGIUM
INVESTMENTS 960 BAY DR, LLC'S OBJECTION TO DEBTOR'S CLAIMED HOMESTEAD EXEMPTION

2.    My instant Chapter 11 case was filed on September 19, 2022. This is my second bankruptcy filing.

3.    I hold title to the following real property which is my principal residence: 116 Rockefeller, Irvine, California 92612 ("Rockefeller Property").

4.    I previously filed a Chapter 13 [case no.: 8:22-bk-11158-TA], which I voluntarily dismissed because I was over the debt limit.

5.    My current Chapter 11 case was filed in order to reorganize my debts.

6.    My primary residence where I live is the Rockefeller Property and it has been by primary residence since I purchased it in 2013, on the date I filed my bankruptcy cases, and continues to be me primary residence.

7.    My current Chapter 11 case, and my previously filed Chapter 13 case listed the Rockefeller Property as my primary residence.

8.    On the Petition Date, and continuously thereafter, I resided in the Rockefeller Property with my sister Reem Hanna and her son. The Rockefeller Property is three (3) bedrooms. I sleep in one (1) bedroom, my sister sleeps in one (1) bedroom and her son sleeps one (1) bedrooms.

9.    The following is additional evidence to show that the Rockefeller Property is my primary residence is:

    a.  A true and correct copy of my Chapter 13 Voluntary Petition listing the Rockefeller Property as my home is attached as **Exhibit "1."**

    b.  A true and correct copy of the first pages of my 2019-2022 tax returns and other tax documents listing the Rockefeller Property as my home is attached as **Exhibit "2."**

    c.  A true and correct copy of my Homeowners Insurance Policy and Car Insurance listing the Rockefeller Property as my home is attached as **Exhibit "3."**

2

d.  A true and correct copy of my various bank statements listing the
Rockefeller Property as my home is attached as **Exhibit "4."**

e.  A true and correct copy of my drivers license listing the Rockefeller
Property as my home is attached as **Exhibit "5."**

f.  A true and correct copy of my car registration listing the Rockefeller
Property as my home is attached as **Exhibit "6."**

g.  A true and correct copy of my SoCalGas Bill for the months of August
2022 through January 2023 listing the Rockefeller Property as my home is
attached as **Exhibit "7."**

h.  A true and correct copy of my Irvine Ranch Water District Bill for the
months of August 2022 through January 2023 listing the Rockefeller
Property as my home is attached as **Exhibit "8."**

i.  A true and correct copy of my health insurance card listing the Rockefeller
Property as my home is attached as **Exhibit "9."**

j.  A true and correct copy of my Uber Eats receipts showing my food
deliveries to the Rockefeller Property is attached as **Exhibit "10."**

k.  A true and correct copy of my Gym check-ins for LA Fitness located at
3021 Michelson Drive, Irvine, CA which is located in Orange County close
to the Rockefeller Property for the months of September 2022 to December
2022 is attached as **Exhibit "11."**

l.  A true and correct copy of my iPhone GPS location for September 18, 2022
is attached as **Exhibit "12."**

m.  A true and correct copy of my airline tickets for travel on September 8,
2022 from San Francisco to Santa Ana airport is attached as **Exhibit "13."**

n.  A true and correct copy of my Amazon receipts showing my purchases
delivered to the Rockefeller Property is attached as **Exhibit "14."**

3

10.     From on or about 2016 through 2021, I was working in Santa Monica and due to the commute between Santa Monica and Orange County, my business associate and I leased an apartment for his associate at 525 Broadway, Santa Monica, CA 90410 (the "Santa Monica Property") which was our principal place of business for a tech start-up we were trying to get off the ground. I would sleep some evenings at Santa Monica Property if I had to work late and was too tired to drive back home to Orange County. However, the Rockefeller Property was and always has been my primary residence.

11.     In the previous depositions I did in connection with the Florida 11st Circuit case with Belgium and the Orange County Superior Court case which sought to enforce the sister state judgment from the Florida case, the questions Belgium's counsel asked me were in regards to whether I was served at the Rockefeller Property. My statements are being misconstrued currently by Belgium's counsel. These depositions were done in 2021 or earlier, well before my bankruptcy filings. At the time I filed my chapter 11 case, I was living at the Rockefeller Property which is my primary residence and I continue to reside there.

12.     I hereby state, unequivocally, prior to, on the petition date, and thereafter, I lived and currently live at the Rockefeller Property, and I have always intended and continue to intend the Rockefeller Property to be my primary residence and I continue to reside there.

13.     On September 19, 2022, I went to Fedex with my father Essam ElMallakh to sign the bankruptcy petition and other commencement documents. I scanned the documents and emailed them to my Bankruptcy Counsel. Attached as **Exhibit "15"** is a true and correct copy of my Fedex receipt from September 19, 2022, from the Fedex store located at 3992 Barranca Park Ste A, Irvine, CA 92606. The Fedex location I went to is 3 miles away from my home, the Rockefeller Property.

SUPPLEMENTAL DECLARATION OF BASSEM VICTOR EL MALLAKH IN SUPPORT OF DEBTOR'S OPPOSITION TO BELGIUM INVESTMENTS 960 BAY DR, LLC'S OBJECTION TO DEBTOR'S CLAIMED HOMESTEAD EXEMPTION

1  I declare under penalty of perjury that the foregoing is true and correct and that

2  this declaration is executed on March __21_, 2023 at_____Egypt_____.

3

4

5  _____

6  Bassem Victor El Mallakh

7

**DEC**

**5**

MICHAEL JAY BERGER (State Bar # 100291)
LAW OFFICES OF MICHAEL JAY BERGER
9454 Wilshire Blvd. 6<sup>th</sup> Floor
Beverly Hills, CA 90212-2929
Telephone:    (310) 271-6223
Facsimile:    (310) 271-9805
michael.berger@bankruptcypower.com

Counsel for Debtor,
Bassem Victor El Mallakh

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

SANTA ANA DIVISION

| | |
|---|---|
| In re:<br><br>BASSEM VICTOR EL MALLAKH,<br><br>    Debtor and Debtor-in-Possession. | CASE NO.: 8:22-bk-11605-TA<br><br>Chapter 11<br><br>**DECLARATION OF REEM HANNA IN SUPPORT OF DEBTOR'S OPPOSITION TO BELGIUM INVESTMENTS 960 BAY DR, LLC'S OBJECTION TO DEBTOR'S CLAIMED HOMESTEAD EXEMPTION**<br><br>Date:    March 30, 2023<br>Time:    11:00 a.m.<br>Place:    411 West Fourth Street<br>          Courtroom 5B<br>          Santa Ana, CA 92701<br><br>Via Tele/Videoconference on Zoom |

## <u>DECLARATION OF REEM HANNA</u>

I, Reem Hanna, declare and state as follows:

1.      I am the sister of Debtor Bassem Victor El Mallakh. I am over the age of 18. I have personal knowledge of the facts set forth below and if called to testify as to those facts, I could and would competently do so.

2.      I live at 116 Rockefeller, Irvine, California 92612 ("Rockefeller Property"). with my brother Bassem who is the Debtor in this case. The Rockefeller Property has

1

three (3) bedrooms. I sleep in one (1) bedroom, my son sleeps one (1) bedroom, and

Bassem sleeps in one (1) bedroom. I pay Bassem $4,000 per month in rent to live in the

Rockefeller Property with him.

3.    Since I started living at the Rockefeller Property on or about mid-2018,

Bassem has always lived at the Rockefeller Property with me there.

4.    On September 19, 2022, when Bassem filed his Chapter 11 case, Bassem

was living at the Rockefeller Property with me and my son, and Bassem continues to

reside there as his primary residence thereafter.

5.    From on or about 2016 through 2021, Bassem was working in Santa

Monica at 525 Broadway, Santa Monica, CA 90410 (the "Santa Monica Property") and

due to the commute between Santa Monica and Orange County, Bassem would sleep

some evenings at the Santa Monica Property if he had to work late and was too tired to

drive back home to the Rockefeller Property. However, the Rockefeller Property was and

always has been Bassem's primary residence.

6.    In the previous depositions I did in connection with Belgium's claims

against Bassem, the questions Belgium's counsel asked me were in regards to whether

Bassem was served at the Rockefeller Property.


I declare under penalty of perjury that the foregoing is true and correct and that

this declaration is executed on March 21 , 2023 at_____5:32 Chicago_____.


_____
Reem Hanna

**DEC
6**

MICHAEL JAY BERGER (State Bar # 100291)
LAW OFFICES OF MICHAEL JAY BERGER
9454 Wilshire Blvd. 6th Floor
Beverly Hills, CA 90212-2929
Telephone:   (310) 271-6223
Facsimile:   (310) 271-9805
michael.berger@bankruptcypower.com

Counsel for Debtor,
Bassem Victor El Mallakh

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

SANTA ANA DIVISION

| | |
|---|---|
| In re: | CASE NO.: 8:22-bk-11605-TA |
| BASSEM VICTOR EL MALLAKH, | Chapter 11 |
| Debtor and Debtor-in-Possession. | **DECLARATION OF ESSAM EL MALLAKH IN SUPPORT OF DEBTOR'S OPPOSITION TO BELGIUM INVESTMENTS 960 BAY DR, LLC'S OBJECTION TO DEBTOR'S CLAIMED HOMESTEAD EXEMPTION** |
| | Date:    March 30, 2023 |
| | Time:    11:00 a.m. |
| | Place:   411 West Fourth Street |
| | Courtroom 5B |
| | Santa Ana, CA 92701 |
| | Via Tele/Videoconference on Zoom |

## <u>DECLARATION OF ESSAM VICTOR EL MALLAKH</u>

I, Essam El Mallakh, declare and state as follows:

1.     I am the father of the Debtor, Bassem Victor El Mallakh. I am over the age of 18. I have personal knowledge of the facts set forth below and if called to testify as to those facts, I could and would competently do so.

2.     On September 19, 2022, I went to Fedex with my son Bassem for Bassem to sign the bankruptcy petition and other commencement documents. I purchased a pen

1

that Bassem needed to sign his documents. Attached as **Exhibit "1"** is a true and correct copy of my Fedex receipt from September 19, 2022, from the Fedex store located at 3992 Barranca Park Ste A, Irvine, CA 92606 where I was with Bassem when he signed the bankruptcy documents.

3.      Over the past few years, I regularly visited Bassem and my daughter Reem and Reem's son (my grandson) who live with Bassem at 116 Rockefeller, Irvine, California 92612 ("Rockefeller Property"). I visit them about every six (6) months. When I visit them, I stay at the Rockefeller Property. The Rockefeller Property is a three (3) bedroom townhouse. During my visits, my daughter sleeps in one bedroom with my grandson, I sleep in my grandson's room and Bassem sleeps in the third bedroom.

4.      As far as I am aware, based on my visits to the United States, Bassem lives at the Rockefeller Property. Bassem was living at the Rockefeller Property on September 19, 2022, and he continues to reside at the Rockefeller Property as his principal residence.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration is executed on March __21__, 2023 at_____ Egypt _____.



_____
Essam El Mallakh

DECLARATION OF ESSAM EL MALLAKH IN SUPPORT OF DEBTOR'S OPPOSITION TO BELGIUM INVESTMENTS 960 BAY DR,
LLC'S OBJECTION TO DEBTOR'S CLAIMED HOMESTEAD EXEMPTION

# EXHIBIT 1

Firefox                                                                                        about:srcdoc



| DATE | | DESCRIPTION | AMOUNT |
|---|---|---|---|
| Sep 19, 2022 | FEDEX OFFICE PRINT SHIP CENTER 3992 BARRANCA PKWY | AplPay FEDEX OFFICE IRVINE CA | $9.68 |
| | IRVINE CA 92606-8223 (888) 889-7121 www.fedex.com | Will appear on your Sep 21, 2022 statement as AplPay FEDEX OFFICE IRVINE CA | |

ACCOUNT ENDING #1004

Green Card

CARD MEMBER

ESSAM ELMALLAKH

METHOD
Paid for with Apple Pay

CARD
ESSAM ELMALLAKH

MEMBERSHIP REWARDS POINTS
1X on Other purchases                                    10

ADDITIONAL INFORMATION
05960023291059600232 91 92606

1 of 1                                                                              2/27/2023, 4:40 PM

**DEC**
**7**

## DECLARATION OF BASSEEM VICTOR EL MALLAKH

I, BASSEM VICTOR EL MALLAKH, declare:

1.     I am an individual over the age of 18.

2.     I know the following facts to be true of my own personal knowledge unless otherwise stated.

3.     I have owned the Rockefeller Property located at 116 Rockefeller, Irvine, California 92612 ("Rockefeller Property") since late-2016 and I leased the Santa Monica Property located at 525 Broadway, Santa Monica, CA 90401 ("Santa Monica Property") with a business partner between 2016 and January 2023.

4.     I share the Irvine Property with my sister and her son pursuant to a lease, and I have a bedroom and belongings in the Irvine Property.

5.     I also spent considerable time in the Santa Monica Property between 2016 and 2023 while working on a start-up company. I kept some items at the Santa Monica Property and slept there when I worked late nights.

6.     I submitted declarations and testimony regarding residing at both properties at the advice of my attorneys. I did not understand the intricacies of the definitions of homestead and residence. I knew that I spent time at, slept at, and kept belongings in both locations.

7.     I did not intend to mislead the Court; I took my attorneys' advice on how to convey the facts to obtain the preferred legal result.

8.     I entered the lease for the Santa Monica Property on November 1, 2016. On or shortly thereafter, I began to spend a lot of time at the Santa Monica Property working on my start-up company. I also spent nights there when I worked late. I still had a bedroom and belongings at the Rockefeller Property.

9.     My uses of both the Santa Monica and Rockefeller Properties meet the dictionary definitions of and my understanding of the words reside, live and occupy as "to dwell for a considerable time," "dwell or reside," and "be a resident or tenant of; dwell in" as I spent considerable time at both properties over several years, including sleeping at

- 5 -

1  both properties.  I spent a lot of time in Santa Monica and sometimes slept there and also

2  slept in the Rockefeller Property, kept my belongings there, and intended it to be my

3  primary long-term residence.

4        10.    My sister, Reem Hanna, was correct, that I spent much of my time in Santa

5  Monica between November 2016 and February 2021.  She was also correct that I "lived"

6  in the Rockefeller Property in the sense that I had a bedroom there with belongings there.

7

8        I declare under penalty of perjury of the laws of the United States of America that

9  the foregoing is true and correct.

10

11  Dated: _____ at _____, Egypt.

12

13  **[SEE ATTACHED SIGNATURE PAGE]**

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 6 -

OPPOSITION TO SANCTIONS MOTION

1  both properties.  I spent a lot of time in Santa Monica and sometimes slept there and also

2  slept in the Rockefeller Property, kept my belongings there, and intended it to be my

3  primary long-term residence.

4       10.    My sister, Reem Hanna, was correct, that I spent much of my time in Santa

5  Monica between November 2016 and February 2021.  She was also correct that I "lived"

6  in the Rockefeller Property in the sense that I had a bedroom there with belongings there.

7

8       I declare under penalty of perjury of the laws of the United States of America that

9  the foregoing is true and correct.

10

11  Dated: August 8th 2023  at ____ Cairo , Egypt.

12

13                         BASSEM VICTOR EL MALLAKH

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 6 -

OPPOSITION TO SANCTIONS MOTION

Created With Tiny Scanner

**DEC**

**8**

1  Bert Briones (SBN 237594)
   **RED HILL LAW GROUP**
2  15615 Alton Pkwy, Suite 210
   Irvine, CA 92618
3  Tel:    (888) 733-4455
   Fax:    (714) 733-4450
4  Email: bb@redhilllawgroup.com

5  Attorneys for Debtor Bassem Victor El Mallakh

6

7                    **UNITED STATES BANKRUPTCY COURT**

8              **CENTRAL DISTRICT OF CALIFORNIA (SANTA ANA)**

9   In re:                               Case No. 8:22-bk-11605-TA

10  BASSEM VICTOR EL MALLAKH,            Chapter 7

11                                       **DIRECT TESTIMONY**
                                         **DECLARATIONS IN OPPOSITION**
12           Debtor                      **TO OBJECTION TO HOMESTEAD**
                                         **EXEMPTION**
13
                                         **HEARING:**
14                                       **Date: August 24, 2023**
                                         **Time: 11:00 a.m.**
15                                       **Ctrm: 5B**

16

17       TO THE HONORABLE THEODOR C. ALBERT, MOVANT BELGIUM

18  INVESTMENTS 960 BAY DR. LLC ("BELGIUM"), AND ALL INTERESTED

19  PARTIES:

20       Debtor Bassem El Mallakh hereby submits direct testimony in support of his

21  Opposition to Belgium Investments 960 Bay Dr., LLC's Objection to Debtor's Claimed

22  Homestead Exemption ("Objection").

23  Dated: August 7, 2023              Respectfully submitted,
                                       **RED HILL LAW GROUP**
24

25                                     By:  ___/s/ Bert Briones_____
                                       Bert Briones
26                                     Attorneys for Debtor Bassem Victor El Mallakh

27

28

                                    - 1 -

                      DIRECT TESTIMONY DECLARATIONS

## DECLARATION OF BASSEM VICTOR EL MALLAKH

I, BASSEM VICTOR EL MALLAKH, declare:

1.    I am an individual over the age of 18.

2.    I know the following facts to be true of my own personal knowledge unless otherwise stated.

3.    I purchased a townhouse located at 116 Rockefeller, Irvine, California 92612 ("Irvine Townhouse") in October 2013.

4.    On my petition date, September 19, 2022, and since then to present, my principal residence has been the Irvine Townhouse.  On September 19, 2022 to present, I have resided and continue to reside in the Irvine Townhouse.  I intend to continue to reside in the Irvine Townhouse.  Since prior to September 19, 2022 to present, I have occupied the Irvine Townhouse except when temporarily away due to business or vacation.  My personal belongings, my entire closet (Passport, Social security, Birth Certificate, copy of my Tax returns, my prescriptions, and my Invisalign retainers), clothing, and furniture have been in the Irvine Townhouse since before September 19, 2022.  I have slept and continue to sleep at the Irvine Townhouse except for the nights when I "crashed" in Santa Monica after work or went on vacation.  The nights when I slept away from the Irvine Townhouse, I always intended to return to the Irvine Townhouse and considered the Irvine Townhouse to be my home and my residence.  During the last 10 years since I purchased the house, I have spent at least 95% of the days there.

The Santa Monica Apartment

5.    In 2016, I entered a lease agreement for an apartment located at 525 Broadway, Santa Monica, CA 90401 ("Santa Monica Apartment" and "Santa Monica Lease").

6.    The Santa Monica Apartment had two bedrooms.

7.    I entered the Santa Monica Lease agreement with my business partner and friend, Mohammed Rostom.

- 2 -

DIRECT TESTIMONY DECLARATIONS

8.    The purpose of the Santa Monica Lease was to provide office space for a business that Rostom and I were starting, which we called Lava Enterprises.

9.    We selected Santa Monica for the office location so we could be close to other people in the industry who were primarily located in Los Angeles.

10.    The Santa Monica Apartment also served as Rostom's living quarters while he was working with me in Santa Monica.

11.    One room in the Santa Monica apartment was Rostom's bedroom. The other room contained two desks that Rostom and I used for business.

12.    Both Rostom and I had to be on the Santa Monica Lease because Rostom was from Canada, and the apartment landlord wanted a co-signor on the lease.

13.    In addition, I had to Co- sign the Santa Monica Lease in order to get keyless Fob entry access to the garage and the elevator when I came to the apartment to work.

14.    I decided to take my desk and computer and office belongings back to my Irvine townhome in April of 2022 and I called the leasing office and let them know that I would be no longer coming there and If I can remove my name on the lease but my friend Rostom will remain on the lease alone. And that I will only come to pick up office and work mail or if I need to open the door for the cleaners while Rostom is out of town. At the end of 2022, Rostom decided he wanted me to help him terminate the Santa Monica Lease and take away all his furniture and belongings and I can give them away to the Goodwill store for charity and vacate the apartment since he was no longer coming back from Dubai to stay with his family.

15.    Between November 2016 and April 2022, I spent a lot of time at the Santa Monica apartment. I would often work at the apartment from early morning until late at night. Sometimes, I would stay overnight at the Santa Monica Apartment and sleep on the couch, since the guest bedroom's bed was a small Twin bed, we had our 2 desks and computers in the guest bedroom so the space won't allow us to fit in a king or queen bed and I am tall I won't be able to sleep in that bed regularly. I would stay overnight there rather than try to drive back to the townhouse in Irvine when I was overly tired.

16.     In 2019 and 2020, when Belgium Investments 960 Bay Dr., LLC ("Belgium") purportedly attempted to serve me with its summons in its Florida lawsuit against me, I was spending most days working in Santa Monica. I was not physically at the Irvine townhouse when the process server(s) purportedly attempted to personally serve me with the summons.

Reem's Lease for the Irvine Townhouse

17.     On January 1, 2017, I entered a lease with my sister, Reem Hanna for two of the bedrooms and common areas of the Irvine townhouse—one bedroom for Reem and one for her son. I continued to reside in the Irvine townhouse's third bedroom and share use of the common areas.

18.     Although Reem and I are siblings, we agreed that we should memorialize her lease in writing. I located and copied a lease from Google. I do not know if all of the language in the lease was necessary or applicable to Reem's and my situation, but it accomplished our goal of agreeing in writing to a rent price and term.

19.     Reem and I always agreed that I would continue to live in the Irvine townhouse, and I in fact have lived in the Irvine townhouse throughout the entire time that Reem has leased the other two bedrooms (2017 to present).

20.     Although I was spending a lot of time in the Santa Monica Apartment during the time since 2017 and since Reem and I entered the lease in 2017 until 2022, my clothing, furniture and other personal belongings have remained in the Irvine townhouse. The only personal items that I kept in the Santa Monica apartment were 2 t-shirts, my tennis rackets bag and my bicycle.

Other Information

21.     I renewed my drivers' license at the DMV in Santa Monica in 2017 and decided to put my business address on it because I knew that the Bungalow lounge at the Fairmont Hotel Miramar, that my business partner Rostom and I go to frequently, would allow Santa Monica residents to skip the line. Since I no longer work in Santa Monica or spend much time there, I changed my drivers' license address back to the Irvine

- 4 -

DIRECT TESTIMONY DECLARATIONS

Case 8:22-bk-11605-TA    Doc 252    Filed 08/08/23    Entered 08/08/23 14:30:54    Desc
Main Document      Page 106 of 108

1    Townhouse.  My drivers' license currently has the Irvine Townhouse address.

2        22.     I took the advice of my attorneys, Michael Sayer in the state court motion to

3    vacate sister state judgment and Michael Berger at the beginning of my bankruptcy case,

4    on how to explain the Santa Monica Apartment versus the Irvine Townhouse.  I was

5    spending time at both locations and did not intend to mislead anyone about my residency.

6        I declare under penalty of perjury of the laws of the United States of America that

7    the foregoing is true and correct.

8

9    Dated:_____ at _____, Egypt (where I am currently

10    on vacation).

11

12               **[SEE ATTACHED SIGNATURE PAGE]**

13                 BASSEM VICTOR EL MALLAKH

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DIRECT TESTIMONY DECLARATIONS

1    Townhouse. My drivers' license currently has the Irvine Townhouse address.

2        22.    I took the advice of my attorneys, Michael Sayer in the state court motion to

3    vacate sister state judgment and Michael Berger at the beginning of my bankruptcy case,

4    on how to explain the Santa Monica Apartment versus the Irvine Townhouse. I was

5    spending time at both locations and did not intend to mislead anyone about my residency.

6        I declare under penalty of perjury of the laws of the United States of America that

7    the foregoing is true and correct.

8

9    Dated: August 8th 2023 at ___Cairo_____ , Egypt (where I am currently

10   on vacation).

11

12

13   BASSEM VICTOR EL MALLAKH

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 5 -

DIRECT TESTIMONY DECLARATIONS

Created With Tiny Scanner

**DEC
9**

## DECLARATION OF BERT BRIONES

I, Bert Briones, declare and state as follows:

1.      The facts set forth in this declaration are personally known to me and if called as a witness, I could and would competently testify thereto. I make this Declaration in support of this Motion for Leave to Withdraw as Counsel of Record for Bassem Victor El Mallakh.

2.      There has been unusual challenges in communications with the debtor who I have never met in person or via videoconference. In early June 2023, the Debtor informed me he was in Egypt on vacation but would be returning to Irvine, California in mid-July however today he informed me that he would not be returning until mid-August.

3.      Bassem Victor El Mallakh has failed to abide by the terms of the representation agreement. Specifically, he failed to pay fees as agreed. The Attorney-Client Fee Agreement, fully executed on or about June 10, 2023 required a deposit of $9,000 which was not paid on time. Additionally, Attorney-Client Fee Agreement requires that when funds held in trust fall below $4,500 the attorney may make a demand payable within 15-days for additional deposits. Such a demand was made on June 10, 2023 and it now past due. Moreover, the Debtor has not made a firm commitment to make the deposit. His text message dated July 27, 2023 indicates that he will "try to send you a payment at the beginning of August once I get paid my rent money".

4.      As to today I have informed the Debtor of my intent to file the instant motion to which his response was to ask for more time. Due the payment history over the past five weeks, I am not agreeable to allow another time extension here.

5.      As of today, the trust funds are completely exhausted and further no assurances have been made to secure funds necessary to provide future services.

6.      To date the following have been drafted and filed in this case:
- Substitution of Attorney
- Disclosure of Compensation (Form 2330)
- Ex Parte Motion to Continue Hearing on Motion to Dismiss Bankruptcy Case
- Ex Parte Motion to Continue Hearing on Motion for Relief from Stay
- Ex Parte Motion to Continue Hearing on Motion re: Sanctions/Perjury

7.   To date the following have been drafted and are nearly ready to file:
- Direct Testimony Declarations in Opposition to Objection to Homestead Exemption
- Supplemental Brief in Support of Opposition to Objection to Homestead Exemption
- Opposition to Motion for Sanctions Due to Debtors Perjury
- Opposition to Motion to Dismiss
- Response to Motion Regarding the Automatic Stay

8.   Attorney has committed to meet and confer with opposing counsel on August 7, 2023 at 11:00 a.m., shortly thereafter the pleadings and documents listed above in paragraph 7 will be filed, pending any changes pursuant to the meet and confer.

9.   There are additional facts which I do not believe I can disclose which make it impossible for me to continue as counsel for Bassem Victor El Mallakh.  I believe disclosure of these facts would violate the attorney client privilege.

10.   I believe that if forced to continue as counsel of record and provide continued representation, I would be in breach of my ethical obligations under the Business and Professions Code and other applicable California Law.

I declare under penalty of perjury, under the laws of the State of California, that the foregoing is true and correct.

Executed on July 27, 2023 at Irvine, California.

/s/ Bert Briones
Bert Briones

MOTION TO WITHDRAW AS ATTORNEY OF RECORD

**SUBS**

**1**

PATRICK MILLER
Email: Patrick.miller@impactadvocateslaw.com
Impact Advocates APC
121 S Oak Ave
Pasadena, CA 91107
Telephone:    213-364-7581

Attorney for Judgement Creditor
BELGIUM INVESTMENTS 960 BAY DR,
LLC A CALIFORNIA CORP.

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

| In re Bassem Victor El Mallakh | Case No 8:22-bk-11605-TA |
|---|---|
| | Chapter 11 |
| | **NOTICE OF OBJECTION AND OBJECTION TO DEBTOR'S CLAIMED HOMESTEAD EXEMPTION; MEMORANDUM OF POINTS & AUTHORITIES; DECLARATION OF PATRICK MILLER** |
| | **Date**: 11 January 2023 |
| | **Time**: 10am |
| | **Crtrm**: Virtual/5B |

**TO THE HONORABLE THEODOR ALBERT, UNITED STATES**

**BANKRUPTCY JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE, THE**

**DEBTOR AND HIS ATTORNEYS OF RECORD, AND ALL PARTIES IN INTEREST:**

**PLEASE TAKE NOTICE** that on 11 January 2023 at 10:00 am, or as soon thereafter as

the Court may hear the matter, in Courtroom 5B (or via Zoom) of the United States Bankruptcy

Court located at 411 West Fourth Street, Santa Ana, CA 92701, the Court will conduct a hearing

OBJECTION TO DEBTOR'S CLAIMED HOMESTEAD EXEMPTION

Page. 1

on the OBJECTION TO DEBTOR'S CLAIMED HOMESTEAD EXEMPTION filed by the

Creditor Belgium Investments 960 Bay Dr, LLC, a California Corp. ("**Belgium**")

    The grounds for the relief requested in the Objection are that: the Debtor has presented

conflicting testimony as to his residence while there is objective evidence showing he does not

reside at the subject property. Debtor's failure to demonstrate his residence prevents his claiming

an automatic homestead exemption. He is also prevented from claiming the homestead

exemption in the present proceedings by virtue of res judicata because the matter has already

been ruled upon in a previous hearing. Additionally, if any homestead exemption is available, it

should be limited to the amount available at the time when Belgium's Abstract of Judgement was

recorded on 9 November 2020.

    The Objection is based on this Notice, the accompanying Memorandum of Points and

Authorities, the concurrently filed Declaration of Patrick Miller, all pleadings on file in this case,

all other matters of which this Court may take judicial notice pursuant to Rule 201 of the Federal

Rules of Evidence, and such other arguments and/or evidence as may be presented at or prior to

the hearing on the Motion.

    **PLEASE TAKE FURTHER NOTICE** that any response/opposition to the Objection

must be in writing, filed with the Court, and served on counsel for Belgium at the address listed

above, at least 14 days prior to the hearing date of 11 January 2023.

    **PLEASE TAKE FURTHER NOTICE** that the failure to respond in writing by the

above referenced deadline may be deemed by the Court to be a lack of opposition to the relief

requested in the Objection.

1    Dated:        23 Nov 2022                              Impact Advocates APC

2

3

4                                                          By_____

5                                                              Patrick Miller
                                                             Attorney for
6                                                            Judgement Creditor
                                                             Belgium Investments
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

OBJECTION TO DEBTOR'S CLAIMED HOMESTEAD EXEMPTION

# TABLE OF CONTENTS

| Section | Description | Page |
|---------|-------------|------|
| I | Introduction. | 5 |
| II | The Objection is timely. | 6 |
| III | Debtor has the burden of proving his right to the HS exemption. | 6 |
| IV | Debtor's evidence is not credible because it is contradictory and transparently self-serving. | 7 |
| IV.A | Summary of the two stories advanced by Debtor regarding his residency. | 7 |
| IV.B | Summary of the relevant factual background. | 8 |
| V | The objective evidence shows that Debtor does not reside in the Rockefeller Property. | 18 |
| VI | Debtor does not meet the legal requirements for claiming an automatic homestead exemption because he does not reside in the subject property. | 20 |
| VII | Debtor is estopped from claiming a HS exemption in the present bankruptcy proceedings by virtue of res judicata. | 22 |
| VIII | If a HS exemption is available, it should be capped at $75,000 because this was the maximum amount available when the Abstract of Judgement was recorded. | 23 |
| IX | Conclusion. | 25 |

<div style="text-align:center">

**POINTS & AUTHORITIES**

</div>

**I.      Introduction.**

The debtor is not entitled to claim the automatic homestead exemption under California Civil Procedure Code Sections 704.710-850 (the "**HS exemption**") because he has not established that he resided in the subject property at any time in the past five years. The subject property is located at 116 Rockefeller, Irvine, CA, 92612 (the "**Rockefeller Property**").

 Debtor has not produced any credible evidence as to where he *intends* to reside and/or where he *actually* resides. This is because he has given conflicting testimony when it suits his interest.

As will be elaborated below, when he was contesting service of process in connection with the proceedings in Florida (and the enforcement of the default judgement resulting from the same), Debtor claimed on multiple occasions that he had not resided in the Rockefeller Property since late-2016 and only visited the Rockefeller Property a handful of times during that period. He claimed to reside full-time at the apartment he rented located at 525 Broadway, Santa Monica, CA, 90410 (the "**Santa Monica Property**").

Now that he is hoping to obtain an automatic HS exemption through this bankruptcy, he claims that he has continually resided in the Rockefeller Property since he purchased it in 2013, suggesting that he would commute to Los Angeles and only occasionally sleep at the Santa Monica Property overnight.

Debtor's evidence cannot be trusted because he has egregiously changed his story to suit his changing legal position. In the absence of credible evidence from Debtor, this court should rely on the key pieces of objective evidence that are available. In particular, it should rely on the lease agreement between Debtor and his sister, Reem Hanna, which makes clear that Debtor has no right to occupy the Rockefeller Property until at least 1 January 2025. Under such circumstances,

<div style="text-align:center">

OBJECTION TO DEBTOR'S CLAIMED HOMESTEAD EXEMPTION

Page. 5

</div>

1

2

Debtor cannot argue that he resides in the Rockefeller Property which is a requirement for

claiming an automatic HS exemption.

3

4

5

6

7

Separately, this court should not make a new ruling on the HS exemption by virtue of the

doctrine of res judicata, since this matter was already addressed during the enforcement action in

California and the Orange County Superior Court has already issued an order finding that the

Rockefeller Property is not subject to a HS exemption.

8

9

10

11

Notwithstanding the points above, if the court finds that Debtor is entitled to claim a HS

exemption, the maximum amount of the HS exemption should be capped at $75,000 as this is the

amount which was available to Debtor at the time Belgium's Abstract of Judgement was

recorded.

12

13

**II.  The Objection is timely.**

14

15

16

17

18

Fed. R. Bankr. P. 4003(b) states: "a party in interest may file an objection to the list of

property claimed as exempt within 30 days after the meeting of creditors held under §341(a)

("**341 meeting**") is concluded or within 30 days after any amendment to the list of or

supplemental schedules is filed, whichever is later." The 341 meeting in this case was first held

on 28 October 2022. As such, this objection is timely.

19

20

**III. Debtor has the burden of proving his right to the HS exemption.**

21

22

23

24

25

26

27

The burden of proof regarding a disputed claim of exemption based on the provisions of

the Bankruptcy Code rests upon the objecting party. Fed. R. Bankr. P. 4003(c). However, if the

exemption is based on state law—as it is here—the burden of proof is governed by state law. See

In re Pashenee, 531 B.R. 834, 837 (Bankr. E.D. Cal. 2015) (citing Raleigh v. Illinois Dept. of

Rev., 530 U.S. 15 (2000)); see also In re Albert- Sheridan, 2019 WL 7372667, at *7 (B.A.P. 9th

Cir. Dec. 18, 2019) ("where the debtor asserts exemption claims based on state law, the burden

of proof is a substantive part of the exemption claim, so where a state law exemption statute

28

specifically allocates the burden of proof to the debtor, [the bankruptcy rules] do not change that allocation.").

Here, California exemption law applies because California has opted out of the federal exemptions provided to debtors under 11 U.S.C. § 522(b)(2), (see Cal. Code. Civ. Proc. § 704.130). Debtor has the burden of establishing his exemption rights under Cal. Code Civ. Proc. §704.780(a)(1). Accordingly, the Debtor bears the burden of proof regarding the validity and amount of the claimed HS exemption.

**IV. Debtor's evidence is not credible because it is contradictory and transparently self-serving.**

Below, we set out some key points in the factual background which demonstrate Debtor's continued resort to deceit in order to suit the legal needs of the moment, with particular emphasis on the conflicting testimony relating to his residency at the Rockefeller Property.

**A. Summary of the two contradictory stories advanced by Debtor regarding his residency.**

We appreciate that it may be difficult to absorb the various stories advanced by Debtor since there are so many conflicting details. We have therefore attempted to summarize the Debtor's two stories as to his residency before setting out the factual background in detail.

The ("**Service of Process Story**") was put forward in Feb/Mar 2021 while Debtor was arguing that service of process in both Florida and California was deficient. It was supported by written and oral testimony from Debtor & his sister—and sworn to under penalty of perjury. It can be summarized as:

- From 1 Nov 2016 until the date the evidence was given (Feb/Mar 2021), Debtor resided in the Santa Monica Property exclusively and almost never went to the Rockefeller Property or saw his sister. His sister lived in the Rockefeller Property with her teenage son and no one else, beginning on 1 January 2017.

Now, as the Debtor is presently arguing that he qualifies for the automatic HS exemption, he has advanced what can be referred to as the ("**HS Exemption Story**"), which Debtor has told (and retold) at multiple 341 meetings under penalty of perjury. It can be summarized as:

- Debtor always resided in the Rockefeller Property since the time he purchased the townhouse in 2013. The Santa Monica Property was only a place that he occasionally stayed overnight while he was working on a startup venture based in Los Angeles. He stayed in the Rockefeller Property most days, unless he had to stay overnight in Los Angeles to avoid lengthy commutes. His sister did not move into the Rockefeller Property until late-2018 (despite there being a lease agreement which was signed on 1 January 2017) and she lived in the townhouse with her teenage son and adult brother/landlord (Debtor).

### B. Summary of the relevant factual background

On 17 August 2018, Belgium filed a complaint in the 11th Circuit Court of Florida claiming millions of dollars in damages due to various acts of fraud and other misconduct committed by the Debtor[1]. Importantly, at no point during the numerous submissions which have been filed has Debtor ever suggested that he is innocent of this misconduct or that he would otherwise assist Belgium in its efforts to obtain redress[2]. One might expect that an innocent defendant might highlight that point in a motion to dismiss a default judgement, or to stay execution of the same, even if the substance of the claim was not technically at issue.

On 17 April 2019, Debtor's sister, Reem Hanna, was served with the complaint and other related documents at the Rockefeller Property[3].

A default judgment (the "**FL judgement**") was entered on 25 February 2020[4]. The FL judgement was entered in California on 18 June 2020[5].

---

[1] See the Declaration of Patrick Miller at paragraph 4.
[2] See the Declaration of Patrick Miller at paragraph 4.
[3] See Belgium's Response to Debtor's Motion to Vacate in Florida with Motion for Sanctions for Debtor's Perjury at Ex 1; see also the Declaration of Patrick Miller at paragraph 5.

OBJECTION TO DEBTOR'S CLAIMED HOMESTEAD EXEMPTION

On 13 September 2020, the Notice of Entry of Sister State Judgement and related documents were served on Debtor's sister, Reem Hanna, at the Rockefeller Property[6]. The Abstract of Judgment was recorded by the Orange County Recorder's office on 9 November 2020[7].

Debtor's bank accounts, and the Rockefeller Property, were levied upon in early-2021[8]. Following these levies, the Debtor filed motions to vacate the FL Judgement and the entry of the same in California[9]. On 17 February 2021, Debtor filed a motion to vacate the sister state judgement in Orange County Superior Court. Debtor included a signed Declaration with this motion which states:

> *I have been residing fulltime at my residence in Santa Monica since 11/21/16.*
>
> *Attached hereto as Ex.6 is a true and correct copy of the lease I executed for my residence in Santa Monica.*
>
> ...
>
> *I have not occupied the real property located at 116 Rockefeller, Irvine CA. since 11/21/16.*
>
> *Although I own the property at 116 Rockefeller, Irvine CA,* ***I leased the property to Reem Hanna, commencing 1/17/17.*** *Attached hereto is as Ex.7, is true and correct copy of the lease as between myself and Reem Hanna.*
>
> ...
>
> *I had no idea that the Judgment Creditor had filed an Application For Entry of Sister State Judgment, the Notice of Entry of Sister State Judgment, or the Sister State*

---

[4] See Belgium's Default Judgement against the Debtor at Ex 2 ;see also the Declaration of Patrick Miller at paragraph 6.
[5] See the Declaration of Patrick Miller at paragraph 7.
[6] See Belgium's Proof of Service for the enforcement documents at Ex 3; see also the Declaration of Patrick Miller at paragraph 8.
[7] See Belgium's Abstract of Judgement at Ex 4; see also the Declaration of Patrick Miller at paragraph 9.
[8] See the Declaration of Patrick Miller at paragraph 10.
[9] See the Declaration of Patrick Miller at paragraph 10.

*Judgment. I had never seen the documents until I hired counsel to represent me and set the Sister State Judgment aside.* (emphasis added)[10].

To summarize the above quotes, Debtor stated that: (i) he had not resided in the Rockefeller Property since late-2016; (ii) he rented the Rockefeller Property to his sister; and (iii) his sister had not informed him that she had received documents which stated that he was liable for a judgement that exceeded $4 million.

Debtor's sister, Reem Hanna, also submitted a signed Declaration in support of the motion to vacate which stated:

*I have been residing fulltime at my residence at 116 Rockefeller, Irvine CA since 1/1/17. Attached hereto is as Ex.7 is a true and correct copy of the lease I executed for my residence.*

*I have never been served with the Application For Entry of Sister State Judgment, the Notice of Entry of Sister State Judgment or the Sister State Judgments.*

*The process server never served me as claimed in the proof of service attached as Ex 5.*

*The proof of serve states at section 5.b. that the process server left a copy of the documents with, "Hanna Reem **co-occupant** to Bassem Essam El Mallakh." (Emphasis added [in original text]). This is a complete untruth. **First, I was never served, and second Bassem Essam El Mallakh is not nor ever has been a co-occupant at my residence. Since the inception of the lease Bassem Essam El Mallakh has never-been a co-occupant.** (emphasis added)[11].*

---

[10] See the Declaration filed by Debtor in support of his motion to vacate entry of default judgement in California at Ex 5; see also the Declaration of Patrick Miller at paragraph 11.

[11] See the Declaration filed by Debtor's sister, Reem Hanna, in support of his motion to vacate entry of default judgement in California at Ex 6; see also the Declaration of Patrick Miller at paragraph 12.

OBJECTION TO DEBTOR'S CLAIMED HOMESTEAD EXEMPTION

In summary, Debtor's sister made many of the same claims regarding her and her brother's residency. Although she added the incredulous claim that the proof of service filed by the Process Server was false in that she was never served with the documents.

On 19 February 2021, Debtor filed a motion to vacate the default judgement in FL which made the same claims as above (supported by another signed Declaration by the Debtor and his sister)[12].

On 18 March 2021, Debtor participated in a deposition conducted by Belgium's Florida counsel in connection with the motion to vacate in Florida where he made numerous statements in support of his Service of Process Story[13]. Frankly, there are so many instances of testimony which conflicts with the recent HS Exemption Story that it would belabor the text to include each instance. Below we have set out a few key instances of testimony where Debtor makes statements which are wholly-incongruous with the HS Exemption Story, a more comprehensive set of extracts from Debtor's deposition testimony is attached at Ex 8:

*Q. **Okay. Where do you reside**?*

*A. **I live in Santa Monica.***

*Q. Okay. What address?*

*A. **525 Broadway**.*

*Q. How long have you resided there?*

*A. Since November 1st of 2016.*

*Q. **And do you essentially sleep every night there***

***in 525 Broadway in Santa Monica?***

*A. **Yes.***

(see pg 25)

*Q. Was there a Ring camera at your property at 116 Rockefeller in 2019?*

---

[12] See the Declaration of Patrick Miller at paragraph 13.
[13] See the Transcripts of the Deposition of Bassem Essam El Mallakh dated 18 March 2021 at Ex 7; see also the Declaration of Patrick Miller at paragraph 14.

OBJECTION TO DEBTOR'S CLAIMED HOMESTEAD EXEMPTION

*A.* **To be -- to be honest with you, I have not been here in 116 Rockefeller for about probably like over two and a half years, maybe -- maybe more, you know.**

*Q. Okay.*

*A. It's been a while.*

*...*

*Q. Do you know if there was a Ring intercom system in 2020 at 116 Rockefeller?*

*A. Can you -- can you raise your voice a bit?*

*Q. Yeah. Was there a Ring camera system at 116 Rockefeller in 2020, to your knowledge?*

*MR. DELLORUSSO: Objection.*

*THE WITNESS: I'm not sure, Andrew, because, as I mentioned to you,* **I have not been in the Irvine house, not even once in 2020, not even once in 2019. I believe even when I came to Orange County in 2018 it was just for Christmas** *-- Christmas Eve at my cousin's house in Mission Viejo area, which is like south of Irvine.*

(pgs 36-37)

*BY MR. DELLORUSSO [Counsel for the Debtor]:*

*Q. In the year of 2018, where was your primary residence?*

*A. 525 Broadway, Santa Monica, Los Angeles.*

*Q. In the year 2019, where was your --*

*A. 525 Broadway, Santa Monica, Los Angeles.*

*Q. In the year 2020, where was your primary residence?*

*A. 525 Broadway, Santa Monica, Los Angeles.*

*Q. And is that the same for 2021?*

*A. Yes.*

(pg 61)

*Q. Okay. And then I want to briefly discuss with you -- let's see if I can -- the 116 Rockefeller, Irvine, California, address. Are you aware of that address?*

*A. Yes, I am.*

OBJECTION TO DEBTOR'S CLAIMED HOMESTEAD EXEMPTION

Page. 12

*Q. Okay. **And who resides at that address?***

*A. **My sister, Reem Hanna.***

*Q. **And does she reside with anybody else?***

*A. **No. She lives with her son.***

*Q. **Okay. Do you reside at that address?***

*A. **I do not.***

(pg 62) (emphasis added)[14].

Debtor's sister, Reem Hanna, also participated in a deposition on the same day in March 2021 where she gave further evidence in support of the Service of Process Story[15]. Again, a full set of extracts can be found at Ex 10, below are just a few of the many problematic statements made during her deposition:

*Q. Okay**. Did you live with anybody else at 116 Rockefeller, Irvine, California in April 2019?***

*A. My son.*

*Q. Okay. How old is your son?*

*A. He's 15.*

*Q. Okay. **So it's just you and your son at 116 Rockefeller, Irvine in March and April 2019?***

*A. **Yes.***

(pgs 45-46)

*Q. Okay. **How often do you see your brother?***

*A. **Not very often.***

*Q. Okay. **In 2020, how many times would you say***

*you'd see your brother?*

*MR. DELLORUSSO: Objection.*

---

[14] See the Extracts of the Deposition of Bassem Essam El Mallakh dated 18 March 2021 at Ex 8; see also the Declaration of Patrick Miller at paragraph 15.

[15] See the Transcripts of the Deposition of Reem Hanna dated 18 March 2021 at Ex 9; see also the Declaration of Patrick Miller at paragraph 16.

OBJECTION TO DEBTOR'S CLAIMED HOMESTEAD EXEMPTION

Page. 13

1

*THE WITNESS: I don't remember.*

2

*...*

3

*Q. Okay. Would you say you saw your brother more*

4

*than 10 times in 2020?*

5

*A. Probably not.*

6

*Q. Okay. So you see your brother -- you saw your*

7

*brother less than 10 times in 2020?*

8

*MR. DELLORUSSO: Objection.*

*THE WITNESS: Yeah. Maybe even less.*

9

*BY MR. BERNHARD:*

10

*Q. Okay.*

11

**A. Very infrequent.**

12

*Q. Okay. What about 2019; same amount of time?*

13

**You saw your brother more or less than five times or so in 2019?**

14

**A. Probably.**

15

**Q. Okay. What about 2021; how often do you see your brother?**

16

**A. Very infrequent.**

17

*Q. Okay. So one of those where you say less than*

18

*five times in 2021? It's only been three months.*

19

*A. Oh, for sure.*

20

(pgs 62-63) (emphasis added)

21

*Q. Okay. The 116 Rockefeller, Irvine, California address, is that your residence?*

22

*A. Yes.*

23

*Q. You live there?*

24

*A. Yes.*

25

**Q. Does your brother, Bassem Essam El Mallakh, live there?**

26

**A. No.**

27

**Q. Where does he live?**

28

**A. In Santa Monica.**

OBJECTION TO DEBTOR'S CLAIMED HOMESTEAD EXEMPTION

Page. 14

(pg 91) (emphasis added)[16].

On 15 May 2021, the Florida court denied Debtor's motion to vacate[17]. While Debtor and his sister contended he never had knowledge of the Florida proceedings, the Florida court did not find those statements persuasive, instead citing Debtor's own deposition testimony where he accepted that he <u>did</u> have knowledge of the claims against him in Florida[18].

Following the denial of his motion to vacate in Florida, Debtor put forward several new arguments (largely based on factual issues) as to why the decision should be revisited. These motions have been summarily dismissed by the Florida courts[19].

For nearly a year, the various motions to revisit the court's decision in Florida allowed for a stay of enforcement in California. Notably, Debtor claimed that the Rockefeller Property would not change in character and this was a reason against ordering that an undertaking be provided to secure Belgium's judgment[20].

Nonetheless, by April 2022, the Florida courts had made clear that Debtor's attempts to revisit the decision would not prevail and the Orange County Superior Court confirmed its order to sell the Rockefeller Property[21]. This Order specifically stated that the Rockefeller Property is not subject to a HS exemption (see further below at Section VII on res judicata)[22]. During the

---

[16] See the Extracts of the Deposition of Reem Hanna dated 18 March 2021 at Ex 10; see also the Declaration of Patrick Miller at paragraph 17.

[17] See the Order Denying Debtor's Motion to Vacate from the 11th Circuit Court in Florida at Ex 11; see also the Declaration of Patrick Miller at paragraph 18. Debtor's motion to vacate in California was also denied on 15 July 2021.

[18] See Ex 11, where the court states on page 11 of its ruling: *"Here, El Mallakh [Debtor] had repeated notice of this lawsuit and opportunity to be heard, over and over again for years. El Mallakh recently testified that he was specifically aware of this lawsuit as of October 9, 2019, and specifically aware that Belgium was attempting service of summons upon him at that time"*.

[19] These dismissals can be found at Ex 12; see also the Declaration of Patrick Miller at paragraph 19.

[20] See the Declaration of Patrick Miller at paragraph 20.

[21] See the Orange County Superior Court's Order to sell the Rockefeller Property at Ex 13; see also the Declaration of Patrick Miller at paragraph 21. The hearing on this order was held on 21 April 2022 and the order was filed by the clerk on 10 May 2022.

[22] See the Orange County Superior Court's Order to sell the Rockefeller Property at Ex 13; see also the Declaration of Patrick Miller at paragraph 21. The hearing on this order was held on 21 April 2022 and the order was filed by the clerk on 10 May 2022.

hearing on whether to sell the property in April 2022, the court noted that it did not have any evidence that Debtor resided in the Rockefeller Property—this was an issue because much of Debtor's arguments against ordering a sale of the property were only relevant if it were a homestead[23]. If Debtor resided there at the time, he might have presented such evidence.

We understand that Debtor first met with bankruptcy counsel at the law firm Heston & Heston in April 2022, this seems to have been after the sale order was confirmed at the hearing on 21 April 2022—although we cannot be sure as the Debtor has not confirmed the exact date in his Declaration[24].

In July 2022, over two months after first meeting with bankruptcy counsel, Debtor filed for Ch 13 protection on the eve of the Sheriff's sale despite him being clearly over the limit for liabilities under this chapter. The bad faith nature of this filing has been addressed in previous submissions.

As of 7 September 2022, Debtor still contended through his Declaration that he was not served with documents for the Florida proceedings despite the evidence that these documents were served at the Rockefeller Property (where he now claims to have been residing when the documents were served)[25].

The present case was filed under Ch 11 on the eve of the second scheduled Sheriff's sale of the Rockefeller Property—and Belgium maintains that this has also been filed in bad faith.

There have been two recent creditors meetings under Section 341 of the Bankruptcy Code in connection with these Ch 11 proceedings. The first meeting took place on 28 October 2022 and the second meeting took place on 10 November 2022. Belgium's counsel was only

---

[23] See the Opposition filed by Debtor on 1 April 2022 at Ex 14; see also the Declaration of Patrick Miller at paragraph 22.
[24] See the Declaration of the Debtor filed in the Ch 11 proceedings at Ex 15; see also the Declaration of Patrick Miller at paragraph 23.
[25] See Ex 15 at paragraph 2.

OBJECTION TO DEBTOR'S CLAIMED HOMESTEAD EXEMPTION

present telephonically at the second meeting—but has listened to the recordings of both meetings[26].

For the first time, Debtor has now begun to claim that he continually resided at the Rockefeller Property and that he would only occasionally stay at the Santa Monica property when it was necessary—we are characterizing this as the HS Exemption Story. In particular, he stated:

> "The Rockefeller is my house, **Rockefeller has been my house since I bought it in 2013, it's always been my primary house**, actually it's my only house that I own and I live in it. And then just during that period when my friends and I started working on a tech startup and we were just like working together during the R&D stage, so most of the expertise that we were meeting and trying to work with, they all lived in LA, so I was meeting and commuting to LA on almost a daily basis and weekly basis. And then it was just like difficult to drive through traffic every day and sometimes it could take three hours just to get there and back. **So then my friend and I we just decided to get a place close to most of the expertise that we needed to meet up with. So then you know we would just like work all day and then spend the night and then I would go back to Orange County the next day or what-not. And then at one point, you know, I would just like maybe go to Santa Monica for like 3 days a week or 4 days a week, and then I would always come back to my house [the Rockefeller Property] on the weekends when I finished work."** (emphasis added)[27].

He proceeded to confirm that he began leasing the Santa Monica Property in November 2016, but still he:

> **"would stay in Rockefeller, you know, most of the time, and then when I don't have any work, then I, you know, I don't actually have to go to Santa Monica,** just like stay and relax in the Rockefeller, but, you know, the Santa Monica is basically an office, like a, kind of a

---

[26] See the Declaration of Patrick Miller at paragraph 24.

[27] See the recording of the second 341 Creditor's meeting which took place on 10 November 2022 at minutes 32-34; see also the Declaration of Patrick Miller related to the same at paragraph 24. A similar statement was made during the first 341 meeting and can be heard around minute 16.

*live and work kind of an office, while I'm working on the project...***Like an office that you can**
**actually spend the night in if you're tired from work and don't wanna drive**, *you know, back*
*late."* (emphasis added)[28].

Debtor then explained that his business partner, Mohamed Rostom, is still currently
living at the Santa Monica property and that he (Debtor), still stays overnight in the Santa
Monica apartment on a weekly basis and they are hoping to work together on a new business
project[29].

Debtor also stated that his sister, Reem Hanna, did not begin living in the Rockefeller
Property until late-2018[30]. This also contradicts their previous testimony in support of the
Service of Process Story—and is but one further instance of Debtor's contradictory evidence.

As is clear from the above, the Service of Process Story—which Debtor and his sister
testified to on numerous occasions in 2021—is wholly-inconsistent with the HS Exemption
Story—which the Debtor has now sworn to on multiple occasions in these Ch 11
proceedings.

Debtor's evidence as to his residency is transparently self-serving, contradictory and
therefore wholly-unreliable.

## V.   The objective evidence shows that Debtor does not reside in the Rockefeller
Property.

Debtor's evidence regarding his residency is riddled with contradictions and transparently
self-serving. This evidence cannot be relied upon when assessing (i) where he resided during the
operative time frame; and/or (ii) his entitlement to claim the automatic homestead exemption.

---

[28] See the recording of the second 341 Creditor's meeting which took place on 10 November 2022 at minutes 32-34; see also the Declaration of Patrick Miller related to the same at paragraph 24. A similar statement was made during the first 341 meeting and can be heard around minute 16.
[29] See the recording of the second 341 Creditor's meeting which took place on 10 November 2022 at minutes 35-37; see also the Declaration of Patrick Miller related to the same at paragraph 24.
[30] See the recording of the second 341 Creditor's meeting which took place on 10 November 2022 at minute 6; see also the Declaration of Patrick Miller related to the same at paragraph 24.

OBJECTION TO DEBTOR'S CLAIMED HOMESTEAD EXEMPTION

In the absence of credible testimony from the Debtor as to his residency, the court should rely on the key pieces of objective evidence which are available, particularly the lease agreement between Debtor and his sister, Reem Hanna[31]. This approach is consistent with the California jurisprudence on this issue (see eg *In re Bhangoo,* 634 B.R. 80, 89 (B.A.P. 9th Cir. 2021), where the court stated "*courts should focus on what objective evidence showed an intent to return*" when assessing the residency requirement to claim a homestead exemption).

The lease agreement attached to Debtor's February 2021 Declaration, which has a term from 1 January 2017 until 31 December 2024, does not allow Debtor to reside in the Rockefeller Property. It states: "*[t]he Premises is to be occupied strictly as a residential dwelling **with only the Tenant(s) mentioned above [Reem Hanna] as the Occupant(s)**.*"[32] (emphasis added).

It goes on to state that: *[t]he Landlord [Debtor] hereby rents to the Tenant(s), subject to the following terms and conditions of this Agreement, a condominium with the address of 116 Rockefeller, Irvine, California, 92612 **consisting of 3.5 bathroom(s) and 3 bedroom(s) hereinafter known as the "Premises"*** [33] (emphasis added).

The lease covers the entirety of the Rockefeller Property and states that no one else shall reside within it. This means that Debtor has no right to reside in the Rockefeller Property, irrespective of what he presently claims. Since Debtor cannot reside in the property, he cannot avail himself of the automatic HS exemption.

There are several other indications that point to Debtor residing elsewhere, including:

  o Debtor admits that he still regularly stays overnight in the Santa Monica Property;

---

[31] This was attached to his February 2021 Declaration and can be found at Ex 5. Debtor has confirmed that this is the only lease agreement covering the Rockefeller Property and that the only change made to the agreement concerns the price raise from $3,00/month to $4,000/month (although he has not confirmed when this change went into effect). See the recording of the 341 Creditor's meeting which took place on 10 November 2022 at minute 4; see also the Declaration of Patrick Miller related to the same at paragraph 24.

[32] See page 1 of the lease agreement attached to Debtor's February 2021 Declaration at Ex 5.

[33] See page 1 of the lease agreement attached to Debtor's February 2021 Declaration at Ex 5.

- o The lease for the Santa Monica Property which was signed by Debtor, and his business partner Mohamed Rostom, is still currently operative;

- o Debtor's family also has a house in Egypt where he stays overnight;

- o Debtor is considering taking a job that would have him living in Egypt for potentially half the year and his work would be based in either Los Angeles or Orange County for the remainder of the year;

- o It seems unusual that Debtor's sister, Reem Hanna, has agreed to pay $4,000 per month to a bankrupt landlord, who is also her brother, even when he insists on living with her and her teenage son in a three-bedroom townhouse.

**VI.   Debtor does not meet the legal requirements for claiming an automatic homestead exemption because he does not reside in the subject property.**

This is not a declared homestead, therefore Debtor must qualify for California's automatic homestead exemption under California Civil Procedure Code Sections 704.710-850. But the Rockefeller Property does not meet the definition of homestead under the CCP because Debtor did not reside there when Belgium's judgement lien attached to the dwelling—being the day the Abstract of Judgement was recorded on 9 November 2020. This issue was already addressed—and dispensed with—in previous proceedings (see further below at Section VII on res judicata).

Debtor may suggest that some alternative date is operative for determining whether he meets the residency requirement under California law. However, this is neither here nor there because the Debtor's evidence as to his residency for the past five years is wholly-unreliable and self-serving. As such, reliance should be placed on objective evidence, particularly the lease agreement with his sister which makes clear that he has not resided in the Rockefeller Property since the lease was signed on 1 January 2017.

*"The essential factors in determining residency for homestead purposes are physical occupancy of the property and the intent to live there."* (see *In re Fisher*, No. 09-91587-D-7,

2009 WL 9087842, at *2 (Bankr. E.D. Cal. Sept. 22, 2009), citing *In re Dodge,* 138 B.R. 602, 607 (Bankr.E.D.Cal.1992), citing *Ellsworth v. Marshall,* 196 Cal.App.2d 471, 474 (1961)).

It is difficult to find jurisprudence squarely relevant to this situation because there are few (if any) cases where Debtor's evidence on his residency is wholly-contradictory. Usually, there is credible evidence put forward by the Debtor that they intend to—and/or actually—reside within the subject property and the court is asked to assess whether objective factors support Debtor's credible evidence.

Here, Debtor's evidence as to his intent and actual residency is wholly-unreliable and self-serving. Therefore, the court should rely on other objective indicia, which all point to the conclusion that he does not reside in the subject property—and thus cannot claim it as an automatic homestead.

This is not a case where Debtor stays in multiple places and has provided credible evidence of its intent to reside in the subject property such that the court is asked to assess whether Debtor has the requisite intent. This case is similar to the facts in *In re Yau*, 115 B.R. 245, 249 (Bankr. C.D. Cal. 1990), where the Debtor "***provided no evidence*** *of how much time may lapse before they would return or, indeed,* ***that they would ever move back into the [subject] property****. Thus,* ***because the Debtors are not temporarily absent from the [subject] property and have not resided at the [subject] property since before this chapter 7 case was filed, they are not entitled to the automatic dwelling exemption of CCP section 704.730.****"* (emphasis added).

The Sections below addressing res judicata and the amount of the available HS exemption under California law may give rise to legal issues for review. But the present inquiry, which obviates the need for any further inquiry below, is a straightforward factual inquiry which asks this court to determine the facts as to Debtor's residency based on the credible, objective

evidence which is available. As set out above, Debtor does not reside in the subject property and

therefore cannot claim a HS exemption.

**VII.**  **Debtor is estopped from claiming a homestead exemption in the present**

**bankruptcy proceedings by virtue of res judicata.**

The homestead issue was specifically addressed at the hearing on the Order for Sale of

the Rockefeller Property on 21 April 2022 when the Debtor's counsel argued against the Order

because certain steps weren't taken which would be applicable to selling real property subject to

a homestead exemption, eg obtaining an estimate of the property's value. During the hearing, the

court asked Debtor's counsel whether he had any basis to argue that this property qualified as a

homestead. Debtor's counsel did not provide any evidence/basis and the resulting Order for Sale

specifically noted that "*that the property is not subject to any homestead exemption*" based on

proof made to the satisfaction of the court.

"*Generally, the preclusive effect of a former adjudication is referred to as 'res judicata.*'"

*Robi v. Five Platters, Inc.*, 838 F.2d 318, 321-22 (9th Cir. 1988). Res judicata includes two types

of preclusion: "claim preclusion" and "issue preclusion."

There are three elements a party must establish to invoke claim preclusion: (i) an identity

of claims; (ii) a final judgment on the merits; and (iii) party privity. *Tahoe-Sierra Preservation*

*Council, Inc. v. Tahoe Reg'l Planning Agency*, 322 F.3d 1064, 1077 (9th Cir. 2003). Here, all

three requirements are met—and the Sale Order acts as claim preclusion barring the Debtor's HS

exemption claim in the Rockefeller Property.

The Sale Order dated 10 May 2022 (at Ex 13) is certainly a final order and the parties to

that action are identical to the present parties (Belgium and Debtor).

The "identity of claims" requirement is satisfied because the hearing on the Order of Sale

and the Superior Court's Sale Order involve the same nucleus of facts, the same rights (eg

Debtor's right to claim a HS exemption), and depend on substantially the same evidence. Additionally, the rights established through the Superior Court's Sale Order would be destroyed or impaired if Debtor is allowed to claim a HS exemption in these proceedings. *See Mpoyo v. Litton Eletrco-Optical Sys.*, 430 F.3d 985, 987 (9th Cir. 2005) (addressing factors considered in analyzing presence of "identity of claims").

In the 9th Circuit, issue preclusion applies where (1) there was a full and fair opportunity to litigate the identical issue in the prior action; (2) the issue was actually litigated in the prior action; (3) the issue was decided in a final judgment; and (4) the party against whom issue preclusion is asserted was a party or in privity with a party to the prior action. *Syverson v. International Business Machines Corp.,* 472 F.3d 1072, 1078 (9th Cir.2007) (citations omitted). Here, the Court should sustain the Objection and disallow the Exemption because each element of issue preclusion is established.

There was a full and fair opportunity to litigate this issue as Debtor's counsel set out its objections to the sale order in written submissions and then repeated those objections at the hearing. The only available evidence was Debtor's February 2021 Declaration where stated he did not reside in the Rockefeller Property. If there was other proof to put forward, there wa opportunity to do so. The issue was actually litigated at the hearing on the Order for Sale of the Rockefeller Property, which resulted in a final judgement, against the Debtor.

**VIII.      If a HS exemption is available, it should be capped at $75,000 because this was the maximum amount available when the Abstract of Judgement was recorded.**

Notwithstanding the above arguments as to Debtor's residency and res judicata, Debtor is not entitled to claim a homestead exemption of $626,000 under controlling California and 9th Circuit law. Debtor is apparently claiming the increased homestead exemption rate in effect following

the change in California law effective 1 January 2021. However, Belgium's Abstract of

Judgment was recorded on 9 November 2020—which is before that change came into effect. He

is only entitled to claim an exemption amount of $75,000 pursuant to the version of Cal. Civ.

Proc. Code § 703.730 which was in effect on the day the lien was created.

The 9th Circuit has repeatedly held that California exemption law must be applied in

California bankruptcies because "*California has chosen to 'opt out' of the federal exemption*

*scheme, so California residents filing for bankruptcy are limited to the exemptions afforded*

*under state law.*" In re Rolland, 317 B.R. 402, 412 (Bankr. C.D. Cal. 2004) (citation omitted).

As such, issues such as the amount of an available exemption must be resolved based on

California law (see In re Nolan, 618 B.R. 860, 863 (Bankr. C.D. Cal. 2020) (citing In re

Tallerico, 532 B.R. 774, 780 (Bankr. E.D. Cal. 2015)).

Under California's exemption law, **"[t]he determination whether property is exempt**

**or the amount of an exemption shall be made by application of the exemption statutes in**

**effect (1) at the time the judgment creditor's lien on the property was created** . . . ." Cal.

Civ. Proc. Code § 703.050(a) (emphasis added). Here, the lien was created when the Abstract of

Judgement was recorded on 9 November 2020.

This approach is supported by California jurisprudence. See, e.g., In re Yau, 115 B.R.

245, 251 (Bankr. C.D. Cal. 1990) (a decision by retired bankruptcy judge Alan Ahart, who

authored the seminal book on enforcement of judgments in California, providing that "*[u]nder*

*California law the validity and amount of the homestead exemption is also determined under*

*the exemption statutes in effect when the attachment lien was created* . . . ."); RUTTER

GUIDE, Special Requirements for Sale of Real Property Dwellings: Cal. Prac. Guide Enf. J. &

Debt Ch. 6D-8; Bernhanu v. Metzger, 12 Cal.App.4th 445, 447 (1992) (homestead exemption

amount determined under exemption statutes in effect at time judgment creditor's lien created);

In re Morgan, 157 B.R. 467, 469-71 (Bankr. C.D. Cal. 1993) ("A plain reading of the California

exemption scheme provides that, pursuant to C.C.P. § 703.050(a), the determination of the

amount of an exemption shall be made by application of the exemption statutes in effect at the

time the judgment creditor's lien was created. A lien on real property is created by recording an

abstract of judgment.").

### IX.   Conclusion.

In a recent hearing regarding the bad faith Ch 13 filing, this court noted its expectation that

Debtor behave with the utmost good faith going forward. Instead, he has offered unbelievable

evidence regarding his finances, unfeasible plans for reorganization, and now a story regarding

his residency which completely contradicts his previous evidence. The reason for this

contradiction is clear—Debtor does not reside in the subject property. This fact is supported by

objective evidence and prohibits him from claiming the HS exemption.

Additionally, res judicata prohibits Debtor from receiving a HS exemption in these

proceedings when the matter has already been decided in a previous ruling. And if any

exemption is available, it should be capped at $75,000 since this was the amount available when

Belgium's lien was created.


Dated:        23 Nov 2022                              Impact Advocates APC


By_____

        Patrick Miller
        Attorney for
        Judgement Creditor
        Belgium Investments

OBJECTION TO DEBTOR'S CLAIMED HOMESTEAD EXEMPTION

Patrick Miller, Esq., SBN 301819
Impact Advocates APC
121 S. Oak Ave.
Pasadena, CA 91107
213-364-7581
Patrick.miller@impactadvocateslaw.com

Attorney for the Creditor
Belgium Investments 960 Bay Dr,
LLC, a California Corp

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| IN RE BASSEM VICTOR EL MALLAKH | ) Case No.: 8:22-bk-11605-TA<br>) Ch 11<br>)<br>) **DECLARATION OF PATRICK MILLER**<br>) **IN SUPPORT OF THE OBJECTION TO**<br>) **DEBTOR'S CLAIMED HOMESTEAD**<br>) **EXEMPTION**<br>)<br>) _____<br>)<br>) **Hearing Date:  11 January 2023**<br>) **Hearing Time: 10:00 AM**<br>) **Dept.: 5B/Virtual**<br>)<br>)<br>) |

## DECLARATION

1. I, Patrick Miller, am counsel for the Creditor Belgium Investments 960 Bay Dr, LLC, a California Corp. ("**Belgium**"). I have read the Objection to Debtor's Homestead Exemption and know the contents thereof. The same is true of my own knowledge, except as those matters that are stated on information and belief, and as to these matters, I believe them to be true.

2. I am over the age of 18 years and am fully familiar with the facts and circumstances surrounding my declaration and could and would competently testify thereto if called upon to do so.

3.  I was engaged as counsel for the Defendant in April 2020 in order to enforce the judgement obtained in the Florida courts against the Debtor, Bassem Essam Victor El Mallakh.

4.  I reviewed several of the submissions made for the proceedings in Florida which note that the Complaint was filed on 17 August 2018. I do not remember reviewing any submission where Debtor explained why he is innocent of the complaints alleged.

5.  Attached to this declaration as Ex 1 is a true and correct copy of Belgium's Response to Debtor's Motion to Vacate in Florida with Motion for Sanctions for Debtor's Perjury filed by Belgium's Florida counsel.

6.  Attached to this declaration as Ex 2 is a true and correct copy of Belgium's Default Judgement against the Debtor in the proceedings in Florida.

7.  I recently reviewed the Application for Entry of Sister State Judgement and Writ of Execution for this enforcement action which noted that the judgment was entered on 18 June 2020.

8.  Attached to this declaration is a true and correct copy of Belgium's Proof of Service for the enforcement documents at Ex 3

9.  Attached to this declaration is a true and correct copy of Belgium's Abstract of Judgement at Ex 4.

10. I was involved in the process whereby Belgium secured levies on Debtor's bank accounts and the Rockefeller Property in early-2021. Following these levies, the Debtor filed motions to vacate the Default Judgment in Florida and the entry of the same in California.

11. Attached to this declaration is a true and correct copy of the Declaration filed by Debtor in support of his motion to vacate entry of default judgement in California at Ex 5.

12. Attached to this declaration is a true and correct copy of the Declaration filed by Debtor's sister, Reem Hanna, in support of his motion to vacate entry of default judgement in California at Ex 6.

13. I reviewed the Declarations by Debtor and Reem Hanna that were filed in connection with the FL motion to vacate the Default Judgement and these Declarations made very similar claims with respect to Debtor's residency as the Declarations in the California enforcement matter.

14. Attached to this declaration is a true and correct copy of the Transcripts of the Deposition of Bassem Essam El Mallakh dated 18 March 2021 at Ex 7. This was previously attached to Belgium's Opposition to the FL Motion to Vacate at Ex 5.

15. Attached to this declaration is a true and correct copy of the Extracts of the Deposition of Bassem Essam El Mallakh dated 18 March 2021 at Ex 8. I identified and extracted these lines from Debtor's testimony because they show that Debtor's previous story regarding his residency is incongruous with his latest story; and/or Debtor's insistence on presenting incredulous/untruthful evidence in the previous hearing, eg (i) the suggestion that Debtor was not aware of the FL proceedings (which is controverted by his own evidence); or (ii) the suggestion that Debtor was never accused of any acts of fraud or deceit in court before this case (which was also false).

16. Attached to this declaration is a true and correct copy of the Transcripts of the Deposition of Reem Hanna dated 18 March 2021 at Ex 9.

17. Attached to this declaration is a true and correct copy of the Extracts of the Deposition of Reem Hanna dated 18 March 2021 at Ex 10. I identified and extracted these lines from Debtor's testimony because they show that Ms Hanna's previous story regarding her brother's residency is incongruous with his latest story; and/or Ms Hanna's insistence on presenting incredulous/untruthful evidence in the previous hearing, eg (i) the suggestion that she was never accused of any acts of fraud or deceit in court before this case (which was false); (ii) her suggestion that multiple independent process servers were untruthful when claiming that they left documents at her doorstep or otherwise served her with documents; or (iii) that she never informed her brother of her encounters with process servers in connection with a multi-million dollar case against him.

3

18. Attached to this declaration is a true and correct copy of the Order Denying Debtor's Motion to Vacate from the 11th Circuit Court in Florida at Ex 11.

19. I have reviewed several of Debtor's submissions putting forward new arguments (largely based on factual issues) as to why the decision should be revisited which have been raised by Debtor's counsel in the Florida proceedings. I have also reviewed the decisions from the Florida courts summarily dismissing these motions. True and correct copies of these dismissals are attached to this declaration at Ex 12

20. I was involved in Belgium's enforcement of its judgement in California and attended hearings where the Orange County Court considered whether to order a stay of enforcement and, if so, whether an undertaking should be provided. During the hearing where the court considered these issues, counsel for the Debtor noted that Debtor's main asset was the Rockefeller Property and that it would not be moved (or presumably its character would not be changed). This seemed to be a key factor the court considered when ordering that enforcement should be stayed without providing an undertaking.

21. Attached to this declaration is a true and correct copy of the Orange County Superior Court's Order to sell the Rockefeller Property at Ex 13.

22. I was counsel for Belgium at the hearing on Belgium's motion for an order of sale of the Rockefeller Property on 21 April 2022 and I remember that the court noted that it did not have any evidence that the Rockefeller Property qualified as a homestead. This was an issue because Debtor's counsel raised a number of procedural challenges which would have only been applicable if the subject property were a homestead (a true and correct copy of the Opposition filed by Debtor on 1 April 2022 is attached at Ex 14).

23. Attached to this declaration is a true and correct copy of the Declaration of the Debtor filed in the Ch 11 proceedings at Ex 15.

24. I received an audio recording of the first 341 meeting on 9 Nov 2022 through an email from the US Trustee Nancy Goldenberg. I attended the second 341 meeting on 10 Nov 2022 and received an audio recording of this meeting the same day from the US Trustee.

4

I have listened to the recordings of both 341 meetings multiple times. I have replicated what I heard on the recording of the second meeting in the quoted passages included within Belgium's Objection. I note that there were statements made in the recording of the first meeting which are similar to those in the quoted passages from the second meeting.

25. I declare under penalty of perjury that the foregoing is true and correct.

Date: 11/23/22

_____

Patrick Miller

PROOF OF ELECTRONIC SERVICE

I am employed in the County of LOS ANGELES, State of California. I am over the age of 18 and not a party to the within action. My business address is, 121 S Oak Ave, Pasadena, CA 91107.

On the date indicated below, I served by ELECTRONIC SERVICE the foregoing described as **OBJECTION TO DEBTOR'S CLAIMED HOMESTEAD EXEMPTION AND DECLARATION OF PATRICK MILLER IN SUPPORT OF THE SAME** to the electronic address as listed for each attorney below, using the e-filing service pursuant to 2019 California Rules of Court Rule 2.251.(b), Electronic service

| | |
|---|---|
| Michael Berger– Counsel for the Debtor<br><br>Law Offices of Michael Berger<br><br>9454 Wilshire Blvd<br><br>Beverly Hills, CA 90212<br><br>Email: michael.berger@bankruptcypower.com | |

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on this 11/23/2022, at Pasadena, California.

Patrick Miller

**SUBS**

**2**

1   MICHAEL JAY BERGER (State Bar # 100291)
    LAW OFFICES OF MICHAEL JAY BERGER
2   9454 Wilshire Blvd. 6ᵗʰ Floor
    Beverly Hills, CA 90212-2929
3   Telephone:   (310) 271-6223
    Facsimile:   (310) 271-9805
4   michael.berger@bankruptcypower.com

5   Counsel for Debtor,
    Bassem Victor El Mallakh

6

7               UNITED STATES BANKRUPTCY COURT

8               CENTRAL DISTRICT OF CALIFORNIA

9                     SANTA ANA DIVISION

10  In re:                          )  CASE NO.: 8:22-bk-11605-TA
                                    )
11  BASSEM VICTOR EL MALLAKH,       )  Chapter 11
                                    )
12                                  )
        Debtor and Debtor-in-Possession.  )  **DEBTOR'S OPPOSITION TO**
13                                  )  **BELGIUM INVESTMENTS 960 BAY**
                                    )  **DR, LLC'S OBJECTION TO**
14                                  )  **DEBTOR'S CLAIMED HOMESTEAD**
                                    )  **EXEMPTION; DECLARATION OF**
15                                  )  **BASSEM VICTOR EL MALLAKH IN**
                                    )  **SUPPORT THEREOF**
16                                  )
                                    )  Date:     January 11, 2023
17                                  )  Time:     10:00 a.m.
                                    )  Place:    411 West Fourth Street
18                                  )            Courtroom 5B
                                    )            Santa Ana, CA 92701
19                                  )
                                    )  Via Tele/Videoconference on Zoom
20                                  )
                                    )
21  _____)

22

23

24      **TO THE HONORABLE THEODOR C. ALBERT, CHIEF JUDGE OF THE**

25  **UNITED STATES BANKRUPTCY COURT, BELGIUM INVESTMENTS 960**

26  **BAY DR, LLC, TO THE UNITED STATES TRUSTEE, TO DEBTOR'S**

27  **CREDITORS AND TO ALL INTERESTED PARTIES:**

28

                                    1

Bassem Victor El Mallakh (the "<u>Debtor</u>") herein, respectfully submits his Opposition to Belgium Investments 960 Bay Dr, LLC's ("Belgium") Objection to Debtor's Claimed Homestead Exemption (the "Objection to Homestead Exemption") as follows:

## I.  <u>INTRODUCTION</u>

Debtor asks that Belgium's Objection to Debtor's Claimed Homestead Exemption be denied in full on the following bases:

(1) Under *BAC Home Loans Serv., LP v. Abdelgadir (In re Abdelgadir)*, 455 B.R. 896, 898 (9th Cir. BAP 2011) and *Benafel v. One West Bank*, 461 B.R. 581 (2011), the appropriate time for determining whether property is the debtor's primary residence is the petition date. Here, the Debtor's primary residence as of the date of the filing of the Bankruptcy Petition was, and currently is, 116 Rockefeller, Irvine, CA 92612 (the "Rockefeller Property"); and

(2) Based on *Barclay vs. Boskoski*, 2022 WL 16911862 (9th Cir. November 14, 2022), Debtor's available homestead exemption on the Rockefeller Property is determined as of the filing date of Debtor's Bankruptcy case; Debtor is entitled to the full homestead exemption in the amount of $626,400.00 available to the Debtor on the petition date on September 19, 2022 per CCP § 704.730.

## II.  <u>DEBTOR'S ARGUMENTS IN OPPOSITION TO BELGIUM'S OBJECTION TO DEBTOR'S HOMESTEAD EXEMPTION</u>

1. <u>Debtor's Primary Residence on the Petition Date was and Continues to be the Rockefeller Property</u>

Belgium argues the Rockefeller Property should not be considered the Debtor's primary residence because the Debtor previously did not live there. Debtor's primary residence as of the filing of the bankruptcy case was, and currently is, the Rockefeller Property. The controlling authority on establishing a Debtor's primary residence is *BAC Home Loans Serv., LP v. Abdelgadir (In re Abdelgadir)*, 455 B.R. 896, 898 (9th Cir. BAP

2

2011) where the Court held "the appropriate time for determining whether property is a debtor's principal residence is the petition date." *BAC Home Loans Serv., LP v. Abdelgadir (In re Abdelgadir)*, 455 B.R. 896, 898 (9th Cir. BAP 2011).

In *Abdelgadir*, the debtors originally filed a bankruptcy petition under chapter 13. In their petition and schedules, the Abdelgadirs listed a home address in Las Vegas (the "Las Vegas Property"). The Las Vegas Property was encumbered by first and second deeds of trust. According to the security instruments, the Abdelgadirs were required to occupy the Las Vegas Property as a "primary year-round residence."

The Abdelgadirs later moved to convert their case to chapter 11, a motion the bankruptcy court granted. Then they filed a notice with the bankruptcy court, changing their address to a different location, and leased the Las Vegas Property to a third party.

The Abdelgadirs filed a chapter 11 plan on March 9, 2010, in which they proposed to modify the terms of the loan secured by the first mortgage on the Las Vegas Property. According to the plan, at that time, the Las Vegas Property was no longer their residence, but was now an investment property, and therefore, modification of the terms of the loan secured by the Las Vegas Property was no longer barred under of § 1123(b)(5). They argued that whether the Las Vegas Property was their principal residence for purposes of § 1123(b)(5) was a determination that should be made by the bankruptcy court as of the time of plan confirmation.

On appeal, the Court in Abdelgadir held that the majority of the cases favor use of the petition date to determine principal residence and that in the 9th Circuit, the debtor's primary residence is determined on the petition date. *BAC Home Loans Serv., LP v. Abdelgadir (In re Abdelgadir)*, 455 B.R. 896, 898 (9th Cir. BAP 2011).

In *Benafel v. One West Bank*, 461 B.R. 581 (2011), the appellate court upheld the *BAC Home Loans Serv., LP v. Abdelgadir (In re Abdelgadir)*, 455 B.R. 896, 898 (9th Cir. BAP 2011) holding, that a debtor's primary residence is established as of the bankruptcy petition date, and reversed the lower court's decision to use the date a loan was made to

3

establish the debtor's primary residence for bankruptcy purposes. *Benafel v. One West Bank*, 461 B.R. 581, 592 (2011)

The Rockefeller Property is the Debtor's primary residence. Debtor's current Chapter 11 case and his previously filed Chapter 13 case both listed the Rockefeller Property as his primary residence, as do his tax returns, bank statements, car insurance declaration and mortgage payoff statement. A true and correct copy of Debtor's Chapter 13 Voluntary Petition, first pages of Debtor's prepetition 2019-2022 tax returns, Debtor's car insurance policy, Debtor's prepetition bank statement, and Debtor's mortgage payoff statement all addressed to the Debtor at the Rockefeller Property indicating the Debtor's primary residence is the Rockefeller Property are attached to the Declaration of Bassem El Mallakh as **Exhibit "1."** As was held in *BAC Home Loans Serv., LP v. Abdelgadir (In re Abdelgadir),* 455 B.R. 896 (9th Cir. BAP 2011) and *Benafel v. One West Bank*, 461 B.R. 581 (2011), the Rockefeller Property is Debtor's primary residence.

Further, despite Belgium's claims, the lease agreement between the Debtor and his sister does not bar the Debtor from living in the Rockefeller Property as his primary residence. Debtor is leasing part of the Rockefeller Property to his sister who pays him rent. The Debtor is also living in the Rockefeller Property. Belgium's res judicata argument that another Court purportedly made a finding that the Debtor was previously not living at the Rockefeller Property is irrelevant because the Debtor was living at the Rockefeller Property at the time the Debtor's bankruptcy case was filed. Whether the Debtor was served with documents at the Rockefeller Property, or not, as Belgium points out, is not probative of where the Debtor was living as his primary residence at the time the Debtor filed his Chapter 11 Bankruptcy case. The Rockefeller Property was the Debtor's primary residence when the Debtor filed this Chapter 11 case, and continues to be his primary residence.

///

2.  <u>Debtor is Entitled to the Homestead Exemption Available on the</u>
    <u>Bankruptcy Petition Date</u>

The homestead exemption shields a homeowner's principal residence from creditors in case of bankruptcy. The objective of homestead legislation is to provide a place for families and their surviving members to be freed from any anxiety that their primary residence may be taken from them against their will, either by reason of their own necessity or improvidence, or from the importunity of their creditors. *Thorsby v. Babcock,* 36 Cal. 2d 202, 204 (1950) "[T]he homestead law is not designed to protect creditors, but protects the home against creditors . . . thereby preserving the home for the family." *Amin v. Khazindar,* 112 Cal.App.4th 582, 588 (2003).

A.  <u>California's New Homestead Exemption in AB 1885 and its Effect on</u>
    <u>California Code of Civil Procedure Section 704.730 – California's</u>
    <u>Homestead Exemption Statute</u>

On January 1, 2021, AB 1885 went into effect updating the limits prescribed in CCP § 704.730, and protecting debtors who own homes by increasing the California homestead amount to an amount that would keep most homeowners safe from creditors.

AB 1885 provides that:

(a) The amount of the homestead exemption is the greater of the following:

    (1) The countywide median sale price for a single-family home in the calendar year prior to the calendar year in which the judgment debtor claims the exemption, not to exceed six hundred thousand dollars ($600,000[1]).

    (2) Three hundred thousand dollars ($300,000).

(b) The amounts specified in this section shall adjust annually for inflation, beginning on January 1, 2022, based on the change in the annual California

---

[1] The current homestead exemption available to the Debtor is $626,400.00.

Consumer Price Index for All Urban Consumers for the prior fiscal year,

published by the Department of Industrial Relations.

AB 1885

Effective January 1, 2021, California Code of Civil Procedure Section 704.730

now reads:

(a) The amount of the homestead exemption is the greater of the following:

(1) The countywide median sale price for a single-family home in the

calendar year prior to the calendar year in which the judgment debtor

claims the exemption, not to exceed six hundred thousand dollars

($600,000).

(2) Three hundred thousand dollars ($300,000).

(b) The amounts specified in this section shall adjust annually for inflation,

beginning on January 1, 2022, based on the change in the annual California

Consumer Price Index for All Urban Consumers for the prior fiscal year,

published by the Department of Industrial Relations.

CCP § 704.730

Before AB 1885 went into effect on January 1, 2021, the homestead exemptions in

California were $75,000 for a single homeowner, $100,000 for a married couple, and

$175,000 for families who met specific requirements. However, AB 1885 has changed

CCP § 704.730 to "instead make the homestead exemption the greater of $300,000 or the

countywide median sale price of a single-family home in the calendar year prior to the

calendar year in which the judgment debtor claims the exemption, not to exceed

$600,000."

B. Previous and Outdated Limits on Homestead Exemption Do Not Apply in

Bankruptcy

Belgium argues that the new California Code of Civil Procedure § 704.730

exemption limits do not apply to the Debtor's case because the Debtor's homestead

6

exemption should be capped at $75,000 which was the maximum available to the Debtor when Belgium's judgment was recorded. However, <u>this argument has been rejected by multiple cases</u>. Courts have instead ruled that debtors are not limited to a lower, pre-2021 amount even if the declared homestead was recorded before 2021. *See In re Zall*, No. BAP.EC-05-1476-MOSB, 2006 WL 6811022, at *4 (B.A.P. 9th Cir., Sept. 5, 2006). This allows debtors to claim the increased homestead exemption despite a previously declared, pre-2021 homestead exemption. In *Zall*, the Court held exemption law in effect on date of Chapter 13 petition determines available exemptions—not exemptions under state law at the time judgment lien was recorded. "[L]imiting the exemption to the amounts available on the dates that judgment liens attach is inconsistent with section 522(f). . . . In order to determine the amount of an exemption that Debtors could claim if there were no liens on the property, the court must look not to the time the lien was fixed but rather to the time the trustee's hypothetical levy became effective, which is the date Debtors filed their bankruptcy petition." *See In re Zall*, No. BAP.EC-05-1476-MOSB, 2006 WL 6811022, at *4 (B.A.P. 9th Cir., Sept. 5, 2006).

> C. The *Barclay vs. Boskoski*, 2022 WL 16911862 (9th Cir. November 14, 2022) Decision is the Controlling Authority, and Mandates that the Court Use Debtor's Petition Date to Determine the Amount of His Exemption

On November 14, 2022, in *Barclay vs. Boskoski*, 2022 WL 16911862 (9th Cir. November 14, 2022), the United States Court of Appeals for the Ninth Circuit found that the bankruptcy court correctly applied the $600,000 homestead exemption in effect on the filing date of the bankruptcy petition, rather than the significantly lower homestead exemption available when the judgment lien was recorded seven years prior. As a result, the judgment lien was avoided in its entirety.

In 2014, Greek Village, LLC, Konstantinos Manassakis, and Aimilia Manassakis recorded a $256,075.95 judgment lien ("Greek Village Judgment Lien") against Debtor Dejan Boskoski's Carlsbad, California home. Because the debtor was married in 2014,

7

the maximum homestead exemption applicable to the Greek Village Judgment Lien was
$100,000. See Cal. Civ. Proc. Code § 704.730 (2013). Following the perfection of the
judgment, in 2021 California amended its exemption statute to allow debtors to claim the
greater of (1) the "median sale price for a single-family home" in the debtor's county the
year before the debtor claims the exemption, "not to exceed" $600,000; or (2) $300,000.
See Cal. Civ. Proc. Code § 704.730(a) (2021).

   In August 2021 (seven years after the Greek Village Judgment Lien was perfected
and eight months after California enacted the new homestead exemption), the debtor filed
a chapter 7 case. The debtor claimed the $600,000 homestead exemption in his schedules
and sought to avoid the Greek Village Judgment Lien, which exceeded $477,000 as of the
petition date. The debtor argued that the Bankruptcy Code required the court to look to
the exemption the debtor could have claimed, but for the lien, at the time he filed his
bankruptcy petition, not when the judgment lien was created. The Greek Village
Judgment Lien therefore impaired his homestead exemption by $543,897.20, as the home
was subject to two deeds of trust totaling $551,720.47, the Greek Village Judgment Lien,
and the $600,000 homestead exemption. In total, these equaled $1,629,647.20, an amount
exceeding the value of the debtor's home by $543,897.20. The Chapter 7 trustee
objected, arguing that the maximum homestead exemption available to the debtor was
$100,000 because under California law the exemption the debtor could claim was fixed at
the 2014 amount. See Cal. Civ. Proc. Code § 703.050(a).

   The bankruptcy court agreed with the debtor's argument that the exemption
amount is fixed on the date of filing the petition.  Because the bankruptcy court believed
it to be a "close call on an important question," the decision was immediately certified to
the Ninth Circuit as a case of first impression. 2022 WL 16911862 at *6. The Ninth
Circuit affirmed the decision of the bankruptcy court and held that the debtor's
exemption amount was fixed on the date the petition was filed.

8

The Ninth Circuit based its decision on the meaning of 11 U.S.C. Section 522(f), which provides that a debtor may avoid a judgment lien to the extent that the lien "impairs an exemption to which the debtor would have been entitled." Boskoski, 2022 WL 16911862 at * 8 (emphasis in original). In interpreting Section 522(f), the panel reviewed the U.S. Supreme Court's decision Owen v. Owen, 500 U.S. 305 (1991), in which it held that an exemption is fixed on the date of filing the petition. The Ninth Circuit acknowledged that in Owen the Supreme Court held that Section 522(f) established that the "baseline" against which impairment should be measured is not the exemption to which a debtor "is entitled" but is the exemption to which a debtor "would have been entitled." Id. Relying on Owen, the panel therefore held that in deciding whether a judgment lien impairs a debtor's California homestead exemption under Section 522(f), the Bankruptcy Code requires courts to determine the amount of the exemption to which the debtor would have been entitled in the absence of the lien at issue. The Ninth Circuit also noted that the exemptions available to the debtor are generally fixed as of the filing date of the bankruptcy petition, citing White v. Stump, 266 U.S. 310, 313 (1924) (describing the "snapshot rule"). Boskoski, 2022 WL 16911862 at *4.

The Debtor's instant Chapter 11 case was filed on September 19, 2022. Based on the controlling authority in *Barclay vs. Boskoski*, 2022 WL 16911862 (9th Cir. November 14, 2022), the Debtor is entitled to the homestead exemption available to him on the petition date, and not the homestead exemption on the date of the recordation of Belgium's lien.

///
///
///
///
///

9

1

### III.  <u>CONCLUSION</u>

2

WHEREFORE, Debtor asks for an order overruling Belgium's Objection to

3

Debtor's Claimed Homestead Exemption, and for any further relief deemed necessary

4

and proper.

5

6

7

DATED: December 28, 2022          LAW OFFICES OF MICHAEL JAY BERGER

8

9

By: _____

10

Michael Jay Berger
Counsel for Debtor-in-Possession

11

Bassem Victor El Mallakh

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

10

<u>DECLARATION OF BASSEM VICTOR EL MALLAKH</u>

I, Bassem Victor El Mallakh, declare and state as follows:

1.     I am the Debtor. I am over the age of 18. I have personal knowledge of the facts set forth below and if called to testify as to those facts, I could and would competently do so.

2.     The Rockefeller Property is my primary residence. My current Chapter 11 case and my previously filed Chapter 13 case both listed the Rockefeller Property as my primary residence, as do my tax returns, bank statements, car insurance declaration and mortgage payoff statement. A true and correct copy of my Chapter 13 Voluntary Petition, first pages of my prepetition 2019-2022 tax returns, my car insurance policy, my prepetition bank statement, and my mortgage payoff statement all addressed to me at the Rockefeller Property indicating my primary residence is the Rockefeller Property are attached hereto as **Exhibit "1."**

3.     The lease agreement between my sister and I does not bar me from living in the Rockefeller Property as my primary residence. I am leasing part of the Rockefeller Property to my sister who pays me rent. I am also living in the Rockefeller Property. Belgium's res judicata argument that another Court purportedly made a finding that the

I declare under penalty of perjury that the foregoing is true and correct and that this declaration is executed on December 28, 2022 at ___Irvine_____.

_____
Bassem Victor El Mallakh

11

DEBTOR'S OPPOSITION TO BELGIUM INVESTMENTS 960 BAY DR, LLC'S OBJECTION TO DEBTOR'S CLAIMED HOMESTEAD EXEMPTION; DECLARATION OF BASSEM VICTOR EL MALLAKH IN SUPPORT THEREOF

# EXHIBIT 1

| Fill in this information to identify your case: |
| --- |

United States Bankruptcy Court for the:

CENTRAL DISTRICT OF CALIFORNIA

Case number *(if known)*

Chapter you are filing under:

☐ Chapter 7

☐ Chapter 11

☐ Chapter 12

■ Chapter 13

☐ Check if this is an amended filing

Official Form 101

# Voluntary Petition for Individuals Filing for Bankruptcy

02/20

The bankruptcy forms use *you* and *Debtor 1* to refer to a debtor filing alone. A married couple may file a bankruptcy case together—called a *joint case*—and in joint cases, these forms use *you* to ask for information from both debtors. For example, if a form asks, "Do you own a car," the answer would be *yes* if either debtor owns a car. When information is needed about the spouses separately, the form uses *Debtor 1* and *Debtor 2* to distinguish between them. In joint cases, one of the spouses must report information as *Debtor 1* and the other as *Debtor 2*. The same person must be *Debtor 1* in all of the forms.

Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write your name and case number (if known). Answer every question.

| Part 1: | Identify Yourself |
| --- | --- |

|  |  | About Debtor 1: | About Debtor 2 (Spouse Only in a Joint Case): |
| --- | --- | --- | --- |
| 1. | **Your full name** | | |
| | Write the name that is on your government-issued picture identification (for example, your driver's license or passport). | **Bassem**<br>First name | First name |
| | | **Essam**<br>Middle name | Middle name |
| | Bring your picture identification to your meeting with the trustee. | **El Mallakh**<br>Last name and Suffix (Sr., Jr., II, III) | Last name and Suffix (Sr., Jr., II, III) |
| 2. | **All other names you have used in the last 8 years**<br>Include your married or maiden names. | | |
| 3. | **Only the last 4 digits of your Social Security number or federal Individual Taxpayer Identification number (ITIN)** | **xxx-xx-3012** | |

Debtor 1    **Bassem Essam El Mallakh**                                        Case number *(if known)*

|  | About Debtor 1: | About Debtor 2 (Spouse Only in a Joint Case): |

**4. Any business names and Employer Identification Numbers (EIN) you have used in the last 8 years**

Include trade names and *doing business as* names

About Debtor 1:
- ☑ I have not used any business name or EINs.

Business name(s)

EIN

About Debtor 2 (Spouse Only in a Joint Case):
- ☐ I have not used any business name or EINs.

Business name(s)

EIN

**5. Where you live**

**116 Rockefeller**
**Irvine, CA 92612**
Number, Street, City, State & ZIP Code

**Orange**
County

If your mailing address is different from the one above, fill it in here. Note that the court will send any notices to you at this mailing address.

Number, P.O. Box, Street, City, State & ZIP Code

If Debtor 2 lives at a different address:

Number, Street, City, State & ZIP Code

County

If Debtor 2's mailing address is different from yours, fill it in here. Note that the court will send any notices to this mailing address.

Number, P.O. Box, Street, City, State & ZIP Code

**6. Why you are choosing *this district* to file for bankruptcy**

Check one:

- ■ Over the last 180 days before filing this petition, I have lived in this district longer than in any other district.

- ☐ I have another reason.
  Explain. (See 28 U.S.C. § 1408.)

Check one:

- ☐ Over the last 180 days before filing this petition, I have lived in this district longer than in any other district.

- ☐ I have another reason.
  Explain. (See 28 U.S.C. § 1408.)

Case 8:22-bk-11158-TA    Doc 1    Filed 07/12/22    Entered 07/12/22 22:35:39    Desc
Main Document    Page 3 of 12

Debtor 1    **Bassem Essam El Mallakh**
                                                                    Case number *(if known)*

| Part 2: | Tell the Court About Your Bankruptcy Case |
|---|---|

**7.  The chapter of the Bankruptcy Code you are choosing to file under**

*Check one. (For a brief description of each, see Notice Required by 11 U.S.C. § 342(b) for Individuals Filing for Bankruptcy (Form 2010)). Also, go to the top of page 1 and check the appropriate box.*

☐ Chapter 7
☐ Chapter 11
☐ Chapter 12
■ Chapter 13

**8.  How you will pay the fee**

■ **I will pay the entire fee when I file my petition.** Please check with the clerk's office in your local court for more details about how you may pay. Typically, if you are paying the fee yourself, you may pay with cash, cashier's check, or money order. If your attorney is submitting your payment on your behalf, your attorney may pay with a credit card or check with a pre-printed address.

☐ **I need to pay the fee in installments.** If you choose this option, sign and attach the *Application for Individuals to Pay The Filing Fee in Installments* (Official Form 103A).

☐ **I request that my fee be waived** (You may request this option only if you are filing for Chapter 7. By law, a judge may, but is not required to, waive your fee, and may do so only if your income is less than 150% of the official poverty line that applies to your family size and you are unable to pay the fee in installments). If you choose this option, you must fill out the *Application to Have the Chapter 7 Filing Fee Waived* (Official Form 103B) and file it with your petition.

**9.  Have you filed for bankruptcy within the last 8 years?**

■ No.
☐ Yes.

| District _____ | When _____ | Case number _____ |
|---|---|---|
| District _____ | When _____ | Case number _____ |
| District _____ | When _____ | Case number _____ |

**10.  Are any bankruptcy cases pending or being filed by a spouse who is not filing this case with you, or by a business partner, or by an affiliate?**

■ No
☐ Yes.

| Debtor _____ | | Relationship to you _____ |
|---|---|---|
| District _____ | When _____ | Case number, if known _____ |
| Debtor _____ | | Relationship to you _____ |
| District _____ | When _____ | Case number, if known _____ |

**11.  Do you rent your residence?**

■ No.    Go to line 12.
☐ Yes.    Has your landlord obtained an eviction judgment against you?

   ☐    No. Go to line 12.

   ☐    Yes. Fill out *Initial Statement About an Eviction Judgment Against You* (Form 101A) and file it as part of this bankruptcy petition.

Debtor 1   **Bassem Essam El Mallakh**            Case number *(if known)* _____

---

| Part 3: | **Report About Any Businesses You Own as a Sole Proprietor** |
|---|---|

**12. Are you a sole proprietor of any full- or part-time business?**

�■ No.    Go to Part 4.

☐ Yes.   Name and location of business

A sole proprietorship is a business you operate as an individual, and is not a separate legal entity such as a corporation, partnership, or LLC.

If you have more than one sole proprietorship, use a separate sheet and attach it to this petition.

       Name of business, if any

       Number, Street, City, State & ZIP Code

       *Check the appropriate box to describe your business:*

       ☐   Health Care Business (as defined in 11 U.S.C. § 101(27A))

       ☐   Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))

       ☐   Stockbroker (as defined in 11 U.S.C. § 101(53A))

       ☐   Commodity Broker (as defined in 11 U.S.C. § 101(6))

       ☐   None of the above

**13. Are you filing under Chapter 11 of the Bankruptcy Code and are you a *small business debtor*?**

For a definition of *small business debtor*, see 11 U.S.C. § 101(51D).

*If you are filing under Chapter 11, the court must know whether you are a small business debtor so that it can set appropriate deadlines. If you indicate that you are a small business debtor, you must attach your most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if any of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).*

■ No.   I am not filing under Chapter 11.

☐ No.   I am filing under Chapter 11, but I am NOT a small business debtor according to the definition in the Bankruptcy Code.

☐ Yes.   I am filing under Chapter 11, I am a small business debtor according to the definition in the Bankruptcy Code, and I do not choose to proceed under Subchapter V of Chapter 11.

☐ Yes.   I am filing under Chapter 11, I am a small business debtor according to the definition in the Bankruptcy Code, and I choose to proceed under Subchapter V of Chapter 11.

---

| Part 4: | **Report If You Own or Have Any Hazardous Property or Any Property That Needs Immediate Attention** |
|---|---|

**14. Do you own or have any property that poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety? Or do you own any property that needs immediate attention?**

*For example, do you own perishable goods, or livestock that must be fed, or a building that needs urgent repairs?*

■ No.

☐ Yes.   What is the hazard? _____

       If immediate attention is needed, why is it needed? _____

       Where is the property? _____

           Number, Street, City, State & Zip Code

---

Debtor 1    **Bassem Essam El Mallakh**    Case number *(if known)*

<span style="background:black;color:white">Part 5:</span>    **Explain Your Efforts to Receive a Briefing About Credit Counseling**

**15. Tell the court whether you have received a briefing about credit counseling.**

The law requires that you receive a briefing about credit counseling before you file for bankruptcy. You must truthfully check one of the following choices. If you cannot do so, you are not eligible to file.

If you file anyway, the court can dismiss your case, you will lose whatever filing fee you paid, and your creditors can begin collection activities again.

**About Debtor 1:**
*You must check one:*

- ☑ I received a briefing from an approved credit counseling agency within the 180 days before I filed this bankruptcy petition, and I received a certificate of completion.

  Attach a copy of the certificate and the payment plan, if any, that you developed with the agency.

- ☐ I received a briefing from an approved credit counseling agency within the 180 days before I filed this bankruptcy petition, but I do not have a certificate of completion.

  Within 14 days after you file this bankruptcy petition, you MUST file a copy of the certificate and payment plan, if any.

- ☐ I certify that I asked for credit counseling services from an approved agency, but was unable to obtain those services during the 7 days after I made my request, and exigent circumstances merit a 30-day temporary waiver of the requirement.

  To ask for a 30-day temporary waiver of the requirement, attach a separate sheet explaining what efforts you made to obtain the briefing, why you were unable to obtain it before you filed for bankruptcy, and what exigent circumstances required you to file this case.

  Your case may be dismissed if the court is dissatisfied with your reasons for not receiving a briefing before you filed for bankruptcy. If the court is satisfied with your reasons, you must still receive a briefing within 30 days after you file. You must file a certificate from the approved agency, along with a copy of the payment plan you developed, if any. If you do not do so, your case may be dismissed.

  Any extension of the 30-day deadline is granted only for cause and is limited to a maximum of 15 days.

- ☐ I am not required to receive a briefing about credit counseling because of:

  - ☐ **Incapacity.**
    I have a mental illness or a mental deficiency that makes me incapable of realizing or making rational decisions about finances.

  - ☐ **Disability.**
    My physical disability causes me to be unable to participate in a briefing in person, by phone, or through the internet, even after I reasonably tried to do so.

  - ☐ **Active duty.**
    I am currently on active military duty in a military combat zone.

  If you believe you are not required to receive a briefing about credit counseling, you must file a motion for waiver credit counseling with the court.

**About Debtor 2 (Spouse Only in a Joint Case):**
*You must check one:*

- ☐ I received a briefing from an approved credit counseling agency within the 180 days before I filed this bankruptcy petition, and I received a certificate of completion.

  Attach a copy of the certificate and the payment plan, if any, that you developed with the agency.

- ☐ I received a briefing from an approved credit counseling agency within the 180 days before I filed this bankruptcy petition, but I do not have a certificate of completion.

  Within 14 days after you file this bankruptcy petition, you MUST file a copy of the certificate and payment plan, if any.

- ☐ I certify that I asked for credit counseling services from an approved agency, but was unable to obtain those services during the 7 days after I made my request, and exigent circumstances merit a 30-day temporary waiver of the requirement.

  To ask for a 30-day temporary waiver of the requirement, attach a separate sheet explaining what efforts you made to obtain the briefing, why you were unable to obtain it before you filed for bankruptcy, and what exigent circumstances required you to file this case.

  Your case may be dismissed if the court is dissatisfied with your reasons for not receiving a briefing before you filed for bankruptcy.

  If the court is satisfied with your reasons, you must still receive a briefing within 30 days after you file. You must file a certificate from the approved agency, along with a copy of the payment plan you developed, if any. If you do not do so, your case may be dismissed.

  Any extension of the 30-day deadline is granted only for cause and is limited to a maximum of 15 days.

- ☐ I am not required to receive a briefing about credit counseling because of:

  - ☐ **Incapacity.**
    I have a mental illness or a mental deficiency that makes me incapable of realizing or making rational decisions about finances.

  - ☐ **Disability.**
    My physical disability causes me to be unable to participate in a briefing in person, by phone, or through the internet, even after I reasonably tried to do so.

  - ☐ **Active duty.**
    I am currently on active military duty in a military combat zone.

  If you believe you are not required to receive a briefing about credit counseling, you must file a motion for waiver of credit counseling with the court.

Debtor 1    **Bassem El Mallakh**                                       Case number *(if known)*

**Part 6:    Answer These Questions for Reporting Purposes**

| 16. | What kind of debts do you have? | 16a. | **Are your debts primarily consumer debts?** *Consumer debts* are defined in 11 U.S.C. § 101(8) as "incurred by an individual primarily for a personal, family, or household purpose." |
|---|---|---|---|

☐ No. Go to line 16b.

■ Yes. Go to line 17.

16b.  **Are your debts primarily business debts?** *Business debts* are debts that you incurred to obtain money for a business or investment or through the operation of the business or investment.

☐ No. Go to line 16c.

☐ Yes. Go to line 17.

16c.  State the type of debts you owe that are not consumer debts or business debts

**17.  Are you filing under Chapter 7?**

■ No.  I am not filing under Chapter 7. Go to line 18.

Do you estimate that after any exempt property is excluded and administrative expenses are paid that funds will be available for distribution to unsecured creditors?

☐ Yes.  I am filing under Chapter 7. Do you estimate that after any exempt property is excluded and administrative expenses are paid that funds will be available to distribute to unsecured creditors?

☐ No

☐ Yes

**18.  How many Creditors do you estimate that you owe?**

■ 1-49
☐ 50-99
☐ 100-199
☐ 200-999

☐ 1,000-5,000
☐ 5001-10,000
☐ 10,001-25,000

☐ 25,001-50,000
☐ 50,001-100,000
☐ More than100,000

**19.  How much do you estimate your assets to be worth?**

■ $0 - $50,000
☐ $50,001 - $100,000
☐ $100,001 - $500,000
☐ $500,001 - $1 million

☐ $1,000,001 - $10 million
☐ $10,000,001 - $50 million
☐ $50,000,001 - $100 million
☐ $100,000,001 - $500 million

☐ $500,000,001 - $1 billion
☐ $1,000,000,001 - $10 billion
☐ $10,000,000,001 - $50 billion
☐ More than $50 billion

**20.  How much do you estimate your liabilities to be?**

■ $0 - $50,000
☐ $50,001 - $100,000
☐ $100,001 - $500,000
☐ $500,001 - $1 million

☐ $1,000,001 - $10 million
☐ $10,000,001 - $50 million
☐ $50,000,001 - $100 million
☐ $100,000,001 - $500 million

☐ $500,000,001 - $1 billion
☐ $1,000,000,001 - $10 billion
☐ $10,000,000,001 - $50 billion
☐ More than $50 billion

**Part 7:    Sign Below**

**For you**

I have examined this petition, and I declare under penalty of perjury that the information provided is true and correct.

If I have chosen to file under Chapter 7, I am aware that I may proceed, if eligible, under Chapter 7, 11,12, or 13 of title 11, United States Code. I understand the relief available under each chapter, and I choose to proceed under Chapter 7.

If no attorney represents me and I did not pay or agree to pay someone who is not an attorney to help me fill out this document, I have obtained and read the notice required by 11 U.S.C. § 342(b).

I request relief in accordance with the chapter of title 11, United States Code, specified in this petition.

I understand making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $250,000, or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

**Bassem Essam El Mallakh**
Signature of Debtor 1

Executed on **7/12/2022**
          MM / DD / YYYY

Signature of Debtor 2

Executed on _____
          MM / DD / YYYY

Debtor 1    **Bassem Essam El Mallakh**                                    Case number *(if known)*

---

| For your attorney, if you are represented by one<br><br>If you are not represented by an attorney, you do not need to file this page. | I, the attorney for the debtor(s) named in this petition, declare that I have informed the debtor(s) about eligibility to proceed under Chapter 7, 11, 12, or 13 of title 11, United States Code, and have explained the relief available under each chapter for which the person is eligible. I also certify that I have delivered to the debtor(s) the notice required by 11 U.S.C. § 342(b) and, in a case in which § 707(b)(4)(D) applies, certify that I have no knowledge after an inquiry that the information in the schedules filed with the petition is incorrect. |
|---|---|

Signature of Attorney for Debtor                    Date    7/12/2022
                                                             MM / DD / YYYY

**Benjamin Heston**
Printed name

Firm name

**100 Bayview Circle, Suite 100**
**Newport Beach, CA 92660**
Number, Street, City, State & ZIP Code

Contact phone    **951-290-2827**          Email address    **bheston.ecf@gmail.com**

**297798 CA**
Bar number & State

---

Official Form 101          Voluntary Petition for Individuals Filing for Bankruptcy          page 7

| Form **1040** | Department of the Treasury — Internal Revenue Service (99)<br>**U.S. Individual Income Tax Return** | **2021** | OMB No. 1545-0074 | IRS Use Only — Do not write or staple in this space. |

| **Filing Status**<br>Check only<br>one box. | [X] Single  [ ] Married filing jointly  [ ] Married filing separately (MFS)  [ ] Head of household (HOH)  [ ] Qualifying widow(er) (QW)<br>If you checked the MFS box, enter the name of your spouse. If you checked the HOH or QW box, enter the child's name if the qualifying<br>person is a child but not your dependent ▶ |

| Your first name and middle initial | Last name | Your social security number |
|---|---|---|
| Bassem El Mallakh | | 3012 |

| If joint return, spouse's first name and middle initial | Last name | Spouse's social security number |

Home address (number and street). If you have a P.O. box, see instructions.    Apt. no.

116 Rockefeller

City, town, or post office. If you have a foreign address, also complete spaces below.    State    ZIP code

Irvine, CA 92612

Foreign country name          Foreign province/state/county          Foreign postal code

**Presidential Election Campaign**
Check here if you, or your spouse
if filing jointly, want $3 to go to this
fund. Checking a box below will
not change your tax or refund.
[ ] You  [ ] Spouse

At any time during 2021, did you receive, sell, exchange, or otherwise dispose of any financial interest in any virtual currency?   [ ] Yes  [X] No

| **Standard Deduction** | Someone can claim:  [ ] You as a dependent  [ ] Your spouse as a dependent<br>[ ] Spouse itemizes on a separate return or you were a dual-status alien |

**Age/Blindness**   You:  [ ] Were born before January 2, 1957  [ ] Are blind   Spouse:  [ ] Was born before January 2, 1957  [ ] Is blind

**Dependents** (see instructions):

| | (1) First name    Last name | (2) Social security number | (3) Relationship to you | (4) ✓ if qualifies for (see instructions):<br>Child tax credit | Credit for other dependents |
|---|---|---|---|---|---|
| If more<br>than four<br>dependents,<br>see instructions<br>and check<br>here ▶ [ ] | | | | [ ] | [ ] |
| | | | | [ ] | [ ] |
| | | | | [ ] | [ ] |
| | | | | [ ] | [ ] |

| | | | | |
|---|---|---|---|---|
| Attach<br>Sch. B if<br>required. | **1** Wages, salaries, tips, etc. Attach Form(s) W-2 | | **1** | |
| | **2a** Tax-exempt interest . . . | **2a** | **b** Taxable interest . . . . . . . . . . . | **2b** | 3. |
| | **3a** Qualified dividends . . . . | **3a** | **b** Ordinary dividends . . . . . . . . | **3b** | |
| | **4a** IRA distributions . . . . . . . . | **4a** | **b** Taxable amount . . . . . . . . . . | **4b** | |
| | **5a** Pensions and annuities . . . . . | **5a** | **b** Taxable amount . . . . . . . . . . | **5b** | |
| | **6a** Social security benefits . . . . | **6a** | **b** Taxable amount . . . . . . . . . . | **6b** | |
| | **7** Capital gain or (loss). Attach Schedule D if required. If not required, check here . . . . ▶ [ ] | | **7** | |
| | **8** Other income from Schedule 1, line 10 . . . . . . . . . . . . . . . . . . . . . . . | | **8** | |
| **Standard**<br>**Deduction for —**<br>• Single or<br>Married filing<br>separately, $12,550<br>• Married filing<br>jointly or Qualifying<br>widow(er), $25,100<br>• Head of<br>household, $18,800<br>• If you checked any<br>box under Standard<br>Deduction,<br>see instructions. | **9** Add lines 1, 2b, 3b, 4b, 5b, 6b, 7, and 8. This is your **total income** . . . . . . . . . . . ▶ | | **9** | 3. |
| | **10** Adjustments to income from Schedule 1, line 26 . . . . . . . . . . . . . . . . . . | | **10** | |
| | **11** Subtract line 10 from line 9. This is your **adjusted gross income** . . . . . . . . . . . . . ▶ | | **11** | 3. |
| | **12a** Standard deduction or itemized deductions (from Schedule A) | **12a** | 12,550. | | |
| | **b** Charitable contributions if you take the standard deduction (see instructions) . . | **12b** | | | |
| | **c** Add lines 12a and 12b . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | **12c** | 12,550. |
| | **13** Qualified business income deduction from Form 8995 or Form 8995-A . . . . . . . . . . . | | **13** | |
| | **14** Add lines 12c and 13 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | **14** | 12,550. |
| | **15** **Taxable income.** Subtract line 14 from line 11. If zero or less, enter -0- . . . . . . . . . | | **15** | 0. |

**BAA  For Disclosure, Privacy Act, and Paperwork Reduction Act Notice, see separate instructions.**          Form **1040** (2021)

FDIA0112L  12/10/21

| Form **1040** | Department of the Treasury — Internal Revenue Service (99) | **2019** | OMB No. 1545-0074 | IRS Use Only — Do not write or staple in this space. |
|---|---|---|---|---|
| | **U.S. Individual Income Tax Return** | | | |

**Filing Status**
Check only one box.

[X] Single  [ ] Married filing jointly  [ ] Married filing separately (MFS)  [ ] Head of household (HOH)  [ ] Qualifying widow(er) (QW)

If you checked the MFS box, enter the name of spouse. If you checked the HOH or QW box, enter the child's name if the qualifying person is a child but not your dependent. ▶

| Your first name and middle initial | Last name | Your social security number |
|---|---|---|
| Bassem El Mallakh | | 3012 |

| If joint return, spouse's first name and middle initial | Last name | Spouse's social security number |
|---|---|---|
| | | |

Home address (number and street). If you have a P.O. box, see instructions.  Apt. no.

116 Rockefeller

City, town or post office, state, and ZIP code. If you have a foreign address, also complete spaces below (see instructions).

Irvine, CA 92612

| Foreign country name | Foreign province/state/county | Foreign postal code |
|---|---|---|
| | | |

**Presidential Election Campaign**
Check here if you, or your spouse if filing jointly, want $3 to go to this fund. Checking a box below will not change your tax or refund.  [ ] You  [ ] Spouse

If more than four dependents, see instructions and ✓ here ▶ [ ]

**Standard Deduction**

Someone can claim:  [ ] You as a dependent  [ ] Your spouse as a dependent

[ ] Spouse itemizes on a separate return or you were a dual-status alien

**Age/Blindness**  You:  [ ] Were born before January 2, 1955  [ ] Are blind  Spouse:  [ ] Was born before January 2, 1955  [ ] Is blind

**Dependents** (see instructions):

| (1) First name    Last name | (2) Social security number | (3) Relationship to you | (4) ✓ if qualifies for (see instructions): |  |
|---|---|---|---|---|
| | | | Child tax credit | Credit for other dependents |
| | | | [ ] | [ ] |
| | | | [ ] | [ ] |
| | | | [ ] | [ ] |
| | | | [ ] | [ ] |

| | | | | |
|---|---|---|---|---|
| **1** | Wages, salaries, tips, etc. Attach Form(s) W-2 . . . . . . . . . . . . . . . . . . . . . . . . | | **1** | |
| **2a** | Tax-exempt interest . . . . . . . . . . . . . | **2a** | **b** Taxable int. Att. Sch. B if reqd. . . . . | **2b** | 5. |
| **3a** | Qualified dividends . . . . . . . . . . . . . | **3a** | **b** Ordinary div. Att. Sch. B if reqd. . . . | **3b** | |
| **4a** | IRA distributions. . . . . . . . . . | **4a** | **b** Taxable amount. . . . . . . . . . . . . | **4b** | |
| **c** | Pensions and annuities . . . . . . | **4c** | **d** Taxable amount. . . . . . . . . . . . . | **4d** | |
| **5a** | Social security benefits . . . . . . . . . | **5a** | **b** Taxable amount. . . . . . . . . . . . . | **5b** | |
| **6** | Capital gain or (loss). Attach Schedule D if required. If not required, check here . . . . . . . . . . . . . . . . ▶ [ ] | | **6** | |
| **7a** | Other income from Schedule 1, line 9. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | **7a** | |
| **b** | Add lines 1, 2b, 3b, 4b, 4d, 5b, 6, and 7a. This is your **total income** . . . . . . . . . . . . . ▶ | | **7b** | 5. |
| **8a** | Adjustments to income from Schedule 1, line 22. . . . . . . . . . . . . . . . . . . . . . . | | **8a** | |
| **b** | Subtract line 8a from line 7b. This is your **adjusted gross income** . . . . . . . . . . . . . . . . . ▶ | | **8b** | 5. |
| **9** | Standard deduction or itemized deductions (from Schedule A) . . . . . . . . . . | **9** | 12,200. | | |
| **10** | Qualified business income deduction. Attach Form 8995 or Form 8995-A . . . . . . | **10** | | | |
| **11a** | Add lines 9 and 10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | **11a** | 12,200. |
| **b** | **Taxable income.** Subtract line 11a from line 8b. If zero or less, enter -0- . . . . . . . . . . . . . . . | | **11b** | 0. |

**Standard Deduction for —**
• Single or Married filing separately, $12,200
• Married filing jointly or Qualifying widow(er), $24,400
• Head of household, $18,350
• If you checked any box under *Standard Deduction,* see instructions.

**BAA  For Disclosure, Privacy Act, and Paperwork Reduction Act Notice, see separate instructions.**    Form **1040** (2019)

# INTERINSURANCE EXCHANGE OF THE AUTOMOBILE CLUB

## MEMBERS' CONDOMINIUM OWNERS POLICY – FORM 6
## PROPERTY INSURANCE POLICY DECLARATIONS

**Evidence of Insurance**

Policy contains 438BFU, printed on next page, in favor of Mortgagee shown.

**MORTGAGEE**
ADDITIONAL OWNERS INTEREST
US TRUSTEE
UNITED STATES TRUSTEE (SA)
411 W FOURTH ST SUITE 7160
SANTA ANA CA 92701

**LOAN NUMBER**

**POLICY NUMBER**
[redacted]20189

**NAMED INSURED AND MAILING ADDRESS**
BASSEM EL MALLAKH
116 ROCKEFELLER
IRVINE CA 92612

**LOCATION OF PREMISES (IF DIFFERENT FROM MAILING ADDRESS)**

☐ PROPERTY INSURANCE POLICY DECLARATIONS
EFFECTIVE DATE OF THIS POLICY 10262022 12:01 A.M. (PACIFIC STANDARD TIME)
EXPIRATION DATE OF THIS POLICY 10262023 12:01 A.M. (PACIFIC STANDARD TIME)

ANNUAL PREMIUM $

☐ AMENDMENT OF PROPERTY INSURANCE DECLARATIONS ENDORSEMENT
EFFECTIVE DATE 12:01 A.M (PACIFIC STANDARD TIME)
EXPIRATION DATE OF THE POLICY 12.01 A.M. (PACIFIC STANDARD TIME)

**COVERAGES AND LIMITS OF LIABILITY**

**PART I - PROPERTY COVERAGES**

| | |
|---|---|
| COVERAGE A – BUILDING PROPERTY | 82000 |
| OTHER PERILS DEDUCTIBLE | 5000 |
| WATER DEDUCTIBLE | 5000 |

**PROVISIONS**

This form is not a contract of insurance. The provisions of the policy shall prevail in all respects. All premiums for the insurance policy shall be computed in accordance with the Interinsurance Exchange of the Automobile Club rules, forms, premiums and minimum premiums applicable to the insurance afforded which are in effect at the inception of the insurance policy and upon each anniversary thereof, including the date of interim changes. The insurance policy does not become effective unless and until escrow closes, the named insured has an ownership interest in the residence premises, and the premium is paid or reserved in an escrow account. If the insurance protection evidenced herein terminates, the mortgagee will be given notice in accordance with the standard mortgagee clause (438BFU)

*ACSC Management Services, Inc.*
ATTORNEY-IN-FACT

**FOR QUESTIONS OR CHANGES CALL**
8720 01/16

DETACH HERE AND RETURN WITH PREMIUM PAYMENT

INTERINSURANCE EXCHANGE of the
Automobile Club of Southern California
MAILING ADDRESS: P.O. Box 25448 SANTA ANA, CALIFORNIA 92799-5448

**NOTICE OF PREMIUM DUE**

**LOAN NUMBER**

POLICY NUMBER
CHO183020189

DUE DATE

PREMIUM DUE

**PLEASE PAY THE PREMIUM DUE BEFORE OR ON THE DUE DATE**

**MAKE CHECK PAYABLE TO ACSC**

BASSEM EL MALLAKH

# Wells Fargo Combined Statement of Accounts

September 30, 2022 ■ Page 1 of 6



BASSEM VICTOR EL MALLAKH
116 ROCKEFELLER
IRVINE CA 92612-8114

**Questions?**

Available by phone 24 hours a day, 7 days a week.
We accept all relay calls, including 711

**1-800-742-4932**

En español: 1-877-727-2932

Online: wellsfargo.com

Write: Wells Fargo Bank, N.A. (114)
P.O. Box 6995
Portland, OR 97228-6995

## You and Wells Fargo

Thank you for being a loyal Wells Fargo customer. We value your trust in our
company and look forward to continuing to serve you with your financial needs.

## Account options

A check mark in the box indicates you have these
convenient services with your account(s). Go to
wellsfargo.com or call the number above if you have
questions or if you would like to add new services.

| Service | | Service | |
|---|---|---|---|
| Online Banking | ☐ | Direct Deposit | ☐ |
| Online Bill Pay | ☐ | Auto Transfer/Payment | ☐ |
| Online Statements | ☐ | Overdraft Protection | ☐ |
| Mobile Banking | ☐ | Debit Card | ☐ |
| My Spending Report | ☐ | Overdraft Service | ☑ |

**Other Wells Fargo Benefits**

**From Wells Fargo Home Mortgage**

Is a home purchase in your future? Competitive rates and low down payment options make now a great time to buy a home. Plus, as a
Wells Fargo customer, you can count on personalized guidance and streamlined service every step of the way.

Get started with an online mortgage application that can pre-fill your Wells Fargo account information and save you time. Use your
Wells Fargo Online® username and password at the start of the application. Go to wellsfargo.com/homepurchase or contact your local
home mortgage consultant.

Sheet Seq = 0105191
Sheet 00001 of 00003

Created With Tiny Scanner



**FREEDOM MORTGAGE®**
PO Box 50485, Indianapolis, IN 46250-0485

August 16, 2021

BASSEM ELMALLAKH
116 ROCKEFELLER
IRVINE      CA 92612

## PAYOFF STATEMENT

Loan Number:      ▓▓▓▓4275        Next Payment Due Date: February 1, 2020
Borrower:      BASSEM ELMALLAKH

Property:      116 ROCKEFELLER
              IRVINE      CA 92612

Loan Type:      CONVENTIONAL

### Payoff Quote Good Through September 15, 2021

The accrued interest shown below is projected through September 15, 2021. After that date, please add an additional $ 13.80 per day.

| Please send the following Remittance: | |
|---|---|
| Current Unpaid Principal | $ 201,970.66 |
| Accrued Interest | $ 9,657.70 |
| Prepayment Penalty | $  0.00 |
| Escrow/Impound Required | $ 12,564.30 |
| Mortgage Insurance Premium Due | $ 0.00 |
| Less Escrow/Impound Funds | $ - 0.00 |
| Less Unapplied Funds Balance | $  0.00 |
| Statement Fee | $  30.00 |
| Unpaid Late Charges | $  60.14 |
| Recording Fee | $ 168.00 |
| Release Fee | $  0.00 |
| Additional Items Due | $  75.00 |
| Deferred Balance | $.00 |
| Optional Insurance | $  0.00 |
| **TOTAL PAYOFF DUE:** | $ 224,525.80 |

A Deferred Balance may include items such as deferred Principal Balance, Late Charges, Escrow Advances, Expense Advances and Administrative Fees.
The current escrow balance is $-12,564.30. Any escrow payments scheduled to disburse prior to the payoff expiration date will be deducted from the total escrow balance. If the scheduled disbursement creates a negative balance in the escrow account, these funds will appear as an escrow advance and included in the total payoff due. Available escrow funds will be returned to the borrower within 14 business days from the date the loan is paid in full.

261



**FREEDOM MORTGAGE**
PO Box 50485, Indianapolis, IN 46250-0485

*When applicable, any escrow funds credited toward the total payoff will not be returned.*

The information shown on this statement is subject to change. To ensure that you are submitting sufficient funds to pay your account in full, please contact our Customer Care Department for updated figures prior to remitting payoff funds. If your loan is referred to foreclosure this payoff statement will no longer be valid, therefore, a new payoff statement will need to be requested.

## WHERE TO SUBMIT PAYOFF FUNDS

**WIRE TRANSFER**
Freedom Mortgage Corporation
Reference:  Payoff/Payment Department
Keybank, 127 Public Square, Cleveland, OH
ABA:  041001039
Bank Account███████3402
Borrower Name:  BASSEM ELMALLAKH
Loan Number:  ████4275

**OVERNIGHT DELIVERIES OF PAYMENTS**
Freedom Mortgage Corporation
ATTN: Payoff Department
10500 Kincaid Drive, Suite 111
Fishers, Indiana  46037-9764

*Please note that Freedom Mortgage requires payoffs to be received in the form of certified funds. Personal checks will not be accepted. Additionally, Freedom Mortgage will only accept funds to pay off the account in full. Payoff funds received that are not sufficient to pay the loan account in full will be returned.*
*Incoming wire transfers received by 4pm EST will be credited the same day. Wires received after that time will be processed on the next business day.  Please ensure that all payoff funds submitted include the borrower's name and loan number.*

Customer Care representatives are available to assist you at (855) 690-5900 Monday through Friday from 8:00am – 10:00pm and Saturday from 9:00am – 6:00pm Eastern Time.

**FREEDOM MORTGAGE CORPORATION IS A DEBT COLLECTOR ATTEMPTING TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.**

**IMPORTANT NOTICE: TO THE EXTENT YOUR OBLIGATION HAS BEEN DISCHARGED IN BANKRUPTCY, IS SUBJECT TO THE AUTOMATIC STAY OR IS PROVIDED FOR IN A CONFIRMED PLAN, THIS COMMUNICATION IS FOR REGULATORY COMPLIANCE AND/OR INFORMATIONAL PURPOSES ONLY, AND DOES NOT CONSTITUTE A DEMAND FOR PAYMENT OR AN ATTEMPT TO IMPOSE PERSONAL LIABILITY FOR SUCH OBLIGATION.**

-----------------------------------------------------------------------------------------------------------

### Change of Address Notification Form

Is your mailing address changing as a result of this payoff request? Please let us know your new address below in order to ensure all trailing documents are sent to the appropriate address. Please return this form to:

Freedom Mortgage P.O. Box 50428 Indianapolis IN 46250-0401

**New Address:** _____ **City/State/Zip** _____

**Loan Number:** 0113204275

261



JP Morgan Chase Bank, N.A.
PO Box 659754
San Antonio, TX 78265-9754

Questions?

chase.com

1-800-935-9935

We accept operator relay calls

10/28/2022

BASSEM V ELMALLAKH
116 ROCKEFELLER
IRVINE, CA 92612-8114

## Update: We closed your account

Your account ending in 7832

Dear Bassem Elmallakh

Thank you for your recent inquiry about your account. We closed your account above on 09/20/2022
If you have questions, please call us at 1-800-935-9935 or visit any of our branches.

Sincerely,

Customer Service

©2019 JPMorgan Chase Bank, N.A. Member FDIC
M1008-01 (09/19)

Created With Tiny Scanner

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
9454 Wilshire Blvd., 6th Fl., Beverly Hills, CA 90212

A true and correct copy of the foregoing document entitled (*specify*): **DEBTOR'S OPPOSITION TO BELGIUM INVESTMENTS 960 BAY DR, LLC'S OBJECTION TO DEBTOR'S CLAIMED HOMESTEAD EXEMPTION; DECLARATION OF BASSEM VICTOR EL MALLAKH IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) 12/28/2022, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

Counsel for Debtor: Jay Berger michael.berger@bankruptcypower.com,
yathida.nipha@bankruptcypower.com;michael.berger@ecf.inforuptcy.com
U.S. Trustee; Nancy S Goldenberg nancy.goldenberg@usdoj.gov
Interested Party: Benjamin Heston bhestonecf@gmail.com, benheston@recap.email,NexusBankruptcy@jubileebk.net
United States Trustee (SA) ustpregion16.sa.ecf@usdoj.gov
Interested Party: Chad L Butler caecf@tblaw.com
Counsel for TD Bank: Randall P Mroczynski randym@cookseylaw.com
Counsel for Belgium Investments 960 Bay Dr, LLC: Patrick Miller    patrick.miller@impactadvocateslaw.com

☐ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On 12/28/2022, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☒ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on 12/28/2022, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

**Honorable Theodore Albert**
**United States Bankruptcy Court**
**Central District of California**
**Ronald Reagan Federal Building and Courthouse**
**411 West Fourth Street, Suite 5085 / Courtroom 5B**
**Santa Ana, CA 92701-4593**

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 12/28/2022 | Peter Garza | /s/Peter Garza |
|---|---|---|
| Date | Printed Name | Signature |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1.PROOF.SERVICE**

**SUBS**

**3**

PATRICK MILLER
Email: Patrick.miller@impactadvocateslaw.com
Impact Advocates APC
121 S Oak Ave
Pasadena, CA 91107
Telephone:     213-364-7581


Attorney for Judgement Creditor
BELGIUM INVESTMENTS 960 BAY DR,
LLC A CALIFORNIA CORP.

<div align="center">

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

</div>

| In re Bassem Victor El Mallakh | Case No 8:22-bk-11605-TA<br>Chapter 11 |
|---|---|
| | **REPLY TO OPPOSITION TO CREDITOR'S OBJECTION TO DEBTOR'S CLAIMED HOMESTEAD EXEMPTION; DECLARATION OF PATRICK MILLER**<br><br>**Date**: 11 January 2023<br>**Time**: 10am<br>**Crtrm**: Virtual/5B |

**TO THE HONORABLE THEODOR ALBERT, UNITED STATES**

**BANKRUPTCY JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE, THE**

**DEBTOR AND HIS ATTORNEYS OF RECORD, AND ALL PARTIES IN INTEREST:**

     **PLEASE TAKE NOTICE** that the Creditor Belgium Investments 960 Bay Dr, LLC, a

California Corp. ("**Belgium**") herein sets out its REPLY to Debtor's OPPOSITION to its

OBJECTION TO DEBTOR'S CLAIMED HOMESTEAD EXEMPTION.

1

## TABLE OF CONTENTS

2

| Section | Description | Page |
|---------|-------------|------|
| I | Introduction. | 3 |
| II | The Legal Standard in California requires an intent to continuously reside—and actual residency—at the subject property. | 3 |
| III | Debtor has the burden of proof to demonstrate his actual occupancy and intent to continuously reside in the Rockefeller Property. | 4 |
| IV | Debtor has failed to meet its burden of proof as to his actual residency—and intent to reside—at the Rockefeller Property. | 4 |
| IV.A | Debtor's evidence cannot be trusted because he fails to address Belgium's important criticism regarding his contradictory witness evidence. | 4 |
| IV.B | Debtor's Submissions do not adequately address Belgium's important criticism regarding the operative lease agreement because this agreement prohibits his residing in the Rockefeller Property. | 5 |
| IV. C | Debtor has not addressed the other indicators that point to Debtor residing elsewhere noted at Section V of the Objection. | 6 |
| IV.D | Debtor's caselaw references regarding the operative date for determining residency are inapposite and ultimately inconsequential. | 7 |
| IV.E | Debtor's evidence is neither persuasive nor comprehensive. | 8 |
| IV.E.1 | Debtor's Declaration is unhelpful and cannot be relied upon absent an explanation for his past contradictory statements. | 9 |
| IV.E.2 | Debtor's documentary evidence is not objective or persuasive. | 9 |
| IV.E.3 | Debtor's documentary evidence is also not complete. | 10 |
| V | Debtor failed to explain why res judicata does not prohibit this court from revisiting the state court's ruling on his entitlement to claim a homestead exemption. | 11 |
| VI | Conclusion. | 13 |

**POINTS & AUTHORITIES**

**I.    Introduction.**

Debtor's Opposition to Belgium's HS Objection (the "**Opposition**") does not address Belgium's key points for objecting to the claimed HS exemption. The Opposition does not explain Debtor's wholly-contradictory witness evidence regarding his residency. It also doesn't adequately address the lease agreement which prohibits him from residing at the property.

Debtor's affirmative evidence is neither comprehensive, nor persuasive. His one-page Declaration is unhelpful and the scant documents he provides are incomplete and not as objective as the lease agreement noted above. The documents are also not as probative as those Debtor presented in 2021 to establish that he resided in the Santa Monica Property. Given the above, Debtor has failed to meet his burden of proof to demonstrate his entitlement to the exemption.

Separate from the evidentiary issues noted above, Debtor is legally estopped from claiming the HS exemption in these proceedings by virtue of res judicata. Debtor has accepted that all the elements of issue preclusion & claim preclusion have been met in this case. Therefore, this court should not revisit the order of the California state court finding that Debtor is not entitled to claim the homestead exemption over the Rockefeller Property. If the court is minded to make such a ruling, then this might best be postponed until after Debtor proposes his reorganization plan on 1 March 2023.

**II.  The Legal Standard in California requires an intent to continuously reside—and actual residency—at the subject property.**

California Civil Procedure Code Section 704.710(c) states in relevant part: *"*"Homestead" means **the principal dwelling (1) in which the judgment debtor** or the judgment debtor's spouse **resided on the date the judgment creditor's lien attached to the dwelling**, and (2) **in which the**

*judgment debtor* or the judgment debtor's spouse **resided continuously thereafter** until the date of the court determination that the dwelling is a homestead." (emphasis added).

"*The factors a court considers in determining residency for homestead purposes are the debtor's **physical occupancy** of the property and the **debtor's intent to live there**.*" (emphasis added)[1]. This intent to reside at the subject property must remain continuous even if there is temporary absence from the property[2].

### III. Debtor has the burden of proof to demonstrate his actual occupancy and intent to continuously reside in the Rockefeller Property.

As set out in Section III of Belgium's Objection to Debtor's HS Exemption (the "**Objection**"), the burden of proof in this instance is governed by California legal principles and requires Debtor to prove that he is entitled to the claimed exemption[3]. It does not appear that Debtor contests that it maintains the burden of proof with respect to this issue. Objective evidence is particularly crucial here since the Debtor's witness evidence is wholly-compromised

### IV. Debtor has failed to meet its burden of proof as to his actual residency—and intent to reside—at the Rockefeller Property.

#### A. Debtor's evidence cannot be trusted because he fails to address Belgium's important criticism regarding his contradictory witness evidence.

Belgium set out in detail the numerous examples where Debtor put forward contradictory, self-serving witness evidence regarding his residency. It also noted the numerous

---

[1] (See In re Bhangoo, 634 B.R. 80, 85–86 (B.A.P. 9th Cir. 2021) (referencing In re Gilman, 887 F.3d at 965 (first citing In re Diaz, 547 B.R. at 335; and then citing Ellsworth v. Marshall, 196 Cal. App. 2d 471, 474, 16 Cal.Rptr. 588 (1961))).

[2] See In re Bhangoo, 634 B.R. 80, 86 (B.A.P. 9th Cir. 2021) (referencing In re Elliott, 523 B.R. at 196-97).

[3] See *In re Bhangoo*, 634 B.R. 80, 85 (B.A.P. 9th Cir. 2021) (See also CPC Sec 703.580(b) & Sec 704.708(a)(1))The records of the Orange County Tax Assessor do not indicate a current homeowner's exemption, ie Debtor is claiming an automatic homestead exemption. See the record from the Orange County Tax Assessor at Ex 1; see also the Declaration of Patrick Miller at paragraph 4.

REPLY TO OPPOSITION TO OBJECTION TO DEBTOR'S CLAIMED HOMESTEAD EXEMPTION

instances of contradictory evidence from his sister, Reem Hanna. Debtor's submissions do not address these contradictions or explain in any way how such extensive contradictions could be present regarding such a critical issue. The only conclusion that can be drawn is that Debtor's evidence can not be trusted.

As detailed in the Objection and accompanying documents, Debtor stated in February & March 2021 that he hadn't even visited the Rockefeller Property for years and that he lived full-time in his apartment in Santa Monica (the lease for which appears to remain operative). Despite these previous statements, he gave detailed testimony in October 2022 claiming that he resided full-time at the Rockefeller Property since he purchased the townhouse in 2013 and only stays at the Santa Monica Property when necessary for work.

The instances of contradictory statements are so numerous that they will not be replicated here (or even fully set out in the Objection). Debtor has provided no explanation for these numerous contradictory statements in his evidence. Debtor's evidence as to his residency remains transparently self-serving, contradictory and wholly-unreliable.

**B. Debtor's Submissions do not adequately address Belgium's important criticism regarding the operative lease agreement because this agreement prohibits his residing in the Rockefeller Property.**

Given Debtor's unreliable witness evidence, he has an even higher burden to put forward credible, objective evidence <u>and</u> to address Belgium's evidence demonstrating that he does not meet the residency requirements.

In contrast to the limited documents produced by Debtor, the primary issue relevant in the lease agreement signed between Debtor and his sister was the legal right to reside at the Rockefeller Property. This is why it is the most objective, useful piece of evidence as to intention

and actual residency. Debtor's failure to adequately address this key piece of objective, reliable evidence further underscores his failure to prove his entitlement to claim the HS Exemption.

As detailed at Section V of the Objection, the lease agreement does not allow the Debtor (or anyone other than his sister) to occupy the Rockefeller Property. The terms of the lease agreement clearly show that she is the only individual authorized to occupy the premises—and the lease agreement covers the entirety of the property[4]. Furthermore, Debtor confirmed during the recent 341 creditor meetings that the lease agreement is still operative and the only change that has been made concerns the price per month to rent the property[5].

Despite the clear language of the lease agreement highlighted in the Objection, Debtor's Opposition merely states "*the lease agreement between the Debtor and his sister does not bar the Debtor from living in the Rockefeller Property as his primary residence*" without any argument or explanation to support this bald assertion.

Debtor can not claim he resides in the Rockefeller Property, or intends to make it his primary residency, when he has no legal right to occupy the premises.

### C. Debtor has not addressed the other indicators that point to Debtor residing elsewhere noted at Section V of the Objection.

Belgium listed several other indicators that Debtor lives elsewhere at pages 19-20 of its Objection. Debtor failed to address any of these points. One key indicator is the unusual nature of the lease and rental terms agreed with his sister[6]. The original terms of the lease agreement required that she pay $3,000/month to rent the entire property. She is now apparently paying $4,000/month to simply rent a portion of the property. Under similar circumstances, it would be expected for such a tenant to pay a reduced rent to share the premises with her landlord.

---

[4] See footnote 31 of the Objection.
[5] See footnote 31 of the Objection.
[6] See pages 19-20 of the Objection. These issues were canvassed during the 341 creditor meetings and were not contested by Debtor in the Opposition.

REPLY TO OPPOSITION TO OBJECTION TO DEBTOR'S CLAIMED HOMESTEAD EXEMPTION

Page. 6

In fact, it is highly irregular that the only source of income to sustain Debtor's Ch 11 filing is the rent paid by his sister for her residing at the Rockefeller Property, while he also claims that the property is being utilized as his primary residence.

Another key indicator is the fact that Debtor is considering taking on employment which could require he live in Egypt and Los Angeles for most of the year[7].

### D. Debtor's caselaw references regarding the operative date for determining residency are inapposite and ultimately inconsequential.

Rather than address the numerous, serious concerns raised in Belgium's Objection, the bulk of Debtor's Opposition focuses on the operative time for determining residency. Debtor contends that the operative time during which residency must be continuously maintained begins as of the filing date of the bankruptcy action. In support for this position, it references 9th circuit cases from Nevada and Oregon (the *BAC* and *Benafel* cases, respectively). However, those cases are inapposite because (i) California law governs the determination of a homestead exemption; and (ii) those cases did not directly concern the ability to claim a homestead exemption.

California law requires that the Debtor reside in the property on the date the creditor's lien attached. (See CCP Section 704.710(c)). Belgium's lien attached on 9 November 2020 when its Abstract of Judgement was recorded in Orange County.

The court in *In re Bhangoo* noted that "*[a]n automatic homestead exemption arises by operation of law when a party's principal dwelling is sold in a forced sale.*" (referencing In re Cumberbatch, 302 B.R. 675, 678 (Bankr. C.D. Cal. 2003) (citing In re Mulch, 182 B.R. 569, 572 (Bankr. N.D. Cal. 1995)). "*The filing of bankruptcy petition constitutes a forced sale for purposes of the automatic homestead exemption.*" Diaz v. Kosmala (In re Diaz), 547 B.R. 329, 334 (9th Cir. BAP 2016) (citing In re Kelley, 300 B.R. at 21)).

---

[7] See pages 19-20 of the Objection. These issues were canvassed during the 341 creditor meetings and were not contested by Debtor in the Opposition.

REPLY TO OPPOSITION TO OBJECTION TO DEBTOR'S CLAIMED HOMESTEAD EXEMPTION

Perhaps one could argue that a similar logic would allow for the filing date to be operative in California. However, this reasoning would not apply in the present case because there has already been a forced sale ordered by a state court wherein the court made a specific finding as to the homestead issue—ruling that the Rockefeller Property was not a homestead. Therefore, the operative date for determining residency for homestead purposes has already been established as being the date Belgium's lien attached in November 2020 (see further below).

Notwithstanding the above, Debtor has not established his actual, or intention to, reside in the Rockefeller Property as of any date—either the bankruptcy filing date or the date Belgium's lien attached. The evidence is inconclusive at best and several pieces of evidence actually indicate the Debtor resides at the Santa Monica Property (including his own testimony). As such, the operative date issue is ultimately inconsequential to determining the present Objection.

### E.    Debtor's evidence is neither persuasive nor comprehensive.

California Evidence Code §412 states: "*If weaker and less satisfactory evidence is offered when it was within the power of the party to produce stronger and more satisfactory evidence, the evidence offered should be viewed with distrust.*"

Given Debtor's burden of proof and contradictory evidence, it was incumbent upon him to present a substantial amount of compelling evidence to prove his residency—or at least an amount commensurate with that which he referenced to support the Service of Process Story in 2021 (that he resided in Santa Monica since 2016)). However, Belgium has referenced more objective documentary evidence, particularly the lease agreement showing he does not reside in Rockefeller. Debtor has merely submitted a one-page Declaration supported by a limited set of 'cherry-picked' documents which are not objective or persuasive—and even this limited set of documents appears incomplete.

Debtor can not claim to have met his burden to prove that he resides, and intends to continue residing, at the Rockefeller Property without credible, persuasive evidence and explanations that address Belgium's points noted above.

### 1. Debtor's Declaration is unhelpful and cannot be relied upon absent an explanation for his past contradictory statements.

Debtor submitted a one-page Declaration with his Opposition that does not address any of his contradictory evidence over the years and appears to be mainly a reproduction of the text from the Opposition. In fact, the text of paragraph 3 inexplicably ends in the middle of a sentence—indicating that this was not reviewed by the Declarant before it was signed.

No reliance should be placed on this Declaration without explanation for his, and his sister's, previous inconsistent statements.

### 2. Debtor's documentary evidence is not objective or persuasive.

Debtor attaches a few documents to his Declaration purportedly demonstrating his residency in the Rockefeller Property. However, these documents are not objective or persuasive because the address information provided is not questioned by the recipient—therefore, it is simply a reproduction of Debtor's own contradictory, unreliable statements.

In fact, it is clear that the address information provided by Debtor to third parties is not reliable evidence because several other documents show address information which contradicts Debtor's stated position as to his residency. For example, the claim filed by TD Bank NA arises from Debtor's purchase of a Mercedes Benz automobile in August 2016. The Proof of Claim documentation shows Debtor's address as 405 Rockefeller, Unit A056, Irvine CA, 92612[8]. However, at that time Debtor claims to have resided at 116 Rockefeller. This either means

---

[8] See the Proof of Claim documents at Ex 2; see also the Declaration of Patrick Miller at paragraph 5.

Debtor has again testified falsely regarding his residency—or Debtor does not always provide accurate address information to third parties.

Another example of this problem can be found in documents associated with Debtor's bank accounts. Debtor recently produced documents associated with his bank accounts with Chase Bank & Wells Fargo to support his current claim that he resides at the Rockefeller Property. But he also produced similar documents from these same banks in 2021 showing he lives in the Santa Monica Property (despite his recent testimony that at the time he resided in the Rockefeller Property)[9]. Debtor's bank documents are not reliable evidence as to his residency.

Debtor's bankruptcy filings are also not reliable since he's already accepted that the Ch 13 filing contains egregious errors. Debtor's Ch 13 filing contains a factual inaccuracy so egregious that it was the subject of bad faith submissions (where Belgium highlighted the improbability that Debtor accidentally listed his assets & liabilities at $0-$50,000 when he was well-aware of Belgium's judgement). There is no reason to suspect that the current Ch 11 filing information is accurate when it is only being tested for the first time through this Objection.

In summary, the address information which Debtor provides to uninterested third parties, or within untested documents, is not helpful to determine his actual residency.

### 3. Debtor's documentary evidence is also not complete.

There are a number of documents that Debtor could have provided to demonstrate his residency which were not included. He could have exhibited his Driver's License Registration information or a copy of his Driver's license. It's likely he also has photos during the relevant time period which indicate where he resides. These items have not been listed at random—they

---

[9] See the bank documents from Wells Fargo & Chase (indicating Debtor resides in the Santa Monica Property) at Ex 3; see also the Declaration of Patrick Miller at paragraph 6.

REPLY TO OPPOSITION TO OBJECTION TO DEBTOR'S CLAIMED HOMESTEAD EXEMPTION

were actually referenced in 2021 as evidence that Debtor resided in the Santa Monica Property[10].

His failure to provide documents such as these should be viewed adversely.

There are also several other types of documents from utility providers, cell phone service

providers, and other bills which might prove useful for these purposes.

In addition to Debtor failing to produce the full scope of documents within his control, he

has not even produced full sets of the documents he has indicated have been produced.

Disconcertingly, Debtor stated in his Declaration that he provided "*first pages of my prepetition

2019-2022 tax returns*". This indicates he would be providing <u>four</u> separate returns from the

years 2019 until 2022[11]. However, he only provided the first pages from <u>two</u> tax returns, for the

years 2019 and 2021[12]. He also failed to provide any of his California state tax returns.

One would suspect that the reason he failed to provide the full set of tax returns—even

the returns he stated were provided—is because the information contained in those documents

would contradict his most recent claims of residing at the Rockefeller Property.

**V.  Debtor failed to explain why res judicata does not prohibit this court from revisiting
the state court's ruling on his entitlement to claim a homestead exemption.**

The only submissions made by the Debtor concerning res judicata were that: "*Belgium's

res judicata argument that another Court purportedly made a finding that the Debtor was

previously not living at the Rockefeller Property is irrelevant because the Debtor was living at

the Rockefeller Property at the time the Debtor's bankruptcy case was filed.*"

Importantly, Debtor has not contested any specific element of the res judicata test for

issue or claim preclusion. Instead, it merely argues that this ruling is somehow *irrelevant*.

---

[10] See Debtor's Driver's License (indicating he resides at the Santa Monica Property) at Ex 4; see also the
Declaration of Patrick Miller at paragraph 7.
[11] We must note that the necessary implication from the inclusion of these returns is that Debtor lied under oath in
2021 when he stated unequivocally that he resided in the Santa Monica Property.
[12] See pages 20 & 21 of the Opposition.

Notwithstanding Debtor's opinions, the fact that each element of the res judicata test is met in these circumstances speaks heavily to the relevance of the state court's ruling—and underscores why his present homestead exemption claim is precluded by virtue of res judicata.

Debtor has also misstated the state court's findings, as the court specifically ruled that "*the property is not subject to any homestead exemption*" (not simply that Debtor was previously not living there)[13]. Debtor has not cited any cases in California (or elsewhere) that involve a bankruptcy court overturning a ruling on a homestead exemption by a state court which was issued shortly before the bankruptcy filing.

Courts generally disfavor revisiting (much less overturning) the rulings made by other courts. This allows for comity & good order between the courts. It also provides security to the prevailing party that it will not be forced to relitigate the same issue in another forum.

It's particularly important to honor the state court's order in this instance as it came within the context of a years-long enforcement matter over which it presided. As detailed in the Objection and attached Declaration, the state court considered whether Debtor should provide an undertaking to secure Belgium's judgement during a hearing in September 2021. Debtor's counsel indicated that the Rockefeller Property would be available to satisfy Belgium's judgement if Debtor's appeal was unsuccessful (which it was). The court decided against requiring an undertaking at that time but also specifically required that Belgium's levy on the Rockefeller Property should be maintained[14].

---

[13] See the Declaration of Patrick Miller dated 23 Nov 2022 at paragraphs 21-22; see also Exhibit 13 to the same.
[14] See the Declaration of Patrick Miller dated 23 Nov 2022 at paragraph 20 and the Declaration in support of this Reply at paragraph 8; see also Ex 5.

REPLY TO OPPOSITION TO OBJECTION TO DEBTOR'S CLAIMED HOMESTEAD EXEMPTION

After Debtor's Florida appeal was unsuccessful, the state court specifically ruled that Debtor was not entitled to claim the homestead exemption and the property should be sold without reference to the homestead exemption provisions of the CCP[15].

Overturning a ruling by a state court would be a serious issue that requires careful consideration. Rather than providing this court with substantial submissions to weigh in the balance, Debtor put forward one sentence that inaccurately summarized the key issue. Debtor's limited submissions reflect the relative strength of Belgium's arguments—and demonstrate why the state court ruling should not be overturned.

In fact, given the importance of this issue and the context of the present bankruptcy action, it may be prudent to postpone a final judgement on the homestead issue until after Debtor proposes his reorganization plan on 1 March 2022. This is because Belgium plans to re-commence its enforcement efforts pursuant to the state court sale order if Debtor's plan is unsatisfactory and the bankruptcy case is dismissed. A conflicting ruling from a bankruptcy court could unnecessarily complicate Belgium's enforcement efforts. Although postponement would only be necessary if this court was minded to overturn the state court ruling.

**VI.    Conclusion.**

Belgium respectfully requests that this court sustain its objection to the claimed homestead exemption and issue any other relief it deems necessary and proper.

Dated:        4 Jan 2023                           Impact Advocates APC


By_____
        Patrick Miller
        Attorney for
        Belgium Investments

---

[15] See the Declaration of Patrick Miller dated 23 Nov 2022 at paragraphs 21-22; see also Exhibit 13 to the same.

REPLY TO OPPOSITION TO OBJECTION TO DEBTOR'S CLAIMED HOMESTEAD EXEMPTION

**SUBS**

**4**

PATRICK MILLER
Email: Patrick.miller@impactadvocateslaw.com
Impact Advocates APC
121 S Oak Ave
Pasadena, CA 91107
Telephone:    213-364-7581


Attorney for Judgement Creditor
BELGIUM INVESTMENTS 960 BAY DR,
LLC A CALIFORNIA CORP.


## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

In re Bassem Victor El Mallakh

Case No 8:22-bk-11605-TA
Chapter 11

**MOTION FOR SANCTIONS
DUE TO THE DEBTOR'S
PERJURY**

**Date**: TBD
**Time**: TBD

### TO THE HONORABLE THEODOR ALBERT, UNITED STATES

### BANKRUPTCY JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE, THE

### DEBTOR AND HIS ATTORNEYS OF RECORD, AND ALL PARTIES IN INTEREST:

Creditor, Belgium Investments 960 Bay Dr, LLC, a California Corp. ("**Belgium**"), herein

sets out its MOTION FOR SANCTIONS DUE TO DEBTOR'S PERJURY. The nature of

Debtor's perjurious evidence and the basis for this Motion is set out in further detail in the

attached Memorandum of Points & Authorities.

Dated:        24 Mar 2023

Impact Advocates APC

By_____
Patrick Miller
Attorney for Belgium Investments

1

**POINTS & AUTHORITIES**

2

**I.  Introduction.**

3

It is trite that a Debtor's bad faith during bankruptcy can be grounds for dismissal.

4

Therefore, Debtor's egregious perjury must certainly provide grounds for dismissal.

5

6

This Motion details Debtor's perjury and his bad faith explanation of the same. It then

7

explains how this perjury amounts to fraud on the court sufficient to warrant dismissal as

8

sanction. It addresses the basis of the court's power to issue this sanction as well as other courts'

9

approaches under similar circumstances. It concludes by suggesting further steps that might be

10

taken to protect the justice system.

11

**II.  It is now irrefutable that Debtor has committed perjury.**

12

**A.  The Debtor has recently confirmed that his previous statements under oath were**

13

**perjurious—and this perjury was done in conjunction with his attorney(s).**

14

15

The clearest instance of repeated perjury by the Debtor involves his recent claims that he

16

continuously resided in the Rockefeller Property since he purchased it in 2013. This is

17

contradicted by his repeated claims in 2021 that he had not resided at the Rockefeller Property

18

since late-2016.

19

20

It is still not certain which statement is actually true, ie we still don't know where Debtor

21

resided over the past few years. However, Debtor's explanations in the present proceedings

22

regarding the perjurious evidence amount to even more bad faith—and could also be considered

23

perjury itself (see further below).

24

Belgium has continually pointed to Debtor's contradictory statements as evidence of his

25

bad faith. But Debtor has now made clear that these statements actually amount to perjury. A

26

deposition of the Debtor was conducted by Belgium's counsel on 15 March 2023. During this

27

deposition, Debtor repeated his claim that he resided in the Rockefeller Property (in Irvine) since

28

he purchased it in 2013[1]. Belgium's counsel directed Debtor to his previous testimony in a sworn Declaration where he stated: "*I've been residing full-time at my residence in Santa Monica since November 21st, 2016.*". Debtor was asked to explain this statement in light of his new testimony and he responded: "*Yeah. That was my -- it's my civil attorney advice that he said, you know, like we need to write this declaration.*"[2].

This shocking admission seems to implicate a member of the Bar in California and/or Florida in having suborned perjury. This conspiracy would have also involved Debtor's sister, Reem Hanna, who has now presented similar perjurious evidence.

Debtor, and his sister Reem Hanna, have now attempted to explain this perjury by stating that: "*the questions Belgium's counsel asked me [during the previous proceedings in 2021] were in regards to whether I was served at the Rockefeller Property.*"[3]. However, this is only further evidence of Debtor's continued refusal to give truthful evidence to this Court.

Debtor's previous statements regarding residency were ostensibly used to support his allegations that (i) substitute service of process at the Rockefeller Property in 2019 & 2020 was not made at his *residence* (because he resided in Santa Monica); and (ii) he did not have knowledge of the service made upon his sister (because he rarely saw her and resided elsewhere).

Despite Debtor's recent explanation, there are numerous examples of statements made which are clearly perjurious and are not "*in regards to whether [he] was served*". A few illustrative examples are summarized below, but this Court must note that there are many more examples of perjurious statements such as these.

---

[1] See page 7, line 18 to page 8, line 3 of Exhibit 8 of the Pre-Hearing Brief. All references to Exhibits in this Motion will be for Exhibits to the Pre-Hearing Brief for the Evidentiary Hearing on Homestead [Docket Number 153].
[2] See page 27, line 4 to page 28, line 3 of Exhibit 8.
[3] See Exhibit 10.

| Paragraphs 3-4 of Debtor's CA Declaration dated 17 Feb 2021 | Page 91 of Reem Hanna's FL Deposition dated 21 Mar 2021 | Paragraph 6 of Debtor's BK Declaration dated 21 Mar 2023 |
|---|---|---|
| I have **been residing fulltime at my residence in Santa Monica since 11/21/16.** … I have not occupied the real property located at 116 Rockefeller, Irvine CA. since 11/21/16. | Q. Okay. The [Rockefeller Property], is that your residence? A. Yes. … **Q. Does your brother, Bassem Essam El Mallakh, live there? A. No. Q. Where does he live? A. In Santa Monica.** | My **primary residence** where I live is the **Rockefeller Property** and it has been by primary residence **since I purchased it in 2013**... |

| Paragraph 6 of Reem Hanna's CA Declaration dated 17 Feb 2021 | Paragraph 3 of Reem Hanna's BK Declaration dated 21 Mar 2023 | Page 28, ln 22 to 29, ln 6 of Debtor's BK Deposition dated 15 March 2023 |
|---|---|---|
| **Bassem Essam El Mallakh is not nor ever has been a co-occupant at my residence** [the Rockefeller Property]. Since the inception of the lease Bassem Essam El | Since I started living at the Rockefeller Property on or about mid-2018, **Bassem has always lived at the Rockefeller Property with me there.** | Q. Okay. Was anyone living with you at the Rockefeller property in 2020? A. My sister. Q. She was your co- |

| | | |
|---|---|---|
| Mallakh has **never-been a co-occupant.** | | occupant at the time?<br><br>A. She was what?<br><br>**Q. She was your co-occupant at the time?**<br><br>**A. Yeah. Roommate. Co-occupant**. |

| **Page 25 of Debtor's FL Deposition dated 21 Mar 2021** | **Pages 10, ln 4 to ln 18 of Debtor's BK Deposition dated 15 March 2023** |
|---|---|
| Q. Okay. Where do you reside?<br><br>A. I live in Santa Monica.<br><br>Q. Okay. What address?<br><br>A. 525 Broadway.<br><br>Q. How long have you resided there?<br><br>A. Since November 1st of 2016.<br><br>Q. **And do you essentially sleep every night there in 525 Broadway in Santa Monica?**<br><br>**A. Yes.** | Q. When did you sign the lease for the Santa Monica apartment?<br><br>A. It was in November of 2016.<br><br>Q. Okay. November of 2016.<br><br>So -- so you always lived in the Rockefeller house.<br><br>**How many nights did you normally sleep there [at Rockefeller]?**<br><br>**A. Most of the week.** You know, I would be working between Santa Monica and Irvine. It just depends on the week. Some weeks I would just be in like, you know, Irvine for the whole week. Some weeks I would work in Santa Monica a few days, and then, you know, some weeks I would just work, you know, maybe Monday to Thursday, and I'll just go back to my house on the |

|  | weekends. It was really all depending on the traffic. |

| **Pages 36-37 of Debtor's FL Deposition dated 21 Mar 2021** | **Pages 22, ln 5 to 23, ln 1 of Debtor's BK Deposition dated 15 March 2023** |
|---|---|
| Q. Yeah. **Was there a Ring camera system**[4] **at 116 Rockefeller in 2020**, to your knowledge?<br><br>[Debtor's FL Counsel]: Objection.<br><br>THE WITNESS: I'm not sure, Andrew, because, as I mentioned to you, **I have not been in the Irvine house, not even once in 2020, not even once in 2019.** I believe even when I came to Orange County in 2018 it was just for Christmas -- Christmas Eve at my cousin's house in Mission Viejo area, which is like south of Irvine. | Q. **Do you have any security cameras at the Rockefeller property?**<br><br>**A. I have a Ring camera.**<br><br>...<br><br>Q. Did you purchase the Ring camera system?<br><br>A. It was actually a Christmas gift from my -- from my father.<br><br>Q. Do you remember when you received it?<br><br>A. I think it was in 2017. 2017. Christmas of 2017. It's been awhile. |

We cannot determine whether Debtor's current statements are untrue, or his previous statements in 2021 were untrue. We can only be certain that they are directly conflicting, and thus at one of these instances he intentionally gave false testimony concerning a material issue.

---

[4] Debtor's evasiveness on answering questions regarding a ring camera system at the Rockefeller Property were likely due to Debtor's spurious claims that multiple process servers were lying when they testified to having left documents with his sister at the Rockefeller Property. These encounters were likely captured on the Ring camera system and thus would provide evidence that comported with the process servers' testimony.

His supposed explanation in his most recent Declaration is nothing but a continuation of this perjury.

The evidence in 2021 on Debtor's residency was highly material as it concerned whether proper service of process had been given. Debtor challenged the service of process in part on the basis that he did not reside at the address where substitute service was made (the Rockefeller Property). He also needed to support the incredulous claim that his sister, who was served with the documents, never informed him of their contents because his motion to vacate was predicated in part on his lack of knowledge of the case (which the court in Florida ultimately did not accept because Debtor admitted to having knowledge independently through his conversations with co-defendants).

Debtor's residence is again material in the present Ch 11 proceedings to determine whether he is entitled to claim a homestead exemption.

**B.  Other statements regarding the Debtor's finances likely amount to perjury as well.**

As noted in earlier submissions, Debtor's previous Ch 13 filing contained egregiously inaccurate statements regarding Debtor's assets & liabilities. At the time, Belgium suggested that these statements were intentional misrepresentations made for the bad faith purpose of obstructing enforcement and utilizing sections of the Bankruptcy Code which were clearly not available to this Debtor by virtue of his extensive liabilities.

This court previously found those statements did not amount to bad faith. However, now that we have confirmation from Debtor that he has a propensity to commit perjury on material issues, we request that this court reassess the nature of Debtor's previous incredulous statements in light of the new understanding of this Debtor's behavior.

Additionally, Belgium noted that much of the evidence that Debtor gave regarding his finances during the early stages of this Ch 11 filing appeared false and/or highly suspect. Again,

Belgium asks this court to reconsider the various questionable claims made by Debtor in the early stages of this Ch 11 proceeding as it assesses the reasonableness of the sanctions requested by Belgium. Belgium would be willing to provide further submissions on these other potentially perjurious statements if necessary.

### III. Debtor's perjury amounts to fraud on the court sufficient to warrant dismissal as sanction.

Debtor has now admitted to perjury and thus must be sanctioned by this Court to the same degree as the nature of his crime. The Supreme Court of the United States has clearly explained the gravity of the harm caused to the judicial process by perjurious evidence, stating: *"[f]alse testimony in a formal proceeding is intolerable. We must neither reward nor condone such a flagrant 'affront' to the truth-seeking function of adversary proceedings."*[5] (emphasis added).

Dismissal of these proceedings should be the minimum consequence for such an egregious fraud on the court, particularly given Debtor's continued reliance on perjurious and/or bad faith explanations.*"In numerous cases, a litigant's fabrication, destruction, or suppression of evidence and related perjury has led to dismissal of the perjuring plaintiff's claim or default judgment against the perjuring defendant"*[6] (emphasis added). For example, while affirming the trial court's dismissal of an action for fraud on the court, the court in *Rockdale Mgmt* stated: *"[a] fraud on the court" occurs where it can be demonstrated, clearly and convincingly, that a party has sentimentally set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the*

---

[5] Jonathan M. Stern, Untangling a Tangled Web without Trial: Using the Court's Inherent Powers and Rules to Deny a Perjuring Litigant His Day in Court, 66 J. AIR L. & COM. 1251 (2001) https://scholar.smu.edu/jalc/vol66/iss3/7 (referencing ABF Freight Sys., Inc. v. NLRB, 510 U.S. 317, 323 (1994)).

[6] Id (referencing e.g., Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 246 (1944); Aoude v. Mobil Oil Corp., 892 F.2d 1115 (1st Cir. 1989);Joza v. Million Air, Inc., No. 96-3165, slip op. at *8 (S.D. Fla. May 31, 2001); Anheuser-Busch, Inc. v. Natural Beverage Distrib., 151 F.R.D. 346 (N.D. Cal. 1993) affd, 69 F.3d 337 (9th Cir. 1998); Sun World, Inc. v. Lizarazu Olivarria, 144 F.R.D. 384, 390-291 (E.D. Cal. 1992); Eppes v. Snowden, 656 F. Supp. 1267, 1279 (E.D. Ky. 1986); Rockdale Mgmt. Co. v. Shawmut Bank, N.A., 638 N.E.2d 29 (Mass. 1994).

*trier or unfairly hampering the presentation of the opposing party's claim or defense*" (emphasis added )[7].

The Supreme Court has described fraud on the court as "*a wrong against the institutions set up to protect and safeguard the public.*"[8].

Numerous courts have held that dismissal is warranted for fraud on the court before issuing formal ruling on perjury where a litigant's own testimony is irreconcilably inconsistent—as is the case here[9].

Courts have also invoked the 'clean hands" doctrine as a basis for dismissal[10]**.** The clean hands doctrine is an equitable doctrine which largely overlaps with fraud on the court analysis. Its basis was well-summarized by Professor Pomeroy as follows: "*It assumes that the suitor asking the aid of a court of equity has himself been guilty of conduct in violation of the fundamental conceptions of equity jurisprudence, and therefore refuses him all recognition and relief with reference to the subject-matter or transaction in question. It says that **whenever a party**, who, as actor seeks to set the judicial machinery in motion and obtain some remedy**, has violated conscience, or good faith,** or other equitable principle, **in his prior conduct, then the doors of the court will be shut against him in limine; the court will refuse to interfere on his behalf, to acknowledge his right, or to award him any remedy***.*" (emphasis added)[11].

---

[7] Id (referencing Rockdale Mgmt. Co. v. Shawmut Bank, N.A., 638 N.E.2d 29 (Mass. 1994) (quoting Aoude, 892 F.2d at 1118)).
[8] Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 246 (1944).
[9] Id (referencing e.g., Aris-Isotoner Gloves, Inc. v. Berkshire Fashions, Inc., 792 F. Supp. 969 (S.D.N.Y. 1992), afffd without op., 983 F.2d 1048 (2d Cir. 1992). See also Rogal v. Am. Broad. Cos., No. 89-5235, 1994 U.S. Dist. LEXIS 3683, at *19 (E.D. Pa. Mar.29, 1994) (awarding sanctions after adverse verdict and judgment where contradictions and inconsistencies from defendant's own evidence reflected "utter contempt for the oath"), rev'd and remanded, 74 F.3d 40 (3d Cir. 1996) (finding trial court's failure to hold an evidentiary hearing was, under the specifics of the case, an abuse of discretion); Meador, 1995 U.S. Dist. LEXIS 11201, at *29-30 ("In the absence of inconsistent representations to the Court or evidence which shows that there is no genuine issue of material fact, the truthfulness of statements is necessarily a question for the finder of fact, and not properly resolvable on a motion for summary judgment.")).
[10] Id (referencing eg Smith v. Cessna Aircraft Co., 124 F.R.D. 103, 105 (D. Md. 1989)).
[11] Id (referencing John Norton Pomeroy, Equity Jurisprudence § 397 (5th ed. 1941)).

MOTION FOR SANCTIONS DUE TO DEBTOR'S PERJURY
Page. 9

1
2
3
4
5
6

Issues of equity are certainly present in this case, where the Debtor: (i) has been found to have defrauded Belgium in an amount exceeding $4 million dollars; (ii) has obstructed enforcement of this judgement through bad faith & perjury; and (iii) is now using further bad faith & perjury in an attempt to illegitimately claim exemptions over property which it assured the Orange County Superior Court would be available for satisfaction of Belgium's judgement.

7
8

**IV. This Court has the authority to issue the requested sanction by virtue of its inherent powers and the Federal Rules of Civil Procedure.**

9
10
11
12
13

It is well-settled that courts have inherent powers to issue sanctions for bad faith conduct by litigants such as fraud on the court[12]. "*Courts that dismiss or default for fraud practiced on the court often cite their **inherent powers as a source of sanctioning authority***"[13] (emphasis added).

14
15
16

Moore's Federal Practice note observed that "[t]*he fabrication of evidence or testimony is subject to the court's **inherent sanctioning power and dismissal** is a potential sanction*."[14] (emphasis added).

17
18
19
20
21

Additionally, this court arguably has the power to issue such a sanction by virtue of several of the Federal Rules of Civil Procedure, including Rules 11, 26, 37, and 41. For example, "*[a] number of courts have relied on Rule 41(b), in addition to **inherent powers, for authority to dismiss a plaintiff who has committed fraud on the court***"[15] (emphasis added).

22
23
24
25
26
27
28

[12] Id (referencing e.g., Chambers v. NASCO, Inc., 501 U.S. 32 (1991); Link v. Wabash R.R. Co., 370 U.S. 626, 630-31 (1962); Zaldivar v. Los Angeles, 780 F.2d 823, 830 (9th Cir. 1986); Vargas v. Peltz, 901 F. Supp. 1572, 1579 (S.D. Fla. 1995). See also HazelAtlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238 (1944) (addressing the inherent power of a circuit court of appeals).
[13] Id (referencing E.g., Brady v. United States, 877 F. Supp. 444 (C.D. 11. 1994); Sun World, Inc. v. Lizarazu Olivarria, 144 F.R.D. 384, 390 (E.D. Cal. 1992); Eppes v. Snowden, 656 F. Supp. 1267, 1279 (E.D. Ky. 1986)).
[14] Id (referencing 6JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE 26.06[1] (citing Pope, 974 F.2d at 984; Vargas, 901 F. Supp. at 1579)).
[15] Id (referencing E.g., Pope v. Fed. Express Corp., 138 F.R.D. 675 (W.D. Mo. 1990), affd in part, vacated in part on other grounds, 974 F.2d 982 (8th Cir. 1992); McDowell v. Seaboard Farms of Athens, Inc., No. 95-609-CIV-ORL-19, 1996 U.S. Dist. LEXIS 19558 (M.D. Fla. Nov. 4, 1996); Synanon Church v. United States, 579 F. Supp. 967, 975-76 (D.D.C. 1984)).

**V. Dismissal is an appropriate sanction in this instance.**

The court in *Vargas* noted that "[t]*he federal case law is well established that **dismissal is the appropriate sanction where a party manufactures evidence** which purports to corroborate its substantive claims*."[16] (emphasis added). Several of the cases cited above have allowed for dismissal as the sanction for perjury, eg *Rockdale Mgmt.*

With respect to the 9th Circuit, in particular, many courts have found that perjury can form the basis for dismissal. For instance, the court in *Anheuser-Busch* stated: "[*i]t is **well settled that dismissal is warranted where**, as here, **a party has engaged deliberately in deceptive practices that undermine the integrity of judicial proceedings**: "**courts have inherent power to dismiss an action when a party has willfully deceived the court** and engaged in conduct utterly inconsistent with the orderly administration of justice.""* [17] (emphasis added). The ruling in *Anheuser-Busch* has been cited by over 1,000 cases since it was published and certainly reflects the relevant legal threshold for dismissal when perjury is discovered in the 9th Circuit.

When ordering the dismissal, the lower court in *Anheuser-Busch* noted that the violator: "***does not take her oath to tell the truth seriously** and ... will say anything at any time in order to prevail in this litigation. **There is little guarantee that if the court were to impose lesser sanctions [the violator's] misconduct would cease.***" (emphasis added)[18]. This is eerily similar to the present case because this Debtor's conduct unequivocally shows that he will not take his oath to provide truthful information seriously—and this misconduct will continue until he is no longer provided with the protections granted to a bona fide debtor in bankruptcy.

---

[16] Id (referencing Vargas v. Peltz, 901 F. Supp. 1572, 1581 (S.D. Fla. 1995)).

[17] Anheuser-Busch, Inc. v. Nat. Beverage Distributors, 69 F.3d 337, 348 (9th Cir. 1995) (quoting *Wyle v. R.J. Reynolds Indus., Inc.,* 709 F.2d 585, 589 (9th Cir.1983)  (upholding dismissal of complaint pursuant to court's inherent power where plaintiff's denials of material fact were knowingly false and plaintiff willfully failed to comply with discovery orders)).

[18] Id at 352.

Dismissal is particularly warranted in the context of bankruptcy. Debtor is tenuously asking for this Court to utilize the powers of bankruptcy law to delay the enforcement by creditors of their duly-won judgment—a judgement which was the result of Debtor's fraud & misconduct and whose enforcement has been obstructed for several years due to Debtor's admitted-perjury.

It is the Debtor who must prove to this court why he should be allowed the privilege of utilizing the bankruptcy code, particularly given his dubious filing under Ch 11 in circumstances where he has virtually no chance of actually reorganizing his assets and is continuing to rely on perjurious, bad faith explanations.

As noted above, Debtor has made several other statements during his bankruptcy that appear to amount to perjury—and it remains to be seen exactly what evidence is inaccurate regarding Debtor's residency. His explanations regarding the perjurious evidence may also amount to perjury, or at least have been made in bad faith. But even if the only perjury occurred during a previous case, this would still amount to misconduct that must be sanctioned by this court in the form of dismissal.

Courts have taken two approaches when considering perjury which only took place in a previous case. Some courts find that the subsequent case cannot proceed because it is "*infected*" by the earlier perjury[19]**.** The other approach is to employ res judicata by acknowledging the earlier case did (or would have) resulted in a dismissal which would bar the subsequent litigation[20]. In this way, a perjurious litigant cannot prevail in a subsequent action simply because the perjury occurred earlier.

---

[19] See Jonathan M. Stern, Untangling a Tangled Web without Trial: Using the Court's Inherent Powers and Rules to Deny a Perjuring Litigant His Day in Court, 66 J. AIR L. & COM. 1251 (2001) https://scholar.smu.edu/jalc/vol66/iss3/7 (referencing Aoude v. Mobil Oil Corp., 892 F.2d 1115, 1121-1122 (1st Cir. 1989)).

[20] Id (referencing e.g., Massie v. Paul, 92 S.W.2d 11 (Ky. 1936)).

**VI. Additional steps should also be taken by this Court in furtherance of justice.**

As there is now clear evidence of perjury and conspiracy to commit perjury in multiple states, it seems this matter should be referred to the US Attorney's Office for further prosecution. As this egregious perjury has occurred in this Court, Belgium respectfully requests that this Court takes steps to actively ensure that the matter is properly investigated and that the appropriate criminal sanctions are sought by the US Attorney.

Additionally, as this misconduct seems to implicate members of the Bar in California and/or Florida, we respectfully request this Court to issue the proper referrals to the relevant Bar Associations for further investigation.

This misconduct strikes at the heart of the judicial system and implicates several Canons of the Codes of Conduct for US Judges, including Canon 1 and Canon 3(b)(6). We therefore have no doubt that this Court will take the appropriate steps in light of these serious violations of the judicial system.

## VII.    Conclusion

Belgium has not yet set a date for this Motion to be heard. It hopes that this Motion can be incorporated into the Court's analysis at the hearing next Thursday, 30 March 2023 where it will be deciding Belgium's earlier Motion to Dismiss and the US Trustee's Motion to Dismiss [Docket Nos 63 & 121, respectively].

As cited in those earlier submissions, there is ample basis to support dismissal of this bankruptcy due to the infeasibility of reorganization, bad faith misconduct, and the fact that dismissal is undoubtedly in the best interest of the creditors. Irrespective of these points, Debtor's perjury would be a separate, and perhaps superseding, reason to dismiss this bankruptcy.

1

2          Debtor must not be allowed to continue this bankruptcy any longer now that he has

3    confirmed it is predicated on bad faith and perjury. Immediate dismissal is the only recourse at

4    this stage.

5          Given Debtor's admitted perjury & unrepentant bad faith, every single day hereafter that

6    this bankruptcy continues represents an intolerable affront to the institutions of justice in this

7    country.

8

9    Dated:        24 Mar 2023                              Impact Advocates APC

10

11

12                                                          By_____

13                                                          Patrick Miller
                                                            Attorney for Belgium Investments
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## PROOF OF ELECTRONIC SERVICE

I am employed in the County of LOS ANGELES, State of California. I am over the age of 18 and not a party to the within action. My business address is, 121 S Oak Ave, Pasadena, CA 91107.

A true and correct copy of the foregoing described as **MOTION FOR SANCTIONS DUE TO DEBTOR'S PERJURY** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d) (through electronic filing); and **(b)** in the manner stated below:

**TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:
Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On 3/24/23, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

Michael Jay Berger on behalf of Debtor Bassem Victor El Mallakh
michael.berger@bankruptcypower.com,
yathida.nipha@bankruptcypower.com;michael.berger@ecf.inforuptcy.com

Chad L Butler on behalf of Interested Party Courtesy NEF
caecf@tblaw.com

Nancy S Goldenberg on behalf of U.S. Trustee United States Trustee (SA)
nancy.goldenberg@usdoj.gov

Benjamin Heston on behalf of Interested Party Benjamin Heston

bhestonecf@gmail.com,

benheston@recap.email,NexusBankruptcy@jubileebk.net


Patrick Miller on behalf of Creditor Belgium Investments 960 Bay Dr,

LLC A California Corp.

patrick.miller@impactadvocateslaw.com


Randall P Mroczynski on behalf of Creditor TD Bank, N.A., successor in

interest to TD Auto Finance LLC

randym@cookseylaw.com


United States Trustee (SA)

ustpregion16.sa.ecf@usdoj.gov


I declare under penalty of perjury under the laws of the State of California that the above is true

and correct.

Executed on this 3/24/2022, at Pasadena, California.


Patrick Miller

**SUBS**

**5**

PATRICK MILLER
Email: Patrick.miller@impactadvocateslaw.com
Impact Advocates APC
121 S Oak Ave
Pasadena, CA 91107
Telephone:    213-364-7581


Attorney for Judgement Creditor
BELGIUM INVESTMENTS 960 BAY DR,
LLC A CALIFORNIA CORP.

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

In re Bassem Essam El Mallakh

Case No 8:22-bk-11605-TA
Chapter 11

**PRE-HEARING BRIEF FOR
EVIDENTIARY HEARING ON
HOMESTEAD EXEMPTION**

**Date**: 30 March 2023
**Time**: 10am
**Crtrm**: Virtual/5B

    Belgium Investments 960 Bay Dr, LLC, a California Corp. ("**Belgium**") hereby sets out

its Pre-Hearing Brief to summarize its arguments in advance of the evidentiary hearing on

Debtor's entitlement to claim a homestead exemption over the property located at 116

Rockefeller Dr, Irvine, CA, 92612 (the "**Rockefeller Property**") which is scheduled to take

place on 30 March 2023

Dated:       23 March 2022

Patrick Miller – Impact Advocates APC
Attorney for Creditor Belgium Investments

# TABLE OF CONTENTS

| I | Introduction. | 3 |
|---|---|---|
| II | Debtor's evidence regarding his residency is littered with perjury, suspicious dates, and ultimately not persuasive. | 3 |
| II.A | Debtor's perjurious witness evidence is highly-compromised and unpersuasive. | 3 |
| II.B | Debtor's documentary evidence is incomplete and indicates he moved into the Rockefeller Property months after the filing date. | 9 |
| III | Objective evidence demonstrates that Debtor did not meet the residency requirements on the filing date for intent or actual occupancy. | 14 |
| III.A | The evidence indicates that Debtor did not physically reside in the subject property until months after the filing date (if ever). | 14 |
| III.B | Objective documentary evidence shows that Debtor did not have the requisite intent to reside in the subject property on the filing date. | 16 |
| IV | Res Judicata prevents Debtor from claiming the homestead exemption in the present bankruptcy proceedings. | 17 |
| V | Conclusion. | 19 |

**POINTS & AUTHORITIES**

**I.  Introduction.**

Debtor is unable to meet his burden of proof to claim a homestead exemption because his witness evidence is irretrievably tainted and the documentary evidence indicates that he did not meet the legal requirements for intent or actual occupancy on the filing date. If anything, the objective documentary evidence indicates the Debtor may have moved into the Rockefeller Property in January 2023 (which was months after the filing date).

These submissions summarize: (i) why Debtor's witness and documentary evidence are unpersuasive; (ii) what the objective evidence shows regarding Debtor's intent and actual residency; and (iii) why res judicata precludes Debtor from claiming a homestead exemption irrespective of any new factual findings on residency in these proceedings.

**II.  Debtor's evidence regarding his residency is littered with perjury, suspicious dates, and ultimately not persuasive.**

    **A.  Debtor's perjurious witness evidence is highly-compromised and unpersuasive.**

Belgium's Objection to Debtor's Claimed Homestead Exemption ("**Belgium's HS Objection**") details some of the various inconsistencies between Debtor's previous evidence on his residency and his current evidence. The HS Objection characterizes this evidence as wholly-contradictory, self-serving, and unreliable.

Following further information provided by Debtor subsequent to the HS Objection, it has become undeniable that his evidence amounts to perjury and implicates co-conspirators who may include members of the Bars in California and/or Florida. This perjury is detailed in Belgium's Motion for Sanctions due to Debtor's Perjury ("**Belgium's Motion for Perjury Sanctions**") which will be filed imminently.

Belgium incorporates those submissions by reference and will not be repeating those submissions fully here. In brief, in connection with Motions to Vacate Belgium's default judgement in California and Florida during early-2021, Debtor and his sister (Reem Hanna) made multiple statements in Declarations, depositions, and before a judge of the Florida 11th Circuit Court, to support their allegation that Debtor resided at his apartment at 525 Broadway, Santa Monica, CA, 90410 (the "**Santa Monica Property**") from late-2016 until the day they gave their evidence.

Debtor and his sister have now made several statements in Declarations and depositions claiming that Debtor resided in the Rockefeller Property from 2013 to the present. This inconsistency cannot be reconciled or explained.

Debtor's attempt at explaining this perjurious testimony began during a deposition conducted by Belgium's counsel on 15 March 2023. During this deposition, Debtor repeated his claim that he resided in the Rockefeller Property (in Irvine) since he purchased it in 2013[1]. Belgium's counsel directed Debtor to his previous testimony in a sworn Declaration where he stated: "*I've been residing full-time at my residence in Santa Monica since November 21st, 2016.*". Debtor was asked to explain this statement, and he responded: "*Yeah. That was my -- it's my civil attorney advice that he said, you know, like we need to write this declaration.*"[2].

After this deposition, Debtor and his sister have filed Declarations reiterating their claim that Debtor has resided in the Rockefeller Property since 2013. In a specious attempt to explain his admitted perjury, Debtor stated to this Court in his Declaration that: "*the questions Belgium's counsel asked me [during the previous proceedings in 2021] were in regards to whether I was served at the Rockefeller Property.*"[3]. However, this is only further evidence of Debtor's

---

[1] See page 7, line 18 to page 8, line 3 of Exhibit 8.
[2] See page 27, line 4 to page 28, line 3 of Exhibit 8.
[3] See Exhibit 10.

continued refusal to give truthful evidence before courts of law. This abuse of process strikes to the very heart of the judicial system.

Debtor's previous statements regarding residency were ostensibly used to support his allegations that (i) substitute service of process at the Rockefeller Property in 2019 & 2020 was not made at his *residence* (because he resided in Santa Monica); and (ii) he did not have knowledge of the service made upon his sister (because he rarely saw her and resided elsewhere).

Despite Debtor's recent explanation, there are numerous examples of statements made which are clearly perjurious and are not "*in regards to whether [he] was served*". A few illustrative examples are summarized below, but this Court must note that there are many more examples of perjurious statements such as these.

| Paragraphs 3-4 of Debtor's CA Declaration dated 17 Feb 2021 | Page 91 of Reem Hanna's FL Deposition dated 21 Mar 2021 | Paragraph 6 of Debtor's BK Declaration dated 21 Mar 2023 |
|---|---|---|
| I have **been residing fulltime at my residence in Santa Monica since 11/21/16.** … I have not occupied the real property located at 116 Rockefeller, Irvine CA. since 11/21/16. | Q. Okay. The [Rockefeller Property], is that your residence? A. Yes. … **Q. Does your brother, Bassem Essam El Mallakh, live there? A. No. Q. Where does he live? A. In Santa Monica.** | My **primary residence** where I live is the **Rockefeller Property** and it has been by primary residence **since I purchased it in 2013**... |

| **Paragraph 6 of Reem Hanna's CA Declaration dated 17 Feb 2021** | **Paragraph 3 of Reem Hanna's BK Declaration dated 21 Mar 2023** | **Page 28, ln 22 to 29, ln 6 of Debtor's BK Deposition dated 15 March 2023** |
|---|---|---|
| **Bassem Essam El Mallakh is not nor ever has been a co-occupant at my residence** [the Rockefeller Property]. Since the inception of the lease Bassem Essam El Mallakh has **never-been a co-occupant.** | Since I started living at the Rockefeller Property on or about mid-2018, **Bassem has always lived at the Rockefeller Property with me there.** | Q. Okay. Was anyone living with you at the Rockefeller property in 2020? A. My sister. Q. She was your co-occupant at the time? A. She was what? **Q. She was your co-occupant at the time?** **A. Yeah. Roommate. Co-occupant**. |

| **Page 25 of Debtor's FL Deposition dated 21 Mar 2021** | **Pages 10, ln 4 to ln 18 of Debtor's BK Deposition dated 15 March 2023** |
|---|---|
| Q. Okay. Where do you reside? A. I live in Santa Monica. Q. Okay. What address? | Q. When did you sign the lease for the Santa Monica apartment? A. It was in November of 2016. Q. Okay. November of 2016. |

| | |
|---|---|
| A. 525 Broadway.<br><br>Q. How long have you resided there?<br><br>A. Since November 1st of 2016.<br><br>Q. **And do you essentially sleep every night there in 525 Broadway in Santa Monica?**<br><br>**A. Yes.** | So -- so you always lived in the Rockefeller house. **How many nights did you normally sleep there [at Rockefeller]?**<br><br>**A. Most of the week.** You know, I would be working between Santa Monica and Irvine. It just depends on the week. Some weeks I would just be in like, you know, Irvine for the whole week. Some weeks I would work in Santa Monica a few days, and then, you know, some weeks I would just work, you know, maybe Monday to Thursday, and I'll just go back to my house on the weekends. It was really all depending on the traffic. |

| **Pages 36-37 of Debtor's FL Deposition dated 21 Mar 2021** | **Pages 22, ln 5 to 23, ln 1 of Debtor's BK Deposition dated 15 March 2023** |
|---|---|
| Q. Yeah. **Was there a Ring camera system[4] at 116 Rockefeller in 2020**, to your knowledge?<br><br>[Debtor's FL Counsel]: Objection.<br><br>THE WITNESS: I'm not sure, Andrew, because, as I mentioned to you, **I have not been in the Irvine house, not even once in** | Q. **Do you have any security cameras at the Rockefeller property?**<br><br>**A. I have a Ring camera.**<br><br>...<br><br>Q. Did you purchase the Ring camera system?<br><br>A. It was actually a Christmas gift from |

---

[4] Debtor's evasiveness on answering questions regarding a ring camera system at the Rockefeller Property were likely due to Debtor's spurious claims that multiple process servers were lying when they testified to having left documents with his sister at the Rockefeller Property. These encounters were likely captured on the Ring camera system and thus would provide evidence that comported with the process servers' testimony.

| 2020, not even once in 2019. I believe even when I came to Orange County in 2018 it was just for Christmas -- Christmas Eve at my cousin's house in Mission Viejo area, which is like south of Irvine. | my -- from my father. Q. Do you remember when you received it? A. I think it was in 2017. 2017. Christmas of 2017. It's been awhile. |
| --- | --- |

There are several exhibits attached to this Pre-Hearing Brief which may be referenced during the upcoming hearing to further establish Debtor's perjury. This will make clear that the evidence from Debtor, and his sister Reem Hanna, is so tainted by their perjury that it should be wholly-disregarded for the purposes of deciding Belgium's HS Objection. In fact, Debtor's perjury and continued refusal to admit the truth in these proceedings should result in harsh sanctions, including dismissal.

We must also note that Ms Hanna's failure to sit for depositions last week after having requested this several months in advance should cast further doubt on the credibility of her evidence—in addition to what appears to be her admitted perjury.

As to Debtor's father, his deposition testimony makes clear that he has little (if any) basis for providing evidence as to Debtor's residency because: (i) he lives in Egypt; (ii) his son did not tell him he was a signatory on the lease for the Santa Monica Property; (iii) he never discussed the Santa Monica Property with his son; (iv) he doesn't discuss finances with his son and rarely discusses personal matters; (v) he doesn't know much about the details of his son's life; and in fact, (vi) they never actually discussed where Debtor was living[5].

---

[5] See page 11, line 5 to 25 and page 12, line 24 to page 13, line 17 of Exhibit 12.

**B. Debtor's documentary evidence is incomplete and indicates he moved into the Rockefeller Property months after the filing date.**

As stated in the HS Objection, and noted by this court in previous proceedings, Debtor has the burden of proof to demonstrate he meets the requirements to claim a homestead exemption under these circumstances. In the absence of credible witness evidence (due to Debtor and his sister's admitted perjury on this topic), Debtor holds the high burden of submitting extensive, complete, and trustworthy evidence to establish his residency on the filing date.

Debtor's evidence falls far short of meeting this burden. In fact, as explained below, the documentary evidence, when considered with recent deposition testimony, actually indicates that Debtor did not move into the Rockefeller Property until January 2023 (if ever).

Debtor's documentary exhibits ("**Debtor's Exhibits**"), which were just received two days ago, are attached to his Declaration and can be found at Exhibit 10 of this Brief.

In summary, many of the sets of documentary evidence are suspiciously incomplete (see Debtor's Exhibits 2, 5, 6, 10, 13, and 14)— and all (or nearly all) of the evidence which has some indicia of credibility indicates Debtor did not reside in the Rockefeller Property until January 2023 (see Debtor's Exhibits 5, 6, 10, and 14).

Additionally, several of Debtor's Exhibits: (i) are difficult (or impossible) to read; (ii) contain objectionable redactions without any basis; and/or (iii) indicate dates when they were generated which appear suspicious. Belgium objects to the presentation of this evidence without having had any means to authenticate the same through inspection or otherwise. Notably, these documents have all been presented and authenticated through Declarations from the Debtor— whose evidence is littered with irredeemable perjury. As such, Belgium requests that this problematic evidence be thrown out entirely—or accorded little (if any) weight.

Notwithstanding the above, Belgium wishes to note the following points with respect to this evidence:

Debtor's Exhibit 1 includes his Bankruptcy filing documents. However, he has already admitted that these contain grave inaccuracies, eg regarding his assets & liabilities. Furthermore, this evidence is not tested by any entity and is therefore simply a replication of Debtor's own compromised evidence.

As noted at page 9 of Belgium's Reply to Debtor's Opposition to the Homestead Objection ("**Belgium's HS Reply**"), the claim filed by TD Bank NA, which arises from Debtor's purchase of a Mercedes Benz automobile in August 2016, shows Debtor's address as 405 Rockefeller, Unit A056, Irvine CA, 92612. This is despite his repeated claims to have resided in the Rockefeller Property and/or Santa Monica Property at this time. This either means Debtor has again testified falsely regarding his residency—or Debtor does not always provide accurate address information to third parties when it is not tested.

Debtor's Exhibit 2 erroneously claims to contain copies of Debtor's tax filings from 2019-2022. However, Debtor has not included his California filings or his federal tax filings for 2020 or 2022. This has already been highlighted at page 11 of Belgium's HS Reply. Debtor's failure to correct this error can only mean that the information contained in the other filings would be prejudicial to his case. The absence of documents speaks quite loudly in this instance.

Debtor's Exhibits 3 & 4 have been addressed in Belgium's HS Reply. To repeat, these are also untested assertions by the Debtor which would likely replicate his false evidence. These should be given little, if any, weight, particularly given the more reliable evidence which points to his residency being elsewhere at the relevant time. We also note that Debtor also provided bank account information in the previous case indicating he resided in Santa Monica (which he now claims is false).

Debtor's Exhibit 5 is one of the first examples of a suspicious document which actually indicates Debtor may have moved into the Rockefeller Property in January 2023 (well after the filing date).

Debtor previously submitted a Driver's License which listed his address as the Santa Monica Property[6]. The previously-submitted License expired on 21 August 2021 (Debtor's 40th birthday). However, Debtor has not submitted the Driver's License he obtained after this one expired in August 2021. Instead, he has chosen to submit a copy of what purports to be a Driver's License that was issued on 18 January 2023. He has also chosen to redact certain information from this Driver's License without any apparent basis—to which Belgium objects.

Notwithstanding this objection, it's clear that Debtor had at least one (and likely more) previously issued Driver's License(s) which list his address as the Santa Monica Property. He then updated the address in January 2023. Far from proving that Debtor resided in the Rockefeller Property on the filing date (18 Sept 2022), this evidence indicates that he did not move into Rockefeller until at least January 2023, particularly when it is considered alongside his other evidence.

This other evidence, which will be addressed below at Section II(A), includes the facts that: (i) the lease to the Santa Monica Property was not terminated until about January 2023; (ii) he alone moved out all of the furniture from the Santa Monica Property in January 2023; (iii) his roommate at the Santa Monica Property has been regularly living in Dubai since late-2020; and (iv) he admits to regularly staying at the Santa Monica Property and takes responsibility for the care & maintenance of the apartment.

---

[6] See Exhibit 22.

Debtor's Exhibit 6 purports to contain a copy of Debtor's vehicle registration listing his address as the Rockefeller Property. However, this is another example of suspicious evidence which actually indicates a January 2023 move in date.

The document shows that the prior expiry date was 26 August 2022. Again, we have not been provided with the registration document that Debtor would have obtained upon the expiry of the previous registration. Instead, he has provided a copy of a registration document that was issued on <u>18 January 2023</u>. So again, Debtor chose not to provide a complete set of documents, but the documents that have been provided indicate Debtor only changed his residency in January 2023.

Debtor's Exhibits 7 & 8 purport to contain water and gas bills for the Rockefeller Property addressed to the Debtor. These again have much less evidentiary value than other documents because they are not tested by the recipient. Furthermore, Debtor has not even explained who is responsible for, and who actually transmits, payment of these bills.

It is noteworthy that the documents which might indicate his residing at Rockefeller before January 2023 are those which are untested by the recipient. Whereas the more credible documents indicate a January 2023 move in date.

Debtor's Exhibit 9 purports to be a copy of Debtor's insurance card listing his address at Rockefeller. Again this information is unreliable since it is untested by the recipient—and there is no indication as to the date when this document was issued. Some Debtors may be granted the benefit of the doubt regarding documents such as this. However, this Court should accord very little weight to this type of unverified evidence given Debtor's admitted perjury regarding this very topic.

Debtor's Exhibit 10 purports to show copies of 3 receipts for food delivery from restaurants near the Rockefeller Property. Again, all three receipts are from dates in <u>January</u>

2023. It is highly instructive that Debtor has chosen to submit a (presumably) incomplete set of documents which actually indicate his having moved into Rockefeller in January 2023.

Debtor's Exhibit 11 purports to show evidence of instances where Debtor checked into an LA Fitness facility in Irvine from May-December 2022. However, nothing on the document indicates the actual location of the LA Fitness center and LA Fitness has a number of locations throughout Southern California. Additionally, the check-ins between June and December are highly sporadic (9 check-ins over 23 weeks). Thus, even if these were at the Irvine location—which is disputed—it would indicate nothing more than Debtor having occasionally visited a gym near his sister's townhouse.

Debtor's Exhibit 12 purports to show a screenshot indicating that Debtor's phone was near the Rockefeller Property on the date of the filing. One isolated piece of evidence does not tend to show that Debtor actually resided—and intended to continuously reside—in the Rockefeller Property from the time he filed this case up to the present. It is more likely that Debtor was in Irvine briefly because his parents were visiting from Egypt but he continued residing in the Santa Monica Property until it was vacated in January 2023.

Debtor's Exhibit 13 purports to show a flight receipt for Debtor, and presumably his nephew, for a flight which departed from Santa Ana airport in early-September 2023. However, it's not exactly helpful to demonstrate Debtor's residency to show that he was actually in San Francisco just before the filing. More importantly, the flight originating from Santa Ana airport can be easily explained by the presence of his nephew because his nephew lives in Irvine. There are likely to be other flight receipts that Debtor could have provided which would indicate other residencies. For example, Debtor has not provided the flight receipt associated with his recent trip to Egypt (where he is apparently currently staying).

Debtor's Exhibit 14 purports to contain receipts from Amazon purchases Debtor made on

14, 15, and 24 <u>January 2023</u>. Once again, Debtor has provided what appears to be an incomplete[7]

set of documents that actually indicate he did not move into the Rockefeller Property until

January 2023 (after the Santa Monica Property was vacated).

Debtor's Exhibit 15 purports to contain a copy of a receipt from a Fedex location near the

Rockefeller Property on the date of the filing. However, this does not necessarily prove that

Debtor actually resided, or intended to reside, in the Rockefeller Property. As with Debtor's

Exhibit 12, his presence in Irvine on that one day is much more likely due to his parents' visiting

from Egypt. The other documents and witness evidence persuasively show that Debtor did not

move into the Rockefeller Property until at least January 2023.

**III. Objective evidence demonstrates that Debtor did not meet the residency requirements on the filing date for intent or actual occupancy.**

"*The essential factors in determining residency for homestead purposes are physical occupancy of the property and the intent to live there*." (see In re Fisher, No. 09-91587-D-7, 2009 WL 9087842, at *2 (Bankr. E.D. Cal. Sept. 22, 2009), citing In re Dodge, 138 B.R. 602, 607 (Bankr.E.D.Cal.1992), citing Ellsworth v. Marshall, 196 Cal.App.2d 471, 474 (1961)). The

sections below detail how the evidence actually demonstrates that Debtor does not meet the

intent or actual occupancy requirements.

**A.  The evidence indicates that Debtor did not physically reside in the subject property until months after the filing date (if ever).**

As detailed above, many of the sets of documentary evidence are suspiciously incomplete

(see Debtor's Exhibits 2, 5, 6, 10, 13, and 14)— and all (or nearly all) of the evidence which has

---

[7] We suspect that these are not the only Amazon purchases made by Debtor during the past six months.

some indicia of credibility indicates Debtor did not move into the Rockefeller Property until

January 2023 (see Debtor's Exhibits 5, 6, 10, and 14).

Below we address Debtor's deposition testimony that helps to uncover where he was

actually residing when taken together with the documentary evidence he has produced.

Debtor has testified that his roommate, Mohamed Rostom, moved to Dubai in late-

2020[8]. He would sometimes return to Santa Monica and Debtor would regularly stay with him

overnight at the Santa Monica Property[9]. His roommate then moved to Dubai again in 2022[10]. At

this point, Debtor took sole responsibility for the care and maintenance of the Santa Monica

Property[11]. Their lease for the Santa Monica Property was terminated some time in late-2022 or

early 2023; and Debtor eventually removed all of the furniture from the Santa Monica Property

on his own in <u>January 2023</u>—since his roommate was now living in Dubai[12].

At the outset, it is notable that Debtor continuously refers to this individual as his

roommate during depositions in 2021 & 2023. Furthermore, the evidence indicates that Debtor

likely continued staying in the Santa Monica Property during the duration of their lease

agreement since it would have otherwise been vacant. Debtor is asking this Court to believe that

he chose to share a three-bedroom townhouse in Irvine with his sister and nephew rather than

staying in a vacant apartment in Santa Monica, which is just five blocks from the Ocean, where

he admits to regularly sleeping, where is a signatory to an active lease, and which he is

responsible for maintaining.

---

[8] See fl depo 30,5-8
[9] Cal depo 14,1-15,3
[10] Ca dep trans 12,6-10
[11] Ca dep trans 12,6-10
[12] 12,11-13,12

. As a reminder, Debtor's evidence in February & March 2021 was that he had been residing in the Santa Monica Property for several years. There is no reason to suspect that this changed between 2021 and the filing date in September 2022.

The only indication where it appears that Debtor changed his residency was when they terminated their lease for the Santa Monica Property at some unspecified time in late-2022 or early-2023. He then took sole responsibility for vacating the apartment in January 2023.

Around this same time in January 2023, we see that Debtor updated his Driver's License and car registration to reflect a new address. He also began receiving Amazon packages and food deliveries in Irvine in January 2023.

This all tends to show that he did not move into the Rockefeller Property until the time when he vacated the Santa Monica Property—in January 2023.

### B. Objective documentary evidence shows that Debtor did not have the requisite intent to reside in the subject property on the filing date.

California jurisprudence makes clear that a Debtor must prove his intent to reside in the subject property on the filing date and he must continually maintain this intent if he is temporarily absent after the filing date. (see eg *In re Bhangoo,* 634 B.R. 80, 89 (B.A.P. 9th Cir. 2021)[13]. Courts should rely on objective evidence wherever possible when making this determination of intent, particularly under circumstances where Debtor's witness evidence is so highly-compromised.

Belgium explains at Section V of its HS Objection how a key piece of objective evidence—the lease agreement for the Rockefeller Property—unequivocally prohibits Debtor

---

[13] Debtor may attempt to argue that the only relevant date is the filing date of 18 September 2023. However, analysis of Debtor's whereabouts during the preceding, and subsequent, dates are essential for this Court to determine Debtor's intentions. Particularly, given Debtor's compromised witness evidence and the evidence we have highlighted indicating that he resided elsewhere.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

from residing in the property. The lease agreement states: *"[t]he Premises is to be occupied*

*strictly as a residential dwelling with only the Tenant(s) mentioned above [Reem Hanna] as the*

*Occupant(s)."*[14].

Debtor has confirmed that the lease agreement covers the entirety of the Rockefeller

Property[15]; and Debtor is not listed as a Tenant in the lease agreement. In fact, he is identified as

Landlord in the lease agreement. It is to be expected that the owner of the property who is

leasing it out as a landlord would be prohibited from having unrestricted access to the premises.

Debtor has confirmed that there have been no changes to the lease agreement other than

an increase in the monthly rental payments[16]. Debtor therefore cannot claim that there is some

undisclosed separate agreement between he and his sister which allows him to reside in the

property.

Belgium argues that Debtor cannot legally maintain he has the requisite intent to reside in

a dwelling which he has no legal right to occupy. This is because someone cannot reasonably

intend to make a place their primary residency if they can be removed at-will due to their lack of

having any rights to occupy the premises.

Debtor cannot claim to have the legal intent to reside at the Rockefeller Property anymore

than he can claim to have the objective, legal intent to reside in Dodger's Stadium.

**IV. Res Judicata prevents Debtor from claiming the homestead exemption in the**

**present bankruptcy proceedings.**

As detailed at Section VII of Belgium's HS Objection, Debtor is estopped from claiming

a homestead exemption in the present bankruptcy proceedings by virtue of res judicata. It

explained how the homestead issue was specifically addressed at the hearing on the Order for

---

[14] See page 1 of the lease agreement attached to Debtor's CA Declaration dated 17 February 2021 at Exhibit 1.
[15] See Debtor's BK Declaration dated 21 March 2023 at Exhibit 10.
[16] See Page 36, lines 10-12 of the transcripts from the Deposition of Bassem El Mallakh dated 15 March 2023 Exhibit 8.

Sale of the Rockefeller Property on 21 April 2022 (the "**Order for Sale**")—and how this resulted in a ruling by the Orange County Superior Court that found that the Rockefeller Property was not subject to a homestead exemption.

Section VII also explains how all of the elements for claim preclusion and issue preclusion are met in this case, because: (i) identical parties (Belgium and Debtor); (ii) actually litigated the merits of this identical issue (Debtor's ability to claim a homestead exemption); and (iii) this resulted in a final award in Belgium's favor (the Order for Sale).

There should be no controversy whether the parties are identical in both cases, or whether the issue was actually litigated.

The "identity of claims" requirement is satisfied because the hearing on the Order of Sale and the Order itself involved the same nucleus of facts, the same rights (Debtor's right to claim a homestead exemption), and depend on substantially the same evidence. Additionally, the rights established through the Order of Sale would be destroyed or impaired if Debtor is allowed to claim a HS exemption in these proceedings. See Mpoyo v. Litton Eletrco-Optical Sys., 430 F.3d 985, 987 (9th Cir. 2005).

The Order of Sale was a final order which allowed for the sale of the subject property. It thus meets the requirements of finality for the purposes of res judicata.

Debtor might argue that res judicata should not apply because he has submitted new evidence during bankruptcy regarding his residency. As described above and in the Motion for Perjury Sanctions, it is undeniable that Debtor's evidence regarding his residency amounts to perjury in the present proceedings and/or the previous proceedings.

Section V of the Motion for Perjury Sanctions addresses how res judicata has been invoked to prohibit perjury in prior proceedings from affecting subsequent proceedings. Res

judicata has been employed by courts as a tool to ensure that perjurious abuses of process are not

rewarded in subsequent proceedings.

**V. Conclusion**

Debtor has given perjurious evidence regarding his residency and tried to explain this

perjury with further bad faith misrepresentations. His, and his witnesses', evidence should be

given zero weight.

His documentary evidence contains suspicious irregularities, gaps, and redactions. But

more importantly, the objective pieces of evidence point to his residing in the Rockefeller

Property well after the filing date—in January 2023.

In addition to the questions as to his physical location, the lease agreement between he

and his sister precludes him from claiming to have the legal intent to reside in the subject

property.

Debtor woefully failed to meet his evidentiary burden to prove his residency.

Nonetheless, Debtor is also estopped from claiming the homestead exemption irrespective of the

factual issues due to res judicata.


Dated:        23 March 2023                              Impact Advocates APC


                                                         By_____
                                                              Patrick Miller
                                                              Attorney for
                                                              Judgement Creditor

Patrick Miller, Esq., SBN 301819
Impact Advocates APC
121 S. Oak Ave.
Pasadena, CA 91107
213-364-7581
Patrick.miller@impactadvocateslaw.com

Attorney for the Creditor
Belgium Investments 960 Bay Dr,
LLC, a California Corp

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| IN RE BASSEM VICTOR EL MALLAKH | ) Case No.: 8:22-bk-11605-TA<br>) Ch 11<br>)<br>) **DECLARATION OF PATRICK MILLER**<br>) **IN SUPPORT OF THE PRE-HEARING**<br>) **BRIEF**<br>)<br>) _____<br>)<br>) **Hearing Date: 30 March 2023**<br>) **Hearing Time: 11:00 AM**<br>) **Dept.: 5B/Virtual**<br>)<br>)<br>)<br>) |

DECLARATION

1. I, Patrick Miller, am counsel for the Creditor Belgium Investments 960 Bay Dr, LLC, a California Corp. ("**Belgium**"). I have read Belgium's Pre Hearing Brief and know the contents thereof. The same is true of my own knowledge, except as those matters that are stated on information and belief, and as to these matters, I believe them to be true.

2. I am over the age of 18 years and am fully familiar with the facts and circumstances surrounding my declaration and could and would competently testify thereto if called upon to do so.

3. I was engaged as counsel for the Defendant in April 2020 in order to enforce the judgement obtained in the Florida courts against the Debtor, Bassem Essam Victor El Mallakh.

4. Exhibit 1 contains a true and correct copy of the Declaration filed by Debtor in support of his motion to vacate entry of default judgement in California.

1. Exhibit 2 contains a true and correct copy of the Declaration filed by Reem Hanna in support of his motion to vacate entry of default judgement in California.

2. Exhibit 3 contains a true and correct copy of the Debtor's Motion to Vacate in Florida with supporting Declarations from Debtor and his sister attached.

3. Exhibits 4 & 5 contain a true and correct copies of the Transcripts of the Deposition of Debtor dated 18 March 2021; and extracts from the same.

4. Exhibits 6 & 7 contain a true and correct copies of the Transcripts of the Deposition of Reem Hanna dated 18 March 2021; and extracts from the same.

5. Exhibit 8 contains a true and correct copy of the deposition transcripts from the deposition of the Debtor conducted on 15 March 2023. I, acting as Belgium's counsel, conducted this deposition. These transcripts were delivered to Debtor's counsel on 22 March 2023 and have not yet been signed by the Debtor.

6. Exhibit 9 contains a true and correct copy of the deposition transcripts from the deposition of Essam El Mallakh (Debtor's father) conducted on 15 March 2023. I, acting as Belgium's counsel, conducted this deposition. These transcripts were delivered to Debtor's counsel on 22 March 2023 and have not yet been signed by Essam El Mallakh.

7. Exhibit 10 contains a true and correct copy of the Declaration filed by Debtor on 21 March 2023 in support of his homestead exemption.

8. Exhibit 11 contains a true and correct copy of the Declaration filed by Reem Hanna on 21 March 2023 in support of Debtor's homestead exemption.

9. Exhibit 12 contains a true and correct copy of the Declaration filed by Essam El Mallakh on 21 March 2023 in support of Debtor's homestead exemption.

10. Exhibit 13 contains a true and correct copy of the Debtor's Ch 11 Filing documents.

11. Exhibit 14 contains a true and correct copy of the Debtor's Amended Ch 11 Schedules.

12. Exhibit 15 contains a true and correct copy of the Declaration of Debtor as to income in the past 60 days.

13. Exhibit 16 contains a true and correct copy of the Debtor's Motion to Appoint Counsel in Bankruptcy.

14. Exhibit 17 contains a true and correct copy of the Debtor's Motion to Continue the Automatic Stay.

15. Exhibit 18 contains a true and correct copy of the Debtor's Reply for the Motion to Continue the Automatic Stay.

16. Exhibit 19 contains a true and correct copy of the Debtor's Opposition to Belgium's Motion to Dismiss.

17. Exhibit 20 contains a true and correct copy of the Debtor's Opposition to Belgium's Objection to Homestead.

18. Exhibit 21 contains a true and correct copy of the Debtor's Opposition to US Trustee's Motion to Dismiss.

19. I reviewed the Transcripts of the Deposition of Bassem Essam El Mallakh dated 18 March 2021 (which is at Ex 4). During this deposition, he references several photographs contained in his cellular phone to support the point that he was residing in Santa Monica at the relevant time. He also discusses his Driver License Registration and provides a copy of his Driver's License to support his residing in the Santa Monica Property (despite his recent evidence to the contrary). Exhibit 22 is a true and correct copy of Debtor's Driver's License provided at the time.

20. Exhibit 23 contains a true and correct copy of the Debtor's Financial Statement filed on 14 March 2023.

21. Exhibit 24 contains a true and correct copy of the Debtor's Reorganization Plan filed on 14 March 2023.

22. I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 3/23/2022, at Pasadena, California.

Patrick Miller

PROOF OF ELECTRONIC SERVICE

I am employed in the County of LOS ANGELES, State of California. I am over the age of 18
and not a party to the within action. My business address is, 121 S Oak Ave, Pasadena, CA
91107.

A true and correct copy of the foregoing described as **PRE-HEARING BRIEF FOR
EVIDENTIARY HEARING ON HOMESTEAD EXEMPTION AND DECLARATION OF
PATRICK MILLER IN SUPPORT OF THE SAME** will be served or was served **(a)** on the
judge in chambers in the form and manner required by LBR 5005-2(d) (through electronic
filing); and **(b)** in the manner stated below:

**TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:
Pursuant to controlling General Orders and LBR, the foregoing document will be served by the
court via NEF and hyperlink to the document. On 3/23/23, I checked the CM/ECF docket for this
bankruptcy case or adversary proceeding and determined that the following persons are on the
Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

Michael Jay Berger on behalf of Debtor Bassem Victor El Mallakh
michael.berger@bankruptcypower.com,
yathida.nipha@bankruptcypower.com;michael.berger@ecf.inforuptcy.com

Chad L Butler on behalf of Interested Party Courtesy NEF
caecf@tblaw.com

Nancy S Goldenberg on behalf of U.S. Trustee United States Trustee (SA)
nancy.goldenberg@usdoj.gov

Benjamin Heston on behalf of Interested Party Benjamin Heston

bhestonecf@gmail.com,

benheston@recap.email,NexusBankruptcy@jubileebk.net


Patrick Miller on behalf of Creditor Belgium Investments 960 Bay Dr,

LLC A California Corp.

patrick.miller@impactadvocateslaw.com


Randall P Mroczynski on behalf of Creditor TD Bank, N.A., successor in

interest to TD Auto Finance LLC

randym@cookseylaw.com


United States Trustee (SA)

ustpregion16.sa.ecf@usdoj.gov

I declare under penalty of perjury under the laws of the State of California that the above is true

and correct.

Executed on this 3/23/2022, at Pasadena, California.

Patrick Miller

**SUBS**

**6**

| Attorney or Party Name, Address, Telephone & FAX Nos., State Bar No. & Email Address | FOR COURT USE ONLY |
|---|---|
| Patrick Miller<br>Bar No 301819<br>Impact Advocates APC<br>121 S Oak Ave<br>Pasadena, CA 91107<br>213-364-7581<br>patrick.miller@impactadvocateslaw.com<br><br>☐ *Movant appearing without an attorney*<br>☒ *Attorney for Movant* | |

<div align="center">

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION**

</div>

| In re:<br><br>In re Bassem Victor El Mallakh | CASE NO.: 8:22-bk-11605-TA<br>CHAPTER: 7 |
|---|---|
| | **NOTICE OF MOTION AND MOTION FOR RELIEF FROM THE AUTOMATIC STAY UNDER 11 U.S.C. § 362 (with supporting declarations)**<br>**(REAL PROPERTY)** |
| Debtor(s). | DATE: 06/27/2023<br>TIME: 10:30am<br>COURTROOM: Zoom/5B |

**Movant:** Creditor, Belgium Investments 960 Bay Dr, LLC, a California Corp.

1. **Hearing Location**:

   ☐ 255 East Temple Street, Los Angeles, CA 90012    ☒ 411 West Fourth Street, Santa Ana, CA 92701
   ☐ 21041 Burbank Boulevard, Woodland Hills, CA 91367    ☐ 1415 State Street, Santa Barbara, CA 93101
   ☐ 3420 Twelfth Street, Riverside, CA 92501

2. Notice is given to the Debtor and trustee (*if any*)(Responding Parties), their attorneys (*if any*), and other interested parties that on the date and time and in the courtroom stated above, Movant will request that this court enter an order granting relief from the automatic stay as to Debtor and Debtor's bankruptcy estate on the grounds set forth in the attached Motion.

3. To file a response to the motion, you may obtain an approved court form at www.cacb.uscourts.gov/forms for use in preparing your response (optional LBR form F 4001-1.RFS.RESPONSE), or you may prepare your response using the format required by LBR 9004-1 and the Court Manual.

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2017*                                    Page 1                          **F 4001-1.RFS.RP.MOTION**

4.  When serving a response to the motion, serve a copy of it upon the Movant's attorney (or upon Movant, if the motion was filed by an unrepresented individual) at the address set forth above.

5.  If you fail to timely file and serve a written response to the motion, or fail to appear at the hearing, the court may deem such failure as consent to granting of the motion.

6.  ☒ This motion is being heard on REGULAR NOTICE pursuant to LBR 9013-1(d). If you wish to oppose this motion, you must file and serve a written response to this motion no later than 14 days before the hearing and appear at the hearing.

7.  ☐ This motion is being heard on SHORTENED NOTICE pursuant to LBR 9075-1(b). If you wish to oppose this motion, you must file and serve a response no later than (date) _____ and (time) _____; and, you may appear at the hearing.

   a.  ☐ An application for order setting hearing on shortened notice was not required (according to the calendaring procedures of the assigned judge).

   b.  ☐ An application for order setting hearing on shortened notice was filed and was granted by the court and such motion and order have been or are being served upon the Debtor and upon the trustee (if any).

   c.  ☐ An application for order setting hearing on shortened notice was filed and remains pending. After the court rules on that application, you will be served with another notice or an order that specifies the date, time and place of the hearing on the attached motion and the deadline for filing and serving a written opposition to the motion.

Date: 05/31/2023

Impact Advocates APC
_____
Printed name of law firm (if applicable)

Patrick Miller
_____
Printed name of individual Movant or attorney for Movant

_____
Signature of individual Movant or attorney for Movant

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2017                      Page 2                      F 4001-1.RFS.RP.MOTION

| Attorney or Party Name, Address, Telephone & FAX Nos., State Bar No. & Email Address | FOR COURT USE ONLY |
|---|---|
| PATRICK MILLER<br>Email: Patrick.miller@impactadvocateslaw.com<br>Impact Advocates APC<br>121 S Oak Ave<br>Pasadena, CA 91107<br>Telephone:    213-364-7581<br><br>Attorney for Judgment Creditor and Movant<br><br>☐ **_Attorney for Movant_**<br>☐ _Movant appearing without an attorney_ | |

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA -Central DIVISION**

| In re: El Mallakh | CASE NO.: 8:22-bk-11605-TA |
|---|---|
| | CHAPTER:  7 |
| Debtor(s) | **SUPPLEMENTAL NOTICE OF HEARING TO BE HELD REMOTELY USING ZOOMGOV AUDIO AND VIDEO** |
| | HEARING DATE:  27 June 2023<br>HEARING TIME: 10:30am |

**Movant:**

1. The Movant has filed the following written notice or other pleading ("Notice") advising of a hearing to be held in the above-captioned case, on the date and time indicated above, before the Honorable Martin R. Barash, United States Bankruptcy Judge *(insert name of pleading and, if available, docket number):*

   **MOTION FOR RELIEF FROM AUTOMATIC STAY OF ENFORCEMENT**

2. Notwithstanding any language in the Notice advising or suggesting that the hearing will be held physically in one of the Court's courtrooms, **please be advised that due to the COVID-19 pandemic, the Court will conduct the hearing remotely, using ZoomGov audio and video technology.**  Individuals will not be permitted access to the courtroom.  Information on how to participate in the hearing remotely using ZoomGov is provided on the following page of this notice.

3.  Hearing participants and members of the public may participate in and/or observe the hearing using ZoomGov, free of charge.

4.  Individuals may connect by ZoomGov audio and video using a personal computer (equipped with camera, microphone and speaker), or a handheld mobile device with an integrated camera, microphone and speaker (such as an iPhone, iPad, Android phone or Android tablet).  The connection can be initiated by entering the "Meeting URL" into a web browser on any of these devices, provided the device is connected to the Internet.  Individuals connecting in this manner will be prompted for the Meeting ID and Password shown below.

5.  Individuals also may connect to the hearing by telephone only, using the telephone number provided below.  Individuals connecting in this manner also will be prompted for the Meeting ID and Password.

6.  Neither a Zoom nor a ZoomGov account is necessary to participate in or observe the hearing, and no pre-registration is required.

7.  The audio portion of the hearing will be recorded electronically by the Court and constitute its official record.

8.  All persons are strictly prohibited from making any other recording of court proceedings, whether by video, audio, "screenshot," or otherwise. Violation of this prohibition may result in the imposition of monetary and non-monetary sanctions.

9.  The following is the unique ZoomGov connection information for the above-referenced hearing:

    Meeting URL:
    https://cacb.zoomgov.com/j/1611571786
    Meeting ID:     161 157 1786
    Password:       692831
    Telephone:     1 (669) 254 5252 or 1
    (646) 828 7666

10. More information on using ZoomGov to participate in this hearing is available on the Court's website at the following web address:  https://www.cacb.uscourts.gov/news/zoom-video-hearing-guide-participants.

Date:  5/31/23                              Impact Advocates APC
                                           _____
                                           Printed name of law firm (if applicable)


                                           Patrick Miller Attorney for Creditor Movant
                                           _____
                                           Printed name of individual Movant or attorney for Movant

## MOTION FOR RELIEF FROM THE AUTOMATIC STAY AS TO REAL PROPERTY

1. **Movant is the:**

   ☐ Holder: Movant has physical possession of a promissory note that either (1) names Movant as the payee under the promissory note or (2) is indorsed to Movant, or indorsed in blank, or payable to bearer.

   ☐ Beneficiary: Movant is either (1) named as beneficiary in the security instrument on the subject property (e.g., mortgage or deed of trust) or (2) is the assignee of the beneficiary.

   ☐ Servicing agent authorized to act on behalf of the Holder or Beneficiary.

   ☒ Other (*specify*):
   Judgement creditor

2. **The Property at Issue (Property):**

   a. Address:

   *Street address*: 116 Rockefeller St
   *Unit/suite number*:
   *City, state, zip code*: Irvine, CA 92612

   b. Legal description, or document recording number (including county of recording), as set forth in Movant's deed of trust (attached as Exhibit _1___):

3. **Bankruptcy Case History:**

   a. A ☒ voluntary ☒ involuntary  bankruptcy petition under chapter ☐ 7 ☒ 11 ☐ 12 ☐ 13
   was filed on (*date*) _09/19/2002_ .

   b. ☒ An order to convert this case to chapter ☒ 7 ☐ 11 ☐ 12 ☐ 13  was entered on (*date*) _03/30/2023_ .

   c. ☐ A plan, if any, was confirmed on (*date*) _____.

4. **Grounds for Relief from Stay:**

   a. ☒ Pursuant to 11 U.S.C. § 362(d)(1), cause exists to grant Movant relief from stay as follows:

      (1) ☐ Movant's interest in the Property is not adequately protected.

         (A) ☐ Movant's interest in the Property is not protected by an adequate equity cushion.

         (B) ☐ The fair market value of the Property is declining and payments are not being made to Movant sufficient to protect Movant's interest against that decline.

         (C) ☐ Proof of insurance regarding the Property has not been provided to Movant, despite the Debtor's obligation to insure the collateral under the terms of Movant's contract with the Debtor.

      (2) ☒ The bankruptcy case was filed in bad faith.

         (A) ☒ Movant is the only creditor, or one of very few creditors, listed or scheduled in the Debtor's case commencement documents.

         (B) ☐ The Property was transferred to the Debtor either just before the bankruptcy filing or after the filing.

         (C) ☐ A non-individual entity was created just prior to the bankruptcy petition date for the sole purpose of filing this bankruptcy case.

         (D) ☐ Other bankruptcy cases have been filed in which an interest in the Property was asserted.

         (E) ☐ The Debtor filed only a few case commencement documents with the bankruptcy petition. Schedules and the statement of financial affairs (or chapter 13 plan, if appropriate) have not been filed.

         (F) ☒ Other (*see attached continuation page*).

---

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2017*                                    Page 3                          **F 4001-1.RFS.RP.MOTION**

(3) ☐ *(Chapter 12 or 13 cases only)*

    (A) ☐ All payments on account of the Property are being made through the plan.
         ☐ Preconfirmation ☐ Postconfirmation plan payments have not been made to the chapter 12 trustee or chapter 13 trustee.

    (B) ☐ Postpetition mortgage payments due on the note secured by a deed of trust on the Property have not been made to Movant.

(4) ☐ The Debtor filed a Statement of Intentions that indicates the Debtor intends to surrender the Property.

(5) ☐ The Movant regained possession of the Property on *(date)* _____,
    which is ☐ prepetition ☐ postpetition.

(6) ☒ For other cause for relief from stay, see attached continuation page.

b. ☒ Pursuant to 11 U.S.C. § 362(d)(2)(A), the Debtor has no equity in the Property; and, pursuant to § 362(d)(2)(B), the Property is not necessary for an effective reorganization.

c. ☐ Pursuant to 11 U.S.C. § 362(d)(3), the Debtor has failed, within the later of 90 days after the order for relief or 30 days after the court determined that the Property qualifies as "single asset real estate" as defined in 11 U.S.C. § 101(51B) to file a reasonable plan of reorganization or to commence monthly payments.

d. ☐ Pursuant to 11 U.S.C. § 362(d)(4), the Debtor's filing of the bankruptcy petition was part of a scheme to delay, hinder, or defraud creditors that involved:

    (1) ☐ The transfer of all or part ownership of, or other interest in, the Property without the consent of Movant or court approval; or

    (2) ☐ Multiple bankruptcy cases affecting the Property.

5. ☐ **Grounds for Annulment of the Stay.** Movant took postpetition actions against the Property or the Debtor.

a. ☐ These actions were taken before Movant knew the bankruptcy case had been filed, and Movant would have been entitled to relief from the stay to proceed with these actions.

b. ☐ Movant knew the bankruptcy case had been filed, but Movant previously obtained relief from stay to proceed with these enforcement actions in prior bankruptcy cases affecting the Property as set forth in Exhibit _____.

c. ☐ Other *(specify):*

6. **Evidence in Support of Motion: (D***eclaration(s) MUST be signed under penalty of perjury and attached to this motion***)**

a. The REAL PROPERTY DECLARATION on page 6 of this motion.

b. ☐ Supplemental declaration(s).

c. ☐ The statements made by Debtor under penalty of perjury concerning Movant's claims and the Property as set forth in Debtor's case commencement documents. Authenticated copies of the relevant portions of the case commencement documents are attached as Exhibit 2____.

d. ☒ Other:
    See the Continuation Page for this form at Exhibit 4, which includes a Memorandum of Points & Authorities (originally filed on 12 May 2023) and attached Declarations of Patrick Miller.

7. ☒ **An optional Memorandum of Points and Authorities is attached to this motion.**

---

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2017*　　　　　　　　　　　　　　　　　Page 4　　　　　　　　　　　**F 4001-1.RFS.RP.MOTION**

**Movant requests the following relief:**

1. Relief from the stay is granted under: ☐ 11 U.S.C. § 362(d)(1) ☒ 11 U.S.C. § 362(d)(2) ☐ 11 U.S.C. § 362(d)(3).

2. ☒ Movant (and any successors or assigns) may proceed under applicable nonbankruptcy law to enforce its remedies to foreclose upon and obtain possession of the Property.

3. ☒ Movant, or its agents, may, at its option, offer, provide and enter into a potential forebearance agreement, loan modification, refinance agreement or other loan workout or loss mitigation agreement. Movant, through its servicing agent, may contact the Debtor by telephone or written correspondence to offer such an agreement.

4. ☒ Confirmation that there is no stay in effect.

5. ☒ The stay is annulled retroactive to the bankruptcy petition date. Any postpetition actions taken by Movant to enforce its remedies regarding the Property shall not constitute a violation of the stay.

6. ☐ The co-debtor stay of 11 U.S.C. §1201(a) or § 1301(a) is terminated, modified or annulled as to the co-debtor, on the same terms and conditions as to the Debtor.

7. ☒ The 14-day stay prescribed by FRBP 4001(a)(3) is waived.

8. ☒ A designated law enforcement officer may evict the Debtor and any other occupant from the Property regardless of any future bankruptcy filing concerning the Property for a period of 180 days from the hearing on this Motion:
   ☒ without further notice, or ☐ upon recording of a copy of this order or giving appropriate notice of its entry in compliance with applicable nonbankruptcy law.

9. ☐ Relief from the stay is granted under 11 U.S.C. § 362(d)(4): If recorded in compliance with applicable state laws governing notices of interests or liens in real property, the order is binding in any other case under this title purporting to affect the Property filed not later than 2 years after the date of the entry of the order by the court, except that a debtor in a subsequent case under this title may move for relief from the order based upon changed circumstances or for good cause shown, after notice and hearing.

10. ☒ The order is binding and effective in any bankruptcy case commenced by or against any debtor who claims any interest in the Property for a period of 180 days from the hearing of this Motion:
    ☒ without further notice, or ☐ upon recording of a copy of this order or giving appropriate notice of its entry in compliance with applicable nonbankruptcy law.

11. ☒ The order is binding and effective in any future bankruptcy case, no matter who the debtor may be:
    ☒ without further notice, or ☐ upon recording of a copy of this order or giving appropriate notice of its entry in compliance with applicable nonbankruptcy law.

12. ☐ Upon entry of the order, for purposes of Cal. Civ. Code § 2923.5, the Debtor is a borrower as defined in Cal. Civ. Code § 2920.5(c)(2)(C).

13. ☒ If relief from stay is not granted, adequate protection shall be ordered.

14. ☒ See attached continuation page for other relief requested.

Date: 05/31/2023

Impact Advocates APC
Printed name of law firm (*if applicable*)
Patrick Miller
Printed name of individual Movant or attorney for Movant
[signature]
Signature of individual Movant or attorney for Movant

# REAL PROPERTY DECLARATION

I, (*print name of Declarant*) Patrick Miller _____, declare:

1.  I have personal knowledge of the matters set forth in this declaration and, if called upon to testify, I could and would competently testify thereto. I am over 18 years of age.  I have knowledge regarding Movant's interest in the real property that is the subject of this Motion (Property) because (*specify*):

    a.  ☐  I am the Movant.

    b.  ☐  I am employed by Movant as (*state title and capacity*):

    c.  ☒  Other (*specify*): I act as counsel for the Movant, Belgium Investments 960 Bay Dr, LLC, a California Corp.

2.  a.  ☐  I am one of the custodians of the books, records and files of Movant that pertain to loans and extensions of credit given to Debtor concerning the Property.  I have personally worked on the books, records and files, and as to the following facts, I know them to be true of my own knowledge or I have gained knowledge of them from the business records of Movant on behalf of Movant.  These books, records and files were made at or about the time of the events recorded, and which are maintained in the ordinary course of Movant's business at or near the time of the actions, conditions or events to which they relate.  Any such document was prepared in the ordinary course of business of Movant by a person who had personal knowledge of the event being recorded and had or has a business duty to record accurately such event.  The business records are available for inspection and copies can be submitted to the court if required.

    b.  ☐  Other (*see attached*):
        I have been involved in the judgment enforcement on behalf of my client and filed the Abstract of Judgment at Exhibit 3.

3.  The Movant is:

    a.  ☐  Holder: Movant has physical possession of a promissory note that (1) names Movant as the payee under the promissory note or (2) is indorsed to Movant, or indorsed in blank, or payable to bearer.  A true and correct copy of the note, with affixed allonges/indorsements, is attached as Exhibit _____.

    b.  ☐  Beneficiary: Movant is either (1) named as beneficiary in the security instrument on the subject property (e.g.,mortgage or deed of trust) or (2) is the assignee of the beneficiary.  True and correct copies of the recorded security instrument and assignments are attached as Exhibit _____.

    c.  ☐  Servicing agent authorized to act on behalf of the:

        ☐  Holder.
        ☐  Beneficiary.

    d.  ☒  Other (*specify*): a Judgment Creditor

4.  a.  The address of the Property is:

        *Street address*: 116 Rockefeller
        *Unit/suite no.*:
        *City, state, zip code*: Irvine, CA 92612

    b.  The legal description of the Property or document recording number (including county of recording) set forth in the Movant's deed of trust is:
        Unit 91, as shown and described in the Condominium Plan for a portion of Lot 9 of Tract # 16989. The Condominium Plan was recorded on 6/25/13 as Instrument No 2013000382583 in the Official Records of Orange County. APN # in Grant Deed is 445-231-10 (WOP) and APN # in County Record search is 445-231-37

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

5. Type of property (*check all applicable boxes*):

    a. ☐ Debtor's principal residence      b. ☒ Other residence

    c. ☐ Multi-unit residential      d. ☐ Commercial

    e. ☐ Industrial      f. ☐ Vacant land

    g. ☐ Other (*specify*):

6. Nature of the Debtor's interest in the Property:

    a. ☒ Sole owner

    b. ☐ Co-owner(s) (*specify*):

    c. ☐ Lienholder (*specify*):

    d. ☐ Other (*specify*):

    e. ☐ The Debtor ☒ did ☐ did not  list the Property in the Debtor's schedules.

    f. ☒ The Debtor acquired the interest in the Property by ☐ grant deed ☐ quitclaim deed ☒ trust deed.

        The deed was recorded on (*date*) 10/29/2013   .

7. Movant holds a ☐ deed of trust ☒ judgment lien ☐ other (*specify*) _____
that encumbers the Property.

    a. ☒ A true and correct copy of the document as recorded is attached as Exhibit 3____.

    b. ☐ A true and correct copy of the promissory note or other document that evidences the Movant's claim is
attached as Exhibit _____.

    c. ☐ A true and correct copy of the assignment(s) transferring the beneficial interest under the note and deed of
trust to Movant is attached as Exhibit _____.

8. Amount of Movant's claim with respect to the Property:

| | | PREPETITION | POSTPETITION | TOTAL |
|---|---|---|---|---|
| a. | Principal: | $ | $ | $ 5,436,919 |
| b. | Accrued interest: | $ | $ | $ |
| c. | Late charges | $ | $ | $ |
| d. | Costs (attorney's fees, foreclosure fees, other costs): | $ | $ | $ |
| e. | Advances (property taxes, insurance): | $ | $ | $ |
| f. | Less suspense account or partial balance paid: | $[          ] | $[          ] | $[          ] |
| g. | TOTAL CLAIM as of (*date*): | $ | $ | $ 5,436,919 |

    h. ☐ Loan is all due and payable because it matured on (*date*) _____

9. Status of Movant's foreclosure actions relating to the Property (*fill the date or check the box confirming no such action
has occurred*):

    a. Notice of default recorded on (*date*) _____ or ☒ none recorded.

    b. Notice of sale recorded on (*date*) _____ or ☒ none recorded.

    c. Foreclosure sale originally scheduled for (*date*) 07/13/2022  or ☐ none scheduled.

    d. Foreclosure sale currently scheduled for (*date*) _____ or ☒ none scheduled.

    e. Foreclosure sale already held on (*date*) _____ or ☒ none held.

    f. Trustee's deed upon sale already recorded on (*date*) _____ or ☒ none recorded.

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

10. Attached (*optional*) as Exhibit _____ is a true and correct copy of a POSTPETITION statement of account that accurately reflects the dates and amounts of all charges assessed to and payments made by the Debtor since the bankruptcy petition date.

11. ☒ (*chapter 7 and 11 cases only*) Status of Movant's loan:

    a. Amount of current monthly payment as of the date of this declaration: $_____ for the month of _____ 20___.

    b. Number of payments that have come due and were not made: _____. Total amount: $_____

    c. Future payments due by time of anticipated hearing date (*if applicable*):

        An additional payment of $_____ will come due on (*date*) _____, and on the _____ day of each month thereafter. If the payment is not received within _____ days of said due date, a late charge of $_____ will be charged to the loan.

    d. The fair market value of the Property is $ 1,120,000_____, established by:

        (1) ☐ An appraiser's declaration with appraisal is attached as Exhibit _____.

        (2) ☐ A real estate broker or other expert's declaration regarding value is attached as Exhibit _____.

        (3) ☒ A true and correct copy of relevant portion(s) of the Debtor's schedules is attached as Exhibit _2___.

        (4) ☐ Other (*specify*):

    e. **Calculation of equity/equity cushion in Property:**

        Based upon ☐ a preliminary title report ☐ the Debtor's admissions in the schedules filed in this case, the Property is subject to the following deed(s) of trust or lien(s) in the amounts specified securing the debt against the Property:

| | Name of Holder | Amount as Scheduled by Debtor (*if any*) | Amount known to Declarant and Source |
|---|---|---|---|
| 1st deed of trust: | | $ 243,078 | $ 243,078 |
| 2nd deed of trust: | | $ | $ |
| 3rd deed of trust: | | $ | $ |
| Judgment liens: | | $ 5,436,919 | $ 5,436,919 |
| Taxes: | | $ | $ |
| Other: | Sums owed to Debtor's HOAs | $ 10,155 | $ 10,155 |
| **TOTAL DEBT:** $ 5,690,152 | | | |

    f. Evidence establishing the existence of these deed(s) of trust and lien(s) is attached as Exhibit 1-3___ and consists of:

        (1) ☐ Preliminary title report.

        (2) ☐ Relevant portions of the Debtor's schedules.

        (3) ☒ Other (*specify*): Copies of deed of trust; abstract of judgement; and Financial Statement excerpts

    g. ☒ **11 U.S.C. § 362(d)(1) - Equity Cushion:**
        I calculate that the value of the "equity cushion" in the Property exceeding Movant's debt and any lien(s) senior to Movant's debt is $ 0_____ and is 0_____% of the fair market value of the Property.

    h. ☐ **11 U.S.C. § 362(d)(2)(A) - Equity:**
        By subtracting the total amount of all liens on the Property from the value of the Property as set forth in Paragraph 11(e) above, I calculate that the Debtor's equity in the Property is $ 0_____.

---

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2017*                                    Page 8                                    **F 4001-1.RFS.RP.MOTION**

i. ☒ Estimated costs of sale: $ 0_____ (estimate based upon _____% of estimated gross sales price)

j. ☒ The fair market value of the Property is declining because:
Home prices across the country have been declining due to increasing interest rates.


12. ☐ (Chapter 12 and 13 cases only) Status of Movant's loan and other bankruptcy case information:

a. A 341(a) meeting of creditors is currently scheduled for (or concluded on) the following date: _____.
A plan confirmation hearing currently scheduled for (or concluded on) the following date:_____.
A plan was confirmed on the following date (if applicable): _____.

b. Postpetition preconfirmation payments due BUT REMAINING UNPAID since the filing of the case:

| Number of Payments | Number of Late Charges | Amount of Each Payment or Late Charge | Total |
|---|---|---|---|
| | | $ | $ |
| | | $ | $ |
| | | $ | $ |
| | | $ | $ |
| | | $ | $ |
| | | $ | $ |
| | | $ | $ |
| | | $ | $ |

(See attachment for additional breakdown of information attached as Exhibit _____.)

c. Postpetition postconfirmation payments due BUT REMAINING UNPAID since the filing of the case:

| Number of Payments | Number of Late Charges | Amount of each Payment or Late Charge | Total |
|---|---|---|---|
| | | $ | $ |
| | | $ | $ |
| | | $ | $ |
| | | $ | $ |
| | | $ | $ |
| | | $ | $ |
| | | $ | $ |
| | | $ | $ |

d. Postpetition advances or other charges due but unpaid:                                    $
(For details of type and amount, see Exhibit _____)

e. Attorneys' fees and costs:                                                                            $
(For details of type and amount, see Exhibit _____)

f. Less suspense account or partial paid balance:                                          $[                            ]

TOTAL POSTPETITION DELINQUENCY:          $

g. Future payments due by time of anticipated hearing date (if applicable): _____.
An additional payment of $_____ will come due on _____, and on the _____ day of each month thereafter. If the payment is not received by the _____ day of the month, a late charge of $_____ will be charged to the loan.

h. Amount and date of the last 3 postpetition payments received from the Debtor in good funds, regardless of how applied (if applicable):
$_____ received on (date) _____
$_____ received on (date) _____
$_____ received on (date) _____

i. ☐ The entire claim is provided for in the chapter 12 or 13 plan and postpetition plan payments are delinquent.
A plan payment history is attached as Exhibit _____. See attached declaration(s) of chapter 12 trustee or 13 trustee regarding receipt of payments under the plan (attach LBR form F 4001-1.DEC.AGENT.TRUSTEE).

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

13. ☐  Proof of insurance regarding the Property has not been provided to Movant, despite the Debtor's obligation to insure the collateral under the terms of Movant's contract with the Debtor.

14. ☐  The court determined on (*date*) _____ that the Property qualifies as "single asset real estate" as defined in 11 U.S.C. § 101(51B).  More than 90 days have passed since the filing of the bankruptcy petition; more than 30 days have passed since the court determined that the Property qualifies as single asset real estate; the Debtor has not filed a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable time; or the Debtor has not commenced monthly payments to Movant as required by 11 U.S.C. § 362(d)(3).

15. ☐  The Debtor's intent is to surrender the Property.  A true and correct copy of the Debtor's statement of intentions is attached as Exhibit _____.

16. ☐  Movant regained possession of the Property on (*date*) _____, which is ☐ prepetition ☐ postpetition.

17. ☒  The bankruptcy case was filed in bad faith:

   a. ☒  Movant is the only creditor or one of few creditors listed in the Debtor's case commencement documents.

   b. ☐  Other bankruptcy cases have been filed in which an interest in the Property was asserted.

   c. ☐  The Debtor filed only a few case commencement documents.  Schedules and a statement of financial affairs (or chapter 13 plan, if appropriate) have not been filed.

   d. ☐  Other (*specify*):
       **Please see the attached Memorandum of Points & Authorities at the Continuation Page (Exhibit 4).**

18. ☒  The filing of the bankruptcy petition was part of a scheme to delay, hinder, or defraud creditors that involved:

   a. ☐  The transfer of all or part ownership of, or other interest in, the Property without the consent of Movant or court approval. See attached continuation page for facts establishing the scheme.

   b. ☒  Multiple bankruptcy cases affecting the Property include:

      1.  Case name: In re El Mallakh _____
         Chapter: _13___    Case number: _8:22-bk-11158-TA_____
         Date dismissed: _07/26/2022_    Date discharged: _____    Date filed: _07/12/2022_
         Relief from stay regarding the Property ☐ was  ☒ was not  granted.

      2.  Case name: _____
         Chapter: _____    Case number: _____
         Date dismissed: _____    Date discharged: _____    Date filed: _____
         Relief from stay regarding the Property ☐ was  ☐ was not  granted.

      3.  Case name: _____
         Chapter: _____    Case number: _____
         Date dismissed: _____    Date discharged: _____    Date filed: _____
         Relief from stay regarding the Property ☐ was  ☐ was not  granted.

   ☐  See attached continuation page for information about other bankruptcy cases affecting the Property.

   ☐  See attached continuation page for facts establishing that the multiple bankruptcy cases were part of a scheme to delay, hinder, or defraud creditors.

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2017*                                      Page 10                                      **F 4001-1.RFS.RP.MOTION**

19. ☐ Enforcement actions taken after the bankruptcy petition was filed are specified in the attached supplemental declaration(s).

   a. ☐ These actions were taken before Movant knew the bankruptcy petition had been filed, and Movant would have been entitled to relief from stay to proceed with these actions.

   b. ☐ Movant knew the bankruptcy case had been filed, but Movant previously obtained relief from stay to proceed with these enforcement actions in prior bankruptcy cases affecting the Property as set forth in Exhibit _____.

   c. ☐ For other facts justifying annulment, see attached continuation page.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 05/31/2023 | Patrick Miller | |
| --- | --- | --- |
| Date | Printed name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2017*                                  Page 11                          **F 4001-1.RFS.RP.MOTION**

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:

121 S Oak Ave, Pasadena, CA, 91107

A true and correct copy of the foregoing document entitled: **NOTICE OF MOTION AND MOTION FOR RELIEF FROM THE AUTOMATIC STAY UNDER 11 U.S.C. § 362 (with supporting declarations) (REAL PROPERTY)** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) _05/31/2023_ , I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) _05/31/2023_ , I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

Bassem Essam El Mallakh
116 Rockefeller, Irvine, CA, 92612

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____ , I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☒ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| _05/31/2023_ | _Patrick Miller_ | |
|---|---|---|
| Date | Printed Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

| |
|---|
| Michael Jay Berger on behalf of Debtor Bassem Victor El Mallakh<br>michael.berger@bankruptcypower.com,<br>yathida.nipha@bankruptcypower.com;michael.berger@ecf.inforuptcy.com |
| Chad L Butler on behalf of Interested Party Courtesy NEF<br>caecf@tblaw.com |
| Nancy S Goldenberg on behalf of U.S. Trustee United States Trustee (SA)<br>nancy.goldenberg@usdoj.gov |
| Benjamin Heston on behalf of Interested Party Benjamin Heston<br>bhestonecf@gmail.com, benheston@recap.email,NexusBankruptcy@jubileebk.net |
| Patrick Miller on behalf of Creditor Belgium Investments 960 Bay Dr, LLC A California Corp.<br>patrick.miller@impactadvocateslaw.com |
| Randall P Mroczynski on behalf of Creditor TD Bank, N.A., successor in<br>interest to TD Auto Finance LLC<br>randym@cookseylaw.com |
| United States Trustee (SA)<br>ustpregion16.sa.ecf@usdoj.gov |
| Weneta M.A. Kosmala (TR)<br>c/o Law Offices of Weneta M.A. Kosmala<br>ecf.alert+Kosmala@titlexi.com<br>(Trustee) |

# EXHIBIT "1"

**RECORDING REQUESTED BY:**
**NORTH AMERICAN TITLE CO.**

Recording Requested By:
Marilyn M Turner

Return To:
Universal American Mortgage
Company, LLC
Secondary Marketing Ops
15550 Lightwave Drive, Suite
200
Clearwater, FL  33760

Prepared By: Marilyn M Turner

Universal American Mortgage
Company, LLC
1725 W Greentree Drive, Ste
124
Tempe, ARIZONA  85284

1255839

Recorded in Official Records, Orange County
Hugh Nguyen, Clerk-Recorder



75.00

\* \$ R O 0 0 6 2 8 9 4 9 7 \$ \*

2013000604919 3:52 pm 10/29/13
156 407 D11  24
0.00 0.00 0.00 0.00 69.00 0.00 0.00 0.00 0.00

——————[Space Above This Line For Recording Data]——————

# DEED OF TRUST

MIN 101202500078271328

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated October 24, 2013                    , together with all Riders to this document.

**(B) "Borrower"** is BASSEM ESSAM VICTOR ELMALLAKH, A SINGLE MAN

Borrower's address is 34 FALKNER DRIVE, LADEERA RANCH, CA 92694
                                    . Borrower is the trustor under this Security Instrument.

**(C) "Lender"** is Universal American Mortgage Company of California

Lender is a a California Corporation
organized and existing under the laws of California

0007827132                                                                      A9926

**CALIFORNIA**-Single Family-**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS**        **Form 3005  1/01**

Wolters Kluwer Financial Services
VMP ®-6A(CA) (0711)
Page 1 of 15                      Initials: BV

I001188
D06A01.UFF

Lender's address is 391 N. Main Street, Suite 200, Corona, CA 92800

**(D) "Trustee"** is Universal American Mortgage Company, LLC

**(E) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary under this Security Instrument**. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

**(F) "Note"** means the promissory note signed by Borrower and dated October 24, 2013
The Note states that Borrower owes Lender Two Hundred Thirty Four Thousand and 00/100
                                                                                      Dollars
(U.S. $  234,000.00    ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than November 01, 2043      .

**(G) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(H) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(I) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [X] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

**(J) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(K) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(L) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(M) "Escrow Items"** means those items that are described in Section 3.

**(N) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(O) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(P) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

0007827132                                                                                      A9926
**CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS**          Form 3005  1/01
VMP®-6A(CA) (0711)                    Page 2 of 15        Initials: ʃℓⱴ        I001188
                                                                              D06A02.UFF

**(Q)** "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(R)** "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the
County                                of                              ORANGE                        :
[Type of Recording Jurisdiction]                           [Name of Recording Jurisdiction]
Described according to exhibit 'A' attached hereto and made a part hereof

Parcel ID Number: 445-231-10 W.O.P.                                       which currently has the address of
116 ROCKEFELLER                                                                                            [Street]
IRVINE                                                       [City], California 92612          [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances
0007827132                                                                                                      A9926
CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS          Form 3005  1/01
VMP®-6A(CA) (0711)                          Page 3 of 15      Initials: BV      I001188
                                                                                                   D06A03.UFF

of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be

0007827132                                                                                              A9926

**CALIFORNIA**-Single Family-**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS**          **Form 3005   1/01**
VMP ®-6A(CA) (0711)                    Page 4 of 15          Initials: ___          I001188
                                                                                    D06A04.UFF

in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

0007827132                                                                                                    A9926
**CALIFORNIA**-Single Family-**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS**          Form 3005   1/01
VMP®-6A(CA) (0711)                     Page 5 of 15          Initials: SV          I001188
                                                                                  D06A05.UFF

Document Number: 2013000604919 Page: 5 of 24

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

0007827132                                                                                    A9926

CALIFORNIA-Single Family-**Fannie Mae/Freddie Mac** UNIFORM INSTRUMENT WITH MERS        **Form 3005  1/01**
VMP®-6A(CA) (0711)                      Page 6 of 15        Initials: R V              I001188
                                                                                      D06A06.UFF

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

0007827132                                                                                      A9926

**CALIFORNIA**-Single Family-**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS**          Form 3005   1/01
VMP®-6A(CA) (0711)                          Page 7 of 15          Initials: SV          I001188   D06A07.UFF

Document Number: 2013000604919 Page: 7 of 24

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

0007827132                          A9926

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS     **Form 3005** 1/01
VMP®-6A(CA) (0711)             Page 8 of 15     Initials: _____     I001188
D06A08.UFF

**(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender

0007827132                                                                                          A9926

to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

    **13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

    Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

    **14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

    If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

    **15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

0007827132                                                                                      A9926

**CALIFORNIA**-Single Family-**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS**        **Form 3005   1/01**
VMP®-6A(CA) (0711)                          Page 10 of 15        Initials: ⌐B⌐        I001188
                                                                                    D06A10.UFF

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

0007827132                                                                                          A9926

CALIFORNIA-Single Family-**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS**      Form 3005  1/01
VMP ®-6A(CA) (0711)                          Page 11 of 15        Initials: _____        I001188
                                                                                        D06A11.UFF

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

0007827132                                                                                              A9926
CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS          Form 3005   1/01
VMP ®-6A(CA) (0711)                     Page 12 of 15        Initials:            I00118B
                                                                                 D06A12.UFF

Document Number: 2013000604919 Page: 12 of 24

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.**

**Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.**

**23. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

**24. Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

**25. Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

0007827132

A9926

**CALIFORNIA**-Single Family-**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS**     Form 3005   1/01
VMP ®-6A(CA) (0711)                    Page 13 of 15     Initials: ẞⱽ        I001188
D06A13.UFF

Document Number: 2013000604919 Page: 13 of 24

The undersigned Borrower requests that a copy of any Notice of Default and any Notice of Sale under this Security Instrument be mailed to the Borrower at the address set forth above. A copy of any Notice of Default and any Notice of Sale will be sent only to the address contained in this recorded request. If the Borrower's address changes, a new request must be recorded.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____          _____ (Seal)
                                          BASSEM ESSAM VICTOR ELMALLAKH        -Borrower


_____          _____ (Seal)
                                                                               -Borrower


                                          _____ (Seal)
                                                                               -Borrower


                                          _____ (Seal)
                                                                               -Borrower


0007827132                                                                              A9926
**CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS**    Form 3005   1/01
VMP®-6A(CA) (0711)                        Page 14 of 15                    I001188
                                                                          D06A14.UFF

State of California
County of *Orange*

On  26  Oct  2013          before me, *R.D. Vanderwork-Simon, Notary Public*

} ss.

, personally appeared

BASSEM ESSAM VICTOR ELMALLAKH

, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

R. D. VANDERWORK-SIMON
COMM. #1934577
Notary Public - California
Riverside County
My Comm. Expires May 18, 2015

_(Seal)_

0007827132                                                                    A9926

**CALIFORNIA**-Single Family-**Fannie Mae/Freddie Mac** UNIFORM INSTRUMENT WITH MERS    Form 3005   1/01
VMP ®-6A(CA) (0711)              Page 15 of 15        Initials: ____        I001188
                                                                            DO6A15.UFF

0007827132              # CONDOMINIUM RIDER              3140/FNMA

THIS CONDOMINIUM RIDER is made this 24th        day of October, 2013        ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed
of Trust, or Security Deed (the "Security Instrument") of the same date given by the
undersigned (the "Borrower") to secure Borrower's Note to Universal American
Mortgage Company of California, a California Corporation

                                                                              (the
"Lender") of the same date and covering the Property described in the Security Instrument
and located at:

                         116 ROCKEFELLER
                    IRVINE, CALIFORNIA 92612
                        [Property Address]
The Property includes a unit in, together with an undivided interest in the common elements
of, a condominium project known as:
                 Manhattans at Central Park West  BV
                    [Name of Condominium Project]
(the "Condominium Project"). If the owners association or other entity which acts for the
Condominium Project (the "Owners Association") holds title to property for the benefit or use
of its members or shareholders, the Property also includes Borrower's interest in the Owners
Association and the uses, proceeds and benefits of Borrower's interest.

      **CONDOMINIUM COVENANTS.** In addition to the covenants and agreements made in the
Security Instrument, Borrower and Lender further covenant and agree as follows:
      **A. Condominium Obligations.** Borrower shall perform all of Borrower's obligations under
the Condominium Project's Constituent Documents. The "Constituent Documents" are the: (i)
Declaration or any other document which creates the Condominium Project; (ii) by-laws; (iii)
code of regulations; and (iv) other equivalent documents. Borrower shall promptly pay, when
due, all dues and assessments imposed pursuant to the Constituent Documents.
      **B. Property Insurance.** So long as the Owners Association maintains, with a generally
accepted insurance carrier, a "master" or "blanket" policy on the Condominium Project which
is satisfactory to Lender and which provides insurance coverage in the amounts (including
deductible levels), for the periods, and against loss by fire, hazards included within the term
"extended coverage," and any other hazards, including, but not limited to, earthquakes and
floods, from which Lender requires insurance, then: (i) Lender waives the provision in

                              I000014
                              D008R1.UFF

**MULTISTATE CONDOMINIUM RIDER** - Single Family - **Fannie Mae/Freddie Mac UNIFORM
INSTRUMENT**
**Form 3140 1/01**
Wolters Kluwer Financial Services
VMP ®-8R (0810)
Page 1 of 3              Initials: BV

0007827132                                                              3140/FNMA

Section 3 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, whether to the unit or to common elements, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender for application to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

**C. Public Liability Insurance.** Borrower shall take such actions as may be reasonable to insure that  the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**D. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property, whether of the unit or of the common elements, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

**E. Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the Condominium Project, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the Constituent Documents if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**F. Remedies.** If Borrower does not pay condominium dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

I000014
D00BR2.UFF

**MULTISTATE CONDOMINIUM RIDER** - Single Family - **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**
VMP ®-8R (0810)                    Page 2 of 3          Initials: $\mathcal{BV}$      Form 3140 1/01

0007827132                                                                3140/FNMA

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Condominium Rider.

_____ (Seal)
BASSEM ESSAM VICTOR ELMALLAKH              -Borrower


_____ (Seal)
                                           -Borrower


_____ (Seal)
                                           -Borrower


_____ (Seal)
                                           -Borrower


**MULTISTATE CONDOMINIUM RIDER** - Single Family - **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**                                    **Form 3140 1/01**
VMP ®-8R (0810)                    Page 3 of 3

I000014
D008R3.UFF

# ADJUSTABLE RATE RIDER

0007827132                    **(1-Year LIBOR Index - Rate Caps)**                    D856R1
                              **(Assumable after Initial Period)**

THIS ADJUSTABLE RATE RIDER is made this 24th   day of October, 2013                    ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed
of Trust, or Security Deed (the "Security Instrument") of the same date given by the
undersigned (the "Borrower") to secure the Borrower's Adjustable Rate Note (the "Note") to
Universal American Mortgage Company of California, a California
Corporation

(the "Lender") of the same date and covering the property described in the Security
Instrument and located at:

116 ROCKEFELLER, IRVINE, CALIFORNIA 92612
[Property Address]

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE
INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE
AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE
TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the
Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. INTEREST RATE AND MONTHLY PAYMENT CHANGES**

The Note provides for an initial interest rate of                    3.125 %. The Note
provides for changes in the interest rate and the monthly payments as follows:

**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A) Change Dates**

The interest rate I will pay may change on the first day of November, 2020                    ,
and may change on that day every 12th month thereafter. Each date on which my interest
rate could change is called a "Change Date."

**(B) The Index**

Beginning with the first Change Date, my interest rate will be based on an Index. The
"Index" is the one-year London Interbank Offered Rate ("LIBOR") which is the average of
interbank offered rates for one-year U.S. dollar-denominated deposits in the London market,
as published in The Wall Street Journal. The most recent Index figure available as of the date
45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is
based upon comparable information. The Note Holder will give me notice of this choice.

---

MULTISTATE ADJUSTABLE RATE RIDER - 1-Year LIBOR Index (Assumable after Initial Period)
Single Family - Freddie Mac UNIFORM INSTRUMENT
VMP ®
Wolters Kluwer Financial Services

I001984
D856R1.UFF

Initials: _____

Form 5131 3/04

VMP856R (0804).01
Page 1 of 4

0007827132                                                                      D856R1

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding
Two and One Quarter                                               percentage point(s)
(                      2.250  %) to the Current Index. The Note Holder will then round the result
of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the
limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the
next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be
sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full
on the maturity date at my new interest rate in substantially equal payments. The result of
this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than
          8.125 % or less than                    2.250  %. Thereafter, my interest rate will
never be increased or decreased on any single Change Date by more than Two
                                                                          percentage point(s)
(                      2.000 %) from the rate of interest I have been paying for the preceding 12
months. My interest rate will never be greater than                      8.125 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount
of my new monthly payment beginning on the first monthly payment date after the Change
Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and
the amount of my monthly payment before the effective date of any change. The notice will
include information required by law to be given to me and also the title and telephone number
of a person who will answer any question I may have regarding the notice.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

**1. UNTIL BORROWER'S INITIAL INTEREST RATE CHANGES UNDER THE TERMS
STATED IN SECTION A ABOVE, UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT
SHALL BE IN EFFECT AS FOLLOWS:**

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this
Section 18, "Interest in the Property" means any legal or beneficial interest in the
Property, including, but not limited to, those beneficial interests transferred in a bond
for deed, contract for deed, installment sales contract or escrow agreement, the
intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or
transferred (or if Borrower is not a natural person and a beneficial interest in
Borrower is sold or transferred) without Lender's prior written consent, Lender may
require immediate payment in full of all sums secured by this Security Instrument.
However, this option shall not be exercised by Lender if such exercise is prohibited
by Applicable Law.

MULTISTATE ADJUSTABLE RATE RIDER - 1-Year LIBOR Index (Assumable after Initial Period)
Single Family - Freddie Mac UNIFORM INSTRUMENT
VMP ®
Wolters Kluwer Financial Services

I001984
D856R2.UFF

Initials: _____

Form 5131 3/04

VMP856R (0804).01
Page 2 of 4

0007827132                                                                    D856R1

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**2. AFTER BORROWER'S INITIAL INTEREST RATE CHANGES UNDER THE TERMS STATED IN SECTION A ABOVE, UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT DESCRIBED IN SECTION B1 ABOVE SHALL THEN CEASE TO BE IN EFFECT, AND THE PROVISIONS OF UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT SHALL BE AMENDED TO READ AS FOLLOWS:**

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

MULTISTATE ADJUSTABLE RATE RIDER - 1-Year LIBOR Index (Assumable after Initial Period)
Single Family - Freddie Mac UNIFORM INSTRUMENT
VMP ®
Wolters Kluwer Financial Services

I001984
D856R3 UFF

Initials: _____

Form 5131 3/04

VMP856R (0804).01
Page 3 of 4

0007827132                                                                    D856R1

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained
in this Adjustable Rate Rider.

_____  (Seal)
BASSEM ESSAM VICTOR ELMALLAKH              -Borrower


_____  (Seal)
                                           -Borrower


_____  (Seal)
                                           -Borrower


_____  (Seal)
                                           -Borrower


MULTISTATE ADJUSTABLE RATE RIDER - 1-Year LIBOR Index (Assumable after Initial Period)      I001984          Form 5131 3/04
Single Family - Freddie Mac UNIFORM INSTRUMENT                                              D856R4.UFF
VMP ®                                                                                                        VMP856R (0804).01
Wolters Kluwer Financial Services                                                           Initials: BL            Page 4 of 4

# EXHIBIT "A"

## LEGAL DESCRIPTION

Real property in the City of Irvine, County of Orange, State of California, described as follows:

PARCEL NO. 1

Unit 91 (the "Unit") as shown and described in the Condominium Plan (together with any amendments thereto, collectively, the "Plan") for Lot 18 of Tract No. 16989, which Plan was recorded on June 25, 2013, 2013, as Instrument No. 2013000382584 in Official Records of Orange County, California ("Official Records"). Tract No. 16989 is shown on the Subdivision Map ("Map") filed in Book 887, Pages 36 to 48, inclusive, of Miscellaneous Maps in the Office of the Orange County Recorder.

EXCEPTING THEREFROM, all oil, oil rights, mineral, mineral rights, natural gas, natural gas rights and other hydrocarbons by whatsoever name known that may be within or under the parcel of land hereinabove described, together with the perpetual right of drilling, mining, exploring and/or operating therefor and storing in and removing the same from said land or any other land, including the right to whipstock or directionally drill and mine from lands other than those hereinabove described, oil or gas wells, tunnels and shafts into, through or across the subsurface of the land hereinabove described, and to bottom such whipstocked or directionally drilled wells, tunnels and shafts under and beneath or beyond the exterior limits thereof and to redrill, retunnel, equip, maintain, repair, deepen and operate any such wells or mines, without, however, the right to drill, mine, store, explore and operate through the surface or the upper 500 feet of the subsurface of the land hereinabove described, as reserved in deed from Irvine Industrial Complex, a corporation, recorded September 19, 1968 in Book 8725, Page 311, of Official Records.
ALSO EXCEPTING THEREFROM, for the benefit of Grantor, its successors and assigns, together with the right to grant and transfer all or a portion of the same as follows:

A. Any and all remaining oil, oil rights, minerals, mineral rights, natural gas rights and other hydrocarbons by whatsoever name known, geothermal steam, any other material resources and all products derived from any of the foregoing, that may be within or under the Property, together with the perpetual right of drilling, mining, exploring and operating therefor and storing in and removing the same from the Property or any other land, including the right to whipstock or directionally drill and mine from lands other than the Property, oil or gas wells, tunnels and shafts into, through or across the subsurface of the Property, and to bottom such whipstocked or directionally drilled wells, tunnels and shafts under and beneath or beyond the exterior limits thereof, and to redrill, retunnel, equip, maintain, repair, deepen and operate any such wells or mines without, however, the right to drill, mine, store, explore or operate through the surface or upper five hundred (500) feet of the subsurface of the Property.

B. Any and all water, water rights or interests therein appurtenant or relating to the Property or owned or used by Grantor in connection with or with respect to the Property (no matter how acquired by Grantor), whether such water, water rights or interest therein shall be riparian, overlying, appropriative, littoral, percolating, prescriptive, adjudicated, statutory or contractual, together with the right and power to explore, drill, re-drill, remove and store the same from or in the Property or to divert or otherwise utilize such water, water rights or interest therein on any Property owned or leased by Grantor; but without, however, any right to enter upon the surface of the Property in the exercise of such rights.

PARCEL NO. 2

An undivided one-tenth (1/10) fee simple interest as a tenant-in-common in and to the Common Area described in the Plan.

PARCEL NO. 3

Exclusive easements for the benefit of the Unit appurtenant to Parcel Nos. 1 and 2 described

above, for Exclusive Use Areas over those portions of the Neighborhood Association Property shown on the Plan or as described in the Neighborhood Declaration or Notice of Addition.

PARCEL NO. 4

Nonexclusive easements for access, drainage, support, encroachment, maintenance, repair, and for other purposes, all as may be shown on the Plan and the Map, and as described in the Master Declaration of Covenants, Conditions, Restrictions and Reservation of Easements for Central Park West, recorded May 1, 2008, as Instrument No. 2008000207242 (together with any amendments thereto, collectively, the "Master Declaration"), the Supplemental Declaration of Covenants, Conditions and Restrictions for Central Park West – The Townes at Central Park West (Manhattans, Units 89 to 98) recorded on June 27, 2013, as Instrument No. 2013000391502 (together with any amendments thereto, collectively, the "Supplemental Declaration"), the Neighborhood Declaration of Covenants, Conditions, Restrictions and Reservation of Easements for The Townes at Central Park West, recorded on July 2, 2010, as Instrument No. 2010000315037 (together with any amendments thereto, collectively, the "Neighborhood Declaration"), and the Notice of Addition of Territory and Supplemental Declaration of Covenants, Conditions and Restrictions for The Townes at Central Park West (Manhattans, Units 89 to 98), recorded on June 27, 2013, as Instrument No. 2013000391503 (together with any amendments thereto, collectively, the "Notice of Addition"), all in Official Records.

# EXHIBIT "2"

1  MICHAEL JAY BERGER (State Bar # 100291)
2  SOFYA DAVTYAN (State Bar # 259544)
   LAW OFFICES OF MICHAEL JAY BERGER
3  9454 Wilshire Blvd. 6th Floor
   Beverly Hills, CA 90212-2929
4  Telephone:    (310) 271-6223
   Facsimile:    (310) 271-9805
5  E-mail: Michael.Berger@bankruptcypower.com
   E-mail: Sofya.Davtyan@bankruptcypower.com
6
7  Attorney for Debtor and Plan Proponent
   Bassem Victor El Mallakh

8              UNITED STATES BANKRUPTCY COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10                  SANTA ANA DIVISION

11 In re:                          )  CASE NO.: 8:22-BK-11605-TA
12                                 )
                                   )  Chapter 11
13                                 )
                                   )  **DEBTOR'S DISCLOSURE STATEMENT**
14 Bassem Victor El Mallakh,       )  **DESCRIBING CHAPTER 11 PLAN OF**
                                   )  **REORGANIZATION**
15                                 )
                                   )  Continued Status Hearing
16              Debtor-in-Possession.)
                                   )  Date:  March 23, 2023
17                                 )  Time:  10:00 a.m.
                                   )  Ctrm:  5B [via ZoomGov]
18                                 )        411 West Fourth Street
                                   )        Santa Ana, CA 92701-4593
19                                 )
20                                 )
                                   )
21                                 )
                                   )
22 _____ )

23 ///
24 ///
25 ///
26 ///
27 ///
28

                                   1
        DEBTOR'S DISCLOSURE STATEMENT DESCRIBING CHAPTER 11 PLAN OF REORGANIZATION

1  information, the Debtor cannot warrant or represent that the information in this Disclosure

2  Statement, including any and all financial information, is without inaccuracy or omission.

3  ***No entity may rely upon the Plan or this Disclosure Statement, or any of the***

4  ***accompanying exhibits, for any purpose other than to determine whether to vote in favor of or***

5  ***against the Plan.*** Nothing contained in such documents constitutes an admission of any fact or

6  liability by any party, and no such information may be deemed evidence of the tax or other legal

7  effects of the Plan on holders of claims or interests in these cases.

8  ## II.    BACKGROUND

9  ### A. DESCRIPTION AND HISTORY OF THE DEBTOR'S BUSINESS

10  On September 19, 2022, Bassem Essam Victor El Mallakh (the "Debtor") filed the

11  present Chapter 11 bankruptcy petition.  Debtor had one prior chapter 13 bankruptcy case filed

12  on July 12, 2022, Case No.: 8:22-bk-11158-TA, which was dismissed on July 26, 2022 per

13  
14  Debtor's Request for Voluntary Dismissal.

15  The Debtor holds title to the following real property which is the Debtor's principal

16  residence: 116 Rockefeller, Irvine, California 92612 ("Property").

17  The Property has a scheduled value of $1,120,000.00 and is encumbered by the following

18  four secured obligations:

20  - Freedom Mortgage Corporation (1st TD Holder) with a claim of $243,078.15
       [POC #8].

22  - Belgium Investments 960 Bay Dr, LLC (2nd position judgment lienholder) with a
       claim of $5,436,919.76 [POC #9] which arose from a state court judgment in the
       matter entitled *Belgium Investments 960 Bay Dr, LLC v. Bassem Essam El
       Mallakh*, Orange County Case No.: 30-2020-01148745-CU-EN-CJC.

25  - The Townes at Central Park West Association (3rd position lienholder) with a
       claim of $7,276.60 [POC #3] with an Abstract of Judgment recorded on February
       9, 2022; and

8

- Central Park West Community Association (4<sup>th</sup> position lienholder) with a claim of $2,878.93 [POC #6] for delinquent assessments with a Notice of Delinquent Assessment recorded on May 16, 2022.

The Debtor currently collects $4,000.00 in rental income from the Property, part of which is being rented to Debtor's sister who lives in the Property with her son. The Debtor is still actively seeking a full-time employment. Until an employment is secured, Debtor's father is willing and able to provide a financial contribution to help Debtor meet the obligations proposed under the Chapter 11 Reorganization Plan.

The principal assets of the estate are the Debtor's Property with a scheduled value of $1,120,000.00 and personal property assets with a combined scheduled value of approximately $113,144.00. The list of the property of the estate and the valuation as of the Plan Confirmation Date is attached hereto as **Exhibit-A**.

The principal liabilities of the estate are the secured claims on the Debtor's Property with claims totaling $5,690,153.44 and a car loan owed to TD Auto Finance with an outstanding balance of $6,732.97. The list of the secured creditors is attached hereto as **Exhibit B-1**. The Debtor has one priority IRS tax claim with a nominal claim amount of $27.97 (see **Exhibit B-2**) and general unsecured claims totaling $5,209,476.19. The list of the unsecured nonpriority general creditors is attached hereto as **Exhibit B-3**.

The major event that precipitated the filing of the Debtor's Chapter 11 bankruptcy was the pending foreclosure sale of the Property initiated by judgment creditor Belgium Investments.

The Debtor's 5-year projected Income and Expense Statement is attached hereto as **Exhibit-C**.

Debtor's summary of the monthly operating reports is attached hereto as **Exhibit- D.**

The liquidation analysis is attached hereto as **Exhibit-E.**

DEBTOR'S DISCLOSURE STATEMENT DESCRIBING CHAPTER 11 PLAN OF REORGANIZATION

(1) Internal Revenue Service: $27.97 [POC #5]. This claim will be paid in full in one lump-sum payment on the Effective Date at the applicable interest rate, currently 7%. See **Exhibit B-2**.

## C. CLASSIFIED CLAIMS

### Class 1 – Secured Claims

**CLASS 1(A)**

**Claim/Collateral:** Freedom Mortgage Corporation ("Freedom Mortgage") holds a claim secured by Debtor's principal residence located at 116 Rockefeller, Irvine, CA 92612 (the "Property") for $243,078.15 [POC #8]. The claim includes $63,820.41 in pre-petition arrears.

**Impaired/Not Impaired:** Impaired.

**Treatment:** Debtor has been making the post-petition regular mortgage payments to Freedom Mortgage and will stay current with the monthly contractual payments, currently $1,961.41. Debtor also proposes to cure the pre-petition arrears of $63,820.41 over 60 months by tendering equal monthly payments of $1,063.67 each, with the first payment of $1,063.67 due on the first of the month following the effective date, and continuing monthly for an additional 59 months until the arrears are paid in full.

**CLASS 1(B)**

**Claim/Collateral:** Belgium Investments 960 Bay Dr. LLC ("Belgium") filed a claim secured through a recorded abstract of judgment against Debtor's Property for $5,436,919.76 [POC #9]. Belgium's POC #9 acknowledges the value of Debtor's Property at $1,120,000.00, bifurcates its own claim into $876,921.85 secured claim and $4,559,997.91 unsecured claim.

**Impaired/Not Impaired:** Impaired.

**Treatment:** Through the Plan, Debtor bifurcates Belgium's claim into $250,521.85[1] secured claim ("secured claim") and $5,186,397.91 as a general unsecured claim. Debtor proposes to

---

[1] Debtor has a pending motion to avoid Belgium's Lien per 11 U.S.C. Section 522(f) which is set for a hearing on March 23, 2023 concurrently with Belgium's Motion Objecting to Debtor's Claimed Homestead Exemption. The value of $250,521.85 is computed by deducting the balance owed to Freedom Mortgage from the value of the Property ($1,120,000.00 which Belgium did not dispute

DEBTOR'S DISCLOSURE STATEMENT DESCRIBING CHAPTER 11 PLAN OF REORGANIZATION

pay Belgium's $250,521.85 secured claim over 60 months from the effective date at 10% interest, by offering monthly payments of $5,322.85, with the first payment of $5,322.85 due on the effective date, followed by 59 consecutive payments thereafter, each in the amount of $5,322.85, until the secured claim is paid in full.

**CLASS 1(C)**

**Claim/Collateral:** TD Bank, N.A., successor in interest to TD Auto Finance LLC ("TD Bank") holds a claim secured by Debtor's 2016 Mercedes C300 for $6,732.97 [POC #2]. POC #2 reflects $6,392.74 in pre-petition arrears.

**Impaired/Not Impaired:** Impaired.

**Treatment:** Debtor entered into a Stipulation with TD Bank for Resolution of Motion for Relief From the Automatic Stay, For Maintenance of Adequate Protection Payments and For Resolution of Claim Treatment Issues ("TD Stipulation") [docket no.: 49], and order approving TD Stipulation [docket no.: 50]. A true and correct copies of the TD Stipulation and order approving TD Stipulation are attached hereto as **Exhibit-F**, and the terms of the TD Stipulation are incorporated herein by this reference. Pursuant to TD Stipulation, Debtor shall pay TD Bank the secured claim of $6,732.97 at 8.25% interest rate. Debtor shall make monthly pre-confirmation adequate protection payments and post-confirmation plan payments to TD Bank in the amount of $211.76 commencing November 15, 2022 and continuing on the 9th day of each month thereafter until the secured claim is paid in full.

**SECURED CLAIMS WHICH ARE FULLY UNDERSECURED AND TREATED IN CLASS 2 AS GENERAL UNSECURED CLAIMS**

1. **The Townes at Central Park West Assn** ("Townes") filed a claim secured by Debtor's Property in the amount of $7,276.60 [POC #3], which claim arises from February 4, 2022 judgment with the abstract of judgment recorded on February 9, 2022. Since Townes'

---

and in fact used in its proof of claim #9) less the Debtor's homestead exemption, which reduced Belgium's lien to $250,521.85. The Property has two additional junior liens, The Townes at Central Park West Assn [POC #3] and Central Park West Community Association [POC #6], both of which are being avoided through the plan as they are junior to Belgium's claim and are fully undersecured.

DEBTOR'S DISCLOSURE STATEMENT DESCRIBING CHAPTER 11 PLAN OF REORGANIZATION

claim is junior to Belgium's abstract of judgment which was recorded on November 9, 2020, it is fully undersecured, is avoided through Debtor's Plan, and treated in Class 2 as a general unsecured claim.

2. **Central Park West Community Association** ("Central Park") filed a claim secured by Debtor's Property in the amount of $2,878.93 [POC #6], which claim arises from a notice of delinquent assessment which was recorded on May 16, 2022. Since Central Park's claim is junior to Belgium's abstract of judgment which was recorded on November 9, 2020, it is fully undersecured, is avoided through Debtor's Plan, and treated in Class 2 as a general unsecured claim.

## Class 2 - General Unsecured Claims

**Claim:**

General unsecured claims are unsecured claims not entitled to priority under Code §507(a). In the present case, the Debtor estimates that there are approximately $5,209,476.19 in general unsecured debts. **See Exhibit B-3 for details regarding the treatment of each creditor's claim.** General unsecured claims classified in **Class 2** will receive a total of approximately 1.25%[2] of their claims in monthly payments over 60 months.

**Impaired/Not Impaired:** Impaired.

**Treatment**: Holders of General Unsecured Claims will receive their pro-rata share of $1,085.56 per month for 60 months for a total of $65,133.76. The first payment of $1,085.56 will be due on the Effective Date, followed by 59 consecutive monthly payments thereafter, with each payment due by the first of the month.

### D. MEANS OF PERFORMING THE PLAN

i.   *Funding for the Plan*

---

[2] See the Absolute Priority Rule section for further analysis re New Value Contribution and Exhibit-E (liquidation analysis).

17

DEBTOR'S DISCLOSURE STATEMENT DESCRIBING CHAPTER 11 PLAN OF REORGANIZATION

# EXHIBIT "3"

30-2020-01148745-CU-EN-CJC - ROA # 16 - DAVID H. YAMASAKI, Clerk of the Court By Arlene Gill, Deputy Clerk.

320

**EJ-001**

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, address, and State Bar number)*:
After recording, return to:
Patrick Miller (Cal Bar No 301819)
285 E California, Unit 201
Pasadena, CA, 91106

TEL NO.: FAX NO. (optional):

E-MAIL ADDRESS *(Optional)*: patrick.miller@pmillerlegal.com

[ X ] ATTORNEY  [ X ] JUDGMENT  [ ] ASSIGNEE
FOR  CREDITOR  OF RECORD

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Orange

STREET ADDRESS: 700 Civic Center Dr West

MAILING ADDRESS:

CITY AND ZIP CODE: Santa Ana, CA 92701

BRANCH NAME: Unlimited Civil

Recorded in Official Records, Orange County
Hugh Nguyen, Clerk-Recorder

| | | |
|||||||||||||| 98.00
* $ R 0 0 1 2 2 2 4 5 5 8 8 *
**2020000643121** 10:39 am 11/09/20
**320 RW1A A03    2**
0.00 0.00 0.00 0.00 3.00 10.00 0.000.0075.00 3.00

*FOR RECORDER'S USE ONLY*

PLAINTIFF: Belgium Investments 960 Bay Dr, LLC, a California Corp.

DEFENDANT: Bassem Essam El Mallakh

CASE NUMBER:
30-2020-01148745-CU-EN-CJC

1T
2P
SB
FF
1D

**ABSTRACT OF JUDGMENT—CIVIL
AND SMALL CLAIMS**  [ ] Amended

*FOR COURT USE ONLY*

Pursuant to California Government
Code § 68150(f), the Clerk of the
Court hereby certifies this document
accurately reflects the official court
record. The electronic signature and
seal on this document have the
same validity and legal force and
effect as an original clerk's
signature and court seal. California
Government Code § 68150(g).

1. The [ X ] judgment creditor  [ ] assignee of record
   applies for an abstract of judgment and represents the following:
   a. Judgment debtor's
   Name and last known address

   Bassem Essam El Mallakh, 116 Rockefeller Irvine, CA,
   92612

   b. Driver's license no. [last 4 digits] and state:  [ X ] Unknown
   c. Social security no. [last 4 digits]:  [ X ] Unknown
   d. Summons or notice of entry of sister-state judgment was personally served or mailed to *(name and address)*:

   Bassem Essam El Mallakh, 116 Rockefeller Irvine, CA, 92612 (through substituted service on Ms Reem Hanna)

2. [ ] Information on additional judgment debtors is
   shown on page 2.

3. Judgment creditor *(name and address)*:
   Belgium Investments 960 Bay Dr, LLC, a California
   Corporation
   960 Bay Drive, Miami, FL, 33141

   Date: October 29, 2020
   Patrick Miller
   _____
   (TYPE OR PRINT NAME)

4. [ ] Information on additional judgment creditors is
   shown on page 2.

5. [ ] Original abstract recorded in this county:
   a. Date:
   b. Instrument No.:

   _____
   (SIGNATURE OF APPLICANT OR ATTORNEY)

6. Total amount of judgment as entered or last renewed:
   $ 4,345,250

7. All judgment creditors and debtors are listed on this abstract.

8. a. Judgment entered on *(date)*:  6/18/20
   b. Renewal entered on *(date)*:

9. [ ] This judgment is an installment judgment.

10. [ ] An [ ] execution lien [ ] attachment lien
    is endorsed on the judgment as follows:
    a. Amount: $
    b. In favor of *(name and address)*:

11. A stay of enforcement has
    a. [ X ] not been ordered by the court.
    b. [ ] been ordered by the court effective until
       *(date)*:

12. a. [ X ] I certify that this is a true and correct abstract of
       the judgment entered in this action.
    b. [ ] A certified copy of the judgment is attached.

[SEAL]

David H. Yamasaki, Clerk of the Court

This abstract issued on *(date)*:
11/06/2020

Clerk, by  A. Gill  , Deputy

Form Adopted for Mandatory Use
Judicial Council of California
EJ-001 [Rev. July 1, 2014]

**ABSTRACT OF JUDGMENT—CIVIL
AND SMALL CLAIMS**

Page 1 of 2
Code of Civil Procedure, §§ 488.480,
674, 700.190

| PLAINTIFF:  Belgium Investments 960 Bay Dr, LLC, a California Corp. | COURT CASE NO.: |
|---|---|
| DEFENDANT:  Bassem Essam El Mallakh | 30-2020-01148745-CU-EN-CJC |

NAMES AND ADDRESSES OF ADDITIONAL JUDGMENT CREDITORS:

13. Judgment creditor *(name and address)*:

14. Judgment creditor *(name and address)*:

15. ☐ Continued on Attachment 15.

INFORMATION ON ADDITIONAL JUDGMENT DEBTORS:

16. Name and last known address

Driver's license no. [last 4 digits] and state:
☐ Unknown

Social security no. [last 4 digits]:
☐ Unknown

Summons was personally served at or mailed to *(address)*:

17. Name and last known address

Driver's license no. [last 4 digits] and state:
☐ Unknown

Social security no. [last 4 digits]:
☐ Unknown

Summons was personally served at or mailed to *(address)*:

18. Name and last known address

Driver's license no. [last 4 digits] and state:
☐ Unknown

Social security no. [last 4 digits]:
☐ Unknown

Summons was personally served at or mailed to *(address)*:

19. Name and last known address

Driver's license no. [last 4 digits] and state:
☐ Unknown

Social security no. [last 4 digits]:
☐ Unknown

Summons was personally served at or mailed to *(address)*:

20. ☐ Continued on Attachment 20.

EJ-001 [Rev. July 1, 2014]

**ABSTRACT OF JUDGMENT—CIVIL
AND SMALL CLAIMS**

Page 2 of 2

**EXHIBIT "4"**

PATRICK MILLER
Email: Patrick.miller@impactadvocateslaw.com
Impact Advocates APC
121 S Oak Ave
Pasadena, CA 91107
Telephone:    213-364-7581


Attorney for Judgement Creditor
BELGIUM INVESTMENTS 960 BAY DR,
LLC A CALIFORNIA CORP.


## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re Bassem Victor El Mallakh | Case No 8:22-bk-11605-TA<br>Chapter 7 |
| | **MOTION FOR RELIEF FROM AUTOMATIC STAY OF ENFORCEMENT** |
| | **Date**: 6 June 2023<br>**Time**: 10:30am |

**TO THE HONORABLE THEODOR ALBERT, UNITED STATES**

**BANKRUPTCY JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE, THE**

**DEBTOR AND HIS ATTORNEYS OF RECORD, AND ALL PARTIES IN INTEREST:**

Creditor, Belgium Investments 960 Bay Dr, LLC, a California Corp. ("**Belgium**"), herein

sets out its MOTION FOR RELIEF FROM AUTOMATIC STAY OF ENFORCEMENT. The

bases for the relief requested are set out in the attached Memorandum of Points & Authorities.

Dated:         12 May 2023                                    Impact Advocates APC


By_____
Patrick Miller
Attorney for Belgium Investments

1

**POINTS & AUTHORITIES**

2

**I.  Introduction.**

3

This Motion details why Belgium should be granted a relief from the automatic stay so

4

that it may enforce the Court Order for Sale of the property located at 116 Rockefeller Dr, Irvine,

5

CA, 92612 (the "**Rockefeller Property**"). Relief should be granted for cause under 11 USC

6

Section 362(d) because Debtor has continually failed to prosecute his bankruptcy in a timely

7

8

manner. Furthermore, enforcing the Sale Order will not prejudice any other creditors in this case

9

because Belgium has a secured interest over the entire value of the Rockefeller Property other

10

than the interest held by Debtor's mortgage company (which will not be impaired by the sale).

11

**II.  Factual Background**

12

Belgium was awarded a judgement of $4,255,000 in February 2020. It began its

13

14

enforcement efforts in California in June 2020.

15

After successfully arguing against Debtor's spurious attempts to claim he was not served

16

in the underlying action, Belgium received an Order for Sale of the Rockefeller Property on 10

17

May 2022 (the "**Order for Sale**"). Importantly, Debtor repeatedly claimed that he had not

18

resided in the Rockefeller Property for several years. As such, the Order for Sale specifically

19

20

stated that "*the property is not subject to any homestead exemption*" and that the sale was to

21

proceed under the statutory scheme which does not incorporate the homestead exemption.

22

In July 2022, Debtor filed an initial Ch 13 bankruptcy case on the eve of the first

23

scheduled Sheriff's sale. Debtor voluntarily withdrew its filing two weeks later because he was

24

clearly above the liability threshold for Ch 13.

25

On 19 September 2022, Debtor filed a second bankruptcy case under Ch 11 again on the

26

eve of a Sheriff's sale [see Docket #1]. Belgium immediately resisted the filing under Ch 11 and

27

Debtor's motion to extend the automatic stay indefinitely [see eg Docket #25].

28

On 25 October 2022, the Court ordered that the automatic stay should continue [Docket #35]. Although the Court noted during the hearing its hope that Debtor would make progress on its bankruptcy case quickly, particularly given the tenuous nature of its filing under Ch 11.

Belgium objected to Debtor's claimed homestead exemption over the Rockefeller Property and a hearing was held on this objection on 11 January 2023 [see Docket #s 55 & 84]. Debtor filed a one-page Declaration in support of its homestead exemption and the Court ruled that a full evidentiary hearing must be held in order to properly determine the factual issues (the "**homestead evidentiary hearing**") [see Docket #s 91-92]. The homestead evidentiary hearing was initially scheduled for 8 March 2022.

Thereafter, we understand that Debtor was refusing to cooperate with his Ch 11 counsel which resulted in Debtor's counsel's first motion to withdraw, which it filed on 8 February 2023 [Docket #102]. Given the impending withdrawal of counsel and the need to obtain alternate counsel, Debtor was granted a two week extension to file its Ch 11 plan [Docket #118].

This extension turned out to be wholly-unnecessary, however, because: (a) Debtor's Ch 11 counsel remained on; and (b) Debtor's "reorganization plan" consisted of nothing more than gratuitous promises to make unlimited payments from Debtor's family and no details as to how it might actually be feasible. Nonetheless, the extension had already been granted.

On 15 March 2023, a day after the "reorganization plan" was submitted, Debtor's counsel requested a further delay of two weeks before the Court would consider the pending motions to dismiss or convert which were filed by both the US Trustee and Belgium. This further extension was granted and the hearing on the dismissal/conversion motions—as well as the homestead evidentiary hearing—were continued to 30 March 2023 [Docket # 144-145].

On 30 March 2023, this Court ruled that the case should be converted to Chapter 7. Given the conversion, this Court also ruled that the homestead evidentiary hearing should be continued to 8 June 2023 [Docket #s 155-160].

1

2   On 7 April 2023, Debtor's Ch 11 counsel filed its second motion to withdraw [Docket

3   #167].

4   On 27 April 2023, a 341 creditor meeting was postponed because Debtor failed to

5   provide the requisite documents to the Ch 7 trustee [Docket #171].

6   On 5 May 2023, Debtor's Ch 11 counsel withdrew from the case [Docket #173].

7   On 11 May 2023, a second 341 creditor meeting was held where the Debtor indicated he

8   was hoping to obtain new counsel. Debtor mentioned that he may engage his previous Ch 13

9   counsel (who filed Debtor under Ch 13 despite him being well above the liabilities limit).

10  Despite Debtor's previous counsel having filed its motion to withdraw over five weeks ago,

11  Debtor indicated that he would not be able to confirm who his new counsel might be until at best

12  15 May 2023. He also noted that his new counsel may request a further continuance of the

13  homestead evidentiary hearing.

14

15  **III. Belgium should be granted relief from the automatic stay for cause pursuant to 11
    USC Section 362(d).**

16

17  Debtor's continued failure to take the steps necessary to properly prosecute his

18  bankruptcy action creates sufficient cause for granting relief from the automatic stay of

19  enforcement.

20  The above factual background describes a number of instances where Debtor's failure to

21  properly prosecute his bankruptcy has caused unreasonable delay and obstruction. It is likely that

22  Debtor will request this Court to delay the homestead evidentiary hearing once again. He is

23  refusing to cooperate with his previous counsel and to take adequate steps to obtain new counsel.

24  He is also failing to provide documents requested of him by the Ch 7 trustee in a timely manner.

25  Belgium should no longer be forced to absorb Debtor's obstruction and delay. It should

26  be allowed to proceed with enforcing the Order for Sale which it received over one year ago.

27

28

1

2

**IV. Granting Belgium relief from the automatic stay will not prejudice other creditors.**

3

4

11 USC Section 362(d)(2) allows for relief from stay where: "*(A) the debtor does not*

5

*have an equity in such property; and (B)such property is not necessary to an effective*

6

*reorganization*". As reflected at page 8 of Debtor's Disclosure Statement: (i) the Rockefeller

7

Property is valued at $1,120,000; (ii) Freedom Mortgage Corporation holds a first priority

8

secured claim amounting to $243,078.45 over the property; and (iii) Belgium has the next

9

highest priority secured claim amounting to $5,436,919.76 [see Docket #143].

10

Therefore, there is no further remaining equity in the property. Additionally, this property

11

is not necessary to an effective reorganization since this case was converted to Ch 7.

12

Superior lienholders, ie the mortgage holder, will not be impaired by the sheriff's sale

13

14

because the Order for Sale requires the property to be "*sold in the manner provided for under*

15

*Code of Civil Procedures Sections 701.510-701.680*" [see Exhibit 1]. This Section confirms that

16

superior lienholders will not be impaired by the sale, ie the purchaser at the sheriff's sale will

17

take the Rockefeller Property subject to the mortgage holder's lien. In fact, the mortgage holder

18

19

would arguably be in better position once the sale is completed and a reliable, paying owner can

20

be found for the Rockefeller Property.

21

Debtor might argue that Belgium should continue waiting indefinitely until the

22

homestead evidentiary hearing takes place. However, it is unfair to continue obstructing

23

Belgium's enforcement when Debtor has consistently failed to prosecute his bankruptcy.

24

It is particularly unjust to continue forcing Belgium to wait when Debtor's entitlement to

25

a homestead exemption was already the subject of adjudication wherein the Orange County

26

Superior Court specifically found that Debtor was not eligible to claim a homestead exemption.

27

This was because Debtor testified on numerous occasions that he had not resided in the

28

Rockefeller Property for several years in order to incredulously claim that he did not have notice

MOTION FOR RELIEF FROM AUTOMATIC STAY OF ENFORCEMENT
Page 5

of the underlying proceedings. Debtor is now contradicting his earlier testimony by claiming he has resided there continuously since 2013—and this contradictory testimony has formed the basis of Belgium's independent motion for sanctions due to perjury [see Docket #154].

Debtor chose to testify that he did not reside in Rockefeller—which is reflected in Belgium's Order for Sale. Debtor's dubious attempts to unwind his previous perjury—and/or commit further perjury in this case—should not provide the basis for any further delay. As a reminder, the genesis of Belgium's original judgement was Debtor's fraud and misconduct. It should not be delayed from obtaining redress any further.

## V.  Conclusion.

Belgium respectfully requests an order that lifts the automatic stay and specifically allows it to enforce the Order for Sale against the Rockefeller Property. It also requests any further relief which the Court deems may be just and proper.


Dated:         12 May 2023                              Impact Advocates APC


                                                        By_____
                                                        Patrick Miller
                                                        Attorney for Belgium Investments

PROOF OF ELECTRONIC SERVICE

I am employed in the County of LOS ANGELES, State of California. I am over the age of 18 and not a party to the within action. My business address is 121 S Oak Ave, Pasadena, CA 91107.

A true and correct copy of the foregoing described as **MOTION FOR RELIEF FROM AUTOMATIC STAY OF ENFORCEMENT** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d) (through electronic filing); **(b)** on the Debtor through mailing at his address at 116 Rockefeller, Irvine, CA, 92612; and **(c)** in the manner stated below:

**TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:
Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On 5/11/23, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

Michael Jay Berger on behalf of Debtor Bassem Victor El Mallakh
michael.berger@bankruptcypower.com,
yathida.nipha@bankruptcypower.com;michael.berger@ecf.inforuptcy.com

Chad L Butler on behalf of Interested Party Courtesy NEF
caecf@tblaw.com

Nancy S Goldenberg on behalf of U.S. Trustee United States Trustee (SA)
nancy.goldenberg@usdoj.gov

Benjamin Heston on behalf of Interested Party Benjamin Heston

bhestonecf@gmail.com,

benheston@recap.email,NexusBankruptcy@jubileebk.net


Patrick Miller on behalf of Creditor Belgium Investments 960 Bay Dr,

LLC A California Corp.

patrick.miller@impactadvocateslaw.com


Randall P Mroczynski on behalf of Creditor TD Bank, N.A., successor in

interest to TD Auto Finance LLC

randym@cookseylaw.com


United States Trustee (SA)

ustpregion16.sa.ecf@usdoj.gov


Weneta M.A. Kosmala (TR)

c/o Law Offices of Weneta M.A. Kosmala

ecf.alert+Kosmala@titlexi.com

(Trustee)


I declare under penalty of perjury under the laws of the State of California that the above is true
and correct.

Executed on this 5/12/2022, at Pasadena, California.

Patrick Miller

1
2
Patrick Miller, Esq., SBN 301819
Impact Advocates APC
121 S. Oak Ave.
Pasadena, CA 91107
213-364-7581
Patrick.miller@impactadvocateslaw.com

3
4
5
Attorney for the Creditor
Belgium Investments 960 Bay Dr,
LLC, a California Corp

6
7
8                    **UNITED STATES BANKRUPTCY COURT**

9                    **CENTRAL DISTRICT OF CALIFORNIA**

10                                              )  Case No.: 8:22-bk-11605-TA
11                                              )  Ch 7
                                                )
12                                              )  **DECLARATION OF PATRICK MILLER**
                                                )  **IN SUPPORT OF THE MOTION FOR**
13   IN RE BASSEM VICTOR EL MALLAKH             )  **RELIEF FROM AUTOMATIC STAY OF**
                                                )  **ENFORCEMENT**
14                                              )
15                                              )  _____
                                                )
16                                              )  **Hearing Date:  16 June 2023**
                                                )  **Hearing Time: 10:30 AM**
17                                              )
18                                              )
                                                )
19                                              )

20                                **DECLARATION**

21   1.  I, Patrick Miller, am counsel for the Creditor Belgium Investments 960 Bay Dr, LLC, a
22       California Corp. ("**Belgium**"). I have read the Motion for relief from automatic stay of
23       enforcement and know the contents thereof. The same is true of my own knowledge,
24       except as those matters that are stated on information and belief, and as to these matters,
25       I believe them to be true.
26   2.  I am over the age of 18 years and am fully familiar with the facts and circumstances
27       surrounding my declaration and could and would competently testify thereto if called
28       upon to do so.

_____

DECLARATION OF PATRICK MILLER

3. I was engaged as counsel for the Defendant in April 2020 in order to enforce the judgement obtained in the Florida courts against the Debtor, Bassem Essam Victor El Mallakh.

4. I attended a Section 341 creditors meeting organized by the Ch 7 Trustee Weneta Kosmala on 11 May 2023.

5. During this meeting, the Debtor gave a number of answers in response to questions posed by myself and Ms Kosmala. In response to our questions, Debtor indicated and/or stated that:

    a. he was hoping to obtain new counsel;

    b. he may engage his previous Ch 13 counsel (Ben Heston);

    c. he would not be able to confirm who his new counsel might be until at least 15 May 2023 because his previous Ch 13 counsel would not be confirming his engagement until that date;

    d. he would consider finding alternative counsel if Mr Heston counsel did not agree to take the engagement; and

    e. he and/or his new counsel may request a further continuance of the homestead evidentiary hearing.

6. I also attended what was scheduled to be a 341 creditors meeting organized by Ms Kosmala on 27 April 2023. However, I remember Ms Kosmala explaining that the meeting must be postponed because Debtor failed to provide the requisite documents in advance of the meeting.

7. I declare under penalty of perjury that the foregoing is true and correct.

Date: 5/12/23

_____

Patrick Miller

2

1

2

3

4

5

6

Patrick Miller, Esq., SBN 301819
Impact Advocates APC
121 S. Oak Ave.
Pasadena, CA 91107
213-364-7581
Patrick.miller@impactadvocateslaw.com

Attorney for the Creditor
Belgium Investments 960 Bay Dr,
LLC, a California Corp

7

8

9

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

10

11

12

13

14

15

16

17

18

19

IN RE BASSEM VICTOR EL MALLAKH

)  Case No.: 8:22-bk-11605-TA
)  Ch 7
)
)  **DECLARATION OF PATRICK MILLER**
)  **IN SUPPORT OF THE MOTION FOR**
)  **RELIEF FROM AUTOMATIC STAY OF**
)  **ENFORCEMENT**
)
)  _____
)
)  **Hearing Date:  27 June 2023**
)  **Hearing Time: 10:30 AM**
)
)
)
)

20

21

22

23

24

25

26

27

28

DECLARATION

1.  I, Patrick Miller, am counsel for the Creditor Belgium Investments 960 Bay Dr, LLC, a
    California Corp. ("**Belgium**"). I have read the Motion for relief from automatic stay of
    enforcement and know the contents thereof. The same is true of my own knowledge,
    except as those matters that are stated on information and belief, and as to these matters,
    I believe them to be true.

2.  I am over the age of 18 years and am fully familiar with the facts and circumstances
    surrounding my declaration and could and would competently testify thereto if called
    upon to do so.

1

2

3.  I was engaged as counsel for the Defendant in April 2020 in order to enforce the judgement obtained in the Florida courts against the Debtor, Bassem Essam Victor El Mallakh.

4.  I have attached true and accurate copies of the deed of trust for the Debtor's property in Irvine and an abstract of judgement relating to my client's claim against Debtor—these can be found at Exhibits 1 & 3, respectively, to the Motion for relief from stay of enforcement filed on 31 May 2023.

5.  I have also attached extracts from Debtor's Financial Statement which he filed in connection with his Ch 11 action—this can be found at Exhibit 2 to the Motion for relief from stay of enforcement.

6.  I declare under penalty of perjury that the foregoing is true and correct.


Date: 5/31/23

_____

Patrick Miller

2

**SUBS**

**7**

PATRICK MILLER
Email: Patrick.miller@impactadvocateslaw.com
Impact Advocates APC
121 S Oak Ave
Pasadena, CA 91107
Telephone:    213-364-7581


Attorney for Judgement Creditor
BELGIUM INVESTMENTS 960 BAY DR,
LLC A CALIFORNIA CORP.


UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re Bassem Victor El Mallakh | Case No 8:22-bk-11605-TA<br>Chapter 7<br><br>**NOTICE OF MOTION &<br>MOTION FOR DISMISSAL**<br><br>**Date**: 27 June 2023<br>**Time**: 11:00am |

**TO THE HONORABLE THEODOR ALBERT, UNITED STATES**

**BANKRUPTCY JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE, THE**

**DEBTOR AND HIS ATTORNEYS OF RECORD, AND ALL PARTIES IN INTEREST:**

**PLEASE TAKE NOTICE** that on 27 June 2023 at 11:00 am, or as soon thereafter as the

Court may hear the matter, in Courtroom 5B (or via Zoom) of the United States Bankruptcy

Court located at 411 West Fourth Street, Santa Ana, CA 92701, the Court will conduct a hearing

on the **MOTION FOR DISMISSAL** filed by the Creditor Belgium Investments 960 Bay Dr,

LLC, a California Corp. ("**Belgium**")

The grounds for the relief requested in the Motion for Dismissal are that there is cause

for dismissal because the present action was filed in bad faith and dismissal is in the best interest

of the creditors.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

This Motion for Dismissal is based on this Notice, the accompanying Memorandum of Points and Authorities, all pleadings on file in this case, all other matters of which this Court may take judicial notice pursuant to Rule 201 of the Federal Rules of Evidence, and such other arguments and/or evidence as may be presented at or prior to the hearing on the Motion.

**PLEASE TAKE FURTHER NOTICE** that any response/opposition to the Motion for Dismissal must be in writing, filed with the Court, and served on counsel for Belgium at the address listed above, at least 14 days prior to the hearing date of 27 June 2023.

**PLEASE TAKE FURTHER NOTICE** that the failure to respond in writing by the above referenced deadline may be deemed by the Court to be a lack of opposition to the relief requested in the Motion for Dismissal.


Dated:        5 June 2023                                    Impact Advocates APC


                                                            By_____
                                                            Patrick Miller
                                                            Attorney for Belgium Investments

| Attorney or Party Name, Address, Telephone & FAX Nos., State Bar No. & Email Address | FOR COURT USE ONLY |
|---|---|
| PATRICK MILLER<br>Email: Patrick.miller@impactadvocateslaw.com<br>Impact Advocates APC<br>121 S Oak Ave<br>Pasadena, CA 91107<br>Telephone:    213-364-7581<br><br>Attorney for Judgment Creditor and Movant<br><br>☐ **Attorney for Movant**<br>☐ *Movant appearing without an attorney* | |

<div align="center">

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA -Central DIVISION**

</div>

| In re: El Mallakh | CASE NO.: 8:22-bk-11605-TA |
|---|---|
| | CHAPTER:  7 |
| | **SUPPLEMENTAL NOTICE OF HEARING TO BE HELD REMOTELY USING ZOOMGOV AUDIO AND VIDEO** |
| Debtor(s) | HEARING DATE:  27 June 2023<br>HEARING TIME: 11:00am |

**Movant:**

1. The Movant has filed the following written notice or other pleading ("Notice") advising of a hearing to be held in the above-captioned case, on the date and time indicated above, before the Honorable Martin R. Barash, United States Bankruptcy Judge *(insert name of pleading and, if available, docket number):*

   **MOTION FOR DISMISSAL**

2. Notwithstanding any language in the Notice advising or suggesting that the hearing will be held physically in one of the Court's courtrooms, **please be advised that due to the COVID-19 pandemic, the Court will conduct the hearing remotely, using ZoomGov audio and video technology**.  Individuals will not be permitted access to the courtroom.  Information on how to participate in the hearing remotely using ZoomGov is provided on the following page of this notice.

3.  Hearing participants and members of the public may participate in and/or observe the hearing using ZoomGov, free of charge.

4.  Individuals may connect by ZoomGov audio and video using a personal computer (equipped with camera, microphone and speaker), or a handheld mobile device with an integrated camera, microphone and speaker (such as an iPhone, iPad, Android phone or Android tablet).  The connection can be initiated by entering the "Meeting URL" into a web browser on any of these devices, provided the device is connected to the Internet.  Individuals connecting in this manner will be prompted for the Meeting ID and Password shown below.

5.  Individuals also may connect to the hearing by telephone only, using the telephone number provided below.  Individuals connecting in this manner also will be prompted for the Meeting ID and Password.

6.  Neither a Zoom nor a ZoomGov account is necessary to participate in or observe the hearing, and no pre-registration is required.

7.  The audio portion of the hearing will be recorded electronically by the Court and constitute its official record.

8.  All persons are strictly prohibited from making any other recording of court proceedings, whether by video, audio, "screenshot," or otherwise. Violation of this prohibition may result in the imposition of monetary and non-monetary sanctions.

9.  The following is the unique ZoomGov connection information for the above-referenced hearing:

    Meeting URL:
    https://cacb.zoomgov.com/j/1611571786
    Meeting ID:     161 157 1786
    Password:       692831
    Telephone:      1 (669) 254 5252 or 1
    (646) 828 7666


10. More information on using ZoomGov to participate in this hearing is available on the Court's website at the following web address:  https://www.cacb.uscourts.gov/news/zoom-video-hearing-guide-participants.


Date:  6/5/23                           Impact Advocates APC
                                        _____
                                        Printed name of law firm (if applicable)


                                        Patrick Miller Attorney for Creditor Movant
                                        _____
                                        Printed name of individual Movant or attorney for Movant

**POINTS & AUTHORITIES**

### I.  Introduction.

This Motion incorporates by reference the relevant points from Belgium's previous

Motion for Dismissal and/or Conversion to Ch 7, which was filed on 30 November 2023 [Docket

#63] and the Reply to the same [Docket #78].

Belgium has consistently argued that this bankruptcy action was filed in bad faith by the

Debtor in order to obstruct Belgium's enforcement efforts. This has been apparent by reference

to most of the indicators of bad faith in bankruptcy caselaw, particularly the fact that this is

essentially a two-party dispute where there is one main secured creditor enforcing its secured

claim against the Debtor's one asset.

While there may have been doubts as to Debtor's intentions throughout these

proceedings, the most recent events in this case have left no room for doubt. These recent events

are: (a) Debtor's refusal to cooperate with previous counsel (or appoint new counsel); and (b) the

Ch 7 Trustee's confirmation that Debtor has no assets to distribute to unsecured creditors.

As it is now clear that this case was filed in bad faith, sufficient cause exists for dismissal

under 11 U.S.C. §707. If dismissal is granted, Belgium respectfully requests that the dismissal

order include a bar against refiling for at least 180 days. Belgium believes this bar is warranted

under the circumstances. If no dismissal is granted, this Court may still grant Belgium's separate

motion for relief from the stay of enforcement, which is also scheduled to be heard on the same

date as the present motion for dismissal.

### II.  Factual Background

Belgium was awarded a judgement of $4,255,000 in February 2020. It began its

enforcement efforts in California in June 2020.

After successfully arguing against Debtor's spurious attempts to claim he was not served

in the underlying action, Belgium received an Order for Sale of the Rockefeller Property on 10

May 2022 (the "**Order for Sale**"). Importantly, Debtor repeatedly claimed that he had not resided in the Rockefeller Property for several years. As such, the Order for Sale specifically stated that "*the property is not subject to any homestead exemption*" and that the sale was to proceed under the statutory scheme which does not incorporate the homestead exemption.

In July 2022, Debtor filed an initial Ch 13 bankruptcy case on the eve of the first scheduled Sheriff's sale. Debtor voluntarily withdrew its filing two weeks later because he was clearly above the liability threshold for Ch 13 given Belgium's judgement (of which Debtor was fully aware).

On 19 September 2022, Debtor filed a second bankruptcy case under Ch 11 again on the eve of a Sheriff's sale [see Docket #1]. Belgium immediately resisted the filing under Ch 11 and Debtor's motion to extend the automatic stay indefinitely [see eg Docket #25].

On 25 October 2022, the Court ordered that the automatic stay should continue [Docket #35]. Although the Court noted during the hearing its hope that Debtor would make progress on its bankruptcy case quickly, particularly given the tenuous nature of its filing under Ch 11.

Belgium filed its previous Motion to Dismiss and/or Convert this case to Ch 7 on 30 November 2022 after it became clear that Debtor was not making any progress [Docket #63].

Belgium also objected to Debtor's claimed homestead exemption over the Rockefeller Property and a hearing was held on this objection on 11 January 2023 [see Docket #s 55 & 84]. Debtor filed a one-page Declaration in support of its homestead exemption and the Court ruled that a full evidentiary hearing must be held in order to properly determine the factual issues (the "**homestead evidentiary hearing**") [see Docket #s 91-92]. The homestead evidentiary hearing was initially scheduled for 8 March 2022.

Thereafter, we understand that Debtor was refusing to cooperate with his Ch 11 counsel which resulted in Debtor's counsel's first motion to withdraw, which it filed on 8 February 2023

Case 8:22-bk-11605-TA    Doc 254    Filed 08/10/23    Entered 08/10/23 21:07:20    Desc
Main Document    Page 690 of 872

[Docket #102]. Given the impending withdrawal of counsel and the need to obtain alternate counsel, Debtor was granted a two-week extension to file its Ch 11 plan [Docket #118].

This extension turned out to be wholly-unnecessary, however, because: (a) Debtor's Ch 11 counsel remained on; and (b) Debtor's "reorganization plan" consisted of nothing more than gratuitous promises to make unlimited payments from Debtor's family and no details as to how it might actually be feasible. Nonetheless, the extension had already been granted.

On 15 March 2023, a day after the "reorganization plan" was submitted, Debtor's counsel requested a further delay of two weeks before the Court would consider the pending motions to dismiss or convert which were filed by both the US Trustee and Belgium. This further extension was granted and the hearing on the dismissal/conversion motions—as well as the homestead evidentiary hearing—were continued to 30 March 2023 [Docket # 144-145].

On 30 March 2023, this Court ruled that the case should be converted to Chapter 7. Given the conversion, this Court also ruled that the homestead evidentiary hearing should be continued to 8 June 2023 [Docket #s 155-160].

On 7 April 2023, Debtor's Ch 11 counsel filed its second motion to withdraw [Docket #167]. On 27 April 2023, a 341 creditor meeting was postponed because Debtor failed to provide the requisite documents to the Ch 7 trustee [Docket #171]. On 5 May 2023, Debtor's Ch 11 counsel withdrew from the case [Docket #173].

On 11 May 2023, a second 341 creditor meeting was held where the Debtor indicated he was hoping to obtain new counsel. Debtor mentioned that he may engage his previous Ch 13 counsel (who filed Debtor under Ch 13 despite him being well above the liabilities limit). Despite Debtor's previous counsel having filed its motion to withdraw nearly two months ago, no new counsel has yet appeared in this case.

On 1 June 2023, Belgium filed a form motion requesting relief from the automatic stay of enforcement. Later that same day, Trustee Weneta Kosmala filed a Chapter 7 Trustee's Report of

MOTION FOR DISMISSAL
Page 5

No Distribution because it is now apparent that Debtor has no assets to distribute to unsecured creditors.

Belgium would be happy to re-commence enforcement against the Rockefeller Property if it is granted relief from the stay of enforcement. Nonetheless, now that the Trustee has confirmed there are no assets to distribute, Belgium believes this now elucidates the bad faith character of Debtor's filing and why dismissal is appropriate. As such, Belgium has also filed the present motion to be heard on the same date as the motion for relief from stay. Belgium hopes that this provides the Court with sufficient latitude to issue a ruling which is in the best interest of the parties and equity in general.

### III. Recent developments confirm this case was filed in bad faith.

As detailed at Sec III of Belgium's previous motion to dismiss, this case includes many of the indicia of bad faith which courts have relied upon when considering dismissal for cause[1].

Belgium does not wish to recapitulate every instance of Debtor's behavior which evidences his bad faith. Although Belgium would be remiss if it failed to mention: (i) the egregious inaccuracy in Debtor's Ch 13 Schedules which failed to acknowledge Belgium's claim (and thus allowed him to incorrectly file under Ch 13); (ii) Debtor's refusal to properly participate in this case through his repeated failures to cooperate with counsel or instruct witnesses to attend depositions; and (iii) Debtor's admitted perjury which forms the basis for his incredulous claim of a homestead exemption.

Since the outset, Belgium has contended that this is essentially a two-party dispute where one creditor is seeking to enforce its secured interest against the Debtor's one asset. Debtor seemed to indicate that there were other relevant creditors or other relevant assets in his estate. But these claims were themselves completely bad faith.

---

[1] Belgium notes that some of the points raised in its previous Motion to dismiss would only be relevant in the context of a Ch 11 case. Nonetheless, the key indicia of bad faith continue to be relevant in the present Ch 7 action.

Debtor's other assets seem to have been a tenuous interest in a real estate venture which apparently has no value; and his other creditors' claims are dwarfed by Belgium's.

While Belgium remains suspicious as to whether Debtor may have other assets which he is using to finance his lifestyle, his filings show there is effectively nothing other than the Rockefeller Property.

As there are no assets for the Ch 7 Trustee to administer and no creditors to protect, it appears the only purpose for this bankruptcy is to obstruct Belgium's enforcement. This may be the reason Debtor has not even bothered to engage new counsel.

Under these circumstances, Debtor should be asked to put forward credible reasons for why the bankruptcy should continue. Failing this, Belgium should be allowed to proceed with enforcing the Order for Sale which it received over one year ago.

## IV. Granting Belgium's requested relief will not prejudice other creditors.

As reflected at page 8 of Debtor's Disclosure Statement: (i) the Rockefeller Property is valued at $1,120,000; (ii) Freedom Mortgage Corporation holds a first priority secured claim amounting to $243,078.45 over the property; and (iii) Belgium has the next highest priority secured claim amounting to $5,436,919.76 [see Docket #143]. Therefore, there is no further remaining equity in the property.

Superior lienholders, ie the mortgage holder, will not be impaired by the sheriff's sale because the Order for Sale requires the property to be "*sold in the manner provided for under Code of Civil Procedures Sections 701.510-701.680*". This Section confirms that superior lienholders will not be impaired by the sale, ie the purchaser at the sheriff's sale will take the Rockefeller Property subject to the mortgage holder's lien. In fact, the mortgage holder would arguably be in better position once the sale is completed and a reliable, paying owner can be found for the Rockefeller Property.

Debtor might argue that Belgium should continue waiting indefinitely until the homestead evidentiary hearing takes place. However, it is unfair to continue obstructing Belgium's enforcement when Debtor has no basis to maintain his action in bankruptcy.

It is particularly unjust to continue forcing Belgium to wait when Debtor's entitlement to a homestead exemption was already the subject of adjudication wherein the Orange County Superior Court specifically found that Debtor was not eligible to claim a homestead exemption. This was because Debtor testified on numerous occasions that he had not resided in the Rockefeller Property for several years in order to incredulously claim that he did not have notice of the underlying proceedings. Debtor is now contradicting his earlier testimony by claiming he has resided there continuously since 2013—and this contradictory testimony has formed the basis of Belgium's independent motion for sanctions due to perjury [see Docket #154].

Debtor chose to testify that he did not reside in Rockefeller—which is reflected in Belgium's Order for Sale. Debtor's dubious attempts to unwind his previous perjury—and/or commit further perjury in this case—should not provide the basis for any further delay. As a reminder, the genesis of Belgium's original judgement was Debtor's fraud and misconduct. It should not be delayed from obtaining redress any further.

## V. This Dismissal should include sanctions which prohibit Debtor from filing a new bankruptcy case for at least 180 days.

As noted in Belgium's motion for sanctions in the previously filed Ch 13 case, 11 U.S.C. § 349 (a) and 11 U.S.C. § 109(g) allow bankruptcy courts to issue remedial orders when granting a debtor's 11 U.S.C. § 1307(b) motion to dismiss to address bad faith or abuse of the bankruptcy process by the debtor. *In re Minogue,* 632 B.R. 287, 293-294 (Bankr. D.S.C. 2021).

Given the overwhelming evidence of bad faith, Belgium respectfully requests that the present dismissal order include a condition barring Debtor further bankruptcy filings for at least

180 days so as to ensure that Debtor does not make another wrongful filing in attempt to obstruct

further enforcement efforts.

### VI. Conclusion.

Belgium respectfully requests an order for dismissal of this action which includes a bar

against this Debtor filing any subsequent bankruptcies for at least 180 days. It also requests any

further relief which the Court deems may be just and proper.


Dated:        5 June 2023                                    Impact Advocates APC


                                                            By_____
                                                            Patrick Miller
                                                            Attorney for Belgium Investments

PROOF OF ELECTRONIC SERVICE

I am employed in the County of LOS ANGELES, State of California. I am over the age of 18 and not a party to the within action. My business address is 121 S Oak Ave, Pasadena, CA 91107.

A true and correct copy of the foregoing described as **MOTION FOR DISMISSAL** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d) (through electronic filing); **(b)** on the Debtor through overnight express courier to his address at 116 Rockefeller, Irvine, CA, 92612; and **(c)** in the manner stated below:

**TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On 6/5/23, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

Chad L Butler on behalf of Interested Party Courtesy NEF
caecf@tblaw.com

Nancy S Goldenberg on behalf of U.S. Trustee United States Trustee (SA)
nancy.goldenberg@usdoj.gov

Benjamin Heston on behalf of Interested Party Benjamin Heston
bhestonecf@gmail.com,
benheston@recap.email,NexusBankruptcy@jubileebk.net

Patrick Miller on behalf of Creditor Belgium Investments 960 Bay Dr,

LLC A California Corp.

patrick.miller@impactadvocateslaw.com


Randall P Mroczynski on behalf of Creditor TD Bank, N.A., successor in

interest to TD Auto Finance LLC

randym@cookseylaw.com


United States Trustee (SA)

ustpregion16.sa.ecf@usdoj.gov


Weneta M.A. Kosmala (TR)

c/o Law Offices of Weneta M.A. Kosmala

ecf.alert+Kosmala@titlexi.com

(Trustee)

I declare under penalty of perjury under the laws of the State of California that the above is true

and correct.

Executed on this 6/5/2022, at Pasadena, California.

Patrick Miller

**SUBS**

**8**

1  Bert Briones (SBN 237594)
   **RED HILL LAW GROUP**
2  15615 Alton Pkwy, Suite 210
   Irvine, CA 92618
3  Tel:   (888) 733-4455
   Fax:   (714) 733-4450
4  Email: bb@redhilllawgroup.com

5  Attorneys for Debtor Bassem Victor El Mallakh

6

7                **UNITED STATES BANKRUPTCY COURT**

8          **CENTRAL DISTRICT OF CALIFORNIA (SANTA ANA)**

9

   In re:                          | Case No. 8:22-bk-11605-TA
10
                                    | Chapter 7
11 BASSEM VICTOR EL MALLAKH,

12              Debtor              | **OPPOSITION TO MOTION FOR
                                    | SANCTIONS DUE TO THE
13                                  | DEBTOR'S PERJURY;
                                    | DECLARATION OF BASSEM EL
14                                  | MALLAKH**

15                                  | **HEARING:**
                                    | **Date: August 24, 2023**
16                                  | **Time: 11:00 a.m.**
                                    | **Ctrm: 5B**
17

18

19

20

21      Debtor Bassem Victor El Mallakh hereby opposes the Motion for Sanctions Due to

22 the Debtor's Perjury filed by creditor Belgium Investments 960 Bay Dr., LLC, a

23 California Corporation ("Movant").  Debtor has owned the Rockefeller Property since

24 late-2016 and he leased the Santa Monica Property with a business partner between

25 November 1, 2016 and January 2023.  Debtor shares the Rockefeller Property with his

26 sister and her son pursuant to a lease, and Debtor has a bedroom and belongings in the

27 Rockefeller Property.  Debtor also spent considerable time in the Santa Monica Property

28 between 2016 and 2023 while working on a start-up company.  He kept some items at the

                                   - 1 -

1   Santa Monica Property and slept there when he worked late nights.  Debtor submitted

2   declarations and testimony regarding residing at both properties at the advice of his

3   attorneys.  Debtor did not understand the intricacies of the legal definitions of homestead

4   and residence—Debtor knew that he spent time at, slept at, and kept belongings in both

5   locations.  Debtor did not intend to mislead the Court; he took his attorneys' advice on

6   how to convey the facts to fit a particular legal definition.

7   I.    LEGAL AUTHORITY

8       The California Penal Code sets for the elements of perjury as follows:

9        (1) a willful statement, (2) either (a) under oath in any of the cases in which the

10       oath may be administered or (b) in writing under penalty of perjury in

11       circumstances permitted by law, (3) of any material matter, and (4) which the

12       person knows to be false.

13   *Ho Sang Yim v. Barr*, F.3d , 1083 (9th Cir. 2020).  Likewise, federal criminal law contains

14   the same elements of perjury: 1) that a defendant gave false testimony 2) on a material

15   matter 3) with willful intent. *Id*. at 94.  *United States v. Sampson*, 2023 WL 3883703, at

16   *3 (9th Cir. (Wash.) 2023).

17       "The falsity element of the crime of perjury requires that a statement be literally

18   false." *Chein v. Shumsky*, 373 F.3d 978, 985 (9th Cir. (Cal.) 2004).  Misleading testimony

19   that is otherwise true cannot support a perjury conviction.  *Id*.

20       The dictionary.com definitions of "reside," "live in," and "occupy" are:

21       Reside: "to dwell permanently or for a considerable time."

22       Live: "to dwell or reside (usually followed by in, at, etc.)."

23       Occupy: "to be a resident or tenant of; dwell in."

24   II.    TESTIMONY AT ISSUE

25       Movant points to Debtor's testimony in a declaration of 17 February 2021 and

26   deposition testimony from 21 March 2021 in which he stated that he was residing in Santa

27   Monica since November 2016 and sleeping there most nights.

28       Movant then points to Debtor's declaration to this Court dated 21 March 2023 and

- 2 -

OPPOSITION TO SANCTIONS MOTION

1  similar testimony from Debtor's deposition on 15 March 2023 in which he states that his

2  residence and "where I live" is the Rockefeller Property and that he went back and forth

3  between the Santa Monica Property and the Rockefeller Property depending on how much

4  he was working and on traffic.

5      Debtor entered the lease for the Santa Monica Property on 1 November 2016.  On

6  or shortly thereafter, Debtor began to spend a lot of time at the Santa Monica Property

7  working on his start-up company.  He also spent nights there when he worked late.

8  Debtor still had a bedroom and belongings at the Rockefeller Property.

9      Debtor's uses of both the Santa Monica and Rockefeller Properties meet the

10 dictionary definition of reside, live and occupy as "to dwell for a considerable time,"

11 "dwell or reside," and "be a resident or tenant of; dwell in" as Debtor spent considerable

12 time at both properties over several years, including sleeping at both properties.  While the

13 statements from 2021 compared side by side to those in 2023 may be misleading, they

14 were not literally false.  Debtor in fact spent a lot of his time in Santa Monica and

15 sometimes slept there and also slept in the Irvine Property, kept his belongings there, and

16 intended it to be his primary residence.

17     Debtor did not control his sister Reem Hanna's statements.  She was correct,

18 however, that Debtor spent much of his time in Santa Monica between November 2016

19 and February 2021.  She was also correct that Debtor "lived" in Irvine in the sense that he

20 had a bedroom there with belongings there.

21     Debtor does not remember the facts surrounding the Ring camera, as he explained

22 in both 2021 and 2023 that he was "unsure" about the camera "and thought he received it

23 in 2017 but "it's been a while." (Motion, 6:12-18.)  Moreover, the existence of a Ring

24 camera is not "a material matter" for purposes of perjury.

25

26

27

28  / / /

- 3 -

<u>CONCLUSION</u>

Debtor did not have willful intent to commit perjury.  He made statements surrounding his use of both properties as instructed by his layman's knowledge of the meanings of to reside, live, and occupy and his prior attorneys' instructions of how to explain the facts to fit a certain legal definition.  Debtor's statements do not amount to sanctionable perjury.  Movant's motion for sanctions should therefore be denied.

Dated: August 7, 2023

Respectfully submitted,
**RED HILL LAW GROUP**

By: ___*/s/ Bert Briones*_____
Bert Briones
Attorneys for Debtor Bassem Victor El Mallakh

OPPOSITION TO SANCTIONS MOTION

## DECLARATION OF BASSEEM VICTOR EL MALLAKH

I, BASSEM VICTOR EL MALLAKH, declare:

1.   I am an individual over the age of 18.

2.   I know the following facts to be true of my own personal knowledge unless otherwise stated.

3.   I have owned the Rockefeller Property located at 116 Rockefeller, Irvine, California 92612 ("Rockefeller Property") since late-2016 and I leased the Santa Monica Property located at 525 Broadway, Santa Monica, CA 90401 ("Santa Monica Property") with a business partner between 2016 and January 2023.

4.   I share the Irvine Property with my sister and her son pursuant to a lease, and I have a bedroom and belongings in the Irvine Property.

5.   I also spent considerable time in the Santa Monica Property between 2016 and 2023 while working on a start-up company. I kept some items at the Santa Monica Property and slept there when I worked late nights.

6.   I submitted declarations and testimony regarding residing at both properties at the advice of my attorneys. I did not understand the intricacies of the definitions of homestead and residence. I knew that I spent time at, slept at, and kept belongings in both locations.

7.   I did not intend to mislead the Court; I took my attorneys' advice on how to convey the facts to obtain the preferred legal result.

8.   I entered the lease for the Santa Monica Property on November 1, 2016. On or shortly thereafter, I began to spend a lot of time at the Santa Monica Property working on my start-up company. I also spent nights there when I worked late. I still had a bedroom and belongings at the Rockefeller Property.

9.   My uses of both the Santa Monica and Rockefeller Properties meet the dictionary definitions of and my understanding of the words reside, live and occupy as "to dwell for a considerable time," "dwell or reside," and "be a resident or tenant of; dwell in" as I spent considerable time at both properties over several years, including sleeping at

- 5 -

1  both properties.  I spent a lot of time in Santa Monica and sometimes slept there and also

2  slept in the Rockefeller Property, kept my belongings there, and intended it to be my

3  primary long-term residence.

4        10.     My sister, Reem Hanna, was correct, that I spent much of my time in Santa

5  Monica between November 2016 and February 2021.  She was also correct that I "lived"

6  in the Rockefeller Property in the sense that I had a bedroom there with belongings there.

7

8        I declare under penalty of perjury of the laws of the United States of America that

9  the foregoing is true and correct.

10

11  Dated:_____ at _____, Egypt.

12

13             **[SEE ATTACHED SIGNATURE PAGE]**

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

OPPOSITION TO SANCTIONS MOTION

both properties.  I spent a lot of time in Santa Monica and sometimes slept there and also slept in the Rockefeller Property, kept my belongings there, and intended it to be my primary long-term residence.

10.    My sister, Reem Hanna, was correct, that I spent much of my time in Santa Monica between November 2016 and February 2021.  She was also correct that I "lived" in the Rockefeller Property in the sense that I had a bedroom there with belongings there.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Dated: August 8th 2023 at _____ Cairo _____, Egypt.

BASSEM VICTOR EL MALLAKH

- 6 -

OPPOSITION TO SANCTIONS MOTION

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:

15615 Alton Pkwy., Ste. 210, Irvine CA 92618

A true and correct copy of the foregoing document entitled: **OPPOSITION TO MOTION FOR SANCTIONS DUE TO THE DEBTOR'S PERJURY; DECLARATION OF BASSEM EL MALLAKH** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) _____08/08/2023_____, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

Michael Jay Berger    michael.berger@bankruptcypower.com, yathida.nipha@bankruptcypower.com;michael.berger@ecf.inforuptcy.com
Chad L Butler    caecf@tblaw.com
Nancy S Goldenberg    nancy.goldenberg@usdoj.gov
Benjamin Heston    bhestonecf@gmail.com, benheston@recap.email,NexusBankruptcy@jubileebk.net
Weneta M.A. Kosmala (TR)    ecf.alert+Kosmala@titlexi.com, wkosmala@txitrustee.com;dmf@txitrustee.com;sdk@txitrustee.com
Patrick Miller    patrick.miller@impactadvocateslaw.com
Randall P Mroczynski    randym@cookseylaw.com
United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov

☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) ____08/08/2023____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

Debtor
Bassem Victor El Mallakh
116 Rockefeller
Irvine, CA 92618-4298

The Honorable Theodor C. Albert
U.S. Bankruptcy Court
Ronald Reagan Federal Building
411 W. Fourth Street – Ste. 5085
Santa Ana, CA 92701

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) ____8-8-23____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

Debtor: Served via electronic notification on secure encrypted client portal and email.
[Client email address is protected by the Attorney Client Privilege.]

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 08/08/2023 | Robin Briones | /s/ Robin Briones |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is optional.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2014*                                    Page 4                                    **F 4001-1.RFS.RESPONSE**

**SUBS
9**

<table>
<tr><td>

Attorney or Party Name, Address, Telephone & FAX
Nos., State Bar No. & Email Address

Bert Briones (SBN 237594)
RED HILL LAW GROUP
15615 Alton Pkwy, Suite 210
Irvine, CA 92618
Tel:  (888) 733-4455
Fax: (714) 733-4450
Email: bb@redhilllawgroup.com

</td><td>

FOR COURT USE ONLY

</td></tr>
</table>

☐ *Respondent appearing without attorney*
☒ *Attorney for Respondent:* Bassem Victor El Mallakh

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA · SANTA ANA DIVISION**

| In re:<br><br>BASSEM VICTOR EL MALLAKH | CASE NO.: 8:22-bk-11605-TA<br><br>CHAPTER: 7 |
|---|---|
| | **RESPONSE TO MOTION REGARDING THE AUTOMATIC STAY AND DECLARATION(S) IN SUPPORT** |
| | DATE: 08/24/2023<br>TIME: 11:00 am<br>COURTROOM: 5B<br>PLACE: 411 West Fourth Street<br>            Santa Ana, CA 92701-4593 |
| Debtor(s). | |

**Movant:** Belgium Investments 960 Bay Dr., LLC, a California Corp.

**Respondent:**   ☒ Debtor    ☐ trustee    ☐ other:

NOTE REGARDING FILING AND SERVICE OF RESPONSE, EXHIBITS AND DECLARATIONS:

A copy of the Response, exhibit(s) and declaration(s) must be served upon:

(1) Movant's attorney (or Movant, if Movant does not have an attorney);
(2) the trustee; and
(3) the judge who presides over this bankruptcy case.

Then the document must be filed with the court.

1.  ☐  **NONOPPOSITION**

The Respondent does not oppose the granting of the Motion.

---

This form is optional.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2014*                                    Page 1                                    **F 4001-1.RFS.RESPONSE**

2. ☐  **LIMITED OPPOSITION**

a. ☐  Respondent opposes the Motion only to the extent that it seeks immediate relief from stay. Respondent requests that no lock out, foreclosure, or repossession take place before (*date*): _____ and the reason for this request is (*specify*):

b. ☐  As set forth in the attached declaration of the Respondent or the Debtor, the motion is opposed only to the extent that it seeks a specific finding that the Debtor was involved in a scheme to hinder, delay or defraud creditors.

The Debtor:

(1) ☐  has no knowledge of the Property.
(2) ☐  has no interest in the Property.
(3) ☐  has no actual possession of the Property.
(4) ☐  was not involved in the transfer of the Property.

c. ☐  Respondent opposes the Motion and will request a continuance of the hearing since there is an application for a loan modification under consideration at this time. Evidence of a pending loan modification is attached as Exhibit _____.

3. ☒  **OPPOSITION:** The Respondent opposes granting of the Motion for the reasons set forth below.

a. ☐  The Motion was not properly served (*specify*):

(1) ☐  Not all of the required parties were served.
(2) ☐  There was insufficient notice of the hearing.
(3) ☐  An incorrect address for service of the Motion was used for (*specify*):

b. ☒  Respondent disputes the allegations/evidence contained in the Motion and contends as follows:

(1) ☒  The value of the Property is $ _1,120,000.00_____ , based upon (*specify*):
Comparable sales

(2) ☒  Total amount of debt (loans) on the Property is $ _5,690,152.00_____ .

(3) ☐  More payments have been made to Movant than the Motion accounts for. True and correct copies of canceled checks proving the payments that have been made are attached as Exhibit _____.

(4) ☐  There is a loan modification agreement in effect that lowered the amount of the monthly payments. A true and correct copy of the loan modification agreement is attached as Exhibit _____.

(5) ☐  The Property is necessary for an effective reorganization. Respondent filed or intends to file a plan of reorganization that requires use of the Property. A true and correct copy of the plan is attached as Exhibit _____.

(6) ☐  The Property is fully provided for in the chapter 13 plan and all postpetition plan payments are current. A true and correct copy of the chapter 13 plan is attached as Exhibit _____ and proof that the plan payments are current through the chapter 13 trustee is attached as Exhibit _____.

(7) ☐  The Property is insured. Evidence of current insurance is attached as Exhibit _____.

This form is optional. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2014*                                          Page 2                                          **F 4001-1.RFS.RESPONSE**

(8) ☐ Movant's description of the status of the unlawful detainer proceeding is not accurate.

(9) ☒ Respondent denies that this bankruptcy case was filed in bad faith.

(10) ☐ The Debtor will be prejudiced if the Nonbankruptcy Action is allowed to continue the nonbankruptcy forum.

(11) ☒ Other (specify):
Debtor has a valid homestead exemption in the sum of $624,400 in the Property, which is superior to Movant's lien.

c.  ☒ Respondent asserts the following as shown in the declaration(s) filed with this Response:

(1) ☒ The bankruptcy case was converted from chapter  11  to chapter  7  .

(2) ☐ All postpetition arrearages will be cured by the hearing date on this motion.

(3) ☐ The Property is fully provided for in the chapter 13 plan and all postpetition plan payments
     ☐ are current, or  ☐ will be cured by the hearing date on this motion.

(4) ☐ The Debtor has equity in the Property in the amount of $ _____.

(5) ☐ Movant has an equity cushion of $ _____ or _____% which is sufficient to provide adequate protection.

(6) ☐ The Property is necessary for an effective reorganization because (specify):


(7) ☒ The motion should be denied because (specify):
Debtor's homestead in the sum of $624,400 is senior to Movant's judicial lien.


(8) ☐ An optional memorandum of points and authorities is attached in support of this Response.


4.  **EVIDENCE TO AUTHENTICATE EXHIBITS AND TO SUPPORT FACTS INSERTED IN THE RESPONSE:**

Attached are the following documents in support of this Response:

☐ Declaration by the Debtor              ☐ Declaration by the Debtor's attorney
☐ Declaration by trustee                 ☐ Declaration by trustee's attorney
☐ Declaration by appraiser               ☒ Other (specify): Debtor's Schedules; Pleadings filed
                                            in conneciton with Debtor's Opposition to Homestead Obj.


Date:  08/07/2023

Red Hill Law Group
_____
Printed name of law firm for Respondent (if applicable)

Bert Briones
_____
Printed name of individual Respondent or attorney for Respondent


 /s/ Bert Briones
_____
Signature of individual Respondent or attorney for Respondent

This form is optional.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2014                          Page 3                          F 4001-1.RFS.RESPONSE

# EXHIBIT "A"

# EXHIBIT "A"

| Attorney or Party Name, Address, Telephone & FAX Nos.,State Bar No. & Email Address | FOR COURT USE ONLY |
|---|---|
| **Michael Jay Berger (SBN 100291)**<br>**Law Offices of Michael Jay Berger**<br>**9454 Wilshire Boulevard, 6th floor**<br>**Beverly Hills, CA 90212**<br>**(310) 271-6223 Fax:  (310) 271-9805**<br>**E-mail: Michael.Berger@bankruptcypower.com** | |
| ☐ *Individual appearing without attorney*<br>☑ *Attorney for Debtor* | |

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| In re:<br><br>    **Bassem Victor El Mallakh,**<br><br><br><br><br>    Debtor. | CASE NO.: 8:22-bk-11605-TA<br><br>CHAPTER: 11<br><br>---<br><br>**SUMMARY OF AMENDED SCHEDULES,**<br>**MASTER MAILING LIST,**<br>**AND/OR STATEMENTS**<br>**[LBR 1007-1(c)]** |
|---|---|

A filing fee is required to amend Schedules D, or E/F (see Abbreviated Fee Schedule on the Court's website www.cacb.uscourts.gov). A supplemental master mailing list (do not repeat any creditors on the original) is also required as an attachment if creditors are being added to the Schedule D or E/F. Are one or more creditors being added? ☐ Yes ☑ No

The following schedules, master mailing list or statements (check all that apply) are being amended:

☑ Schedule A/B          ☑ Schedule C          ☑ Schedule D          ☐ Schedule E/F          ☐ Schedule G

☐ Schedule H          ☐ Schedule I          ☐ Schedule J          ☐ Schedule J-2          ☐ Statement of Financial Affairs

☐ Statement About Your Social Security Number(s)          ☐ Statement of Intentions          ☐ Master Mailing List

☐ Other (*specify*) _____

I/we declare under penalty of perjury under the laws of the United States that the amended schedules, master mailing list, and or statements are true and correct.

Date:     11/23/2022

*[signature]*

**Bassem Victor El Mallakh**
Debtor 1 Signature

_____
Debtor 2 (Joint Debtor) Signature (if applicable)

**NOTE:** It is the responsibility of the Debtor, or the Debtor's attorney, to serve copies of all amendments on all creditors listed in this Summary of Amended Schedules, Master Mailing List, and/or Statements, and to complete and file the attached Proof of Service of Document.

---

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

| Fill in this information to identify your case and this filing: | |
|---|---|

**Debtor 1**  **Bassem Victor El Mallakh**
First Name    Middle Name    Last Name

**Debtor 2**
(Spouse, if filing)    First Name    Middle Name    Last Name

United States Bankruptcy Court for the:  CENTRAL DISTRICT OF CALIFORNIA

Case number   8:22-bk-11605-TA

☑ Check if this is an amended filing

## Official Form 106A/B
# Schedule A/B: Property                                          12/15

In each category, separately list and describe items. List an asset only once. If an asset fits in more than one category, list the asset in the category where you think it fits best. Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write your name and case number (if known). Answer every question.

**Part 1:**  Describe Each Residence, Building, Land, or Other Real Estate You Own or Have an Interest In

1. Do you own or have any legal or equitable interest in any residence, building, land, or similar property?

☐ No. Go to Part 2.
☑ Yes. Where is the property?

**1.1**

**116 Rockefeller**
Street address, if available, or other description

**Irvine**    **CA**    **92612-0000**
City    State    ZIP Code

**Orange**
County

**What is the property?** Check all that apply

☐ Single-family home
☐ Duplex or multi-unit building
☐ Condominium or cooperative
☐ Manufactured or mobile home
☐ Land
☐ Investment property
☐ Timeshare
☑ Other   **Townhouse**

**Who has an interest in the property?** Check one
☑ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another

Other information you wish to add about this item, such as local property identification number:

**Debtor's principal residence: townhouse.**

Do not deduct secured claims or exemptions. Put the amount of any secured claims on *Schedule D: Creditors Who Have Claims Secured by Property*.

**Current value of the entire property?**
**$1,120,000.00**

**Current value of the portion you own?**
**$1,120,000.00**

Describe the nature of your ownership interest (such as fee simple, tenancy by the entireties, or a life estate), if known.
**100%**

☐ Check if this is community property (see instructions)

2. Add the dollar value of the portion you own for all of your entries from Part 1, including any entries for pages you have attached for Part 1. Write that number here.................................................=>

**$1,120,000.00**

**Part 2:**  Describe Your Vehicles

Do you own, lease, or have legal or equitable interest in any vehicles, whether they are registered or not? Include any vehicles you own that someone else drives. If you lease a vehicle, also report it on *Schedule G: Executory Contracts and Unexpired Leases.*

Debtor 1    **Bassem Victor El Mallakh**                                    Case number *(if known)*    8:22-bk-11605-TA

### 3. Cars, vans, trucks, tractors, sport utility vehicles, motorcycles

☐ No

☑ Yes

| | | | | |
|---|---|---|---|---|
| 3.1 | Make: **Mercedes** | **Who has an interest in the property?** Check one | Do not deduct secured claims or exemptions. Put the amount of any secured claims on *Schedule D: Creditors Who Have Claims Secured by Property.* | |
| | Model: **C300** | ☑ Debtor 1 only | | |
| | Year: **2016** | ☐ Debtor 2 only | **Current value of the entire property?** | **Current value of the portion you own?** |
| | Approximate mileage: **42,000** | ☐ Debtor 1 and Debtor 2 only | | |
| | Other information: | ☐ At least one of the debtors and another | | |
| | The vehicle is financed with TD Financial. Monthly payment is $367.00. | ☐ Check if this is community property (see instructions) | $15,000.00 | $15,000.00 |

### 4. Watercraft, aircraft, motor homes, ATVs and other recreational vehicles, other vehicles, and accessories
*Examples:* Boats, trailers, motors, personal watercraft, fishing vessels, snowmobiles, motorcycle accessories

☑ No

☐ Yes

**5** Add the dollar value of the portion you own for all of your entries from Part 2, including any entries for pages you have attached for Part 2. Write that number here......................................=>    $15,000.00

### Part 3:  Describe Your Personal and Household Items

| Do you own or have any legal or equitable interest in any of the following items? | Current value of the portion you own? Do not deduct secured claims or exemptions. |
|---|---|

### 6. Household goods and furnishings
*Examples:* Major appliances, furniture, linens, china, kitchenware

☐ No

☑ Yes. Describe.....

| | |
|---|---|
| Debtor's residence: Couch, coffee table, mattress, dresser, dining room table with 6 chairs, patio furniture, wall mirror, lamps, and other household goods and furniture | $2,000.00 |
| Debtor's residence: 3 televisions, stove, fridge, laptop, desk computer, 2 cell phones, dishwashers, washer and dryer, and other household electronics | $3,000.00 |

### 7. Electronics
*Examples:* Televisions and radios; audio, video, stereo, and digital equipment; computers, printers, scanners; music collections; electronic devices including cell phones, cameras, media players, games

☑ No

☐ Yes. Describe.....

### 8. Collectibles of value
*Examples:* Antiques and figurines; paintings, prints, or other artwork; books, pictures, or other art objects; stamp, coin, or baseball card collections; other collections, memorabilia, collectibles

☑ No

☐ Yes. Describe.....

### 9. Equipment for sports and hobbies
*Examples:* Sports, photographic, exercise, and other hobby equipment; bicycles, pool tables, golf clubs, skis; canoes and kayaks; carpentry tools; musical instruments

☐ No

☑ Yes. Describe.....

Official Form 106A/B                    Schedule A/B: Property                    page 2

| Debtor 1 | **Bassem Victor El Mallakh** | | Case number (if known) | 8:22-bk-11605-TA |

---

| Debtor's residence: Bicycle and tennis equipment | $500.00 |

---

**10. Firearms**
   *Examples:* Pistols, rifles, shotguns, ammunition, and related equipment
   ■ No
   ☐ Yes. Describe.....

**11. Clothes**
   *Examples:* Everyday clothes, furs, leather coats, designer wear, shoes, accessories
   ☐ No
   ■ Yes.  Describe.....

| Debtor's residence: Clothes and shoes | $800.00 |

---

**12. Jewelry**
   *Examples:* Everyday jewelry, costume jewelry, engagement rings, wedding rings, heirloom jewelry, watches, gems, gold, silver
   ■ No
   ☐ Yes. Describe.....

**13. Non-farm animals**
   *Examples:* Dogs, cats, birds, horses
   ■ No
   ☐ Yes. Describe.....

**14. Any other personal and household items you did not already list, including any health aids you did not list**
   ■ No
   ☐ Yes.  Give specific information.....

**15.** Add the dollar value of all of your entries from Part 3, including any entries for pages you have attached for Part 3. Write that number here ............................................................................

| | $6,300.00 |

---

**Part 4:** Describe Your Financial Assets

| Do you own or have any legal or equitable interest in any of the following? | Current value of the portion you own? Do not deduct secured claims or exemptions. |
| --- | --- |

**16. Cash**
   *Examples:* Money you have in your wallet, in your home, in a safe deposit box, and on hand when you file your petition
   ☐ No
   ■ Yes.................................................................................

| | Cash | $150.00 |

---

**17. Deposits of money**
   *Examples:* Checking, savings, or other financial accounts; certificates of deposit; shares in credit unions, brokerage houses, and other similar institutions. If you have multiple accounts with the same institution, list each.
   ☐ No
   ■ Yes.......................

Institution name:

| 17.1. | **Checking account** | **Chase checking account ending in 7332** | $1,658.00 |

---

| 17.2. | **Checking account** | **Wells Fargo account ending in 4464** | $0.00 |

---

Official Form 106A/B                    Schedule A/B: Property                    page 3

Debtor 1    **Bassem Victor El Mallakh**                                    Case number *(if known)*    **8:22-bk-11605-TA**

| | | | |
|---|---|---|---|
| 17.3. | **Checking account** | Wells Fargo account ending in 3158 | $0.00 |
| 17.4. | **Brokerage account ending in 9722** | **Robinhood Markets, Inc.** | **$1,629.40** |

**18. Bonds, mutual funds, or publicly traded stocks**
    *Examples:* Bond funds, investment accounts with brokerage firms, money market accounts
    ■ No
    ☐ Yes.................                    Institution or issuer name:

**19. Non-publicly traded stock and interests in incorporated and unincorporated businesses, including an interest in an LLC, partnership, and joint venture**
    ☐ No
    ■ Yes.  Give specific information about them...................
                        Name of entity:                                % of ownership:

| | | |
|---|---|---|
| **Debtor has a 10% ownership interest in Belgium Investments 5655 S Troy LLC.  The LLC owns an interest in a multi-family building (10 units), which are rented. However, due to Covid-19, some tenants have not been paying rent.  The intention is to sell the property.** | **10%    %** | **$40,000.00** |
| **Debtor has a 20% ownership interest in Belgium Investments 5544 North Avenue, LLC.   Debtor's 20% interest in Belgium Investments 5544 North Avenue, LLC held by his corporation BBGIP, Inc., in which Debtor holds a 20% interest, with another individual holding 80% interest.  The property is vacant and has been in rehabilitation during the last two years.** | **20%    %** | **Unknown** |

**20. Government and corporate bonds and other negotiable and non-negotiable instruments**
    *Negotiable instruments* include personal checks, cashiers' checks, promissory notes, and money orders.
    *Non-negotiable instruments* are those you cannot transfer to someone by signing or delivering them.
    ■ No
    ☐ Yes. Give specific information about them
                        Issuer name:

**21. Retirement or pension accounts**
    *Examples:* Interests in IRA, ERISA, Keogh, 401(k), 403(b), thrift savings accounts, or other pension or profit-sharing plans
    ■ No
    ☐ Yes. List each account separately.
                        Type of account:              Institution name:

**22. Security deposits and prepayments**
    Your share of all unused deposits you have made so that you may continue service or use from a company
    *Examples:* Agreements with landlords, prepaid rent, public utilities (electric, gas, water), telecommunications companies, or others
    ■ No
    ☐ Yes. ....................                    Institution name or individual:

**23. Annuities (A contract for a periodic payment of money to you, either for life or for a number of years)**
    ■ No
    ☐ Yes.............                    Issuer name and description.

**24. Interests in an education IRA, in an account in a qualified ABLE program, or under a qualified state tuition program.**
    26 U.S.C. §§ 530(b)(1), 529A(b), and 529(b)(1).
    ■ No
    ☐ Yes.............                    Institution name and description. Separately file the records of any interests.11 U.S.C. § 521(c):

Official Form 106A/B                    Schedule A/B: Property                    page 4

Debtor 1    **Bassem Victor El Mallakh**    Case number *(if known)*    8:22-bk-11605-TA

25. **Trusts, equitable or future interests in property (other than anything listed in line 1), and rights or powers exercisable for your benefit**
  ■ No
  ☐ Yes.  Give specific information about them...

26. **Patents, copyrights, trademarks, trade secrets, and other intellectual property**
  *Examples:* Internet domain names, websites, proceeds from royalties and licensing agreements
  ■ No
  ☐ Yes.  Give specific information about them...

27. **Licenses, franchises, and other general intangibles**
  *Examples:* Building permits, exclusive licenses, cooperative association holdings, liquor licenses, professional licenses
  ■ No
  ☐ Yes.  Give specific information about them...

| Money or property owed to you? | | Current value of the portion you own?<br>Do not deduct secured claims or exemptions. |
|---|---|---|

28. **Tax refunds owed to you**
  ☐ No
  ■ Yes. Give specific information about them, including whether you already filed the returns and the tax years.......

| | | |
|---|---|---|
| 2021 tax refund | **Federal and State** | **$1,400.00** |

29. **Family support**
  *Examples:* Past due or lump sum alimony, spousal support, child support, maintenance, divorce settlement, property settlement
  ■ No
  ☐ Yes.  Give specific information......

30. **Other amounts someone owes you**
  *Examples:* Unpaid wages, disability insurance payments, disability benefits, sick pay, vacation pay,  workers' compensation, Social Security benefits; unpaid loans you made to someone else
  ■ No
  ☐ Yes.  Give specific information..

31. **Interests in insurance policies**
  *Examples:* Health, disability, or life insurance; health savings account (HSA); credit, homeowner's, or renter's insurance
  ■ No
  ☐ Yes. Name the insurance company of each policy and list its value.
       Company name:                              Beneficiary:              Surrender or refund value:

32. **Any interest in property that is due you from someone who has died**
  If you are the beneficiary of a living trust, expect proceeds from a life insurance policy, or are currently entitled to receive property because someone has died.
  ■ No
  ☐ Yes.  Give specific information..

33. **Claims against third parties, whether or not you have filed a lawsuit or made a demand for payment**
  *Examples:* Accidents, employment disputes, insurance claims, or rights to sue
  ■ No
  ☐ Yes.  Describe each claim.........

34. **Other contingent and unliquidated claims of every nature, including counterclaims of the debtor and rights to set off claims**
  ■ No
  ☐ Yes.  Describe each claim.........

Debtor 1    **Bassem Victor El Mallakh**                                 Case number *(if known)*    **8:22-bk-11605-TA**

35. Any financial assets you did not already list
    ■ No
    ☐ Yes. Give specific information..

36. Add the dollar value of all of your entries from Part 4, including any entries for pages you have attached
    for Part 4. Write that number here.................................................................................................... | **$44,837.40**

| Part 5: | Describe Any Business-Related Property You Own or Have an Interest in. List any real estate in Part 1. |

37. Do you own or have any legal or equitable interest in any business-related property?
    ■ No. Go to Part 6.
    ☐ Yes.  Go to line 38.

| Part 6: | Describe Any Farm- and Commercial Fishing-Related Property You Own or Have an Interest in. |
|         | If you own or have an interest in farmland, list it in Part 1. |

46. Do you own or have any legal or equitable interest in any farm- or commercial fishing-related property?
    ■ No. Go to Part 7.
    ☐ Yes.  Go to line 47.

| Part 7: | Describe All Property You Own or Have an Interest in That You Did Not List Above |

53. Do you have other property of any kind you did not already list?
    *Examples:* Season tickets, country club membership
    ■ No
    ☐ Yes. Give specific information.........

54. Add the dollar value of all of your entries from Part 7. Write that number here  ..................................... | **$0.00**

| Part 8: | List the Totals of Each Part of this Form |

55. **Part 1: Total real estate, line 2** ............................................................................. | **$1,120,000.00**
56. **Part 2: Total vehicles, line 5** | $15,000.00
57. **Part 3: Total personal and household items, line 15** | $6,300.00
58. **Part 4: Total financial assets, line 36** | $44,837.40
59. **Part 5: Total business-related property, line 45** | $0.00
60. **Part 6: Total farm- and fishing-related property, line 52** | $0.00
61. **Part 7: Total other property not listed, line 54** | + | $0.00

62. **Total personal property. Add lines 56 through 61...** | **$66,137.40** | Copy personal property total ▶ | **$66,137.40**

63. **Total of all property on Schedule A/B. Add line 55 + line 62** | **$1,186,137.40**

| Fill in this information to identify your case: | |
|---|---|
| Debtor 1 | **Bassem Victor El Mallakh** |
| | First Name            Middle Name            Last Name |
| Debtor 2 | |
| (Spouse if, filing) | First Name            Middle Name            Last Name |
| United States Bankruptcy Court for the: | CENTRAL DISTRICT OF CALIFORNIA |
| Case number | 8:22-bk-11605-TA |
| (if known) | |

☑ Check if this is an
amended filing

## Official Form 106C

# Schedule C: The Property You Claim as Exempt

4/22

Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. Using the property you listed on *Schedule A/B: Property* (Official Form 106A/B) as your source, list the property that you claim as exempt. If more space is needed, fill out and attach to this page as many copies of *Part 2: Additional Page* as necessary. On the top of any additional pages, write your name and case number (if known).

For each item of property you claim as exempt, you must specify the amount of the exemption you claim. One way of doing so is to state a specific dollar amount as exempt. Alternatively, you may claim the full fair market value of the property being exempted up to the amount of any applicable statutory limit. Some exemptions—such as those for health aids, rights to receive certain benefits, and tax-exempt retirement funds—may be unlimited in dollar amount. However, if you claim an exemption of 100% of fair market value under a law that limits the exemption to a particular dollar amount and the value of the property is determined to exceed that amount, your exemption would be limited to the applicable statutory amount.

### Part 1:    Identify the Property You Claim as Exempt

1. **Which set of exemptions are you claiming?** *Check one only, even if your spouse is filing with you.*

    ■ You are claiming state and federal nonbankruptcy exemptions.  11 U.S.C. § 522(b)(3)

    ☐ You are claiming federal exemptions.  11 U.S.C. § 522(b)(2)

2. **For any property you list on** *Schedule A/B* **that you claim as exempt, fill in the information below.**

| Brief description of the property and line on *Schedule A/B* that lists this property | Current value of the portion you own<br><br>Copy the value from *Schedule A/B* | Amount of the exemption you claim<br><br>*Check only one box for each exemption.* | Specific laws that allow exemption |
|---|---|---|---|
| **116 Rockefeller Irvine, CA 92612 Orange County Debtor's principal residence: townhouse.** Line from *Schedule A/B*: **1.1** | $1,120,000.00 | ■ $626,400.00<br>☐ 100% of fair market value, up to any applicable statutory limit | C.C.P. § 704.730 |
| **2016 Mercedes C300 42,000 miles The vehicle is financed with TD Financial.  Monthly payment is $367.00.** Line from *Schedule A/B*: **3.1** | $15,000.00 | ■ $3,625.00<br>☐ 100% of fair market value, up to any applicable statutory limit | C.C.P. § 704.010 |
| **Debtor's residence: Couch, coffee table, mattress, dresser, dining room table with 6 chairs, patio furniture, wall mirror, lamps, and other household goods and furniture** Line from *Schedule A/B*: **6.1** | $2,000.00 | ■ $2,000.00<br>☐ 100% of fair market value, up to any applicable statutory limit | C.C.P. § 704.020 |
| **Debtor's residence: 3 televisions, stove, fridge, laptop, desk computer, 2 cell phones, dishwashers, washer and dryer, and other household electronics** Line from *Schedule A/B*: **6.2** | $3,000.00 | ■ $3,000.00<br>☐ 100% of fair market value, up to any applicable statutory limit | C.C.P. § 704.020 |

| Debtor 1 | **Bassem Victor El Mallakh** | | Case number (if known) | **8:22-bk-11605-TA** |

| Brief description of the property and line on *Schedule A/B* that lists this property | Current value of the portion you own<br><br>Copy the value from *Schedule A/B* | Amount of the exemption you claim<br><br>*Check only one box for each exemption.* | Specific laws that allow exemption |
|---|---|---|---|
| **Debtor's residence: Bicycle and tennis equipment**<br>Line from *Schedule A/B*: **9.1** | $500.00 | ☒ _____ $500.00<br>☐ 100% of fair market value, up to any applicable statutory limit | **C.C.P. § 704.020** |
| **Debtor's residence: Clothes and shoes**<br>Line from *Schedule A/B*: **11.1** | $800.00 | ☒ _____ $800.00<br>☐ 100% of fair market value, up to any applicable statutory limit | **C.C.P. § 704.020** |

3. **Are you claiming a homestead exemption of more than $189,050?**
   (Subject to adjustment on 4/01/25 and every 3 years after that for cases filed on or after the date of adjustment.)

   ☐ No

   ☒ Yes. Did you acquire the property covered by the exemption within 1,215 days before you filed this case?

      ☒ No

      ☐ Yes

**Fill in this information to identify your case:**

| | |
|---|---|
| Debtor 1 | **Bassem Victor El Mallakh** |
| | First Name          Middle Name          Last Name |
| Debtor 2 | |
| (Spouse if, filing) | First Name          Middle Name          Last Name |
| United States Bankruptcy Court for the: | CENTRAL DISTRICT OF CALIFORNIA |
| Case number | **8:22-bk-11605-TA** |
| (if known) | |

■ Check if this is an
amended filing

## Official Form 106D
## Schedule D: Creditors Who Have Claims Secured by Property                    12/15

Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. If more space is needed, copy the Additional Page, fill it out, number the entries, and attach it to this form. On the top of any additional pages, write your name and case number (if known).

1. Do any creditors have claims secured by your property?

☐ No. Check this box and submit this form to the court with your other schedules. You have nothing else to report on this form.

■ Yes. Fill in all of the information below.

**Part 1:    List All Secured Claims**

2. **List all secured claims.** If a creditor has more than one secured claim, list the creditor separately for each claim. If more than one creditor has a particular claim, list the other creditors in Part 2. As much as possible, list the claims in alphabetical order according to the creditor's name.

| | | Column A<br>Amount of claim<br>Do not deduct the<br>value of collateral. | Column B<br>Value of collateral<br>that supports this<br>claim | Column C<br>Unsecured<br>portion<br>If any |
|---|---|---|---|---|
| **2.1** **Belgium Investments 960 Bay Dr, LLC** | | $4,345,250.00 | $1,120,000.00 | $3,469,221.77 |
| Creditor's Name | Describe the property that secures the claim: | | | |

**116 Rockefeller Irvine, CA 92612
Orange County
Debtor's principal residence:
townhouse.**

c/o Patrick Miller, Esq.
P. Miller Legal Services
121 S Oak Avenue
Pasadena, CA 91107

Number, Street, City, State & Zip Code

**As of the date you file, the claim is:** Check all that apply.

☐ Contingent
☐ Unliquidated
■ Disputed

**Who owes the debt?** Check one.

■ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another
☐ Check if this claim relates to a community debt

**Nature of lien.** Check all that apply.

☐ An agreement you made (such as mortgage or secured car loan)
☐ Statutory lien (such as tax lien, mechanic's lien)
☐ Judgment lien from a lawsuit
■ Other (including a right to offset)    A writ of execution

Date debt was incurred  **11/9/2020**          Last 4 digits of account number  **NCJC**

Debtor 1    **Bassem Victor El Mallakh**
　　　　　First Name　　　　Middle Name　　　　Last Name

Case number (if known)　**8:22-bk-11605-TA**

| | | | | |
|---|---|---|---|---|
| **2.2** | **Central Park West Community Associa** <br> Creditor's Name | Describe the property that secures the claim: | $2,878.93 | $1,120,000.00 | $2,878.93 |

**Central Park West Community Associa**
Creditor's Name

**401 Rockefeller #208
Irvine, CA 92612**
Number, Street, City, State & Zip Code

Describe the property that secures the claim:

> **116 Rockefeller Irvine, CA 92612
> Orange County
> Debtor's principal residence:
> townhouse.**

**$2,878.93**　　**$1,120,000.00**　　**$2,878.93**

**As of the date you file, the claim is:** Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

**Who owes the debt?** Check one.
■ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another
☐ Check if this claim relates to a community debt

**Nature of lien.** Check all that apply.
☐ An agreement you made (such as mortgage or secured car loan)
☐ Statutory lien (such as tax lien, mechanic's lien)
☐ Judgment lien from a lawsuit
■ Other (including a right to offset)　**HOA**

Date debt was incurred　**5/16/2022**　　Last 4 digits of account number　**3201**

---

| | | | | |
|---|---|---|---|---|
| **2.3** | **Freedom Mortgage Corporation** <br> Creditor's Name | Describe the property that secures the claim: | $243,971.77 | $1,120,000.00 | $0.00 |

**Freedom Mortgage Corporation**
Creditor's Name

**Attn: Bankruptcy
907 Pleasant Valley Ave,
Ste 3
Mt Laurel, NJ 08054**
Number, Street, City, State & Zip Code

Describe the property that secures the claim:

> **116 Rockefeller Irvine, CA 92612
> Orange County
> Debtor's principal residence:
> townhouse.**

**$243,971.77**　　**$1,120,000.00**　　**$0.00**

**As of the date you file, the claim is:** Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

**Who owes the debt?** Check one.
■ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another
☐ Check if this claim relates to a community debt

**Nature of lien.** Check all that apply.
☐ An agreement you made (such as mortgage or secured car loan)
☐ Statutory lien (such as tax lien, mechanic's lien)
☐ Judgment lien from a lawsuit
■ Other (including a right to offset)　**First Trust Deed**

Date debt was incurred　**October 29, 2013**　　Last 4 digits of account number　**4275**

---

Debtor 1    **Bassem Victor El Mallakh**
_____
First Name    Middle Name    Last Name

Case number (if known)    **8:22-bk-11605-TA**

| 2.4 | **Td Auto Finance** | Describe the property that secures the claim: | $6,493.00 | $15,000.00 | $0.00 |

Creditor's Name

Describe the property that secures the claim:

**2016 Mercedes C300 42,000 miles The vehicle is financed with TD Financial. Monthly payment is $367.00.**

**Attn: Bankruptcy**
**Po Box 9223**
**Farmington Hills, MI**
**48333**
_____
Number, Street, City, State & Zip Code

**As of the date you file, the claim is:** Check all that apply.

☐ Contingent
☐ Unliquidated
☐ Disputed

**Who owes the debt?** Check one.

■ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another
☐ Check if this claim relates to a community debt

**Nature of lien.** Check all that apply.

☐ An agreement you made (such as mortgage or secured car loan)
☐ Statutory lien (such as tax lien, mechanic's lien)
☐ Judgment lien from a lawsuit
■ Other (including a right to offset)    **Auto loan**

**Date debt was incurred**    **Opened 08/16  Last Active 04/21**    **Last 4 digits of account number**    **9787**

| 2.5 | **The Townes at Central Park West Ass** | Describe the property that secures the claim: | $7,276.60 | $1,120,000.00 | $7,276.60 |

Creditor's Name

Describe the property that secures the claim:

**116 Rockefeller Irvine, CA 92612 Orange County Debtor's principal residence: townhouse.**

**15241 Laguna Canyon Rd.**
**Irvine, CA 92618**
_____
Number, Street, City, State & Zip Code

**As of the date you file, the claim is:** Check all that apply.

☐ Contingent
☐ Unliquidated
☐ Disputed

**Who owes the debt?** Check one.

■ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another
☐ Check if this claim relates to a community debt

**Nature of lien.** Check all that apply.

☐ An agreement you made (such as mortgage or secured car loan)
☐ Statutory lien (such as tax lien, mechanic's lien)
☐ Judgment lien from a lawsuit
■ Other (including a right to offset)    **HOA**

**Date debt was incurred**    **2/9/2022**    **Last 4 digits of account number**    **3401**

Add the dollar value of your entries in Column A on this page. Write that number here:    **$4,605,870.30**

If this is the last page of your form, add the dollar value totals from all pages.
Write that number here:    **$4,605,870.30**

**Part 2:    List Others to Be Notified for a Debt That You Already Listed**

Use this page only if you have others to be notified about your bankruptcy for a debt that you already listed in Part 1. For example, if a collection agency is trying to collect from you for a debt you owe to someone else, list the creditor in Part 1, and then list the collection agency here. Similarly, if you have more than one creditor for any of the debts that you listed in Part 1, list the additional creditors here. If you do not have additional persons to be notified for any debts in Part 1, do not fill out or submit this page.

[ ]    Name, Number, Street, City, State & Zip Code
**First Service Residential**
**c/o Community Legal Advisors**
**509 N. Coast Highway**
**Oceanside, CA 92054**

On which line in Part 1 did you enter the creditor?    **2.5**

Last 4 digits of account number    ___

| Debtor 1 | **Bassem Victor El Mallakh** | | | Case number (if known) | **8:22-bk-11605-TA** |
|---|---|---|---|---|---|
| | First Name | Middle Name | Last Name | | |

[ ]    Name, Number, Street, City, State & Zip Code
**Freedom Mortgage**
**951 Yamato Rd.**
**Boca Raton, FL 33431**

On which line in Part 1 did you enter the creditor?    **2.3**

Last 4 digits of account number ___

---

[ ]    Name, Number, Street, City, State & Zip Code
**Freedom Mortgage**
**PO Box 50428**
**Indianapolis, IN 46250**

On which line in Part 1 did you enter the creditor?    **2.3**

Last 4 digits of account number ___

---

[ ]    Name, Number, Street, City, State & Zip Code
**TD Auto Finance**
**6 Atlantis Way**
**Lewiston, ME 04240**

On which line in Part 1 did you enter the creditor?    **2.4**

Last 4 digits of account number ___

---

Official Form 106D     Additional Page of **Schedule D: Creditors Who Have Claims Secured by Property**     page 4 of 4

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
**9454 Wilshire Boulevard, 6th floor**
**Beverly Hills, CA 90212**

A true and correct copy of the foregoing document entitled (*specify*):   **Summary of Amended Schedules, Master Mailing List, and or Statements**   will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On  **11/23/2022**  , I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

Counsel for Debtor: Jay Berger michael.berger@bankruptcypower.com,
yathida.nipha@bankruptcypower.com;michael.berger@ecf.inforuptcy.com
U.S. Trustee; Nancy S Goldenberg nancy.goldenberg@usdoj.gov
Interested Party: Benjamin Heston bhestonecf@gmail.com,
HestonBR41032@notify.bestcase.com,NexusBankruptcy@jubileebk.net
United States Trustee (SA) ustpregion16.sa.ecf@usdoj.gov

☐ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**: On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL (state method for each person or entity served)**: Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| 11/23/2022 | Peter Garza | /s/ Peter Garza |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

---

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

# EXHIBIT "B"

# EXHIBIT "B"

**SUBS**

**10**

1 | Bert Briones (SBN 237594)
**RED HILL LAW GROUP**
2 | 15615 Alton Pkwy, Suite 210
Irvine, CA 92618
3 | Tel:   (888) 733-4455
Fax:   (714) 733-4450
4 | Email: bb@redhilllawgroup.com

5 | Attorneys for Debtor Bassem Victor El Mallakh

6

7 | **UNITED STATES BANKRUPTCY COURT**

8 | **CENTRAL DISTRICT OF CALIFORNIA (SANTA ANA)**

9

10 | In re:                                    Case No. 8:22-bk-11605-TA

11 | BASSEM VICTOR EL MALLAKH,     Chapter 7

12 |                Debtor                **OPPOSITION TO MOTION TO**
                                          **DISMISS**
13
                                          **HEARING:**
14                                        **Date: August 24, 2023**
                                          **Time: 11:00 a.m.**
15                                        **Ctrm: 5B_____**

16

17

18

19

20

21

22 |      Debtor Bassem Victor El Mallakh ("Debtor") submits the following opposition to

23 | the Motion to Dismiss his Chapter 7 bankruptcy case ("Motion to Dismiss") filed by

24 | movant Belgium Investments 960 Bay Dr., LLC a California Corporation ("Movant").

25 | / / /

26 | / / /

27 | / / /

28

*(left margin, vertical text)* RED HILL LAW GROUP  15615 Alton Pkwy, Suite 210  Irvine, California  92618

- 1 -

I.    INTRODUCTION

The Motion to Dismiss should be denied because § 707 bad faith dismissal, which is requested in the Motion to Dismiss, is available only in consumer debtor cases—here, Debtor's debt is primarily nonconsumer business debt. The majority of Debtor's debt is owed to Movant arising out of a business transaction to renovate a condominium building in Miami Beach. Moreover, the deadline to file a motion to dismiss under § 707 expired before the Motion to Dismiss was filed on June 5, 2023; the expiration was 60 days after the first 341 meeting of creditors set for October 28, 2022.

II.    LEGAL AUTHORITY

The deadline for filing a § 707(b)(3) dismissal motion is 60 days after the first date set for the creditors' meeting. FRBP 1017(e)(1); *In re dePellegrini*, supra, 365 BR 830, 831 (Bankr. SD Ohio 2007). Here, the first meeting of creditors was set for October 28, 2022, and the Motion to Dismiss was filed on June 5, 2023. Thus, the Motion to Dismiss should be denied as untimely.

A *consumer* debtor's case may be dismissed as an "abuse" of Chapter 7 where:

— the debtor filed the petition in bad faith; or

— the "totality of the circumstances" of the debtor's financial situation demonstrates "abuse." 11 USC § 707(b)(3)(A) & (B); *see also In re Reed*, 422 BR 214, 229-230 (CD Cal. 2009); *In re dePellegrini*, 365 BR 830, 833 (Bankr. SD Ohio 2007). Section 707(b) only applies to consumer debtors, as a matter of statutory construction it follows that cases filed by nonconsumer debtors cannot be dismissed for "bad faith" under that provision: "The only mention of 'bad faith' in all of Chapter 7 is in Section 707(b)(3)(A). Its location indicates that the analysis for bad faith arises only in a consumer debtor case. If Congress intended 'bad faith' to be a reason for dismissal of any Chapter 7 case, it would have added that term to § 707(a) which applies to all chapter 7 cases. It did not." *In re Lobera*, 454 BR 824, 838 (Bankr. D. NM 2011) (emphasis added).

///

OPPOSITION TO MOTION TO DISMISS

1      A debtor is a "consumer" debtor if more than half of the dollar amount owed is

2 consumer debt. *In re Kelly*, 841 F.2d 908, 913 (9th Cir. 1988). Debt incurred for a

3 business venture or with a profit motive is not "consumer debt." *In re Runski*, 102 F.3d

4 744, 747 (4th Cir. 1996); *In re Stewart*, 175 F.3d 796, 806 (10th Cir. 1999).

5      The majority of Debtor's debt is business debt arising out of his efforts to renovate

6 a condominium building in Miami Beach. Movant invested in this business venture,

7 thereby giving rise to its alleged claim. Debtor has some credit card debt and an auto

8 loan, but because the majority of the debt is nonconsumer, his case is not subject to

9 dismissal under § 707. The Court should therefore deny the Motion to Dismiss.

10 III.   <u>CONCLUSION</u>

11      For the reasons explained above, the Debtor requests that the Court deny the

12 Motion to Dismiss as untimely and not warranted in light of Debtor's nonconsumer debt.

13

14 Dated: August 7, 2023             Respectfully submitted,

15                            **RED HILL LAW GROUP**

16                          By:   */s/ Bert Briones*

17                          Bert Briones
                           Attorneys for Debtor Bassem Victor El Mallakh

18

19

20

21

22

23

24

25

26

27

28

OPPOSITION TO MOTION TO DISMISS

<u>DECLARATION OF BASSEM VICTOR EL MALLAKH</u>

I, Bassem Victor El Mallakh, declare as follows:

    1.    I am an individual over the age of 18 and the debtor in the above-referenced case.

    2.    I know the following facts to be true of my own personal knowledge.

    3.    My debt is primarily business debt. The majority of my debt is owed to Movant arising out of a business transaction to renovate a condominium building in Miami Beach.

    4.    My first 341 meeting of creditors was set for October 28, 2022.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Dated: _____ at _____, Egypt.

## [SEE ATTACHED SIGNATURE PAGE]

                     BASSEM VICTOR EL MALLAKH

- 4 -

## DECLARATION OF BASSEM VICTOR EL MALLAKH

I, Bassem Victor El Mallakh, declare as follows:

    1.    I am an individual over the age of 18 and the debtor in the above-referenced case.

    2.    I know the following facts to be true of my own personal knowledge.

    3.    My debt is primarily business debt. The majority of my debt is owed to Movant arising out of a business transaction to renovate a condominium building in Miami Beach.

    4.    My first 341 meeting of creditors was set for October 28, 2022.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Dated: _August 8th 2023_ at _Cairo_, Egypt.

_[signature]_

BASSEM VICTOR EL MALLAKH

- 4 -

OPPOSITION TO MOTION TO DISMISS

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

15615 Alton Pkwy., Ste. 210, Irvine CA 92618

A true and correct copy of the foregoing document entitled: **OPPOSITION TO MOTION TO DISMISS** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) ___08/08/2023___ , I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

Michael Jay Berger    michael.berger@bankruptcypower.com, yathida.nipha@bankruptcypower.com;michael.berger@ecf.inforuptcy.com
Chad L Butler    caecf@tblaw.com
Nancy S Goldenberg    nancy.goldenberg@usdoj.gov
Benjamin Heston    bhestonecf@gmail.com, benheston@recap.email,NexusBankruptcy@jubileebk.net
Weneta M.A. Kosmala (TR)    ecf.alert+Kosmala@titlexi.com, wkosmala@txitrustee.com;dmf@txitrustee.com;sdk@txitrustee.com
Patrick Miller    patrick.miller@impactadvocateslaw.com
Randall P Mroczynski    randym@cookseylaw.com
United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov

☐  Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) ___08/08/2023___ , I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

Debtor
Bassem Victor El Mallakh
116 Rockefeller
Irvine, CA 92618-4298

The Honorable Theodor C. Albert
U.S. Bankruptcy Court
Ronald Reagan Federal Building
411 W. Fourth Street – Ste. 5085
Santa Ana, CA 92701

☐  Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) ___8-8-23___ , I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

Debtor: Served via electronic notification on secure encrypted client portal and email.
[Client email address is protected by the Attorney Client Privilege.]

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 08/08/2023 | Robin Briones | /s/ Robin Briones |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

---

This form is optional.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2014*                    Page 4                    **F 4001-1.RFS.RESPONSE**

**SUBS**

**11**

Bert Briones (SBN 237594)
**RED HILL LAW GROUP**
15615 Alton Pkwy, Suite 210
Irvine, CA 92618
Tel:   (888) 733-4455
Fax:  (714) 733-4450
Email: bb@redhilllawgroup.com

Attorneys for Debtor Bassem Victor El Mallakh

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA (SANTA ANA)**

| | |
|---|---|
| In re:<br><br>BASSEM VICTOR EL MALLAKH,<br><br>Debtor | Case No. 8:22-bk-11605-TA<br><br>Chapter 7<br><br>**SUPPLEMENTAL BRIEF IN SUPPORT OF OPPOSITION TO OBJECTION TO HOMESTEAD EXEMPTION**<br><br>**HEARING:**<br>**Date: August 24, 2023**<br>**Time: 11:00 a.m.**<br>**Ctrm: 5B** |

Debtor Bassem Essam El Mallakh ("Debtor") submits the following supplemental brief in support of his Opposition to Objection to Homestead filed by Belgium Investments 960 Bay Dr., LLC a California Corporation ("Objecting Party").

/ / /

/ / /

/ / /

- 1 -

I.    FACTS

    a.    Debtor's Homestead[1]

    On Debtor's bankruptcy petition date, September 19, 2022, Debtor resided at the townhouse he owns at 116 Rockefeller, Irvine, California 92612 ("Irvine Townhouse") and intended to continue to occupy and reside at the Irvine Townhouse. He continues to occupy and reside at the Irvine Townhouse as his primary residence. Since before the petition date to present, he has kept his clothing and personal belongings at the Irvine Townhouse and slept at the Irvine Townhouse.

    Between 2016 and January 2023, Debtor sometimes temporarily slept at an apartment in Santa Monica at 525 Broadway, Santa Monica, CA 90401 ("Santa Monica Apartment"), but he always intended to return to the Irvine Townhouse as his personal residence. The Santa Monica Apartment was leased by Debtor and his business partner to conduct a start-up business and for Debtor's business partner to reside at during their start-up efforts. Debtor did not keep his belongings at the Santa Monica Apartment and did not have a bedroom or bed at the Santa Monica Apartment. He sometimes "crashed" at the Santa Monica Apartment after working late nights so as not to have to drive back to the Irvine Townhouse when he was overly tired.

    On January 1, 2017, Debtor entered a lease with his sister, Reem Hanna, for two bedrooms and the common areas of the Irvine Townhouse. One bedroom is used by Reem, the other by her son, and Debtor continues to occupy the third bedroom.

    Although Reem and Debtor are siblings, they agreed to memorialize her lease in writing. Debtor located and copied a lease from Google. He did not verify if all of the language in the lease was necessary or applicable to Reem's and his situation, but it accomplished their goal of agreeing in writing to a rent price and term. Reem and Debtor always agreed that Debtor would continue to occupy the Irvine Townhouse.

---

[1] The Debtor's Homestead facts are based on the Declaration of Bassem Victor El Mallakh filed with the "Direct Testimony Declarations" concurrently with this Supplemental Brief.

SUPPLEMENTAL HOMESTEAD EXEMPTION BRIEF

b. <u>State court homestead order</u>

The underlying dispute between Movant and Debtor was originally adjudicated by a Florida state court. (*See* Movant's Objection.) Movant obtained a default judgment against Debtor in Florida and moved for entry of sister state judgment in California. Despite Debtor's efforts to prevent enforcement of the judgment, Movant prevailed in obtaining a California judgment. As part of Movant's enforcement efforts, Movant obtained an abstract of judgment, recorded it against the Irvine Townhouse, and moved in the California state court to foreclose. On May 10, 2022, Movant obtained an order from the California state court "Granting Application for Order of Sale of Dwelling" ("Sale Order"). The Sale Order ruled that the Irvine Townhouse was not subject to any homestead as of May 10, 2022.

II.     ANALYSIS

Bankruptcy courts must consider the facts on the petition date to determine eligibility for a homestead exemption. *In re Morgan*, 149 B.R. 147, 153 (1993) ("eligibility for exemption claimed under § 522 is determined based on facts extant on the date the debtor files bankruptcy" and entitlement to a homestead exemption "is made as of the date the debtor files bankruptcy"). A state court homestead exemption determination made by a state court months before a bankruptcy petition, therefore, is not *res judicata* to determination of bankruptcy homestead exemption. *Id.* In *In re Morgan*, the bankruptcy court erred by merely looking "to the state court decision that was rendered some 14 months before Morgan's bankruptcy." "This was error." *Id.*

Under California law, a homestead is defined as:

"Homestead" means the principal dwelling (1) in which the judgment debtor or judgment debtor's spouse resided on the date the judgment creditor's lien attached to the dwelling, and (2) in which the judgment debtor or the judgment debtor's spouse resided continuously thereafter until the date of the court determination that the dwelling is a homestead.

Cal. Code Civ. Proc., § 704.710(c).

SUPPLEMENTAL HOMESTEAD EXEMPTION BRIEF

1     Residency for purposes of the homestead requires that the debtor physically

2   occupy the property and intends to occupy the property. Temporary absence is permitted

3   so long as the debtor intends to occupy the property as a principal dwelling. *In re*

4   *Gilman*, 887 F. 3d 956, 966 (9th Cir. 2018; *In re Bruton*, 167 B.R. 923, 926 (Bankr. SD.

5   Cal. 1994).

6     Here, the evidence shows that on the petition date of September 19, 2022, Debtor

7   resided in the Irvine Property and intended to occupy the property as his principal

8   residence. The state court Sale Order determining that there was no homestead on May

9   10, 2022 is not *res judicata* on the issue of whether Debtor had a valid homestead

10   exemption in the Irvine Townhouse on September 19, 2022.

11   III.    CONCLUSION

12     For the reasons explained in Debtor's Opposition to the Objection to Homestead

13   Exemption (Docket No. 81), accompanying declarations (Docket Nos. 146-148), and this

14   Supplemental Brief and accompanying direct testimony declarations, Debtor's homestead

15   on the petition date and continuing to present was and is the Irvine Townhouse.

16   Movant's Objection to Debtor's homestead exemption should therefore be denied.

17

18   Dated: August 7, 2023                 Respectfully submitted,
                                            **RED HILL LAW GROUP**
19

20                                          By:    */s/ Bert Briones*
                                            Bert Briones
21                                          Attorneys for Debtor Bassem Victor El Mallakh

22

23

24

25

26

27

28

- 4 -

# EXHIBIT "A"

# EXHIBIT "A"

MICHAEL JAY BERGER (State Bar # 100291)
LAW OFFICES OF MICHAEL JAY BERGER
9454 Wilshire Blvd. 6th Floor
Beverly Hills, CA 90212-2929
Telephone:    (310) 271-6223
Facsimile:    (310) 271-9805
michael.berger@bankruptcypower.com

Counsel for Debtor,
Bassem Victor El Mallakh

<div align="center">

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

SANTA ANA DIVISION

</div>

| | |
|---|---|
| In re:<br><br>BASSEM VICTOR EL MALLAKH,<br><br>       Debtor and Debtor-in-Possession. | CASE NO.: 8:22-bk-11605-TA<br><br>Chapter 11<br><br>**DEBTOR'S OPPOSITION TO BELGIUM INVESTMENTS 960 BAY DR, LLC'S OBJECTION TO DEBTOR'S CLAIMED HOMESTEAD EXEMPTION; DECLARATION OF BASSEM VICTOR EL MALLAKH IN SUPPORT THEREOF**<br><br>Date:    January 11, 2023<br>Time:   10:00 a.m.<br>Place:   411 West Fourth Street<br>          Courtroom 5B<br>          Santa Ana, CA 92701<br><br>Via Tele/Videoconference on Zoom |

**TO THE HONORABLE THEODOR C. ALBERT, CHIEF JUDGE OF THE UNITED STATES BANKRUPTCY COURT, BELGIUM INVESTMENTS 960 BAY DR, LLC, TO THE UNITED STATES TRUSTEE, TO DEBTOR'S CREDITORS AND TO ALL INTERESTED PARTIES:**

<div align="center">1</div>

Bassem Victor El Mallakh (the "Debtor") herein, respectfully submits his

Opposition to Belgium Investments 960 Bay Dr, LLC's ("Belgium") Objection to

Debtor's Claimed Homestead Exemption (the "Objection to Homestead Exemption") as

follows:

## I.    **INTRODUCTION**

Debtor asks that Belgium's Objection to Debtor's Claimed Homestead Exemption

be denied in full on the following bases:

(1) Under *BAC Home Loans Serv., LP v. Abdelgadir (In re Abdelgadir)*, 455 B.R.

896, 898 (9th Cir. BAP 2011) and *Benafel v. One West Bank*, 461 B.R. 581 (2011), the

appropriate time for determining whether property is the debtor's primary residence is the

petition date. Here, the Debtor's primary residence as of the date of the filing of the

Bankruptcy Petition was, and currently is, 116 Rockefeller, Irvine, CA 92612 (the

"Rockefeller Property"); and

(2) Based on *Barclay vs. Boskoski*, 2022 WL 16911862 (9th Cir. November 14,

2022), Debtor's available homestead exemption on the Rockefeller Property is

determined as of the filing date of Debtor's Bankruptcy case; Debtor is entitled to the full

homestead exemption in the amount of $626,400.00 available to the Debtor on the

petition date on September 19, 2022 per CCP § 704.730.

## II.    **DEBTOR'S ARGUMENTS IN OPPOSITION TO BELGIUM'S**
## **OBJECTION TO DEBTOR'S HOMESTEAD EXEMPTION**

1. Debtor's Primary Residence on the Petition Date was and Continues to be the
   Rockefeller Property

Belgium argues the Rockefeller Property should not be considered the Debtor's

primary residence because the Debtor previously did not live there. Debtor's primary

residence as of the filing of the bankruptcy case was, and currently is, the Rockefeller

Property. The controlling authority on establishing a Debtor's primary residence is *BAC*

*Home Loans Serv., LP v. Abdelgadir (In re Abdelgadir)*, 455 B.R. 896, 898 (9th Cir. BAP

2

2011) where the Court held "the appropriate time for determining whether property is a debtor's principal residence is the petition date." *BAC Home Loans Serv., LP v. Abdelgadir (In re Abdelgadir),* 455 B.R. 896, 898 (9th Cir. BAP 2011).

In *Abdelgadir*, the debtors originally filed a bankruptcy petition under chapter 13. In their petition and schedules, the Abdelgadirs listed a home address in Las Vegas (the "Las Vegas Property"). The Las Vegas Property was encumbered by first and second deeds of trust. According to the security instruments, the Abdelgadirs were required to occupy the Las Vegas Property as a "primary year-round residence."

The Abdelgadirs later moved to convert their case to chapter 11, a motion the bankruptcy court granted. Then they filed a notice with the bankruptcy court, changing their address to a different location, and leased the Las Vegas Property to a third party.

The Abdelgadirs filed a chapter 11 plan on March 9, 2010, in which they proposed to modify the terms of the loan secured by the first mortgage on the Las Vegas Property. According to the plan, at that time, the Las Vegas Property was no longer their residence, but was now an investment property, and therefore, modification of the terms of the loan secured by the Las Vegas Property was no longer barred under of § 1123(b)(5). They argued that whether the Las Vegas Property was their principal residence for purposes of § 1123(b)(5) was a determination that should be made by the bankruptcy court as of the time of plan confirmation.

On appeal, the Court in Abdelgadir held that the majority of the cases favor use of the petition date to determine principal residence and that in the 9th Circuit, the debtor's primary residence is determined on the petition date. *BAC Home Loans Serv., LP v. Abdelgadir (In re Abdelgadir),* 455 B.R. 896, 898 (9th Cir. BAP 2011).

In *Benafel v. One West Bank*, 461 B.R. 581 (2011), the appellate court upheld the *BAC Home Loans Serv., LP v. Abdelgadir (In re Abdelgadir),* 455 B.R. 896, 898 (9th Cir. BAP 2011) holding, that a debtor's primary residence is established as of the bankruptcy petition date, and reversed the lower court's decision to use the date a loan was made to

3

1    establish the debtor's primary residence for bankruptcy purposes. *Benafel v. One West*

2    *Bank,* 461 B.R. 581, 592 (2011)

3        The Rockefeller Property is the Debtor's primary residence. Debtor's current

4    Chapter 11 case and his previously filed Chapter 13 case both listed the Rockefeller

5    Property as his primary residence, as do his tax returns, bank statements, car insurance

6    declaration and mortgage payoff statement. A true and correct copy of Debtor's Chapter

7    13 Voluntary Petition, first pages of Debtor's prepetition 2019-2022 tax returns, Debtor's

8    car insurance policy, Debtor's prepetition bank statement, and Debtor's mortgage payoff

9    statement all addressed to the Debtor at the Rockefeller Property indicating the Debtor's

10   primary residence is the Rockefeller Property are attached to the Declaration of Bassem

11   El Mallakh as **Exhibit "1."** As was held in *BAC Home Loans Serv., LP v. Abdelgadir (In*

12   *re Abdelgadir),* 455 B.R. 896 (9th Cir. BAP 2011) and *Benafel v. One West Bank,* 461

13   B.R. 581 (2011), the Rockefeller Property is Debtor's primary residence.

14

15       Further, despite Belgium's claims, the lease agreement between the Debtor and his

16   sister does not bar the Debtor from living in the Rockefeller Property as his primary

17   residence. Debtor is leasing part of the Rockefeller Property to his sister who pays him

18   rent. The Debtor is also living in the Rockefeller Property. Belgium's res judicata

19   argument that another Court purportedly made a finding that the Debtor was previously

20   not living at the Rockefeller Property is irrelevant because the Debtor was living at the

21   Rockefeller Property at the time the Debtor's bankruptcy case was filed. Whether the

22   Debtor was served with documents at the Rockefeller Property, or not, as Belgium points

23   out, is not probative of where the Debtor was living as his primary residence at the time

24   the Debtor filed his Chapter 11 Bankruptcy case. The Rockefeller Property was the

25   Debtor's primary residence when the Debtor filed this Chapter 11 case, and continues to

26   be his primary residence.

27   ///

28

DEBTOR'S OPPOSITION TO BELGIUM INVESTMENTS 960 BAY DR, LLC'S OBJECTION TO DEBTOR'S CLAIMED HOMESTEAD
EXEMPTION; DECLARATION OF BASSEM VICTOR EL MALLAKH IN SUPPORT THEREOF

2.   <u>Debtor is Entitled to the Homestead Exemption Available on the
     Bankruptcy Petition Date</u>

The homestead exemption shields a homeowner's principal residence from
creditors in case of bankruptcy. The objective of homestead legislation is to provide a
place for families and their surviving members *to* be freed from any anxiety that their
primary residence may be taken from them against their will, either by reason of their
own necessity or improvidence, or from the importunity of their creditors. *Thorsby v.
Babcock,* 36 Cal. 2d 202, 204 (1950) "[T]he homestead law is not designed to protect
creditors, but protects the home against creditors . . . thereby preserving the home for the
family." *Amin v. Khazindar,* 112 Cal.App.4th 582, 588 (2003).

A.   <u>California's New Homestead Exemption in AB 1885 and its Effect on
     California Code of Civil Procedure Section 704.730 – California's
     Homestead Exemption Statute</u>

On January 1, 2021, AB 1885 went into effect updating the limits prescribed in
CCP § 704.730, and protecting debtors who own homes by increasing the California
homestead amount to an amount that would keep most homeowners safe from creditors.

AB 1885 provides that:

(a) The amount of the homestead exemption is the greater of the following:

   (1) The countywide median sale price for a single-family home in the
   calendar year prior to the calendar year in which the judgment debtor
   claims the exemption, not to exceed six hundred thousand dollars
   ($600,000[1]).

   (2) Three hundred thousand dollars ($300,000).

(b) The amounts specified in this section shall adjust annually for inflation,
beginning on January 1, 2022, based on the change in the annual California

---

[1] The current homestead exemption available to the Debtor is $626,400.00.

5

Consumer Price Index for All Urban Consumers for the prior fiscal year,

published by the Department of Industrial Relations.

AB 1885

Effective January 1, 2021, California Code of Civil Procedure Section 704.730

now reads:

> (a) The amount of the homestead exemption is the greater of the following:
>
>> (1) The countywide median sale price for a single-family home in the
>> calendar year prior to the calendar year in which the judgment debtor
>> claims the exemption, not to exceed six hundred thousand dollars
>> ($600,000).
>>
>> (2) Three hundred thousand dollars ($300,000).
>
> (b) The amounts specified in this section shall adjust annually for inflation,
> beginning on January 1, 2022, based on the change in the annual California
> Consumer Price Index for All Urban Consumers for the prior fiscal year,
> published by the Department of Industrial Relations.

CCP § 704.730

Before AB 1885 went into effect on January 1, 2021, the homestead exemptions in

California were $75,000 for a single homeowner, $100,000 for a married couple, and

$175,000 for families who met specific requirements. However, AB 1885 has changed

CCP § 704.730 to "instead make the homestead exemption the greater of $300,000 or the

countywide median sale price of a single-family home in the calendar year prior to the

calendar year in which the judgment debtor claims the exemption, not to exceed

$600,000."

B. Previous and Outdated Limits on Homestead Exemption Do Not Apply in
Bankruptcy

Belgium argues that the new California Code of Civil Procedure § 704.730

exemption limits do not apply to the Debtor's case because the Debtor's homestead

6

DEBTOR'S OPPOSITION TO BELGIUM INVESTMENTS 960 BAY DR, LLC'S OBJECTION TO DEBTOR'S CLAIMED HOMESTEAD
EXEMPTION; DECLARATION OF BASSEM VICTOR EL MALLAKH IN SUPPORT THEREOF

exemption should be capped at $75,000 which was the maximum available to the Debtor when Belgium's judgment was recorded. However, this argument has been rejected by multiple cases. Courts have instead ruled that debtors are not limited to a lower, pre-2021 amount even if the declared homestead was recorded before 2021. *See In re Zall*, No. BAP.EC-05-1476-MOSB, 2006 WL 6811022, at *4 (B.A.P. 9th Cir., Sept. 5, 2006). This allows debtors to claim the increased homestead exemption despite a previously declared, pre-2021 homestead exemption. In *Zall*, the Court held exemption law in effect on date of Chapter 13 petition determines available exemptions—not exemptions under state law at the time judgment lien was recorded. "[L]imiting the exemption to the amounts available on the dates that judgment liens attach is inconsistent with section 522(f). . . . In order to determine the amount of an exemption that Debtors could claim if there were no liens on the property, the court must look not to the time the lien was fixed but rather to the time the trustee's hypothetical levy became effective, which is the date Debtors filed their bankruptcy petition." *See In re Zall*, No. BAP.EC-05-1476-MOSB, 2006 WL 6811022, at *4 (B.A.P. 9th Cir., Sept. 5, 2006).

   C. The *Barclay vs. Boskoski*, 2022 WL 16911862 (9th Cir. November 14, 2022) Decision is the Controlling Authority, and Mandates that the Court Use Debtor's Petition Date to Determine the Amount of His Exemption

On November 14, 2022, in *Barclay vs. Boskoski*, 2022 WL 16911862 (9th Cir. November 14, 2022), the United States Court of Appeals for the Ninth Circuit found that the bankruptcy court correctly applied the $600,000 homestead exemption in effect on the filing date of the bankruptcy petition, rather than the significantly lower homestead exemption available when the judgment lien was recorded seven years prior. As a result, the judgment lien was avoided in its entirety.

In 2014, Greek Village, LLC, Konstantinos Manassakis, and Aimilia Manassakis recorded a $256,075.95 judgment lien ("Greek Village Judgment Lien") against Debtor Dejan Boskoski's Carlsbad, California home. Because the debtor was married in 2014,

7

the maximum homestead exemption applicable to the Greek Village Judgment Lien was $100,000. See Cal. Civ. Proc. Code § 704.730 (2013). Following the perfection of the judgment, in 2021 California amended its exemption statute to allow debtors to claim the greater of (1) the "median sale price for a single-family home" in the debtor's county the year before the debtor claims the exemption, "not to exceed" $600,000; or (2) $300,000. See Cal. Civ. Proc. Code § 704.730(a) (2021).

In August 2021 (seven years after the Greek Village Judgment Lien was perfected and eight months after California enacted the new homestead exemption), the debtor filed a chapter 7 case. The debtor claimed the $600,000 homestead exemption in his schedules and sought to avoid the Greek Village Judgment Lien, which exceeded $477,000 as of the petition date. The debtor argued that the Bankruptcy Code required the court to look to the exemption the debtor could have claimed, but for the lien, at the time he filed his bankruptcy petition, not when the judgment lien was created. The Greek Village Judgment Lien therefore impaired his homestead exemption by $543,897.20, as the home was subject to two deeds of trust totaling $551,720.47, the Greek Village Judgment Lien, and the $600,000 homestead exemption. In total, these equaled $1,629,647.20, an amount exceeding the value of the debtor's home by $543,897.20. The Chapter 7 trustee objected, arguing that the maximum homestead exemption available to the debtor was $100,000 because under California law the exemption the debtor could claim was fixed at the 2014 amount. See Cal. Civ. Proc. Code § 703.050(a).

The bankruptcy court agreed with the debtor's argument that the exemption amount is fixed on the date of filing the petition. Because the bankruptcy court believed it to be a "close call on an important question," the decision was immediately certified to the Ninth Circuit as a case of first impression. 2022 WL 16911862 at *6. The Ninth Circuit affirmed the decision of the bankruptcy court and held that the debtor's exemption amount was fixed on the date the petition was filed.

8

The Ninth Circuit based its decision on the meaning of 11 U.S.C. Section 522(f), which provides that a debtor may avoid a judgment lien to the extent that the lien "impairs an exemption to which the debtor would have been entitled." Boskoski, 2022 WL 16911862 at * 8 (emphasis in original). In interpreting Section 522(f), the panel reviewed the U.S. Supreme Court's decision Owen v. Owen, 500 U.S. 305 (1991), in which it held that an exemption is fixed on the date of filing the petition. The Ninth Circuit acknowledged that in Owen the Supreme Court held that Section 522(f) established that the "baseline" against which impairment should be measured is not the exemption to which a debtor "is entitled" but is the exemption to which a debtor "would have been entitled." Id. Relying on Owen, the panel therefore held that in deciding whether a judgment lien impairs a debtor's California homestead exemption under Section 522(f), the Bankruptcy Code requires courts to determine the amount of the exemption to which the debtor would have been entitled in the absence of the lien at issue. The Ninth Circuit also noted that the exemptions available to the debtor are generally fixed as of the filing date of the bankruptcy petition, citing White v. Stump, 266 U.S. 310, 313 (1924) (describing the "snapshot rule"). Boskoski, 2022 WL 16911862 at *4.

The Debtor's instant Chapter 11 case was filed on September 19, 2022. Based on the controlling authority in *Barclay vs. Boskoski*, 2022 WL 16911862 (9th Cir. November 14, 2022), the Debtor is entitled to the homestead exemption available to him on the petition date, and not the homestead exemption on the date of the recordation of Belgium's lien.

///

///

///

///

///

9

1

### III.   <u>CONCLUSION</u>

2      WHEREFORE, Debtor asks for an order overruling Belgium's Objection to

3   Debtor's Claimed Homestead Exemption, and for any further relief deemed necessary

4   and proper.

5

6

7   DATED: December 28, 2022      LAW OFFICES OF MICHAEL JAY BERGER

8

9                                    By: _____

10                                       Michael Jay Berger
                                         Counsel for Debtor-in-Possession
11                                       Bassem Victor El Mallakh

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DECLARATION OF BASSEM VICTOR EL MALLAKH

I, Bassem Victor El Mallakh, declare and state as follows:

1.      I am the Debtor. I am over the age of 18. I have personal knowledge of the facts set forth below and if called to testify as to those facts, I could and would competently do so.

2.      The Rockefeller Property is my primary residence. My current Chapter 11 case and my previously filed Chapter 13 case both listed the Rockefeller Property as my primary residence, as do my tax returns, bank statements, car insurance declaration and mortgage payoff statement. A true and correct copy of my Chapter 13 Voluntary Petition, first pages of my prepetition 2019-2022 tax returns, my car insurance policy, my prepetition bank statement, and my mortgage payoff statement all addressed to me at the Rockefeller Property indicating my primary residence is the Rockefeller Property are attached hereto as **Exhibit "1."**

3.      The lease agreement between my sister and I does not bar me from living in the Rockefeller Property as my primary residence. I am leasing part of the Rockefeller Property to my sister who pays me rent. I am also living in the Rockefeller Property. Belgium's res judicata argument that another Court purportedly made a finding that the

I declare under penalty of perjury that the foregoing is true and correct and that this declaration is executed on December 28, 2022 at___Irvine_____.

_____
Bassem Victor El Mallakh

11

EXHIBIT 1

Case 8:22-bk-11158-TA    Doc 1    Filed 07/12/22    Entered 07/12/22 22:35:39    Desc
Main Document    Page 1 of 12

<table>
<tr><td colspan="2"><b>Fill in this information to identify your case:</b></td></tr>
</table>

United States Bankruptcy Court for the:

CENTRAL DISTRICT OF CALIFORNIA

Case number *(if known)*

Chapter you are filing under:

☐ Chapter 7

☐ Chapter 11

☐ Chapter 12

☑ Chapter 13

☐ Check if this is an
amended filing

# Official Form 101
# Voluntary Petition for Individuals Filing for Bankruptcy

02/20

The bankruptcy forms use *you* and *Debtor 1* to refer to a debtor filing alone. A married couple may file a bankruptcy case together—called a *joint case*—and in joint cases, these forms use *you* to ask for information from both debtors. For example, if a form asks, "Do you own a car," the answer would be *yes* if either debtor owns a car. When information is needed about the spouses separately, the form uses *Debtor 1* and *Debtor 2* to distinguish between them. In joint cases, one of the spouses must report information as *Debtor 1* and the other as *Debtor 2*. The same person must be *Debtor 1* in all of the forms.

Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write your name and case number (if known). Answer every question.

## Part 1:   Identify Yourself

|  |  | About Debtor 1: | About Debtor 2 (Spouse Only in a Joint Case): |
|---|---|---|---|
| **1.** | **Your full name** | | |
| | Write the name that is on your government-issued picture identification (for example, your driver's license or passport). | **Bassem**<br>First name | First name |
| | | **Essam**<br>Middle name | Middle name |
| | Bring your picture identification to your meeting with the trustee. | **El Mallakh**<br>Last name and Suffix (Sr., Jr., II, III) | Last name and Suffix (Sr., Jr., II, III) |
| **2.** | **All other names you have used in the last 8 years**<br>Include your married or maiden names. | | |
| **3.** | **Only the last 4 digits of your Social Security number or federal Individual Taxpayer Identification number (ITIN)** | xxx-xx-3012 | |

Debtor 1   **Bassem Essam El Mallakh**                                        Case number *(if known)*

|  | About Debtor 1: | About Debtor 2 (Spouse Only in a Joint Case): |
|---|---|---|
| **4. Any business names and Employer Identification Numbers (EIN) you have used in the last 8 years**<br><br>Include trade names and *doing business as* names | ☑ I have not used any business name or EINs.<br><br>Business name(s)<br><br>EIN | ☐ I have not used any business name or EINs.<br><br>Business name(s)<br><br>EIN |
| **5. Where you live** | **116 Rockefeller**<br>**Irvine, CA 92612**<br>Number, Street, City, State & ZIP Code<br><br>**Orange**<br>County<br><br>If your mailing address is different from the one above, fill it in here. Note that the court will send any notices to you at this mailing address.<br><br>Number, P.O. Box, Street, City, State & ZIP Code | If Debtor 2 lives at a different address:<br><br>Number, Street, City, State & ZIP Code<br><br>County<br><br>If Debtor 2's mailing address is different from yours, fill it in here. Note that the court will send any notices to this mailing address.<br><br>Number, P.O. Box, Street, City, State & ZIP Code |
| **6. Why you are choosing *this district* to file for bankruptcy** | Check one:<br><br>☑ Over the last 180 days before filing this petition, I have lived in this district longer than in any other district.<br><br>☐ I have another reason. Explain. (See 28 U.S.C. § 1408.) | Check one:<br><br>☐ Over the last 180 days before filing this petition, I have lived in this district longer than in any other district.<br><br>☐ I have another reason. Explain. (See 28 U.S.C. § 1408.) |

Debtor 1    **Bassem Essam El Mallakh**                                                Case number *(if known)*

| <span style="background:black;color:white">Part 2:</span> | **Tell the Court About Your Bankruptcy Case** |

**7.** **The chapter of the Bankruptcy Code you are choosing to file under**

*Check one. (For a brief description of each, see Notice Required by 11 U.S.C. § 342(b) for Individuals Filing for Bankruptcy (Form 2010)). Also, go to the top of page 1 and check the appropriate box.*

☐ Chapter 7

☐ Chapter 11

☐ Chapter 12

■ Chapter 13

**8.** **How you will pay the fee**

■ **I will pay the entire fee when I file my petition.** Please check with the clerk's office in your local court for more details about how you may pay. Typically, if you are paying the fee yourself, you may pay with cash, cashier's check, or money order. If your attorney is submitting your payment on your behalf, your attorney may pay with a credit card or check with a pre-printed address.

☐ **I need to pay the fee in installments.** If you choose this option, sign and attach the *Application for Individuals to Pay The Filing Fee in Installments* (Official Form 103A).

☐ **I request that my fee be waived** (You may request this option only if you are filing for Chapter 7. By law, a judge may, but is not required to, waive your fee, and may do so only if your income is less than 150% of the official poverty line that applies to your family size and you are unable to pay the fee in installments). If you choose this option, you must fill out the *Application to Have the Chapter 7 Filing Fee Waived* (Official Form 103B) and file it with your petition.

**9.** **Have you filed for bankruptcy within the last 8 years?**

■ No.

☐ Yes.

| | | | |
|---|---|---|---|
| District | | When | Case number |
| District | | When | Case number |
| District | | When | Case number |

**10.** **Are any bankruptcy cases pending or being filed by a spouse who is not filing this case with you, or by a business partner, or by an affiliate?**

■ No

☐ Yes.

| | | | |
|---|---|---|---|
| Debtor | | | Relationship to you |
| District | | When | Case number, if known |
| Debtor | | | Relationship to you |
| District | | When | Case number, if known |

**11.** **Do you rent your residence?**

■ No.    Go to line 12.

☐ Yes.    Has your landlord obtained an eviction judgment against you?

   ☐    No. Go to line 12.

   ☐    Yes. Fill out *Initial Statement About an Eviction Judgment Against You* (Form 101A) and file it as part of this bankruptcy petition.

Debtor 1    **Bassem Essam El Mallakh**                                    Case number *(if known)*

| | |
|---|---|
| 12. **Are you a sole proprietor of any full- or part-time business?** | ■ **No.**  Go to Part 4. |
| | ☐ **Yes.**  Name and location of business |
| A sole proprietorship is a business you operate as an individual, and is not a separate legal entity such as a corporation, partnership, or LLC. | Name of business, if any |
| If you have more than one sole proprietorship, use a separate sheet and attach it to this petition. | Number, Street, City, State & ZIP Code |

*Check the appropriate box to describe your business:*

☐  Health Care Business (as defined in 11 U.S.C. § 101(27A))

☐  Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))

☐  Stockbroker (as defined in 11 U.S.C. § 101(53A))

☐  Commodity Broker (as defined in 11 U.S.C. § 101(6))

☐  None of the above

13. **Are you filing under Chapter 11 of the Bankruptcy Code and are you a *small business debtor*?**

*If you are filing under Chapter 11, the court must know whether you are a small business debtor so that it can set appropriate deadlines. If you indicate that you are a small business debtor, you must attach your most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if any of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).*

For a definition of *small business debtor,* see 11 U.S.C. § 101(51D).

■ **No.**  I am not filing under Chapter 11.

☐ **No.**  I am filing under Chapter 11, but I am NOT a small business debtor according to the definition in the Bankruptcy Code.

☐ **Yes.**  I am filing under Chapter 11, I am a small business debtor according to the definition in the Bankruptcy Code, and I do not choose to proceed under Subchapter V of Chapter 11.

☐ **Yes.**  I am filing under Chapter 11, I am a small business debtor according to the definition in the Bankruptcy Code, and I choose to proceed under Subchapter V of Chapter 11.

14. **Do you own or have any property that poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety? Or do you own any property that needs immediate attention?**

*For example, do you own perishable goods, or livestock that must be fed, or a building that needs urgent repairs?*

■ **No.**

☐ **Yes.**  What is the hazard?

If immediate attention is needed, why is it needed?

Where is the property?

Number, Street, City, State & Zip Code

Debtor 1    **Bassem Essam El Mallakh**                                      Case number *(if known)*

| Part 5: | **Explain Your Efforts to Receive a Briefing About Credit Counseling** |

**15.  Tell the court whether you have received a briefing about credit counseling.**

The law requires that you receive a briefing about credit counseling before you file for bankruptcy. You must truthfully check one of the following choices. If you cannot do so, you are not eligible to file.

If you file anyway, the court can dismiss your case, you will lose whatever filing fee you paid, and your creditors can begin collection activities again.

**About Debtor 1:**

*You must check one:*

■ **I received a briefing from an approved credit counseling agency within the 180 days before I filed this bankruptcy petition, and I received a certificate of completion.**

Attach a copy of the certificate and the payment plan, if any, that you developed with the agency.

☐ **I received a briefing from an approved credit counseling agency within the 180 days before I filed this bankruptcy petition, but I do not have a certificate of completion.**

Within 14 days after you file this bankruptcy petition, you MUST file a copy of the certificate and payment plan, if any.

☐ **I certify that I asked for credit counseling services from an approved agency, but was unable to obtain those services during the 7 days after I made my request, and exigent circumstances merit a 30-day temporary waiver of the requirement.**

To ask for a 30-day temporary waiver of the requirement, attach a separate sheet explaining what efforts you made to obtain the briefing, why you were unable to obtain it before you filed for bankruptcy, and what exigent circumstances required you to file this case.

Your case may be dismissed if the court is dissatisfied with your reasons for not receiving a briefing before you filed for bankruptcy. If the court is satisfied with your reasons, you must still receive a briefing within 30 days after you file. You must file a certificate from the approved agency, along with a copy of the payment plan you developed, if any. If you do not do so, your case may be dismissed.

Any extension of the 30-day deadline is granted only for cause and is limited to a maximum of 15 days.

☐ **I am not required to receive a briefing about credit counseling because of:**

☐ **Incapacity.**
I have a mental illness or a mental deficiency that makes me incapable of realizing or making rational decisions about finances.

☐ **Disability.**
My physical disability causes me to be unable to participate in a briefing in person, by phone, or through the internet, even after I reasonably tried to do so.

☐ **Active duty.**
I am currently on active military duty in a military combat zone.

If you believe you are not required to receive a briefing about credit counseling, you must file a motion for waiver credit counseling with the court.

**About Debtor 2 (Spouse Only in a Joint Case):**

*You must check one:*

☐ **I received a briefing from an approved credit counseling agency within the 180 days before I filed this bankruptcy petition, and I received a certificate of completion.**

Attach a copy of the certificate and the payment plan, if any, that you developed with the agency.

☐ **I received a briefing from an approved credit counseling agency within the 180 days before I filed this bankruptcy petition, but I do not have a certificate of completion.**

Within 14 days after you file this bankruptcy petition, you MUST file a copy of the certificate and payment plan, if any.

☐ **I certify that I asked for credit counseling services from an approved agency, but was unable to obtain those services during the 7 days after I made my request, and exigent circumstances merit a 30-day temporary waiver of the requirement.**

To ask for a 30-day temporary waiver of the requirement, attach a separate sheet explaining what efforts you made to obtain the briefing, why you were unable to obtain it before you filed for bankruptcy, and what exigent circumstances required you to file this case.

Your case may be dismissed if the court is dissatisfied with your reasons for not receiving a briefing before you filed for bankruptcy.

If the court is satisfied with your reasons, you must still receive a briefing within 30 days after you file. You must file a certificate from the approved agency, along with a copy of the payment plan you developed, if any. If you do not do so, your case may be dismissed.

Any extension of the 30-day deadline is granted only for cause and is limited to a maximum of 15 days.

☐ **I am not required to receive a briefing about credit counseling because of:**

☐ **Incapacity.**
I have a mental illness or a mental deficiency that makes me incapable of realizing or making rational decisions about finances.

☐ **Disability.**
My physical disability causes me to be unable to participate in a briefing in person, by phone, or through the internet, even after I reasonably tried to do so.

☐ **Active duty.**
I am currently on active military duty in a military combat zone.

If you believe you are not required to receive a briefing about credit counseling, you must file a motion for waiver of credit counseling with the court.

Debtor 1    **Bassem El Mallakh**                                             Case number *(if known)*

| Part 6: | Answer These Questions for Reporting Purposes |
|---|---|

16. **What kind of debts do you have?**

    16a.  **Are your debts primarily consumer debts?** *Consumer debts* are defined in 11 U.S.C. § 101(8) as "incurred by an individual primarily for a personal, family, or household purpose."

    ☐ No. Go to line 16b.

    ■ Yes. Go to line 17.

    16b.  **Are your debts primarily business debts?** *Business debts* are debts that you incurred to obtain money for a business or investment or through the operation of the business or investment.

    ☐ No. Go to line 16c.

    ☐ Yes. Go to line 17.

    16c.  State the type of debts you owe that are not consumer debts or business debts

17. **Are you filing under Chapter 7?**

    ■ No.    I am not filing under Chapter 7. Go to line 18.

    **Do you estimate that after any exempt property is excluded and administrative expenses are paid that funds will be available for distribution to unsecured creditors?**

    ☐ Yes.   I am filing under Chapter 7. Do you estimate that after any exempt property is excluded and administrative expenses are paid that funds will be available to distribute to unsecured creditors?

    ☐ No

    ☐ Yes

18. **How many Creditors do you estimate that you owe?**

    ■ 1-49
    ☐ 50-99
    ☐ 100-199
    ☐ 200-999

    ☐ 1,000-5,000
    ☐ 5001-10,000
    ☐ 10,001-25,000

    ☐ 25,001-50,000
    ☐ 50,001-100,000
    ☐ More than100,000

19. **How much do you estimate your assets to be worth?**

    ■ $0 - $50,000
    ☐ $50,001 - $100,000
    ☐ $100,001 - $500,000
    ☐ $500,001 - $1 million

    ☐ $1,000,001 - $10 million
    ☐ $10,000,001 - $50  million
    ☐ $50,000,001 - $100 million
    ☐ $100,000,001 - $500 million

    ☐ $500,000,001 - $1 billion
    ☐ $1,000,000,001 - $10 billion
    ☐ $10,000,000,001 - $50 billion
    ☐ More than $50 billion

20. **How much do you estimate your liabilities to be?**

    ■ $0 - $50,000
    ☐ $50,001 - $100,000
    ☐ $100,001 - $500,000
    ☐ $500,001 - $1 million

    ☐ $1,000,001 - $10 million
    ☐ $10,000,001 - $50  million
    ☐ $50,000,001 - $100 million
    ☐ $100,000,001 - $500 million

    ☐ $500,000,001 - $1 billion
    ☐ $1,000,000,001 - $10 billion
    ☐ $10,000,000,001 - $50 billion
    ☐ More than $50 billion

| Part 7: | Sign Below |
|---|---|

**For you**

I have examined this petition, and I declare under penalty of perjury that the information provided is true and correct.

If I have chosen to file under Chapter 7, I am aware that I may proceed, if eligible, under Chapter 7, 11,12, or 13 of title 11, United States Code. I understand the relief available under each chapter, and I choose to proceed under Chapter 7.

If no attorney represents me and I did not pay or agree to pay someone who is not an attorney to help me fill out this document, I have obtained and read the notice required by 11 U.S.C. § 342(b).

I request relief in accordance with the chapter of title 11, United States Code, specified in this petition.

I understand making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $250,000, or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

**Bassem Essam El Mallakh**
Signature of Debtor 1

Executed on  **7/12/2022**
           MM / DD / YYYY

Signature of Debtor 2

Executed on
           MM / DD / YYYY

Debtor 1    **Bassem Essam El Mallakh**                                                    Case number *(if known)*

For your attorney, if you are represented by one

If you are not represented by an attorney, you do not need to file this page.

I, the attorney for the debtor(s) named in this petition, declare that I have informed the debtor(s) about eligibility to proceed under Chapter 7, 11, 12, or 13 of title 11, United States Code, and have explained the relief available under each chapter for which the person is eligible. I also certify that I have delivered to the debtor(s) the notice required by 11 U.S.C. § 342(b) and, in a case in which § 707(b)(4)(D) applies, certify that I have no knowledge after an inquiry that the information in the schedules filed with the petition is incorrect.

Signature of Attorney for Debtor

Date    7/12/2022
        MM / DD / YYYY

**Benjamin Heston**
Printed name

Firm name

**100 Bayview Circle, Suite 100**
**Newport Beach, CA 92660**
Number, Street, City, State & ZIP Code

Contact phone    **951-290-2827**          Email address    **bheston.ecf@gmail.com**

**297798 CA**
Bar number & State

Form **1040**    Department of the Treasury — Internal Revenue Service (99)
**U.S. Individual Income Tax Return**    **2021**    OMB No. 1545-0074    IRS Use Only — Do not write or staple in this space.

| Filing Status | [X] Single | [ ] Married filing jointly | [ ] Married filing separately (MFS) | [ ] Head of household (HOH) | [ ] Qualifying widow(er) (QW) |
|---|---|---|---|---|---|

Check only one box. If you checked the MFS box, enter the name of your spouse. If you checked the HOH or QW box, enter the child's name if the qualifying person is a child but not your dependent ▶

| Your first name and middle initial | Last name | Your social security number |
|---|---|---|
| Bassem El Mallakh | | 3012 |

| If joint return, spouse's first name and middle initial | Last name | Spouse's social security number |
|---|---|---|

Home address (number and street) If you have a P.O. box, see instructions.    Apt. no.

116 Rockefeller

City, town, or post office. If you have a foreign address, also complete spaces below.    State    ZIP code

Irvine, CA 92612

Foreign country name    Foreign province/state/county    Foreign postal code

**Presidential Election Campaign**
Check here if you, or your spouse if filing jointly, want $3 to go to this fund. Checking a box below will not change your tax or refund.
[ ] You    [ ] Spouse

At any time during 2021, did you receive, sell, exchange, or otherwise dispose of any financial interest in any virtual currency?    [ ] Yes  [X] No

**Standard Deduction**    Someone can claim:    [ ] You as a dependent    [ ] Your spouse as a dependent
[ ] Spouse itemizes on a separate return or you were a dual-status alien

**Age/Blindness**    You:  [ ] Were born before January 2, 1957    [ ] Are blind    Spouse:  [ ] Was born before January 2, 1957    [ ] Is blind

**Dependents** (see instructions):

| | (1) First name    Last name | (2) Social security number | (3) Relationship to you | (4) ✓ if qualifies for (see instructions): |  |
|---|---|---|---|---|---|
| If more than four dependents, see instructions and check here ▶ [ ] | | | | Child tax credit | Credit for other dependents |
| | | | | [ ] | [ ] |
| | | | | [ ] | [ ] |
| | | | | [ ] | [ ] |
| | | | | [ ] | [ ] |

Attach Sch. B if required.

| | | | | | |
|---|---|---|---|---|---|
| **1** | Wages, salaries, tips, etc. Attach Form(s) W-2 | | | **1** | |
| **2a** | Tax-exempt interest......... | 2a | **b** Taxable interest........... | **2b** | 3. |
| **3a** | Qualified dividends......... | 3a | **b** Ordinary dividends........ | **3b** | |
| **4a** | IRA distributions........... | 4a | **b** Taxable amount........... | **4b** | |
| **5a** | Pensions and annuities...... | 5a | **b** Taxable amount........... | **5b** | |
| **6a** | Social security benefits...... | 6a | **b** Taxable amount........... | **6b** | |
| **7** | Capital gain or (loss). Attach Schedule D if required. If not required, check here ........ ▶ [ ] | | | **7** | |
| **8** | Other income from Schedule 1, line 10................ | | | **8** | |
| **9** | Add lines 1, 2b, 3b, 4b, 5b, 6b, 7, and 8. This is your **total income**........ ▶ | | | **9** | 3. |
| **10** | Adjustments to income from Schedule 1, line 26....... | | | **10** | |
| **11** | Subtract line 10 from line 9. This is your **adjusted gross income** ........ ▶ | | | **11** | 3. |

**Standard Deduction for —**
• Single or Married filing separately, $12,550
• Married filing jointly or Qualifying widow(er), $25,100
• Head of household, $18,800
• If you checked any box under *Standard Deduction,* see instructions.

| | | | | | |
|---|---|---|---|---|---|
| **12a** | Standard deduction or itemized deductions (from Schedule A) | 12a | 12,550. | | |
| **b** | Charitable contributions if you take the standard deduction (see instructions).. | 12b | | | |
| **c** | Add lines 12a and 12b | | | **12c** | 12,550. |
| **13** | Qualified business income deduction from Form 8995 or Form 8995-A .............. | | | **13** | |
| **14** | Add lines 12c and 13 | | | **14** | 12,550. |
| **15** | **Taxable income.** Subtract line 14 from line 11. If zero or less, enter -0-............. | | | **15** | 0. |

**BAA For Disclosure, Privacy Act, and Paperwork Reduction Act Notice, see separate instructions.**    Form **1040** (2021)

FDIA0112L  12/10/21

Form **1040**　Department of the Treasury — Internal Revenue Service (99)
**U.S. Individual Income Tax Return** **2019**　OMB No. 1545-0074　IRS Use Only — Do not write or staple in this space.

**Filing Status**
Check only one box.
[X] Single　[ ] Married filing jointly　[ ] Married filing separately (MFS)　[ ] Head of household (HOH)　[ ] Qualifying widow(er) (QW)

If you checked the MFS box, enter the name of spouse. If you checked the HOH or QW box, enter the child's name if the qualifying person is a child but not your dependent. ▶

| Your first name and middle initial | Last name | Your social security number |
|---|---|---|
| Bassem El Mallakh | | 3012 |

| If joint return, spouse's first name and middle initial | Last name | Spouse's social security number |
|---|---|---|
| | | |

Home address (number and street). If you have a P.O. box, see instructions. — Apt. no.
116 Rockefeller

City, town or post office, state, and ZIP code. If you have a foreign address, also complete spaces below (see instructions).
Irvine, CA 92612

| Foreign country name | Foreign province/state/county | Foreign postal code |
|---|---|---|
| | | |

**Presidential Election Campaign**
Check here if you, or your spouse if filing jointly, want $3 to go to this fund. Checking a box below will not change your tax or refund.　[ ] You　[ ] Spouse

If more than four dependents, see instructions and ✓ here ▶ [ ]

**Standard Deduction**
Someone can claim:　[ ] You as a dependent　[ ] Your spouse as a dependent
[ ] Spouse itemizes on a separate return or you were a dual-status alien

**Age/Blindness**　You: [ ] Were born before January 2, 1955　[ ] Are blind　Spouse: [ ] Was born before January 2, 1955　[ ] Is blind

**Dependents** (see instructions):

| (1) First name    Last name | (2) Social security number | (3) Relationship to you | (4) ✓ if qualifies for (see instructions): Child tax credit | Credit for other dependents |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| | | | | |
|---|---|---|---|---|
| 1 | Wages, salaries, tips, etc. Attach Form(s) W-2 | | **1** | |
| 2a | Tax-exempt interest . . . . . . . . . . . . | **2a** | b Taxable int. Att. Sch. B if reqd. . . . **2b** | 5. |
| 3a | Qualified dividends . . . . . . . . . . | **3a** | b Ordinary div. Att. Sch. B if reqd. . . **3b** | |
| 4a | IRA distributions . . . . . . . . . | **4a** | b Taxable amount . . . . . . . . . . . . **4b** | |
| c | Pensions and annuities . . . . . . | **4c** | d Taxable amount . . . . . . . . . . . . **4d** | |
| 5a | Social security benefits . . . . . . . . . | **5a** | b Taxable amount . . . . . . . . . . . . **5b** | |
| 6 | Capital gain or (loss). Attach Schedule D if required. If not required, check here . . . . . . . . . . . . . . . ▶ [ ] | | **6** | |
| 7a | Other income from Schedule 1, line 9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | **7a** | |
| b | Add lines 1, 2b, 3b, 4b, 4d, 5b, 6, and 7a. This is your **total income** . . . . . . . . . . ▶ | | **7b** | 5. |
| 8a | Adjustments to income from Schedule 1, line 22 . . . . . . . . . . . . . . . . . . | | **8a** | |
| b | Subtract line 8a from line 7b. This is your **adjusted gross income** . . . . . . . . . . . . . ▶ | | **8b** | 5. |
| 9 | Standard deduction or itemized deductions (from Schedule A) . . . . . . . . . . **9** | 12,200. | | |
| 10 | Qualified business income deduction. Attach Form 8995 or Form 8995-A . . . . . . **10** | | | |
| 11a | Add lines 9 and 10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | **11a** | 12,200. |
| b | **Taxable income.** Subtract line 11a from line 8b. If zero or less, enter -0- . . . . . . . . . . . . . . . | | **11b** | 0. |

Standard Deduction for —
• Single or Married filing separately, $12,200
• Married filing jointly or Qualifying widow(er), $24,400
• Head of household, $18,350
• If you checked any box under *Standard Deduction,* see instructions.

**BAA For Disclosure, Privacy Act, and Paperwork Reduction Act Notice, see separate instructions.**　Form 1040 (2019)

FDIA0112L  10/07/19



# INTERINSURANCE EXCHANGE OF THE AUTOMOBILE CLUB

## MEMBERS' CONDOMINIUM OWNERS POLICY – FORM 6
## PROPERTY INSURANCE POLICY DECLARATIONS

### Evidence of Insurance
Policy contains 438BFU, printed on next page, in favor of Mortgagee shown.

| | |
|---|---|
| **MORTGAGEE**<br>ADDITIONAL OWNERS INTEREST<br>US TRUSTEE<br>UNITED STATES TRUSTEE (SA)<br>411 W FOURTH ST SUITE 7160<br>SANTA ANA CA 92701 | **LOAN NUMBER**<br><br>**POLICY NUMBER**<br>████20189 |
| **NAMED INSURED AND MAILING ADDRESS**<br>BASSEM EL MALLAKH<br>116 ROCKEFELLER<br>IRVINE CA 92612 | **LOCATION OF PREMISES (IF DIFFERENT FROM MAILING ADDRESS)** |

| | |
|---|---|
| ☐ **PROPERTY INSURANCE POLICY DECLARATIONS**<br>EFFECTIVE DATE OF THIS POLICY 10262022   12:01 A.M.<br>(PACIFIC STANDARD TIME)<br>EXPIRATION DATE OF THIS POLICY 10262023   12:01 A.M.<br>(PACIFIC STANDARD TIME)<br>**ANNUAL PREMIUM $**<br><br>☐ **AMENDMENT OF PROPERTY INSURANCE DECLARATIONS**<br>**ENDORSEMENT**<br>EFFECTIVE DATE   12:01 A.M<br>(PACIFIC STANDARD TIME)<br>EXPIRATION DATE OF THE POLICY   12:01 A.M.<br>(PACIFIC STANDARD TIME) | **COVERAGES AND LIMITS OF LIABILITY**<br><br>**PART I - PROPERTY COVERAGES**<br><br>COVERAGE A – BUILDING PROPERTY     82000<br><br>OTHER PERILS DEDUCTIBLE     5000<br><br>WATER DEDUCTIBLE     5000 |

**PROVISIONS**
This form is not a contract of insurance. The provisions of the policy shall prevail in all respects. All premiums for the insurance policy shall be computed in accordance with the Interinsurance Exchange of the Automobile Club rules, forms, premiums and minimum premiums applicable to the insurance afforded which are in effect at the inception of the insurance policy and upon each anniversary thereof, including the date of interim changes. The insurance policy does not become effective unless and until escrow closes, the named insured has an ownership interest in the residence premises, and the premium is paid or reserved in an escrow account. If the insurance protection evidenced herein terminates, the mortgagee will be given notice in accordance with the standard mortgage clause (438BFU).

*ACSC Management Services, Inc.*
**ATTORNEY-IN-FACT**

**FOR QUESTIONS OR CHANGES CALL**
6720 01/16

.................................................................. **DETACH HERE AND RETURN WITH PREMIUM PAYMENT** ..................................................................



INTERINSURANCE EXCHANGE of the
Automobile Club of Southern California
MAILING ADDRESS: P.O. Box 25448 SANTA ANA, CALIFORNIA 92799-5448

**NOTICE OF
PREMIUM DUE**

| **LOAN NUMBER** | **POLICY NUMBER**<br>CHO183020189 | **PLEASE PAY THE PREMIUM<br>DUE BEFORE OR ON THE<br>DUE DATE** |
|---|---|---|
| | **DUE DATE** | |
| **BASSEM EL MALLAKH**<br>116 ROCKEFELLER | **PREMIUM DUE** | **MAKE CHECK PAYABLE TO<br>ACSC** |

# Wells Fargo Combined Statement of Accounts

September 30, 2022 ◼ Page 1 of 6



BASSEM VICTOR EL MALLAKH
116 ROCKEFELLER
IRVINE CA 92612-8114

**Questions?**

Available by phone 24 hours a day, 7 days a week.
We accept all relay calls, including 711
**1-800-742-4932**

En español: 1-877-727-2932

Online: wellsfargo.com

Write: Wells Fargo Bank, N.A. (114)
P.O. Box 6995
Portland, OR 97228-6995

## You and Wells Fargo

Thank you for being a loyal Wells Fargo customer. We value your trust in our
company and look forward to continuing to serve you with your financial needs.

## Account options

A check mark in the box indicates you have these
convenient services with your account(s). Go to
wellsfargo.com or call the number above if you have
questions or if you would like to add new services.

| | | | |
|---|---|---|---|
| Online Banking | ☐ | Direct Deposit | ☐ |
| Online Bill Pay | ☐ | Auto Transfer/Payment | ☐ |
| Online Statements | ☐ | Overdraft Protection | ☐ |
| Mobile Banking | ☐ | Debit Card | ☐ |
| My Spending Report | ☐ | Overdraft Service | ☑ |

**Other Wells Fargo Benefits**

**From Wells Fargo Home Mortgage**

Is a home purchase in your future? Competitive rates and low down payment options make now a great time to buy a home. Plus, as a
Wells Fargo customer, you can count on personalized guidance and streamlined service every step of the way.

Get started with an online mortgage application that can pre-fill your Wells Fargo account information and save you time. Use your
Wells Fargo Online® username and password at the start of the application. Go to wellsfargo.com/homepurchase or contact your local
home mortgage consultant.

Created With Tiny Scanner

FREEDOM MORTGAGE®
PO Box 50485, Indianapolis, IN 46250-0485

BASSEM ELMALLAKH
116 ROCKEFELLER
IRVINE          CA 92612

August 16, 2021

## PAYOFF STATEMENT

Loan Number:        ████275          Next Payment Due Date: February 1, 2020
Borrower:           BASSEM ELMALLAKH

Property:           116 ROCKEFELLER
                    IRVINE          CA 92612

Loan Type:          CONVENTIONAL

### Payoff Quote Good Through September 15, 2021

The accrued interest shown below is projected through September 15, 2021. After that date, please add an additional $ 13.80 per day.

| Please send the following Remittance: | |
| --- | --- |
| Current Unpaid Principal | $ 201,970.66 |
| Accrued Interest | $ 9,657.70 |
| Prepayment Penalty | $ 0.00 |
| Escrow/Impound Required | $ 12,564.30 |
| Mortgage Insurance Premium Due | $ 0.00 |
| Less Escrow/Impound Funds | $ - 0.00 |
| Less Unapplied Funds Balance | $ 0.00 |
| Statement Fee | $ 30.00 |
| Unpaid Late Charges | $ 60.14 |
| Recording Fee | $ 168.00 |
| Release Fee | $ 0.00 |
| Additional Items Due | $ 75.00 |
| Deferred Balance | $.00 |
| Optional Insurance | $ 0.00 |
| **TOTAL PAYOFF DUE:** | $ 224,525.80 |

A Deferred Balance may include items such as deferred Principal Balance, Late Charges, Escrow Advances, Expense Advances and Administrative Fees.

The current escrow balance is $-12,564.30. Any escrow payments scheduled to disburse prior to the payoff expiration date will be deducted from the total escrow balance. If the scheduled disbursement creates a negative balance in the escrow account, these funds will appear as an escrow advance and included in the total payoff due. Available escrow funds will be returned to the borrower within 14 business days from the date the loan is paid in full.

261



**FREEDOM MORTGAGE**
PO Box 50485, Indianapolis, IN 46250-0485

*When applicable, any escrow funds credited toward the total payoff will not be returned.*

The information shown on this statement is subject to change. To ensure that you are submitting sufficient funds to pay your account in full, please contact our Customer Care Department for updated figures prior to remitting payoff funds. If your loan is referred to foreclosure this payoff statement will no longer be valid, therefore, a new payoff statement will need to be requested.

## WHERE TO SUBMIT PAYOFF FUNDS

**WIRE TRANSFER**
Freedom Mortgage Corporation
Reference:  Payoff/Payment Department
Keybank, 127 Public Square, Cleveland, OH
ABA:  041001039
Bank Account ████████3402
Borrower Name:  BASSEM ELMALLAKH
Loan Number:  ████████4275

**OVERNIGHT DELIVERIES OF PAYMENTS**
Freedom Mortgage Corporation
ATTN: Payoff Department
10500 Kincaid Drive, Suite 111
Fishers, Indiana  46037-9764

*Please note that Freedom Mortgage requires payoffs to be received in the form of certified funds. Personal checks will not be accepted. Additionally, Freedom Mortgage will only accept funds to pay off the account in full. Payoff funds received that are not sufficient to pay the loan account in full will be returned.*
*Incoming wire transfers received by 4pm EST will be credited the same day. Wires received after that time will be processed on the next business day.  Please ensure that all payoff funds submitted include the borrower's name and loan number.*

Customer Care representatives are available to assist you at (855) 690-5900 Monday through Friday from 8:00am – 10:00pm and Saturday from 9:00am – 6:00pm Eastern Time.

**FREEDOM MORTGAGE CORPORATION IS A DEBT COLLECTOR ATTEMPTING TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.**

**IMPORTANT NOTICE: TO THE EXTENT YOUR OBLIGATION HAS BEEN DISCHARGED IN BANKRUPTCY, IS SUBJECT TO THE AUTOMATIC STAY OR IS PROVIDED FOR IN A CONFIRMED PLAN, THIS COMMUNICATION IS FOR REGULATORY COMPLIANCE AND/OR INFORMATIONAL PURPOSES ONLY, AND DOES NOT CONSTITUTE A DEMAND FOR PAYMENT OR AN ATTEMPT TO IMPOSE PERSONAL LIABILITY FOR SUCH OBLIGATION.**

-----------------------------------------------------------------------------------------------------------------

### Change of Address Notification Form

Is your mailing address changing as a result of this payoff request? Please let us know your new address below in order to ensure all trailing documents are sent to the appropriate address. Please return this form to:

Freedom Mortgage P.O. Box 50428 Indianapolis IN 46250-0401

New Address: _____   City/State/Zip_____

**Loan Number:** 0113204275

261

# CHASE ◯

JP Morgan Chase Bank, N.A.
PO Box 659754
San Antonio, TX 76265-9754

**Questions?**

▢ chase.com

☏ 1-800-935-9935

We accept operator relay calls

10/28/2022

BASSEM V ELMALLAKH
116 ROCKEFELLER
IRVINE, CA 92612-8114

## Update:    We closed your account

Your account ending in 7532

*Dear Bassem Elmallakh*

Thank you for your recent inquiry about your account. We closed your account above on 09/20/2022
If you have questions, please call us at 1-800-935-9935 or visit any of our branches.

*Sincerely,*

**Customer Service**

©2019 JPMorgan Chase Bank, N.A. Member FDIC
M1008-01 (09/19)

Created With Tiny Scanner

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
9454 Wilshire Blvd., 6th Fl., Beverly Hills, CA 90212

A true and correct copy of the foregoing document entitled (*specify*): **DEBTOR'S OPPOSITION TO BELGIUM INVESTMENTS 960 BAY DR, LLC'S OBJECTION TO DEBTOR'S CLAIMED HOMESTEAD EXEMPTION; DECLARATION OF BASSEM VICTOR EL MALLAKH IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) 12/28/2022, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

Counsel for Debtor: Jay Berger michael.berger@bankruptcypower.com,
yathida.nipha@bankruptcypower.com;michael.berger@ecf.inforuptcy.com
U.S. Trustee; Nancy S Goldenberg nancy.goldenberg@usdoj.gov
Interested Party: Benjamin Heston bhestonecf@gmail.com, benheston@recap.email,NexusBankruptcy@jubileebk.net
United States Trustee (SA) ustpregion16.sa.ecf@usdoj.gov
Interested Party: Chad L Butler caecf@tblaw.com
Counsel for TD Bank: Randall P Mroczynski randym@cookseylaw.com
Counsel for Belgium Investments 960 Bay Dr, LLC: Patrick Miller    patrick.miller@impactadvocateslaw.com

☐ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On 12/28/2022, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☒ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on 12/28/2022, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

**Honorable Theodore Albert**
**United States Bankruptcy Court**
**Central District of California**
**Ronald Reagan Federal Building and Courthouse**
**411 West Fourth Street, Suite 5085 / Courtroom 5B**
**Santa Ana, CA 92701-4593**

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 12/28/2022 | Peter Garza | /s/Peter Garza |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

1  MICHAEL JAY BERGER (State Bar # 100291)
   LAW OFFICES OF MICHAEL JAY BERGER
2  9454 Wilshire Blvd. 6<sup>th</sup> Floor
   Beverly Hills, CA 90212-2929
3  Telephone:   (310) 271-6223
   Facsimile:    (310) 271-9805
4  michael.berger@bankruptcypower.com

5  Counsel for Debtor,
   Bassem Victor El Mallakh
6

7              UNITED STATES BANKRUPTCY COURT

8              CENTRAL DISTRICT OF CALIFORNIA

9                   SANTA ANA DIVISION

10 In re:                          )   CASE NO.:  8:22-bk-11605-TA
                                   )
11 BASSEM VICTOR EL MALLAKH,       )   Chapter 11
                                   )
12                                 )   SUPPLEMENTAL DECLARATION
           Debtor and Debtor-in-Possession. )   OF BASSEM VICTOR EL MALLAKH
13                                 )   IN SUPPORT OF DEBTOR'S
                                   )   OPPOSITION TO BELGIUM
14                                 )   INVESTMENTS 960 BAY DR, LLC'S
                                   )   OBJECTION TO DEBTOR'S
15                                 )   CLAIMED HOMESTEAD
                                   )   EXEMPTION
16                                 )
                                   )
17                                 )   Date:    March 30, 2023
                                   )   Time:    11:00 a.m.
18                                 )   Place:   411 West Fourth Street
                                   )            Courtroom 5B
19                                 )            Santa Ana, CA 92701
                                   )
20 _____ )   Via Tele/Videoconference on Zoom
21

22    **SUPPLEMENTAL DECLARATION OF BASSEM VICTOR EL MALLAKH**

23      I, Bassem Victor El Mallakh, declare and state as follows:

24      1.      I am the Debtor. I am over the age of 18. I have personal knowledge of the

25 facts set forth below and if called to testify as to those facts, I could and would

26 competently do so.

27

28

                                      1

2.    My instant Chapter 11 case was filed on September 19, 2022. This is my second bankruptcy filing.

3.    I hold title to the following real property which is my principal residence: 116 Rockefeller, Irvine, California 92612 ("Rockefeller Property").

4.    I previously filed a Chapter 13 [case no.: 8:22-bk-11158-TA], which I voluntarily dismissed because I was over the debt limit.

5.    My current Chapter 11 case was filed in order to reorganize my debts.

6.    My primary residence where I live is the Rockefeller Property and it has been by primary residence since I purchased it in 2013, on the date I filed my bankruptcy cases, and continues to be me primary residence.

7.    My current Chapter 11 case, and my previously filed Chapter 13 case listed the Rockefeller Property as my primary residence.

8.    On the Petition Date, and continuously thereafter, I resided in the Rockefeller Property with my sister Reem Hanna and her son. The Rockefeller Property is three (3) bedrooms. I sleep in one (1) bedroom, my sister sleeps in one (1) bedroom and her son sleeps one (1) bedrooms.

9.    The following is additional evidence to show that the Rockefeller Property is my primary residence is:

    a.  A true and correct copy of my Chapter 13 Voluntary Petition listing the Rockefeller Property as my home is attached as **Exhibit "1."**

    b.  A true and correct copy of the first pages of my 2019-2022 tax returns and other tax documents listing the Rockefeller Property as my home is attached as **Exhibit "2."**

    c.  A true and correct copy of my Homeowners Insurance Policy and Car Insurance listing the Rockefeller Property as my home is attached as **Exhibit "3."**

2

d.  A true and correct copy of my various bank statements listing the
    Rockefeller Property as my home is attached as **Exhibit "4."**

e.  A true and correct copy of my drivers license listing the Rockefeller
    Property as my home is attached as **Exhibit "5."**

f.  A true and correct copy of my car registration listing the Rockefeller
    Property as my home is attached as **Exhibit "6."**

g.  A true and correct copy of my SoCalGas Bill for the months of August
    2022 through January 2023 listing the Rockefeller Property as my home is
    attached as **Exhibit "7."**

h.  A true and correct copy of my Irvine Ranch Water District Bill for the
    months of August 2022 through January 2023 listing the Rockefeller
    Property as my home is attached as **Exhibit "8."**

i.  A true and correct copy of my health insurance card listing the Rockefeller
    Property as my home is attached as **Exhibit "9."**

j.  A true and correct copy of my Uber Eats receipts showing my food
    deliveries to the Rockefeller Property is attached as **Exhibit "10."**

k.  A true and correct copy of my Gym check-ins for LA Fitness located at
    3021 Michelson Drive, Irvine, CA which is located in Orange County close
    to the Rockefeller Property for the months of September 2022 to December
    2022 is attached as **Exhibit "11."**

l.  A true and correct copy of my iPhone GPS location for September 18, 2022
    is attached as **Exhibit "12."**

m.  A true and correct copy of my airline tickets for travel on September 8,
    2022 from San Francisco to Santa Ana airport is attached as **Exhibit "13."**

n.  A true and correct copy of my Amazon receipts showing my purchases
    delivered to the Rockefeller Property is attached as **Exhibit "14."**

3

10. From on or about 2016 through 2021, I was working in Santa Monica and due to the commute between Santa Monica and Orange County, my business associate and I leased an apartment for his associate at 525 Broadway, Santa Monica, CA 90410 (the "Santa Monica Property") which was our principal place of business for a tech start-up we were trying to get off the ground. I would sleep some evenings at Santa Monica Property if I had to work late and was too tired to drive back home to Orange County. However, the Rockefeller Property was and always has been my primary residence.

11. In the previous depositions I did in connection with the Florida 11st Circuit case with Belgium and the Orange County Superior Court case which sought to enforce the sister state judgment from the Florida case, the questions Belgium's counsel asked me were in regards to whether I was served at the Rockefeller Property. My statements are being misconstrued currently by Belgium's counsel. These depositions were done in 2021 or earlier, well before my bankruptcy filings. At the time I filed my chapter 11 case, I was living at the Rockefeller Property which is my primary residence and I continue to reside there.

12. I hereby state, unequivocally, prior to, on the petition date, and thereafter, I lived and currently live at the Rockefeller Property, and I have always intended and continue to intend the Rockefeller Property to be my primary residence and I continue to reside there.

13. On September 19, 2022, I went to Fedex with my father Essam ElMallakh to sign the bankruptcy petition and other commencement documents. I scanned the documents and emailed them to my Bankruptcy Counsel. Attached as **Exhibit "15"** is a true and correct copy of my Fedex receipt from September 19, 2022, from the Fedex store located at 3992 Barranca Park Ste A, Irvine, CA 92606. The Fedex location I went to is 3 miles away from my home, the Rockefeller Property.

4

SUPPLEMENTAL DECLARATION OF BASSEM VICTOR EL MALLAKH IN SUPPORT OF DEBTOR'S OPPOSITION TO BELGIUM INVESTMENTS 960 BAY DR, LLC'S OBJECTION TO DEBTOR'S CLAIMED HOMESTEAD EXEMPTION

1    I declare under penalty of perjury that the foregoing is true and correct and that

2  this declaration is executed on March __21__, 2023 at_____Egypt_____.

3

4

5  _____

6  Bassem Victor El Mallakh

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

5

EXHIBIT 1

Fill in this information to identify your case:

United States Bankruptcy Court for the:

CENTRAL DISTRICT OF CALIFORNIA

Case number *(if known)*

Chapter you are filing under:

☐ Chapter 7

☐ Chapter 11

☐ Chapter 12

■ Chapter 13

☐ Check if this is an amended filing

## Official Form 101
# Voluntary Petition for Individuals Filing for Bankruptcy                   02/20

The bankruptcy forms use *you* and *Debtor 1* to refer to a debtor filing alone. A married couple may file a bankruptcy case together—called a *joint case*—and in joint cases, these forms use *you* to ask for information from both debtors. For example, if a form asks, "Do you own a car," the answer would be *yes* if either debtor owns a car. When information is needed about the spouses separately, the form uses *Debtor 1* and *Debtor 2* to distinguish between them. In joint cases, one of the spouses must report information as *Debtor 1* and the other as *Debtor 2*. The same person must be *Debtor 1* in all of the forms.

Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write your name and case number (if known). Answer every question.

### Part 1:    Identify Yourself

|  |  | About Debtor 1: | About Debtor 2 (Spouse Only in a Joint Case): |
|---|---|---|---|
| 1. | **Your full name** |  |  |
|  | Write the name that is on your government-issued picture identification (for example, your driver's license or passport). | **Bassem**<br>First name | First name |
|  |  | **Essam**<br>Middle name | Middle name |
|  | Bring your picture identification to your meeting with the trustee. | **El Mallakh**<br>Last name and Suffix (Sr., Jr., II, III) | Last name and Suffix (Sr., Jr., II, III) |
| 2. | **All other names you have used in the last 8 years**<br>Include your married or maiden names. |  |  |
| 3. | **Only the last 4 digits of your Social Security number or federal Individual Taxpayer Identification number (ITIN)** | xxx-xx-3012 |  |

Debtor 1   **Bassem Essam El Mallakh**

Case number (if known)

| | | About Debtor 1: | About Debtor 2 (Spouse Only in a Joint Case): |
|---|---|---|---|
| 4. | Any business names and Employer Identification Numbers (EIN) you have used in the last 8 years | ■ I have not used any business name or EINs. | ☐ I have not used any business name or EINs. |
| | Include trade names and *doing business as* names | Business name(s) | Business name(s) |
| | | EIN | EIN |
| 5. | Where you live | **116 Rockefeller**<br>**Irvine, CA 92612**<br>Number, Street, City, State & ZIP Code | If Debtor 2 lives at a different address:<br><br>Number, Street, City, State & ZIP Code |
| | | **Orange**<br>County | County |
| | | If your mailing address is different from the one above, fill it in here. Note that the court will send any notices to you at this mailing address. | If Debtor 2's mailing address is different from yours, fill it in here.  Note that the court will send any notices to this mailing address. |
| | | Number, P.O. Box, Street, City, State & ZIP Code | Number, P.O. Box, Street, City, State & ZIP Code |
| 6. | Why you are choosing *this district* to file for bankruptcy | Check one:<br><br>■ Over the last 180 days before filing this petition, I have lived in this district longer than in any other district.<br><br>☐ I have another reason.<br>Explain. (See 28 U.S.C. § 1408.) | Check one:<br><br>☐ Over the last 180 days before filing this petition, I have lived in this district longer than in any other district.<br><br>☐ I have another reason.<br>Explain. (See 28 U.S.C. § 1408.) |

Debtor 1    **Bassem Essam El Mallakh**                              Case number (if known)

---

███ **Part 2:**  **Tell the Court About Your Bankruptcy Case**

7.  **The chapter of the Bankruptcy Code you are choosing to file under**

Check one. (For a brief description of each, see *Notice Required by 11 U.S.C. § 342(b) for Individuals Filing for Bankruptcy (Form 2010)*). Also, go to the top of page 1 and check the appropriate box.

☐ Chapter 7

☐ Chapter 11

☐ Chapter 12

■ Chapter 13

8.  **How you will pay the fee**

■ **I will pay the entire fee when I file my petition.** Please check with the clerk's office in your local court for more details about how you may pay. Typically, if you are paying the fee yourself, you may pay with cash, cashier's check, or money order. If your attorney is submitting your payment on your behalf, your attorney may pay with a credit card or check with a pre-printed address.

☐ **I need to pay the fee in installments.** If you choose this option, sign and attach the *Application for Individuals to Pay The Filing Fee in Installments* (Official Form 103A).

☐ **I request that my fee be waived** (You may request this option only if you are filing for Chapter 7. By law, a judge may, but is not required to, waive your fee, and may do so only if your income is less than 150% of the official poverty line that applies to your family size and you are unable to pay the fee in installments). If you choose this option, you must fill out the *Application to Have the Chapter 7 Filing Fee Waived* (Official Form 103B) and file it with your petition.

9.  **Have you filed for bankruptcy within the last 8 years?**

■ No.

☐ Yes.

| District | When | Case number |
|---|---|---|
| District | When | Case number |
| District | When | Case number |

10. **Are any bankruptcy cases pending or being filed by a spouse who is not filing this case with you, or by a business partner, or by an affiliate?**

■ No

☐ Yes.

| Debtor | | Relationship to you |
|---|---|---|
| District | When | Case number, if known |
| Debtor | | Relationship to you |
| District | When | Case number, if known |

11. **Do you rent your residence?**

■ No.    Go to line 12.

☐ Yes.    Has your landlord obtained an eviction judgment against you?

☐    No. Go to line 12.

☐    Yes. Fill out *Initial Statement About an Eviction Judgment Against You* (Form 101A) and file it as part of this bankruptcy petition.

---

Official Form 101                    Voluntary Petition for Individuals Filing for Bankruptcy                    page 3

Debtor 1    **Bassem Essam El Mallakh**                                    Case number (if known)

---

**Part 3:    Report About Any Businesses You Own as a Sole Proprietor**

12. **Are you a sole proprietor of any full- or part-time business?**

A sole proprietorship is a business you operate as an individual, and is not a separate legal entity such as a corporation, partnership, or LLC.

If you have more than one sole proprietorship, use a separate sheet and attach it to this petition.

- ☑ **No.**    Go to Part 4.
- ☐ **Yes.**    Name and location of business

    Name of business, if any

    Number, Street, City, State & ZIP Code

    *Check the appropriate box to describe your business:*
    - ☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))
    - ☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))
    - ☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))
    - ☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))
    - ☐ None of the above

13. **Are you filing under Chapter 11 of the Bankruptcy Code and are you a *small business debtor*?**

For a definition of *small business debtor*, see 11 U.S.C. § 101(51D).

*If you are filing under Chapter 11, the court must know whether you are a small business debtor so that it can set appropriate deadlines. If you indicate that you are a small business debtor, you must attach your most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if any of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).*

- ☑ **No.**    I am not filing under Chapter 11.
- ☐ **No.**    I am filing under Chapter 11, but I am NOT a small business debtor according to the definition in the Bankruptcy Code.
- ☐ **Yes.**    I am filing under Chapter 11, I am a small business debtor according to the definition in the Bankruptcy Code, and I do not choose to proceed under Subchapter V of Chapter 11.
- ☐ **Yes.**    I am filing under Chapter 11, I am a small business debtor according to the definition in the Bankruptcy Code, and I choose to proceed under Subchapter V of Chapter 11.

---

**Part 4:    Report If You Own or Have Any Hazardous Property or Any Property That Needs Immediate Attention**

14. **Do you own or have any property that poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety?**
**Or do you own any property that needs immediate attention?**

*For example, do you own perishable goods, or livestock that must be fed, or a building that needs urgent repairs?*

- ☑ **No.**
- ☐ **Yes.**    What is the hazard?

    If immediate attention is needed, why is it needed?

    Where is the property?

                Number, Street, City, State & Zip Code

---

Official Form 101                    Voluntary Petition for Individuals Filing for Bankruptcy                    page 4

Debtor 1    **Bassem Essam El Mallakh**                            Case number *(if known)*

▇▇▇▇▇ **Part 5:**  Explain Your Efforts to Receive a Briefing About Credit Counseling

**16.  Tell the court whether you have received a briefing about credit counseling.**

The law requires that you receive a briefing about credit counseling before you file for bankruptcy. You must truthfully check one of the following choices. If you cannot do so, you are not eligible to file.

If you file anyway, the court can dismiss your case, you will lose whatever filing fee you paid, and your creditors can begin collection activities again.

**About Debtor 1:**
*You must check one:*

- ☑ **I received a briefing from an approved credit counseling agency within the 180 days before I filed this bankruptcy petition, and I received a certificate of completion.**

  Attach a copy of the certificate and the payment plan, if any, that you developed with the agency.

- ☐ **I received a briefing from an approved credit counseling agency within the 180 days before I filed this bankruptcy petition, but I do not have a certificate of completion.**

  Within 14 days after you file this bankruptcy petition, you MUST file a copy of the certificate and payment plan, if any.

- ☐ **I certify that I asked for credit counseling services from an approved agency, but was unable to obtain those services during the 7 days after I made my request, and exigent circumstances merit a 30-day temporary waiver of the requirement.**

  To ask for a 30-day temporary waiver of the requirement, attach a separate sheet explaining what efforts you made to obtain the briefing, why you were unable to obtain it before you filed for bankruptcy, and what exigent circumstances required you to file this case.

  Your case may be dismissed if the court is dissatisfied with your reasons for not receiving a briefing before you filed for bankruptcy. If the court is satisfied with your reasons, you must still receive a briefing within 30 days after you file. You must file a certificate from the approved agency, along with a copy of the payment plan you developed, if any. If you do not do so, your case may be dismissed.

  Any extension of the 30-day deadline is granted only for cause and is limited to a maximum of 15 days.

- ☐ **I am not required to receive a briefing about credit counseling because of:**

  - ☐ **Incapacity.**
    I have a mental illness or a mental deficiency that makes me incapable of realizing or making rational decisions about finances.

  - ☐ **Disability.**
    My physical disability causes me to be unable to participate in a briefing in person, by phone, or through the internet, even after I reasonably tried to do so.

  - ☐ **Active duty.**
    I am currently on active military duty in a military combat zone.

  If you believe you are not required to receive a briefing about credit counseling, you must file a motion for waiver credit counseling with the court.

**About Debtor 2 (Spouse Only in a Joint Case):**
*You must check one:*

- ☐ **I received a briefing from an approved credit counseling agency within the 180 days before I filed this bankruptcy petition, and I received a certificate of completion.**

  Attach a copy of the certificate and the payment plan, if any, that you developed with the agency.

- ☐ **I received a briefing from an approved credit counseling agency within the 180 days before I filed this bankruptcy petition, but I do not have a certificate of completion.**

  Within 14 days after you file this bankruptcy petition, you MUST file a copy of the certificate and payment plan, if any.

- ☐ **I certify that I asked for credit counseling services from an approved agency, but was unable to obtain those services during the 7 days after I made my request, and exigent circumstances merit a 30-day temporary waiver of the requirement.**

  To ask for a 30-day temporary waiver of the requirement, attach a separate sheet explaining what efforts you made to obtain the briefing, why you were unable to obtain it before you filed for bankruptcy, and what exigent circumstances required you to file this case.

  Your case may be dismissed if the court is dissatisfied with your reasons for not receiving a briefing before you filed for bankruptcy.

  If the court is satisfied with your reasons, you must still receive a briefing within 30 days after you file. You must file a certificate from the approved agency, along with a copy of the payment plan you developed, if any. If you do not do so, your case may be dismissed.

  Any extension of the 30-day deadline is granted only for cause and is limited to a maximum of 15 days.

- ☐ **I am not required to receive a briefing about credit counseling because of:**

  - ☐ **Incapacity.**
    I have a mental illness or a mental deficiency that makes me incapable of realizing or making rational decisions about finances.

  - ☐ **Disability.**
    My physical disability causes me to be unable to participate in a briefing in person, by phone, or through the internet, even after I reasonably tried to do so.

  - ☐ **Active duty.**
    I am currently on active military duty in a military combat zone.

  If you believe you are not required to receive a briefing about credit counseling, you must file a motion for waiver of credit counseling with the court.

Debtor 1   **Bassem El Mallakh**

**Part 6:   Answer These Questions for Reporting Purposes**

| | | |
|---|---|---|
| 16. What kind of debts do you have? | 16a. | **Are your debts primarily consumer debts?** *Consumer debts* are defined in 11 U.S.C. § 101(8) as "incurred by an individual primarily for a personal, family, or household purpose." |
| | | ☐ No. Go to line 16b. |
| | | ■ Yes. Go to line 17. |
| | 16b. | **Are your debts primarily business debts?** *Business debts* are debts that you incurred to obtain money for a business or investment or through the operation of the business or investment. |
| | | ☐ No. Go to line 16c. |
| | | ☐ Yes. Go to line 17. |
| | 16c. | State the type of debts you owe that are not consumer debts or business debts |

| | | |
|---|---|---|
| 17. Are you filing under Chapter 7? | ■ No. | I am not filing under Chapter 7. Go to line 18. |
| Do you estimate that after any exempt property is excluded and administrative expenses are paid that funds will be available for distribution to unsecured creditors? | ☐ Yes. | I am filing under Chapter 7. Do you estimate that after any exempt property is excluded and administrative expenses are paid that funds will be available to distribute to unsecured creditors? |
| | | ☐ No |
| | | ☐ Yes |

| | | | |
|---|---|---|---|
| 18. How many Creditors do you estimate that you owe? | ■ 1-49 ☐ 50-99 ☐ 100-199 ☐ 200-999 | ☐ 1,000-5,000 ☐ 5001-10,000 ☐ 10,001-25,000 | ☐ 25,001-50,000 ☐ 50,001-100,000 ☐ More than100,000 |
| 19. How much do you estimate your assets to be worth? | ☐ $0 - $50,000 ☐ $50,001 - $100,000 ☐ $100,001 - $500,000 ☐ $500,001 - $1 million | ☐ $1,000,001 - $10 million ☐ $10,000,001 - $50 million ☐ $50,000,001 - $100 million ☐ $100,000,001 - $500 million | ☐ $500,000,001 - $1 billion ☐ $1,000,000,001 - $10 billion ☐ $10,000,000,001 - $50 billion ☐ More than $50 billion |
| 20. How much do you estimate your liabilities to be? | ☐ $0 - $50,000 ☐ $50,001 - $100,000 ☐ $100,001 - $500,000 ☐ $500,001 - $1 million | ☐ $1,000,001 - $10 million ☐ $10,000,001 - $50 million ☐ $50,000,001 - $100 million ☐ $100,000,001 - $500 million | ☐ $500,000,001 - $1 billion ☐ $1,000,000,001 - $10 billion ☐ $10,000,000,001 - $50 billion ☐ More than $50 billion |

**Part 7:   Sign Below**

**For you**

I have examined this petition, and I declare under penalty of perjury that the information provided is true and correct.

If I have chosen to file under Chapter 7, I am aware that I may proceed, if eligible, under Chapter 7, 11,12, or 13 of title 11, United States Code. I understand the relief available under each chapter, and I choose to proceed under Chapter 7.

If no attorney represents me and I did not pay or agree to pay someone who is not an attorney to help me fill out this document, I have obtained and read the notice required by 11 U.S.C. § 342(b).

I request relief in accordance with the chapter of title 11, United States Code, specified in this petition.

I understand making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $250,000, or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

| | |
|---|---|
| ✗ _(signature)_ | |
| **Bassem Essam El Mallakh** | Signature of Debtor 2 |
| Signature of Debtor 1 | |
| Executed on _7/12/2022_ | Executed on _____ |
| MM / DD / YYYY | MM / DD / YYYY |

Debtor 1    **Bassem Essam El Mallakh**                                                      Case number *(if known)*

For your attorney, if you are represented by one

If you are not represented by an attorney, you do not need to file this page.

I, the attorney for the debtor(s) named in this petition, declare that I have informed the debtor(s) about eligibility to proceed under Chapter 7, 11, 12, or 13 of title 11, United States Code, and have explained the relief available under each chapter for which the person is eligible. I also certify that I have delivered to the debtor(s) the notice required by 11 U.S.C. § 342(b) and, in a case in which § 707(b)(4)(D) applies, certify that I have no knowledge after an inquiry that the information in the schedules filed with the petition is incorrect.

Signature of Attorney for Debtor                                    Date    7/12/2022
                                                                                              MM / DD / YYYY

**Benjamin Heston**
Printed name

Firm name

**100 Bayview Circle, Suite 100**
**Newport Beach, CA 92660**
Number, Street, City, State & ZIP Code

Contact phone    **951-290-2827**                    Email address    **bheston.ecf@gmail.com**

**297798 CA**
Bar number & State

EXHIBIT 2

| Form **1040** | Department of the Treasury — Internal Revenue Service (99) | | **2021** | OMB No. 1545-0074 | | IRS Use Only — Do not write or staple in this space. |
|---|---|---|---|---|---|---|
| | U.S. Individual Income Tax Return | | | | | |

**Filing Status**
Check only one box.

[X] Single  [ ] Married filing jointly  [ ] Married filing separately (MFS)  [ ] Head of household (HOH)  [ ] Qualifying widow(er) (QW)

If you checked the MFS box, enter the name of your spouse. If you checked the HOH or QW box, enter the child's name if the qualifying person is a child but not your dependent ▶

| Your first name and middle initial | Last name | Your social security number |
|---|---|---|
| Bassem El Mallakh | | 3012 |
| If joint return, spouse's first name and middle initial | Last name | Spouse's social security number |
| | | |

| Home address (number and street) If you have a P.O. box, see instructions. | | Apt. no. | **Presidential Election Campaign** |
|---|---|---|---|
| 116 Rockefeller | | | Check here if you, or your spouse if filing jointly, want $3 to go to this fund. Checking a box below will not change your tax or refund. |
| City, town, or post office. If you have a foreign address, also complete spaces below. | State | ZIP code | |
| Irvine, CA 92612 | | | |
| Foreign country name | Foreign province/state/county | Foreign postal code | [ ] You  [ ] Spouse |

At any time during 2021, did you receive, sell, exchange, or otherwise dispose of any financial interest in any virtual currency? [ ] Yes  [X] No

**Standard Deduction**

Someone can claim: [ ] You as a dependent  [ ] Your spouse as a dependent

[ ] Spouse itemizes on a separate return or you were a dual-status alien

**Age/Blindness**  You: [ ] Were born before January 2, 1957  [ ] Are blind  Spouse: [ ] Was born before January 2, 1957  [ ] Is blind

**Dependents** (see instructions):

| | (1) First name    Last name | (2) Social security number | (3) Relationship to you | (4) ✓ if qualifies for (see instructions): |  |
|---|---|---|---|---|---|
| If more than four dependents, see instructions and check here ▶ | | | | Child tax credit | Credit for other dependents |
| | | | | [ ] | [ ] |
| | | | | [ ] | [ ] |
| | | | | [ ] | [ ] |
| | | | | [ ] | [ ] |

| | | | | | | |
|---|---|---|---|---|---|---|
| Attach Sch. B if required. | **1** | Wages, salaries, tips, etc. Attach Form(s) W-2 | | | **1** | |
| | **2a** | Tax-exempt interest . | 2a | **b** Taxable interest | **2b** | 3. |
| | **3a** | Qualified dividends . | 3a | **b** Ordinary dividends | **3b** | |
| | **4a** | IRA distributions | 4a | **b** Taxable amount | **4b** | |
| | **5a** | Pensions and annuities | 5a | **b** Taxable amount | **5b** | |
| | **6a** | Social security benefits | 6a | **b** Taxable amount | **6b** | |
| | **7** | Capital gain or (loss). Attach Schedule D if required. If not required, check here ▶ [ ] | | | **7** | |
| | **8** | Other income from Schedule 1, line 10 | | | **8** | |
| Standard Deduction for — | **9** | Add lines 1, 2b, 3b, 4b, 5b, 6b, 7, and 8. This is your **total income** ▶ | | | **9** | 3. |
| • Single or Married filing separately, $12,550 | **10** | Adjustments to income from Schedule 1, line 26 | | | **10** | |
| | **11** | Subtract line 10 from line 9. This is your **adjusted gross income** ▶ | | | **11** | 3. |
| • Married filing jointly or Qualifying widow(er), $25,100 | **12a** | Standard deduction or itemized deductions (from Schedule A) | 12a | 12,550. | | |
| | **b** | Charitable contributions if you take the standard deduction (see instructions) | 12b | | | |
| • Head of household, $18,800 | **c** | Add lines 12a and 12b | | | **12c** | 12,550. |
| • If you checked any box under Standard Deduction, see instructions. | **13** | Qualified business income deduction from Form 8995 or Form 8995-A | | | **13** | |
| | **14** | Add lines 12c and 13 | | | **14** | 12,550. |
| | **15** | **Taxable income.** Subtract line 14 from line 11. If zero or less, enter -0- | | | **15** | 0. |

**BAA** For Disclosure, Privacy Act, and Paperwork Reduction Act Notice, see separate instructions.

Form **1040** (2021)

FDIA0112L  12/10/21

| Form **1040** | Department of the Treasury — Internal Revenue Service (99)<br>**U.S. Individual Income Tax Return** | **2019** | OMB No. 1545-0074 | | IRS Use Only — Do not write or staple in this space. |

| **Filing Status**<br>Check only<br>one box. | [X] Single | [ ] Married filing jointly | [ ] Married filing separately (MFS) | [ ] Head of household (HOH) | [ ] Qualifying widow(er) (QW) |
|---|---|---|---|---|---|

If you checked the MFS box, enter the name of spouse. If you checked the HOH or QW box, enter the child's name if the qualifying person is a child but not your dependent. ▶

| Your first name and middle initial | Last name | Your social security number |
|---|---|---|
| Bassem El Mallakh | | 3012 |

| If joint return, spouse's first name and middle initial | Last name | Spouse's social security number |
|---|---|---|

| Home address (number and street). If you have a P.O. box, see instructions. | Apt. no. | **Presidential Election Campaign**<br>Check here if you, or your spouse if filing jointly, want $3 to go to this fund. Checking a box below will not change your tax or refund. |
|---|---|---|
| 116 Rockefeller | | [ ] You  [ ] Spouse |

City, town or post office, state, and ZIP code. If you have a foreign address, also complete spaces below (see instructions).

Irvine, CA 92612

| Foreign country name | Foreign province/state/county | Foreign postal code | If more than four dependents, see instructions and ✓ here ▶ [ ] |
|---|---|---|---|

**Standard Deduction** — Someone can claim:  [ ] You as a dependent    [ ] Your spouse as a dependent
[ ] Spouse itemizes on a separate return or you were a dual-status alien

**Age/Blindness**  You:  [ ] Were born before January 2, 1955  [ ] Are blind   Spouse:  [ ] Was born before January 2, 1955  [ ] Is blind

**Dependents (see instructions):**

| (1) First name    Last name | (2) Social security number | (3) Relationship to you | (4) ✓ if qualifies for (see instructions):<br>Child tax credit    Credit for other dependents |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

| | | | | | |
|---|---|---|---|---|---|
| | 1 | Wages, salaries, tips, etc. Attach Form(s) W-2 .......................... | | **1** | |
| | 2a | Tax-exempt interest ............. | **2a** | b Taxable int. Att. Sch. B if reqd. ....... **2b** | 5. |
| | 3a | Qualified dividends ............. | **3a** | b Ordinary div. Att. Sch. B if reqd. ...... **3b** | |
| | 4a | IRA distributions .. ........ | **4a** | b Taxable amount ............... **4b** | |
| | c | Pensions and annuities ...... | **4c** | d Taxable amount ............... **4d** | |
| | 5a | Social security benefits ......... | **5a** | b Taxable amount ............... **5b** | |
| **Standard Deduction for —**<br>• Single or Married filing separately, $12,200<br>• Married filing jointly or Qualifying widow(er), $24,400<br>• Head of household, $18,350<br>• If you checked any box under *Standard Deduction,* see instructions. | 6 | Capital gain or (loss). Attach Schedule D if required. If not required, check here ..... ▶ [ ] | | **6** | |
| | 7a | Other income from Schedule 1, line 9 .................................. | | **7a** | |
| | b | Add lines 1, 2b, 3b, 4b, 4d, 5b, 6, and 7a. This is your **total income** .......... ▶ | | **7b** | 5. |
| | 8a | Adjustments to income from Schedule 1, line 22 ....................... | | **8a** | |
| | b | Subtract line 8a from line 7b. This is your **adjusted gross income** ............ ▶ | | **8b** | 5. |
| | 9 | Standard deduction or itemized deductions (from Schedule A) ......... | **9** | 12,200. | |
| | 10 | Qualified business income deduction. Attach Form 8995 or Form 8995-A .... | **10** | | |
| | 11a | Add lines 9 and 10 ..................................................... | | **11a** | 12,200. |
| | b | **Taxable income.** Subtract line 11a from line 8b. If zero or less, enter -0- ............... | | **11b** | 0. |

**BAA For Disclosure, Privacy Act, and Paperwork Reduction Act Notice, see separate instructions.**    Form 1040 (2019)

# Tax Returns

Tax Returns 2022

IRS Department of the Treasury Internal Revenue Service
PO BOX 236
MEMPHIS TN 38101-0236

In reply refer to: 0539300000
Dec. 13, 2022 LTR 2645C K0
###-##-3012 201912 30
Input Op: 0309926218 00014802
BODC: WI

BASSEM EL MALLAKH
116 ROCKEFELLER
IRVINE CA 92612-8114

Taxpayer identification number: ###-##-3012
Tax periods: Dec. 31, 2019
Form: 1040

Dear Taxpayer:

Thank you for your inquiry of Oct. 05, 2022.

We're working on your account. However, we need an additional 60 days to send you a complete response on what action we are taking on your account. We don't need any further information from you right now.

If you prefer, you can write to that office at the address we provided in this letter.

If you have questions, you can call 1-800-829-0922.

If you prefer, you can write to the address at the top of the first page of this letter.

Find tax forms or publications by visiting www.irs.gov/forms or calling 800-TAX-FORM (800-829-3676).

Whenever you write, include a copy of this letter and your telephone numbers along with the hours we can reach you.

Keep a copy of this letter for your records.

Thank you for your cooperation.

# Tax Returns

CPA letter confirming Tax
Returns was filed

**SHENOUDA & ASSOCIATES, LLP**
16377 BEACH BLVD., SUITE 222
HUNTINGTON BEACH, CA 92648
(714) 842-5045

September 15, 2022

Bavani El-Maliah
116 Rochefeller
Irvine CA 92612

Dear Bavani,

Your 2021 Federal Income Tax Return was acknowledged as accepted by the Internal Revenue Service. No tax is payable with the filing of this return. The refund of $1,400 will be directly deposited into your checking account.

Your 2021 California Individual Income Tax Return was acknowledged as accepted by the State of California on . There is a balance due of $5,300. The balance due will be directly withdrawn from your bank account once the State of California has processed the return.

Please be sure to call if you have any questions.

Sincerely,

Helan Shenouda, MBA

Visit us online:
www.shenoudallp.com
www.facebook.com/ShenoudaLLP
www.twitter.com/ShenoudaLLP

Access Your Tax Returns and Tax Documents Securely Anytime!
https://shenoudallp.smartvault.com
(Request Invite From Our Office)

EXHIBIT 3



## INTERINSURANCE EXCHANGE OF THE AUTOMOBILE CLUB

### MEMBERS' CONDOMINIUM OWNERS POLICY – FORM 6
### PROPERTY INSURANCE POLICY DECLARATIONS

**Evidence of Insurance**

Policy contains 438BFU, printed on next page, in favor of Mortgagee shown.

| | |
|---|---|
| **MORTGAGEE**<br>ADDITIONAL OWNERS INTEREST<br>US TRUSTEE<br>UNITED STATES TRUSTEE (SA)<br>411 W FOURTH ST SUITE 7160<br>SANTA ANA CA 92701 | **LOAN NUMBER**<br><br>**POLICY NUMBER**<br>⬛⬛⬛⬛20189 |
| **NAMED INSURED AND MAILING ADDRESS**<br>BASSEM EL MALLAKH<br>116 ROCKEFELLER<br>IRVINE CA 92612 | **LOCATION OF PREMISES (IF DIFFERENT FROM MAILING ADDRESS)** |

| | |
|---|---|
| ☐ **PROPERTY INSURANCE POLICY DECLARATIONS**<br>EFFECTIVE DATE OF THIS POLICY 10262022    12:01 A.M.<br>(PACIFIC STANDARD TIME)<br>EXPIRATION DATE OF THIS POLICY10262023    12:01 A.M.<br>(PACIFIC STANDARD TIME)<br>**ANNUAL PREMIUM $** | **COVERAGES AND LIMITS OF LIABILITY**<br><br>**PART I - PROPERTY COVERAGES**<br><br>COVERAGE A – BUILDING PROPERTY          82000<br><br>OTHER PERILS DEDUCTIBLE                         5000<br><br>WATER DEDUCTIBLE                                     5000 |
| ☐ **AMENDMENT OF PROPERTY INSURANCE DECLARATIONS**<br>**ENDORSEMENT**<br>EFFECTIVE DATE                                     12:01 A.M<br>(PACIFIC STANDARD TIME)<br>EXPIRATION DATE OF THE POLICY          12.01 A.M.<br>(PACIFIC STANDARD TIME) | |

**PROVISIONS**
This form is not a contract of insurance  The provisions of the policy shall prevail in all respects. All premiums for the insurance policy shall be computed in accordance with the Interinsurance Exchange of the Automobile Club rules, forms, premiums and minimum premiums applicable to the insurance afforded which are in effect at the inception of the insurance policy and upon each anniversary thereof, including the date of interim changes. The insurance policy does not become effective unless and until escrow closes, the named insured has an ownership interest in the residence premises, and the premium is paid or reserved in an escrow account. If the insurance protection evidenced herein terminates, the mortgagee will be given notice in accordance with the standard mortgagee clause (438BFU)

*ACSC Management Services, Inc.*
**ATTORNEY-IN-FACT**

**FOR QUESTIONS OR CHANGES CALL**
8720 01/16

- - - - - - - - - - - - **DETACH HERE AND RETURN WITH PREMIUM PAYMENT** - - - - - - - - - - - -

**INTERINSURANCE EXCHANGE of the**
**Automobile Club of Southern California**
MAILING ADDRESS: P.O. Box 25446 SANTA ANA, CALIFORNIA 92799-5446

**NOTICE OF**
**PREMIUM DUE**

| | | |
|---|---|---|
| **LOAN NUMBER** | **POLICY NUMBER**<br>CHO183020189<br><br>**DUE DATE** | **PLEASE PAY THE PREMIUM**<br>**DUE BEFORE OR ON THE**<br>**DUE DATE** |
| **BASSEM EL MALLAKH**<br>116 ROCKEFELLER | **PREMIUM DUE** | **MAKE CHECK PAYABLE TO**<br>**ACSC** |

# Insurance

Car and Home Insurance 2023

# Insurance

Medical Insurance 2022

blue california
601 12th Street
Oakland, CA 94607

NAME: BASSEM ELMALLAKH
MEMBER ID#: 911268111

**Updates to your 2022 coverage**

********************AUTO**5-DIGIT 92617
131525 13 92 T756 P1 2MO
BASSEM ELMALLAKH
116 ROCKEFELLER
IRVINE, CA 92612-8114

November 28, 2022

Update to your Blue Shield of California 2022 coverage for Silver 87 PPO Jan22

Dear Member,

This is an endorsement to your Blue Shield of California (Blue Shield) plan. It updates your coverage to reflect recent changes to laws that apply to your 2022 Blue Shield plan. The pages enclosed show exactly how and where we revised your plan documents.

Review this endorsement and refer to it when you access your plan documents. Make sure to keep it with the rest of your records. You can access your plan documents online at blueshieldca.com/policies.

If you have questions about this update, please contact member services at the number on the back of your Blue Shield member ID card.

Thank you for choosing Blue Shield. We look forward to continuing to meet your health coverage needs.

Sincerely,

Patrice Bergman
Vice President and General Manager

Blue Shield of California is an independent member of the Blue Shield Association A543671FP_1022



EXHIBIT 4

# Wells Fargo Combined Statement of Accounts

September 30, 2022 ▪ Page 1 of 6



BASSEM VICTOR EL MALLAKH
116 ROCKEFELLER
IRVINE CA 92612-6114

### Questions?

Available by phone 24 hours a day, 7 days a week.
We accept all relay calls, including 711
**1-800-742-4932**
En español: 1-877-727-2932

Online: wellsfargo.com

Write: Wells Fargo Bank, N.A. (114)
P.O. Box 6995
Portland, OR 97228-6995

## You and Wells Fargo

Thank you for being a loyal Wells Fargo customer. We value your trust in our company and look forward to continuing to serve you with your financial needs.

## Account options

A check mark in the box indicates you have these convenient services with your account(s). Go to wellsfargo.com or call the number above if you have questions or if you would like to add new services.

| | | | | |
|---|---|---|---|---|
| Online Banking | ☐ | Direct Deposit | ☐ |
| Online Bill Pay | ☐ | Auto Transfer/Payment | ☐ |
| Online Statements | ☐ | Overdraft Protection | ☐ |
| Mobile Banking | ☐ | Debit Card | |
| My Spending Report | ☐ | Overdraft Service | ☑ |

**Other Wells Fargo Benefits**

**From Wells Fargo Home Mortgage**

Is a home purchase in your future? Competitive rates and low down payment options make now a great time to buy a home. Plus, as a Wells Fargo customer, you can count on personalized guidance and streamlined service every step of the way.

Get started with an online mortgage application that can pre-fill your Wells Fargo account information and save you time. Use your Wells Fargo Online® username and password at the start of the application. Go to wellsfargo.com/homepurchase or contact your local home mortgage consultant.

Sheet Seq = 0100191
Sheet 00001 of 00003

Created With Tiny Scanner

# CHASE ⬤

JP Morgan Chase Bank, N.A.
PO Box 659754
San Antonio, TX 78265-9754

**Questions?**
✉ chase.com
☎ 1-800-935-9935
We accept operator relay calls

10/28/2022

**BASSEM V ELMALLAKH**
**116 ROCKEFELLER**
**IRVINE, CA 92612-6114**

## Update:   We closed your account

Your account ending in 7532

*Dear Bassem Elmallakh*

Thank you for your recent inquiry about your account. We closed your account above on 09/20/2022
If you have questions, please call us at 1-800-935-9935 or visit any of our branches.

Sincerely,

Customer Service

©2019 JPMorgan Chase Bank, N.A. Member FDIC
M1006-01 (09/19)

Created With Tiny Scanner

# EXHIBIT 5

California Driver License



EXHIBIT 6

# Car Registration



EXHIBIT 7

# Gas Bills



Gas Bills from August
To November 2022

Gas Bills



Gas Bills from December
To February 2023

EXHIBIT 8

# Water Bills

Water bill for August 2022



# Water Bills

Water bill for September 2022

# Water Bills

Water bill for October 2022

# Water Bills

Water bill for November 2022



# Water Bills

Water bill for January 2023



EXHIBIT 9

Insurance



Medical Insurance Card

# EXHIBIT 10

# Food Delivery



Uber Eats receipts

# Food Delivery

Uber Eats receipts
Examples




EXHIBIT 11

# Gym Check in's



Gym Check-ins at LA fitness location: 3021 Michelson Dr, Irvine, CA September to December 2022 dates



Gym Check in's

Gym Check-ins at LA fitness location: 3021 Michelson Dr, Irvine, CA May to August 2022 dates

# EXHIBIT 12



Find my iPhone GPS device

Find my iPhone GPS
locator device on the
iPhone IOS

EXHIBIT 13

# Travel

From Orange county to San Fran on September 08 2022



2/2/23 1:41 AM

Find Your confirmation receipt (RPN/OT for your flight to San Francisco on 9/8/22

| Thu, Sep 08 04:00 PM | Thu, Sep 08 05:25 PM |
|---|---|
| **SNA** | **SFO** |
| Orange County/Santa Ana | San Francisco |

## Summary of airfare charges

Bassem Elmallakh
*Mileage Plan # Join Mileage Plan not add to reservation*
Ticket 0272310620554

| Base fare and surcharges | $14.65 |
| Taxes and other fees | $15.70 |
| Per person total | $30.35 |

Alexander Hanna
*Mileage Plan # Join Mileage Plan not add to reservation*
Ticket 0272310620556

| Base fare and surcharges | $14.65 |
| Taxes and other fees | $15.70 |
| Per person total | $30.35 |

**Total charges for air travel** **$60.70**

# Travel

2/28/23 1:41 AM

Find Your confirmation receipt IRPWOT for your flight to San Francisco on 9/8/22

✈

## Bassem,
## you're all set.

We can't wait to see you on board. Before you fly, view full reservation details or make changes to your flight online. With Mileage Plan™, you earn a mile for every mile flown. Don't miss out on miles, join Mileage Plan now.

MANAGE TRIP

Confirmation code

**IRPWOT**

**Alaska**
Flight 3454
Embraer ERJ 175

**Traveler(s)**
Bassem Elmalikhi
Seat 19A, Class L (Coach)

Alexander Hanna
Seat 19B, Class L (Coach)

Flight operated by SkyWest Airlines as AlaskaSkyWest. Check in with Alaska Airlines

From Orange county to San Fran on September 08 2022

# EXHIBIT 14







Amazon packages

Amazon Prime family
account receipts

# Amazon packages

Amazon Prime family
account receipts



# Amazon packages

Amazon Personal account- ( non-Prime Service ) takes longer time to deliver packages



# EXHIBIT 15



FedEx Office

3992 Barranca Pkwy Ste A
Irvine, CA 92606
(949) 552-1717

Terminal: 0596MIX04
9/19/2022 19:22
Receipt #: 059661N2952
Type: Purchase

| Qty | Description | Amount |
|---|---|---|
| 18 | Self Serve Scan 8.5x11/14, 11x17 | 8.82 |
| | SubTotal | 8.82 |
| | District tax | 0.04 |
| | City tax | 0.00 |
| | County tax | 0.11 |
| | State tax | 0.53 |
| | Total | USD $9.50 |

Acct #:************1451
VISA DEBIT
Chip Read
Auth No.: 011522
Mode: Issuer
AID: A0000000031010
NO CVM
CVM Result: 5F0002
TVR: 8000008000
IAD: 06011203608000
TSI: 6800
ARC: 00
APPROVED

The Cardholder agrees to pay the Issuer of the charge card in accordance with the agreement between the Issuer and the Cardholder.

FedEx Office

Tell us how we're doing and receive $5 off your next $30 print order*. Complete our survey by scanning the QR code below, visit **fedex.com/welisten**.

Offer expires 12/31/2022

*$5 off print order of $30.00 or more. Discount applies to orders placed in a FedEx Office store or online through FedEx Office® Print Online. Offer is valid at time of purchase only, no cash value and may not be discounted or credited toward past or future purchases. Discount cannot be used in combination with custom-bid orders, other coupons, or discounts, including account pricing. Discount not valid on the following products and services: finishing only orders, self-service print, photo station, fax or scan, direct mail, EDDM® or postage. Does not apply to shipping, Custom Branded boxes, rush or delivery charges. Does not apply to retail products. No cash value. Offer void where prohibited or restricted by law. Products, services and hours may vary by location. © 2022 FedEx. All rights reserved. Offer expires 12/31/2022.

By submitting your project to FedEx Office or by making a purchase in a FedEx Office store, you agree to all FedEx Office terms and conditions, including limitations of liability.

Request a copy of our terms and conditions from a team member or visit fedex.com/officeserviceterms for details.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
9454 Wilshire Blvd., 6th Fl., Beverly Hills, CA 90212

A true and correct copy of the foregoing document entitled (*specify*): **SUPPLEMENTAL DECLARATION OF BASSEM VICTOR EL MALLAKH IN SUPPORT OF DEBTOR'S OPPOSITION TO BELGIUM INVESTMENT 960 BAY DR, LLC'S OBJECTION TO DEBTOR'S CLAIMED HOMESTEAD EXEMPTION** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

1. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) 3/21/23, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:
Counsel for Debtor: Jay Berger michael.berger@bankruptcypower.com,
yathida.nipha@bankruptcypower.com;michael.berger@ecf.inforuptcy.com
U.S. Trustee: Nancy S Goldenberg nancy.goldenberg@usdoj.gov
Interested Party: Benjamin Heston bhestonecf@gmail.com, benheston@recap.email,NexusBankruptcy@jubileebk.net
United States Trustee (SA) ustpregion16.sa.ecf@usdoj.gov
Interested Party: Chad L Butler caecf@tblaw.com
Counsel for TD Bank: Randall P Mroczynski randym@cookseylaw.com
Counsel for Belgium Investments 960 Bay Dr, LLC: Patrick Miller    patrick.miller@impactadvocateslaw.com

☐ Service information continued on attached page

2. **SERVED BY UNITED STATES MAIL**:
On _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.
U.S. Trustee
Nancy S. Goldenberg
411 W. Fourth St., Ste. 7160
Santa Ana, CA 92701

☐ Service information continued on attached page

3. **SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on 3/21/23, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

**Honorable Theodore Albert**
**United States Bankruptcy Court**
**Central District of California**
**Ronald Reagan Federal Building and Courthouse**
**411 West Fourth Street, Suite 5085 / Courtroom 5B**
**Santa Ana, CA 92701-4593**

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 3/21/23 | Peter Garza | /s/Peter Garza |
|---|---|---|
| Date | Printed Name | Signature |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012* **F 9013-3.1.PROOF.SERVICE**

MICHAEL JAY BERGER (State Bar # 100291)
LAW OFFICES OF MICHAEL JAY BERGER
9454 Wilshire Blvd. 6<sup>th</sup> Floor
Beverly Hills, CA 90212-2929
Telephone:   (310) 271-6223
Facsimile:    (310) 271-9805
michael.berger@bankruptcypower.com

Counsel for Debtor,
Bassem Victor El Mallakh

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

SANTA ANA DIVISION

| | |
|---|---|
| In re:<br><br>BASSEM VICTOR EL MALLAKH,<br><br>       Debtor and Debtor-in-Possession. | CASE NO.: 8:22-bk-11605-TA<br><br>Chapter 11<br><br>**DECLARATION OF REEM HANNA IN SUPPORT OF DEBTOR'S OPPOSITION TO BELGIUM INVESTMENTS 960 BAY DR, LLC'S OBJECTION TO DEBTOR'S CLAIMED HOMESTEAD EXEMPTION**<br><br>Date:   March 30, 2023<br>Time:  11:00 a.m.<br>Place:  411 West Fourth Street<br>       Courtroom 5B<br>       Santa Ana, CA 92701<br><br>Via Tele/Videoconference on Zoom |

## DECLARATION OF REEM HANNA

I, Reem Hanna, declare and state as follows:

1.      I am the sister of Debtor Bassem Victor El Mallakh. I am over the age of 18. I have personal knowledge of the facts set forth below and if called to testify as to those facts, I could and would competently do so.

2.      I live at 116 Rockefeller, Irvine, California 92612 ("Rockefeller Property"). with my brother Bassem who is the Debtor in this case. The Rockefeller Property has

1

three (3) bedrooms. I sleep in one (1) bedroom, my son sleeps one (1) bedroom, and

Bassem sleeps in one (1) bedroom. I pay Bassem $4,000 per month in rent to live in the

Rockefeller Property with him.

3.    Since I started living at the Rockefeller Property on or about mid-2018,

Bassem has always lived at the Rockefeller Property with me there.

4.    On September 19, 2022, when Bassem filed his Chapter 11 case, Bassem

was living at the Rockefeller Property with me and my son, and Bassem continues to

reside there as his primary residence thereafter.

5.    From on or about 2016 through 2021, Bassem was working in Santa

Monica at 525 Broadway, Santa Monica, CA 90410 (the "Santa Monica Property") and

due to the commute between Santa Monica and Orange County, Bassem would sleep

some evenings at the Santa Monica Property if he had to work late and was too tired to

drive back home to the Rockefeller Property. However, the Rockefeller Property was and

always has been Bassem's primary residence.

6.    In the previous depositions I did in connection with Belgium's claims

against Bassem, the questions Belgium's counsel asked me were in regards to whether

Bassem was served at the Rockefeller Property.


I declare under penalty of perjury that the foregoing is true and correct and that

this declaration is executed on March 21, 2023 at _____5:32 Chicago_____.


_____
Reem Hanna

DECLARATION OF REEM HANNA IN SUPPORT OF DEBTOR'S OPPOSITION TO BELGIUM INVESTMENTS 960 BAY DR, LLC'S
OBJECTION TO DEBTOR'S CLAIMED HOMESTEAD EXEMPTION

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
9454 Wilshire Blvd., 6<sup>th</sup> Fl., Beverly Hills, CA 90212

A true and correct copy of the foregoing document entitled (*specify*): **DECLARATION OF REEM HANNA IN SUPPORT OF DEBTOR'S OPPOSITION TO BELGIUM INVESTMENTS 960 BAY DR, LLC'S OBJECTION TO DEBTOR'S CLAIMED HOMESTEAD EXEMPTION** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) 3/21/2023, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:
Counsel for Debtor: Jay Berger michael.berger@bankruptcypower.com,
yathida.nipha@bankruptcypower.com;michael.berger@ecf.inforuptcy.com
U.S. Trustee; Nancy S Goldenberg nancy.goldenberg@usdoj.gov
Interested Party: Benjamin Heston bhestonecf@gmail.com, benheston@recap.email,NexusBankruptcy@jubileebk.net
United States Trustee (SA) ustpregion16.sa.ecf@usdoj.gov
Interested Party: Chad L Butler caecf@tblaw.com
Counsel for TD Bank: Randall P Mroczynski randym@cookseylaw.com
Counsel for Belgium Investments 960 Bay Dr, LLC: Patrick Miller    patrick.miller@impactadvocateslaw.com

☐ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on 3/21/2023, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

**Honorable Theodore Albert**
**United States Bankruptcy Court**
**Central District of California**
**Ronald Reagan Federal Building and Courthouse**
**411 West Fourth Street, Suite 5085 / Courtroom 5B**
**Santa Ana, CA 92701-4593**

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 3/21/2023 | Peter Garza | /s/Peter Garza |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

**2. SERVED BY UNITED STATES MAIL**:

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                 **F 9013-3.1.PROOF.SERVICE**

MICHAEL JAY BERGER (State Bar # 100291)
LAW OFFICES OF MICHAEL JAY BERGER
9454 Wilshire Blvd. 6th Floor
Beverly Hills, CA 90212-2929
Telephone:   (310) 271-6223
Facsimile:    (310) 271-9805
michael.berger@bankruptcypower.com

Counsel for Debtor,
Bassem Victor El Mallakh

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

SANTA ANA DIVISION

In re:

BASSEM VICTOR EL MALLAKH,

          Debtor and Debtor-in-Possession.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CASE NO.: 8:22-bk-11605-TA

Chapter 11

**DECLARATION OF ESSAM EL MALLAKH IN SUPPORT OF DEBTOR'S OPPOSITION TO BELGIUM INVESTMENTS 960 BAY DR, LLC'S OBJECTION TO DEBTOR'S CLAIMED HOMESTEAD EXEMPTION**

Date:   March 30, 2023
Time:   11:00 a.m.
Place:   411 West Fourth Street
       Courtroom 5B
       Santa Ana, CA 92701

Via Tele/Videoconference on Zoom

## DECLARATION OF ESSAM VICTOR EL MALLAKH

I, Essam El Mallakh, declare and state as follows:

1.     I am the father of the Debtor, Bassem Victor El Mallakh. I am over the age of 18. I have personal knowledge of the facts set forth below and if called to testify as to those facts, I could and would competently do so.

2.     On September 19, 2022, I went to Fedex with my son Bassem for Bassem to sign the bankruptcy petition and other commencement documents. I purchased a pen

1

that Bassem needed to sign his documents. Attached as **Exhibit "1"** is a true and correct copy of my Fedex receipt from September 19, 2022, from the Fedex store located at 3992 Barranca Park Ste A, Irvine, CA 92606 where I was with Bassem when he signed the bankruptcy documents.

3.     Over the past few years, I regularly visited Bassem and my daughter Reem and Reem's son (my grandson) who live with Bassem at 116 Rockefeller, Irvine, California 92612 ("Rockefeller Property"). I visit them about every six (6) months. When I visit them, I stay at the Rockefeller Property. The Rockefeller Property is a three (3) bedroom townhouse. During my visits, my daughter sleeps in one bedroom with my grandson, I sleep in my grandson's room and Bassem sleeps in the third bedroom.

4.     As far as I am aware, based on my visits to the United States, Bassem lives at the Rockefeller Property. Bassem was living at the Rockefeller Property on September 19, 2022, and he continues to reside at the Rockefeller Property as his principal residence.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration is executed on March ___21, 2023 at_____ Egypt _____.

_____
Essam El Mallakh

2

EXHIBIT 1

Firefox

about:srcdoc



AMERICAN EXPRESS

**Green Card**

ACCOUNT ENDING  #1004

CARD MEMBER

**ESSAM ELMALLAKH**

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| Sep 19, 2022 | **FEDEX OFFICE PRINT SHIP CENTER** 3992 BARRANCA PKWY | $9.68 |
| | IRVINE CA 92606-8223 (888) 889-7121 www.fedex.com | AplPay FEDEX OFFICE IRVINE CA Will appear on your Sep 21, 2022 statement as AplPay FEDEX OFFICE IRVINE CA |

METHOD
Paid for with Apple Pay

CARD
ESSAM ELMALLAKH

MEMBERSHIP REWARDS POINTS
1X on Other purchases                    10

ADDITIONAL INFORMATION
05960023291059600232 91 92606

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
9454 Wilshire Blvd., 6th Fl., Beverly Hills, CA 90212

A true and correct copy of the foregoing document entitled (*specify*): **DECLARATION OF ESSAM EL MALLAKH IN SUPPORT OF DEBTOR'S OPPOSITION TO BELGIUM INVESTMENTS 960 BAY DR, LLC'S OBJECTION TO DEBTOR'S CLAIMED HOMESTEAD EXEMPTION** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) 3/21/2023, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:
Counsel for Debtor: Jay Berger michael.berger@bankruptcypower.com,
yathida.nipha@bankruptcypower.com;michael.berger@ecf.inforuptcy.com
U.S. Trustee; Nancy S Goldenberg nancy.goldenberg@usdoj.gov
Interested Party: Benjamin Heston bhestonecf@gmail.com, benheston@recap.email,NexusBankruptcy@jubileebk.net
United States Trustee (SA) ustpregion16.sa.ecf@usdoj.gov
Interested Party: Chad L Butler caecf@tblaw.com
Counsel for TD Bank: Randall P Mroczynski randym@cookseylaw.com
Counsel for Belgium Investments 960 Bay Dr, LLC: Patrick Miller    patrick.miller@impactadvocateslaw.com

☐ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL (state method for each person or entity served)**: Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on 3/21/2023, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

**Honorable Theodore Albert**
**United States Bankruptcy Court**
**Central District of California**
**Ronald Reagan Federal Building and Courthouse**
**411 West Fourth Street, Suite 5085 / Courtroom 5B**
**Santa Ana, CA 92701-4593**

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 3/21/2023 | Peter Garza | /s/Peter Garza |
|---|---|---|
| Date | Printed Name | Signature |

---

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                    **F 9013-3.1.PROOF.SERVICE**

# EXHIBIT "B"

# EXHIBIT "B"

Bert Briones (SBN 237594)
**RED HILL LAW GROUP**
15615 Alton Pkwy, Suite 210
Irvine, CA 92618
Tel:   (888) 733-4455
Fax:   (714) 733-4450
Email: bb@redhilllawgroup.com

Attorneys for Debtor Bassem Victor El Mallakh

**RED HILL LAW GROUP**
15615 Alton Pkwy, Suite 210
Irvine, California 92618

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA (SANTA ANA)

| | |
|---|---|
| In re:<br><br>BASSEM VICTOR EL MALLAKH,<br><br>      Debtor | Case No. 8:22-bk-11605-TA<br><br>Chapter 7<br><br>**DIRECT TESTIMONY DECLARATIONS IN OPPOSITION TO OBJECTION TO HOMESTEAD EXEMPTION**<br><br>**HEARING:**<br>**Date: August 24, 2023**<br>**Time: 11:00 a.m.**<br>**Ctrm:_5B** |

TO THE HONORABLE THEODOR C. ALBERT, MOVANT BELGIUM INVESTMENTS 960 BAY DR. LLC ("BELGIUM"), AND ALL INTERESTED PARTIES:

Debtor Bassem El Mallakh hereby submits direct testimony in support of his Opposition to Belgium Investments 960 Bay Dr., LLC's Objection to Debtor's Claimed Homestead Exemption ("Objection").

Dated: August 7, 2023

Respectfully submitted,
**RED HILL LAW GROUP**

By:   */s/ Bert Briones*
Bert Briones
Attorneys for Debtor Bassem Victor El Mallakh

## DECLARATION OF BASSEM VICTOR EL MALLAKH

I, BASSEM VICTOR EL MALLAKH, declare:

1.     I am an individual over the age of 18.

2.     I know the following facts to be true of my own personal knowledge unless otherwise stated.

3.     I purchased a townhouse located at 116 Rockefeller, Irvine, California 92612 ("Irvine Townhouse") in October 2013.

4.     On my petition date, September 19, 2022, and since then to present, my principal residence has been the Irvine Townhouse. On September 19, 2022 to present, I have resided and continue to reside in the Irvine Townhouse. I intend to continue to reside in the Irvine Townhouse. Since prior to September 19, 2022 to present, I have occupied the Irvine Townhouse except when temporarily away due to business or vacation. My personal belongings, my entire closet (Passport, Social security, Birth Certificate, copy of my Tax returns, my prescriptions, and my Invisalign retainers), clothing, and furniture have been in the Irvine Townhouse since before September 19, 2022. I have slept and continue to sleep at the Irvine Townhouse except for the nights when I "crashed" in Santa Monica after work or went on vacation. The nights when I slept away from the Irvine Townhouse, I always intended to return to the Irvine Townhouse and considered the Irvine Townhouse to be my home and my residence. During the last 10 years since I purchased the house, I have spent at least 95% of the days there.

The Santa Monica Apartment

5.     In 2016, I entered a lease agreement for an apartment located at 525 Broadway, Santa Monica, CA 90401 ("Santa Monica Apartment" and "Santa Monica Lease").

6.     The Santa Monica Apartment had two bedrooms.

7.     I entered the Santa Monica Lease agreement with my business partner and friend, Mohammed Rostom.

8.      The purpose of the Santa Monica Lease was to provide office space for a business that Rostom and I were starting, which we called Lava Enterprises.

9.      We selected Santa Monica for the office location so we could be close to other people in the industry who were primarily located in Los Angeles.

10.      The Santa Monica Apartment also served as Rostom's living quarters while he was working with me in Santa Monica.

11.      One room in the Santa Monica apartment was Rostom's bedroom.  The other room contained two desks that Rostom and I used for business.

12.      Both Rostom and I had to be on the Santa Monica Lease because Rostom was from Canada, and the apartment landlord wanted a co-signor on the lease.

13.      In addition, I had to Co- sign the Santa Monica Lease in order to get keyless Fob entry access to the garage and the elevator when I came to the apartment to work.

14.      I decided to take my desk and computer and office belongings back to my Irvine townhome in April of 2022 and I called the leasing office and let them know that I would be no longer coming there and If I can remove my name on the lease but my friend Rostom will remain on the lease alone. And that I will only come to pick up office and work mail or if I need to open the door for the cleaners while Rostom is out of town. At the end of 2022, Rostom decided he wanted me to help him terminate the Santa Monica Lease and take away all his furniture and belongings and I can give them away to the Goodwill store for charity and vacate the apartment since he was no longer coming back from Dubai to stay with his family.

15.      Between November 2016 and April 2022, I spent a lot of time at the Santa Monica apartment.  I would often work at the apartment from early morning until late at night.  Sometimes, I would stay overnight at the Santa Monica Apartment and sleep on the couch, since the guest bedroom's bed was a small Twin bed, we had our 2 desks and computers in the guest bedroom so the space won't allow us to fit in a king or queen bed and I am tall I won't be able to sleep in that bed regularly. I would stay overnight there rather than try to drive back to the townhouse in Irvine when I was overly tired.

- 3 -

16.    In 2019 and 2020, when Belgium Investments 960 Bay Dr., LLC ("Belgium") purportedly attempted to serve me with its summons in its Florida lawsuit against me, I was spending most days working in Santa Monica. I was not physically at the Irvine townhouse when the process server(s) purportedly attempted to personally serve me with the summons.

Reem's Lease for the Irvine Townhouse

17.    On January 1, 2017, I entered a lease with my sister, Reem Hanna for two of the bedrooms and common areas of the Irvine townhouse—one bedroom for Reem and one for her son. I continued to reside in the Irvine townhouse's third bedroom and share use of the common areas.

18.    Although Reem and I are siblings, we agreed that we should memorialize her lease in writing. I located and copied a lease from Google. I do not know if all of the language in the lease was necessary or applicable to Reem's and my situation, but it accomplished our goal of agreeing in writing to a rent price and term.

19.    Reem and I always agreed that I would continue to live in the Irvine townhouse, and I in fact have lived in the Irvine townhouse throughout the entire time that Reem has leased the other two bedrooms (2017 to present).

20.    Although I was spending a lot of time in the Santa Monica Apartment during the time since 2017 and since Reem and I entered the lease in 2017 until 2022, my clothing, furniture and other personal belongings have remained in the Irvine townhouse. The only personal items that I kept in the Santa Monica apartment were 2 t-shirts, my tennis rackets bag and my bicycle.

Other Information

21.    I renewed my drivers' license at the DMV in Santa Monica in 2017 and decided to put my business address on it because I knew that the Bungalow lounge at the Fairmont Hotel Miramar, that my business partner Rostom and I go to frequently, would allow Santa Monica residents to skip the line. Since I no longer work in Santa Monica or spend much time there, I changed my drivers' license address back to the Irvine

- 4 -

1    Townhouse.  My drivers' license currently has the Irvine Townhouse address.

2          22.    I took the advice of my attorneys, Michael Sayer in the state court motion to

3    vacate sister state judgment and Michael Berger at the beginning of my bankruptcy case,

4    on how to explain the Santa Monica Apartment versus the Irvine Townhouse.  I was

5    spending time at both locations and did not intend to mislead anyone about my residency.

6          I declare under penalty of perjury of the laws of the United States of America that

7    the foregoing is true and correct.

8

9    Dated:_____ at _____, Egypt (where I am currently

10   on vacation).

11

12          **[SEE ATTACHED SIGNATURE PAGE]**

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  Townhouse. My drivers' license currently has the Irvine Townhouse address.

2      22.    I took the advice of my attorneys, Michael Sayer in the state court motion to

3  vacate sister state judgment and Michael Berger at the beginning of my bankruptcy case,

4  on how to explain the Santa Monica Apartment versus the Irvine Townhouse. I was

5  spending time at both locations and did not intend to mislead anyone about my residency.

6      I declare under penalty of perjury of the laws of the United States of America that

7  the foregoing is true and correct.

8

9  Dated: August 8th 2023 at _____Cairo_____, Egypt (where I am currently

10  on vacation).

11

12

13      BASSEM VICTOR EL MALLAKH

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 5 -

DIRECT TESTIMONY DECLARATIONS

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

15615 Alton Pkwy., Ste. 210, Irvine CA 92618

A true and correct copy of the foregoing document entitled: **SUPPLEMENTAL BRIEF IN SUPPORT OF OPPOSITION TO OBJECTION TO HOMESTEAD EXEMPTION** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) ___08/08/2023___ I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

Nancy S Goldenberg    nancy.goldenberg@usdoj.gov
Weneta M.A. Kosmala (TR)    ecf.alert+Kosmala@titlexi.com, wkosmala@txitrustee.com;dmf@txitrustee.com;sdk@txitrustee.com

COUNSEL FOR OBJECTING CREDITOR: Patrick Miller    patrick.miller@impactadvocateslaw.com

Randall P Mroczynski    randym@cookseylaw.com
United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov                          ☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) ___08/08/2023___, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

Debtor
Bassem Victor El Mallakh
116 Rockefeller
Irvine, CA 92618-4298

The Honorable Theodor C. Albert
U.S. Bankruptcy Court
Ronald Reagan Federal Building
411 W. Fourth Street – Ste. 5085
Santa Ana, CA 92701                          ☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) ___8-8-23___, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

Debtor: Served via electronic notification on secure encrypted client portal and email.
[Client email address is protected by the Attorney Client Privilege.]

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 08/08/2023 | Robin Briones | /s/ Robin Briones |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

---

This form is optional.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**RUL**

**1**

CFN: 20200138107 BOOK 31
DATE:03/04/2020  04:15:21 F
HARVEY RUVIN, CLERK OF COU

IN THE CIRCUIT COURT OF THE 11TH
JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

BELGIUM INVESTMENTS 960 BAY DR, LLC,
a California LLC, et al.,

       Plaintiffs,

v.

SPENCER BLANK, et al.,

       Defendants.

_____/

CASE NO.: 18-28145 CA



## FINAL JUDGMENT AGAINST BASSEM ESSAM EL MALLAKH

THIS CAUSE having come before the Court upon Plaintiff's Motion for Entry of Final Judgment Against Bassem Essam El Mallakh (the "Motion"), and the Court having reviewed the record and been otherwise duly advised, it is hereby

**ORDERED AND ADJUDGED:**

1. The Motion is GRANTED.

2. The Court hereby enters final judgment against Defendant Bassem Essam El Mallakh as to Count VI, Count VII, and Count VIII.

3. This judgment is final.

4. Plaintiff is currently due $4,255,000.00 (four million two hundred and fifty-five thousand dollars USD) in damages from Defendant Bassem Essam El Mallakh.

5. Plaintiff is entitled to post-judgment interest from Defendant Bassem Essam El Mallakh.

6. The sum referenced above in paragraph 4 shall bear interest from this date forward at the prevailing legal rate of interest.

7.    The Court finds that it has jurisdiction over the Defendant Bassem Essam El Mallakh.

8.    The Court further finds that Defendant failed to timely respond to the Complaint, default has been entered against Defendant, and thus Defendant has admitted *pro confesso* to the allegations in the Complaint.

9.    The Court finds as follows as to Defendant Bassem Essam El Mallakh:

a.    Plaintiff BELGIUM INVESTMENTS 960 BAY DR, LLC ("Plaintiff Belgium") owns the property located at 960 W Bay Drive, Miami Beach, Florida (the "Property").

b.    Plaintiff Belgium was originally co-managed by, among others, Defendant Bassem Essam El Mallakh.

c.    Defendant Bassem Essam El Mallakh was acting in a fiduciary capacity, oversaw decisions on Plaintiff Belgium's behalf, and co-managed its operations.

d.    Amongst the tasks Defendant Bassem Essam El Mallakh was required to perform, was the engagement and supervision of contractors to perform construction and renovation work on the Property.

e.    Unbeknownst to the Plaintiffs, and as set forth with specificity in the Complaint, Defendant Bassem Essam El Mallakh engaged in activity to defraud Plaintiff Belgium of hundreds of thousands of dollars.

f.    Defendant Bassem Essam El Mallakh acted to introduce and induce Plaintiffs to engage certain contractors, whom Defendant Bassem Essam El Mallakh improperly lauded and extoled in order to induce Plaintiffs to engage them.

2

g.     Defendant Bassem Essam El Mallakh concealed key details concerning his relationship to the certain contractors, including without limitations, that they were partners in various other projects.

h.     Had the Plaintiffs been aware of all the facts—including without limitation the undisclosed closed ties between Defendant Bassem Essam El Mallakh and the contractors, and the conspiracy between them to improperly enrich themselves at the expense of the Plaintiffs— they would not have engaged the contractors.

i.     As a consequence of Defendant Bassem Essam El Mallakh's acts, Plaintiffs entered into an agreement dated March 14, 2016 (the "Agreement") to finish the renovation of the Property (the "Project") for an amount of $400,000.

j.     The timeframe promised to complete the project was 60 days i.e., by May 18, 2016, including a certificate of occupancy.

k.     Under Defendant Bassem Essam El Mallakh's mismanagement and improper acts, the Project failed to complete on the specified time or otherwise, and instead lost all funds to and through Defendant Bassem Essam El Mallakh, whereby he defrauded and improperly enriched himself at the expense of the Plaintiffs.

l.     Under Defendant Bassem Essam El Mallakh's mismanagement and improper acts, additional funds were improperly taken under threat that a failure to provide the additional funds would result in their abrupt withdrawal from the Project, which would inter alia, cause the Project to fail.

m.     Defendant Bassem Essam El Mallakh misrepresented to Plaintiffs that the financial requests were legitimate when they were not, and urged the payment of additional and unwarranted moneys improperly.

3

n.      Defendant Bassem Essam El Mallakh then took the ill-gotten profits from overcharging Plaintiffs.

o.      Defendant Bassem Essam El Mallakh would support and otherwise corroborate the risks to Project if the Plaintiffs did not pay the additional funds.

p.      As a consequence of Defendant Bassem Essam El Mallakh actions, Defendant Bassem Essam El Mallakh initially extorted over $703,912.00.

q.      Notwithstanding the additional funds paid by Plaintiffs, the Project did not get close to being finished.

r.      Plaintiffs requested on multiple instances an accounting and/or explanation on the use of the additional funds (over the agreed-upon amount) paid by Plaintiffs, yet Defendant Bassem Essam El Mallakh never provided it.

s.      Under Defendant Bassem Essam El Mallakh's mismanagement, and improper acts a revised "final budget" requesting an additional $667,500 to complete the Project was made to Plaintiffs, with another $134,030.66, allegedly for "past work performed," accompanied by threats to withdraw from the Project, and to record liens upon the Property if Plaintiffs did not provide the additional monies demanded.

t.      Defendant Bassem Essam El Mallakh provided no documentary support for the "requests" for additional funds; no invoices (or other support) were provided by Defendant Bassem Essam El Mallakh.

u.      The limited actual work performed was shoddy, incomplete, and failed to meet minimum acceptable standards, and did not meet the requirements necessary to obtain a certificate of occupancy, as promised in the Agreement.

4

v.    All conditions precedent to bringing this action occurred, have been performed, or have been waived.

w.    Plaintiffs have provided additional supporting documentation and evidence on damages, which remain uncontested by Defendant Bassem Essam El Mallakh.

10.    As to Count VI for breach of fiduciary duty:

a.    Defendant Bassem Essam El Mallakh owed a fiduciary duty to Plaintiff Belgium and all of its members to act with the highest degree of good faith and loyalty, and to always act for the benefit of Plaintiff Belgium and its members.

b.    Defendant Bassem Essam El Mallakh breached his fiduciary duty by mismanaging and misappropriating Plaintiff Belgium's monies, using those monies for their personal benefit and not for the benefit of Plaintiff Belgium, and engaging in actions contrary to the best interests of Plaintiff Belgium and its members, for their own personal interest.

c.    As a result of Defendant Bassem Essam El Mallakh's breach of fiduciary duty, the Plaintiff Belgium has suffered, and continues to suffer, damages.

d.    WHEREFORE, the Court enters final judgment against Defendant Bassem Essam El Mallakh for breach of fiduciary duty, for $4,255,000.00 in damages, plus interest, attorney's fees and costs.

11.    As to Count VII for conversion/theft:

a.    By using and misappropriating the assets and property of Plaintiff Belgium for his own personal use and benefit, Defendant Bassem Essam El Mallakh has exercised wrongful dominion and control over the assets and property of Plaintiff Belgium, to the detriment of the rights of Plaintiff Belgium, the rightful and lawful owner of same.

5

        b.     Defendant Bassem Essam El Mallakh's conduct constitutes a conversion and theft of Plaintiff Belgium's property and assets, which has caused, and continues to cause, damage to the Plaintiff Belgium.

        c.     WHEREFORE, the Court enters default final judgment against Defendant Bassem Essam El Mallakh for $4,255,000.00 in damages, plus interest, attorney's fees and costs.

   12.    As to Count VIII for unjust enrichment:

        a.     By diverting Plaintiff Belgium's funds to himself, and for his own personal benefit, Defendant Bassem Essam El Mallakh has conferred a benefit on themselves to which he was not lawfully entitled.

        b.     Defendant Bassem Essam El Mallakh knew, or should have known, that the monies taken belonged to the Plaintiff Belgium and not to him individually.

        c.     Defendant Bassem Essam El Mallakh improperly retained the Plaintiff Belgium's funds, despite a lack of lawful right to do so.

        d.     It would be unjust and inequitable to allow Defendant Bassem Essam El Mallakh to retain said benefit without adequate consideration.

        e.     WHEREFORE, the Court enters default final judgment against Defendant Bassem Essam El Mallakh for $4,255,000.00 in damages, plus attorney's fees and costs.

   13.    Execution shall issue immediately upon Defendant Bassem Essam El Mallakh for the judgment principal of $4,255,000.00, along with post-judgment interest at the prevailing legal rate, due to Plaintiffs by Defendant Bassem Essam El Mallakh.

   14.    This Court retains jurisdiction to enforce this judgment and enter further orders that are proper.

15.    Defendant Bassem Essam El Mallakh shall serve within 45 calendar days a fact information sheet with all supporting documentation, as provided under Florida Rule of Civil Procedure 1.977.

**DONE AND ORDERED** in Chambers in Miami-Dade County, Florida this _21_ day of ___February___, 2020.

THE HONORABLE WILLIAM THOMAS
CIRCUIT COURT JUDGE

William Thomas
Circuit Court Judge

7

**RUL**

**2**

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

BELGIUM INVESTMENTS 960 BAY DR,
LLC, a California LLC, et al.,

CASE NO.: 2018-28145 CA 44

     Plaintiffs,

v.

SPENCER BLANK, et al.,

     Defendants.

_____/

## ORDER ON DEFENDANT EL MALLAKH'S MOTION
## TO VACATE,

**THIS MATTER** came before the Court on Defendant Bassem El Mallakh's Motion to

Quash Service and Vacate Final Judgment.   The Court having reviewed the motion, response,

having conducted an evidentiary hearing, heard argument of counsel and being otherwise advised

in the premises, Court makes the following findings:

Belgium Investments filed this lawsuit on August 17, 2018, naming El Mallakh as

defendant. On August 29, 2018, the Clerk issued a summons for El Mallakh. On January 8, 2019,

Plaintiff ran a skip trace on El Mallakh, which showed that he resided at 116 Rockefeller, Irvine

CA. The skip trace showed that El Mallakh owned 116 Rockefeller, Irvine CA. The skip trace

showed that Equifax also showed 116 Rockefeller as El Mallakh's address. The 2019 skip trace

provided no other potential addresses for El Mallakh. The skip trace identified Reem Hanna as El

Mallakh's associate or relative, co-defendant in a business lawsuit, and co-resident of El Mallakh's

at 116 Rockefeller, along with previous addresses of 606 Rockefeller, 405 Rockefeller, and 34

Falkner Drive. The skip trace identified Mohamed Rostom as El Mallakh's associate or relative,

and co-resident of El Mallakh at 116 Rockefeller. The skip trace identified a 2014 lawsuit against

Bassem El Mallakh and Reem Hanna, along with Essam El Mallakh and Mona Mikhaeil, for

CASE NO.: 2018-28145 CA 44

making false and slanderous representations, in Orange County Case No. 2014-00728897-CU-BT-CJC.

Given the information in the skip traces, Belgium Investments drafted an alias summons to serve El Mallakh at his house at 116 Rockefeller. On January 25, 2019, the Clerk of Court issued an alias summons for El Mallakh for his 116 Rockefeller address.

Plaintiff hired a private investigator to further investigate El Mallakh at his 116 Rockefeller address. Private investigator Johnson performed a California DMV search on El Mallakh and found that his vehicle, a 2016 Mercedes Benz C Class was registered at 116 Rockefeller. Private investigator Johnson attempted service at 116 Rockefeller on March 19, 2019. Reem Hanna answered the door at 116 Rockefeller, identified herself as "Reem," and represented that she did not know El Mallakh. This was obviously not true. Private investigator Johnson reviewed public database sources and identified the woman as Reem Hanna, co-resident at 116 Rockefeller. Private investigator Johnson returned on March 28, 2019, March 31, 2019 and April 6, 2019. However, no one answered the door. On April 17, 2019, at 12:20 p.m., private investigator Johnson again returned to 116 Rockefeller. Reem Hanna identified herself as "Reem Hanna," and investigator Johnson notified her that she had legal documents for El Mallakh and that she was being sub-served. Hanna again misrepresented that she did not know El Mallakh and refused to open the door to take the documents, for which the investigator placed the alias summons and complaint at the door of 116 Rockefeller.

On July 1, 2019, Plaintiff Belgium filed a return of service for El Mallakh, showing that he was sub-served at his 116 Rockefeller residence on April 17, 2019, through co-resident Reem Hanna. On July 1, 2019, Belgium filed a motion for default against El Mallakh.

On October 9, 2019, El Mallakh contacted co-defendant Petit to advise that he was aware of Plaintiff Belgium's activity, that he believed Belgium was seeking to sell the Property at issue in this lawsuit, despite the pending lawsuit. As to October 9, 2019, El Mallakh recently testified that he was specifically aware of this lawsuit at that time, and specifically aware that Belgium was attempting service of summons upon him at that time.

On October 23, 2019, Belgium moved the Court for an order of judicial default against El Mallakh. On November 18, 2019, the Court entered judicial default against El Mallakh, for his failure to respond or participate in this lawsuit in any way. On February 21, 2020, the Court entered default judgment against El Mallakh. Plaintiff initiated domestication of El Mallakh's February 25th judgment in California, in Orange County Case No. 2020-01148745.

In July 2020, Belgium engaged California process server Michael Danley to serve El Mallakh with Notice of Entry of Sister-State Judgment and related documents. Process server Danley attempted service on: September 12, 2020 at 10:50 a.m., September 13, 2020 at 9:10 a.m., September 13, 2020 at 8:27 p.m. However, no resident came to the door. On September 13, 2020 after 8:27 p.m., process server Hanley briefly staked out 116 Rockefeller. Around 9:02 p.m., process server Danley witnessed lights come on at 116 Rockefeller and people began moving around inside. Process server Danley approached 116 Rockefeller and called out to a woman inside the apartment near the sliding glass door. Process server Danely called out "Reem Hanna" and the woman said "yes," confirming she was Reem Hanna. A middle-aged man came to the door of 116 Rockefeller but refused to identify himself. Reem Hanna came to the door and refused to identify the man or provide any information as to El Mallakh. Process server Danely then served the court papers upon El Mallakh's co-resident Hanna. Process server Danely informed Hanna of the nature of the documents and mailed the documents thereafter to 116 Rockefeller.

On September 23, 2020, the Court dismissed the other defendants pursuant to an approved settlement agreement; the order and agreement expressly excluded El Mallakh because he had refused to participate and was under order of default.  On November 16, 2020, El Mallakh "became aware of a judgment against me [Mallakh] on November 16, 2020 when the County of Orange Clerk of Records sent a Courtesy Notice regarding a lien that was placed on my [El Mallakh's] property."  El Mallakh failed to take any action or exercise his opportunity to be heard.   On February 19, 2021, El Mallakh filed an <u>unverified</u> motion to vacate default order and default judgment in this Florida case, with no exhibits or supporting evidence.  In the motion, El Mallakh advised the Court that Reem Hanna is his sister. El Mallakh also confirmed that the Court entered an order of judicial default on July 1, 2019—nearly two years beforehand.

El Mallakh alleged that he had resided at 525 Broadway, Apt 5037, Santa Monica, CA 90401, since 2017. El Mallakh included an affidavit by him, testifying: "I only became aware of a judgment against me on November 16, 2020 when the County of Orange Clerk of Records sent a Courtesy Notice regarding a lien that was placed on my property." El Mallakh also filed an affidavit of Reem Hanna, testifying that:

> [REEM HANNA]: I never received notice of this lawsuit or the judgment against my brother in this case. I am unaware of any service attempted to be made to me or my brother.

Mallakh testified as to when he learned of the judgment against him:

> [MALLAKH]: When I went to the bank in February . . . then they said that your account has been frozen; and they took all the money out based on a judgment. And I'm like—I was like 'What kind of judgment?' And they gave me a printout that says a judgment based on a Florida case. And that's when I actually found out that there is a lawsuit/judgment. So I found out about it in February of 2021 just from going to the bank.

> Q: And that's the very first time you heard anything about it.

CASE NO.: 2018-28145 CA 44

[MALLAKH]: First time. First time, February 2021.

The sum of Mallakh's prior testimony on when he learned of the Judgment is outline below:

| CA Affidavit of El Mallakh | FL. Affidavit of El Mallakh | Deposition of El Mallakh |
|---|---|---|
| "I had no idea that the Judgment Creditor had filed an Application for Entry of Sister State Judgment, the Notice of Entry of Sister State Judgment, or the Sister State Judgment . . . until I hired counsel to represent me and set the Sister State Judgment aside." | "I only became aware of a judgment against me on November 16, 2020 when the County of Orange Clerk of Records sent a Courtesy Notice regarding a lien that was placed on my property." | "And that's when I actually found out that there is a lawsuit/judgment. So I found out about it in February of 2021 just from going to the bank.<br><br>[Q: And that's the very first time you heard anything about it?]<br><br>"First time. First time, February 2021." |
| CA Affidavit at ¶ 8. | FL Affidavit at ¶ 7. | Depo. Tr. 48, ln. 25 – Tr. 49, ln. 11 |

Mallakh also testified that he had been in communications with co-defendant Bernard Petit, as to this Florida lawsuit and the property at issue on October 9, 2019, and that co-defendant Petit specifically asked El Mallakh if he had been served with summons yet for this lawsuit. Mallakh testified that he continued to talk to co-defendant Petit several times between October 2019 and February 2021.

Mallakh then testified that from October 2019 and after, he continued to be aware that he was sued in this Florida lawsuit, but that he intentionally and knowingly refused to investigate, hire an attorney, or exercise his multiple opportunities to participate in this lawsuit:

Q: from October 2019 to today, you think you've talked to [co-defendant] Bernard Petit once or twice?

[MALLAKH]: Once or twice.

Q: Okay. In all that, did he mention to you that you were being sued in a lawsuit here in Florida?

[MALLAKH]: He said he's – he's getting sued, and he says, 'Did you get any documents or any service – service?' And I said, 'I did not.'

Q: Did you understand by that question that somebody was attempting to serve documents about a lawsuit on you?

[MALLAKH]: Right.

Q: Okay. Did you do anything to investigate if you were getting sued or what that was all about?

[MALLAKH]: No. I did not because, you know, usually when someone is suing you, you need to obviously service you with the documents to know what is going on with the lawsuit.

Q: Okay. Did you hire an attorney to look into it?

[MALLAKH]: No, because I was waiting to get serviced.

Q: Okay. Did you call anybody in Miami or in Florida to find out what was going on with the lawsuit against you?

[MALLAKH]: No.

Q: So you're just waiting for somebody to service summons on you?

[MALLAKH]: Right.

Exhibit 5 (Transcript El Mallakh) at Tr. 59, ln. 18–Tr. 61, ln. 1.

Legal Standard

A process server's affidavit alone is sufficient to support a finding of valid service and creates a presumption of effective service of process. *Magazine v. Bedoya*, 475 So. 2d 1035, 1035 (Fla. 3d DCA 1985) (affirming order denying motion to vacate where defendant failed to show by clear and convincing evidence that service was defective); *Buttigieg v. Prunetti*, 610 So. 2d 667, (Fla. 4th DCA 1992) (same). A plaintiff need only substantially comply with service statutes to acquire personal jurisdiction and overcome a motion to quash service or vacate an order on service

of process. *Fernandez v. Chamberlain*, 201 So. 2d 781, 784–85 (Fla. 2d DCA 1967) (holding substantial compliance with service statute was sufficient to defeat motion to quash, despite inability to file return receipt). Where there is sufficient evidence from which it might be reasonably found that service of summons was sufficient, the Court may deny a motion to vacate service of process, notwithstanding that the return of service has technical variances or does not address every aspect of proper service. *Pentecostal Holiness Church, Inc. v. Mauney*, 220 So. 2d 25, 26 (Fla. 4th DCA 1969).

A defendant challenging service of process must prove invalidity of the service by clear and convincing evidence and failure to do so will have the service of process stand as effective. *Conde v. Professional Mediquip of Fla., Inc.*, 436 So. 2d 322, 323–24 (Fla. 4th DCA 1983) (holding that where defendant admits to having notice of lawsuit, and has not by clear and convincing evidence demonstrated the invalidity of the service, the service will stand as effective); *Travelers Ins. Co. v. Davis*, 371 So. 2d 702, 703 (Fla. 3d DCA 1979) (defendant must prove the invalidity of service of process by clear and convincing evidence). Where defendant does not provide clear and convincing record evidence to overturn presumption of valid service, the Court cannot grant a motion to vacate. *Magazine*, 475 So. 2d at 1035 (affirming order denying motion to vacate where defendant failed to show by clear and convincing evidence that service was defective); *Wadkin Ltd. v. Platt*, 545 So. 2d 314, 314 (Fla. 4th DCA 1989) (affirming order denying motion to quash service of process, where defendant failed to provide clear and convincing evidence to overturn presumption of effective service of process).

Florida Statutes § 48.031(1) provides that service of process can be made by leaving copies of summons at a defendant's usual place of abode with any person residing therein who is 15 years

of age or older. § 48.031(1), Fla. Stat. (2019). Under Florida Statutes s. 48.031(1)(a), the term "usual place of abode" means the place where the defendant is actually living at the time of service. *Shurman v. Atlantic Mortg. & Inv. Corp.*, 795 So. 2d 952, 954 (Fla. 2001).

Where a person to be served with process evades the presence of a process server in a deliberate attempt to avoid service of process, the delivery requirement may be satisfied if the process server leaves the papers at a place in which such person can easily retrieve them and takes reasonable steps to call such delivery to the attention of the person to be served. *Palamara v. World Class Yachts, Inc.*, 824 So. 2d 194, 194–95 (Fla. 4th DCA 2002); *Haney v. Olin Corp.,* 245 So. 2d 671(Fla. 4th DCA 1971); *Olin Corp. v. Haney*, 245 So. 2d 669(Fla. 4th DCA 1971); *Liberman v. Commercial Nat'l Bank of Broward Cnty.*, 256 So. 2d 63 (Fla. 4th DCA 1971); *Dowd Shipping, Inc. v. Lee*, 354 So. 2d 1252 (Fla. 4th DCA 1978); *see also Wendel v. Int'l Real Estate News, LLC,* 2020WL5803510 at *4 (S.D. Fla. Aug. 10, 2020) (denying motion to vacate default where defendant failed to meet burden to present strong and convincing evidence that she had not evaded service); *Kennedy v. Grova*, 2012WL1368139 at *3 (S.D. Fla. April 19, 2012); *U.S. S.E.C. v. Reinhard*, 352 Fed. App'x 309, 313 (11th Cir. 2009).

Here, the service of process at El Mallakh's home, which he owns and where his car was registered, upon his adult sister also residing there, sufficed Florida Statutes § 48.031 and gave due process notice and opportunity to be heard.

Authorized investigator Johnson served process upon El Mallakh through his sister Reem Hanna at 116 Rockefeller, Irvine CA, on April 17, 2019. Hanna had previously identified herself to investigator Johnson on March 19, 2019, and again identified herself as "Reem Hanna" on April 17, 2019. *Id.* at *1. Despite Hanna's misrepresentations that she did not know El Mallakh,

investigator Johnson notified Hanna that she had legal documents for El Mallakh and that she was

being sub-served, in compliance with Florida law. *Id*. at *2

A skip trace showed El Mallakh owned and resided at 116 Rockefeller, Irvine CA, with no

other possible addresses. Exhibit 1 (1/8/19 skip trace). The skip trace showed Reem Hanna was

his co-resident there, along with Mohamed Roston. *Id*. at *4, 6, 19–29 and 56.

Investigator Johnson performed a California DMV search on El Mallakh and found that

his vehicle, a 2016 Mercedes Benz C Class was currently registered at 116 Rockefeller. Exhibit 4

(Declaration of The Titan Group, Professional Investigations). The return of service is regular on

its face, creating the presumption of good service. This suffices and puts burden on El Mallakh to

prove by clear and convincing evidence that service was defective.  It is the finding of this Court

that El Mallakh and Hanna are not credible and have failed to provide clear and convincing

evidence that El Mallakh's usual place of abode is not 116 Rockefeller, Irvine CA.

The purpose of service of process is to provide the defendant due process notice and

opportunity to be heard. The Third District Court of Appeal has plainly stated:

> The purpose of service of process is to give a defendant proper notice that it is
> answerable to a plaintiff's claim, to advise the defendant of the nature of that claim,
> and to afford the defendant an opportunity to defend against it.

*Am. Hosp. of Miami, Inc. v. Nateman*, 498 So. 2d 444, 445 (Fla. 3d DCA 1986) (affirming denial

of motion to vacate despite defect in summons, where defendant received notice and opportunity

to be heard); *Davis*, 371 So. 2d at 703 (holding object of service of process is to give defendant

notice that legal proceeding has been instituted, and opportunity to defend against it); *Shurman*,

795 So. 2d at 954  ("the purpose of this jurisdictional scheme is to give the person affected notice

of the proceedings and an opportunity to defend his rights."); *Cruz v. Citimortgage, Inc*., 197 So.

3d 1185, 1189 (Fla. 4th DCA 2016) ("It is well-settled that the fundamental purpose of the service

of process statute 'is to give the person affected notice of the proceedings and an opportunity to

defend his rights.'") (citing *Shurman*).

As the *Kozinski v. Phillips* court discussed:

> Further, cases addressing insufficient service of process have emphasized that <u>a
> defendant may not 'simply ignore the process, sit idly by, let default be entered
> against it,' and then successfully move to set aside</u> the judgment more than a year
> after it is rendered. *Craven v. J.M. Fields, Inc.*, 226 So. 2d 407, 410 (Fla. 4th DCA
> 1969). Instead, 'a party complaining of an irregular service or return is required to
> move diligently to effectuate those remedies available to the party by our rules of
> civil procedure <u>lest the party suffer the consequences.</u>' *Id.*

*Kathleen G. Kozinski, P.A. v. Phillips*, 126 So. 3d 1264, 1268 (Fla. 4th DCA 2013) (emphasis

added). Likewise, a defendant and his family cannot make deliberate attempts to avoid the presence

of a process server and service of process. *Palamara,* 824 So. 2d at 194–95; *Haney*, 245 So. 2d  at

671; *Olin Corp.¸* 245 So. 2d at 673–74; *Liberman*, 256 So. 2d  at 63; *Dowd Shipping*,  354 So. 2d

at 1252; *Wendel*, 2020WL5803510 at *4; *Kennedy*, 2012WL1368139 at *3; *Reinhard¸* 352 Fed.

App'x at 313.

Where defendants have notice and an opportunity to be heard prior to entry of a default

order or default judgment, the Court property denies their later motion to vacate and the Third

District Court of Appeal should affirm. *Estrada v. Estrada*, 274 So. 3d 426, 430 (Fla. 3d DCA

2019) (holding son and daughter-in-law had notice of action by father, and thus due process rights

were preserved and default order entered after they filed appearance and answer to complaint was

not void).

Additionally, irregularities or technical variances in service of process, summons, and

return of service which do not result in prejudice to defendant do not serve to invalidate service.

*Nateman*, 498 So. at 445–46 (affirming denial of motion to vacate despite defect in summons,

where defendant received notice and opportunity to be heard); *Buttigieg*, 610 So. 2d at 669–70

CASE NO.: 2018-28145 CA 44

("Irregularities in a writ or other process, where they do not prejudice a defendant, will not invalidate the service.").

Hyper-technical defects in summonses or returns of service do not require the Court to quash service, where the defendant did have notice and opportunity to be heard. *Nateman*, 498 So. 2d at 445–46 (affirming denial of motion to vacate despite defect in summons, where defendant received notice and opportunity to be heard).

Here, El Mallakh had repeated notice of this lawsuit and opportunity to be heard, over and over again for years. El Mallakh recently testified that he was specifically aware of this lawsuit as of October 9, 2019, and specifically aware that Belgium was attempting service of summons upon him at that time:

> [MALLAHK]: [A]t that time, also Bernard [Petit] asked me – I remember very well. He says 'Did anybody try to serve you any documents?'
>
> Q: from <u>October 2019</u> . . . did he mention to you that you were being sued in a lawsuit here in Florida? Did you understand by that question that somebody was attempting to serve documents about a lawsuit on you?
>
> [MALLAKH]: Right."

Exhibit 5 (Mallakh deposition) Tr. 55, ln. 17–20 and Tr. 59, ln. 18–Tr. 61, ln. 1. This was before Belgium moved for an order of judicial default against El Mallakh (motion filed 10/23/19). Between October 2019 and February 2020, El Mallakh continued to communicate with his co-defendant Petit as to this lawsuit, its stage of advance, and its impact on El Mallakh's interests.

Further, El Mallakh had notice by delivery of summons and complaint through his sister at his house on April 17, 2019. Exhibit 4 (declaration of investigator Johnson). El Mallakh had notice on September 13, 2020, when process server Hanley served notice of default judgment upon El Mallakh through Reem Hanna at El Mallakh's home. Exhibit 10 (Declaration of Michael Danley) at ¶¶ 8–14. It is undisputed that process server Hanley communicated with Hanna on September

13, 2020 to give service of process to El Mallakh at his home. Exhibit 21 (Transcript Hanna) at

Tr. 71, ln. 17 –Tr. 73, ln. 20 ("Q: at 116 Rockefeller at 9 o'clock p.m. on September 13, 2020,

when this process server came to your house; is that right?" "[HANNA]: Right.").

El Mallakh also testified that he received additional notice of the Florida judgment against

him on November 16, 2020 when the County of Orange Clerk of Records sent a Courtesy Notice

regarding a lien that was placed on my property." Exhibit 13 (Mallakh CA affidavit) at ¶ 7. El

Mallakh could not explain why he continued to delay his appearance in this Court to address this

lawsuit against him.

Mallakh has testified that he knowingly and intentionally squandered his due process notice

and opportunity to be heard for years, after he continued to be aware that he was sued in this

Florida lawsuit, but that he intentionally and knowingly refused to investigate, hire an attorney, or

exercise his multiple opportunities to participate in this lawsuit:

> Q: from October 2019 to today, you think you've talked to [co-defendant] Bernard
> Petit once or twice?
>
> [MALLAKH]: Once or twice.
>
> Q: Okay. In all that, did he mention to you that you were being sued in a lawsuit
> here in Florida?
>
> [MALLAKH]: He said he's – he's getting sued, and he says, 'Did you get any
> documents or any service – service?' And I said, 'I did not.'
>
> Q: Did you understand by that question that somebody was attempting to serve
> documents about a lawsuit on you?
>
> [MALLAKH]: Right.
>
> Q: Okay. Did you do anything to investigate if you were getting sued or what that
> was all about?
>
> [MALLAKH]: No. I did not because, you know, usually when someone is suing
> you, you need to obviously service you with the documents to know what is going
> on with the lawsuit.

Q: Okay. Did you hire an attorney to look into it?

[MALLAKH]: No, because I was waiting to get serviced.

Q: Okay. Did you call anybody in Miami or in Florida to find out what was going on with the lawsuit against you?

[MALLAKH]: No.

Q: So you're just waiting for somebody to service summons on you?

[MALLAKH]: Right.

Exhibit 5 (Transcript El Mallakh) at Tr. 59, ln. 18–Tr. 61, ln. 1.

This Court concludes the above notice and opportunity to be heard sufficed El Mallakh's due process rights. Florida law requires El Mallakh to diligently exercise his due process rights to participate in this lawsuit, upon such notice. *Kozinski*, 126 So. 3d  at 1268. Instead, El Mallakh chose to "simply ignore the process and let default be entered against [him]." *Id*. Florida law prohibits El Mallakh from now successfully moving to set aside the judgment more than a year after it is rendered. *Id*.; *Craven*, 226 So. 2d  at 410.

Additionally, the Court must differentiate between "defective" service and "total lack" of service. *Kozinski,* , 126 So. 3d at 1268. Total lack of service renders a judgment void, while defective service renders a judgment <u>voidable</u>. Under circumstances where service is irregular or defective but actually gives the defendant notice of the proceedings against him, a defendant has only one year to move to vacate a particular order, under Florida Rule of Civil Procedure 1.540(b). Id.  It is the finding of this Court that the record shows that El Mallakh had repeated notice of this lawsuit and opportunity to be heard.  Thus, El Mallakh only had one year from the November 19, 2019 order of judicial default to move to vacate that order—up to November 19, 2020. Fla. R. Civ. P. 1.540(b). Accordingly, it is

CASE NO.: 2018-28145 CA 44

**ORDERED AND ADJUDGED** that the motion to vacate final judgment is **DENIED**.

DONE AND ORDERED in Chambers at Miami-Dade County, Florida, on 05/15/21.

WILLIAM THOMAS
CIRCUIT COURT JUDGE

**FINAL ORDERS AS TO ALL PARTIES**
**SRS DISPOSITION NUMBER    2**
**THE COURT DISMISSES THIS CASE AGAINST
ANY PARTY NOT LISTED IN THIS FINAL ORDER
OR PREVIOUS ORDER(S). THIS CASE IS CLOSED
AS TO ALL PARTIES.**

**Judge's Initials    WT**

The parties served with this Order are indicated in the accompanying 11th Circuit email confirmation which includes all emails provided by the submitter.  The movant shall IMMEDIATELY serve a true and correct copy of this Order, by mail, facsimile, email or hand-delivery, to all parties/counsel of record for whom service is not indicated by the accompanying 11th Circuit confirmation, and file proof of service with the Clerk of Court.

Signed original order sent electronically to the Clerk of Courts for filing in the Court file.

14

**RUL
3**

# Third District Court of Appeal

## State of Florida

Opinion filed February 16, 2022.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D21-1295
Lower Tribunal No. 18-28145
_____

**Bassem Essam El Mallakh,**

Appellant,

vs.

**Belgium Investments 960 Bay Dr,**

Appellee.

An appeal from a non-final order from the Circuit Court for Miami-Dade County, William Thomas, Judge.

Frank Law Firm, P.A., and Cody L. Frank (Fort Lauderdale); South Florida Law, PLLC, and Frank DelloRusso (Hallandale Beach), for appellant.

Bernhard Law Firm, PLLC, and Andrew J. Bernhard, for appellee.

Before EMAS, LOGUE, and MILLER, JJ.

PER CURIAM.

Appellant, Bassem Essam El Mallakh, challenges an order denying his verified motion to vacate a default final judgment rendered in favor of appellee, Belgium Investments 960 Bay Drive.  The trial court conducted an extensive evidentiary hearing, resolved all disputed factual issues, and articulated legal conclusions in a carefully reasoned, fourteen-page opinion. Adhering to the presumptions codified in the Supreme Court's seminal decision, <u>Koster v. Sullivan</u>, 160 So. 3d 385 (Fla. 2015), the principles advanced in <u>Lazcar International, Inc. v. Caraballo</u>, 957 So. 2d 1191 (Fla. 3d DCA 2007), and the adage that we must decline to "substitute [our] judgment for that of the trial court on questions of fact, likewise of the credibility of the witnesses as well as the weight to be given to the evidence by the trial court," <u>Goldfarb v. Robertson</u>, 82 So. 2d 504, 506 (Fla. 1955), as this "is not the function of the appellate court," <u>Shaw v. Shaw</u>, 334 So. 2d 13, 16 (Fla. 1976), we affirm the order under review in all respects.

Affirmed.

# RUL

# 4

IN THE DISTRICT COURT OF APPEAL

OF FLORIDA

THIRD DISTRICT

JUNE 28, 2022

BASSEM ESSAM EL MALLAKH,                    CASE NO.: 3D**21-1295**
Appellant(s)/Petitioner(s),
vs.                                          L.T. NO.:    18-28145
BELGIUM INVESTMENTS 960 BAY
DR, etc.,
Appellee(s)/Respondent(s),

  Appellee's Responses to the Motion for Rehearing, filed May

26, 2022, are noted.

  Upon consideration, Appellant's Motion for Certification or,

Alternatively, for Rehearing or Clarification is hereby denied.

  Appellant's Motion for Rehearing En Banc is denied.

  EMAS, LOGUE and MILLER, JJ., concur.

A True Copy
ATTEST

CLERK
DISTRICT COURT OF APPEAL
THIRD DISTRICT

cc: Andrew J. Bernhard  Cody L. Frank   Frank Dellorusso

la

**RUL**

**5**

T# 4132610

1    Patrick Miller: State Bar # 301819
     P Miller Legal Services
2    121 S Oak Ave
     Pasadena, CA 91107
3    213-364-7581
     Patrick.miller@pmillerlegal.com
4

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

**MAY 10 2022**

DAVID H. YAMASAKI, Clerk of the Court

BY:_____,DEPUTY

5

6    Attorney for the Judgement Creditor
     Belgium Investments 960 Bay Dr, LLC, a California Corp.

7

8            **IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9            **IN AND FOR THE COUNTY OF ORANGE**

10

11   **Belgium Investments 960 Bay Dr, LLC, a**          )    Case Number: 30-2020-01148745-CU-EN-
     **California Corp.**                                )    CJC
                                                         )
12              Plaintiff(s),                            )
                                                         )    **ORDER GRANTING APPLICATION**
13       vs.                                             )    **FOR ORDER OF SALE OF DWELLING**
                                                         )
14   **Bassem Essam El Mallakh**                         )    DATE:
                                                         )
15              Defendant(s).                            )    TIME:
                                                         )
16                                                       )    DEPARTMENT: C12
                                                         )
17                                                       )
                                                         )
18                                                       )
                                                         )
19                                                       )
                                                         )
20   _____           )

21

22   The application of Plaintiff Belgium Investments 960 Bay Dr, LLC, a California Corp. for an

23   order for sale of a certain dwelling, namely: the real property located at 116 Rockefeller, Irvine,

24   CA 92612 and owned by the Judgement Debtor, Bassem Essam El Mallakh, (hereinafter, the

25   "Rockefeller Property"), came on regularly for hearing by the court on 21 April 2022. Plaintiff

26   appeared by counsel Patrick Miller; opposing party, Defendant Bassem Essam El Mallakh,

27   appeared by counsel Michael Sayer.

28

             ORDER GRANTING APPLICATION FOR ORDER OF SALE OF DWELLING

1  On proof made to the satisfaction of the court that the property is not subject to any homestead

2  exemption and that the application ought to be granted,

3  IT IS ORDERED that the application be, and it hereby is, granted. The clerk shall forthwith

4  transmit a copy of the order in accordance with Code of Civil Procedure Section 704.780.

5

6  IT IS FURTHER ORDERED that the property be sold in the manner provided in Code of Civil

7  Procedure Sections 701.510-701.680.

8

9  Date: _____       MAY 1 0 2022

10                                          _____
                                            Layne H. Melzer
                                            JUDGE OF THE SUPERIOR COURT

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ORDER GRANTING APPLICATION FOR ORDER OF SALE OF DWELLING